FILED

JAN 05 2026

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF TEXAS

SAN ANTONIO DIVISION

| | | |
|---|---|---|
| **JAMES LOUIS RODEN JR.,** | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | **Civil Action No.** _____ |
| | | |
| **Elaine Michelle Reamer** | § | SA26CA0054 XR |
| in her individual capacity, | § | |
| | § | |
| and | § | |
| | § | |
| **COUNTY OF GUADALUPE, TEXAS,** | § | |
| Defendants. | § | |

# I. INTRODUCTION

### Section 1: Opening Statement

This case begins with a fundamental inversion of the rule of law: the mandated reporter who repeatedly sought to protect an intellectually disabled adult from sexual exploitation was arrested, while the individuals whose conduct he reported were left unexamined. The question before this Court is not simply whether probable cause existed, but how a teacher who fulfilled every statutory duty under Texas Family Code § 261.101 became the target of a first-degree

1

felony prosecution in the absence of any meaningful investigation and evidence. The allegations demonstrate that Plaintiff's arrest resulted not from a search for truth, but from the omission of it.

This civil-rights action arises from an extraordinary sequence of events in which the only individual who consistently reported, documented, and attempted to prevent the sexual exploitation of an intellectually disabled adult was charged with First-Degree Felony Tampering with a Witness, while the individuals whose conduct he reported faced no comparable scrutiny. Plaintiff James Louis Roden Jr.—a longtime Texas educator, minister, and state-mandated reporter—provided county officials with sworn statements, medical evaluations, recorded interviews, disability documentation, and formal mandated reports demonstrating that his intellectually disabled niece was being abused and later re-victimized under County-arranged supervision. Rather than investigate the information he provided, County officials extracted selective portions of Plaintiff's communications, stripped them of their context, disregarded exculpatory evidence already in their possession, and sought a first-degree felony arrest warrant without interviewing Plaintiff, the victim he was protecting, or any witness with relevant knowledge.

The arrest occurred six days after Plaintiff submitted a mandated report documenting renewed sexual exploitation and identifying systemic failures in the County's prior handling of the matter. The warrant relied on unverified assertions supplied by the County Attorney's Office and the defense team for the alleged perpetrator, while ignoring sworn affidavits, disability records, and prior recorded statements that directly contradicted the accusation as reflected on the face of the warrant affidavit. Plaintiff's seventy-seven-year-old father—a bedridden, wheelchair-bound Army veteran with no involvement—was arrested the same day on a parallel charge based on uncorroborated hearsay.

2

These arrests operated to remove the only individual actively insisting on protection for the disabled victim and accountability for the County's investigative failures. No neutral probable-cause review has ever occurred in either case. As a result, Plaintiff's unsupported first-degree felony arrest remains listed as "HELD" in county, state, national and commercial databases, destroying his twenty-year career as an educator, damaging his professional reputation as an educator, coach, minister, author and musician, and preventing him from obtaining employment of any kind.

This lawsuit seeks redress for the constitutional violations that allowed a mandated reporter to be treated as an offender, a disabled victim's disclosures to be disregarded, and a baseless first-degree felony allegation to be used as the mechanism for silencing those attempting to protect her. At its core, this case challenges a system that punished the whistleblower, ignored the victim, protected the wrongdoers, and used the machinery of criminal process to silence those who insisted on the truth.

### Section 2: Plaintiff's Background and Mandated Role

At all relevant times, Plaintiff James Louis Roden Jr. was precisely the type of individual Texas law depends upon to protect vulnerable citizens: a highly trained educator, a mandated reporter/advocate with decades of experience identifying abuse, a certified school administrator, and a minister who routinely provides support to individuals who lack the capacity to advocate for themselves. His involvement in the events described in this Complaint arose not from personal interest or interference, but from the statutory obligations imposed on every Texas educator—and especially on educators trained to work with individuals with intellectual and developmental disabilities.

3

Prior to the events giving rise to this lawsuit, Plaintiff had never been arrested, charged with any offense, or been the subject of any criminal investigation at any time in his life. He possesses a completely clean criminal record and even a clean driving record as TDLR licensed drivers education instructor. His decades-long professional, personal, and community-service history reflect an individual who has consistently modeled compliance with the law, ethical conduct, and public accountability.

Plaintiff is a 47-year-old Texas public-school teacher, minister, athletic coach and long-serving mandated reporter with more than twenty years of experience serving vulnerable youth and adults, including individuals with documented IDD. He holds five master's degrees from accredited universities (UTSA, Texas A&M, WGU)—in Education Administration, Curriculum and Instruction, Management and Leadership, Human Resource Management, and Business Administration—and is fully certified in Special Education EC-12, Core Subjects EC-6 with STR, Physical Education EC-12, Social Studies 4-8 and 8-12, Business Education 6-12, Technology Applications EC-12, Technology Education 6-12, Health EC-12, ESL Supplemental, Gifted & Talented Supplemental, Family and Consumer Sciences 6-12, Speech 8-12, and Principal (EC-12). He is also T-TESS certified, trained in teacher evaluation, and experienced in compliance obligations involving student safety and welfare.

Plaintiff is also a husband and father with deep roots in the Texas educational community. He and his wife—an educator with more than twenty years of experience as a school counselor, former assistant principal, and former 2nd-grade teacher—are raising two young children of their own. His family life reflects the same commitment to service, protection, and educational integrity that guides his professional work. As both a parent and an educator married to an educational administrator, Plaintiff has lived for decades within a culture of community service,

4

disability advocacy, and strict compliance with Texas school-safety standards and laws that govern teachers conduct.

Throughout his career, Plaintiff has served in multiple leadership roles, including Department Head, Athletic Coordinator, PLC Lead, Committee Chair, and elected Precinct Chairman. Beyond the school environment, he is the founder of the Holistic Church of Christ, a street ministry serving homeless and at-risk individuals in Houston, including homeless veterans and youth lacking access to basic services. His work includes providing blankets, food, spiritual support, advocacy in times of crisis, and helping families obtain housing, medical services, and stabilization support.

Plaintiff has also spent years volunteering in after-school tutoring programs for struggling students—particularly in science—and coaching extracurricular sports programs for underserved children, including homeless youth residing at The Bridge shelter who attended the school where he taught. He is a published author of thirty-one books and a recording artist with three albums and more than thirty songs streamed across all major digital platforms (iTunes, Amazon Music, Apple Music, Spotify, iHeartRadio, Pandora, YouTube Music, and gaming platforms like Roblox). His public identity, professional life, and ministry work have been defined by service, advocacy, and accountability.

Under Texas Family Code § 261.101, Plaintiff is legally required to report suspected abuse or neglect and is expressly prohibited from withholding such reports. His professional record reflects a longstanding pattern of lawfully documenting concerns, forwarding information to appropriate authorities, and assisting vulnerable individuals—students, disabled adults, homeless persons, and families in crisis—in navigating school systems, medical processes, and disability-related services. The steps he took in the months preceding his arrest—including

5

assisting with affidavits at the victim's request, relaying recorded disclosures, forwarding medical and disability documentation, and submitting mandated reports—were fully consistent with the statutory responsibilities of a reasonable and well-trained mandated reporter and advocate.

The conduct giving rise to this lawsuit occurred solely because Plaintiff acted exactly as Texas law requires. Every communication he made, every report he filed, and every effort he undertook on behalf of the intellectually disabled adult at the center of this case was a direct exercise of his legal and professional duties—not an attempt to interfere with a criminal investigation. Far from inserting himself improperly into a criminal matter, Plaintiff did precisely what the law demands when faced with disclosures of harm from an IDD adult who repeatedly sought his assistance.

Accordingly, the allegations in this Complaint must be understood in the context of Plaintiff's statutory duties, professional training, advanced academic qualifications, long record of leadership, and well-established role as an advocate for vulnerable individuals. The actions that led to his arrest were not aberrational; they were the predictable, lawful, and required actions of a mandated reporter responding to credible evidence of ongoing exploitation. In the simplest terms, Plaintiff was arrested for doing precisely what the law required him to do.

### Section 3: Overview of the Wrongful Charge

The criminal charge at the center of this case arose from an arrest-warrant affidavit that inverted the investigative record: it presented a selectively curated narrative while omitting the extensive exculpatory evidence already in the County's possession. Rather than evaluate the full evidentiary context, county officials relied on isolated fragments of Plaintiff's communications,

none of which contained threats, inducements, or coercion, and ignored the disability

documentation, prior sworn statements, and recorded victim interviews that directly contradicted

the tampering allegation.

On April 7, 2025, Plaintiff was arrested for First-Degree Felony Tampering with a

Witness based solely on an affidavit sworn by Sergeant Elaine M. Reamer. The affidavit asserted

that Plaintiff coerced his intellectually disabled niece, Shelby Jane Koelle (S.J.K.), into recanting

allegations against her mother. This assertion was made despite the fact that no official

interviewed Plaintiff, no official interviewed his father, and—critically—no official interviewed

the victim herself before seeking a warrant. The charge was issued without a single investigative

step directed toward corroborating the allegation.

The affidavit relied exclusively on selective interpretations of Plaintiff's submitted

recordings and emails while omitting material exculpatory evidence already in the County's files,

including: (a) S.J.K.'s prior recorded April 4, 2024 interview with Officer Reamer in which she

independently affirmed her mother's innocence; (b) sworn affidavits in which she repeated the

same account; (c) disability-related documentation confirming long-established intellectual and

developmental limitations; and (d) medical, psychological, and forensic evidence verifying that

the pregnancy at issue resulted from sexual conduct with her stepfather. None of these materials

were disclosed to the magistrate.

Despite possessing these facts, the County sought a first-degree felony warrant by

presenting an affidavit that did not contain a single allegation of coercive language, did not

describe any investigative corroboration, and did not acknowledge the extensive contradictory

evidence in the case file. No attempt was made to compare the affidavit's conclusions with

preexisting victim interviews, prior affidavits, disability evaluations with ADA advocacy, or

7

forensic findings. Instead, the affidavit rested entirely on Investigator Reamer's distorted interpretation of Plaintiff's own transparent communications with the County Attorney's Office—stripping those communications of context, disregarding exculpatory evidence already in the County's possession, and presenting fabricated conclusions as "probable cause" despite having conducted no interviews of Plaintiff, the victim, or any witness.

As a result, Plaintiff—the individual who repeatedly submitted reports, forwarded evidence, and acted in accordance with his mandated-reporting duties and ADA advocacy laws—became the target of a first-degree felony accusation premised on an affidavit that omitted the very information establishing his innocence. The absence of investigative steps, the exclusion of critical evidence, and the reliance on selective excerpts made the charge factually implausible and constitutionally defective from its inception.

In short, the warrant issued against Plaintiff was based not on evidence of wrongdoing, but on the omission of the overwhelming evidence demonstrating that no wrongdoing had occurred.

### Section 4: Evidence the County Already Had

Before obtaining the April 7, 2025 arrest warrant, the Guadalupe County Sheriff's Office and County Attorney's Office already possessed extensive evidence that directly contradicted the allegation that Plaintiff coerced his intellectually disabled niece, S.J.K., into altering her account. This evidence included recorded interviews, sworn affidavits, disability documentation, and medical and forensic findings—all predating Plaintiff's arrest and all omitted from the warrant affidavit.

8

**First**, County officials possessed—and Sergeant Elaine M. Reamer herself had personally conducted—a recorded April 4, 2024 victim interview in which S.J.K. unequivocally affirmed that her mother, Jamie Renee Walker an IDD domestic violence victim, was not responsible for the abuse. In that interview, which Reamer recorded during her own investigative work nearly one year before she sought Plaintiff's arrest, S.J.K. consistently identified her stepfather, Michael Allen Walker, as the perpetrator and her mother was not involved in the abuse. This interview was never contradicted by any later evidence and was fully known to the Sheriff's Office and County Attorney's Office when Reamer presented her April 7, 2025 affidavit. Despite its direct relevance, the interview—generated by Reamer herself—was omitted entirely from the probable-cause affidavit.

**Second,** County officials had actual possession of the March 15, 2025 notarized affidavit that S.J.K. independently initiated, executed under oath, and caused to be e-filed into the criminal case, with electronic service to Assistant County Attorney Jessica Johnson. In that sworn affidavit, S.J.K. affirmed that she acted freely and voluntarily, without coercion, bribery, or influence, and unequivocally stated that her mother was innocent. She further attested that she had repeatedly communicated these facts to law enforcement, including Investigator Elaine Reamer, yet those statements were dismissed and she was pressured to reconsider her account. S.J.K. specifically stated that despite her repeated disclosures, Investigator Reamer refused to believe her and attempted to convince her otherwise, raising serious concerns regarding the handling of material exculpatory evidence. This sworn filing directly contradicted the theory advanced in the arrest-warrant affidavit, yet Investigator Reamer omitted it entirely despite its availability within the prosecution's file. The affidavit was e-filed into Jamie Renee Walker's criminal case on March 31, 2025, with electronic service to the assigned prosecutor Jessica

Johnson. Plaintiff and his father were arrested seven days later. The close temporal proximity between County officials' receipt and possession of this sworn exculpatory affidavit—implicating law enforcement conduct—and the initiation of felony charges against Plaintiff supports a reasonable inference that the arrest was not coincidental, but retaliatory in nature.

**Third,** Plaintiff's ADA-based advocacy on behalf of S.J.K. constituted necessary and expressly protected activity. Plaintiff submitted formal requests for disability accommodations, notified County officials that S.J.K. had long been recognized as an individual with intellectual and developmental disabilities, and sought safeguards to protect her decisional vulnerability in the pending criminal proceedings. On March 23, 2025, Plaintiff filed a written request with the court seeking ADA accommodations for S.J.K. and contemporaneously provided notice of that request to County Attorney leadership. These filings were part of the official case record and were available to investigators and prosecutors prior to any decision to seek Plaintiff's arrest.

Plaintiff further sought to remove himself from any informal advocacy role and to ensure that S.J.K., as an alleged victim and individual with disabilities, received independent and professional representation. On March 26, 2025, Plaintiff formally requested the appointment of a Guardian ad Litem for S.J.K., explaining that such an appointment was necessary to protect her constitutional rights and to provide professional advocacy tailored to her needs. Plaintiff expressly conveyed that his own commitments as an educator, a father, and a graduate student working toward his 5th Masters degree in preparation for his Administration role limited his capacity to continue serving in an advocacy role and that S.J.K. deserved neutral, court-appointed protection. This request was directed to Elected County Attorney David Willborn, First Assistant Jonathan Amdur, Chief of the Family Justice Unit Maritza Stewart, lead prosecutor Jessica Johnson, and Victim Coordinator Ileen Rangel. Rather than being treated as good-faith

efforts to protect a vulnerable witness, these protected requests were followed shortly thereafter by Plaintiff's arrest.

The County's own files contained extensive disability documentation, including S.J.K.'s longstanding SSI eligibility and the comprehensive neuropsychological evaluation performed by Dr. Daniel K. Sanders on May 13, 2024, which confirmed significant cognitive limitations, memory impairments, and decisional-capacity deficits. Investigator Reamer also referenced S.J.K.'s disability status in investigative narratives. Yet the grand-jury charging instruments did not plead disability as the aggravating element, highlighting the County's ability to invoke or omit disability depending on the narrative it sought to advance.

Despite this established disability record, the arrest-warrant affidavit deliberately omitted every ADA-related advocacy filing submitted by Plaintiff, including multiple requests for disability accommodations, the documented evaluations confirming S.J.K.'s intellectual and developmental disabilities, and Plaintiff's formal request for appointment of a Guardian ad Litem. None of these materials—each directly relevant to S.J.K.'s decisional capacity and to Plaintiff's protected advocacy—were disclosed or acknowledged in the affidavit.

These omissions were not accidental. By April 1, 2025, the County Attorney's Office had received Plaintiff's mandated report documenting that S.J.K. had been placed—through County-driven decisions—into an environment where she was again being sexually exploited, resulting in a second pregnancy. The report further included a recorded phone call in which Cody described one of the individuals involved as a dangerous drug dealer he could no longer house because he feared for the safety of his wife and children. This information placed the County on actual notice that their placement decisions had exposed an intellectually disabled adult to renewed abuse and criminal conduct by individuals connected to their own key witness.

Acknowledging S.J.K.'s IDD status in this context would have confirmed that County officials themselves created the conditions that allowed her renewed exploitation—an outcome that carried obvious legal and political consequences for the County Attorney's Office. To shield themselves from this liability, officials sought to erase or minimize her disability status internally, even while relying on that same disability record to charge the Plaintiff.

Investigator Reamer then repurposed this denial of disability into a fabricated theory that Plaintiff had exploited S.J.K.'s vulnerability. The resulting affidavit concealed the County's own failures, omitted exculpatory disability documentation already in its possession, and reframed Plaintiff's protected ADA advocacy as criminal conduct. By doing so, the County pursued a baseless first-degree felony charge—the most severe classification of offense under Texas law, reserved for the gravest crimes—to impose extraordinary financial hardship on Plaintiff and to deter further protected activity. The threat of a charge carrying potential punishment of up to ninety-nine years' imprisonment not only devastated Plaintiff personally and professionally, but also sent a clear and intimidating message to others: that anyone who sought to advocate for or speak truthfully about the abuse S.J.K. endured while in County protective custody risked similar retaliation. This conduct created a real and substantial chilling effect on constitutionally protected speech and lawful efforts to expose abuse of a vulnerable, intellectually disabled adult.

**Fourth**, medical and forensic evidence—including DNA confirmation—established the source of the pregnancy underlying the criminal cases and directly contradicted any theory that Plaintiff influenced or "tampered with" the reporting of abuse. This evidence aligned entirely with Plaintiff's mandated reports, communications, and advocacy efforts and was available to county officials well before April 7, 2025.

12

Taken together, the documents in the County's possession showed a consistent and uninterrupted pattern of statements by S.J.K. identifying the same perpetrator, exculpating her mother, and seeking assistance from Plaintiff as a trusted advocate. None of this evidence supported the allegation of witness tampering.

Nonetheless, the probable-cause affidavit used to arrest Plaintiff omitted all of these exculpatory materials while relying exclusively on selective interpretations of Plaintiff's communications. No comparison was made between the affidavit's assertions and the extensive evidence already in the County's files. The omission of these materials—particularly Sergeant Reamer's own recorded interview—forms a central basis for Plaintiff's Fourth and Fourteenth Amendment claims, including fabrication of evidence, suppression of material facts, deliberate indifference, and malicious prosecution.

### Section 5: Plaintiff's Advocacy & Reporting Timeline

From the outset of 2024, Plaintiff acted in full conformity with his statutory duties as an educator, minister, and state-mandated reporter. In January 2024, after learning of his niece's first pregnancy and receiving concerning disclosures, Plaintiff submitted reports to law enforcement and Adult Protective Services identifying both Michael Allen Walker and Jamie Renee Walker as individuals who required investigation. At that early stage, Plaintiff had no way of knowing the full extent of the abuse or who bore responsibility. His report therefore requested investigation into both adults—precisely what a reasonable mandated reporter must do when confronted with ambiguous or incomplete information involving an intellectually disabled adult.

In the weeks and months that followed, however, it was Shelby Jane Koelle (S.J.K) herself, not Plaintiff, who repeatedly insisted that her mother was innocent and had been

13

victimized alongside her. As Shelby continued to disclose additional details—including physical abuse, threats, and coercive control—Plaintiff documented her statements and forwarded them to the appropriate authorities. This evolving information was the direct result of Shelby's own voluntary disclosures, made independently of Plaintiff. The accuracy and consistency of these disclosures were later confirmed in multiple recorded statements and sworn affidavits.

When early law-enforcement responses categorized the sexual conduct between Michael Allen Walker and S.J.K. as "consensual," Plaintiff assisted his family in obtaining an independent neuropsychological evaluation to clarify her decisional capacity. On May 13, 2024, Dr. Daniel K. Sanders completed a comprehensive assessment confirming longstanding intellectual and developmental disabilities that substantially impaired her ability to consent or navigate coercive environments. The County itself later relied on this evaluation to upgrade charges in the related sexual-assault prosecution—evidence of its reliability and legal relevance.

Throughout late 2024 and into 2025, Plaintiff continued to provide disability records, sworn statements, recorded interviews, and written correspondence to the County Attorney's Office to ensure that officials had accurate and current information about Shelby's disclosures. Plaintiff repeatedly advised prosecutors of the need for ADA accommodations, a guardian ad litem, and consistent communication with an intellectually disabled victim who had been left without prosecutorial contact for months.

On March 19, 2025, Plaintiff submitted a recorded phone call in which Cody Lane Koelle admitted that he had signed the November 15, 2024 affidavit affirming Michael Allen Walker's violent behavior, confirmed that the statements in that affidavit were truthful, and stated that he had been pressured by members of the County Attorney's Office to alter his testimony. Plaintiff

provided the recording and a written explanation of its significance to prosecutors immediately upon receiving it.

On April 1, 2025, Plaintiff—again acting under Texas Family Code § 261.101— submitted a mandated report documenting renewed sexual exploitation of S.J.K. while she resided in the home of her brother, convicted felon Cody Lane Koelle. The report included a recorded call in which Cody acknowledged that S.J.K. was being "used for sex" inside the home and disclosed that another adult with extensive criminal record had impregnated her. Plaintiff expressly invoked his statutory right to anonymity under § 261.101(f), warning that disclosure of his identity could expose him and his family to retaliation.

To this day, no investigation has ever been conducted into the circumstances of S.J.K.'s second pregnancy or the involvement of the convicted felon whom Cody—on a recorded call provided to the County Attorney's Office—described as a danger to his wife and children and used S.J.K for personal sexual gratification. Instead, Plaintiff and his father were arrested and charged with a first-degree felony, removing the only advocates with the financial ability and advocate experience to protect S.J.K. and leaving her without meaningful support. The severity of the charges, and the County's willingness to pursue them without probable cause, created a chilling effect on every other potential advocate, as no family member, church leader, or community supporter was willing to risk the destruction of their livelihood, reputation, or future by facing a similarly fabricated charge carrying a potential sentence of up to ninety-nine years. As a result, S.J.K.—a vulnerable adult with significant cognitive limitations, no ability to read or write, and now living more than six hundred miles away from the only individuals who consistently attempted to protect her—has been left entirely at the mercy of those who exploited

her, with no oversight, no investigative protection, and no advocate other than the hope of divine intervention for her safety.

Plaintiff's conduct throughout this period reflects the precise duties imposed on a mandated reporter and ADA recognized advoactes: he did not assume facts, he did not shield any suspect, and he did not influence Shelby's disclosures. He reported both potential perpetrators at the beginning, documented Shelby's subsequent statements as they emerged, and consistently transmitted accurate information to officials charged with investigating abuse.

The timeline shows that Plaintiff followed the law exactly as written, that Shelby's independent disclosures—not Plaintiff—established her mother's innocence, and that Plaintiff's lawful advocacy, not any improper conduct, triggered the retaliatory actions taken against him.

### Section 6: April 7, 2025 Arrest & the Absence of Investigation

The April 7, 2025 arrests of Plaintiff and his father occurred without any meaningful investigation, without a single witness interview, and without consideration of extensive exculpatory evidence already in the County's possession. The warrants were issued on the basis of incomplete and misleading information presented to the magistrate, rather than any objective assessment of the facts.

When Plaintiff was arrested, no officer had interviewed Plaintiff, the victim S.J.K, Plaintiff's father James Roden Sr., or any witness with relevant knowledge. The arrest-warrant affidavit sworn by Sergeant Elaine M. Reamer relied solely on selective excerpts of Plaintiff's communications and on unverified statements supplied through the Guadalupe County Attorney's Office. No independent steps were taken to corroborate these statements, assess

inconsistencies, or compare them with the extensive documentary and recorded evidence previously submitted to County officials.

Despite seeking the most serious felony (1st degree felony) under Texas law, Sergeant Reamer conducted no contemporaneous interviews, obtained no phone or digital communication records, reviewed no prior sworn statements, and made no attempt to evaluate disability findings or recorded statements involving the victim. The affidavit omitted the April 4, 2024 recorded interview that Sergeant Reamer herself conducted; omitted the November 2024 affidavits; omitted the March 15, 2025 sworn statement; and omitted disability documentation and medical evidence that the County had already relied on in related prosecutions. Each of these materials directly contradicted the allegation that Plaintiff coerced or influenced S.J.K., yet none were disclosed to the magistrate.

The complete lack of inquiry into exculpatory materials, the dependence on evidence funneled through the County Attorney's Office, and the failure to conduct even the most basic investigative steps demonstrate a breakdown in the separation between prosecutor and investigator. The Sheriff's Office functioned as an extension of prosecutorial direction rather than as an independent investigative body responsible for determining probable cause.

These circumstances show that Plaintiff was arrested not through lawful investigation, but through a process that ignored available evidence and relied on fabricated conclusions while omitting exculpatory evidence.

### Section 7: The Paralleled Wrongful Arrest of Plaintiff's Father

County officials did not merely arrest Plaintiff; they arrested both of the only individuals insisting that an intellectually disabled adult victim be protected. The April 7, 2025 arrests of

Plaintiff and his seventy-seven-year-old father occurred in tandem, through identical methods, based on the same structural failures: no investigation, no corroboration, and exclusive reliance on allegations supplied by individuals with compromised credibility and conflicting interests. This section demonstrates that the County's actions were not isolated errors but part of a coordinated pattern that silenced mandated reporters, whistleblowers and advoactes while elevating the unverified statements of others.

The events of April 7, 2025 did not involve Plaintiff alone. On the same day, county officials sought and obtained an arrest warrant for Plaintiff's seventy-seven-year-old father, James Louis Roden Sr.—a bedridden, wheelchair-bound retired U.S. Army Master Sergeant with no criminal record and with significant mobility and medical limitations—charging him with the identical first-degree felony offense of tampering with a witness.

Unlike Plaintiff, Mr. Roden Sr. spent most of his days confined to a bed, living out what doctors believed were his final years, and enduring recurring hospitalizations and multiple surgeries that severely limited his ability to speak, travel, or move without assistance. His physical condition—marked by extended inpatient stays, prolonged recovery periods, and significant mobility restrictions—left him with only a limited understanding of the complex legal matters surrounding his daughter, Jamie Renee Walker, and his granddaughter, S.J.K. A quiet, medically fragile man who passed what time he could at home in bed watching old western reruns, he had no meaningful involvement in any of the events the County later attributed to him.

Yet, like Plaintiff, he was arrested without a single interview, without any investigation into his actual conduct, and without any attempt to corroborate the allegations inserted into the arrest-warrant affidavit. The County treated a terminally ill, home-bound senior citizen—who could barely walk, speak for extended periods, or leave his residence without medical support—

18

as if he were the architect of a criminal scheme, despite possessing no evidence and having made no effort to speak with him before seeking a first-degree felony warrant.

The only "danger" James Roden Sr. posed to the County was that he was financing the care and legal representation of his Intellectually Disabled daughter, Jamie Renee Walker. County officials understood that without his financial support, both Plaintiff and any other willing advocate would be left defenseless against preset bonds approaching a quarter of a million dollars and the crushing attorney fees required to fight a fabricated first-degree felony. By arresting both men—the only financial anchors in the family—the County ensured that any challenge to its conduct, and any attempt to hold officials accountable for their treatment of an intellectually disabled adult, would be financially impossible.

The affidavit supporting Mr. Roden Sr.'s arrest asserted that he had threatened a convicted felon Cody Lane Koelle—who lived more than 600 miles away in Dodge City, Kansas—in an effort to influence his statements. The affidavit offered no explanation for how a medically fragile, wheelchair-bound elderly veteran could have traveled out of state or communicated with Cody in a manner consistent with the claim. No officer attempted to verify travel feasibility, phone records, electronic communications, or medical documentation demonstrating that Mr. Roden Sr. was physically incapable of engaging in the alleged conduct. Instead, the affidavit relied entirely on unverified hearsay originating from Cody, a convicted felon with a documented history of false statements, prior felony-level arrests for filing false reports, and a criminal conviction for impersonating a police officer. Cody's statements were funneled form Michael Allen Walker defense lawyer John Green to County Attorney's to Officer Reamer, three layers of hearsay was the foundation and only evidence cited by Officer Reamer in her arrest warrant affidavit.

As reflected directly in Officer Reamer's arrest-warrant affidavit, the statements attributed to Cody were not the product of any independent investigation. Instead, the affidavit expressly states that these allegations were transmitted to her through the Guadalupe County Attorney's Office, who had themselves received the materials from Michael Allen Walker's defense attorneys. Thus, the only "evidence" cited as probable cause consisted of multilayered, unverified statements originating with defense counsel, passed to prosecutors, and then incorporated by Investigator Reamer without any corroboration, inquiry, or direct interview. These compounded hearsay assertions — transmitted through three separate intermediaries — formed the entire factual basis for the arrest-warrant affidavit and were accepted wholesale despite the absence of any independent investigative verification.

The arrest of Plaintiff's father occurred under the same structural deficiencies that characterized Plaintiff's own arrest:

• no investigation,

• no corroboration,

• no review of exculpatory materials, and

• exclusive reliance on statements supplied by individuals whose credibility was demonstrably in question.

Presented together, the two arrests reveal a coherent pattern: two law-abiding citizens were arrested; the felon witness was protected. When Plaintiff submitted evidence undermining Cody's reliability—including his recorded admission that he had previously told the truth and was being pressured to change his statements by County Attorney Jessica Johnson and Ileen Rangel—the County did not seek clarification from Cody, re-interview witnesses, or evaluate the credibility issues raised. Instead, within days of receiving this contradictory information and

Plaintiff's April 1,2025 mandated report documenting renewed sexual exploitation of an intellectually disabled adult, both Plaintiff and his father were charged with a first-degree felony.

The circumstances surrounding Mr. Roden Sr.'s arrest also introduce additional constitutional concerns under the Americans with Disabilities Act. Despite his severe mobility impairments and physician-documented restrictions, county officials imposed in-person bond supervision requirements that required him to travel an eight-hour round trip to Seguin for brief check-ins, without providing reasonable accommodations. These ADA-related issues are addressed more fully in later sections, but their origin traces directly to the same absence of individualized assessment, investigative diligence, and procedural safeguards that characterized the arrest decision itself.

The parallel arrests of Plaintiff and his father, obtained without investigation and predicated on unverified allegations supplied by a witness whose credibility had been directly called into question, underscore the County's reliance on unsupported accusations while disregarding the documented efforts of two individuals attempting to protect an intellectually disabled adult. This pattern of conduct forms a significant part of the factual basis for Plaintiff's Fourth Amendment, Fourteenth Amendment, and ADA-related claims.

The arrests of Plaintiff and his father illustrate a single, chilling reality: the County chose to criminalize the mandated reporters while elevating the unverified accusations of the very individuals whose conduct Plaintiff lawfully reported.

### Section 8: Cody's Role, Recantation, Contradictions, and the County's Dependence on Him

The credibility of Cody Lane Koelle was the linchpin of every charging decision that county officials made against Plaintiff, his father, and Jamie Renee Walker. This section shows

that the County built its entire criminal theory on a witness whose statements repeatedly shifted, directly contradicted one another, and were inconsistent with disability evaluations, medical findings, prior sworn affidavits, and the County's own investigative record. Rather than investigate these contradictions, officials adopted whichever version of Cody's story supported their prosecutorial goals while ignoring the evidence that undermined him.

Cody occupied a central position in the criminal cases underlying this Complaint. He was simultaneously the County's primary witness against Jamie Renee Walker and the principal defense witness for Michael Allen Walker, despite a criminal history that included multiple prior arrests for filing false reports, documented instances of deception, and a conviction for impersonating a police officer. These credibility issues were well known to county officials, yet they continued to rely on Cody as a key source of information even as his accounts materially changed over time.

By late 2024, county officials possessed sworn affidavits from both Cody and S.J.K. affirming that IDD and domestic violence victim Jamie Renee Walker was not responsible for the pregnancy and that the abuse originated with Michael Allen Walker. These affidavits were transmitted to prosecutors, filed in court, and were part of the documentary record available to investigators. In January 2025, Cody abruptly submitted a new affidavit repudiating his earlier sworn statements and alleging that his signature on the November 15, 2024 affidavit had been forged. This claim was facially implausible because the November 15, 2024 affidavit had been notarized in Dodge City, Kansas by the same notary who later notarized Cody's January 31, 2025 affidavit in which he made the forgery allegation. This internal contradiction was readily apparent on the face of the notarized documents and was visible to Michael Allen Walker's defense counsel, John Green, as well as to Assistant County Attorney Jessica Johnson and

Guadalupe County Sheriff Investigator Elaine Reamer, yet no inquiry or verification was conducted and the inconsistency was ignored.

Despite the evident inconsistencies, county officials adopted Cody's new version of events without investigating the authenticity of either affidavit, without interviewing the notary who signed both documents, and without reconciling Cody's reversal with the disability findings the County itself had relied upon when upgrading charges in the related prosecution. These omissions were significant: Cody's reliability was essential to both prosecutions, and acknowledging inconsistencies would have undermined the factual basis for multiple charging decisions.

On March 18, 2025, Cody participated in a recorded phone call with Plaintiff in which he admitted that he had, in fact, signed the November 15, 2024 affidavit and that "everything in it was true." During the same call, Cody further stated that individuals within the County Attorney's Office (Jessica Johnson and Ileen Rangel) were pressuring him to change his statements. Cody also disclosed that the man who impregnated S.J.K. during her second pregnancy was a convicted drug offender who had been living in his home, and that Cody had called police reporting "cocaine, weed," expressing fear for the safety of his wife and young children and requesting the man's removal. Concerned not only about prosecutorial pressure on a key witness but also the immediate safety and well-being of S.J.K.—an intellectually disabled adult now pregnant by an individual Cody himself described as dangerous—Plaintiff forwarded the recording to prosecutors on March 19, 2025, accompanied by written correspondence explaining its urgent relevance to witness credibility, renewed abuse risks, and potential investigative misconduct.

County officials took no steps to investigate Cody's admission, to interview him regarding the contradictory affidavits, or to review the implications for the prosecutions that depended upon his credibility. Instead, they disregarded the earlier sworn statements and the March 18th, 2025 recording and continued to rely exclusively on Cody's later account—despite knowing that his statements were inconsistent, unverified, and contradicted by the County's own files.

The reliance on Cody's shifting accounts, without verification and despite clear evidence of unreliability, demonstrates a knowing or reckless use of information that would have been recognized by any reasonable official as unreliable. Under Winfrey v. Rogers and related Fifth Circuit precedent, officials violate the Constitution when they knowingly rely on false, misleading, or contradictory statements to obtain an arrest warrant or initiate criminal process.

By seeking arrest warrants for both Plaintiff and his father while simultaneously ignoring Cody's contradictions and S.J.K. safety concerns, the County selected the version of events that advanced its prosecutorial narrative, shielded them ADA liability and excluded the exculpatory materials—including Cody's own recorded admission—that would have negated probable cause. The County's dependence on Cody, despite overwhelming reasons to doubt him, provides essential motive, context, and constitutional significance to the wrongful arrests that followed.

The County's unwavering reliance on Cody—despite his contradictory sworn statements, documented credibility issues, and his own recorded admission that a convicted drug offender living in his home had impregnated S.J.K. and posed a danger to his wife and children—reveals why officials treated him as indispensable. By depending on Cody's narrative, County officials shielded themselves from responsibility for placing an intellectually disabled adult in his care, a placement that resulted in renewed exploitation and a second pregnancy. Rather than confront the

liability created by their own decisions, the County embraced Cody's statements as the foundation of a predetermined theory of wrongdoing by Plaintiff father James Roden Sr and the man who reported Cody, Plaintiff James Roden Jr. In doing so, officials ignored disability records, exculpatory affidavits, and even Cody's confession of County Attorney's pressure on his testimony, choosing instead the version of events most useful to justify Plaintiff's arrest—not the version most consistent with evidence.

### Section 9: The April 1 Mandated Report as the Retaliatory Trigger

The events surrounding April 1–7, 2025 cannot be understood without recognizing that Plaintiff's arrest occurred immediately after he fulfilled his statutory duty to report renewed sexual exploitation of an intellectually disabled adult. This section demonstrates that every material event—the mandated report, the unlawful breach of reporter confidentiality, the absence of any investigation, and the rapid preparation of a misleading arrest-warrant affidavit—occurred in a tight, six-day sequence that strongly supports retaliatory motive. The timing is not coincidental; it is the structure of the constitutional violation.

On April 1, 2025, Plaintiff submitted a formal mandated report under Texas Family Code § 261.101 documenting renewed sexual exploitation of his intellectually disabled niece, S.J.K., while she lived in a County-arranged environment. The report included a recorded telephone call in which Cody Lane Koelle acknowledged that S.J.K. was being sexually exploited by an individual he described as posing a danger to his wife and children, identified as a convicted drug felon, and further admitted that S.J.K. had become pregnant again. Plaintiff made this report in full compliance with state law, requested anonymity as required under § 261.101(f), and warned that disclosure of his identity could expose him and his family to retaliation.

County officials violated § 261.101(f) on April 4, 2025—just three days after the report—by revealing Plaintiff's identity to the intellectually disabled victim S.J.K. At that time, the victim remained in an unsafe, poorly supervised environment, and the confidentiality breach removed the statutory protection the Legislature deems essential for the safety of mandated reporters and the integrity of the reporting system. This disclosure was the critical turning point: it exposed Plaintiff to foreseeable harm and immediately preceded the rapid movement toward his arrest.

Plaintiff was arrested on April 7, 2025—only six days after submitting the mandated report and three days after his identity was unlawfully disclosed. During this six-day period, no officer contacted Plaintiff, no witness was interviewed, no investigation was conducted, and no steps were taken to examine the renewed allegations of sexual exploitation. Instead, officials prepared an arrest-warrant affidavit using selective excerpts drawn from Plaintiff's own transparent communications with prosecutors—communications he voluntarily provided to show that the victim was trying to reach the County and seeking assistance in navigating the judicial process and get help and relief from the living conditions she had suffered.

The affidavit omitted every exculpatory context contained in those communications, including the following facts already documented and in the County's possession:

• the victim repeatedly initiated contact with Plaintiff;

• she asked for help reaching prosecutors who were not responding to her;

• her recorded statements show she acted voluntarily and without coercion;

• Plaintiff consistently asked whether she was acting of her own free will; and

• the County already possessed prior interviews and affidavits, in which she gave the same account since April 2024 a full year prior to Plaintiff arrest.

26

None of this appeared in the affidavit. Instead, officials extracted isolated messages stripped of their context and omitted the very evidence demonstrating that Plaintiff was acting as a mandated reporter and ADA protected advacote assisting an intellectually disabled adult who was repeatedly attempting to communicate with the County.

When viewed chronologically, the causal chain is unmistakable:

1. Plaintiff submitted a mandated report documenting renewed sexual exploitation of an intellectually disabled adult while under County supervision;

2. County officials unlawfully disclosed his identity in violation of § 261.101(f);

3. No investigation was undertaken into the safety concerns he reported; and

4. Plaintiff was arrested within days based solely on mischaracterizations of the very materials he had voluntarily provided.

This sequence lies at the heart of Plaintiff's Fourth Amendment, Fourteenth Amendment, First Amendment, and ADA retaliation theories. Rather than investigate the abuse or consider the full context of Plaintiff's communications, officials used selective excerpts to create a misleading appearance of wrongdoing and initiate a first-degree felony charge that removed Plaintiff from further involvement in protecting an endangered, intellectually disabled adult.

The arrest occurred not because Plaintiff violated the law, but because he followed it— and the timing and omissions in the affidavit reveal that the mandated reporter, not the abuser, became the target.

**Section 10: Systemic Failure: No Investigation Before Either Arrest**

27

The arrests of Plaintiff and his father occurred in a complete investigative vacuum. The record shows that before seeking either warrant, county officials conducted no interviews, gathered no contemporaneous evidence, reviewed no medical or disability records, and performed no independent corroboration of the allegations presented. Instead, the Sheriff's Office relied exclusively on selective excerpts provided by the County Attorney's Office—material drawn almost entirely from Plaintiff's own good-faith communications—while omitting the exculpatory context that would have negated probable cause. This section establishes that the constitutional violations were not the product of an isolated mistake but the predictable result of a systemic collapse of investigative function.

Before obtaining the warrant for Plaintiff, no officer interviewed Plaintiff, S.J.K., the disabled adult at the center of the case, Plaintiff's father, or any individual with firsthand knowledge. No steps were taken to examine electronic communications, review sworn affidavits already in the County's possession, or evaluate disability documentation that had informed earlier charging decisions. Instead, officials extracted isolated lines from Plaintiff's transparent communications with prosecutors while omitting the surrounding materials that demonstrated:

• the disabled adult repeatedly contacted Plaintiff first;

• she voluntarily recorded statements affirming she was not coerced;

• Plaintiff acted exclusively within his mandated-reporting and advocacy duties; and

• the County already possessed recorded interviews and affidavits from 2024 reflecting the same account a year before Plaintiff's arrest.

The affidavit supporting Plaintiff's arrest concealed all of this context, rendering the presentation to the magistrate materially misleading. Texas law requires officers to investigate,

corroborate, and independently verify allegations before seeking a warrant. Here, none of those statutory duties were performed.

The warrant issued for Plaintiff's father reflected the same defects—but in an even more extreme form. Nearly all of the information used to obtain the arrest warrant for James Louis Roden Sr. came not from any firsthand interview, investigation, or communication with the witness allegedly involved, but from materials generated by Michael Allen Walker's defense attorneys. According to Officer Reamer's own affidavit, the only evidence attributed to Cody Lane Koelle consisted of affidavits supplied to prosecutors by defense counsel, which were then forwarded to the County Attorney's Office and ultimately to Officer Reamer. No officer contacted Cody, no independent statement was taken, and no effort was made to determine whether the information attributed to him was accurate, voluntary, or authentic.

This failure became unmistakable on June 18, 2025, when Cody testified under oath that he had never signed any affidavits at all—not the affidavits used against Plaintiff's father, and not even the affidavits submitted in support of Michael Allen Walker. The result is stark: the warrant for a seventy-seven-year-old, wheelchair-bound, medically fragile Army veteran was issued without a single piece of firsthand evidence, based entirely on unverified documents originating from the defense team of the individual accused of raping the disabled adult S.J.K. Officer Reamer's affidavit confirms that she relied solely on these attorney-supplied materials and conducted no independent verification before seeking a first-degree felony warrant carrying a potential sentence of ninety-nine years.

No officer attempted to verify whether Mr. Roden Sr.—a bedridden veteran with severe mobility and medical limitations—could have engaged in the conduct alleged. No travel feasibility was assessed. No medical records were reviewed. No corroboration was attempted. As

with Plaintiff's case, the affidavit rested exclusively on secondhand allegations supplied by prosecutorial staff without any investigation, credibility assessment, or comparison to known facts.

The timing of both arrests becomes even more revealing when viewed in the context of Plaintiff's April 1, 2025 mandated report. That report did not merely document renewed exploitation of an intellectually disabled adult; it exposed the County itself to direct liability. The report demonstrated that the County had disregarded Shelby's documented IDD status, failed to protect her, and allowed her to remain in an environment that resulted in further sexual exploitation. It also placed Cody Lane Koelle—the County's designated "star witness"—at risk of criminal exposure for his role in that renewed harm. Faced with the choice of investigating their own negligence or targeting the individuals bringing it to light, officials chose the latter. Rather than investigate the April 1, 2025 report or reassess the credibility of the witness whose statements they had relied upon, the County moved swiftly to silence the mandated reporter and eliminate the individuals most capable of exposing misconduct.

The refusal to investigate the April 1st, 2025 report, the denial of Shelby's disability, and the decision to charge two innocent men with first-degree felonies served a unified purpose: to shield the County's negligence from scrutiny, protect their star witness Cody from criminal liability and to ensure that neither Plaintiff, his father, nor Shelby would ever be in a position to testify to the truth.

Both arrests occurred only after Plaintiff produced evidence contradicting Cody's statements and exposing serious investigative failures—timing that further supports the inference of retaliation.

These parallel failures demonstrate that the County Attorney's Office functioned as the investigative arm for the Sheriff's Office. Prosecutors supplied the narrative; investigators adopted it wholesale; and the warrants were presented to a magistrate without any independent fact-finding. This collapse in the separation between prosecutor and investigator is the hallmark of a Monell-level structural deficiency. It reflects a system in which detectives do not evaluate evidence, assess witness reliability, examine disability documentation, or review available statements, but instead act as a conduit for prosecutorial assertions—even when those assertions contradict the documentary record.

At no point before either arrest did a neutral magistrate ever receive a complete evidentiary record capable of establishing probable cause.

The reliance on unverified attorney-generated documents in place of independent investigation fits precisely within the category of conduct that the Supreme Court and Fifth Circuit identify as unconstitutional fabrication or reckless disregard for the truth.

The same omissions appear across both warrants:

• no review of disability advocacy documentation already provided;

• no interviews of witnesses or individuals with firsthand knowledge;

• no verification of statements supplied by interested parties;

• no assessment of Plaintiff's submitted communications in their full context;

• no effort to reconcile contradictions in witness accounts; and

• no evaluation of substantial exculpatory evidence known to the County.

Such uniformity is not random. It demonstrates a practice in which arrest affidavits are prepared without investigation, exculpatory information is intentionally withheld, and magistrates are provided only selective, incomplete, and misleading portions of the underlying

materials. This practice violates clearly established Fourth and Fourteenth Amendment principles prohibiting the use of material omissions and misleading evidence to secure criminal process.

The absence of investigation before either arrest was not an oversight—it was the system functioning exactly as it had been allowed to operate. Two warrants were issued because no investigation occurred, and no investigation occurred because the County had adopted a structure in which prosecutors, not investigators, controlled the narrative presented to the magistrate.

### Section 11: Post-Arrest Conduct & Refusal to Correct the Record

The post-arrest period did not correct the constitutional violations that led to the April 7, 2025 warrants—it deepened them. After both arrests, county officials repeatedly received exculpatory materials demonstrating that the affidavits supporting the warrants omitted critical context, misstated the evidentiary record, and failed to reflect the victim's prior consistent accounts. Yet at every procedural juncture where the County had an opportunity to investigate, clarify, or correct the record, officials instead chose inaction. This pattern is central to Plaintiff's claims because it shows that the harm did not end with the arrest; the County *affirmatively maintained* the false narrative despite knowing it was contradicted by the evidence.

Following the arrests, Plaintiff submitted multiple packets of documented exculpatory evidence, including prior affidavits, disability findings, forensic records, recorded interviews, and the March 15 and May 29, 2025 sworn statements from the reporting victim S.J.K. These materials directly contradicted the theory presented in the arrest affidavit and established that Plaintiff's communications were transparent, voluntary, and part of his statutory obligations as a mandated reporter and advocate. Nevertheless, no officer or prosecutor initiated follow-up, asked

clarifying questions, re-interviewed witnesses, or attempted to reconcile the contradictions between the affidavit and the full evidentiary record.

Despite the absence of investigation and the existence of overwhelming exculpatory evidence, the charge against Plaintiff remained active for more than three months. During this time, he was subjected to restrictive bond conditions, immediately excluded from his 20-year career in education, and burdened with the reputational and economic consequences of a publicly searchable first-degree felony allegation. No Examining Trial was set, the case was not presented to a grand jury, and no independent judicial review of probable cause occurred at any point.

The turning point appeared only when judicial oversight became imminent. On July 18, 2025—shortly after Plaintiff's counsel formally requested an Examining Trial that would have required a magistrate to review the arrest affidavit—First Assistant County Attorney Jonathan Amdur declined the case. The declination contained no explanation and made no effort to correct or withdraw the misleading affidavit used to obtain the arrest. Because the case was administratively "declined" rather than dismissed by a court, Plaintiff's arrest remains classified as "HELD" in all criminal databases, blocking expunction for years and perpetuating ongoing reputational and employment damage.

Plaintiff's father experienced the identical procedural pattern. Arrested on April 7, 2025 without investigation, he made repeated written requests for a judicial determination of probable cause. An Examining Trial was finally set for December 1, 2025—nearly eight months after arrest. Before the hearing could occur, and before any judicial officer could review the affidavit, Amdur again declined the case. As with Plaintiff, the declination forestalled judicial review, preserved the original allegations, and maintained the "HELD" status of a first-degree felony accusation in statewide and national databases. The default view of HELD on a background

check for a 1st degree felony charge is that it is active, open and still under investigation, preventing any meaningful employment.

Across both arrests, the County followed the same sequence:

• maintain the charge for months without investigation;

• disregard exculpatory evidence submitted repeatedly;

• impose restrictive bond conditions causing ongoing constitutional and psychological harm; and

• decline prosecution only at the moment a judicial review of probable cause became unavoidable.

This pattern demonstrates deliberate indifference and an institutional refusal to correct known inaccuracies in the arrest record. The failure to amend the affidavits, withdraw the misleading statements, or acknowledge the contradictory evidence constitutes a continuing constitutional injury—one that persists for as long Plaintiff and his father are publicly classified as individuals arrested for a first-degree felony unsupported by probable cause.

By declining the cases only when judicial oversight became imminent and refusing to correct the inaccurate affidavits, county officials perpetuated the constitutional violations initiated on April 7, 2025 and ensured that the resulting harms—employment loss, reputational destruction, ADA-related consequences, and public classification as first-degree felons—would continue indefinitely.

### SECTION 12 — Digital & Reputational Destruction

The reputational harm arising from Plaintiff's April 7–8, 2025 arrest was immediate, foreseeable, and permanently embedded in his digital identity. Because Plaintiff is a public-school educator, coach, published author and known musician—whose name is routinely

searched by parents, students, athletes, employers, fans and community members—the public release of an unsupported first-degree felony allegation guaranteed instantaneous and widespread dissemination. This section establishes that the County's constitutional violations did not end with the arrest warrant; they triggered a cascading, irreversible digital footprint that continues to impair every aspect of Plaintiff's professional and personal life.

Within hours of Plaintiff's booking on April 8, 2025, his full name, photograph, and the label "First-Degree Felony Tampering (Family Violence)" were captured by automated jail-scraper websites, arrest-notification networks, and social-media indexing systems. These platforms distributed the information across search engines and third-party databases, ensuring that the allegation became the dominant result for any online search of Plaintiff's name. For a public-school educator and coach, the appearance of a first-degree felony allegation—unsupported by probable cause and never subjected to judicial review—is functionally career-ending.

Digital contamination escalated rapidly. On TikTok, automated "discovery pages" were created using Plaintiff's name, former school, and former district. These pages displayed headings such as "James Louis Roden Jr Arrested," "Milstead Middle School Felony Case," and "Milstead Coach Arrested," each aggregating unrelated true-crime clips, commentary videos, and algorithmic tags falsely associating Plaintiff with violent or sexual misconduct. Over time, nearly a billion views accumulated across nearly 85 million hashtag clusters, and Plaintiff's name became permanently tethered to criminal-themed taxonomies. Even searches for his published books, recorded music, or education-related content returned arrest-related pages.

The reputational damage extended across all major platforms. Plaintiff's name and booking photograph circulated on Facebook, Instagram, TikTok, and X/Twitter, frequently

accompanied by speculation or misinformation. Neighborhood-based community networks recirculated the allegations. These posts were then indexed by Google and other search engines, copied by data brokers, archived by long-term record-preservation websites, and stored indefinitely by private databases.

This contamination destroyed Plaintiff's career. Plaintiff is a twenty-year educator, minister, district-level trainer, coach, author of more than thirty books, and a recording artist under the name *James Roden Jr.*, with professionally distributed music available on major, widely recognized platforms including Spotify; Apple Music and iTunes; Amazon Music; YouTube and YouTube Music; Pandora; iHeartRadio; and leading social-media discovery platforms such as TikTok, Instagram, and Facebook. Plaintiff's music is also accessible on Roblox, one of the world's largest digital gaming and content platforms, with hundreds of millions of active users, significantly expanding his public reach and visibility.

Plaintiff is likewise a published author whose books are sold through Amazon and other major book-retail platforms, and whose education-focused works have been hosted and sold through the Harvard Book Store. Prior to April 2025, searches of Plaintiff's name returned professional materials related to education, ministry, authorship, and creative work. After the arrest, nearly all search results became dominated by arrest-related and viral content, preventing employers, collaborators, students, parents, readers, or members of the public from locating legitimate information about Plaintiff's identity, qualifications, or body of work.

The economic consequences were total. Since April 7, 2025, every background check conducted by any potential employer—public or private—has returned a "HELD" first-degree felony charge, even though prosecutors declined the case. Plaintiff has been denied employment opportunities in education, nonprofit work, public-sector roles, private industry, entry-level

support positions, and service-sector jobs. Human Resources departments immediately reject Plaintiff's applications upon seeing a recent first-degree felony labeled as involving "Family Violence," which results in automatic disqualification from nearly all positions for which Plaintiff is otherwise fully qualified.

Compounding this barrier, most employers now conduct informal digital-reputation screening, including social-media presence and public perception tied to an applicant's name. Plaintiff's online footprint—distorted by more than 85 million TikTok impressions falsely associating him with a violent first-degree felony—has rendered him effectively unemployable in any meaningful capacity aligned with his education, certifications, and twenty-year professional career.

This collapse of career prospects has also destroyed Plaintiff's ability to earn retirement credit, maintain his expected retirement income, or continue providing financial stability for his wife and two young children. The combination of an unremovable violent felony flag and widespread public mischaracterization has eliminated Plaintiff's capacity to support his family and permanently undermined his long-term economic security.

These harms are not incidental—they were the predictable outcome of the County's actions. The arrest occurred without probable cause; the affidavit omitted material facts; the County refused to correct the record when confronted with exculpatory evidence; and the prosecutor's decision to decline the case without judicial review ensured that the arrest remains permanently classified as "HELD," with all associated digital, reputational, and economic consequences.

The County's unconstitutional conduct did not merely initiate a criminal accusation—it permanently redefined Plaintiff's public identity, embedding an unsupported first-degree felony allegation into every search result, every background check, and every opportunity involving his name.

### Section 13: ADA Violations, Due Process Failures, and the Denial of Access to Courts for a Pro Se Disabled Veteran

The facts underlying the arrests of Plaintiff and his father reveal a broader pattern of ADA retaliation, disability-based discrimination, and systemic denial of access to the courts. Plaintiff was targeted after engaging in protected ADA activity on behalf of an intellectually disabled adult, and his father—a severely disabled, medically fragile veteran forced to proceed pro se—was subjected to conditions and procedural barriers that made meaningful participation in the criminal process impossible. Together, these events show a County operating without regard to disability law, accommodation requirements, or the constitutional protections owed to disabled defendants and those advocating for them.

Plaintiff repeatedly engaged in protected ADA activity before his arrest. He notified county officials that the victim, S.J.K., had documented intellectual and developmental disabilities, requested ADA accommodations so she could meaningfully communicate with prosecutors, advised that she was unable to read or write independently, submitted disability documentation, sought a neutral court appointment of a guardian ad litem, and reported that prosecutors had failed to contact her for nearly eight months despite her disability. These notifications fall squarely under Title II of the ADA and 42 U.S.C. § 12203, which prohibit retaliation against individuals who assist, advocate for, or facilitate accommodations for people with disabilities.

Rather than examine or respond to these ADA filings, the County used Plaintiff's disability-related communications as part of the narrative supporting his arrest. Six days after Plaintiff submitted a mandated report documenting renewed sexual exploitation of an intellectually disabled adult—and three days after officials unlawfully disclosed his identity in violation of Texas Family Code § 261.101(f)—the County initiated a first-degree felony prosecution based exclusively on selective excerpts of Plaintiff's own ADA-based advocacy. None of the surrounding context, including the reporting victim's voluntary disclosures and her repeated efforts to contact the County, was included in the affidavit. Plaintiff's arrest thus occurred in direct temporal proximity to his protected ADA activity and relied on a mischaracterization of the very communications he made to assist an individual entitled to accommodations under federal law.

The County's ADA violations extended further in its treatment of Plaintiff's father, James Louis Roden Sr., a seventy-seven-year-old retired U.S. Army Master Sergeant (E-8) who is wheelchair-bound, medically fragile, and dependent on continuous treatment to maintain basic physiological stability. Although the County was fully aware of his severe disabilities, it imposed standard first-degree felony bond-supervision conditions requiring in-person reporting nearly four hours away in Seguin. These obligations forced an eight-hour round-trip journey for a brief check-in, directly violated medical orders, placed a medically fragile veteran at serious risk, and ignored the requirement under ADA Title II for individualized assessment and reasonable modification of supervision conditions.

Because he did not qualify for appointed counsel and could not afford private counsel without sacrificing the medical care needed to keep him alive, Mr. Roden Sr. was forced to proceed pro se through a complex felony prosecution. He submitted multiple written motions

seeking ADA accommodations, requesting remote or local reporting, and seeking modification of bond based on medical necessity. Yet the Court Coordinator ignored several motions entirely, failed to docket others, and scheduled one motion only after months of delay—so far in the future that it provided no meaningful relief. This pattern of administrative non-action denied a disabled pro se defendant any functional access to judicial review and constitutes a violation of both Title II of the ADA and the Fourteenth Amendment right of access to the courts.

Only after eight months of dangerous travel, unanswered motions, and the total absence of accommodation did the court set an Examining Trial for December 1, 2025—the first opportunity for a judicial officer to evaluate probable cause or review the County's treatment of a disabled pro se defendant. Before that hearing could occur, and before any of these issues could be examined by a magistrate, First Assistant County Attorney Jonathan Amdur declined the case. This mirrored the pattern in Plaintiff's own case: the County preserved the charges long enough to impose severe disability-related burdens but terminated the prosecution immediately before judicial review could expose the defects in the affidavits or the County's ADA violations.

Because both cases were declined rather than dismissed, neither Plaintiff nor his father ever received a neutral review of probable cause, and both continue to bear the "HELD" designation of a first-degree felony in state, national and commercial databases. For Plaintiff's father, this unjustified classification jeopardizes even his Military Funeral Honors. For Plaintiff, it preserves the reputational, economic, and educational harms that followed from an arrest unsupported by probable cause and obtained in retaliatory response to his ADA-protected advocacy.

Together, these facts show a County that disregarded ADA obligations, retaliated against individuals advocating for disability rights, imposed dangerous and discriminatory supervision

conditions, and systematically avoided judicial scrutiny. They form a critical foundation for Plaintiff's ADA, due process, access-to-courts, and Monell claims by demonstrating a sustained pattern of deliberate indifference to the rights of disabled individuals and those who seek to protect them.

## Section 14: Post-Case Outcomes Confirm the Systemic Failures Underlying This Civil Action

Despite Plaintiff's repeated efforts to protect S.J.K., an individual with a well-documented intellectual and developmental disability ("IDD"), the Guadalupe County Attorney's Office ultimately dismissed with prejudice all sexual-assault charges against J.R.W., permanently acknowledging her innocence and abandoning any claim that she committed sexual crimes against her daughter. At the same time, the County dismissed all six first-degree felony aggravated sexual-assault charges against Michael Allen Walker—the adult male who sexually assaulted S.J.K.—and reduced his criminal exposure to a single charge of prohibited sexual conduct (incest).

In doing so, the County Attorney's Office disregarded extensive and longstanding evidence of S.J.K.'s intellectual and developmental disability, including psychological testing, medical records, educational history, and decades of Social Security disability benefits. Rather than assessing S.J.K.'s cognitive capacity to consent, the County adopted a legal position that treated her status as an adult without a court-appointed guardian as dispositive of consent. Under this theory, because S.J.K. had reached the age of majority and had no legal guardian, she was deemed capable of consenting to sexual activity, notwithstanding documented cognitive limitations and functional impairments.

41

That position misstates Texas law. Guardianship status is a procedural safeguard, not a legal determination of capacity. The absence of a guardian does not establish that an individual possesses the cognitive ability to understand the nature, consequences, and risks of sexual activity. Texas law and constitutional due-process principles require a substantive, fact-based inquiry into capacity—particularly where the alleged victim has documented intellectual disabilities. Consent cannot be inferred from age alone where cognitive impairment materially affects judgment, comprehension, and vulnerability to manipulation.

The County's theory further treated grooming behavior—such as providing gifts, attention, or inducements—as evidence of a consensual relationship, rather than as indicia of exploitation. When directed toward an individual with intellectual and developmental disabilities, such conduct heightens concerns regarding coercion and undue influence; it does not cure incapacity. By collapsing the legal inquiry into a binary question of age and guardianship, the County effectively stripped statutory and constitutional protections from a disabled adult whom the law is designed to protect.

This legal position stood in stark contrast to the County's aggressive prosecution of Plaintiff and his family members—individuals who reported abuse, sought ADA accommodations, and attempted to safeguard a vulnerable adult. While extensive evidence of sexual exploitation was minimized or disregarded in Michael Allen Walker's case, Plaintiff and others were charged with first-degree felonies carrying potential sentences exponentially greater than the punishment imposed on the admitted perpetrator. The County's selective treatment of capacity, consent, and criminal culpability forms a central basis for the constitutional and civil-rights violations alleged in this action.

That inconsistency was not coincidental. The County rejected S.J.K.'s documented intellectual and developmental disability when doing so shielded Michael Allen Walker from aggravated sexual-assault liability, yet invoked that same disability to justify pursuing a first-degree felony witness-tampering charge against Plaintiff—asserting that S.J.K. was so vulnerable and impressionable that Plaintiff could have coerced her merely by supporting her consistent, voluntary statements and reporting abuse through lawful channels. This inconsistent and internally contradictory treatment of disability status—disregarded to protect an accused offender yet invoked to punish an advocate—demonstrates the absence of any coherent legal basis for Plaintiff's arrest and supports the inference that the prosecution was retaliatory and pretextual.

After months of irreversible harm, the County Attorney's Office declined to proceed with Plaintiff's case without indictment, without dismissal with prejudice, without correcting the public record, and without acknowledging Plaintiff's innocence. The first-degree felony charge that destroyed Plaintiff's career was not adjudicated, but simply left to linger—blocking expunction, foreclosing employment, and imposing ongoing stigma without due process.

By refusing to dismiss the charge outright or permit expunction after permanently abandoning the underlying allegations Plaintiff was accused of influencing, Defendants insulated themselves from scrutiny and denied Plaintiff any meaningful opportunity for judicial review. Plaintiff was never afforded a probable-cause hearing, never allowed to confront the accusation in court, and never given a forum to clear his name. Compounding this denial, Plaintiff submitted a written, certified complaint—return receipt requested—seeking an internal investigation into Defendant Reamer's conduct, yet County officials ignored the complaint entirely and undertook no inquiry, review, or disciplinary process. Through this combination of procedural obstruction

and deliberate inaction, Defendants foreclosed every available mechanism by which Plaintiff could challenge the accusations, obtain accountability, or vindicate his rights.

With every state avenue of correction deliberately closed, Plaintiff has no choice but to seek relief under 42 U.S.C. § 1983 to vindicate his constitutional rights, restore the truth, and obtain accountability the criminal process was manipulated to avoid. Plaintiff brings this action not out of anger or vengeance, but for vindication—of truth, of principle, and of the fundamental trust that must exist between a government and the people it serves. He seeks to ensure that no educator, advocate, or mandated reporter is ever again forced to choose between fulfilling a legal duty and preserving a livelihood. When constitutional protections are ignored in one case, they are weakened for all. This action therefore stands as both a plea for justice and a safeguard against the unchecked misuse of government authority.

### Section 15: Closing Summary

The events giving rise to this action reflect a complete inversion of the protections the law is designed to provide. The individual who consistently reported, documented, and attempted to prevent the sexual exploitation of an intellectually disabled adult was arrested on a first-degree felony charge that contradicted the very evidence the County already possessed. His seventy-seven-year-old, wheelchair-bound father—who had limited knowledge of the cases, no involvement in any communications with County Attorney's or Law Enforcement leading up to arrest, and no ability to travel—was arrested the same day based on unverified hearsay later disavowed under oath. At the same time, the witness whose contradictory statements formed the basis for both prosecutions avoided investigation, avoided charges, and remained central to the County's narrative despite a documented history that called Cody's reliability into question.

These circumstances frame the constitutional and statutory violations detailed throughout this Complaint.

The sequence and timing of events in Guadalupe County demonstrate that the arrest was not preceded by a good-faith investigation that reached an incorrect conclusion, but instead followed immediately after formal complaints against Jessica Johnson and Officer Reamer were submitted to County leadership, Judge Steel, and after the April 1, 2025 mandated report. That report exposed that County-directed placement decisions had placed an intellectually disabled adult—S.J.K.—back into an environment where she was again sexually exploited, resulting in a second pregnancy. Instead of investigating the renewed abuse or the County's own role in the circumstances reported, County officials took no investigative action and, within days, initiated criminal process against the mandated reporter/advocate. The County already possessed clear evidence of S.J.K.'s longstanding IDD status, her consistent statements identifying the perpetrator, her repeated assertions of her mother's innocence, and the authenticity of the November 15, 2024 affidavit. Officials also had disability evaluations, sworn affidavits, and recorded communications confirming that Plaintiff's actions were transparent, voluntary, and exculpatory.

Once the April 1, 2025 report placed the County at risk of liability for exposing an IDD adult to renewed victimization—and jeopardized their prosecution against Jamie Renee Walker—the investigative focus shifted entirely. Rather than investigate the new exploitation or acknowledge their own failures, prosecutors supplied a narrative that ignored disability records, omitted exculpatory evidence, and reframed Plaintiff's ADA advocacy as criminal conduct. Investigators adopted that narrative without interviews, corroboration, or comparison to the evidence already in their possession. The charges against Michael Allen Walker were quietly

45

abandoned, while Plaintiff and his father were arrested based on affidavits stripped of context, contradictions, and the very disability information that would have revealed the truth. No effort was made to reconcile known inconsistencies, verify statements, or address the renewed exploitation disclosed in the mandated report—because the report itself had become the threat they sought to suppress.

The consequences were severe and immediate. Plaintiff lost his career in public education, his professional standing, and his ability to support his family. His father—a disabled pro se veteran—was subjected to dangerous travel, denied ADA accommodations, and deprived of meaningful access to judicial review for nearly a year. Both men continue to bear the burden of publicly visible "HELD" felony charges that remain in state, national and commercial databases, preventing them from clearing their names and restoring their livelihoods.

These facts collectively demonstrate a systemic pattern: exculpatory evidence was disregarded, unreliable statements were selectively adopted, mandated reporters were targeted, and individuals with disabilities and those advocating for them were denied the protections guaranteed by law. This pattern forms the basis of the First Amendment, Fourth Amendment, and Fourteenth Amendment claims asserted herein, as well as the claims under Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act.

The injustice that occurred was not an isolated error but the foreseeable result of structural failures that allowed unsupported accusations to replace investigation, silenced those who fulfilled their legal duties, and left an intellectually disabled adult without the protections mandated by state and federal law.

# II. EXECUTIVE SUMMARY

1.      This civil-rights action arises from Guadalupe County officials' decision to arrest and prosecute Plaintiff—a long-time educator, mandated reporter, minister, and advocate for adults with intellectual disabilities—after he repeatedly alerted law-enforcement and prosecutorial authorities that S.J.K., an adult with documented intellectual and developmental disabilities (IDD), was being sexually exploited, denied accommodations, and unlawfully isolated from her family and advocates. Rather than investigate these reports or review the substantial exculpatory evidence in their possession, county officials initiated criminal proceedings against Plaintiff based on an arrest-warrant affidavit that omitted key facts, misrepresented the investigative record, and contained assertions directly contradicted by evidence known to the County at the time.

2.      Investigator Elaine M. Reamer obtained the April 7, 2025 arrest warrant by presenting a facially deficient affidavit that did not reference, incorporate, or address any of the exculpatory materials previously delivered to the Sheriff's Office or County Attorney's Office. The affidavit omitted:

• the April 4, 2024 recorded interview in which S.J.K. reaffirmed her mother's innocence;

• the March 10–12, 2025 video statements in which S.J.K. again confirmed her prior disclosures and denied any coercion;

• the March 15, 2025 notarized sworn affidavit affirming the same;

• Plaintiff's April 1, 2025 mandated report of renewed sexual exploitation;

• evidence of Plaintiff's long-standing role as S.J.K.'s advocate;

• the County's months-long failure to communicate with S.J.K.; and

• the County's knowledge that S.J.K. could not read or write independently, requiring ADA accommodations.

3.      None of these materials appeared in the affidavit, nor did the affidavit identify any interview with S.J.K., **any** independent corroboration, or any investigative steps undertaken to substantiate the accusation. Instead, the affidavit stated only that Plaintiff had "coerced" S.J.K. into recanting—a conclusion unsupported by the investigative file, contradicted by video evidence, and presented to the magistrate without the context necessary to evaluate its reliability. The omissions were so significant that the affidavit failed to establish even arguable probable cause under clearly established Fourth Amendment law.

4.      The arrest occurred six days after Plaintiff submitted an ADA-based report documenting renewed sexual exploitation of an IDD adult and after months of Plaintiff's repeated written notifications to the County Attorney's Office, Sheriff's Office, and APS leadership. These reports placed County policymakers on explicit notice of (1) the need for disability accommodations; (2) the lack of prosecutorial communication with an IDD victim; and (3) the County's reliance on unverified, inconsistent statements while disregarding exculpatory evidence. Within days, the County sought felony charges against Plaintiff, and his father, and imposed a preset $100,000 bond on each, despite their clean criminal histories.

5.      Following the arrests, Plaintiff provided the County with additional exculpatory materials—including recorded calls, certified transcripts, and sworn affidavits—but County leadership declined to review, investigate, or correct the false narrative. Plaintiff also submitted multiple certified-mail letters, ADA accommodation requests, guardian-ad-litem submissions, and internal-affairs complaints. Those submissions were received by Sheriff Joshua Ray, First Assistant County Attorney Jonathan Amdur, Chief Prosecutor Maritza Stewart, County Attorney David Willborn, the Commissioners Court, County Judge Kyle Kutscher, and the Sheriff's Office Internal Affairs Division. No corrective action was taken by any policymaker.

6.      Plaintiff brings this action under 42 U.S.C. § 1983, the Americans with Disabilities Act, and the Rehabilitation Act based on:

• False arrest and unlawful seizure under the Fourth Amendment;

• Continuing seizure based on prolonged legal restraints without probable cause;

• Malicious prosecution under Thompson v. Clark;

• Retaliation for engaging in protected First Amendment and ADA advocacy;

• Selective and retaliatory enforcement under the Equal Protection Clause; and

• Municipal liability under Monell based on ratification, failure to supervise, and an established custom of disregarding ADA obligations and failing to investigate exculpatory evidence.

7.      The County's actions destroyed Plaintiff's twenty-year career in education, permanently reduced his retirement benefits, eliminated his professional advancement prospects, caused widespread reputational and emotional harm, and imposed years of unconstitutional restraints on his liberty. The facts alleged demonstrate a coordinated sequence of omissions, misrepresentations, retaliatory acts, and policymaker-level failures that directly violated clearly established constitutional and federal statutory rights.

## LEGAL ROADMAP

The following summarizes the constitutional violations supporting this action:

### Fourth Amendment – False Arrest & Fabricated Probable Cause

8.      County officials initiated criminal process without any objectively reasonable basis. Defendant Reamer conducted no meaningful investigation of her own and instead relied almost entirely on second-hand assertions from the County Attorney's Office while omitting substantial exculpatory evidence already in the County's possession. The affidavit excluded prior recorded

interviews, sworn affidavits, and contemporaneous communications from S.J.K. demonstrating that her statements were independent and consistent over time. This omitted evidence included the April 4, 2024 recorded interview—conducted nearly a year before the statements Reamer attributed to Plaintiff—in which S.J.K. independently stated that her mother "was never involved." By presenting a selectively incomplete and materially misleading investigative record that contradicted the County's own files, Defendant Reamer violated established Fourth Amendment requirements under Franks v. Delaware, Malley v. Briggs, Manuel v. City of Joliet, and Winfrey v. Rogers.

### Fourteenth Amendment – Fabrication and Suppression of Evidence (Due Process)

**9.**     Independent of the false-arrest theory, Plaintiff alleges that Defendant Reamer knowingly or recklessly distorted, withheld, or misrepresented critical exculpatory evidence when preparing the April 7, 2025 warrant affidavit. This included omitting the April 4, 2024 forensic interview; the March 15, 2025 notarized affidavit; recorded statements confirming voluntariness; and County records showing prosecutors had no contact with the victim for months. Under *Mooney v. Holohan*, *Cole v. Carson*, *Winfrey*, *Haggard*, and related Fifth Circuit authority, fabricating or suppressing evidence that initiates or prolongs criminal proceedings violates the Due Process Clause and states an independent constitutional claim.

### Fourth Amendment – Continuing Seizure

**10.**     Plaintiff remained under a Fourth Amendment seizure from April 8, 2025 until July 18, 2025, when the County formally declined prosecution. During this period, Plaintiff was subjected to bond conditions, reputational restraints, and ongoing legal-process obligations constituting a continuing seizure under *Manuel* and *Winfrey*. Although the seizure ended with the

favorable termination, Plaintiff continues to experience compensable harms traceable to the unconstitutional initiation of legal process.

### Fourth Amendment – Malicious Prosecution

11.    Defendant Reamer initiated criminal proceedings despite possessing no evidence that Plaintiff coerced or tampered with a witness. She failed to interview a single witness, omitted the April 4, 2024 recorded interview, multiple consistent affidavits from S.J.K., the March 2025 video statements where she confirms she is peaking freely without coercion, and Plaintiff's emails documenting repeated requests for ADA accommodations and concerns. Rather than presenting the full evidentiary record already available to the County—including prior interviews, affidavits, and recorded statements—Defendant Reamer relied on the narrative supplied by the County Attorney's Office and submitted a selectively curated version of the facts to the magistrate, omitting critical exculpatory materials necessary to an accurate probable-cause assessment. During the nearly four months that the charge remained pending, the County Attorney's Office never produced any evidence supporting the tampering allegation, never identified a witness alleging coercion, and never disclosed any factual basis for the charge. The prosecution formally terminated in Plaintiff's favor on July 18, 2025. Under *Thompson v. Clark,* these allegations satisfy each element of a Fourth Amendment malicious-prosecution claim: (1) initiation of criminal process; (2) absence of probable cause; (3) maintenance of the prosecution without evidentiary basis; and (4) favorable termination.

### First Amendment Retaliation

12.    Plaintiff engaged in core First Amendment activity by (a) submitting a mandated report of suspected abuse involving an intellectually disabled adult, (b) requesting ADA

accommodations to ensure meaningful access to prosecutors, and (c) communicating with state agencies about disability-related barriers. Plaintiff filed the mandated report on April 1, 2025, and was arrested six days later. The unusually short temporal proximity—combined with the County's omission of exculpatory evidence and use of Plaintiff's protected communications as part of the warrant affidavit—plausibly supports a retaliatory motive under Keenan v. Tejeda, Gonzalez v. Treviño, and the general principles recognized in Nieves v. Bartlett.

### ADA Title II & Rehabilitation Act Retaliation

13.    Plaintiff requested ADA accommodations for an intellectually disabled adult, notified County officials of disability-related communication barriers, and submitted a mandated report documenting disability-based exploitation. These actions constitute protected activity under 42 U.S.C. § 12203. Because ADA retaliation does not require the plaintiff himself to be disabled, Plaintiff's advocacy on behalf of a disabled adult is fully protected conduct. The arrest occurring just days after these ADA-related filings—combined with the County's use of Plaintiff's disability-related communications in the warrant affidavit—plausibly establishes retaliatory motive and provides one of the most direct liability theories in this Complaint.

### Equal Protection – Selective Enforcement

14.    Multiple similarly situated individuals—including **Cody Lane Koelle**, who had far more extensive contact with S.J.K., communicated with her hundreds of times, transported her across state lines, and directly discussed affidavit preparation—were never investigated, detained, or charged. Despite having substantially **less** involvement, Plaintiff alone was targeted for a first-degree felony. The County's decision to investigate and arrest only Plaintiff, while affirmatively supporting or facilitating the actions of others with equal or greater involvement, constitutes

selective enforcement under *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000), and Fifth Circuit equal-protection doctrine. The disparity, combined with retaliatory motive and temporal proximity to Plaintiff's protected activity, satisfies the requirement that the differential treatment be intentional and irrational.

### Monell Liability – Policy, Custom, Failure to Train, and Ratification

15.    Guadalupe County's final policymakers—including the Sheriff, County Attorney, First Assistant County Attorney, Chief Prosecutor, County Judge, and all four Commissioners— received multiple written notices regarding the underlying constitutional violations through emails, sworn affidavits, certified-mail submissions, recorded statements, Open Records correspondence, and ADA-related communications. Those notices expressly revealed that Sheriff leadership had affirmatively deferred investigative authority to the County Attorney's Office, permitting prosecutors to control investigative direction and factual narratives rather than requiring independent law-enforcement verification of probable cause. Despite this notice, no policymaker intervened to correct, investigate, or halt the unlawful conduct. Instead, policymakers continued to approve and ratify investigative and charging decisions that relied on unverified prosecutorial representations, as reflected in the arrest-warrant affidavits prepared against Plaintiff and his father. This repeated non-response, combined with the County's express delegation of investigative responsibility to prosecutors, plausibly demonstrates a municipal custom of tolerating constitutionally deficient investigations, deliberate indifference to known risks of constitutional injury, and policymaker ratification of the challenged conduct. These facts satisfy Monell liability under *Pembaur*, *Praprotnik*, *Grandstaff*, *Piotrowski*, and *Espinal v. City of Houston*.

# III. NATURE OF ACTION

16.     This is a civil-rights action brought pursuant to 42 U.S.C. § 1983, Title V of the Americans with Disabilities Act, 42 U.S.C. § 12203, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794. Plaintiff seeks redress for the deprivation of rights secured by the Constitution and federal law arising from his arrest, prosecution, and the County's handling of matters involving an adult with documented intellectual and developmental disabilities.

17.     Plaintiff files this Complaint **pro se** to preserve his rights under federal law. Plaintiff is actively seeking qualified legal representation and anticipates retaining counsel as this litigation progresses. Plaintiff also seeks attorney's fees and litigation costs as authorized by 42 U.S.C. § 1988. In the event Plaintiff becomes unable to continue prosecuting this action due to health, financial, or other circumstances, Plaintiff invokes Federal Rule of Civil Procedure 25 and applicable Texas law to ensure that this action may continue through a duly appointed attorney, personal representative, or appropriate successor or estate representative.

18.     Plaintiff reserves the right to amend this Complaint as discovery progresses and additional facts become available, including the potential addition of claims under 42 U.S.C. § 1985 or municipal liability claims under Monell v. Department of Social Services, 436 U.S. 658 (1978), should discovery reveal policies, customs, or supervisory actions that contributed to the violations alleged herein.

19.     Plaintiff brings this action at significant personal and professional risk. Based on his prior experience following disclosures to County officials—which resulted in unexpected criminal charges later dismissed—Plaintiff has a reasonable concern regarding potential interference with his access to the courts during the pendency of this case. Plaintiff respectfully requests that the

Court permit all lawful protections necessary to ensure his ability to pursue this matter without obstruction.

20.    Plaintiff has standing to bring this action as a person directly injured by the arrest, prosecution, bond conditions, reputational harm, and professional consequences that followed. Plaintiff also has standing under the ADA and Section 504 because his involvement in the underlying events stemmed from his role as an advocate assisting an adult with documented intellectual and developmental disabilities in communicating with officials, accessing services, and obtaining accommodations.

21.    Plaintiff seeks relief for injuries personally sustained, including the loss of liberty, employment, reputation, earning capacity, and access to educational and public-service opportunities. References to related conduct involving S.J.K. or other family members are included solely to clarify the context of Plaintiff's involvement and the sequence of events leading to his arrest.

22.    The individual defendants are sued in their individual capacities for damages arising from actions taken under color of law. They are sued in their official capacities only to the extent necessary to obtain declaratory or injunctive relief to prevent ongoing or future violations of federal rights.

23.    Plaintiff seeks redress for the arrest and prosecution that occurred after he fulfilled his obligations as a mandated reporter and advocate for a disabled adult. The facts alleged demonstrate the sequence of events preceding Plaintiff's arrest, the evidence available to officials at the time, and the manner in which the arrest and subsequent proceedings unfolded.

24.    The factual allegations that follow are made upon information and belief and are supported by recorded interviews, sworn affidavits, emails, videos, ADA-related communications, and public records. A substantial portion of this material has been in the possession of County officials for many months, as Plaintiff previously submitted this evidence in good-faith efforts to clarify the record, request ADA-compliant communication, and ensure that officials had access to the information relevant to their decisions

# IV. JURISDICTION AND VENUE

25.    This action arises under the Constitution and laws of the United States, including the First, Fourth, and Fourteenth Amendments, enforced through 42 U.S.C. § 1983, and under Title V of the Americans with Disabilities Act, 42 U.S.C. § 12203, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

26.    This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because the claims presented arise under federal law.

27.    This Court has jurisdiction under 28 U.S.C. § 1343(a)(3)–(4), as Plaintiff seeks redress for the deprivation of rights secured by the Constitution and federal statutes under color of state law.

28.    Venue is proper in the San Antonio Division of the Western District of Texas under 28 U.S.C. § 1391(b), because all or a substantial part of the events and omissions giving rise to these claims occurred in Guadalupe County, Texas, which lies within this District and Division.

29.    This Court has authority to award declaratory, injunctive, and monetary relief pursuant to 28 U.S.C. §§ 2201–2202 and to award attorney's fees and costs pursuant to 42 U.S.C. § 1988.

# V. PARTIES

**Plaintiff**

**30.**    Plaintiff James Louis Roden Jr. is a citizen of the United States and a resident of League

City, Texas. Plaintiff is a certified public-school educator, minister, mandated reporter, and the

original complainant who exposed the sexual exploitation referenced herein. Plaintiff proceeds

pro se. For purposes of service and case communications, Plaintiff may be contacted through the

mailing address and email address on file with the Clerk of Court.

**Defendants**

**31.**    Defendant Sergeant Elaine M. Reamer is employed by the Guadalupe County Sheriff's

Office, Criminal Investigation Division, located at 2617 N. Guadalupe Street, Seguin, Texas

78155. At all relevant times, she acted under color of state law and within the scope of her

employment. Defendant Reamer is sued in her individual capacity only for actions taken under

color of state law. She may be served at her place of employment.

**32.**    Defendant County of Guadalupe, Texas is a political subdivision of the State of Texas and

a "person" subject to suit under 42 U.S.C. § 1983. The County is also a "public entity" within the

meaning of Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, and a recipient of

federal financial assistance subject to Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

Plaintiff asserts retaliation claims under ADA Title V and Section 504. Service upon the County

may be accomplished by serving the County Judge, Kyle Kutscher, in his official capacity as the

County's designated service officer, at the Guadalupe County Courthouse, 101 E. Court Street,

Seguin, Texas 78155.

33. Defendants John and Jane Does 1–10 are individuals whose identities are presently unknown. They are employees, agents, supervisors, investigators, or contractors of the Guadalupe County Attorney's Office and/or the Guadalupe County Sheriff's Office, who, at all relevant times, acted under color of state law and participated in or facilitated the unconstitutional actions described in this Complaint.

34. The Doe Defendants include, but are not limited to, individuals within the County Attorney's Office—including legal staff, administrative employees, investigators, or victim-services personnel—who unlawfully disclosed or transmitted Plaintiff's confidential April 1, 2025 mandated-report email and or audio recording to Cody Lane Koelle, S.J.K., or other third parties. These unauthorized disclosures violated statutory confidentiality protections and directly precipitated the retaliatory arrest that followed.

35. The Doe Defendants further include one or more individuals who directed, encouraged, assisted, or collaborated with Sergeant Reamer in preparing and submitting the April 7, 2025 arrest-warrant affidavits, despite knowing that:

   (a) Plaintiff's mandated-report materials had been leaked,

   (b) key exculpatory evidence—including recordings, affidavits, videos, and emails—was in the County's possession, and

   (c) the affidavits omitted material facts necessary to determine probable cause.

36. The Doe Defendants also include supervisory officials who authorized, approved, ratified, or deliberately ignored these unlawful leaks, retaliatory actions, and investigative omissions.

37. The true names and capacities of the Doe Defendants are presently unknown to Plaintiff. Plaintiff believes that each is an employee, agent, or policymaking official of Guadalupe County

acting within the scope of their official duties. Plaintiff will seek leave to amend this Complaint to substitute their true identities once they are ascertained through subpoenaed communications, public-records responses, or discovery.

38.    Unless otherwise specified, all references to "Defendants" herein include Sergeant Reamer, Guadalupe County, and Does 1–10, collectively and individually, as the context requires.

# VI. Pleading Sufficiency

39.    This Complaint contains detailed factual allegations identifying the dates, decision-makers, communications, statements, and acts linking Plaintiff's protected speech and advocacy to the retaliatory arrest and continued prosecution that followed. The allegations include direct quotations, specific investigative omissions, and contemporaneous communications among County officials. These factual assertions provide far more than the conclusory allegations prohibited under Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009). Because the Complaint alleges a coherent, document-supported chronology of constitutional violations, dismissal under Rule 12(b)(6) is improper.

40.    As a pro se litigant, Plaintiff's factual allegations must be liberally construed and held to less stringent standards than pleadings drafted by attorneys. Erickson v. Pardus, 551 U.S. 89, 94 (2007); Haines v. Kerner, 404 U.S. 519, 520–21 (1972). Federal Rule of Civil Procedure 8(e) directs courts to construe pleadings to do substantial justice rather than apply technical or hyper formalistic standards. At this early stage, the Court must accept all factual allegations as true and draw all reasonable inferences in Plaintiff's favor.

**41.**    Plaintiff's claims are plausible on their face. The Complaint includes concrete factual allegations—specific dates, audio recordings, transcripts, affidavits, emails, sworn statements, police reports, and prosecutorial communications—that permit a reasonable inference that Defendants violated clearly established rights under the First, Fourth, and Fourteenth Amendments, along with Title II and Title V of the ADA and Section 504 of the Rehabilitation Act. See Iqbal, 556 U.S. at 678. At the pleading stage, Plaintiff need not prove the claims; Plaintiff need only allege sufficient facts to state a plausible entitlement to relief. Twombly, 550 U.S. at 555.

**42.**    The length of this Complaint does not undermine its sufficiency. Rule 8 requires a "short and plain statement" of each claim—not an artificially compressed or incomplete one. In complex civil-rights matters involving multiple defendants, extended timelines, Monell liability, mixed ADA and constitutional claims, and over one hundred evidentiary exhibits, a detailed factual narrative is not only permissible but necessary to satisfy plausibility requirements. Courts routinely uphold complaints of substantial length where, as here, the volume of allegations reflects the complexity of the underlying misconduct and the number of legal theories asserted. Length alone is not a basis for dismissal under Rule 8 or Rule 12(b)(6), and no federal rule imposes a page limit or penalizes thorough factual pleading.

**43.**    This Complaint spans nearly two years of events; involves multiple coordinated actions by investigators, prosecutors, coordinators, and policymakers; asserts seven causes of action including Monell liability across several theories; and references more than one hundred exhibits containing emails, recorded statements, affidavits, and official communications. Given the nature of the case, brevity would obscure essential chronology, impede judicial review, and risk omitting factual context necessary for plausibility. The Complaint therefore satisfies Rule 8(a) by

providing a clear, organized, and plain statement of jurisdiction, claims, legal theories, and the grounds entitling Plaintiff to relief, supported by factual allegations that place each Defendant on fair notice of the claims and their bases.

44.    Defendants were placed on actual, written notice of their duty to preserve evidence no later than May 5, 2025, when Plaintiff formally served a Preservation of Evidence Request pursuant to Texas Code of Criminal Procedure Article 39.14 and constitutional due-process principles. *(See Exhibit E-017)*. That request expressly demanded preservation of all records, communications, emails, text messages, reports, recordings, metadata, drafts, notes, routing logs, and warrant-processing materials relating to Plaintiff's investigation, arrest, prosecution, and the retaliatory conduct alleged herein, including materials held by the Guadalupe County Attorney's Office, the Guadalupe County Sheriff's Office, and the Guadalupe County District Clerk. Defendants acknowledged receipt of the preservation request and confirmed that related materials would be preserved. *(Id.)*. Any destruction, alteration, concealment, or failure to preserve such evidence after that date may constitute spoliation and may warrant adverse inferences, evidentiary sanctions, or other relief available under federal law.

# VII. FACTUAL BACKGROUND

### A. Initial Reports and Early Investigation (January 2024 – November 2024)

45.    In **January 2024**, Plaintiff James Louis Roden Jr., a Texas educator, mandated reporter, and longtime disability advocate, was informed by family members that his niece, S.J.K., an adult with a documented intellectual and developmental disability ("IDD"), was being sexually abused by Michael Allen Walker. Acting immediately and in strict compliance with Texas Family Code §§ 261.101 and 48.051, Plaintiff reported the suspected abuse to Adult Protective Services

("APS") and the Guadalupe County Sheriff's Office ("GCSO"). In making these reports, Plaintiff also engaged in disability-related advocacy on behalf of an IDD adult who required legal protections and accommodations, placing his conduct squarely within ADA-protected activity. Plaintiff deferred completely to the proper authorities, seeking only an impartial investigation that accounted for S.J.K.'s disability and her need for protection.

46.    In **March 2024**, Plaintiff followed up with APS and informed Plaintiff that the case had been closed after GCSO reported that the "relationship" between Michael Allen Walker and S.J.K. was "consensual." This determination directly contradicted Texas Penal Code § 22.011(b)(4), which establishes that an individual with an intellectual disability cannot legally consent to sexual conduct. Despite disability-related information already known to APS and GCSO, no disability assessment, ADA-compliant screening, or accommodation appropriate for an adult with a documented intellectual and developmental disability was conducted before the case was closed. APS further informed Plaintiff that Investigator Elaine M. Reamer had been assigned to the case.

47.    On **March 23** and March 25, **2024,** Plaintiff emailed Investigator Elaine Reamer regarding case no. 49991360 *(See Exhibit B-001).* In those emails, Plaintiff reported that his niece, S.J.K., was an adult with an intellectual and developmental disability who received SSI benefits, could not read, write, perform basic math, or live independently, and therefore could not legally consent to sexual activity under Texas Penal Code § 22.011(b)(3). Plaintiff further informed Reamer that S.J.K. was pregnant and that DNA testing would confirm Michael Allen Walker—a probationer for a prior violent offense—as the father. Plaintiff provided Reamer with the names and contact information of multiple family witnesses who could corroborate that S.J.K. had repeatedly reported sexual abuse, coercion, and fear of retaliation. Plaintiff also

relayed that Adult Protective Services had advised him that only law enforcement, not APS, had the legal authority to intervene to protect S.J.K. from ongoing harm.

48.     Reamer acknowledged receiving the emails but responded that she was "out of the office" for the week and directed Plaintiff back to APS, stating that APS, not law enforcement, had the ability to remove S.J.K. from danger. Reamer did not initiate any welfare check, did not contact any of the identified witnesses, did not notify Walker's probation officer, and did not take any investigative or protective action despite the report of ongoing sexual abuse of a disabled adult and nearly two months having passed since Plaintiff first reported the assault.

49.     On **March 25th, 2024** via email *(See Exhibit B-001),* Plaintiff informed Reamer that Michael Walker was on probation for a Deadly Conduct charge and had a prior Aggravated Assault with a Deadly Weapon involving Jamie Renee Walker as reflected in criminal records and prior police reports in Guadalupe County. Despite this information, Michael Walker's probation file was updated on April 24, 2024 to reflect a "satisfactory" status while he was incarcerated—an inconsistency the Probation Department later stated it could not correct because it had not been notified of his incarceration. This failure reflects systemic communication breakdowns within County agencies. On April 30, 2024, at approximately 4:31 p.m., Plaintiff sent a text message to Investigator Reamer inquiring how the incident could have occurred *(See Exhibit R-001).* Investigator Reamer did not respond.

50.     Because APS and GCSO declined to intervene or arrange a protective placement, on March 28th, 2024 Plaintiff coordinated with S.J.K.'s older brother, Colby James Koelle. APS authorized Colby to travel to Seguin, meet with S.J.K., and confirm her desire to relocate to safety. S.J.K. agreed, and she was transported to League City, Texas, where she began residing with her grandparents.

**51.**     After the relocation, Plaintiff worked rapidly to secure long-term housing, counseling, and disability-informed services for S.J.K., whose intellectual and developmental disability required specialized care and supports. Plaintiff coordinated her placement with Anchor Point / Hope House, a residential program for expectant mothers that provides trauma-focused counseling, life-skills training, and services tailored to individuals with cognitive and developmental challenges. These efforts represented continued disability-related advocacy on behalf of an IDD adult—advocacy that Plaintiff had repeatedly communicated to County officials and which constituted ADA-protected activity.

**52.**     On **April 3, 2024**, Plaintiff and his father participated in a group text with Investigator Reamer to arrange a Sexual Assault Nurse Examiner ("SANE") exam. *(See Exhibit R-002)* Plaintiff and his father fully cooperated throughout the process, demonstrating transparency and good faith.

**53.**     On **April 4, 2024**, Investigator Reamer conducted a recorded interview of S.J.K. at Anchor Point in League City. *(See Exhibit R-003)* In that interview, S.J.K. reaffirmed her longstanding account exonerating her mother, Jamie Renee Walker, and identifying Michael Allen Walker as the individual responsible for the conduct previously reported. These statements were materially exculpatory and were already known to both the Sheriff's Office and the County Attorney's Office well before Plaintiff's arrest and knowledge of the facts expressed by S.J.K. At that time, Plaintiff had not been informed of the full circumstances surrounding the events in Seguin and, relying on the allegations reported by others, requested that both Jamie Renee Walker and Michael Allen Walker be investigated.

**54.**     The April 4, 2024 recorded interview conducted by Investigator Reamer—documented in the written Forensic Evidence report authored by Dr. John Delatorre, Psy.D.—reflects the

victim's initial, contemporaneous account of events. *(See Exhibit R-003).* In that interview, the victim stated that Michael Walker threatened her with physical violence if she disclosed their sexual activity, that her mother "was never involved in any sexual activity," and that her mother was afraid of Michael Walker and unaware of what was happening.

55.     This April 4, 2024 recording establishes the victim's baseline disclosures, nearly one year before Plaintiff was accused of any misconduct. In that interview, the victim:

• denied that her mother had ever engaged in sexual activity with Michael Walker;

• identified Michael Walker as the only individual involved in sexual conduct with her; and

• attributed her silence to threats of harm from Michael Walker.

56.     This interview was conducted by Investigator Reamer herself. The statements summarized by Dr. Delatorre were made directly to Reamer and therefore were known to her throughout the period when she later asserted that the victim had "changed" her account. The April 4, 2024 recording does not contain any narrative in which the victim implicated her mother. Rather, it reflects her earliest account, which remained consistent in later disclosures on November 15th 2024 *(See Exhibit R-003)*, March 15th 2025 *(See Exhibit F-005)* and May 29th 2025 that both Shelby and her mother were victims. *(See Exhibit F-006)*

57.     After the April 4, 2024 interview and continuing through 2024 and 2025, the victim gave the same account to multiple individuals, including her advocate Kimberly Kennedy, her grandmother Dolores Jane Roden, her grandfather James Louis Roden Sr., and her brother Colby James Koelle. In each instance, the victim stated that her mother was not involved in any sexual activity and identified Michael Walker as the sole perpetrator. At no time did the victim tell Plaintiff any version of events that differed from these consistent statements.

58.    On **April 6, 2024**, using the Hope House phone, S.J.K. sent a message to Investigator Reamer consistent with her prior statements exonerating her mother. Plaintiff forwarded additional messages provided by Hope House to law enforcement on April 8, 2024, demonstrating full cooperation and transparency. *(See Exhibit R-004).*

59.    On **April 9, 2024**, Officer Reamer conducted a recorded interview of Jamie Renee Walker, Investigator Reamer acknowledged that she was aware of prior domestic violence committed by Michael Allen Walker against Jamie Renee Walker stating that she knew "how bad he hurt you" and referencing his history of violence. Reamer further noted that she had been informed of a physical altercation between Cody Lane Koelle and Michael Allen Walker that resulted from Michael's inappropriate behavior toward Cody's wife, Andrea Martin Koelle. Reamer also stated that she had been told Michael previously expressed that he was "in love" with Shelby, intended to "marry her," and would "kill" Jamie Renee Walker if she interfered or if Shelby disclosed the abuse. In response, Jamie Renee Walker explained that she was afraid to leave the relationship because of these threats and believed Michael would harm her if she attempted to leave.

60.    On **April 9, 2024**, Reamer texted Plaintiff acknowledging that because S.J.K. was a legal adult with no guardian, future communication would occur directly between Reamer and S.J.K.. Plaintiff agreed, explaining he would continue to advocate for S.J.K when needed. *(See Exhibit R-005)*

61.    After **April 9, 2024**, Investigator Reamer ceased communicating with Plaintiff and did not contact him at any point between November 2024 and April 2025 to clarify, verify, or follow up on any information Plaintiff provided to the Guadalupe County Attorney's Office. Prior to applying for the April 7, 2025 arrest warrants, Reamer did not seek interviews, obtain updated

statements, or conduct investigative follow-up with either Plaintiff or the victim. This absence of investigative steps differs from other arrest-warrant applications prepared by Reamer in 2024, where she documented interviews, verified records, and articulated probable cause based on identifiable investigative work.

62.     On **April 22nd, 2024**, at the joint direction of APS and GCSO, S.J.K. underwent a Zoom-based IDD evaluation in a back room on a computer at Hope House—a method inconsistent with accepted standards for assessing individuals with intellectual and developmental disabilities. No in-person standardized testing or disability-appropriate accommodations were provided. The remote evaluation produced findings that conflicted with S.J.K.'s long-documented IDD history and were later refuted by a comprehensive neuropsychological assessment. This flawed evaluation affected subsequent County decisions and reflected a failure to conduct a disability-appropriate inquiry consistent with professional and ADA-compliant practices. This test lead APS to drop the case for S.J.K. leaving her vulnerable and without services.

63.     On **May 13, 2024**, Plaintiff—working with Anchor Point—secured a comprehensive, six hour in-person laboratory psychological evaluation for S.J.K. conducted by licensed psychologist Dr. Daniel K. Sanders using gold-standard, industry-accepted diagnostic practices recognized as the appropriate method for reliably assessing intellectual and developmental disabilities. *(See Exhibit J-001)* Dr. Sanders concluded that S.J.K. met criteria for an Intellectual and Developmental Disability consistent with her longstanding educational and clinical records. Plaintiff provided the full evaluation to APS, the Guadalupe County Sheriff's Office, and the County Attorney's Office. Despite receiving this definitive professional assessment, officials did not correct the earlier flawed remote evaluation or update S.J.K.'s disability status, and took no steps to provide disability-appropriate accommodations.

**64.**    On **May 25th, 2024** instead of updating her disability status or providing appropriate

accommodations, APS—working with Investigator Reamer and Dena Ramos of RCC—removed

S.J.K. from Hope House, prohibited all communication with her family, and concealed her

location. She was later placed at Sanctuary of Surrender (SOS) in Pinehurst Texas over 100 miles

away without disclosure of her documented IDD. Because staff were not informed of her

disability, they misinterpreted her needs and expelled her on July 30th, 2024. During this period,

Investigator Reamer also instructed SOS not to communicate with Plaintiff or any member of

S.J.K.'s family, further depriving her of disability-related support and ADA-protected advocacy.

**65.**    On **May 31, 2024**, Plaintiff filed a missing-person report with the League City Police

Department (Event ID 2024-290377, Date/Time Received: 05/31/24 at 17:36:05) after learning

that S.J.K. had disappeared from Anchor Point without notice to family members or the

advocates assisting her. *(See Exhibit A-011)* The report confirmed that she had been identified as

a sexual-assault victim, yet APS officials refused to disclose her location and stated that she

could "make her own decisions," a position inconsistent with the professionally documented

IDD evaluation conducted by Dr. Sanders and the long-standing disability information

previously known to County officials.

**66**.    APS and Sergeant Reamer subsequently arranged for S.J.K. to be placed at Sanctuary of

Surrender and instructed facility staff that she was not permitted to have contact with any

members of her family or support network from Anchor Point/Hope House. Staff were further

advised that the professionally conducted IDD evaluation performed by Dr. Sanders was "not

valid" and that S.J.K. should be treated as a fully capable adult. At the time of her removal from

Anchor Point, S.J.K. had been in the process of securing disability-appropriate housing and

supportive services through available scholarship and benefits programs. Before these

accommodations could be finalized, Sergeant Reamer removed her from the program and transferred her to Sanctuary of Surrender, despite the documented IDD determination and the need for disability-informed support.

67.    On **June 2** and **June 5, 2024**, Plaintiff emailed Adult Protective Services, the Guadalupe County Sheriff's Office, and Sheriff Arnold Zwicke to document concerns regarding the handling of the investigation involving S.J.K. These concerns included the lack of communication with family members, the removal of S.J.K. from supportive housing, and the apparent disregard of disability-related information already known to County and State officials. *(See Exhibit B-004 and B-005)*

68.    In these communications, Plaintiff provided APS, the County Attorney's Office, and the Guadalupe County Sheriff's Office with the Texas Health and Human Services Best-Practice Guidelines for Determining Intellectual Disability, along with longstanding disability documentation previously available to State and County officials. Plaintiff also provided Dr. Sanders's May 13, 2024 in-person evaluation confirming an Intellectual and Developmental Disability and documentation reflecting that S.J.K. had been receiving SSI benefits on that basis. These materials collectively established that S.J.K. required disability-appropriate accommodations in all interactions with County and State officials.

69.    Plaintiff subsequently filed a formal complaint with the Texas Office of Consumer Affairs (Internal Affairs of DFPS) Complaint #*A052820224.0090017*, again submitting the Best-Practice Guidelines and expressing concern regarding S.J.K.'s removal from supportive housing and the handling of her disability status. After state regulators received this information and APS and GCSO were placed on formal notice of S.J.K.'s professionally documented intellectual and developmental disability. In a **June 5, 2024** email *(See Exhibit B-005)*, Plaintiff expressly

cautioned officials about the risk of retaliatory treatment given his ongoing disability-related advocacy on behalf of an adult with an IDD.

70.      On **June 4, 2024**, Plaintiff received a telephone call from Penny Leuchtag, an attorney with Adult Protective Services (APS). During the call, Ms. Leuchtag stated that she was contacting Plaintiff on behalf of Sgt. Elaine Reamer of the Guadalupe County Sheriff's Office. Ms. Leuchtag informed Plaintiff that, in her understanding, Michael Allen Walker had "fatherly rights" and that S.J.K. was not an individual with intellectual or developmental disabilities. She further stated that the reason S.J.K. could not read or write was due to an assertion that her mother, Jamie Renee Walker had not ensured her attendance in school. Ms. Leuchtag declined to disclose the location where S.J.K. was then residing, stating only that she had been placed in a home that would allow her to live with her child for up to eighteen years. When Plaintiff referenced the prior IDD evaluation conducted by Dr. Sanders, Ms. Leuchtag responded that she believed the report to be invalid. No explanation or supporting documentation was provided for that conclusion.

71.      Between June 2024 and early July 2024, Plaintiff continued to advocate on behalf of S.J.K. by contacting state regulatory agencies, including the Texas Department of State Health Services (DSHS). Plaintiff reported concerns about S.J.K.'s removal from her family and longstanding advocates, the limitations placed on her ability to communicate with them, and the reliance on an approximately twenty-minute virtual IDD evaluation conducted by APS as the basis for determining her disability status and closing her case. Plaintiff further notified state regulators that a subsequent, comprehensive evaluation conducted by Dr. Sanders—prepared after the APS assessment and reaching different conclusions regarding S.J.K.'s disability—had not been acknowledged or incorporated into the ongoing handling of her case. During this

70

period, Plaintiff submitted formal complaints requesting review of these matters and clarification regarding the actions taken in S.J.K.'s placement and evaluation.

72.    On **July 8, 2024**, the criminal cases involving Michael Allen Walker and Jamie Renee Walker were re-evaluated by state authorities. On that date, a Guadalupe County grand jury returned indictments charging Michael Allen Walker with six counts of aggravated sexual assault, first-degree felonies, arising from alleged sexual conduct involving his stepdaughter. Jamie Renee Walker was also indicted on related first-degree felony charges alleging criminal responsibility in connection with the same underlying conduct. Notably, although law enforcement had previously emphasized the victim's intellectual disability during the investigative phase, the indictments themselves did not plead intellectual disability or incapacity as an aggravating element of the offenses.

73.    On **July 31, 2024**, S.J.K. contacted her family reporting that she had been expelled from Sanctuary of Surrender and was homeless. She indicated that she had been pressured to sign paperwork affecting her parental rights in order to obtain basic shelter and support. After her expulsion, local law enforcement placed her and the child in a public shelter until Sergeant Reamer arranged alternative housing. Despite S.J.K.'s documented need for disability-informed services, Sergeant Reamer placed her under the supervision of Andrea Martin Koelle, an individual aligned with Michael Allen Walker and adverse to both S.J.K. and her mother Jamie Renee Walker Andera Martin Koelle transported S.J.K. to Kansas and placed her in a household connected to individuals involved in the events underlying the original investigation, despite the known risks associated with that environment.

74.    At the time of this placement, the residence of Andrea Martin Koelle and Cody Lane Koelle was a two-bedroom mobile home occupied by multiple adults and children, with

information indicating that the household included a large number of residents. The residence had previously drawn the attention of Kansas child-welfare authorities for general safety-related concerns (none reported by Roden Family). Despite the availability of disability-appropriate alternatives—including placement at Hope House, housing with family members in League City, or residence with long-time advocate Kimberly Kennedy—Sergeant Reamer arranged for S.J.K. to live with Andrea Martin Koelle and Cody. Following this transfer, family members and Ms. Kennedy experienced sharply restricted access to S.J.K., limiting her contact with the individuals who had previously assisted her with disability-related support and advocacy.

75.    Between May 2024 and November 2024, Plaintiff had no meaningful contact with S.J.K. During this period, while residing in the home of Cody Lane Koelle, S.J.K. experienced multiple medical emergencies requiring hospital evaluation—health concerns she had not previously exhibited. She was also involved in several conflicts within the household during the same timeframe. One incident resulted in her arrest; the charge was later dismissed after records showed that she had acted in self-defense while protecting her infant child.

76.    In **September 2024**, Cody Lane Koelle received a $44,000 settlement from a workplace injury in a case Plaintiff had assisted him with the prior year. According to statements made by Andrea Martin Koelle *(See Exhibit I-008).*, the settlement funds were spent within approximately one month. During that period, Cody provided substantial sums of money to several women and purchased a vehicle for an individual identified as Summer Ann Myers. He also used part of the settlement to equip his own vehicle with red and blue emergency-style lights. On September 27th, 2024 Cody was arrested on charges including impersonating a police officer, making a false report, destroying evidence, and possession of unauthorized emergency lighting. *(See Exhibit A-005)* After Cody's arrest, Andrea Martin Koelle contacted Plaintiff

seeking financial assistance for bail. Plaintiff recorded the phone call, during which Andrea

Martin Koelle stated she was unaware of how the settlement funds had been used and relayed

additional serious allegations concerning Cody's conduct, which included the allegation of by

Summer Ann Myers against Cody for rape. *(See Exhibit I-008)* Plaintiff provided this recorded

phone call to the Guadalupe County Attorney's Office and the Guadalupe County Sheriff's

Office.

77.     At the time of the September 2024 and early 2025 events, the victim, S.J.K., had been

placed in the Kansas home of her brother, Cody Lane Koelle. Family members understood this

placement to be part of what County officials described as "witness protection," and they were

instructed that the victim would not be permitted to return to Texas during the pendency of the

related criminal proceedings.

78.     Prior to this placement, two alternative living arrangements had been offered to County

officials. First, the victim could have returned to League City, Texas, where she had long-

standing family support, familiarity with the community, and access to safe housing resources.

Second, her lifelong advocate, Kimberly Kennedy, offered to house her on church property in

South Carolina through Morning Star Ministries, where the victim had previously received

pastoral support and where Kennedy had already secured a residence for her.

79.     Both proposed alternatives involved stable environments with individuals who had

longstanding involvement in the victim's care. Neither option was permitted. Instead, the victim

was placed in a crowded Kansas residence occupied by multiple unrelated adults, including

individuals with known criminal backgrounds or prior law-enforcement contacts.

80.     On September 15, 2024, while reviewing recorded calls from the Guadalupe County Jail,

Defendant Reamer described hearing the victim (S.J.K.) in "obvious distress" as she attempted to

confide in her mother, Jamie Renee Walker, about her current living conditions in the Kansas residence. Defendant Reamer documented this observation in her later arrest-warrant affidavit for the tampering charge against Jamie Renee Walker *(See Exhibit A-015)*

81.    Three days later, on September 18, 2024, emergency medical services were dispatched to the Kansas residence after the victim (S.J.K.) lost consciousness. EMS personnel documented that upon arrival the victim was unresponsive, remained unconscious during transport, and exhibited white foam coming from her mouth. She was transported by ambulance to Dodge City General Hospital for emergency evaluation. When Plaintiff later texted Cody Lane Koelle to ask whether the victim was safe following the incident, Cody responded that the victim was "faking," despite the EMS report noting that she was unconscious at the scene and during transport, with visible white foam present. *(See Exhibit K-014)*

82.    Despite this indication that the victim was experiencing distress in her placement location, no steps were taken at that time to evaluate the victim's safety or to reassess the suitability of the placement. Within days, criminal activity involving other residents resulted in S.J.K calling police. On September 21, 2024, Summer Ann Myers—one of the adults living in the home—was arrested for committing Battery against the victim (S.J.K.). *(See Exhibit A-016.)*

83.    Five days later, on September 26, 2024, the same individual, Summer Ann Myers, was again arrested for violating a protective order involving the victim. *(See Exhibit A-017.)* These events further demonstrated instability and safety concerns within the residence, but the placement remained unchanged.

84.    In early 2025, additional safety concerns surfaced. During a recorded phone call on March 18, 2025, Cody Lane Koelle stated that on January 15, 2025 he had contacted law

enforcement regarding drug activity in the home, including cocaine use and the presence of controlled substances by resident Jesse Ross Cole. Cody also stated that numerous adults were staying in the home during this period.

85.    On April 1, 2025, in a recorded call provided to the County Attorney's Office, Cody further stated that Jesse Ross Cole was "using" the victim for sex while she was residing in the home. *(See Exhibit B-024.)* This call was submitted alongside a mandated report requesting immediate safety intervention for the victim.

86.    When reviewing these events collectively—including the September 15, 2024 jail-recording description, the September 21, 2024 and September 26, 2024 arrests, the March 18, 2025 report of drug activity, and the April 1, 2025 disclosure of sexual exploitation—the placement of the victim in the Kansas residence constituted a series of documented safety risks. Because County officials had declined the safer living arrangements previously offered in League City and South Carolina, they retained direct responsibility for the victim's welfare during the period in which these incidents occurred.

87.    After reviewing the materials reflecting the victim's distress on the September 15, 2024 jail call and the subsequent incidents of violence, drug activity, and sexual exploitation occurring in the residence where the victim had been placed, Defendant Reamer did not take steps to reassess the victim's safety or living placement. Instead, on April 7, 2025—six days after Plaintiff submitted a mandated report documenting these conditions—Defendant Reamer prepared and swore an arrest-warrant affidavit accusing Plaintiff of First-Degree Felony Tampering with a Witness.

**B. November 2024 to March 2024 – S.J.K. Asking for Assistance**

88.    In **October 2024**, during preparation of Jamie Renee Walker's criminal-defense case, attorney Kelly Pittl requested statements from individuals with firsthand knowledge of the events involving Jamie Renee Walker and Michael Walker. S.J.K. independently reached out to Plaintiff for assistance preparing her affidavit. On November 7th and November 8th, 2024 S.J.K. sent detailed text messages and voice messages that was later provided to the Sheriff Office to prove that S.J.K. was the one seeking Plaintiff help and was the one saying her IDD mother was innocent. Plaintiff typed the words she dictated nearly word for word she left in her text messages to Plaintiff and returned the draft to her. S.J.K. executed her notarized affidavit voluntarily on November 15, 2024 in Dodge City Kansas over 600 miles away from Plaintiff. *(See Exhibit K-001 and F-004)*

89.    Cody Koelle also independently requested assistance drafting his affidavit regarding the abuse their mother suffered. Plaintiff transcribed Cody's dictated statement and emailed it back to Cody with instructions to verify accuracy before signing. Cody executed his affidavit voluntarily on November 15, 2024 in Dodge City Kansas over 600 miles away from Plaintiff. *( R-006 and B-054)*

90.    Between November 2024 and March 2025, S.J.K. submitted new sworn affidavits and multiple video-recorded statements affirming her mother's innocence and reiterating the same account she had consistently provided to authorities. In each statement, S.J.K. confirmed that she was speaking voluntarily and was not coerced. Plaintiff forwarded these materials to the Guadalupe County Attorney's Office at S.J.K.'s request as part of his role as her chosen advocate. *(See Exhibit F-003 and F-005)*

91.    **On March 18, 2025**, Plaintiff recorded a twenty-five-minute phone call with Cody Lane Koelle. *(See Exhibit I-001)* During the call, Cody admitted he had willingly signed his

November 15, 2024 affidavit, acknowledged its truth, and reaffirmed its substantive contents. Cody also stated that he was being pressured by officials in the County Attorney's Office to retract his prior affidavit, support Michael Walker, and testify against his mother. He further admitted that he had no firsthand knowledge of events in Seguin. Plaintiff sent this recording to the County Attorney's Office on March 19, *2025 (See Exhibit B-011)*. The recording was not referenced in the arrest-warrant affidavits issued against Plaintiff or against his elderly father.

92.    On **March 10, 12, and 19,** 2025, at S.J.K.'s request *(F-003 and F-005)*, Plaintiff recorded three separate video statements from her. In each video, S.J.K. stated that she was acting voluntarily, affirmed that Plaintiff had not pressured or bribed her, and reported ongoing difficulty reaching county officials. She also stated that she had been unable to communicate directly with the County Attorney's Office for months. In the March 12 video, S.J.K. reported that Andrea Martin Koelle had impersonated her in communications, intercepted her mail, and restricted her outside contact, and that Investigator Reamer had previously attempted to persuade her to alter her prior account given on April 4, 2024. These videos were provided to the County Attorney's Office prior to the arrest, but none were referenced in the April 7, 2025 arrest-warrant affidavit.

93.    On **March 15, 2025,** S.J.K. signed a sworn and notarized affidavit in Dodge City, Kansas, confirming that her March 10 and March 12 video statements were accurate and voluntary *(See Exhibit F-005)*. This affidavit was filed in her mother's criminal case on March 20, 2025—approximately three weeks before Plaintiff's arrest—but it was not referenced in Investigator Reamer's April 7th, 2025 affidavit.

94.    On **March 19, 2025,** S.J.K. spoke by phone with a Victim Assistance Coordinator named Abigail in the County Attorney's Office *(See Exhibit I-003)*. The employee confirmed that the

office had not had any documented contact with S.J.K. since October 30, 2024—more than four months earlier. During the call, S.J.K. reported that she had been unable to reach anyone at the office and that her efforts to provide information were not being acknowledged. Plaintiff recorded the call and forwarded it to the County Attorney's Office before his arrest. Despite this, Investigator Reamer later stated in her April 7, 2025 affidavit that Plaintiff was misleading S.J.K. by telling her that no one from the office was contacting her, even though the office itself had acknowledged the lack of communication.

95.    Beginning **March 12, 2025**, Plaintiff initiated email communications with Assistant County Attorney Jessica Johnson. Plaintiff provided recordings of S.J.K.'s statements and summarized her requests to testify. Between March 19 and March 21, 2025, these communications were expanded by Jessica Johnson to include County Attorney David Willborn, First Assistant County Attorney Jonathan Amdur, Victim Coordinator Ileen Rangel, and the Chief of the Family Justice Unit Maritza Stewart. By March 21, all senior supervisory personnel within the County Attorney's Office were receiving Plaintiff's communications about S.J.K.'s statements and ADA-related concerns.

96.    Publicly available materials from the Guadalupe County Attorney's Office outline the qualifications required for attorneys assigned to felony matters. *(See Exhibit L-017)* An employment notice for the position of Assistant County Attorney – Felony Division states that applicants must hold a J.D., be licensed to practice law in Texas, demonstrate a significant understanding of criminal law, and possess a minimum of three years of prosecution experience or comparable criminal-law experience, including three or more felony jury trials.

97.    The same employment notice further explains that felony prosecutors are responsible for reviewing law-enforcement files, making filing decisions, interviewing witnesses, examining

evidence, presenting cases to the grand jury, conducting pretrial hearings, and interpreting complex constitutional provisions. These published expectations reflect the level of training, experience, and responsibility assigned to attorneys in the County Attorney's Office during the period in which Plaintiff's case and the related matters involving S.J.K., Jamie Renee Walker, and Michael Allen Walker were handled.

98.    As of **March 21, 2025**, senior officials in the County Attorney's Office had been directly notified that:

**(1)** S.J.K. had submitted multiple recorded statements and affidavits for consideration in ongoing proceedings;

**(2)** S.J.K. had been unable to reach prosecutors since October 2024; and

**(3)** Plaintiff was acting as her family advocate and requesting ADA-compliant communication due to her intellectual disability. Plaintiff's arrest occurred less than three weeks later, on April 7, 2025.

99.    On **March 21, 2025**, Plaintiff informed prosecutors that Cody Lane Koelle had recently been charged in Kansas with offenses including false impersonation of a police officer, criminal restraint, interference with law enforcement, destruction of evidence, and filing false reports, and that he was on a court-ordered diversion agreement. *(See Exhibit B-014)* Plaintiff further advised that S.J.K. had raised concerns regarding impersonation, interference with her communications, and other actions affecting her ability to contact officials.

100.    Around this same period, Assistant County Attorney Jessica Johnson filed a motion to increase Jamie Renee Walker's bond from $40,000 to $1,000,000 without interviewing either S.J.K. or Jamie Renee Walker *(See Exhibit E-009)* regarding the allegations referenced in the motion. Johnson also issued subpoenas to Plaintiff, his father, his mother, Plaintiff's wife, and a

family advocate, requiring long-distance travel at significant personal cost. Days before the scheduled hearing, the proceeding was canceled, and on April 7, 2025, new first-degree felony arrest warrants were issued for Plaintiff, his father, and Jamie Renee Walker *(See Exhibits E-010 thru E-015)*

101.    On **March 21, 2025**, Plaintiff submitted a letter to the district court presiding over Jamie Renee Walker's case describing the issuance of subpoenas to elderly and out-of-state witnesses who had no direct knowledge of the events underlying the bond modification motion. Plaintiff expressed concern that the subpoenas were being used improperly and placed a significant burden on the witnesses. *(See Exhibit E-002)*

102.    On **March 22, 2025**, Plaintiff sent information to law enforcement in Kansas at their request, including contact information for the Guadalupe County Attorney's Office and GCSO, and copied multiple officials within the County Attorney's Office.*(See Exhibit B-025)* Plaintiff relayed that S.J.K. had filed a police report raising concerns about interference with her communications and other issues affecting her ability to reach officials. Plaintiff also informed authorities that S.J.K. had received no direct contact from the County Attorney's Office for several months and that the office appeared to be relying on individuals with conflicting interests for updates about her.

103.    On **March 23, 2025**, Plaintiff submitted a written ADA accommodation request to the County Attorney's Office on S.J.K.'s behalf, identifying her as an adult with a significant intellectual disability requiring communication-related accommodations. *(See Exhibit E-001)* Plaintiff requested simplified communication, extended response times, and appointment of a support person or similar accommodation so that S.J.K. could communicate effectively with prosecutors. This request was submitted approximately two weeks before Plaintiff's arrest.

104.    Plaintiff has served as an advocate for individuals with intellectual and developmental disabilities for more than twenty years and, during that time, had never encountered a situation in which an IDD adult was unable to obtain any communication or acknowledgement from the agencies responsible for her safety.*(See Exhibit R-008)* For three weeks, Plaintiff made repeated efforts to facilitate communication on behalf of S.J.K., who was attempting to engage with officials regarding matters affecting her. Despite these efforts, Plaintiff received no meaningful response from the County Attorney's Office or the Guadalupe County Sheriff's Office. Balancing these circumstances with his own professional and family obligations, Plaintiff stepped back from his advocacy role and sought formal assistance from the court to ensure that S.J.K., as an adult with an intellectual disability, had access to appropriate representation and support.

105.    On **March 26, 2025**, Plaintiff submitted a written request to the County Attorney's Office asking that the court appoint a Guardian ad Litem for S.J.K. due to her disability and difficulty navigating legal processes *(See Exhibit B-022 and B-023)*. Plaintiff stated that he was a non-attorney advocate and that a neutral professional was necessary to protect her participation rights during the ongoing criminal proceedings. This request was made less than two weeks before Plaintiff's arrest on April 7, 2025.

106.    No Guardian ad Litem was ever appointed for S.J.K., and no ADA accommodations were implemented in response to the requests sent on March 26th, 2025.

107.    Throughout this period, Plaintiff consistently encouraged investigators and prosecutors to communicate directly with S.J.K. and to consider her statements, affidavits, and psychological evaluations. Plaintiff did not attempt to influence her communications; rather, he facilitated her efforts to engage with the County Attorney's Office and repeatedly asked that her input be reviewed using disability-appropriate procedures.

**C. Retaliation and Arrest (March – April 2025)**

**108.**    On **March 31, 2025**, a psychological evaluation of Jamie Renee Walker conducted in February 2025 by forensic psychologist Dr. John Delatorre was filed in her pending criminal case in Guadalupe County. *(See Sealed Exhibit J-002)*. The evaluation indicated that Jamie Renee Walker had significant cognitive and trauma-related impairments requiring disability-related communication assistance. The report further stated that her functional limitations were consistent with longstanding concerns previously raised in court filings.

**109.**    Dr. Delatorre's evaluation referenced prior interviews conducted by Investigator Elaine Reamer, including the April 4, 2024 video-recorded interview of S.J.K. *(See Exhibit P-002a)* This interview occurred more than seven months before Plaintiff became involved in assisting with County Attorney communications and contained information relevant to the allegations later asserted by the County. The report of the psychological evaluation was formally served on Assistant County Attorney Jessica Johnson on March 31, 2025, and placed in the court file for Jamie Rene Walker's case 24-1775-CR-B.

**110.**    The April 4, 2024 video-recorded interview of S.J.K. had been part of the investigative record for nearly a year. The recording contained material information that directly contradicted the allegations later asserted against Plaintiff and demonstrated that the statements attributed to Plaintiff as "influencing" or "coaching" were in fact statements known to Investigator Reamer months before Plaintiff ever assisted with communications. This recording was brought to the attention of the Guadalupe County Attorney's Office multiple times between April 2024 and July 2024, giving County officials prior notice of information inconsistent with the theory of prosecution advanced in April 2025.

**111.**    On April 2, 2025, during a recorded telephone conversation between court-appointed defense counsel Kelly Pittl, Defendant Jamie Renee Walker, and James Louis Roden Sr., Mr. Pittl confirmed—at approximately the 5 minute, 3 second mark of the recording—that he had previously emailed Assistant County Attorney Jessica Johnson raising concerns that Shelby Jane Koelle had stated, long before Plaintiff's involvement, that her mother was innocent and had no involvement in the alleged abuse. Mr. Pittl acknowledged that this communication occurred during the period in which he represented Ms. Walker, beginning on April 18, 2024 and continuing through at least the time of her indictment on July 8, 2024, and potentially as late as October 31, 2024. This recorded admission independently confirms that prosecutors had actual notice months before Plaintiff's arrest that the victim's exculpatory statements were consistent and predated Plaintiff's advocacy. *(See Exhibit I-024a).*

**112.**    Despite having possession of the April 4, 2024 recording, the County Attorney's Office continued to rely on statements from Michael Allen Walker family and Andrea Martin Koelle., who alleged that Jamie Renee Walker was responsible for the events underlying the prosecution. At the time these allegations were being evaluated, both individuals had a documented history relevant to the investigative context, including prior interpersonal conflicts and tensions within the family. During Jamie Renee Walker's April 9, 2024 interview, Investigator Reamer acknowledged awareness of a physical altercation between Cody Lane Koelle and Michael Allen Walker that arose after Michael allegedly flirted with or made advances toward Andrea Martin Koelle. This history, together with prior reports indicating strained relations between Jamie Renee Walker and both Michael and Andrea Martin Koelle, provided information bearing on potential bias, motive, or animosity that could affect the reliability of their statements.

Notwithstanding these circumstances, prosecutors proceeded to credit their accusations despite contradictory information already in the County's possession.

113.    During this same period, public records showed that Michael Allen Walker had a prior history of serious criminal charges involving violent conduct. This information was available to both the Sheriff's Office and the County Attorney's Office at the time they already possessed the April 4, 2024 recording, and it provided additional reason to question the credibility of the narrative later relied upon to initiate the charges against Plaintiff and his elderly father. *(See Exhibit A-014)*

114.    At the time the allegations against Jamie Renee Walker were being advanced, she had a longstanding history of cognitive and developmental limitations documented in family records and sworn affidavits submitted by her parents. *(See Exhibit F-009)* Although her formal psychological evaluation was not completed until February 2025, her family had consistently reported that she required educational and functional support from childhood. Prosecutors were therefore on notice that accusations portraying her as orchestrating complex misconduct were inconsistent with her documented developmental history.

115.    By the time Dr. Delatorre's psychological evaluation was completed and filed in March 2025, the Sheriff's Office and County Attorney's Office were already in possession of: (a) the April 4, 2024 recorded interview of S.J.K., which contained information materially inconsistent with the allegations later pursued; (b) repeated references to that recording from defense counsel; and (c) an investigative record showing that the recording predated Plaintiff's involvement by many months. Despite this, the recording was omitted from the April 7, 2025 arrest-warrant affidavit.

116.    Because the April 4, 2024 recording addressed the same subject matter later attributed to alleged "tampering," and because the recording was created months before Plaintiff had any involvement in assisting S.J.K. with communications, it was not possible for Plaintiff to have influenced or caused the substance of the information provided. The April 4 recording thus directly undermined the factual basis of the allegations asserted against Plaintiff.

117.    As of **March 31, 2025**—the date the psychological evaluation was filed—county officials were on clear notice that the information provided by S.J.K. had remained consistent over time and that the subject matter addressed in the April 4, 2024 recorded interview predated Plaintiff's advocacy to reestablish communications with County Attorney's, at the request of S.J.K, by many months. This timeline placed prosecutors on notice that the statements later attributed to alleged "tampering" existed long before Plaintiff was asked to assist with communications and advocacy between November 2024 and April 2025. *(See Exhibit E-003)*

118.    Both Jamie Renee Walker and S.J.K. had documented cognitive and developmental limitations requiring disability-related communication support and accommodations. *(See Exhibit J-001 and J-002)* Despite having this information, county officials implemented no disability-related measures for either individual following the filing of the psychological evaluation.

119.    The filing of the psychological report confirmed that both the Sheriff's Office and the County Attorney's Office possessed independent evidence showing that the information provided by S.J.K. was consistent over time and originated prior to any communications advocacy efforts by Plaintiff. Despite this, the County proceeded with charging Plaintiff without addressing or reconciling this material exculpatory evidence.

85

120.    References to disability-related information in this Complaint are included solely to establish that county officials had notice of the need for accommodations and were required under federal law to provide disability-appropriate communication and support. No confidential medical or diagnostic details are disclosed.

121.    On **April 1, 2025**, Plaintiff submitted a mandated-report email to the Guadalupe County Attorney's Office and multiple associated officials. *(See Exhibit B-024)* In that report, Plaintiff stated that S.J.K., an adult with documented cognitive and developmental limitations, was being sexually exploited while residing in the home of Cody Koelle and another adult male. Plaintiff included an audio recording in which Cody acknowledged that he was aware she was being sexually used by a known drug-involved individual living in the residence. *(See Exhibit I-001)* Plaintiff explained that, as a certified Texas educator and mandated reporter under state law, he was legally required to report suspected abuse of a vulnerable adult. Because he feared retaliation for filing the report, Plaintiff expressly requested that his identity be protected.

122.    Between March 23 and March 26, 2025, Plaintiff transmitted emails containing exculpatory evidence, disability-related concerns, and mandated-report information to multiple senior officials, including Elected County Attorney David Willborn, First Assistant County Attorney Jonathan Amdur, and Chief Prosecutor Maritza Stewart. Several of these emails were subsequently distributed to all supervisory personnel previously copied on earlier communications. These submissions placed County leadership on direct notice of: (1) the need for disability-related accommodations, (2) Plaintiff's protected advocacy activities, and (3) significant discrepancies in the statements being used in the criminal proceedings.

123.    On **April 5, 2025**, the victim left Plaintiff a recorded voicemail stating that Victim Coordinator Ileen Rangel told her, "your uncle said you were pregnant." At that time, the victim

was residing with an adult male later identified as Jesse, who had been reported to County authorities as the individual responsible for her second pregnancy and who had prior involvement with law enforcement. Plaintiff had not disclosed this information to the victim, to Jesse, or to any other third party. Prior to the disclosure, Plaintiff's identity as the source of the pregnancy information was known only to County personnel involved in the April 1 report. The disclosure occurred two days before Investigator Reamer applied for the April 7, 2025 arrest warrant.

124.    On **April 7, 2025**, Investigator Elaine Reamer executed an arrest-warrant affidavit seeking to charge Plaintiff with First-Degree Felony Witness Tampering *(See Exhibit A-001).* At that time, the County Attorney's Office possessed—and the investigative team therefore had reasonable access to—a substantial body of exculpatory material demonstrating that the victim's narrative had been consistent for nearly a full year. These materials included:

• the **April 4, 2024 forensic interview** conducted personally by Investigator Reamer, in which the victim stated unequivocally that her mother, Jamie Renee Walker, "was never involved in any sexual activity";

• the **November 15, 2024 sworn affidavit** reiterating her mother's innocence;

• three voluntary March 2025 video statements affirming that her statements were voluntary and consistent;

• **the March 15, 2025 notarized affidavit** declaring: "I make this statement freely and voluntarily, without coercion, duress, or promise of benefit";

• contemporaneous phone records showing that the victim—not Plaintiff—initiated virtually all contact;

• and the **March 19, 2025 three-way call** in which a County employee confirmed the office had not communicated with the victim since October 30, 2024.

Despite this, none of these materials were acknowledged or referenced in the April 7 affidavit.

125.    Additionally, just six days earlier, on April 1, 2025, Plaintiff submitted a formal mandated-abuse report under Texas Family Code § 261.101. *(See Exhibit A-024.)* The report documented that the intellectually disabled victim—who had previously been under County-arranged supervision—was pregnant a second time and identified Cody Lane Koelle as the individual exercising control over the victim's living environment at the time of the renewed exploitation. Plaintiff requested anonymity, as required for mandated reporters. The report placed Cody Koelle at the center of the renewed abuse and exposed the County to liability for its failure to protect an intellectually disabled adult.

126.    Despite this report, and despite its direct relevance to motive, context, and Plaintiff's lawful role as a mandated reporter, the April 7 arrest-warrant affidavit omitted the mandated report entirely. Instead, in subsequent bond conditions, the County designated Cody Lane Koelle as a "victim" of Plaintiff—an action directly inconsistent with the County's own possession of a mandated report implicating Cody Koelle in the victim's renewed exploitation. *(See Exhibit A-001 pg. 17)*

127.    This omission prevented the magistrate from knowing that Plaintiff's communications occurred within the protective scope of a statutory reporting duty and advocacy for an IDD adult—not as an attempt to interfere with a criminal proceeding.

128.    Despite possessing the above evidence, the April 7 affidavit did not identify any statement by Plaintiff that satisfied any element of Texas Penal Code § 36.05. The affidavit

generically referenced "videos, transcripts, and recorded phone calls provided by the County
Attorney's Office," but omitted that in every recording the victim stated—without hesitation—
that she was speaking voluntarily and that Plaintiff had not pressured or coerced her. The
affidavit further omitted that Plaintiff explicitly asked whether she was being coerced and she
answered, "No, no sir, I am not." No reasonable officer could watch these videos and conclude
that coercion had occurred.

129.    The affidavit also made a conclusory and misleading assertion that Plaintiff "has
repeatedly been in contact with the victim," implying that Plaintiff initiated improper or coercive
communication. That assertion is directly contradicted by objective carrier records. As shown in
Exhibit R-007, between October 28, 2024 and April 4, 2025, Shelby Jane Koelle initiated
approximately 165 incoming phone calls to Plaintiff. Plaintiff deliberately did not answer or
ignored approximately 145 of those calls, answered only 20 incoming calls, and initiated only
two outbound calls to Shelby during the entire period. In addition, Plaintiff returned
approximately 35 calls, typically for the purpose of redirecting Shelby to her long-time advocate,
Kimberly Kennedy, or to address welfare-related concerns—not to influence testimony or
interfere with any proceeding. The phone records contain no evidence of repeated or improper
initiation by Plaintiff and instead demonstrate sustained restraint and avoidance by Plaintiff
despite persistent inbound contact from the alleged victim. No evidence cited in the affidavit
supports the implication that Plaintiff repeatedly contacted Shelby or exercised improper
influence over her communications. *(See Exhibit R-007.)*

130.    In both the arrest affidavit for Plaintiff and the parallel affidavit for his father,
Investigator Reamer did not identify any specific individual—prosecutor, paralegal, investigator,
or staff member—as the source of the materials she claimed to have reviewed. Instead, the

affidavit relied on vague institutional labels ("from the County Attorney's Office") without describing what was provided, when, or by whom. The affidavit did not quote or attach any of the referenced materials.

**131.**    The affidavit further relied on narrative statements supplied by the defense attorneys for Michael Walker, the criminal defendant in the related aggravated sexual-assault proceeding where S.J.K is the victim. The affidavit did not disclose that these defense-generated materials were unverified, that they contradicted the victim's own forensic interview, or that the affiant conducted no independent corroboration of any statements originating from Walker's counsel (John Green).

**132.**    The affidavit reflected no independent investigative steps taken by Investigator Reamer. It reported no witness interviews, no victim interviews, no review of the November 15 or March 15 affidavits, no review of the March 10–19 videos, no phone-record analysis, no re-contact with the victim, and no attempt to reconcile discrepancies between defense-counsel narratives and the victim's consistent statements.

**133.**    By attributing key factual assertions to "the County Attorney's Office" and Walker's defense attorneys (John Green), the affidavit blended prosecutorial interpretation with defense-generated materials while omitting all victim-initiated evidence and all prior forensic statements. The magistrate was not informed that the victim's earliest and most reliable statements—given directly to Investigator Reamer herself—flatly contradicted the narrative advanced in the warrant affidavit.

**134.**    The affidavit further failed to disclose that the forensic psychologist's February 24th, 2025 evaluation *(See Exhibit J-002)* confirmed that both the victim and her mother were IDD,

that their narratives were consistent, and that both Jamie and S.J.K. were victims rather than perpetrators. This omission removed critical context about the vulnerability of the witness and Plaintiff's lawful role as an ADA advocate and mandated reporter.

135.    Because the affidavit withheld every piece of evidence suggesting innocence and relied solely on curated fragments drawn from defense attorneys and prosecutors, the magistrate received a materially incomplete, misleading, and distorted record. No reasonably trained officer—and certainly no officer with a Master TCOLE License—could have concluded that this narrative satisfied the Fourth Amendment's probable-cause requirement.

136.    On **April 7, 2025**, arrest warrants were issued for Plaintiff and his father, James Louis Roden Sr. *(See Exhibit A-001 and A-003)* Each warrant carried a preset bail amount of $100,000.  No individualized bond assessment was performed for either arrestee, despite the requirements of Texas Code of Criminal Procedure arts. 17.15 and 15.17. Plaintiff—a schoolteacher with no criminal record, no history of flight, and no alleged violent conduct—lived more than six hundred miles from the individuals referenced in the bond conditions as "victims" and presented no risk of danger. When Plaintiff and his elderly father appeared before the magistrate, the magistrate stated that the bond amount had already been preset by Judge Old and that no argument or evidence regarding bail would be heard.

137.    On April 8, 2025 at 4:00 a.m., Plaintiff voluntarily surrendered at the Guadalupe County Jail. Upon arrival, Plaintiff was informed that the $100,000 bail had been preset and would not be reviewed at his magistrate proceeding. Plaintiff was not permitted to present any evidence relevant to bail, flight risk, or community ties. No probable-cause determination was conducted after the arrest, and no examining trial was scheduled. This treatment occurred notwithstanding Plaintiff's lack of any prior criminal history, his longstanding status as a public servant, the

absence of any allegation of violence or direct witness contact, and the fact that the alleged

witnesses resided more than 600 miles away. By contrast, similarly charged defendants in

Guadalupe County with documented criminal histories and alleged conduct occurring locally

were afforded substantially lower bonds and prompt post-arrest judicial review. *(See Exhibit A-001)*

138.    Guadalupe County did not present any of the three related tampering charges arising from

this investigation to a grand jury. Jamie Renee Walker remained incarcerated for approximately

**252 days** on the tampering charge without indictment, charge was declined with prejudice. James

Louis Roden Sr. remained subject to felony arrest restraints for approximately **238 days** before

the charge was declined without prejudice. James Louis Roden Jr. remained charged for

approximately **102 days** before declined without prejudice. All three cases arose from the same

investigation, involved the same investigating officer, mostly relied on the same alleged witness.

At no point during these periods were the charges submitted for grand-jury consideration nor

allowed for judicial review to prove probable cause, leaving Plaintiff and his family branded with

1st degree felony arrest on public records. Each case was declined either on the eve of an

Examining Trial or when judicial review was imminent.

**D. Continuing Harm and Post-Arrest Violations (April – July 2025)**

139.    On **April 9, 2025**, Plaintiff was terminated from his teaching position with Pasadena

Independent School District as a result of his arrest. He immediately lost his salary, health

insurance, and retirement contributions, and his Texas educator certification was placed under

investigation. The termination caused severe financial hardship and significant professional

stigma within the education community. *(See Exhibit N-015)*

**140.** On May 13, 2025, Plaintiff mailed a certified letter with return receipt to Guadalupe County Sheriff Joshua Ray requesting a formal investigation into the actions of Sergeant Elaine M. Reamer. The letter enclosed a detailed written complaint. *(See Exhibit E-005)*

**141.** In the written complaint, Plaintiff explained that he had been arrested for alleged witness tampering despite having previously provided both the County Attorney's Office and the Guadalupe County Sheriff's Office with extensive materials. These materials included multiple sworn affidavits, video-recorded statements, and the April 1, 2025 mandated report documenting concerns about renewed sexual exploitation involving an adult with an intellectual disability.

**142.** Plaintiff asked why neither he nor S.J.K. had ever been interviewed, why exculpatory recordings and affidavits were omitted from the arrest-warrant affidavit, and why his mandated report—submitted in his capacity as a Texas educator and state-mandated reporter—was never investigated. He also asked why, six days after submitting that report, a first-degree felony arrest warrant was issued against him.

**143.** Plaintiff further informed Sheriff Ray of the professional and personal consequences that resulted from the arrest. He provided additional supporting materials, including text messages showing that S.J.K. had independently initiated contact and voluntarily provided the statements later memorialized in her November 15, 2024 affidavit. *(See Exhibit K-001)*

**144.** The Sheriff's Office did not issue a response to Plaintiff's certified letter. No administrative, internal-affairs, or criminal review was initiated following Plaintiff's written request.

**145.** On **May 29, 2025**, family advocate Kimberly Kennedy helped S.J.K. prepare, understand, and execute a sworn and notarized affidavit in Dodge City, Kansas. *(See Exhibit F-006)* S.J.K.

sent the affidavit by certified mail to Guadalupe County Attorney David Willborn with written instructions that it be placed in the case files for the criminal matters involving Jamie Renee Walker, Michael Allen Walker, Plaintiff, and Plaintiff's father. Postal records confirm delivery to the County Attorney's Office in on June 4th, 2025.

146.    In the sworn affidavit, S.J.K. reaffirmed that her prior affidavits, recorded interviews, and video statements were accurate, voluntary, and reflected her own words. She stated that Plaintiff had not attempted to influence her statements and that she required assistance because she cannot independently read or write. She further stated that Plaintiff was innocent of the conduct for which he had been arrested and that he had acted only in the role she requested—helping her communicate with officials when she was unable to reach the County Attorney's Office.

147.    In the affidavit, S.J.K. also explained that Plaintiff's involvement arose from her difficulty reaching County prosecutors directly and her need for help converting her spoken statements into written form. She affirmed that Plaintiff wrote down only what she stated, that he did not tell her what to say, and that she wished for her statements to be heard and reviewed by the officials responsible for the cases affecting her and her mother.

148.    In her May 29, 2025 sworn affidavit, S.J.K. concluded by stating that arresting individuals who had assisted her was "wrong," that failing to consider her sworn statements was "wrong," and that she intended to continue providing truthful accounts as often as necessary.

149.    Despite receiving this affidavit via certified mail return receipt *(See Exhibit M-003)*, the Guadalupe County Attorney's Office did not take steps to correct the record, notify any court, or dismiss the charges then pending against Plaintiff or his father. The affidavit was not disclosed to

the criminal court presiding over Jamie Renee Walker's case, nor was it provided to Jamie Renee Walker's defense counsel before the June 18, 2025 bond hearing.

150. During the same period, in the criminal case involving Michael Allen Walker, county prosecutors was again characterizing S.J.K.'s interactions with Michael Allen Walker as a "consensual" adult relationship rather than as sexual exploitation of a disabled adult. This shift occurred despite medical records, psychological evaluations, school records, and prior investigative materials confirming her documented intellectual and developmental disability and her limited capacity to consent under Texas Penal Code § 22.011(b)(4).

151. In Michael Allen Walker's case, County officials did not highlight or emphasize the disability status that had been repeatedly documented in their possession, including the April 4, 2024 recorded interview, the May 13, 2024 clinical evaluation by Dr. Daniel Sanders, school and medical records, and Plaintiff's repeated ADA-related communications. County filings and hearing presentations during this period treated S.J.K. as a fully capable adult rather than as an intellectually disabled sexual-assault victim.

152. On **June 11, 2025,** Plaintiff sent a follow-up letter *(See Exhibit E-005)* by certified mail and return receipt to Guadalupe County Sheriff Joshua Ray. In this correspondence, Plaintiff noted that he had previously submitted a detailed request seeking a formal review of the circumstances leading to his April 2025 arrest and the first-degree felony charge filed against him, but had not received any response. The letter reiterated Plaintiff's concerns and requested acknowledgment or review from the Sheriff's Office. Plaintiff enclosed a copy of his recently updated book, *Empowered to Advocate: Navigating IDD Rights and Protections in Texas*, explaining that it was intended to assist law-enforcement personnel in understanding federal and state protections involving individuals with intellectual and developmental disabilities and the

legal rights of mandated reporters and advocates. Plaintiff emphasized that his outreach was not accusatory, but a plea for transparency and dialogue concerning how the charge had been initiated. He expressed his ongoing willingness to discuss the matter and requested that the Sheriff's Office evaluate the handling of his case.

**153.**    On **June 11, 2025**, Plaintiff submitted a written request—both by email and by certified mail with return receipt—to the Guadalupe County District Clerk seeking all judicial records related to the issuance, judicial review, and authorization of the April 7, 2025 arrest warrant. *(See Exhibits B-031 and E-017)*

**154.**    In response to Plaintiff's request, the Clerk's Office did not produce an affidavit of probable cause, signature verification, routing documentation, metadata, or any administrative records showing when, how, or through what process the warrant had been reviewed, approved, or signed.

**155.**    When Plaintiff sought clarification regarding the procedures used for the warrant's issuance and approval, the Clerk's Office stated that no case number had been associated with the warrant and that no responsive records were available.

**156.**    No documentation was produced establishing how, when, or under what process the April 7, 2025 warrant was issued, transmitted, or signed. The Clerk's Office further reported that it possessed no records reflecting when or how Judge Old signed the arrest-warrant affidavit. *(See Exhibit B-031and E-017)*

**157.**    Plaintiff noted that the complete absence of judicial records—including the lack of metadata, routing logs, or authentication records—left unanswered questions regarding whether

the warrant had undergone the usual judicial review steps and whether standard procedures for authentication, approval, and recordkeeping had been followed.

158.    On **June 18, 2025**, the Guadalupe County Attorney's Office proceeded with a bond-revocation hearing in Jamie's criminal case before the 274th District Court. *(See Exhibit L-009 Certified Transcript of Hearing)* This hearing was the rescheduled continuation of a proceeding originally set for April 7, 2025—the same day Plaintiff, his father, and his sister were arrested on first-degree felony witness-tampering charges. The cancellation of the April 7th, 2025 hearing, combined with the same-day arrests, prevented Plaintiff and his family from participating in that earlier proceeding.

159.    The June 18, 2025 bond hearing proceeded with the State calling only one witness: Cody Lane Koelle. Although S.J.K. had repeatedly asked to testify and to participate in the hearing, she was not permitted to do so. Neither Plaintiff nor his father testified we permitted to testify.

160.    Prior to the hearing, the County Attorney's Office arranged and funded round-trip airline travel for Cody from Dodge City, Kansas to San Antonio, Texas, along with transportation between the airport, hotel, and courthouse, as well as his meals during the trip. At the time Cody was brought in as the State's sole witness, prosecutors had detailed knowledge of Cody's conflicting narratives, his shifting sworn statements, and his prior false allegation that Plaintiff had forged his November 15, 2024 affidavit—an affidavit that was notarized in Kansas and matched the notary information appearing on every affidavit Cody had previously submitted to the County Attorney's Office. *(See Exhibit E-008)*

161.    The County Attorney's Office also had been provided, months earlier, with documentation of Cody's criminal history, evidence of inconsistent statements, and a recorded

March 18, 2025 phone call in which Cody confirmed that he signed the November 2024 affidavit and that its contents were true. Despite this information, the State presented Cody as its only witness at the June 18 hearing.

162.    During the June 18, 2025 bond hearing, Cody Lane Koelle testified under oath that Plaintiff had forged his signature on a notarized affidavit dated November 15, 2024. At the time of this testimony, the Guadalupe County Attorney's Office already possessed both the November 15, 2024 affidavit and the subsequent January 31, 2025 affidavit, each of which bore Cody's signature and were notarized by the same notary, Sandra Rodriguez, at Landmark National Bank in Dodge City, Kansas. Both affidavits had been provided to Assistant County Attorney Jonathan Amdur prior to the June 18 hearing. Despite the presence of two independently notarized documents executed months apart, Cody asserted during his testimony that he had not signed the November affidavit and claimed it was forged by Plaintiff. *(See Exhibit E-008 and L-009)*

163.    During direct examination, Assistant County Attorney Jonathan Amdur questioned Cody Lane Koelle about whether S.J.K. had an intellectual or cognitive disability. In response, Cody testified that he was unsure whether she was IDD and stated that his wife possessed a recording in which Jamie Renee Walker allegedly said that S.J.K. was not disabled. Later in the proceeding, when the presiding judge questioned Cody directly, Cody stated without hesitation that S.J.K. could not read or write, that she had been this way since birth, and that she was easily influenced by Michael. These statements differed from Cody's earlier responses during direct examination and from representations he had made in prior affidavits and recorded communications.

164.    Following Cody's statements, the presiding judge acknowledged on the record that S.J.K. appeared to have cognitive-functioning limitations. In response, Assistant County Attorney

Amdur focused on S.J.K.'s chronological age, emphasizing that she was an adult, without addressing the disability-related records previously provided to the County.

**165.** Defense counsel for Jamie Renee Walker, who had only recently been appointed, conducted minimal cross-examination. No prior sworn affidavits, video statements, or recent communications from S.J.K.—including her May 29th, 2025 affidavit mailed to the County Attorney's Office—were presented to the court at the hearing. *(See Exhibit F-006)*

**166.** Following Cody's testimony, the court revoked Jamie Renee Walker's bond and ordered that she be taken into custody. After the hearing, a transcript was obtained and reviewed. Multiple portions of Cody's testimony appeared to conflict with his earlier notarized affidavits and his recorded March 18, 2025 statements. Based on those discrepancies, Dolores Jane Roden filed a formal criminal complaint alleging aggravated perjury. *(See Exhibit L-001)*

**167.** Despite the documentary evidence, the recorded contradictions, and the formal complaint, neither the County Attorney's Office nor the Guadalupe County Sheriff's Office took corrective action, amended the record, or revisited Cody's testimony. Cody remained the State's primary witness while first-degree felony charges continued to be pursued against Plaintiff and his elderly disabled father.

**168.** Before this hearing, Cody had provided a sworn affidavit alleging that Plaintiff had forged his signature on the November 15, 2024 affidavit. That November affidavit was notarized in Kansas by a licensed notary public. Plaintiff lived in Texas and did not have access to the Kansas notary or the original documents and has never been to the state of Kansas.

**169.** County officials had documentation from the notary confirming that Cody personally appeared and signed the November 15th, 2024 affidavit *(See Exhibit F-003),* as well as a

recorded phone call in which Cody admitted he signed the affidavit and described its contents as true. Despite this, Cody's allegation of forgery was not corrected in subsequent proceedings.

170.     At the **June 18, 2025** bond hearing, Cody repeated the claim that Plaintiff had forged his signature. The prosecutor did not inform the court of the prior notary verification or the recorded admission contradicting this assertion. The trial court was not provided with materials confirming that Cody had personally signed the November 15th, 2024 affidavit.

171.     The June 18 hearing was handled on behalf of the State by First Assistant County Attorney Jonathan Amdur, a senior official within the Guadalupe County Attorney's Office. He conducted the questioning of witnesses and presented argument to the court while the County Attorney's Office was already in possession of multiple exculpatory materials, including: (a) the May 29, 2025 sworn affidavit from S.J.K.; (b) the April 4, 2024 recorded interview conducted by Investigator Reamer; and (c) psychological evaluations documenting that both S.J.K. and Jamie Renee Walker were adults with intellectual disabilities requiring disability-informed communication despite being E-Filed into the Court record months prior. None of this material was disclosed to the presiding judge or incorporated into the State's presentation, despite its direct relevance to witness credibility, disability status, and the issues before the court.

172.     None of these materials were disclosed to the court or to Jamie Renee Walker's appointed counsel at the bond-revocation hearing. The court instead heard a limited version of S.J.K.'s history and abilities, primarily through Cody's testimony.

173.     After the hearing, Jamie Renee Walker's bond was revoked based in part on Cody's testimony. Neither the judge nor defense counsel were provided with S.J.K.'s latest affidavit reaffirming her mother's innocence and Plaintiff's role as her advocate. During the proceeding,

the court was informed that Plaintiff and his father had been arrested on first-degree felony

witness-tampering charges, and was included in the record presented to the judge.

174. The **June 18, 2025** proceeding effectively served as the replacement for the canceled

April 7th, 2025 hearing. *(See Exhibit L-009)* The County's preparations ensured that Cody

would be present and heard, while S.J.K. remained absent and unable to present her own account

directly to the judge and those advocating for her were arrested and prevented through bond

conditions from communicating or assisting S.J.K in any fashion.

175. Throughout the hearing, both the prosecution and defense repeatedly referred to S.J.K.

and her statements, yet she was not brought before the court. Her prior affidavits and recorded

statements, including those in which she declared Plaintiff's innocence and asserted her own

disability rights, remained outside the evidentiary record considered by the judge.

176. The practical effect of these decisions was that the only witness whose statements aligned

with the prosecution's position was fully facilitated, while the witness with documented

intellectual and developmental disabilities—whose statements conflicted with that position—was

not. S.J.K.'s exclusion from both the April 7, 2025 and June 18, 2025 proceedings left her

without a meaningful opportunity to present her account directly to the court

177. On **June 26, 2025**, Plaintiff's mother, Dolores Jane Roden, filed a sworn criminal

complaint with the Guadalupe County Sheriff's Office against Cody, alleging aggravated perjury

and other misconduct and providing supporting documentation and evidence. No investigation

was opened, and no case number was issued in response to her complaint. *(See Exhibit L-001)*

178. On July 2, 2025, the Guadalupe County Attorney's Office entered a plea agreement in

*State v. Michael Allen Walker* in which the State dismissed all six first-degree aggravated sexual-

assault charges—each of which legally required proof that the victim was intellectually disabled—and instead accepted a single conviction for the lesser offense of "Prohibited Sexual Conduct" (incest). *(See Exhibit A-019)* This outcome was possible only by removing any legal recognition of S.J.K.'s intellectual and developmental disability, despite the County's longstanding knowledge and documentary record confirming her disability status. By the time of the plea, the County possessed: (1) the May 13, 2024 forensic evaluation by Dr. Sanders diagnosing an IDD and recommending protective measures; (2) over twenty years of SSI disability determinations; (3) educational records reflecting special-education classification; (4) the June 18, 2025 judicial acknowledgment by Judge Steel that S.J.K. was IDD; (5) Investigator Reamer's sworn admission in Plaintiff's April 7, 2025 arrest affidavit that the victim was IDD; and (6) DNA evidence proving that Walker impregnated an IDD adult under his control. Nevertheless, the County elected to omit the victim's disability from the plea framework entirely, thereby reducing the charges from a first-degree felony carrying a mandatory minimum to a lesser offense that reframed the case as consensual "prohibited conduct."

179.    Critically, even after downgrading Walker's charges in a manner that eliminated the legal significance of the victim's disability, the County Attorney's Office continued to prosecute Plaintiff and his father under first-degree felony witness-tampering charges that rested on the very disability-related facts the State had discarded in Walker's case. First Assistant County Attorney Jonathan Amdur continued pressing first-degree charges against Plaintiff until July 18, 2025—sixteen days after the Walker plea—and continued pursuing identical charges against Plaintiff's father until December 1, 2025, exposing both men to sentences of up to 99 years in prison. The County's continued pursuit of F1 charges against Plaintiff, even after removing all disability-based elements from Walker's prosecution, demonstrates not only the absence of

probable cause but also the arbitrariness and retaliatory nature of the charging decisions. This sequence further shows that the April 7, 2025 arrest affidavit was not grounded in an objective assessment of evidence but was instead used to protect the County from civil and criminal liability arising from the victim's renewed exploitation, which Plaintiff had reported as a mandated reporter on April 1, 2025.

180.    On **July 8, 2025**, Plaintiff received an email *(See Exhibit B-050)* from his defense attorney stating that prosecutors "definitely won't include" a non-refiling letter because they "want to make sure you stay away from his cases." This communication is not offered to prove that the prosecutor actually made the statement, but to show the information conveyed to Plaintiff, the effect on his state of mind, and the chilling impact on his protected advocacy. Upon receiving this message, Plaintiff understood that the County Attorney's Office was intentionally using the threat of re-prosecution to chill Plaintiff advocacy and to deter his mandated reporting, and prevent further communication with S.J.K. or Jamie Renee Walker. The communication demonstrates the retaliatory motive attributed to County officials and the direct impact these threats had on Plaintiff's liberty, employment prospects, and exercise of First Amendment rights.

181.    On **July 18, 2025**, the County formally declined the charge. However, the County did not promptly provide written confirmation of the declination, and Plaintiff remained under bond conditions for several weeks after learning that the charge would not be pursued. *(See Exhibit A-002)*

182.    On **July 23, 2025**, Plaintiff's counsel at Cofer & Connelly, PLLC issued a written statement confirming that, after presenting evidence to the Guadalupe County Attorney's Office, the unfiled charge against Plaintiff had been formally rejected. Counsel further reported that Assistant County Attorney Jonathan Amdur, the lead prosecutor assigned to Plaintiff's matter,

assured them that the charge would not be refiled and that Plaintiff had no remaining or pending criminal allegations. *(See Exhibit A-002).*

**183.**    On August 26th 2025 at the request of the Guadalupe County Sheriff's Office, Plaintiff's mother, Dolores Jane Roden—an 83-year-old stroke survivor residing approximately four hours from Seguin—was instructed to appear in person to submit her sworn criminal complaint against Cody Lane Koelle, despite having already mailed a notarized version and submitted the same materials by email. Because the Sheriff's Office stated it would only accept the complaint if delivered in person, Ms. Roden undertook the eight-hour round-trip drive to Seguin to comply with the requirement. Upon her arrival, Deputy Bonner received her complaint, issued an intake slip, and assigned it case number **2025-GC00208**. *(See Exhibit L-001)*

**E. Post-Arrest Narrative Control and Coordinated Message-Shaping (Sept–Oct 2025)**

**184.**    In September 2025, private investigator Jesse Prado was retained to assist in the defense of Jamie Renee Walker. Prado, a former law-enforcement officer with more than thirty years of investigative experience, had recently gained national visibility due to his involvement in post-incident review efforts related to the Uvalde school shooting. Prado was presented to the family as an independent investigator. However, a recorded October 2025 interview between Prado and advocate Kimberly Kennedy demonstrates that Prado was in active communication with the Guadalupe County Attorney's Office, had been pre-briefed on its narrative, and was relaying prosecutorial viewpoints while conducting what was represented as a defense investigation. *(See Exhibit I-023.)*

**185.**    During the interview, Prado admitted: *"I know a lot of the answers to the questions that I'm asking you,"* confirming that he had been pre-informed of the County Attorney's

interpretation of the case. He further stated that the County believed *"Shelby makes her own decisions since she's been an adult,"* despite extensive documentation of Shelby's intellectual and developmental disability, including a May 13, 2024 neuropsychological evaluation and longstanding SSI disability status. Prado also asserted that the sexual conduct involving Michael Allen Walker and S.J.K. was *"not illegal"* and appeared "consensual," echoing the County's narrative while disregarding Texas consent laws, disability findings, and Shelby's known decisional vulnerabilities. Prado additionally described the arrests of Plaintiff and his father as *"honorable,"* despite the complete absence of interviews, corroboration, or any legitimate investigation.

186.    Prado's statements reflected a broader pattern of County conduct in which Shelby's disability was invoked only when useful to justify Plaintiff's arrest but denied whenever acknowledging it would expose County liability. The County removed Shelby from Hope House—a safe environment where she was surrounded by family, receiving structured support, and posing no risk to herself or others—yet refused to remove her from far more dangerous placements. These included Cody Lane Koelle's residence, where Shelby suffered a medical emergency involving unconsciousness and foaming at the mouth, and where she was later assaulted and battered by one of Cody's romantic partners, a woman with whom Cody was openly conducting an affair. During this same period, Jesse, a man Cody later described as a convicted drug offender and a danger to his wife and children, was also living inside Cody's home. While Shelby was residing in that environment, she became pregnant a second time. After the pregnancy occurred, Cody forced both Shelby and Jesse out of the home, despite acknowledging to law enforcement that Jesse posed a safety threat. Despite these known dangers, the County never removed Shelby from Cody's household or intervened to protect her.

Instead, County officials retroactively framed these events as "voluntary decisions" by Shelby, while simultaneously weaponizing her disability to justify Plaintiff's arrest. Prado repeated that same narrative during the interview, insisting Shelby was "making her own decisions," even after Kennedy explained she had been forced from one unsafe placement into another.

**187.**    The recording further shows Prado acknowledging that *"Cody... he's not truthful",* yet he nevertheless continued to rely on statements favorable to the prosecution while dismissing the numerous contradictions, felony history, and documented pattern of false statements associated with Cody Lane Koelle. Prado stated that interviews he collected would be *"sent over to the DA,"* demonstrating that he was functioning as an information pipeline for the prosecution rather than an independent defense investigator. This directly contradicted his representation to the family that he had been retained for exculpatory fact-gathering.

**188.**    Prado also attempted to discourage critical evaluation of the County's actions, repeatedly urging Kennedy not to discuss their conversation and warning that challenging the County's narrative could negatively affect Jamie Renee Walker's case. His tone alternated between reassurance and pressure, while pressing the family to accept the County's framing—that the sexual conduct was merely "an affair between two adults" and that Plaintiff and his father were appropriately arrested for *"tampering,"* even though Shelby herself accused Officer Reamer, Andrea, and Cody of attempting to change her story. Prado dismissed these allegations and instead praised the County's actions as *"honorable."*

**189.**    By the time Prado became involved, County officials had already crafted a narrative that intentionally downplayed disability and recharacterized coercive circumstances as voluntary choices. *(See Exhibit A-019)* Prado adopted this narrative wholesale. He ignored Plaintiff's April 1, 2025 mandated report of renewed sexual exploitation; he ignored medical emergencies, the

September 21 assault, and the forced displacement of Shelby; and he ignored disability evidence, instead repeating the County Attorney's assertion that Shelby *"makes her own decisions."* His statements confirmed that the County's version of events was being reinforced—not independently reviewed—within what purported to be a defense investigation.

**190.**    Prado's conduct is consistent with a coordinated effort to protect the County from liability for placing an intellectually disabled adult into dangerous conditions that resulted in renewed exploitation, pregnancy, and documented harm. He minimized Shelby's disability when doing so served the County's interests, echoed prosecutorial positions nearly verbatim, defended arrests of the Plaintiff and his father, and dismissed Shelby's accusations that Officer Reamer, Andrea, and Cody were attempting to alter her story. Prado's willingness to repeat the County's narrative, despite acknowledging that Cody was "not truthful" and despite overwhelming disability documentation, further demonstrates the alignment between his investigative role and prosecutorial objectives, not independent analysis.

**191.**    The **October 2025** recording further reflects that Prado accepted as credible the statements of Cody Lane Koelle despite Cody's documented history of providing conflicting affidavits, recanting and later reaffirming statements, and testifying under oath in ways inconsistent with his prior notarized filings. During the recorded discussion, Prado did not inquire into these inconsistencies or question the reliability of Cody's shifting accounts. Around this same period, defense counsel Zachary Bidner informed family members that he could not speak with witnesses (Shelby, James Louis Roden Jr) because doing so would constitute "witness tampering," and stated that he did not intend to impeach Cody as a witness. These circumstances, as reflected in the available recordings and communications, resulted in the underlying

contradictions in Cody's statements not being explored through the defense's investigative efforts.

**192.**    On October 7, 2025, James Louis Roden Sr. submitted a comprehensive Internal Affairs complaint—assigned complaint number GCI-25-10002—to the Guadalupe County Sheriff's Office regarding the conduct of Investigator Elaine Reamer. *(See Exhibit L-008)* The submission consisted of a 53-page notarized written complaint, a 160-page organized evidence packet, and a 45-minute recorded statement of truth accompanied by a fully transcribed, notarized, and signed transcript. The materials detailed Mr. Roden's account of events leading to the April 7th 2025 arrests and included evidence he asserted demonstrated both his innocence and the innocence of his son, Plaintiff James Louis Roden Jr. The complaint was formally logged by the Sheriff's Office upon receipt, however as of filing no conclusion to the investigation or contact for any interviews for investigation into Officer Reamer conduct. A Public Information Act request was submitted November 30th, 2025 to inquire on the status of that Internal Affairs Complaint on Officer Reamer, however no response has been given as of this filing.

**F. Additional Failures to Investigate and Improper Case Handling (Aug.–Nov. 2025)**

**1. Misclassification and Premature Closure of a Sworn Criminal Complaint (Nov. 2025)**

**193.**    On June 28th, 2025 and again on August 26, 2025, Plaintiff's mother, Dolores Jane Roden, filed a notarized Formal Criminal Complaint with the Guadalupe County Sheriff's Office (GCSO) alleging multiple felony offenses by Cody Lane Koelle, including aggravated perjury, false report to a peace officer, and tampering with a governmental record. The complaint was notarized, assigned an incident number, and logged as a criminal complaint. Deputy Bonner

informed the family that it would be forwarded to the Criminal Investigations Division for follow-up.

**194.**   On **November 12, 2025**, after submitting an Open Records request, Mrs. Roden received a copy of the same report and discovered that the Sheriff's Office had reclassified the sworn criminal complaint as "civil" and marked it "Cleared – Report Taken." The disposition date was listed as September 13, 2025, predating any family review and reflecting closure before any investigative activity had occurred. *(See the end of Exhibit L-001)*

**195.**   That same day, Mrs. Roden notified Sheriff Ray and command staff that her sworn criminal complaint had been misclassified and prematurely closed. *(See Exhibit D-008 and D-009)* She clarified in writing that the filing was a criminal complaint supported by sworn documents and requested information about who reclassified the report and why no investigation had taken place.

**196.**   To clarify the factual basis of the allegations, she provided corroborating documentation including: (a) the June 18, 2025 certified by court reporter bond-hearing transcript; (b) verification from the notary confirming Cody Koelle's sworn 2024 affidavit; and (c) certified criminal-history records for Cody Lane Koelle.

**197.**   Despite receipt of this information, GCSO took no steps to correct the classification, reopen the complaint, or initiate an investigation. No detective contacted the complainant, no follow-up interview was conducted, and no investigative actions appear in the record.

**198.**   Based on the documents produced, the sworn criminal complaint was reclassified as civil and marked closed without investigative action, with a disposition date that predates any recorded review, notwithstanding written notice to supervisory personnel.

## 2. Assignment to the Same Investigator Who Authored the April 7 Warrants

**199.**    On November 13, 2025—one day after Mrs. Roden requested status updates on her sworn criminal complaint against Cody Lane Koelle—the Guadalupe County Sheriff's Office issued a "Supplemental Report" authored by Sergeant Elaine M. Reamer. *(See end last pages of Exhibit L-001)* Sgt. Reamer was the same investigator who had previously relied on statements attributed to Cody Lane Koelle in her April 7, 2025 arrest-warrant affidavits. At the time this Supplemental Report was generated, Plaintiff had a pending internal-investigation request concerning Sgt. Reamer's conduct, and a referral had been transmitted to federal authorities for review. Despite those circumstances, the Sheriff's Office assigned Sgt. Reamer to review a criminal complaint that involved evaluating the credibility of her prior witness. Assigning her to this task resulted in the complaint being reviewed by an investigator whose past work was directly connected to the subject matter of the filing.

**200.**    The Supplemental Report reflects no investigative steps. It contains no intake interview, no evaluation of the sworn criminal complaint, no analysis of the June 18, 2025 transcript, and no review of Koelle's notarized statements or criminal-history documentation. The report states only that the complaint was "reviewed" and that a "packet" was forwarded to the County Attorney's Office.

**201.**    The routing of this complaint to the County Attorney's Office did not result in any investigative action. No case number was created, no detective was assigned, and no follow-up communication occurred.

## 3. Conflicts in Timelines and Internal Records

**202.**    In the Supplemental Report, Sgt. Reamer states that she received the complaint on September 19th, 2025 and forwarded her "packet" on September 24, 2025.

**203.**    However, GCSO's incident report lists the complaint as having been classified as "Civil" and "Cleared – Report Taken" on September 13, 2025—six days before the date Sgt. Reamer stated she received the complaint in her Supplemental Report.

**204.**    This discrepancy reflects that the complaint was marked closed prior to the date on which Sgt. Reamer reported receiving it, creating an inconsistency between the incident-report timeline and the Supplemental Report.

**205.**    The records include no interviews, no evidence entry, no investigative notes, and no creation of a criminal case file.

### 4. Sheriff's Office Declines Investigative Responsibility

**206.**    Also on November 13, 2025, the GCSO Open Records Division informed Mrs. Roden that "they"—referring to the County Attorney's Office—would be conducting the investigation rather than the Sheriff's Office. *(See Exhibit D-011.)*

**207.**    This notification differed from understanding of Texas law, including Articles 2.13 and 2.21 of the Texas Code of Criminal Procedure, which assign peace officers—specifically sheriffs and their deputies—the duty to receive reports of criminal offenses and to conduct criminal investigations.

**208.**    Based on these statutory duties, Mrs. Roden believed that the Guadalupe County Sheriff's Office was the proper authority to investigate the sworn and notarized criminal complaint she submitted.

**209**. When she attempted to obtain further clarification, personnel at the Sheriff's Office declined to discuss the matter with her.

**210.** As a result, her sworn criminal complaint—previously submitted by certified mail, by email, and again in person—was handled solely by the County Attorney's Office. The submission consisted of a 23-page notarized affidavit and 147 pages of organized and categorized supporting exhibits.

**211.** The materials she provided included detailed information concerning alleged criminal conduct involving Cody Lane Koelle, as well as information she believed demonstrated the innocence of James Louis Roden Jr. and James Louis Roden Sr.

**212.** This statement contradicted the original intake process: Deputy Bonner had documented the filing as a "Formal Criminal Complaint," informed the family it would be forwarded to CID, and provided no indication that the matter would be treated as civil or referred away from the Sheriff's Office.

**213.** After this referral, no investigative action occurred at the County Attorney's Office and no further communication was provided to the complainants. Following an email directed to Sheriff Joshua Ray and Sheriff Command Staff inquiring why no investigation had been conducted, the Guadalupe County Sheriff's Office responded through an Open Records production. That response was issued under the authority of Sheriff leadership and was copied to Sheriff Joshua Ray, Chief Deputy Tarinna Skrzycki-Pfeil, Internal Investigations Sergeant Kelly Mann, and Criminal Investigations Division Commander Captain Joel Machost.

**214.** The Open Records response stated verbatim *(See Exhibit D-011)*:

*"The Guadalupe County Attorney's Office will be the agency to better assist with answering your questions that are listed below. They would be conducting the investigation not the Guadalupe County Sheriff's Office for the criminal offense that you are alleging. Any documents that you have provided have been forwarded to that office by Sgt. Reamer per her supplement."*

**215.**     Sheriff leadership neither corrected nor disavowed this response after receiving direct notice, thereby ratifying both its contents and the practice it described. This official position evidences a County custom—applied in matters presenting heightened exposure to County liability—whereby investigative authority is affirmatively ceded to the County Attorney's Office and independent law-enforcement investigation is abandoned. That custom was further compounded by the County's decision to assign Investigator Elaine Reamer to continue handling matters arising from Plaintiff's and his father's case despite her direct involvement in, and reliance upon, the very statements later alleged to constitute perjury, and despite the fact that her conduct had been reported to federal authorities for review. By placing an investigator with an inherent conflict of interest in charge of assessing the credibility and criminality of the same witness whose statements formed the basis of the April 7, 2025 charges, the County created a powerful institutional incentive to suppress investigation into that witness's admitted falsehoods and to preserve the prosecution narrative already advanced.

**216.**     This conflict-laden assignment explains the absence of any meaningful investigation into Cody Lane Koelle's sworn admissions and alleged perjury and further supports an inference of deliberate indifference and ratification. According to the Sheriff's Office report, this investigative posture—including the continuation of Investigator Reamer in a supervisory investigative role— was reviewed and approved by Lieutenant Robert Shockley of the Criminal Investigations

Bureau. Such approval by supervisory personnel constitutes ratification of the conflicted investigative structure and reinforces that the resulting prosecutor-controlled narrative, later adopted in the April 7, 2025 arrest-warrant affidavits for Plaintiff and his father, was the product of official County custom rather than isolated error.

217.    Such supervisory approval and failure to correct a known conflict of interest constitutes ratification of an unconstitutional investigative practice under *Monell*. See *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (municipal liability attaches where policymakers approve a subordinate's decision and the basis for it); *Grandstaff v. City of Borger*, 767 F.2d 161, 171–72 (5th Cir. 1985) (post-event approval and failure to discipline may evidence ratification); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986) (single policymaker decision may constitute official policy).

## 5. Pattern of Unequal Enforcement and Non-Investigation

218.    The handling of the August 26, 2025 criminal complaint mirrored prior instances in 2024–2025 in which allegations made by Cody Lane Koelle were forwarded or relied upon without documented investigative steps, while allegations made against Cody Lane Koelle—despite being supported by sworn affidavits, transcripts, and certified records—show no corresponding investigative activity in the available case files.

219.    The available records show (a) the misclassification of a sworn criminal complaint, (b) the premature "Cleared" disposition before any review, (c) assignment of the matter to the same investigator whose prior affidavits relied on statements attributed to Cody Lane Koelle, and (d) the redirection of responsibility to an office that had relied on Cody Lane Koelle as a witness in pending cases.

**220**. During this same period, another long-time advocate, Kimberly Kennedy, assisted S.J.K. in the same types of activities later used to accuse Plaintiff of witness tampering. Ms. Kennedy helped S.J.K. prepare affidavits, record video statements, and facilitate direct communication with the County Attorney's Office, including participating in three-way calls and relaying S.J.K.'s statements of her mother's innocence. Despite performing these identical advocacy functions, Ms. Kennedy was never investigated, accused, or arrested. This disparate treatment demonstrates that the conduct attributed to Plaintiff was not treated as criminal when engaged in by others, and provides context for the retaliatory and selective nature of the arrest.

**221.**    In early October 2025, during a recorded conference call between S.J.K., her advocate Kimberly Kennedy, Victim Coordinator Ileen Rangel, and lead prosecutor Jonathan Amdur, S.J.K. again provided a detailed account of the physical and sexual abuse she and her mother, Jamie Renee Walker, reported experiencing involving Michael Allen Walker. *(See Exhibit I-022)*

**222.**    During the call, S.J.K. stated that Michael had compelled sexual acts through threats of violence, used intimidation to prevent disclosure, confined her in enclosed spaces, and engaged in assaults while her mother was away at work.

**223.**    S.J.K. also stated that Michael subjected her mother to physical abuse, deprived her of basic needs, attempted to cause her physical harm, and expressed a desire for Jamie Renee Walker not to survive so that he could pursue a relationship with S.J.K.

**224.**    Throughout the conversation, S.J.K. consistently stated that her mother was not present during any of the assaults, did not participate in any abusive conduct, and did not learn about the events until after they had already occurred.

225.    During the same call, Kimberly Kennedy assisted by facilitating communication, asking clarifying questions, and helping ensure that S.J.K.'s statements were accurately conveyed—functions similar to the advocacy assistance Plaintiff provided months earlier.

226.    Although Kimberly participated in the call in this advocacy role, no criminal accusations were made against her, and she was neither investigated nor charged for assisting S.J.K. in communicating her account.

227.    The call again included statements from S.J.K. describing alleged abuse involving Michael Allen Walker and information she believed demonstrated her mother's lack of involvement. *(See Exhibit I-022.)*

**G. County Recognition of Reamer and Her Elevated Role**

228.    At all relevant times, Defendant Sergeant Elaine M. Reamer was not a low-ranking officer acting in isolation. She held a supervisory position within the Guadalupe County Sheriff's Office and was repeatedly promoted, recognized, and publicly endorsed by County leadership.

229.    In December 2022, the Sheriff's Office named Reamer "Investigator of the Year." The award was announced publicly by Sheriff's Office leadership and highlighted her work as exemplary. The recognition reflected leadership's approval of her investigative methods and professional judgment.

230.    On March 3, 2025, Sheriff Joshua Ray promoted Reamer to Sergeant of Criminal Investigations during his first formal promotion ceremony as Sheriff. In an official announcement, Sheriff Ray stated that the promoted officers were leaders who would assume greater responsibility for ensuring the safety and security of county residents. By promoting

Reamer into a supervisory role, the Sheriff's Office granted her increased authority over investigations.

231.    Also in March 2025, the Guadalupe County Commissioners Court appointed Reamer as the Sheriff's Office alternate representative to the Alamo Area Council of Governments Criminal Justice Advisory Committee, a regional body that reviews and recommends criminal-justice policy and funding priorities. Her appointment placed her in a position where her judgment contributed to policy discussions beyond routine casework.

232.    On April 15, 2025, shortly after Plaintiff's arrest, local media reported on a Sheriff's Office community-outreach initiative involving a domestic-violence and crisis center. In that coverage, Reamer was identified as the coordinator of the outreach effort, and Sheriff Ray was quoted endorsing her work and encouraging her leadership in the program.

233.    These recognitions and assignments—including Investigator of the Year, promotion to Sergeant of Criminal Investigations, appointment to a regional criminal-justice advisory committee, and selection as coordinator for a community-outreach initiative—show that Reamer operated with the express trust and support of County leadership.

234.    When Reamer prepared and submitted the April 2025 arrest-warrant affidavits for Plaintiff and his family members, she did so while serving as a supervisory investigator who had recently been promoted and publicly endorsed by the Sheriff and Commissioners Court, rather than as an inexperienced or unsupervised deputy.

235.    During this period, Reamer exercised supervisory authority within the investigative division, had responsibility for overseeing or directing aspects of criminal investigations, and

represented the Sheriff's Office in regional criminal-justice discussions. Her decisions and actions were taken in that capacity.

**236.** County leaders continued to promote, assign, and publicly feature Reamer before and after the arrests at issue in this case. Their ongoing support occurred with knowledge of her central role in the investigation of Plaintiff and his family and reflected continued confidence in her handling of those matters.

**H. Judicial Assignment and Warrant-Issuance History Across Multiple Courts**

**237.** The underlying sexual-assault matter involving co-defendants Jamie Renee Walker and Michael Allen Walker—Case No. 24-1776-CR-B—was pending before the 274th District Court, presided over by Judge Gary Steel, beginning in April 2024 and continuing through December 2025. The alleged victim in that case was S.J.K., and the primary witnesses used by both sides were Cody Lane Koelle, who served simultaneously as the key witness for defense counsel John Green (representing Michael Allen Walker) and as the State's key witness against Jamie Renee Walker under lead prosecutor Assistant County Attorney Jessica Johnson.

**238.** Despite the related nature of the later witness-tampering allegations brought against members of the same family and tied to the same underlying events, the arrest warrants were not presented to Judge Steel, who presided over the underlying sexual-assault case and who possessed familiarity with the evidentiary record, including the victim's IDD evaluations, prior statements, recorded disclosures and formal letter of complaint by Plaintiff over ADA violations and subpoena misuse submitted just a few weeks prior to arrest.

**239.** Instead, on Saturday, April 5, 2025, a warrant for Jamie Renee Walker on a first-degree felony tampering allegation was issued by Judge Jessica Crawford of the 2nd 25th District Court.

*(See Exhibit A-015)* The charge was never presented to a grand jury and no indictment was returned.

**240.**     Two days later, on Monday, April 7, 2025, near noon, warrants for James Louis Roden Jr. and James Louis Roden Sr.—each alleging first-degree felony witness tampering—were reported as having been presented to and signed by Judge William D. Old III of the 25th District Court. Judge Old did not preside over the underlying sexual-assault case in which the evidentiary history had been developed before Judge Steel. *(See Exhibit A-001 and A-003)*

**241.**     On **June 11, 2025**, Plaintiff submitted a Texas Rule 12 Public Information Request to District Clerk Linda Balk, both by email and by certified mail with return receipt *(See Exhibit B-031),* seeking non-confidential administrative records concerning the processing of both arrest warrants. The request specifically sought:

**(1)** verification of whether Judge Old's signature on the warrants was electronic, physical, or applied by other means, with supporting logs;

**(2)** documented timestamps showing when the affidavits were received by the clerk's office, when Judge Old reviewed and signed them, and when they were returned to the Sheriff's Office;

**(3)** the completed return-of-service pages reflecting execution of each warrant; and

**(4)** administrative documentation identifying the date and time of the probable-cause determination or any magistrate-hearing log entries.

**242.**     On **June 26, 2025**, the District Clerk's Office formally responded and confirmed that no records exist reflecting *(See Exhibit B-031):*

• the method of Judge Old's signature;

• any date or time Judge Old reviewed or approved either warrant;

• any routing, receipt, or return logs;

• any administrative timestamping;

• any return-of-service documentation; or

• any record showing when, how, or whether Judge Old made a probable-cause determination.

**243.**    As confirmed by the Clerk's written response, there is no timestamp, no electronic-signature metadata, no magistrate-hearing entry, and no administrative log documenting the path the warrants affidavits followed through the court. Consequently, the procedural history of both warrants cannot be verified from existing court records.

**244.**    Prior to submitting his Rule 12 request to the District Clerk on June 11, 2025, Plaintiff sought verification of the method, timing, and judicial review of the arrest warrant affidavits from the Guadalupe County Sheriff's Office and the Guadalupe County Attorney's Office through written Public Information Act requests dated May 5 and May 14, 2025. Each office responded that it did not possess records reflecting how or when Judge Old received, reviewed, or signed the affidavits, and neither identified any electronic-signature system, timestamp, routing log, or magistrate record documenting a probable-cause determination. On June 26, 2025, the District Clerk confirmed in writing that no such records exist within the court's files. Accordingly, no governmental entity has been able to produce verifiable evidence establishing that a neutral magistrate reviewed sworn probable cause and issued the warrants prior to Plaintiff's arrest. *(See Exhibit B-031)* Additionally, the bond paperwork reflects that the field labeled "Probable Cause Determined" was left blank. The paperwork lists a bail amount of $100,000 but contains no notation, checkmark, date, or initials indicating that a magistrate made an independent probable-cause determination at the time bond was set. As described above, Plaintiff has been unable to obtain any timestamp, electronic-signature metadata, magistrate log, clerk routing record, or other administrative documentation reflecting when, how, or whether a

judicial probable-cause determination occurred with respect to the arrest-warrant affidavit. *(See Exhibit A-001)*

**245.**    Following the April 7 arrests, the County Attorney's Office processed the related charges separately.

- **James Louis Roden Jr.'s** case was declined for prosecution on July 18, 2025, after defense counsel advised First Assistant County Attorney Jonathan Amdur of their intent to file a Motion for an Examining Trial. Mr. Amdur responded that the matter would not be taken to a grand jury in the foreseeable future, and the County Attorney's Office subsequently closed the case without any grand-jury presentation.

- **James Louis Roden Sr.,** who could not afford private counsel and did not qualify for a court-appointed attorney, was forced to proceed pro se. Ongoing medical expenses associated with his severe health conditions left him unable to retain representation, as those costs were necessary to preserve his life. He remained under the same unindicted first-degree felony charge for more than eight months, with no grand-jury submission and no examining-trial hearing despite multiple written requests and filed motions.

**246.**    Lead prosecutor Assistant County Attorney Jessica Johnson was responsible for all related cases—including those involving Jamie Renee Walker, Michael Allen Walker, Plaintiff, and Plaintiff's father—until (according to court records) she was removed from the matters following federal complaints filed with both the FBI and the U.S. Department of Justice. Plaintiff submitted a DOJ Civil Rights Division complaint on May 7, 2025, under Complaint No. **607387-ZQJ,** and the matter was assigned to FBI Special Agent James Robert Wilson III of the San

Antonio Field Office for review. *(See Exhibit B-041)* After Johnson's removal, First Assistant

County Attorney Jonathan Amdur assumed prosecutorial responsibility for the related cases.

### I. Policymaker Knowledge, Notice, and Ratification

**247.**    From March 2024 through late 2025, Guadalupe County's final policymakers—including

Elected County Attorney David Willborn, First Assistant County Attorney Jonathan Amdur,

Chief Prosecutor Maritza Stewart, and Sheriff Joshua Ray—received repeated written notice of

the misconduct underlying Plaintiff's arrest. These notices included Plaintiff's ADA

accommodation requests, mandated-report communications, filings in State v. Jamie Walker, the

April 1, 2025 report of renewed sexual exploitation, certified-mail submissions, and subsequent

sworn affidavits from S.J.K. confirming Plaintiff's innocence and her own intellectual disability.

Each communication placed policymakers on actual notice that Plaintiff was acting in a protected

role as an ADA advocate and mandated reporter.

**248.**    Despite receiving extensive documentary evidence—including sworn affidavits, video

statements, psychological evaluations, and written ADA requests—the County did not initiate

any corrective review. No investigation occurred, no discipline was imposed, and Plaintiff's

prosecution remained active. The evidentiary submissions that contradicted the assertions

underlying Plaintiff's arrest did not result in any change in the County's handling of the matter.

**249.**    County leadership did not respond to formal Texas Public Information Act requests

seeking ADA-related records, training documentation, or policymaker communications. Plaintiff

subsequently filed a complaint with the Texas Attorney General *(Complaint number OR-25-*

*046281-IC)* regarding the lack of response, but no records were produced . These events show

that the County did not provide the requested materials or clarify its handling of ADA-related obligations during this period.

250.    During this same period, the County continued the prosecution without modifying or correcting information contained in the April 7, 2025 arrest-warrant affidavits. Those affidavits indicated that the information underlying the warrant applications originated from communications with the County Attorney's Office and with defense counsel John Green, a former Assistant County Attorney representing Michael Allen Walker. The affidavits further showed that the material provided by those individuals was incorporated into the warrant applications submitted under Sgt. Reamer's name.

251.    On September 24, 2025, Plaintiff's father, James Louis Roden Sr., submitted a detailed, sworn, written complaint to multiple high-level Guadalupe County policymakers. *(See Exhibit C-005.)* The complaint was sent to all four elected County Commissioners (Jacqueline "Jackie" Ott, Drew Engelke, Michael Carpenter, and Stephen Germann), County Judge Kyle Kutscher, Elected County Attorney David Willborn, First Assistant County Attorney Jonathan Amdur, Sheriff Joshua Ray, Chief Deputy Tarinna Skrzycki-Pfeil, Head of Internal Affairs Sergeant Kelly Mann, the Sheriff's Office Open Records Division, and veteran treatment coordinator Doreen Luehlfing, with a courtesy copy to FBI Agent James Wilson.

252.    In his submission, Mr. Roden reported concerns regarding ADA compliance, denial of access to an examining trial, suppression of exculpatory evidence, misclassification of a sworn criminal complaint involving Cody Lane Koelle, and alleged misconduct by Investigator Elaine Reamer.

253. The complaint also described Plaintiff's April 1, 2025 mandated report, the loss of Plaintiff's teaching career and licensure following his arrest, the documented intellectual and developmental disabilities of both S.J.K. and Jamie Renee Walker, and the absence of any investigative steps despite the availability of extensive evidentiary materials.

254. Mr. Roden further informed County policymakers that Investigator Reamer had not interviewed Plaintiff, S.J.K., Jamie Renee Walker, Cody Lane Koelle, or any other relevant witnesses before obtaining three first-degree-felony arrest warrants.

255. The submission included ADA accommodation requests, medical documentation, and attachments that Plaintiff believed demonstrated retaliation and the suppression of exculpatory information.

256. Despite receiving this notice at the highest policymaking levels of County government, no corrective action, administrative inquiry, or policy review was initiated.

257. County Attorney leadership directly received many of Plaintiff's communications and evidentiary submissions during this period. The available records show that senior officials were aware of the communications between the County Attorney's Office and defense counsel John Green, and that Sgt. Reamer proceeded with the warrant applications based on information obtained from those sources. Although the affidavits referenced Sgt. Reamer's investigative training and experience, they reflect that she conducted no interviews and performed no independent fact-gathering before submitting the warrant applications against Plaintiff and his father. The County continued to rely on these affidavits without modification despite the discrepancies identified in later submissions.

**J. Multi-Agency Notifications and Formal Certified Complaints (See Exhibit M-018)**

**258.** Between May and November 2025, Plaintiff's father, James Louis Roden Sr., submitted a series of sworn, notarized complaints—each cover letter tailored to the receiving agency and delivered by certified mail with return receipt—to a broad range of federal, state, and oversight entities. Each submission included (a) a copy of the arrest-warrant affidavit executed by Investigator Elaine Reamer, and (b) a fifty-three-page Internal Affairs complaint detailing fabricated probable cause, perjury, ADA violations, and retaliatory conduct. Agencies notified included:

• **The Federal Bureau of Investigation (FBI)** – San Antonio Field Office, Civil Rights / Public Corruption Unit, including Special Agent James Robert Wilson III.

• **The U.S. Department of Justice, Civil Rights Division** (Special Litigation Section and Disability Rights Section).

• **The U.S. Attorney's Office for the Western District of Texas**, Civil Rights Coordinator.

• **The U.S. Department of Veterans Affairs, Office of Inspector General (OIG).**

• **The Texas Rangers – Public Integrity Unit**, Texas Department of Public Safety.

• **The Office of the Texas Attorney General, Civil Rights Division**, attention: Attorney General Ken Paxton.

• **The Office of the Governor of Texas**, attention: Governor Greg Abbott.

• **President Donald J. Trump**, President of the United States.

• **United States Congress —**

  • U.S. Representative Randy K. Weber, Sr. (Texas's 14th Congressional District).

  • U.S. Senator Ted Cruz (Texas).

  • U.S. Senator John Cornyn (Texas).

• **Texas Legislature —**

- State Representative Dr. Greg Bonnen (House District 24).

- State Senator Mayes Middleton (Senate District 11).

• **The Texas Commission on Law Enforcement (TCOLE)** – Professional Conduct & Complaints Division.

• **The Texas Innocence Network** (University of Houston Law Center) and **The Innocence Project** (National Legal Review Division).

• **The American Civil Liberties Union (ACLU)** – National Office and ACLU of Texas, Civil Rights & Disability Rights Projects.

• **Investigative Media Organizations**, including The Texas Tribune.

**259.**    All submissions were notarized, individualized to each agency, and expressly requested an investigation or federal oversight. Nearly all agencies responded with signed green-card confirmations of receipt.

**260.**    Each packet contained sworn allegations, recorded evidence, and detailed analysis showing that:

**(1)** the arrest-warrant affidavit contained materially false statements and unverified hearsay;

**(2)** no probable-cause determination could be substantiated from the investigative record;

**(3)** both Plaintiff and his father were arrested immediately after making protected reports of abuse of an IDD adult; and

**(4)** the County Attorney's Office and Investigator Reamer engaged in retaliation, ADA violations, and misuse of prosecutorial authority.

**261.**    Despite these extensive notices—supported by sworn documentation and delivered through formal channels—no corrective action was taken by the Sheriff's Office, the County Attorney's Office, or any supervising policymaker. The first-degree felony charges against

Plaintiff and his father remained active for months with no grand-jury presentation, no probable-cause review, and no judicial oversight.

**Procedural Timeline of Events Concerning the Walker Proceedings**

**262.    February 2024** – The investigation concerning allegations against Michael Allen Walker in the rape against IDD Shelby Jane Keolle (S.J.K.) was closed with a finding that the relationship was "consensual."

**263.    April 22, 2024** – The Guadalupe County Sheriff's Office and Adult Protective Services determined that S.J.K. did not meet criteria for intellectual or developmental disabilities (IDD) following a virtual evaluation reported to have lasted approximately twenty minutes. This determination was consistent with the earlier conclusion in February 2024 that the conduct at issue was "consensual."

**264.    April 23, 2024** – Michael Allen Walker was appointed defense counsel John Green, a former Guadalupe County Assistant County Attorney and former classmate of Jessica Johnson, the lead prosecutor assigned to his case.

**265.    April 26, 2024** – While in custody on pending felony charges, Michael Allen Walker's probation on an unrelated "deadly conduct" conviction was finalized with a rating of "satisfactory," resulting in no additional jail time on that conviction.

**266.    May 25, 2024** – S.J.K. was removed from her family and longtime advocates and restricted from communicating with them. At the time, her advocates were attempting to obtain recognition of her IDD status. Following this removal, she no longer had access to advocacy support.

267.    On **July 8, 2024**, a Guadalupe County grand jury returned indictments against Michael Allen Walker that conspicuously omitted any reference to Shelby Jane Koelle's well-documented intellectual and developmental disability. Rather than alleging disability as the aggravating element, the indictments relied instead on allegations that the offense was committed through threats, fear of death, or serious bodily harm. This charging decision was made despite the County's possession of extensive disability documentation, including decades of SSI eligibility, educational records, and a comprehensive neuropsychological evaluation confirming significant cognitive impairments. By electing to proceed under a fear-based theory rather than a disability-based theory, the County avoided placing Shelby's decisional incapacity squarely before the court—an issue that would have materially complicated any claim of consent and significantly strengthened the State's burden. The deliberate omission of disability from the charging instrument reflects a strategic narrowing of the case that insulated Michael Allen Walker from the legal consequences that would have flowed from Shelby's established IDD status, while preserving prosecutorial flexibility to later minimize or abandon the aggravated charges altogether.

268.    **August 1, 2024** – Investigator Reamer denied a request for S.J.K. to return to League City to be near family and instead placed her under the supervision of Andrea Martin Koelle, who had previously expressed negative views toward Jamie Renee Walker and had expressed support for Michael Allen Walker due to a pervious alleged relationship. During this period, S.J.K. reported instability and difficulties in the placement.

269.    **December 18, 2024** – Michael Allen Walker was appointed an additional public defender. During this same period, Jamie Renee Walker continued with a single court-appointed attorney who had limited communication with her.

**270.    January 31, 2025** – Cody Lane Koelle and his wife, Andrea Martin Koelle, executed two sworn affidavits supporting Michael Allen Walker. In her affidavit, Andrea Martin Koelle stated that S.J.K. was not IDD and falsely described her literacy and financial abilities. She also stated she trusted Michael Allen Walker despite his criminal history and his pending first-degree felony charges with DNA evidence.

**271.    February 28, 2025** – Assistant County Attorney Jessica Johnson filed a motion seeking to increase Jamie Renee Walker's bond to one million dollars and set a hearing for April 7, 2025. No contact was made with either Jamie Renee Walker or S.J.K. prior to filing.

**272.    March 15, 2025** – Defense counsel for Michael Allen Walker, in coordination with the County Attorney's Office, arranged transportation, lodging, and meals for Cody Lane Koelle to travel to Seguin to testify at the April 7th, 2025 bond hearing.

**273.    March 20, 2025** – After Plaintiff advocated for S.J.K. to testify at the April 7 hearing, Assistant County Attorney Jessica Johnson denied requests for transportation or lodging for S.J.K.

**274.    March 21, 2025** – Following Plaintiff's request that S.J.K. be permitted to appear, Jessica Johnson issued subpoenas to nearly all members of Plaintiff's family for the April 7 hearing, with notices of potential fines and possible jail sanctions for noncompliance.

**275.    April 1, 2025** – A report submitted to the Guadalupe County Attorney's Office alleged that S.J.K. had been subjected to sexual exploitation involving Cody Lane Koelle and another individual. No criminal investigation or follow-up action was initiated in response to the report before subsequent proceedings.

276.    **April 4, 2025** – The April 7 bond hearing was re-designated as a pretrial hearing. Defense counsel Kelly Pittl filed a motion to withdraw as attorney for Jamie Renee Walker.

277.    On **April 7, 2025**, Plaintiff, his father (James Louis Roden Sr.), and Jamie Renee Walker were arrested on first-degree felony witness-tampering charges shortly before a scheduled court hearing. Approximately fifteen minutes after the arrests, Jamie Renee Walker's court-appointed counsel, Kelly Pittl, appeared and withdrew representation, leaving her unrepresented at a critical stage of the proceedings. Plaintiff, his father, and Jamie Renee Walker were each assigned preset $100,000 bonds, for a combined total approaching one-third of a million dollars. Jamie Renee Walker remained incarcerated, while Plaintiff and his father were released under restrictive bond conditions prohibiting contact with both Cody Lane Koelle and Shelby Jane Koelle (S.J.K.). Ironically, and with no evidentiary consistency, the County invoked S.J.K.'s intellectual and developmental disability to justify charging Plaintiff with first-degree felony witness tampering, while deliberately declining to rely on that same disability status in either the sexual-assault prosecution of Michael Allen Walker or the related case against Jamie Renee Walker.

278.    **June 18, 2025** – During a bond hearing for Jamie Renee Walker, Cody Lane Koelle testified at county expense and alleged that his signature on the November 15, 2024 notarized affidavit had been forged by Plaintiff. He also gave inconsistent statements about whether his sister was IDD. Assistant County Attorney Jonathan Amdur responded to questioning by stating, "but she is an adult," emphasizing age rather than disability status in relation to consent.

279.    **July 2, 2025** – Michael Allen Walker entered into a plea agreement dismissing six pending first-degree felony charges of aggravated sexual assault in exchange for a plea to a single count of *Prohibited Sexual Conduct (Incest)*. **(See Exhibit A-019).** In reaching this disposition, Guadalupe County officials effectively disregarded and erased the victim's

intellectual and developmental disability ("IDD") status, despite overwhelming and undisputed evidence establishing that status, including documented medical evaluations, formal psychological testing, special-education school records, judicial recognition, and more than twenty years of Supplemental Security Income ("SSI") disability payments based on IDD.

280.    By treating an adult with well-documented IDD as legally indistinguishable from a non-disabled individual for purposes of consent, vulnerability, and coercion, the County adopted and enforced a dangerous precedent: that grooming behaviors—such as emotional manipulation, gift-giving, housing control, and financial inducements—can be reframed as "consensual" sexual relationships when directed at an IDD individual, thereby stripping that individual of the heightened protections afforded by Texas law, the ADA, and federal disability-rights statutes.

281.    This precedent not only undermines statutory safeguards designed to protect persons with intellectual and developmental disabilities from sexual exploitation, but also signals to offenders that disability-based protections may be nullified through selective charging decisions, even where the result is unplanned and unwanted pregnancy. Such a practice exposes disabled individuals to increased risk of exploitation and reflects a systemic failure to enforce disability-related protections in the criminal-justice process.

282.    **September 19, 2025** – The Guadalupe County Sheriff's Office closed a sworn criminal complaint submitted by Dolores Jane Roden with a classification of "civil," and no criminal investigation was conducted.

283.    **October 3, 2025** – Through her advocate, Kimberly Kennedy, S.J.K. requested to testify at the upcoming sentencing hearing in Michael Allen Walker's case. During a conference call between Ms. Kennedy, Victim Coordinator Ileen Rangel, and Assistant County Attorney

Jonathan Amdur, S.J.K. personally described the abuse she stated she had experienced and further explained the abuse her mother, Jamie Renee Walker, had suffered, again insisting that both she and her mother were victims. During the call, Ms. Kennedy reminded both officials that S.J.K. and Jamie Renee Walker had documented intellectual and developmental disabilities (IDD). Because S.J.K. was eight months pregnant and residing out of state, Ms. Kennedy requested ADA accommodations, including remote testimony. When Ms. Rangel and Mr. Amdur stated that no remote options were available due to judicial discretion, Ms. Kennedy proposed an alternative accommodation: transcribing a video statement from S.J.K. and having it read aloud in court. After S.J.K. submitted a recorded video statement, the sentencing hearing was canceled. November 3, 2025 – S.J.K. requested that her prior video statement be transcribed and read aloud at the rescheduled sentencing hearing as an ADA accommodation. The request was not acted upon. Michael Allen Walker was sentenced under the plea agreement, making him eligible for parole after serving 25 percent of his sentence. Accounting for time served and "good behavior" credits, he had already exceeded the required portion and became eligible for immediate parole consideration.

284.    **November 3, 2025** – In advance of the rescheduled sentencing hearing, S.J.K. requested ADA accommodations that would allow her to testify by video conference or phone, due to her being a few weeks away from giving birth, living out of state, and medically unable to travel. No such accommodations were provided. She then requested that her prior video statement be transcribed and read aloud in court as an alternative accommodation. This request was also not acted upon. As a result, no victim-impact statement or testimony from S.J.K. was entered into the record. Michael Allen Walker was then sentenced under a negotiated plea agreement in which all six aggravated sexual-assault charges were dismissed, and he pled to a single count incest. Under

Texas parole rules, he became eligible for parole after serving 25 percent of his sentence; because his time served and good-conduct credits already exceeded that threshold, he immediately became eligible for parole consideration. Because no victim testimony was accepted or placed in the record, parole officials will be unable to consider S.J.K.'s account when evaluating his parole suitability.

# VIII. CAUSE OF ACTION

## COUNT 1 – Unlawful Seizure and False Arrest

*(Fourth Amendment, via the Fourteenth Amendment; 42 U.S.C. § 1983)*

**Against Defendant Sergeant Elaine M. Reamer (Individual Capacity)**

### A. Incorporation by Reference

**285.**    Plaintiff incorporates by reference paragraphs 1–284 as though fully set forth herein.

### B. Legal Standard

**286.**    The Fourth Amendment prohibits the arrest or seizure of any person without probable cause. A warrant obtained through false statements, material omissions, or reckless disregard for the truth violates the Fourth Amendment. *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978); *Winfrey v. Rogers*, 901 F.3d 483, 494–95 (5th Cir. 2018).

**287.**    Under *Franks*, a plaintiff states a constitutional violation where the affiant (1) knowingly, intentionally, or recklessly made false statements or omitted material information, and (2) those statements or omissions were necessary to the finding of probable cause.

**288.** An officer also violates clearly established law when she "closes her eyes to facts that would help exonerate the suspect" or when she "knowingly or recklessly disregards exculpatory information." *Hernandez v. City of Houston*, 17 F.4th 788, 797 (5th Cir. 2021).

**289.** The Fifth Circuit further holds that an officer violates the Fourth Amendment when she causes a prosecution by forwarding a materially incomplete, misleading, or distorted investigative record to prosecutors— including by withholding exculpatory evidence or ignoring obvious contradictions— even if a prosecutor makes the ultimate charging decision. *Espinal v. City of Houston*, 87 F.4th 593, 602–04 (5th Cir. 2024).

**290.** The Fifth Circuit recognizes that when criminal charges proceed, a plaintiff remains "seized" for Fourth Amendment purposes under a theory of continuing seizure. *Winfrey v. Rogers*, 901 F.3d 483, 491–92 (5th Cir. 2018). The Supreme Court has likewise held that pretrial detention and ongoing criminal restraints imposed pursuant to legal process unsupported by probable cause constitute a Fourth Amendment seizure. *See Manuel v. City of Joliet*, 580 U.S. 357, 367–69 (2017). Initiating legal process without probable cause therefore constitutes a Fourth Amendment violation.

**291.** Defendant cannot invoke the independent intermediary doctrine to shield herself from liability. Although a magistrate signed the arrest warrant, the warrant was procured through an affidavit that omitted material exculpatory evidence and relied on a narrative controlled by the County Attorney's Office. Where an intermediary's probable-cause determination is tainted by false statements or material omissions supplied by law enforcement, the causal chain is not broken, and liability under 42 U.S.C. § 1983 remains. See, e.g., *Hand v. Gary*, *Deville v. Marcantel*, *Winfrey v. Rogers*, and *Green v. Thomas*.

292.    The false statements and omissions in Defendant Reamer's affidavit were material because, had the magistrate been provided with the April 4, 2024 interview, the multiple consistent affidavits from the victim, and the absence of any evidence of coercion by Plaintiff the omitted evidence directly undermined the sole factual basis cited for probable cause.

**C. Factual Basis of the Violation**

293.    On April 7, 2025, Defendant Sergeant Elaine M. Reamer prepared and swore an arrest-warrant affidavit accusing Plaintiff of First-Degree Felony Tampering with a Witness. Acting pursuant to that affidavit, Plaintiff was seized and taken into custody on April 8, 2025, at approximately 4:43 a.m., when he voluntarily surrendered at the Guadalupe County Sheriff's Office. The affidavit was the sole asserted basis for Plaintiff's arrest and subsequent detention.

294.    As further alleged in ¶¶ 240–243 above, the arrest warrant issued against Plaintiff lacks any verifiable record demonstrating when, how, or by what method a neutral magistrate received, reviewed, or approved the sworn affidavit prior to Plaintiff's arrest. No electronic signature metadata, timestamp, routing log, magistrate record, or clerk entry exists establishing that a judicial probable-cause determination occurred before Plaintiff was seized. This absence of verifiable judicial review independently rendered the warrant constitutionally defective and deprived Plaintiff of the Fourth Amendment safeguard of pre-arrest neutral review.

295.    When preparing the affidavit, Defendant Reamer knowingly or recklessly omitted material exculpatory information that was in her possession, including:

   (a) recorded statements previously provided by the victim, S.J.K., in prior law-enforcement interviews;

   (b) sworn affidavits from the victim that were consistent with those earlier statements;

**(c)** video and audio recordings demonstrating that the victim's communications were voluntary and not coerced;

**(d)** records establishing Plaintiff's lawful role as an advocate assisting the victim due to her intellectual and developmental disabilities; and

**(e)** evidence contradicting any claim that Plaintiff exerted improper influence over the victim.

**296.**    Reamer also failed to disclose that on April 1, 2025—six days before she sought a warrant—Plaintiff submitted a legally mandated abuse report documenting the ongoing sexual exploitation of the victim in Cody Lane Koelle's residence. Rather than investigate that report, Reamer omitted it entirely and instead listed Cody Lane Koelle as a "victim" in Plaintiff's bond conditions. This omission concealed from the magistrate (1) that Plaintiff was fulfilling mandated-reporter duties, not influencing testimony, and (2) that Reamer had disregarded a report of active exploitation that directly contradicted her narrative. Omitting this mandated-report filing materially distorted Plaintiff's intent and constituted reckless disregard for the truth.

**297.**    Defendant Reamer also omitted the April 4, 2024 recorded law-enforcement interview that she personally conducted with the victim, as summarized in the forensic psychological report authored by Dr. John Delatorre, Psy.D. During that interview, the victim stated that Michael Walker threatened her with physical violence if she disclosed their sexual activity, and she affirmatively stated that her IDD mother "was never involved in any sexual activity." These statements matched the victim's subsequent affidavits and recorded statements, including those dated November 15th, 2024 and March 15th, 2025. Despite this, in her April 7, 2025 arrest-warrant affidavit, Defendant Reamer asserted that Plaintiff had "coerced the victim into changing her statement" to say her mother was not involved. The April 4, 2024 interview—which occurred

nearly a year before Plaintiff's involvement—directly contradicted that assertion and demonstrated that the victim's account had not changed.

**298.**     Reamer further omitted that, throughout March 2025, Plaintiff had been acting as a documented advocate for the victim, filing ADA accommodation requests on her behalf, requesting appointment of a guardian ad litem due to her disability, and attempting to restore communication between the victim and the County Attorney's Office, which had ceased contact with her for months. These actions were directly relevant to Plaintiff's intent and inconsistent with any theory of coercion or manipulation. By excluding Plaintiff's documented advocacy and disability-related filings, Reamer deprived the magistrate of information that would have demonstrated a lawful, protective purpose behind Plaintiff's communications and defeated any inference of criminal influence.

**299.**     Defendant Reamer further misrepresented the source of statements regarding the County Attorney's Office's communication with the victim. In the affidavit, Reamer stated that Plaintiff was "telling the victim that no one had been in contact with her from the prosecutor's office," implying that the information originated with Plaintiff. This was inaccurate. In a recorded three-way call on March 19, 2025—reviewed by Reamer—the victim stated independently: "Y'all are saying that you guys have spoken to me, but I've never spoken to y'all," and "I have not spoken to anybody... I haven't been allowed to talk to anybody since I moved down here." During the same call, Victim Assistance Coordinator Abigal from the County Attorney's Office confirmed that their last contact with the victim occurred on October 30, 2024. These statements reflected that this information originated from the victim herself and was consistent with the County's own records.

**300.**    Reamer also asserted in the warrant affidavit that Plaintiff had "repeatedly been in contact with the victim," implying that Plaintiff initiated communication for the purpose of influencing her. This statement was made without interviewing Plaintiff, without interviewing the victim, and without reviewing the phone records that were readily available to her. Those records—later obtained by Plaintiff—show that the victim initiated virtually all substantive communication, including over 100 missed calls to Plaintiff and dozens of text messages sent by her, while Plaintiff made only minimal return contact. By characterizing the victim's attempts to reach Plaintiff as Plaintiff "repeatedly contacting" her, Reamer materially inverted the evidence. No reasonable officer could have reached that conclusion based on the actual call and message logs. This misrepresentation was central to her claim that Plaintiff was attempting to influence a witness, and therefore constitutes a deliberate or reckless falsehood under Franks v. Delaware.

**301.**    Defendant Reamer also possessed a notarized affidavit executed by the victim on March 15, 2025, in Dodge City, Kansas. In that affidavit, the victim affirmed the truthfulness and voluntariness of her prior recorded statements. The affidavit began with the declaration: *"I make this statement freely and voluntarily, without coercion, duress, or promise of benefit."*

**302.**    The affidavit was independently initiated by the victim. At the time it was executed, Plaintiff was living more than 600 miles away. The victim located a notary on her own, signed the affidavit, and mailed it directly to Guadalupe County officials.

**303.**    On March 20, 2025, the affidavit was e-filed into the public court record in *State v. Jamie Renee Walker*, Case No. 24-1775-CR-B. On that same date it was formally served electronically on Assistant County Attorney Jessica Johnson, ensuring that both the County Attorney's Office and the Sheriff's Office had access to the affidavit.

**304.**   Under established law, an investigating officer is deemed to have knowledge of exculpatory materials reasonably available to the investigative team, including evidence in the possession of prosecutors. See *Kyles v. Whitley*, 514 U.S. 419, 437–38 (1995); *Gonzalez v. Treviño*, 601 U.S. ___ (2024); *Espinal v. City of Houston*, 87 F.4th 593, 602–04 (5th Cir. 2024). As the lead investigator, Defendant Reamer was therefore charged with knowledge of the affidavit's contents at the time she submitted her April 7, 2025 arrest-warrant application.

**305.**   In the March 15 affidavit, the victim reiterated multiple factual statements she had previously given to law enforcement, including that:

- her mother, Jamie Renee Walker, was not involved in any criminal activity;

- Jamie was herself a victim of ongoing abuse; and

- Jamie had no knowledge of any alleged offense until after the victim was removed from the home.

These statements were consistent with the victim's April 4, 2024 recorded interview and with every subsequent recorded or written statement by the victim over the following year.

**306.**   The victim's narrative was not only consistent with County records—it was also consistently stated to every family member or advocate who communicated with her during that period, including Kimberly Kennedy, Dolores Jane Roden, James Louis Roden Sr., and Plaintiff. None of these individuals ever heard any version of events different from the victim's account reflected in the April 4, 2024 interview, the November 2024 affidavit, and the March 15, 2025 notarized affidavit. There was no alternative narrative for Plaintiff or anyone else to "influence," "create," or "coerce," because the victim's account had never changed when speaking to any of these witnesses.

**307.** A minimal investigative step—such as interviewing even one of these witnesses—would have immediately revealed that the victim had consistently repeated the same account for more than a year. Despite this, no witness interviews were conducted before Defendant Reamer submitted the April 7, 2025 arrest-warrant affidavit.

**308.** The March 15 affidavit also stated: *"Despite these repeated statements, Officer Reamer refused to believe me and attempted to convince me otherwise."* This information was directly relevant to whether the victim's statements were voluntary, consistent, and independent, and contradicted any suggestion that Plaintiff influenced or altered the victim's narrative.

**309.** Despite having constructive and actual access to the March 15 affidavit—including its voluntariness declaration, its consistency with prior statements, and its account of the victim's repeated communications—Defendant Reamer omitted the affidavit in its entirety from her April 7th, 2025 arrest-warrant submission. She nonetheless asserted in her sworn application that the victim's statements had changed due to Plaintiff's influence, even though the affidavit and the testimony of readily available witnesses directly refuted that proposition.

**310.** These omissions and misrepresentations materially altered the evidentiary presentation provided to the magistrate. Had the affidavit included the April 4, 2024 recorded interview, the March 15, 2025 notarized affidavit, the County's documented lack of communication with the victim, and the victim's consistent non-involvement statements, no reasonably competent officer or magistrate could have concluded that probable cause existed for felony witness tampering.

**311.** As a direct result of Defendant Reamer's affidavit, a warrant issued, and Plaintiff was seized, arrested, detained, subjected to restrictive felony bond conditions, and placed under ongoing criminal process without lawful probable cause.

**312.**    No alternative offense, lesser-included charge, or independent lawful basis existed that could have supported Plaintiff's arrest or seizure. The evidence in Defendant Reamer's possession affirmatively negated every statutory element of felony witness tampering and did not establish probable cause for any other criminal offense.

**313.**    On July 18, 2025, the Guadalupe County Attorney formally declined prosecution, constituting a favorable termination under Thompson v. Clark, 596 U.S. 36 (2022).

**D. Causation**

**314.**    Defendant Reamer's false statements and reckless omissions were essential to the magistrate's finding of probable cause and were therefore the direct and proximate cause of the issuance of the arrest warrant. Because the affidavit was the sole basis for initiating legal process, Reamer's misrepresentations were the moving force behind Plaintiff's seizure, arrest, detention, and the continuing restraints imposed on him. No independent law-enforcement investigation, evidentiary review, witness interview, and credibility assessment occurred between Defendant Reamer's submission of the affidavit and Plaintiff's arrest. Had the affidavit disclosed the omitted exculpatory information or excluded the materially false statements, no reasonable magistrate could have found probable cause.

**E. Clearly Established Right / Qualified Immunity**

**315.**    At the time of Plaintiff's arrest, it was clearly established that:

**(a)** an officer violates the Fourth Amendment by submitting a warrant affidavit containing false statements or statements made with reckless disregard for the truth, *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978);

**(b)** an officer likewise violates the Fourth Amendment by knowingly or recklessly omitting material exculpatory information necessary to the probable-cause determination, *Winfrey v. Rogers*, 901 F.3d 483, 494–95 (5th Cir. 2018); *Hernandez v. City of Houston*, 17 F.4th 788, 797 (5th Cir. 2021);

**(c)** a magistrate's issuance of a warrant does not shield an officer from liability where the officer's affidavit was materially misleading, *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986);

**(d)** an officer may not rely on "isolated pieces of evidence" while ignoring readily available exculpatory information, nor may an officer "close her eyes to facts that would help exonerate the suspect," *Hernandez v. City of Houston, 17 F.4th 788, 797 (5th Cir. 2021)*; and

**(e)** qualified immunity does not apply where a plaintiff plausibly alleges that an officer deliberately or recklessly presented a materially incomplete or distorted record to the magistrate, as reaffirmed in *Gonzalez v. Treviño*, 601 U.S. ___ (2024).

**316.**    A reasonable officer in Defendant Reamer's position—*and particularly an officer with the precise credentials she affirmed under oath*—would have unquestionably known that submitting a materially misleading affidavit violates clearly established Fourth Amendment law. In her sworn arrest-warrant affidavit, Defendant Reamer represented herself as an investigator with 16 years of law-enforcement experience, over 3,000 hours of TCOLE training, and possession of a Master TCOLE License, asserting that she was fully trained in the preparation of criminal complaints and probable-cause affidavits. An officer with this level of training and certification is held to the standard of knowing that:

- exculpatory evidence cannot be withheld from a magistrate,

- known contradictions cannot be ignored,

- material omissions invalidate probable cause, and

- an affiant must not present statements contradicted by the evidence she reviewed.

317.    Given her advanced training, Defendant Reamer would have known that omitting recorded victim interviews, sworn affidavits, and prior consistent statements—while simultaneously presenting assertions refuted by those same materials—constituted a clear violation of *Franks* and its well-established progeny. No reasonable officer, and certainly no officer with a Master TCOLE License, could believe that submitting a warrant application built on omissions, distortions, and statements contrary to the record was lawful. Defendant Reamer is therefore not entitled to qualified immunity.

318.    By affirming her advanced credentials, Reamer eliminated any conceivable argument that these misstatements were the product of mistake, inexperience, or misunderstanding; the only reasonable inference is that the errors were intentional or made with reckless disregard for the truth.

319.    Defendant Reamer affirmatively represented in her sworn affidavit that she had reviewed relevant evidence prior to seeking the arrest warrant. However, the materials she claimed to have reviewed—including recorded interviews, sworn affidavits, communication records, and documentary evidence already in the County's possession—directly contradicted the factual assertions presented in her affidavit and affirmatively exonerated Plaintiff. An officer may not claim to have reviewed evidence while misstating its contents or omitting its exculpatory significance.

320.    Under clearly established law, when an officer asserts that she reviewed evidence but then presents a version of events that is irreconcilable with what that evidence actually shows, the

affidavit is materially false within the meaning of *Franks v. Delaware*. Whether Defendant Reamer failed to review the evidence she claimed to have reviewed, or reviewed it and knowingly or recklessly distorted its contents, the constitutional violation is the same. In either case, no reasonable officer could believe that probable cause existed.

321.    Fifth Circuit precedent makes clear that an officer may not avoid liability by professing review of evidence while simultaneously presenting assertions refuted by that evidence. See *Winfrey v. Rogers*, 901 F.3d 483, 494–96 (5th Cir. 2018); *Hernandez v. City of Houston*, 17 F.4th 788, 797 (5th Cir. 2021). Because Defendant Reamer's affidavit was contradicted by the very materials she claimed to have reviewed, qualified immunity is unavailable.

322.    Arresting a citizen for a first-degree felony based solely on an affidavit that omits recorded victim interviews, sworn affidavits, and objective evidence negating every statutory element of the offense—while mischaracterizing communications and ignoring readily available contradictory facts—is objectively unreasonable under any standard of constitutional policing. No reasonable officer could believe such conduct complied with the Fourth Amendment.

**F. Incorporation of Global Damages and Relief**

323.    Plaintiff incorporates the Global Damages section and the Global Prayer for Relief as though fully set forth herein.

## COUNT 2 – Due Process Violation: Fabrication and Suppression of Evidence

*(Fourteenth Amendment; 42 U.S.C. § 1983)*

**Against Defendant Sgt. Elaine M. Reamer (Individual Capacity)**

**A. Incorporation by Reference**

144

**324.**   Plaintiff incorporates by reference paragraphs 1–323 as though fully set forth herein.

**B. Legal Basis and Clearly Established Rights**

**325.**   The Fourteenth Amendment's Due Process Clause prohibits law-enforcement officers from fabricating evidence, deliberately suppressing known exculpatory information, or materially misrepresenting evidence in order to initiate or maintain criminal proceedings. Criminal process founded on fabricated or materially incomplete evidence violates fundamental principles of fairness and due process. *Mooney v. Holohan*, 294 U.S. 103 (1935); *Castellano v. Fragozo*, 352 F.3d 939, 953–55 (5th Cir. 2003) (en banc).

**326.**   It is clearly established that an officer violates due process by knowingly or recklessly mischaracterizing evidence, omitting material exculpatory facts, or presenting a distorted factual narrative that creates the false appearance of criminal conduct where none exists. *Winfrey v. Rogers*, 901 F.3d 483, 494–96 (5th Cir. 2018); *Cole v. Carson*, 802 F.3d 752, 771–73 (5th Cir. 2015).

**327.**   Due-process liability arises when fabricated or suppressed evidence is used to secure legal process that results in a deprivation of liberty, including arrest, detention, bond restrictions, or the continuation of criminal proceedings. Such violations occur regardless of whether a conviction ultimately results. *Castellano*, 352 F.3d at 953–55; *Winfrey*, 901 F.3d at 491–92.

**328.**   An officer may not shield herself from liability by selectively relying on inculpatory fragments while withholding readily available evidence that negates an essential element of the alleged offense. Nor may an officer claim to have "reviewed" evidence while materially misrepresenting its contents or suppressing its exculpatory significance. *Hernandez v. City of Houston*, 17 F.4th 788, 797 (5th Cir. 2021).

145

**329.**    These principles were clearly established well before April 2025. No reasonable officer could believe it lawful to initiate criminal process through fabricated facts, distorted evidence, or the suppression of material exculpatory information.

**330.**    As set forth in detail below, Defendant Reamer violated these clearly established due-process protections by fabricating a narrative of coercion, suppressing known exculpatory evidence, and initiating criminal proceedings against Plaintiff through materially misleading representations.

### C. Factual Basis of the Violation

**331.**    Defendant Sergeant Elaine M. Reamer is a highly trained law-enforcement officer with over sixteen years of experience, more than 3,000 TCOLE training hours, and a Master Peace Officer License. In the April 7, 2025 arrest-warrant affidavit, she highlighted these credentials to represent to the magistrate that she understood her constitutional duties, including the duty to disclose material facts, avoid false statements, and refrain from misleading omissions. Her subsequent conduct—excluding exculpatory materials, mischaracterizing known evidence, and relying on contradictory witness statements—occurred despite this training.

**332.**    In preparing the April 7, 2025 affidavit, Reamer omitted several categories of exculpatory evidence that were in her possession, including:

**(a)**    The April 4, 2024 video-recorded interview conducted by Reamer, during which S.J.K. stated that Michael Walker threatened her with violence if she disclosed the sexual abuse, and that her mother was never involved in any sexual activity. This interview occurred nearly one year before the affidavit and directly contradicted the claim that Plaintiff influenced or altered her account. The suppression of a pre-existing statement made nearly a year before Plaintiff's

arrest—affirming the mother's innocence—constitutes independent evidence of fabrication because it contradicts the central premise of the affidavit.

**(b)**    Two notarized affidavits executed by S.J.K. on November 15, 2024 and March 15, 2025, confirming that her statements were voluntary, consistent, and not the product of coercion. Both affidavits were obtained independently by S.J.K. in Kansas, over 600 miles away from Plaintiff.

**(c)**    Three voluntary video statements recorded on March 10, March 12, and March 19, 2025, which Defendant Reamer acknowledged reviewing, each initiated by S.J.K., in which she reaffirmed her statements and denied coercion.

**(d)**    Phone-record documentation shows that S.J.K. initiated the overwhelming majority of telephone communications with Plaintiff, with records reflecting hundreds of missed calls from S.J.K. to Plaintiff, and only a small number of outgoing calls from Plaintiff to her—each one corresponding to a return call responding to her prior missed attempts. The call-log pattern further reflects that Plaintiff consistently attempted to limit contact, repeatedly instructing S.J.K. to communicate with her long-time advocate, Kimberly Kennedy, rather than with him. Plaintiff's role during this period was limited to contacting government agencies, assisting with ADA-related requests, researching applicable resources, and supporting Ms. Kennedy in helping S.J.K. secure appropriate services, accommodations, and protections. These objective phone-record patterns contradict the affidavit's assertion that Plaintiff exerted "constant pressure" or initiated improper contact.

**(e).**    In the April 7, 2025 arrest-warrant affidavit, Defendant Reamer affirmatively represented that she had reviewed at least one FaceTime video involving Plaintiff and S.J.K. Despite this representation, the affidavit did not identify, quote, or describe any statement by Plaintiff that

147

directed, requested, induced, threatened, or encouraged S.J.K. to alter testimony, withhold

information, or provide false statements. This omission was not the result of selective

summarization; rather, it reflected the absence of any coercive or tampering conduct in the

recordings themselves. Each video instead shows Plaintiff asking open-ended questions,

confirming that S.J.K. was acting of her own free will, and expressly inquiring whether she was

being coerced, bribed, or pressured by anyone, including Plaintiff. In every instance, S.J.K.

stated she was speaking voluntarily and without coercion.

**333.**    Reamer also excluded the March 18, 2025 recorded phone call in which Cody Lane

Koelle admitted that he signed the November 2024 affidavit, confirmed its truthfulness,

described Michael Walker's violence, and stated that the Guadalupe County Attorney's Office

was pressuring him to change his story. Plaintiff submitted this recording to prosecutors on

March 19, 2025. Reamer omitted it and placed Cody Lane Koelle as a victim in Plaintiff bond

restrictions.

**334.**    Reamer disregarded the March 31, 2025 forensic report by forensic psychologist Dr. John

Delatorre, which documented:

• Both Jamie Renee Walker and S.J.K. are IDD;

• S.J.K. stated clearly that her mother had no sexual contact with her and both were victims of

abuse.

• Their statements remained consistent across time, including the April 4, 2024 interview.

**335.**    Reamer further omitted Plaintiff's April 1, 2025 mandated report, which Plaintiff

submitted to the Guadalupe County Attorney's Office and CPS pursuant to his statutory reporting

obligations. In that report, Plaintiff documented concerns that the victim—an adult with

documented IDD—was pregnant for a second time while residing in a placement arranged by

Officer Reamer and while under the supervision of Guadalupe County and the care of Cody Lane Koelle. Plaintiff expressly requested anonymity, as permitted and protected by Texas mandated-reporter confidentiality laws. The report contained no statements urging, directing, influencing, or interfering with the victim's testimony or communications in any manner. By omitting both the existence and substance of the mandated report, Reamer withheld material information demonstrating that Plaintiff acted through lawful reporting channels, in a protective and non-coercive capacity, and in a manner wholly inconsistent with witness tampering. Disclosure of these facts would have negated any inference of criminal intent and was therefore material to the magistrate's probable-cause determination.

336. On April 5, 2025—four days after submission of the mandated report—the victim informed Plaintiff via voicemail that Victim Coordinator Ileen Rangel had told her, "your uncle said you were pregnant." This disclosure, which originated from the April 1 mandated report, confirms that prosecutors and investigators reviewed the report before the affidavit was prepared. Despite this knowledge, the affidavit omitted any mention of the report, its context, or the request for anonymity, preventing the magistrate from understanding the source and legitimacy of the information attributed to Plaintiff.

337. The timing and content of Plaintiff's April 1, 2025 mandated report provided a plausible contextual explanation for why exculpatory evidence was suppressed and a coercion narrative was advanced. The report implicated the County's key witness, Cody Lane Koelle, in renewed sexual exploitation of an IDD adult and exposed potential County liability for failing to protect her. By omitting this report from the affidavit and instead portraying Plaintiff as the wrongdoer, Defendant Reamer inverted the facts to shield the County, herself and preserve its narrative. This intentional suppression further supports a finding of fabrication.

149

338.    Reamer also excluded Plaintiff's March 23 and March 26, 2025 ADA communications requesting accommodations for S.J.K. and seeking appointment of a Guardian Ad Litem. These filings identified Plaintiff as her advocate and demonstrated his efforts to bring the matter under court supervision. Their omission removed evidence that contradicted the premise of coercion.

339.    Reamer stated in her affidavit that she had "reviewed emails and evidence provided by the Guadalupe County Attorney's Office," indicating reliance solely on curated materials supplied by prosecutors. At that time, the County Attorney's Office possessed all the exculpatory evidence listed above, including the mandated report, psychological evaluation, affidavits, and recordings. Reamer conducted no independent investigation between April 1 and April 7, 2025.

340.    After Plaintiff's arrest, bond conditions were altered to list Cody Lane Koelle as a "victim," despite his absence from the affidavit, probable-cause narrative, or supporting documents. This post-issuance alteration—outside the magistrate's review—served to amplify the appearance of harm and reinforce predetermined bond amounts.

341.    Taken together, the omissions, misrepresentations, and reliance on contradictory evidence constitute deliberate suppression of exculpatory materials and fabrication of a false narrative of coercion. By failing to disclose the April 1 mandated report, the April 4, 2024 video, multiple affidavits, psychological findings, phone-record evidence, and the March 18 recording, Reamer deprived the magistrate of the information required to make an accurate probable-cause determination. These actions deprived Plaintiff of liberty without due process of law.

342.    The allegation of coercion existed nowhere in the investigative record until Defendant Reamer created it; no witness, document, recording, or prior law-enforcement interview ever

suggested coercion by Plaintiff. The affidavit manufactured a narrative that had no evidentiary origin.

**D. Causation**

**343.** Defendant Reamer's fabrication of evidence, omission of known exculpatory materials, and presentation of a materially misleading affidavit were the direct and indispensable cause of the magistrate's issuance of the arrest warrant. Under *Franks v. Delaware*, 438 U.S. 154 (1978), and *Winfrey v. Rogers*, 901 F.3d 483 (5th Cir. 2018), a warrant procured through false statements or suppressed exculpatory facts is constitutionally invalid, and the resulting arrest constitutes a deprivation of liberty.

**344.** Had the magistrate been provided with (a) the April 4, 2024 recorded interview conducted by Reamer; (b) the two notarized affidavits executed independently by S.J.K.; (c) the three voluntary March 2025 video statements confirming voluntariness; (d) the March 18, 2025 recorded call from Cody Koelle admitting the truth of his earlier affidavit; (e) the March 31, 2025 forensic evaluation; (f) phone-record evidence disproving coercion; (g) Plaintiff's ADA filings and guardian-ad-litem requests; and (h) Plaintiff's April 1, 2025 mandated report — no reasonable magistrate could have concluded that probable cause existed.

**345.** Each omitted item contradicts the allegation that Plaintiff coerced or influenced a witness. The affidavit's inclusion of only inculpatory fragments while suppressing overwhelming exculpatory evidence materially altered the probable-cause determination and produced a false narrative of criminal conduct that did not exist.

**346.** Because the arrest warrant was based solely on the affidavit submitted by Defendant Reamer, and because the affidavit would have been facially insufficient had the suppressed facts

been included, Defendant Reamer's actions were the moving force behind Plaintiff's arrest, detention, bond restrictions, and the resulting deprivation of liberty.

347. Thus, the due-process violation—the initiation of legal process through fabricated and misleading evidence—was caused directly and proximately by Defendant Reamer's conduct.

## E. Constitutional Injury

348. As a direct result of Defendant Reamer's fabrication of evidence, suppression of exculpatory materials, and submission of a materially misleading affidavit, Plaintiff was subjected to a constitutionally defective arrest warrant, resulting in his seizure, arrest on April 8, 2025, detention, and the imposition of restrictive felony bond conditions. These actions constitute a deprivation of liberty under the Fourteenth Amendment.

349. Because the warrant was issued on the basis of falsified and incomplete information, Plaintiff was denied the fundamental fairness required before the government may restrain an individual's liberty. The initiation of criminal process through fabricated or deliberately incomplete evidence violates the guarantee of due process. *Mooney v. Holohan*, 294 U.S. 103 (1935); *Castellano v. Fragozo*, 352 F.3d 939 (5th Cir. 2003) (en banc).

350. Plaintiff's constitutional injury continued after the initial arrest. The First-Degree Felony charge remained open and active for months without judicial review, and Plaintiff's disposition status still reflects "HELD," preventing resolution of the accusation. This unresolved charge—originating from Reamer's fabricated affidavit—has restricted Plaintiff's employment opportunities, impaired his ability to work as an educator, and caused ongoing reputational, emotional, and economic harm.

**351.** Under *Winfrey v. Rogers*, 901 F.3d 483 (5th Cir. 2018), and *Cole v. Carson*, 802 F.3d 752 (5th Cir. 2015), the deprivation of liberty caused by fabricated or withheld evidence constitutes a standalone Fourteenth Amendment injury regardless of whether a conviction occurs. Plaintiff suffered that injury the moment legal process was initiated through falsehoods.

**352.** Plaintiff's criminal case was formally declined by the Guadalupe County Attorney on July 18, 2025, confirming a favorable termination under *Thompson v. Clark*, 596 U.S. 36 (2022). The termination of the charge underscores that Plaintiff's deprivation of liberty was caused by a process tainted from its inception by fabricated and suppressed evidence.

**F. Qualified Immunity Does Not Apply**

**353.** Qualified immunity does not protect an officer who fabricates evidence, withholds exculpatory information, or presents materially misleading information to obtain criminal process. For nearly a century, the Supreme Court has held that the Constitution prohibits criminal charges initiated through false evidence or deliberate deception. *Mooney v. Holohan*, 294 U.S. 103, 112–13 (1935).

**354.** By April 2025, it was clearly established that:

**(a)** an officer violates due process by submitting a warrant affidavit containing false statements or material omissions, *Franks v. Delaware*, 438 U.S. 154 (1978);

**(b)** the fabrication or suppression of evidence that results in a deprivation of liberty is unconstitutional, *Castellano v. Fragozo*, 352 F.3d 939, 953–55 (5th Cir. 2003) (en banc);

**(c)** an officer may not "close her eyes to exculpatory evidence" or disregard contradictory facts, *Hernandez v. City of Houston*, 17 F.4th 788, 797 (5th Cir. 2021); and

153

**(d)** initiating or maintaining criminal process through knowingly false or misleading information violates due process, *Winfrey v. Rogers*, 901 F.3d 483, 494–95 (5th Cir. 2018).

**355.** The same falsehoods and omissions that invalidate the warrant under Franks likewise render the initiation of legal process constitutionally defective under established Fourteenth Amendment law.

**356.** The Fifth Circuit has long held that no reasonable officer could believe it lawful to arrest or prosecute someone based on fabricated facts, manipulated evidence, or omitted material information. *Cole v. Carson*, 802 F.3d 752, 771–73 (5th Cir. 2015). An officer who manufactures probable cause and withholds exculpatory evidence is not entitled to qualified immunity.

**357.** Defendant Reamer's conduct—omitting the April 4, 2024 video interview, the two notarized affidavits, the three voluntary March 2025 recordings, the March 18, 2025 recorded admission by Cody Koelle, the March 31 forensic evaluation, phone-record evidence disproving coercion, Plaintiff's ADA and guardian-ad-litem submissions, and Plaintiff's April 1 mandated report—fits squarely within the heartland of cases where qualified immunity is unavailable. These were not discretionary choices. They were violations of constitutional rules so well established that every reasonable officer would have understood them.

**358.** The Supreme Court's recent decision in *Gonzalez v. Treviño*, 601 U.S. ___ (2024), further forecloses qualified immunity. *Gonzalez* held that an officer cannot rely on nominal probable cause where the circumstances—including omissions, selective reliance on incomplete information, or retaliatory timing—indicate that the criminal process was initiated in bad faith. It reaffirmed that fabricated or materially incomplete affidavits cannot be shielded by qualified immunity.

154

**359.** Here, the only "probable cause" asserted for Plaintiff's arrest derived from Defendant Reamer's own misstatements and omissions. Because the probable-cause determination depended entirely on a constitutionally tainted affidavit, *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986), bars qualified immunity: no reasonable officer would believe a warrant valid when its supporting affidavit omits overwhelmingly exculpatory evidence and contradicts known facts.

**360.** A reasonable officer with Defendant Reamer's 16 years of experience, 3,000+ TCOLE hours, and Master Peace Officer License would have understood that submitting a materially false or incomplete affidavit violates clearly established law. She is therefore **not entitled to qualified immunity** for the due-process violations alleged in Count 2.

### G. Damages

**361.** Plaintiff incorporates by reference the Global Damages Section. As a direct and foreseeable result of Defendant Reamer's fabrication and suppression of evidence, Plaintiff suffered loss of liberty, arrest and seizure, felony bond restrictions, reputational harm, emotional distress, economic loss, loss of employment opportunities, and ongoing legal disabilities associated with an active felony charge. These injuries constitute compensable damages under 42 U.S.C. § 1983.

**362.** Because the deprivation of liberty resulted from fabricated and suppressed evidence, Plaintiff is entitled to all remedies available under federal due-process jurisprudence, including compensatory damages, punitive damages against Reamer.

## COUNT 3 – Malicious Prosecution

*(Fourth Amendment, incorporated through the Fourteenth Amendment; 42 U.S.C. § 1983)*

**Against Defendant Sgt. Elaine M. Reamer (Individual Capacity)**

## A. Incorporation by Reference

**363.**  Plaintiff incorporates by reference paragraphs 1–362 as though fully set forth herein.

## B. Legal Basis and Clearly Established Rights

**364.**  The Fourth Amendment, incorporated against the states through the Fourteenth Amendment, prohibits the initiation or continuation of criminal proceedings without probable cause. This protection includes all forms of pretrial restraint—arrest, detention, and restrictive felony bond conditions—because such restraints constitute a "seizure" for Fourth Amendment purposes. Manuel v. City of Joliet, 580 U.S. 357, 367–69 (2017).

**365.**  A § 1983 malicious-prosecution claim lies where a state actor "initiates, influences, or continues a criminal proceeding without probable cause" and thereby causes a deprivation of liberty. Winfrey v. Rogers, 901 F.3d 483, 491–92 (5th Cir. 2018). A defendant need not personally sign the charging instrument; it is sufficient that the defendant's actions "set in motion or continued" the prosecution. Id.

**366.**  It has long been clearly established that an officer violates the Fourth Amendment when she procures a warrant by deliberately or recklessly misstating, omitting, or distorting material facts. Franks v. Delaware, 438 U.S. 154 (1978). The Fifth Circuit's en banc decision in Cole v. Carson, 935 F.3d 444, 452–53 (5th Cir. 2019) (en banc) reaffirms that fabricated evidence, misleading presentations, or the suppression of exculpatory material violate clearly established constitutional law.

**367.**  To state a Fourth Amendment malicious-prosecution claim, a plaintiff must plausibly allege that:

**(1)** the defendant commenced or caused a criminal proceeding;

**(2)** the proceeding lacked probable cause;

**(3)** the proceeding terminated in the plaintiff's favor; and

**(4)** the plaintiff suffered a deprivation of liberty consistent with initiation of legal process.

Winfrey, 901 F.3d at 491; Manuel, 580 U.S. at 367–69.

**368.**    The Supreme Court has clarified that the favorable-termination element is satisfied where the criminal case ends without conviction or adverse judgment. **Thompson v. Clark**, 596 U.S. 36, 44–47 (2022). A prosecutor's formal declination of charges constitutes favorable termination under Thompson.

**369.**    In Gonzalez v. Treviño, 601 U.S. ___ (2024), the Supreme Court reaffirmed that an officer cannot avoid liability by pointing to nominal or arguable probable cause where the officer's own conduct— including omissions, distortions, or selective presentation of evidence—undermines the validity of the charging process. Gonzalez makes clear that courts must consider whether the officer's actions "skewed the evidentiary record," thereby producing a misleading appearance of probable cause. This principle directly applies here, where Defendant Reamer's misrepresentations and suppression of exculpatory evidence were integral to the initiation and continuation of the criminal proceeding.

**370.**    The Fifth Circuit has also confirmed that an officer violates clearly established Fourth Amendment law when she causes a prosecution by forwarding a materially incomplete, misleading, or distorted investigative record to prosecutors—even when a prosecutor makes the charging decision. Espinal v. City of Houston, 87 F.4th 593, 602–04 (5th Cir. 2024). An officer may not shield herself from liability by relying on a prosecutor's subsequent actions where the officer's own omissions or misrepresentations were the moving force behind the initiation or continuation of criminal proceedings.

157

**371.** Defendant cannot invoke the independent intermediary doctrine to shield herself from liability. Although a magistrate signed the arrest warrant and prosecutorial actors later continued the case, those intermediary actions were procured through Defendant Reamer's materially misleading submissions—including false statements and material omissions of exculpatory evidence—presented pursuant to a prosecutor-controlled narrative. Where an intermediary's decision is tainted by false statements or material omissions, the causal chain is not broken, and liability under 42 U.S.C. § 1983 remains. See, e.g., *Hand v. Gary, Deville v. Marcantel, Winfrey v. Rogers*, and *Green v. Thomas*.

## C. Element 1 – Defendant Reamer Commenced the Criminal Proceeding

**372.** On April 7, 2025, Defendant Sergeant Elaine M. Reamer prepared, signed, and swore an arrest-warrant affidavit alleging that Plaintiff committed First-Degree Felony Tampering with a Witness. The magistrate relied exclusively on that affidavit to issue the arrest warrant.

**373.** By drafting, executing, and submitting that affidavit, Defendant Reamer personally initiated—or at minimum, set in motion—the criminal proceeding against Plaintiff. Under Fifth Circuit precedent, an officer who prepares a warrant affidavit containing material omissions or misrepresentations "causes" the prosecution to commence for purposes of a § 1983 malicious-prosecution claim. *Winfrey v. Rogers*, 901 F.3d 483, 491–92 (5th Cir. 2018).

**374.** Defendant Reamer's affidavit did not rely on neutral investigative findings. Instead, it relied on her own characterizations of witness communications, selective summaries of evidence, and factual assertions she knew or should have known were inaccurate, incomplete, or contradicted by the materials in her possession at the time.

**375.** Because the affidavit contained the only factual basis presented to the magistrate, and because no other officer conducted any independent investigation between April 1 and April 7, 2025, Defendant Reamer's affidavit was the direct and exclusive legal mechanism through which the criminal case was commenced, satisfying the first element of a malicious-prosecution claim.

**D. Element 2 – Absence of Probable Cause**

**376.** At the time Defendant Reamer executed the April 7, 2025 affidavit, no reasonably competent officer could have concluded that probable cause existed to arrest Plaintiff for First-Degree Felony Witness Tampering under Texas Penal Code § 36.05. The evidence available to Reamer affirmatively disproved the statutory elements of (1) coercion, (2) threat, (3) inducement, or (4) an attempt to influence testimony.

**377.** Every communication attributed to Plaintiff—including emails, texts, and video-recorded FaceTime conversations—contained no threats, promises, pressure, or inducements of any kind. Instead, the materials showed Plaintiff acting transparently as an advocate: asking whether S.J.K. spoke voluntarily, whether she wished to continue, whether anyone—including Plaintiff—was coercing or bribing her, and repeatedly directing her back to her long-time advocate, Kimberly Kennedy. These communications reflected lawful advocacy protected by the First Amendment and required by Plaintiff's duties as a mandated reporter.

**378.** The objective evidence in Reamer's possession at the time of the affidavit conclusively negated any inference of wrongdoing. This included:

**(a)** Two notarized affidavits voluntarily executed by S.J.K. (Nov. 15, 2024; Mar. 15, 2025), each affirming the truth of her statements, the absence of coercion, and the voluntariness of her disclosures;

**(b)** Three voluntary video statements (Mar. 10, 12, and 19, 2025) initiated by S.J.K., in which she denied coercion and confirmed she was speaking freely;

**(c)** The April 4, 2024 forensic interview conducted by Reamer herself, where S.J.K. stated the same information—her mother was innocent and Michael Walker was violent—long before Plaintiff ever became involved;

**(d)** The March 18, 2025 recorded phone call in which Cody Lane Koelle admitted that he signed the November 2024 affidavit, confirmed its truthfulness, and stated the County Attorney's Office was pressuring him to change his story; and

**(e)** Phone-record analysis showing S.J.K. initiated the overwhelming majority of communications, including hundreds of missed calls to Plaintiff, contradicting any notion of "pressure" or improper inducement by Plaintiff.

**379.**    Defendant Reamer knowingly or recklessly omitted all of this exculpatory evidence from the affidavit, despite possessing the records and despite acknowledging in her affidavit that she had "reviewed emails and evidence" supplied by prosecutors. Under *Franks v. Delaware*, 438 U.S. 154, 171–72 (1978), and *Winfrey v. Rogers*, 901 F.3d 483, 494–95 (5th Cir. 2018), such omissions are constitutionally material where, as here, inclusion of the suppressed evidence would have eliminated any probable cause finding.

**380.**    Reamer relied instead on demonstrably unreliable, contradictory information—primarily the recanted January 31, 2025 affidavit by Cody Lane Koelle—while suppressing the March 18 recording in which Cody admitted the original affidavit was true and acknowledged prosecutorial pressure. Alaska v. Franks squarely prohibits such selective, reckless use of evidence.

**381.**    Reamer also omitted Plaintiff's April 1, 2025 mandated report, which would have shown:

**(1)** Plaintiff acted lawfully as a mandated reporter,

**(2)** Plaintiff explicitly requested anonymity, and

**(3)** The report contained no coercive content but rather a warning that the victim was pregnant while living with an adult male involved in drug activity.

382.    The suppression of this statutorily protected report deprived the magistrate of context and concealed Plaintiff's legal obligations.

383.    Under *Manuel v. City of Joliet*, 580 U.S. 357, 367–69 (2017), and *Thompson v. Clark*, 596 U.S. 36 (2022), the Fourth Amendment prohibits initiating criminal process on the basis of deliberately incomplete or falsified evidence. Defendant Reamer's affidavit violated these principles.

384.    No reasonable officer—particularly one holding a Master TCOLE certification—could believe that probable cause existed under these circumstances. When the affidavit is corrected to remove false statements and include the omitted exculpatory evidence, it eliminates not only actual probable cause but even arguable probable cause, as no reasonable officer could believe the statutory elements of felony witness tampering were satisfied. The Fifth Circuit has recognized that such circumstances reflect a textbook absence of probable cause. *Winfrey v. Rogers*, 901 F.3d 483, 494–95 (5th Cir. 2018); *Hernandez v. City of Houston*, 17 F.4th 788, 797 (5th Cir. 2021).

385.    Because the affidavit's deficiencies were not technical but substantive—negating every statutory element of Texas Penal Code § 36.05—Defendant Reamer lacked not only actual probable cause but also arguable probable cause, precluding qualified immunity.

**386.** Further, *Gonzalez v. Treviño*, 601 U.S. ___ (2024), confirms that an officer may not rely on nominal or illusory probable cause—especially when the affidavit is prepared without investigation, in temporal proximity to protected speech, or through selective omission of evidence. Here, the only evidentiary material newly supplied before the arrest consisted of Plaintiff's protected mandated report and ADA communications, not any wrongdoing.

**387.** Accordingly, the second element of malicious prosecution—absence of probable cause—is satisfied as a matter of law.

**388.** There was no alternative criminal offense, ancillary charge, or lawful basis upon which Plaintiff could have been arrested or prosecuted. The investigative record, when viewed in full, foreclosed probable cause for felony witness tampering and for any other offense under Texas law.

### E. Element 3 – Malice / Improper Purpose

**389.** Defendant Reamer acted with malice and improper purpose in initiating criminal proceedings against Plaintiff. Her affidavit did not reflect a neutral assessment of the evidence but instead constituted a deliberate effort to reframe lawful advocacy and mandated-reporter activity as criminal tampering. The sequence of events—including the suppression of exculpatory evidence, reliance on contradictory statements, and omission of prior consistent victim statements—permits a strong inference that Reamer's purpose was punitive, not investigative.

**390.** Malice may be inferred where, as here, an officer:

**(a)** knowingly omits exculpatory facts material to probable cause;

**(b)** relies on a witness whose statements are internally contradictory and contradicted by earlier

162

sworn statements;

(c) fabricates or selectively presents evidence to create the appearance of criminal intent; or

(d) disregards readily available exculpatory materials that negate every statutory element of the

charged offense.

See Cole v. Carson, 935 F.3d 444, 452–53 (5th Cir. 2019) (en banc); Hernandez v. City of

Houston, 17 F.4th 788, 797 (5th Cir. 2021).

391.   Reamer's malice is further demonstrated by her omission of Plaintiff's April 1, 2025

mandated report, which reflected lawful protective activity and contained no statements

suggesting coercion or influence. Plaintiff expressly requested anonymity as permitted under

Texas law. Yet Reamer omitted the report entirely while adopting a narrative that ignored its

protective purpose and instead portrayed Plaintiff as manipulating the victim. This

mischaracterization is incompatible with neutral law-enforcement purpose.

392.   The malicious intent is reinforced by the broader pattern of retaliatory conduct within the

County Attorney's Office. On April 5, 2025—two days before the affidavit—Victim Coordinator

Ileen Rangel disclosed to the victim that "your uncle said you were pregnant," revealing

information that originated from the confidential mandated report. This disclosure demonstrates

that the County Attorney's Office and Reamer had reviewed Plaintiff's protected

communications and were acting on them immediately prior to preparing the affidavit. The

timing supports an inference that the affidavit was prepared in response to Plaintiff's protected

activity, not in pursuit of legitimate law enforcement objectives.

393.   This inference of malice is further supported by evidence that prosecutors had actual

notice—months before Plaintiff's arrest—that the victim consistently stated her mother was

innocent, as confirmed by a recorded April 2, 2025 call in which Jamie Renee Walker's court-

appointed defense counsel acknowledged emailing the assigned prosecutor about those statements during the pendency of Walker's case, well before Plaintiff's alleged involvement.

394.    Reamer also adopted a version of events that she knew was contradicted by her own prior interview of the victim (April 4, 2024), by the victim's notarized affidavits, by the March 18 recorded call, and by the forensic psychologist's findings. Her selective reliance on only the evidence that supported the predetermined narrative—and deliberate suppression of everything that contradicted it—further supports a finding of malicious or improper purpose.

395.    A reasonable factfinder may conclude that no legitimate law-enforcement objective explains this combination of omissions, distortions, and timing. Instead, the facts plausibly support that Reamer acted with retaliatory animus, improper purpose, and malice, satisfying the third element of a §1983 malicious-prosecution claim under *Winfrey*, *Cole*, and *Manuel*.

396.    Additional evidence of improper purpose emerged on July 8, 2025, when Plaintiff's criminal defense attorney relayed that First Assistant County Attorney Jonathan Amdur "definitely won't include a non-refiling letter" with the rejection of charges because he wanted to "make sure [Plaintiff] stay[s] away from his cases." This communication reflected an intent to preserve the threat of renewed prosecution as leverage to deter Plaintiff's lawful advocacy and communication efforts. Prosecutors likewise declined to identify any evidence supporting the elements of a tampering offense and refused to articulate any factual basis for maintaining the charge, leaving defense counsel unable to determine how the accusation could be substantiated.

397.    The refusal to provide a non-refiling letter carries significant legal consequences: under Texas expunction law, the absence of such a letter imposes a mandatory three-year waiting period before Plaintiff may seek expungement, effectively extending the impact of the

unresolved arrest for nearly four years without any judicial review. During this period, the unadjudicated first-degree felony arrest remains publicly visible on background checks and may be refiled at any time, resulting in an ongoing restraint on Plaintiff's liberty, employment prospects, and reputation. This post-charge posture is consistent with the retaliatory evidentiary framework Defendant Reamer created and initiated.

398.    The continued pendency of the case under these circumstances reasonably permits the inference that charging authority was being used for a retaliatory or punitive objective rather than a legitimate law-enforcement purpose. Such evidence is probative of malice under *Winfrey v. Rogers*, 901 F.3d 483 (5th Cir. 2018), *Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019), and *Gonzalez v. Treviño*, 42 F.4th 487 (5th Cir. 2022).

**F. Element 4 – Favorable Termination**

399.    On July 18, 2025, the Guadalupe County Attorney formally declined prosecution and closed the case, terminating the criminal matter without indictment, conviction, plea, or any judicial finding of guilt or wrongdoing. The declination ended the criminal proceeding in Plaintiff's favor and removed any ongoing criminal jeopardy.

400.    Under *Thompson v. Clark*, 596 U.S. 36, 44–47 (2022), a criminal case terminates favorably for purposes of § 1983 when it ends without a conviction and without any indication of guilt. A prosecutor's declination to pursue charges—particularly where no indictment is sought and no adverse judicial determination occurs—meets this standard. Accordingly, Plaintiff satisfies the favorable-termination requirement of a malicious-prosecution claim.

**G. Element 5 – Constitutional Deprivation of Liberty**

**401.**    Plaintiff suffered a constitutionally significant deprivation of liberty as a direct result of the criminal proceeding initiated by Defendant Reamer. These deprivations included:

• physical arrest and custodial seizure pursuant to the arrest warrant;

• felony-level bond conditions, including restrictions on movement, contact prohibitions, and mandatory court-reporting obligations;

• continuing legal restraints, as the First-Degree Felony charge remains open on Plaintiff's criminal history with a disposition listed as "HELD," preventing clearance or resolution;

• significant occupational and reputational harm, including loss of employment opportunities and exclusion from his profession; and

• inability to obtain judicial review, as no examining trial, preliminary hearing, or judicial determination of probable cause was provided.

**402.**    Under *Manuel v. City of Joliet*, 580 U.S. 357, 367–69 (2017), pretrial restrictions and legal process-based constraints—including bond conditions—constitute a "seizure" for Fourth Amendment purposes. The Fifth Circuit likewise recognizes that a plaintiff remains seized when criminal charges and bond conditions impose ongoing restraints on liberty. *Evans v. Ball*, 168 F.3d 856, 861 (5th Cir. 1999); *Winfrey v. Rogers*, 901 F.3d 483, 491–92 (5th Cir. 2018).

**403.**    Accordingly, Plaintiff's arrest, continued restraint under felony bond requirements, and the unresolved active charge collectively constitute a deprivation of liberty actionable under the Fourth Amendment and satisfy the fifth element of a malicious-prosecution claim.

**H. Causation**

**404.**    Defendant Reamer's conduct was both the direct and proximate cause of Plaintiff's criminal prosecution and the resulting deprivation of liberty. The April 7, 2025 arrest-warrant

166

affidavit—prepared, signed, and submitted solely by Reamer—was the exclusive mechanism that initiated the criminal process. No independent law-enforcement investigation, evidentiary review, and credibility assessment occurred between Defendant Reamer's affidavit and the initiation or continuation of criminal proceedings against Plaintiff.

**405**.    Had Defendant Reamer disclosed the exculpatory materials in her possession, accurately represented the content of the recordings, and refrained from submitting statements contradicted by the evidence she reviewed, no reasonably competent officer or magistrate would have concluded that probable cause existed.

**406.**    Because the criminal proceeding was commenced entirely through the affidavit she authored, Reamer's fabrication, omissions, and misrepresentations were the moving force behind Plaintiff's arrest, bond conditions, reputational harm, and continued legal restraints. See *Winfrey v. Rogers*, 901 F.3d 483, 492 (5th Cir. 2018).

**407.**    Accordingly, the causation element is satisfied: the prosecution and all resulting restraints flowed directly from Reamer's unconstitutional actions and would not have occurred but for her misconduct.

**I. Qualified Immunity Does Not Apply**

**408.**    For decades, it has been clearly established that an officer violates the Fourth Amendment when she:

   • initiates or causes criminal proceedings without probable cause;

   • knowingly or recklessly includes false statements or omits material facts in a warrant affidavit; and

   • causes a seizure through misleading or incomplete information.

**409.**    These principles are established in *Franks v. Delaware*, 438 U.S. 154 (1978); *Malley v. Briggs*, 475 U.S. 335 (1986); *Manuel v. City of Joliet*, 580 U.S. 357 (2017); *Winfrey v. Rogers*, 901 F.3d 483 (5th Cir. 2018); *Hernandez v. City of Houston*, 17 F.4th 788 (5th Cir. 2021); and *Cole v. Carson*, 935 F.3d 444 (5th Cir. 2019) (en banc).

**410.**    Qualified immunity is unavailable where the officer's own actions—not a prosecutor's judgment—were the moving force initiating criminal process. *Winfrey*, 901 F.3d at 492–93. Fabrication, suppression of exculpatory facts, and reckless disregard for contradictory evidence violate clearly established law.

**411.**    A reasonable officer in Defendant Reamer's position—particularly one holding a Master Peace Officer License, over 3,000 hours of TCOLE training, and years of investigative experience—would have known that submitting an affidavit that omitted recorded police interviews, disregarded sworn victim affidavits, ignored forensic evaluations, and relied on unreliable assertions was unconstitutional.

**412.**    In *Gonzalez v. Treviño*, 601 U.S. ___ (2024), the Supreme Court reaffirmed that officers are not entitled to qualified immunity when the evidentiary basis for an arrest or prosecution is selective, incomplete, or contradictory, or when the officer disregards exculpatory evidence. The Court held that "nominal probable cause" does not shield an officer whose actions reflect retaliatory or improper purpose, or whose affidavit omits material facts necessary for a magistrate's review. Gonzalez did not announce new law but reaffirmed longstanding principles governing officer-caused prosecutions through misleading evidence.

**413.**    No reasonable officer could have believed that presenting a materially misleading affidavit—supported only by selectively curated information and contradicted by evidence in her possession—was lawful. Defendant Reamer is therefore not entitled to qualified immunity.

**414.**    Initiating and continuing a felony prosecution by submitting and maintaining a warrant affidavit that selectively omits exculpatory evidence, disregards sworn victim statements, and relies on assertions contradicted by the officer's own investigative record is objectively unreasonable under basic Fourth Amendment principles. Such conduct falls outside any reasonable conception of lawful law enforcement.

**J. Incorporation of Global Damages and Relief**

**415.**    Plaintiff incorporates by reference the Global Damages section and the Global Prayer for Relief as though fully set forth herein.

# COUNT 4 – First Amendment Retaliation

*(42 U.S.C. § 1983)*

**Against Defendant Sgt. Elaine M. Reamer (Individual Capacity)**

**A. Incorporation by Reference**

**416.**    Plaintiff incorporates by reference paragraphs 1–415 as though fully set forth herein.

**B. Legal Basis and Clearly Established Rights**

**417.**    The First Amendment prohibits government officials from retaliating against individuals for engaging in protected speech or petitioning the government for redress of grievances. *Hartman v. Moore*, 547 U.S. 250, 256 (2006).

**41.**   To state a First Amendment retaliation claim, a plaintiff must allege that:

**(1)** he engaged in protected speech;

**(2)** he suffered an adverse action that would deter a person of ordinary firmness; and

**(3)** the adverse action was substantially motivated by his protected speech.

*Nieves v. Bartlett*, 587 U.S. 391 (2019); *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

**419.**   It has long been clearly established that initiating criminal process, causing an arrest, or using official authority in response to protected communications violates the First Amendment. *Gibson v. Kilpatrick*, 773 F.3d 661, 668 (5th Cir. 2014); *Lane v. Franks*, 573 U.S. 228, 238 (2014); *Colson v. Grohman*, 174 F.3d 498 (5th Cir. 1999).

**420.**   The Supreme Court has emphasized that retaliatory-prosecution claims require plausible allegations connecting the retaliatory animus to the initiation of charges. *Hartman*, 547 U.S. at 260–61. In *Nieves*, the Court explained that even when probable cause is asserted, a retaliation claim may proceed where the plaintiff plausibly alleges selective enforcement, differential treatment, or the use of protected speech as a basis for adverse action. This framework applies where the retaliatory sequence involves multiple governmental actors, including individuals whose conduct—such as the disclosure of a mandated reporter's identity by a representative of the County Attorney's Office—forms part of the causal chain leading to the adverse action undertaken by the named defendant.

**421.**   In *Gonzalez v. Treviño*, 601 U.S. ___ (2024), the Supreme Court reaffirmed that retaliatory-arrest and retaliatory-prosecution claims are not barred merely because an officer asserts the existence of probable cause. The Court explained that where a plaintiff plausibly alleges retaliatory motive, differential treatment, temporal proximity, or materially incomplete investigative efforts, a First Amendment retaliation claim may proceed notwithstanding a

nominal charge. This principle directly applies where, as here, the alleged probable cause was supported by an affidavit prepared without investigation and in close temporal proximity to Plaintiff's protected speech.

**422.**    Plaintiff engaged in multiple forms of protected speech and petitioning activity, including:

**(a)** submitting a mandated report of renewed sexual exploitation of S.J.K. on April 1, 2025;

**(b)** submitting ADA accommodation and guardian-ad-litem requests in late March 2025;

**(c)** providing affidavits, videos, and written evidence to the Guadalupe County Attorney's Office regarding the victim's safety and the handling of her prior statements; and

**(d)** communicating concerns regarding prosecutorial conduct, witness treatment, and disability-rights compliance.

**423.**    These communications addressed matters of significant public concern—including the protection of a vulnerable adult with intellectual and developmental disabilities, the proper handling of mandated-reporter information, and the use of governmental authority in criminal proceedings—and therefore constitute core First Amendment activity. *Lane v. Franks*, 573 U.S. 228, 238–40 (2014).

**424.**    Plaintiff's protected activity is further reflected in the fact that on April 5, 2025, the victim communicated to Plaintiff that a representative of the County Attorney's Office, Victim Coordinator Ileen Rangel, had informed her that "your uncle said you were pregnant." Plaintiff had not disclosed that information to the victim. The only source of that information was the April 1 mandated report in which Plaintiff requested anonymity. The disclosure occurred within days of Plaintiff's protected submissions and immediately preceded the arrest-warrant process initiated by Defendant Reamer.

171

425.   Plaintiff's protected activity is additionally demonstrated by the contrasting treatment of another long-time family advocate, Kimberly Kennedy, who engaged in similar conduct—assisting the victim with affidavits, communications, and safeguarding efforts—but was never accused of coercion or tampering. Only Plaintiff, whose recent communications included mandated-reporter submissions, ADA-related requests, and evidence challenging the County's handling of the victim's case, was subjected to arrest. This differential treatment further supports the inference that the adverse action taken by Defendant Reamer was linked to Plaintiff's protected speech and advocacy.

### D. Adverse Action

426.   On April 7, 2025—six days after Plaintiff submitted the April 1, 2025 mandated report, and two days after S.J.K. informed Plaintiff that Victim Coordinator Ileen Rangel had disclosed information originating from that report—Defendant Reamer prepared and swore an arrest-warrant affidavit accusing Plaintiff of First-Degree Felony Tampering with a Witness.

427.   Defendant Reamer's affidavit initiated the criminal process that led to Plaintiff's arrest on April 8, 2025, his detention, and the imposition of restrictive felony bond conditions.

428.   An arrest procured through an affidavit that omits known exculpatory information, relies on materially incomplete evidence, or is prepared in temporal proximity to protected speech constitutes an adverse action that would deter a person of ordinary firmness from continuing to engage in such protected activity. *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002).

### E. Causal Connection and Retaliatory Intent

429. The disclosure made on April 5, 2025 by Victim Coordinator Ileen Rangel—informing the victim, "your uncle said you were pregnant"—further supports the causal link between Plaintiff's

protected speech and the adverse action taken by Defendant Reamer. Plaintiff had not

communicated this information to the victim. The only source was the April 1 mandated report in

which Plaintiff expressly requested anonymity. The disclosure occurred two days before

Defendant Reamer prepared the arrest-warrant affidavit and at a time when the victim was

residing in the same household as the adult male identified as the father of her second pregnancy.

**430.**   Defendant Reamer's adverse actions were substantially motivated by Plaintiff's protected

speech. The temporal proximity—six days between Plaintiff's April 1 mandated report and the

April 7 affidavit and arrest request—strongly supports an inference of retaliation. No intervening

evidence, witness statement, or investigative development occurred during this six-day period

that could explain the arrest other than Plaintiff's protected speech and advocacy. *Shumpert v.*

*City of Tupelo*, 905 F.3d 310, 319 (5th Cir. 2018).

**431.**   Defendant Reamer stated in her affidavit that she had "reviewed emails and evidence"

provided by the County Attorney's Office during the short period immediately following

Plaintiff's protected communications. The only newly submitted materials during this time frame

consisted of Plaintiff's mandated report and the information he provided regarding the victim's

safety and disability-related concerns.

**432.**   Defendant Reamer conducted no investigative steps between April 1 and April 7. She did

not interview Plaintiff, the victim, or any other witness; did not verify records; and did not

perform any independent inquiry. The absence of neutral investigative activity, combined with

the timing of the warrant request, supports the inference that Plaintiff's protected activity was

used as the basis for initiating criminal process.

**433.** Defendant Reamer omitted known exculpatory information—including voluntary video statements, written affidavits, and prior consistent accounts from the victim—that directly contradicted the premise of the arrest-warrant affidavit. These omissions further support retaliatory motive and the lack of an objective law-enforcement purpose.

**434.** Retaliatory intent may be inferred where an officer selectively relies on a citizen's protected speech to justify an arrest or criminal charge. *Hartman v. Moore*, 547 U.S. 250, 260–61 (2006). Here, the only information newly supplied to the County Attorney's Office prior to the arrest request came from Plaintiff's protected speech.

**435.** The absence of any alternative lawful basis for Plaintiff's arrest further supports the inference of retaliatory motive. No independent criminal conduct existed that could explain the initiation of felony charges other than Plaintiff's protected speech and advocacy.

**436.** Plaintiff's ongoing advocacy on behalf of a vulnerable adult, his presentation of evidence contradicting the County's narrative, and his repeated requests for ADA accommodations and oversight collectively served as the catalyst for Defendant Reamer's initiation of criminal process.

**F. Deprivation of Rights**

**437.** As a direct result of Defendant Reamer's retaliatory actions, Plaintiff was arrested, detained, and subjected to restrictive felony bond conditions. These actions deprived Plaintiff of his liberty, interfered with his ability to work, and caused significant reputational harm.

**438.** Because Plaintiff was denied any form of judicial review—including no examining trial, no preliminary hearing, and no determination of probable cause beyond the challenged affidavit—the First-Degree Felony charge remains open and active on his criminal history. His

disposition status continues to show "HELD," preventing resolution of the accusation through any judicial mechanism.

**439.**    The presence of an unresolved First-Degree Felony on Plaintiff's criminal background has severely restricted his employment opportunities, including his ability to work as an educator, and forecloses meaningful participation in the workforce. Under Texas law, Plaintiff must wait a minimum of three years before he is eligible to seek expungement, resulting in prolonged stigma and continuing deprivation of rights directly traceable to Defendant Reamer's conduct.

**440.**    Additional evidence of retaliatory motive emerged on July 8, 2025, when Plaintiff's criminal defense attorney relayed that First Assistant County Attorney Jonathan Amdur refused to include a non-refiling letter with the rejection of charges because he wanted to "make sure [Plaintiff] stay[s] away from his cases." This refusal directly burdened Plaintiff's First Amendment activity by prolonging the impact of the arrest and maintaining the threat of renewed prosecution in response to Plaintiff's protected speech—specifically his efforts to report abuse, assist an intellectually disabled adult in accessing the legal system, and expose prosecutorial and investigative misconduct. The absence of a non-refiling letter triggers a mandatory three-year waiting period before Plaintiff may seek expungement, leaving the unresolved first-degree felony arrest publicly visible and subject to refile at any time. This deliberate preservation of legal jeopardy, tied explicitly to Plaintiff's advocacy for S.J.K., constitutes an ongoing retaliatory act intended to chill constitutionally protected speech, consistent with the retaliation principles recognized in Nieves v. Bartlett, 587 U.S. 391 (2019), Keenan v. Tejeda, 290 F.3d 252 (5th Cir. 2002), Gonzalez v. Treviño, 601 U.S. ___ (2024).

**G. Qualified Immunity Does Not Apply**

175

441.    For decades, it has been clearly established that government officials may not retaliate against a citizen for engaging in protected speech or petitioning the government for redress of grievances. *Gibson v. Kilpatrick*, 773 F.3d 661, 668 (5th Cir. 2014); *Colson v. Grohman*, 174 F.3d 498 (5th Cir. 1999).

442.    A reasonable officer would have understood that initiating criminal charges in response to protected communications—particularly where the arrest-warrant affidavit relied on those communications, omitted known exculpatory information, and was prepared without any independent investigation—violates clearly established First Amendment law. The Supreme Court has long made clear that officials may not use criminal process as a tool of retaliation. *Hartman v. Moore*, 547 U.S. 250 (2006); *Nieves v. Bartlett*, 587 U.S. 391 (2019).

443.    The Supreme Court's 2024 decision in *Gonzalez v. Treviño* further confirms that qualified immunity does not protect an officer who initiates criminal process in retaliation for protected speech. The Court held that an officer cannot rely on nominal probable cause where the circumstances—including omissions, timing, and selective reliance on the plaintiff's speech—indicate retaliatory motive. These principles were clearly established at the time of Defendant Reamer's actions.

444.    No reasonable officer would believe it lawful to prepare or swear an arrest-warrant affidavit under these circumstances, where the only newly acquired information preceding the arrest was the plaintiff's protected speech, and where no neutral law-enforcement purpose justified the adverse action. Defendant Reamer is therefore not entitled to qualified immunity.

445.    Using criminal process to arrest and prosecute a citizen within days of protected speech—based on an affidavit that relies on that speech while omitting known exculpatory evidence—is

objectively unreasonable and incompatible with fundamental First Amendment protections. No reasonable officer could believe such conduct was lawful.

**H. Objective Comparator Evidence Satisfying the Nieves Exception and Defeating Probable-Cause Defense**

**446.** Plaintiff alleges objective comparator evidence demonstrating selective enforcement within the meaning of *Nieves v. Bartlett*, 587 U.S. 391 (2019). During the same period in which Plaintiff engaged in advocacy on behalf of the victim, another family advocate, Kimberly Kennedy, provided affidavits, recordings, and communications to the Guadalupe County Attorney's Office and participated in multi-party calls with the victim and County personnel, including Jonathan Amdur and Ileen Rangel.

**447.** Kennedy engaged in materially identical conduct to Plaintiff—assisting the victim with written statements, facilitating communication with prosecutors, and relaying the victim's consistent disclosures that her mother was not involved in any sexual activity—yet Kennedy was never investigated, accused of coercion, or arrested.

**448.** The only material distinction between the two advocates was that Plaintiff had (a) submitted the April 1st, 2025 mandated report implicating County-arranged supervision, (b) raised ADA-related deficiencies, and (c) disclosed concerns regarding prosecutorial coercion. Kennedy engaged in none of these protected activities during the days immediately preceding Plaintiff's arrest.

**449.** This disparate treatment constitutes objective comparator evidence sufficient to defeat any argument under *Nieves* that asserted probable cause bars a retaliation claim. As clarified in *Gonzalez v. Treviño*, 601 U.S. ___ (2024), a plaintiff need only allege that similarly situated

individuals who engaged in the same conduct were not subjected to the same enforcement. Plaintiff's allegations meet and exceed that threshold.

**I. Incorporation of Global Damages and Global Relief**

**450**.    Plaintiff incorporates the Global Damages section and the Global Prayer for Relief as though fully set forth herein.

## COUNT 5 – Retaliation Under ADA Title V and Section 504

### *(42 U.S.C. § 12203; 29 U.S.C. § 794)*

**Against Defendant Guadalupe County, Texas**

**A. Incorporation by Reference**

**451.**    Plaintiff incorporates by reference paragraphs 1–450 as though fully set forth herein.

**B. Legal Basis and Rights Violated**

**452.**    Title V of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12203, prohibits any public entity from retaliating against an individual because he opposed disability-based discrimination or assisted a person with a disability in asserting or exercising protected rights. Retaliation under Title V applies broadly to "any individual," including non-disabled advocates who speak, report, assist, or support a person with a disability in seeking accommodations or protection.

**453.**    Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, likewise prohibits retaliation against any individual who aids or assists a qualified person with a disability in securing federally protected rights in programs receiving federal financial assistance, including county law-enforcement and prosecutorial functions.

178

**454.** The ADA's anti-retaliation provision, 42 U.S.C. § 12203(a)–(b), makes it unlawful for any public entity or employee to intimidate, threaten, coerce, or retaliate against any individual who:

**(1)** opposes disability discrimination;

**(2)** assists a disabled individual in exercising ADA rights; or

**(3)** participates in any ADA-related process, inquiry, or proceeding.

**455.** Federal courts, including the Fifth Circuit, have long held that ADA retaliation protections extend to non-disabled individuals such as family members, advocates, mandated reporters, and witnesses who assist a disabled person. See Shotz v. City of Plano, 375 F.3d 732, 738 (5th Cir. 2004); Block v. Texas Bd. of Law Examiners, 952 F.3d 613, 620 (5th Cir. 2020).

**456.** Guadalupe County is a "public entity" within the meaning of 42 U.S.C. § 12131 and is a recipient of federal financial assistance for purposes of Section 504, making it subject to both the ADA and the Rehabilitation Act.

**457.** Plaintiff brings only a retaliation claim under ADA Title V (42 U.S.C. § 12203) and Section 504 of the Rehabilitation Act. Plaintiff does not assert a disability-discrimination claim under Title II, nor does he claim denial of services or failure to accommodate as to himself. Plaintiff does not assert an independent claim for ADA discrimination on behalf of third parties, but pleads those discriminatory acts as the protected activity underlying his ADA retaliation claim.

**458.** The ADA retaliation provision protects "any individual," regardless of disability status. Courts uniformly hold that non-disabled individuals who assist a disabled person—such as parents, relatives, educators, advocates, volunteers, or mandated reporters—have standing to sue

when retaliated against because of that assistance. Shotz, 375 F.3d at 738; Block, 952 F.3d at 620.

**459.** Retaliation under 42 U.S.C. § 12203 does not require that the underlying ADA right be violated. Liability attaches when a public entity takes an adverse action because an individual assisted, supported, or advocated for a person with a disability.

## C. Protected ADA Activity

**460.** Plaintiff engaged in multiple forms of protected ADA activity by advocating for S.J.K., a qualified individual with documented intellectual and developmental disabilities. Plaintiff's activities fall squarely within 42 U.S.C. § 12203(a)–(b), which protects *any individual* who assists a disabled person in securing ADA rights. Plaintiff's protected actions included:

**(a)** Submitting written ADA accommodation requests on March 23, 2025, notifying Guadalupe County of S.J.K.'s disability and requesting communication and cognitive accommodations to ensure meaningful access to prosecutorial processes;

**(b)** Requesting the appointment of a guardian ad litem on March 26, 2025, to safeguard S.J.K.'s legal interests and ensure compliance with disability-related obligations;

**(c)** Communicating directly with County officials, in writing, regarding S.J.K.'s disability status, limitations, and need for accommodations during ongoing criminal-justice proceedings; and

**(d)** Filing a statutorily required mandated report concerning the safety and exploitation of a disabled adult, submitted in the course of advocating for disability-related protections on April 1,

2025, documenting renewed sexual exploitation of a disabled adult—a report expressly authorized and protected by state law and by § 12203 as participation in an ADA-related process.

461.    Each of these actions constitutes "protected activity" under 42 U.S.C. § 12203. The ADA protects *any individual*—including non-disabled family members, educators, mandated reporters, and advocates—who oppose disability discrimination or who assist a disabled person in exercising ADA rights. See Shotz v. City of Plano, 375 F.3d 732, 738 (5th Cir. 2004) ("The statute protects individuals who are not themselves disabled when they advocate for the rights of a disabled person."). Plaintiff's conduct is exactly the type of advocacy Congress intended to protect when enacting § 12203.

**D. Adverse Action**

462.    On April 7, 2025—six days after Plaintiff submitted the ADA-protected mandated report and less than two weeks after submitting written ADA accommodation requests and a guardian-ad-litem request—Plaintiff was arrested on a first-degree felony charge based solely on an affidavit sworn by County investigator Sgt. Elaine M. Reamer, acting pursuant to County investigative practices and under County Attorney review. The arrest-warrant affidavit expressly relied on communications that formed part of Plaintiff's ADA advocacy.

463.    Plaintiff's arrest, the initiation of criminal proceedings, and the imposition of restrictive felony bond conditions constitute materially adverse actions under the ADA's anti-retaliation standard because they would deter a person of ordinary firmness from continuing to advocate for a disabled individual. See Delano-Pyle v. Victoria Cnty., 302 F.3d 567, 574 (5th Cir. 2002); see also Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006) (retaliation standard applies to any action likely to deter protected activity).

**464.** The actions taken against Plaintiff—arrest, prosecution, bond restrictions, and criminal labeling—were not merely adverse but **severe**, carrying the threat of decades in prison, loss of employment, reputational harm, and significant legal burdens. Such retaliatory measures meet and exceed the ADA's materially adverse action threshold.

## E. Causal Connection

**465.** A strong causal connection exists between Plaintiff's protected ADA activity and the adverse actions taken against him. The sequence of events demonstrates a direct and immediate link:

**(a)** County officials—including the County Attorney, First Assistant County Attorney, Victim Coordinator, and investigative personnel—received and reviewed Plaintiff's ADA accommodation requests (March 23), guardian-ad-litem request (March 26), and mandated report (April 1) in the days immediately preceding the arrest;

**(b)** Plaintiff's arrest occurred six days after the April 1 mandated report and twelve to fourteen days after his ADA filings, a temporal proximity strongly supporting retaliatory motive;

**(c)** County officials ignored the ADA filings, took no steps to accommodate the disabled adult's needs, and instead pivoted toward criminalizing Plaintiff's advocacy; and

**(d)** County officials, through Sgt. Reamer, used Plaintiff's ADA-protected communications—including the mandated report and ADA-related emails—as substantive components of the arrest-warrant affidavit, demonstrating direct reliance on protected activity.

**466.** These facts present more than mere temporal proximity—they show causation through use of the protected activity itself as evidence of supposed wrongdoing, a form of retaliation consistently recognized as actionable under 42 U.S.C. § 12203. See Shotz, 375 F.3d at 738.

467.   Because County officials directly relied on Plaintiff's protected ADA communications to justify his arrest, and because no legitimate investigative steps occurred between the ADA filings and the issuance of the warrant, Plaintiff plausibly alleges a clear retaliatory causal chain under controlling Fifth Circuit and Supreme Court precedent. Once Plaintiff's protected ADA communications are removed from consideration, no independent factual basis remains that could plausibly explain the initiation of criminal process, reinforcing that retaliation—not legitimate law enforcement—was the moving force behind the adverse action.

468.   No alternative criminal offense or lawful enforcement basis existed that could have justified Plaintiff's arrest or prosecution. The sole conduct relied upon by County officials consisted of Plaintiff's ADA-protected advocacy, mandated reporting, and disability-related communications.

469.   The County Attorney's refusal to issue a non-refiling assurance, as communicated in the July 8, 2025 email, further supports Plaintiff's ADA retaliation claim. Plaintiff's attorney reported that this refusal was motivated by the County Attorney's desire to ensure that Plaintiff would "stay away" from cases involving S.J.K. and related IDD matters. Because Plaintiff's involvement in those matters arose solely from assisting an adult with intellectual disabilities in communicating with law enforcement and prosecutors, maintaining the threat of renewed prosecution constitutes retaliation for protected ADA activity under 42 U.S.C. § 12203.

**F. Contextual ADA Noncompliance Supporting Retaliatory Motive**

470.   Plaintiff does not assert an independent ADA Title II "failure to accommodate" or disability-discrimination claim on his own behalf. This subsection provides contextual background demonstrating Guadalupe County's longstanding pattern of ADA noncompliance

toward S.J.K.—an adult with documented intellectual and developmental disabilities—and the County's institutional motive to retaliate against Plaintiff when he attempted to correct that noncompliance.

**471.**    Despite repeated written notice of S.J.K.'s disability and her documented inability to read, write, or understand investigative or legal processes independently, Guadalupe County failed to comply with basic disability-related obligations applicable to public entities, including:

**(a)**    failing to designate or identify any ADA coordinator responsible for receiving or processing accommodation requests;

**(b)**    failing to provide communication, cognitive, or literacy accommodations necessary for S.J.K. to understand or participate meaningfully in investigative or prosecutorial proceedings;

**(c)**    failing to act on Plaintiff's March 26, 2025 guardian-ad-litem request despite clear evidence that S.J.K. lacked the capacity to navigate law-enforcement or prosecutorial processes without assistance; and

**(d)**    failing to ensure meaningful access to law-enforcement or prosecutorial functions as required of public entities subject to ADA Title II standards, including providing communication updates, returning calls, and offering accessible participation mechanisms.

**472.**    These systemic failures form the backdrop for Plaintiff's protected advocacy, including his ADA accommodation request, his guardian-ad-litem request, and his April 1, 2025 mandated report. Plaintiff's efforts to compel ADA compliance threatened to expose the County's ongoing violation of disability-rights obligations, thereby supplying a clear motive for the retaliatory actions taken against Plaintiff.

**473.** These ADA failures—directed toward the disabled individual herself—form part of the broader context demonstrating retaliatory motive. When Plaintiff sought accommodations, requested a guardian ad litem, and reported renewed exploitation of a disabled adult, County officials faced increased scrutiny for their own ADA violations. Rather than address the compliance issues, the County responded by criminalizing Plaintiff's protected advocacy. This pattern supports a plausible inference that Plaintiff was targeted **because** his ADA-protected activity exposed ongoing violations, consistent with the causation standards of 42 U.S.C. § 12203 and controlling Fifth Circuit precedent.

## G. Continuing Violation

**474.** Plaintiff's arrest did not end the County's retaliatory pattern or its disregard of disability-related filings. After April 7, 2025, Plaintiff was no longer acting as S.J.K.'s advocate; however, other individuals—including long-time advocate Kimberly Kennedy and Plaintiff's elderly, disabled parents—continued submitting disability-related documentation, requests for accommodations, and judicial-review filings. Between May and December 2025, Guadalupe County repeatedly ignored these communications, including (a) Kennedy's requests for basic cognitive accommodations for S.J.K., (b) ADA notices submitted by Plaintiff's father, a 77-year-old wheelchair-bound veteran, and (c) multiple pro se motions seeking judicial review of his own felony charge. Plaintiff's father was denied any examining trial or grand-jury review for more than eight months after his arrest, despite filing repeated motions and ADA-related notices of his disability status.

**475.** Although these ADA failures were directed toward other individuals, they form part of the continuing retaliatory environment and demonstrate the County's persistent deliberate indifference toward disability-related communications closely connected to Plaintiff's protected

activity. This ongoing pattern reinforces the plausibility of retaliatory motive under § 12203 and constitutes a continuing violation for purposes of ADA retaliation.

**H. Intent or Deliberate Indifference**

476.    Guadalupe County acted with deliberate indifference—and, at minimum, reckless disregard—toward Plaintiff's protected ADA activity. County officials were placed on actual notice of Plaintiff's ADA-related filings, including (a) his March 23, 2025 accommodation request; (b) his March 26, 2025 guardian-ad-litem request; and (c) his April 1, 2025 mandated report documenting disability-related exploitation of an intellectually disabled adult. Despite receiving these filings, the County took no steps to evaluate, investigate, or provide ADA-required accommodations.

477.    County officials also ignored subsequent disability-related communications from individuals other than Plaintiff—including repeated ADA notices and judicial-review requests submitted on behalf of S.J.K. by Kimberly Kennedy, and multiple ADA-related filings submitted by Plaintiff's disabled parents, both of whom attempted to secure basic accommodations and judicial review following the arrest of disabled army veteran James Louis Roden Sr. This consistent pattern of disregard, occurring immediately after Plaintiff's protected ADA activity, demonstrates an institutional mindset of retaliatory hostility rather than bureaucratic oversight.

478.    Taken together, the County's (a) refusal to acknowledge Plaintiff's protected activity, (b) use of his ADA-related communications as evidence in the arrest-warrant process, and (c) continued disregard of disability-related filings concerning the same family unit, provide more than sufficient factual matter to plausibly allege deliberate indifference for purposes of ADA Title V and Section 504 retaliation. See Delano-Pyle v. Victoria Cnty., 302 F.3d 567, 574 (5th

Cir. 2002). This deliberate indifference satisfies the intent requirement applicable to retaliation claims under the ADA and the Rehabilitation Act.

479.    Arresting and prosecuting an individual for assisting a disabled adult—after submitting ADA accommodation requests, requesting a guardian ad litem, and filing a mandated abuse report—based on reliance on those protected communications is objectively unreasonable and fundamentally inconsistent with the ADA's anti-retaliation mandate. No reasonable public entity could believe such conduct was lawful.

**I. Incorporation of Global Damages and Global Relief**

480.    Plaintiff incorporates by reference the Global Damages section and the Global Prayer for Relief as though fully set forth herein, including all compensatory, equitable, declaratory, and injunctive remedies applicable to ADA Title V and Section 504 retaliation claims.

## COUNT 6 – Equal Protection (Selective and Retaliatory Enforcement)

**(Fourteenth Amendment, 42 U.S.C. § 1983)**

**Against Defendant Sergeant Elaine M. Reamer (Individual Capacity Only)**

**A. Incorporation by Reference**

481.    Plaintiff re-alleges and incorporates by reference paragraphs 1-480 as though fully set forth herein. These include the factual chronology demonstrating the disparate treatment, retaliatory motive, and selective enforcement carried out by Defendant Sergeant Elaine M. Reamer.

**B. Legal Basis and Rights Violated**

**482.** The Equal Protection Clause of the Fourteenth Amendment prohibits law-enforcement officers from intentionally treating an individual differently from others similarly situated without a rational basis or for an impermissible motive such as retaliation for protected activity. See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000) (per curiam); Beeler v. Rounsavall, 328 F.3d 813, 816 (5th Cir. 2003).

**483.**    Selective or retaliatory enforcement violates the Equal Protection Clause when an officer:

**(a)** intentionally treats a person differently from similarly situated individuals;

**(b)** acts without a legitimate governmental or law-enforcement purpose; and

**(c)** is motivated by hostility, animus, or retaliation for the exercise of a protected right.

See Bryan v. City of Madison, 213 F.3d 267, 277 (5th Cir. 2000); Shipp v. McMahon, 234 F.3d 907, 915–16 (5th Cir. 2000); Integrity Collision Ctr. v. City of Fulshear, 837 F.3d 581, 587–88 (5th Cir. 2016).

**484.**    Under the "class-of-one" doctrine, government officials violate the Equal Protection Clause when they intentionally single out a specific individual for adverse treatment without any rational basis, even where no protected class is involved.

Olech, 528 U.S. at 564.

**C. Factual Basis of the Violation**

**1. Plaintiff Was Treated Differently Than Similarly Situated Individuals**

**485.**    Plaintiff—who engaged in lawful, protected advocacy supported by documented ADA-related concerns—was arrested and charged with a first-degree felony based solely on the uncorroborated statements of a witness with known credibility issues. In contrast, similarly situated individuals who engaged in identical or more extensive advocacy activities, or whose

conduct created actual risk or harm to S.J.K., were not subjected to investigation, arrest, or criminal prosecution.

**486.**    Plaintiff and family advocate Kimberly Kennedy were similarly situated in all materially relevant respects: both assisted S.J.K. at her request, both facilitated communication with prosecutors, and both engaged in identical legally protected advocacy. The only material distinction between them was Plaintiff's involvement in submitting mandated reports and ADA-based communications that exposed investigative failures and County liability.

**487.**    Plaintiff was the only individual whose advocacy included ADA-related filings, disability documentation, and mandated reports that exposed County liability for failing to protect an intellectually disabled adult. This distinction—not any legitimate investigative basis—explains why Plaintiff, and not similarly situated advocates, was targeted for criminal enforcement.

**488.**    When Defendant Reamer authored the April 7, 2025 arrest-warrant affidavit, she possessed evidence demonstrating that:

**(a)**    S.J.K. had consistently affirmed Plaintiff's innocence, autonomy, and voluntary participation in preparing affidavits and videos;

**(b)**    S.J.K. had repeatedly stated in sworn and unsworn recordings that she was not coerced or bribed; and

**(c)**    Cody Lane Koelle had provided contradictory statements, including a recorded March 18, 2025 phone call in which he admitted that his January 31, 2025 affidavit was false, that he had in fact signed the November 2024 affidavit, and that he was being pressured by officials to reverse his testimony.

189

**489.**    Despite possessing this evidence, Defendant Reamer treated Plaintiff as a criminal suspect while crediting the statements of Cody Lane Koelle—an individual who had admitted lying under oath and who was implicated by Plaintiff's April 1, 2025 mandated-abuse report. This disparate treatment lacked any legitimate law-enforcement basis.

**490.**    Similarly situated individuals engaging in the same or greater level of involvement with S.J.K. were not investigated or charged. Family advocate Kimberly Kennedy, for example, prepared affidavits, assisted in recording video statements, and facilitated contact between S.J.K. and prosecutors. These are the same activities attributed to Plaintiff. Yet Ms. Kennedy was never questioned, investigated, or accused of misconduct. Plaintiff alone was singled out for criminal enforcement, demonstrating selective treatment unrelated to any legitimate public-safety or evidentiary rationale. This differential treatment cannot be explained by any legitimate investigative or prosecutorial rationale and reflects intentional singling-out of Plaintiff for adverse treatment.

## 2. Defendant Reamer Ignored Comparable or More Serious Misconduct by Similarly Situated Witnesses

**491.** Defendant Reamer declined to investigate or corroborate readily available evidence showing that Cody Lane Koelle:

**(a)** had made materially inconsistent statements regarding the events at issue;

**(b)** had contradicted his own prior sworn affidavits, including reversing positions between the November 2024 and January 31, 2025 statements; and

**(c)** admitted during a recorded March 18, 2025 phone call that his January 2025 affidavit was false and that he was being pressured by County personnel to recant his earlier truthful affidavit supporting Jamie Renee Walker.

**492.**    Despite these inconsistencies and the direct evidence undermining his reliability, Defendant Reamer credited Cody Lane Koelle's statements without independent verification while simultaneously disregarding Plaintiff's communications, which were supported by sworn statements, recorded interviews, and contemporaneous written documentation. This selective acceptance of evidence lacked any legitimate investigative rationale.

**493.**    Defendant Reamer also treated another similarly situated advocate, Kimberly Kennedy, more favorably—even though Ms. Kennedy engaged in the same or greater degree of advocacy and assistance for S.J.K., including preparing affidavits, facilitating video communications, and helping her articulate her statements. Ms. Kennedy was never investigated, questioned, or accused of witness tampering. Plaintiff alone was subjected to criminal enforcement, despite engaging in the same legally permissible conduct as a family advocate. Reamer's willingness to credit attorney-generated statements from the alleged abuser's defense team, while discrediting Plaintiff's statutorily protected communications supported by sworn documentation, further demonstrates intentional, arbitrary, and hostile treatment.

**494.**    Post-arrest events further demonstrate Defendant Reamer's pattern of selective enforcement and arbitrary favoritism toward the County's preferred witness, Cody Lane Koelle. On July 18, 2025, Koelle again contradicted his prior sworn statements, admitting that he had never written or signed *any* affidavits—including those submitted by Michael Allen Walker's defense team and those used to pursue charges against Plaintiff's father. Despite receiving a sworn criminal complaint documenting Koelle's perjury, Defendant Reamer conducted no investigation, made no recommendation for charges, and instead forwarded the matter to the County Attorney's Office while labeling the criminal complaint as "civil." This classification shielded Koelle from criminal liability even though his admissions established that he had

provided false statements in official proceedings concerning the same events for which Plaintiff

was arrested. By contrast, Plaintiff—who lawfully reported abuse, preserved evidence, and

submitted mandated reports—was subjected to a first-degree felony arrest without comparable

scrutiny of witnesses whose contradictory statements undermined the County's narrative. This

disparate post-arrest treatment underscores the selective and retaliatory nature of the enforcement

decision and confirms that Defendant Reamer protected unreliable witnesses while targeting

Plaintiff for performing his mandated duties.

### 3. Defendant Reamer's Enforcement Decisions Were Motivated by Retaliatory Animus

**495.**    The close temporal proximity between Plaintiff's protected advocacy—including the

March 23, 2025 ADA submission, the March 26, 2025 guardian-ad-litem request for S.J.K., and

the April 1, 2025 mandated report of disability-related exploitation—and Plaintiff's arrest on

April 7, 2025 strongly indicates that these protected activities were a substantial factor in the

decision to initiate criminal charges. No additional investigation, interviews, or evidence-

gathering occurred between these protected filings and the decision to seek an arrest warrant.

**496.**    Defendant Reamer relied on Plaintiff's protected communications—including emails,

sworn statements, recorded video submissions, and materials associated with the April 1

mandated report—as the basis for asserting witness-tampering allegations. These

communications were lawful, routed through official governmental channels, and performed in

furtherance of federally protected advocacy. Using these protected actions as the predicate for a

first-degree felony charge reflects retaliatory enforcement rather than neutral investigation.

**497.**    In preparing the April 7, 2025 arrest-warrant affidavit, Defendant Reamer omitted

exculpatory evidence in her possession that directly contradicted the tampering accusation,

including multiple sworn affirmations from S.J.K. confirming that Plaintiff acted only at her request, without coercion, and solely to help her communicate with prosecutors. At the same time, Defendant Reamer elevated unverified and internally inconsistent statements from Cody Lane Koelle despite knowing that he had contradicted his own affidavits and admitted to pressure from others. This selective presentation of evidence demonstrates differential treatment inconsistent with legitimate law-enforcement decision-making.

498.    A reasonable officer would not treat two individuals performing identical advocacy roles—Plaintiff and family advocate Kimberly Kennedy—in such markedly different ways, nor rely on an unreliable witness while disregarding multiple corroborated records favorable to Plaintiff. Defendant Reamer's deviation from standard investigative practice, disparate treatment of similarly situated individuals, and reliance on compromised testimony support an inference that the enforcement decision was driven by animus and selective targeting rather than lawful investigative judgment.

499.    There exists no conceivable legitimate governmental purpose for treating Plaintiff differently than similarly situated advocates, and no rational basis for elevating demonstrably unreliable witnesses over a mandated reporter acting in full compliance with Texas law

**4. Defendant Reamer Lacked Any Rational Basis for the Disparate Treatment**

500.    No legitimate law-enforcement purpose justified treating Plaintiff as a criminal suspect while simultaneously:

**(a)** disregarding multiple pieces of exculpatory evidence in Defendant Reamer's possession, including sworn statements and recorded video affirmations from S.J.K.;

**(b)** ignoring comparable or more serious conduct by similarly situated individuals—such as the

contradictory statements, admitted perjury, and acknowledged external pressure affecting the testimony of Cody Lane Koelle; and

(c) declining to investigate or corroborate plainly inconsistent witness statements that undermined the credibility of the only complaining witness relied upon to justify a first-degree felony charge.

**501.**    The disparate treatment of Plaintiff bore no rational relationship to any legitimate investigative or prosecutorial objective. Defendant Reamer's deviation from ordinary investigative standards, her selective reliance on unreliable evidence, and her failure to apply equivalent scrutiny to similarly situated individuals demonstrate that the enforcement decision was arbitrary and without lawful justification. Enforcement that is arbitrary, selective, or applied unequally violates the Equal Protection Clause. See Yick Wo v. Hopkins, 118 U.S. 356, 373–74 (1886).

**502.**    The refusal to issue a non-refiling assurance by First Assistant County Attorney Jonathan Amdur, as described by Plaintiff's defense counsel in the July 8, 2025 email, further illustrates the County's selective enforcement practices. Other individuals involved in assisting, advising, or communicating with S.J.K.—including family advocate Kimberly Kennedy—were not subjected to criminal charges or continuing threats of prosecution. Likewise, the aggravated sexual-assault charges previously filed against Jamie Renee Walker were dismissed, and her First-Degree Felony Tampering with a Witness allegation was dismissed with prejudice, closing those matters entirely. Only Plaintiff was singled out for continued criminal exposure, and the County Attorney's Office maintained an unresolved felony allegation as ongoing leverage to ensure Plaintiff's silence and deter further advocacy. This disparate treatment is consistent with

the County's custom of selectively targeting Plaintiff while treating similarly situated individuals—who engaged in the same or more significant conduct—more favorably.

**D. Causation**

**503.** Defendant Reamer's enforcement decisions—including her selective consideration of evidence, disparate treatment of similarly situated individuals, and reliance on witness statements she knew or should have known were unreliable—set in motion the events that led to Plaintiff's arrest, seizure, and resulting harms. Plaintiff's injuries were the foreseeable and natural consequence of these actions.

**E. Incorporation of Global Damages and Global Relief**

**504.** Plaintiff incorporates by reference the Global Damages section and the Global Prayer for Relief as though fully set forth herein, including all economic, reputational, emotional, liberty-related, and consequential harms arising from the enforcement actions described in this Count.

## COUNT 7 – Municipal Liability Under Monell v. Department of Social Services, 436 U.S. 658 (1978)

**(42 U.S.C. § 1983 – Policy, Custom, or Practice of Constitutional Violations) Against Defendant Guadalupe County, Texas (Municipal Liability Only)**

**A. Incorporation by Reference**

**505.** Plaintiff re-alleges and incorporates by reference paragraphs 1–504 and Counts 1 through 6 as though fully set forth herein. The incorporated allegations describe in detail the actions of Investigator Elaine M. Reamer and the involvement of Guadalupe County officials that resulted in violations of Plaintiff's rights under the First, Fourth, and Fourteenth Amendments, as well as

violations of Title II of the Americans with Disabilities Act, 42 U.S.C. §§ 12131–12134, the

ADA's anti-retaliation provision, 42 U.S.C. § 12203, and Section 504 of the Rehabilitation Act,

29 U.S.C. § 794.

**506.** This Count seeks to impose liability on Guadalupe County, Texas, under 42 U.S.C. §

1983 for constitutional violations caused by its policies, customs, and practices. Plaintiff does not

seek, in this Count, to enforce the Americans with Disabilities Act or Section 504 of the

Rehabilitation Act through § 1983. Rather, Plaintiff alleges that County policies and customs—

demonstrated by retaliatory conduct, deliberate indifference, and failure to accommodate

protected advocacy related to disability—constitute evidence of unconstitutional motives,

policymaker ratification, and practices that independently violated Plaintiff's rights under the

First, Fourth, and Fourteenth Amendments.

**B. Legal Basis**

**507.** Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality is

liable under § 1983 when execution of its official policy, custom, or practice is the moving force

behind a constitutional violation.

**508.** To establish Monell liability, a plaintiff must show:

**(a)** the existence of an official policy, widespread custom, or persistent practice;

**(b)** that the policy or custom was promulgated, adopted, or ratified by a municipal policymaker

with final decision-making authority; and

**(c)** that the policy or custom was the moving force behind the constitutional violation. *Piotrowski
v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001); *Peterson v. City of Fort Worth*, 588 F.3d

838, 847–48 (5th Cir. 2009).

**509.**    A single decision by an official with final policymaking authority can itself constitute official policy when the decision causes a constitutional injury. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127–28 (1988).

**510.**    At all relevant times:

**(a)** Sheriff Joshua Ray was the final policymaker for investigative practices, probable-cause determinations, and arrest-warrant preparation within the Guadalupe County Sheriff's Office;

**(b)** County Attorney David Willborn, when directing, screening, or controlling investigative materials prior to the initiation of formal prosecutorial advocacy, exercised final policymaking authority over pre-charging investigative coordination and administrative prosecutorial functions; and

**(c)** County Judge Kyle Kutscher, acting together with the Guadalupe County Commissioners Court, exercised final policymaking authority over county-wide administrative policies— including ADA compliance, disability-related accommodation practices, inter-agency oversight responsibilities, and the duty to correct known constitutional violations—such that failure to intervene after receiving written notice constitutes ratification under *Monell*.

**511.**    A municipality may not evade constitutional accountability by structuring its investigative process so that law-enforcement officers defer factual development, verification, or probable-cause analysis to prosecutors. The Fourth Amendment requires an independent and neutral determination of probable cause, and officers may not abdicate that responsibility by adopting unverified narratives supplied by others. *Gerstein v. Pugh*, 420 U.S. 103, 112 (1975); *Coolidge v. New Hampshire*, 403 U.S. 443, 449–53 (1971); *Winfrey v. Rogers*, 901 F.3d 483, 493–94 (5th Cir. 2018). Where policymakers affirmatively permit or encourage prosecutors to control investigative narratives, and officers adopt those narratives without independent

verification, the resulting arrests and prosecutions are attributable to municipal policy rather than isolated error. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988); *Espinal v. City of Houston*, 87 F.4th 593, 602–04 (5th Cir. 2024).

512.    Monell liability is further supported where a municipality, through its policymakers or established practices, causes officers to forward materially incomplete, misleading, or prosecutor-driven investigative information to support criminal charges, thereby initiating or prolonging proceedings without probable cause. *Espinal v. City of Houston*, 87 F.4th 593, 602–04 (5th Cir. 2024). In *Espinal*, the Fifth Circuit held that an officer cannot avoid liability by pointing to a prosecutor's charging decision when the officer's own omissions or misrepresentations were the moving force behind that decision. When a municipality's customs, failures to supervise, or affirmative delegation of investigative authority lead to such conduct, Monell liability attaches.

513.    Here, the directives, approvals, failures to intervene, and affirmative ratifications by Sheriff Ray and County Attorney Willborn—including their express delegation of investigative responsibility to the County Attorney's Office, acceptance of an incomplete and prosecutor-controlled investigative record, inaction in the face of known omissions, and continued maintenance of the prosecution—constitute official County policy for Monell purposes.

514.    These policies, customs, and ratifications were the moving force behind the unconstitutional arrests of Plaintiff and his father and therefore subject Guadalupe County to municipal liability under § 1983.

**C. Policies, Customs, and Practices**

515. Plaintiff asserts three interrelated theories of municipal liability:

1. **Policymaker-directed decisions that caused the specific constitutional violations at issue;**

2. **Widespread customs and practices that predictably resulted in those violations; and**

3. **Deliberate failure to train and supervise in core constitutional and disability-rights obligations.**

516. Each is pled as an independent and reinforcing basis for County liability.

**Custom / Policy 1 – Delegation of Investigative Authority to Prosecutors and Abdication of Independent Probable-Cause Review**

517. As an independent and foundational policy underlying each of the customs described below, Guadalupe County—through Sheriff leadership—maintained and ratified a practice whereby criminal investigations were affirmatively ceded to the County Attorney's Office, and Sheriff's Office investigators were instructed or permitted to rely on prosecutor-controlled narratives rather than conducting independent factual verification or probable-cause analysis.

518. This policy was expressly confirmed in a written Open Records response issued after inquiry to Sheriff Joshua Ray and Sheriff Command Staff, stating that the County Attorney's Office "would be conducting the investigation" and that investigative materials were forwarded by Sgt. Elaine Reamer "per her supplement." By this practice, the Sheriff's Office abdicated its constitutional duty to independently investigate allegations, interview witnesses, evaluate exculpatory evidence, and determine probable cause before seeking arrest warrants.

**519.** This prosecutor-controlled investigative structure predictably resulted in arrest-warrant affidavits that mirrored prosecutorial narratives, omitted material exculpatory evidence, and relied on unverified representations supplied by the County Attorney's Office. As applied to Plaintiff and his father, this policy directly produced the April 7, 2025 arrest-warrant affidavits authored by Defendant Reamer, which repeatedly deferred to "evidence provided by the Guadalupe County Attorney's Office" without independent verification.

**520.** Guadalupe County cannot invoke the independent intermediary doctrine to defeat liability arising from this policy. Where County policymakers and the County Attorney's Office controlled the evidentiary narrative presented to magistrates, and where arrest-warrant affidavits were procured through submissions that omitted material exculpatory evidence, any purported intermediary review was tainted and not independent. When a magistrate's probable-cause determination relies on false statements or material omissions supplied pursuant to County policy or custom, the causal chain is not broken, and liability under 42 U.S.C. § 1983 remains. See, e.g., *Hand v. Gary*, *Deville v. Marcantel*, *Winfrey v. Rogers*, and *Green v. Thomas*.

**521.** This delegation of investigative authority constitutes an official County policy or ratified custom for Monell purposes and served as the structural mechanism by which retaliatory enforcement, suppression of exculpatory evidence, and selective prosecution were carried out against Plaintiff and his family.

**Custom / Policy 2 – Retaliatory Use of Criminal Process Against Mandated Reporters and Advocates**

**522.** As detailed in the Factual Background and in Counts 1, 3, 4, and 6, Plaintiff engaged in lawful, constitutionally protected advocacy and mandated reporting on behalf of an intellectually

200

disabled adult witness, S.J.K. This advocacy included:

(a) repeated sworn statements, videos, and affidavits documenting her exculpatory testimony and abuse;

(b) an ADA accommodation request and guardian-ad-litem request filed on March 23 and 26, 2025; and

(c) a mandated report filed on April 1, 2025, with an explicit request for anonymity pursuant to Texas Family Code § 261.101(f). Retaliatory use of the criminal process in response to protected conduct violates the First and Fourteenth Amendments. Hartman v. Moore, 547 U.S. 250, 256–59 (2006).

523.    Despite Plaintiff's anonymity request, Victim Coordinator Ileen Rangel contacted S.J.K. on April 4, 2025 and disclosed that Plaintiff submitted the April 1 report. Violating the legally protected anonymity of a mandated reporter foreseeably deters reporting and constitutes adverse governmental action. See Lozman v. City of Riviera Beach, 585 U.S. 108, 118–19 (2018) (retaliatory misuse of government machinery actionable even when directed at individual citizen).

524.    At approximately 1:00 a.m. on April 5, 2025, S.J.K. left Plaintiff a voicemail stating that Victim Coordinator Ileen Rangel told her Plaintiff was the person who reported her renewed exploitation. Plaintiff had not informed S.J.K. of the report, nor had he communicated with her at any point after submitting it. The only place that information existed was in Plaintiff's April 1, 2025 mandated report, meaning that County personnel necessarily reviewed its contents before disclosing it to the subject of the report. This disclosure placed Plaintiff at immediate risk of retaliation from the individuals implicated in the report and demonstrates that the County had actual notice of Plaintiff's ADA- and safety-related concerns yet failed to take any protective

action. A municipality may be held liable where officials act with deliberate indifference to known or obvious risks. City of Canton v. Harris, 489 U.S. 378, 388 (1989).

525.    Within six days of Plaintiff's mandated report—and within 72 hours of the anonymity breach—Guadalupe County officials executed coordinated first-degree felony arrest warrants against Plaintiff and his elderly father, using Plaintiff's protected communications as the factual basis for "tampering" allegations. The retaliatory use of criminal process is prohibited under the First and Fourteenth Amendments. Bevill v. Fletcher, 26 F.4th 270, 278 (5th Cir. 2022) (retaliatory initiation of criminal proceedings actionable).

526.    Assistant County Attorney Jessica Johnson forwarded Plaintiff's protected ADA filings and mandated-report materials to First Assistant County Attorney Jonathan Amdur, Chief Prosecutor Maritza Stewart, and Elected County Attorney David Willborn, placing final policymakers on actual notice before the April 7 warrants were sworn. When Defendant Reamer stated she "reviewed evidence provided by the Guadalupe County Attorney's Office," she confirmed that policymaker-level officials curated and supplied the evidence used to obtain the warrants. A single decision by a final policymaker is sufficient to establish municipal liability. Pembaur v. City of Cincinnati, 475 U.S. 469, 480–81 (1986); Praprotnik, 485 U.S. at 123.

527.    The preset $100,000 bail, addition of "victims" not named in the affidavit, and synchronized warrants for two individuals with no criminal history reflect coordinated policymaking decisions, not isolated errors. Where municipal actors act in concert to apply an unconstitutional practice, Monell liability attaches. Grandstaff v. City of Borger, 767 F.2d 161, 171–72 (5th Cir. 1985).

**528.**    These coordinated actions—including violating Plaintiff's anonymity, relying on

protected communications as criminal evidence, ignoring exculpatory witness statements, and

proceeding without any neutral investigation—reflect a persistent County custom of retaliating

against mandated reporters and ADA advocates. Municipal liability attaches when a

municipality's custom or practice causes the constitutional injury. Monell v. Dep't of Soc. Servs.,

436 U.S. 658, 694 (1978).

**529.**    Plaintiff's July 8, 2025 email exchange with his defense attorney further supports Monell

liability. According to counsel, First Assistant County Attorney Jonathan Amdur refused to

provide a non-refiling assurance not for evidentiary or legal reasons, but specifically to "make

sure [Plaintiff] stay[s] away from his cases." This reflects policymaker-level intent to use the

threat of prosecution as a tool of control and suppression. The County's continued maintenance

of the charge—despite receiving multiple exculpatory affidavits, recordings, and ADA-related

submissions—constitutes ratification of unconstitutional objectives and demonstrates a County

custom of retaliatory use of criminal process, consistent with Monell principles recognizing that

a single decision or ratification by a final policymaker may establish municipal liability. *See*

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *City of St. Louis v. Praprotnik*, 485

U.S. 112, 123–27 (1988); *Grandstaff v. City of Borger*, 767 F.2d 161, 171–72 (5th Cir. 1985).

**Custom / Policy 3 – Suppression of Exculpatory Evidence and Fabrication of Probable Cause**

**530.**    As set forth in Counts 1, 2, and 3, Guadalupe County officials—including Defendant

Sergeant Elaine M. Reamer and personnel within the County Attorney's Office—engaged in a

recurring pattern of:

**(a)** disregarding, minimizing, or suppressing sworn affidavits, videos, mandated-report filings,

and recorded statements from S.J.K. and other witnesses that exonerated Plaintiff and his family;

**(b)** elevating later, contradictory statements from Cody Lane Koelle and Andrea Martin Koelle

that aligned with the County's preferred narrative despite known inconsistencies; and

**(c)** presenting incomplete, selectively curated, and misleading information to the magistrate in

order to create the appearance of probable cause where none existed. The fabrication or

intentional distortion of evidence violates clearly established constitutional law. See Mooney v.

Holohan, 294 U.S. 103, 112–13 (1935).

**531.**    County leadership—including supervisory officials within the County Attorney's Office—

received repeated written notice of exculpatory evidence prior to the April 7 warrants, including:

**(a)** the April 4, 2024 recorded interview of S.J.K. affirming her mother's innocence;

**(b)** the November 15, 2024 and March 15, 2025 sworn affidavits from S.J.K., both consistent

with earlier testimony;

**(c)** the March 10–12, 2025 video statements in which S.J.K. expressly confirmed she acted

voluntarily and without coercion;

**(d)** the March 18, 2025 recorded phone call in which Cody Lane Koelle admitted his November

affidavit was true, his January recantation was false, and that he was being pressured by officials;

and

**(e)** the April 1, 2025 mandated report, submitted with an explicit anonymity request, in which

Plaintiff documented renewed sexual exploitation of S.J.K. together with the same exculpatory

narrative that contradicts the County's later prosecution theory.

Despite possessing these materials, County officials withheld the exculpatory evidence from the

warrant application and subsequent bond proceedings.

532.    These practices were not isolated acts of individual misconduct, but the foreseeable result of a County policy that permitted prosecutors to control investigative narratives while Sheriff's Office investigators deferred independent verification and adopted those narratives wholesale in warrant affidavits.

533.    After Plaintiff's arrest, additional exculpatory evidence—including a notarized affidavit mailed by S.J.K. on May 29, 2025, and written complaints submitted by Plaintiff and his parents—was delivered to both the Sheriff's Office and the County Attorney's Office. No steps were taken to correct the warrant affidavit, withdraw the warrant, notify the magistrate, or adjust bond conditions. The County instead continued to rely on the same discredited and contradicted narrative to justify ongoing restraints.

534.    This pattern of suppressing exculpatory information, disregarding the April 1 mandated report, failing to disclose witness credibility issues, and selectively elevating statements known to be unreliable reflects a longstanding County practice of protecting its prosecution theory at the expense of constitutional due process. Such conduct violates well-established obligations under Brady v. Maryland, 373 U.S. 83, 87 (1963), Giglio v. United States, 405 U.S. 150, 153–54 (1972), and Mooney v. Holohan, 294 U.S. 103 (1935). The Fifth Circuit recognizes municipal liability where a pattern of withholding or distorting evidence causes constitutional harm. Bevill v. Fletcher, 26 F.4th 270, 279–80 (5th Cir. 2022).

535.    These customs were a moving force behind Plaintiff's unlawful seizure and malicious prosecution. Had the County followed a policy of disclosing and weighing exculpatory evidence—including the April 1 mandated report and the verified March video statements—no reasonable officer or magistrate could have found probable cause. The County's systematic suppression and distortion of evidence directly caused Plaintiff's arrest, detention, reputational

injury, and continuing harm. None of these exculpatory materials were disclosed to the magistrate in connection with the April 7th, 2025 warrants or to the court in subsequent bond proceedings

**Custom / Policy 4 – Arrest-Based Punishment Through Strategic Non-Indictment, Pre-Hearing Declination, and Maintenance of Open Felony Status**

536.    Guadalupe County's ordinary practice is to present felony cases for grand-jury review within approximately ninety days, particularly where the charge is a first-degree felony imposing severe liberty restraints. In these three related tampering matters—arising from the same investigation, involving the same investigating officer, and the same alleged victim. —the County never sought a single indictment. Jamie Renee Walker remained jailed for approximately 252 days without indictment on the tampering charge and was dismissed with prejudice; James Louis Roden Sr. remained subject to felony restraint for approximately 238 days before declination without prejudice; and James Louis Roden Jr. remained under felony charge for approximately 102 days before declination without prejudice—each without ever being presented to a grand jury.

537.    Critically, each declination occurred immediately before a scheduled court proceeding at which the County would have been required to defend the existence of probable cause based on Investigator Elaine M. Reamer's arrest-warrant affidavit and the witnesses and materials attributed to it. By declining the charges on the eve of judicial review, the County avoided sworn testimony, evidentiary testing, and judicial scrutiny of the affidavit's omissions, misstatements, and reliance on contested and contradictory witness accounts.

**538.**  For Plaintiff and his father, the County declined the charges without prejudice, leaving the cases active and unresolved in criminal-history systems, including DPS and commercial background-check databases, where the disposition appears as "HELD." This status signals an unresolved felony matter and triggers automatic rejection by human-resources screening systems, educational institutions, and licensing bodies that are programmed to disqualify applicants with pending or unresolved felony entries—regardless of guilt or evidentiary strength.

**539.**  As a result of the County's decision to decline without prejudice rather than formally terminate the prosecutions, Plaintiff continues to suffer ongoing financial and professional harm, including repeated employment rejections, loss of income, and exclusion from professional opportunities, despite the County's own determination that it would not proceed to indictment. The unresolved status also imposes a continuing and reasonable fear of reindictment at any time within the applicable statute of limitations, effectively extending the punitive consequences of arrest indefinitely without judicial determination of probable cause.

**540.**  These decisions were not made by line prosecutors exercising isolated discretion. At all relevant times, Jonathan Amdur served as First Assistant County Attorney, the second-in-command under Elected County Attorney David Willborn, and was the assigned prosecutor in all three cases. As First Assistant County Attorney, Amdur exercised final policymaking authority over pre-indictment charging decisions, declination timing, and whether charges would be dismissed with or without prejudice. Decisions made and ratified at this level constitute official County policy for purposes of Monell liability. See Pembaur v. City of Cincinnati, 475 U.S. 469, 480–81 (1986); City of St. Louis v. Praprotnik, 485 U.S. 112, 123–27 (1988).

**541.**  The prolonged refusal to seek indictment—followed by strategic, last-minute declinations immediately preceding probable-cause hearings, and the deliberate choice to leave felony entries

unresolved—cannot reasonably be attributed to workload, scheduling, or routine prosecutorial discretion. Rather, it reflects a County practice of imposing arrest-based punishment, chilling protected advocacy, and retaliating against disability-related reporting and ADA-protected conduct, while intentionally avoiding neutral adjudication. By maintaining open felony status without judicial review, the County preserved coercive leverage, deterred further advocacy on behalf of an adult with intellectual disability, and shielded defective warrant affidavits from constitutional scrutiny. Such conduct violates the Fourth and Fourteenth Amendments and constitutes retaliation for protected ADA advocacy. See Gerstein v. Pugh, 420 U.S. 103, 114 (1975); Manuel v. City of Joliet, 580 U.S. 357, 367–69 (2017); Winfrey v. Rogers, 901 F.3d 483, 491–94 (5th Cir. 2018).

**542.**    By maintaining these cases in a limbo posture—neither indicted nor dismissed with finality—the County subjected Plaintiff and his father to continuing seizure-like restraints, reputational injury, and economic exclusion, while reserving the unilateral power to refile charges at will. This repeated pattern across multiple defendants and the same investigation demonstrates an institutional custom of punishment without adjudication, directed and ratified by officials with final policymaking authority, and was a moving force behind Plaintiff's ongoing constitutional injuries.

**Custom / Policy 5 – Selective Enforcement and Protection of a Key Witness**

**543.**    As detailed in Count 6 and the Factual Background, Guadalupe County consistently treated Cody Lane Koelle—the County's preferred witness—more favorably than Plaintiff, despite Cody's:

**(a)** contradictory affidavits;

**(b)** admission during a recorded March 18, 2025 call that his January 31 recantation was false

and that external pressure caused him to change his story; and

**(c)** criminal history involving false statements to law enforcement, including documented conduct that undermined his credibility as a witness.

**544.**    The County credited Cody's statements even though they conflicted with prior sworn affidavits, video-recorded testimony, and contemporaneous written submissions. Selectively elevating an unreliable witness while discrediting contradictory exculpatory evidence violates clearly established Equal Protection principles. See Beeler v. Rounsavall, 328 F.3d 813, 816 (5th Cir. 2003).

**545.**    By contrast, family advocate Kimberly Kennedy—who engaged in equal or greater levels of advocacy for S.J.K. during the same period, including assisting with affidavits, facilitating communications with prosecutors, and helping S.J.K. articulate statements—was never investigated, questioned, or threatened with criminal charges. Both Ms. Kennedy and Plaintiff supported S.J.K.'s right to speak freely and without coercion, and in both contexts S.J.K. consistently stated that her mother was innocent. Ms. Kennedy's conduct was materially indistinguishable from Plaintiff's in all constitutionally relevant respects, yet Plaintiff alone was charged with a first-degree felony for allegedly "influencing" S.J.K. to express that same consistent position. The only meaningful distinction was that Plaintiff, unlike Ms. Kennedy, reported prosecutorial misconduct to the court, submitted formal ADA-related advocacy filings, and filed a mandated abuse report under Texas Family Code § 261.101 implicating renewed exploitation and County inaction. Plaintiff alone was then subjected to felony arrest and prosecution. This differential treatment supports a plausible inference that enforcement decisions were driven by retaliatory animus toward Plaintiff's protected reporting and advocacy activities, and by viewpoint-based hostility toward speech challenging the County's prosecution theory,

rather than any legitimate law-enforcement objective. See Yick Wo v. Hopkins, 118 U.S. 356,

373–74 (1886); Beeler v. Rounsavall, 328 F.3d 813, 816–17 (5th Cir. 2003); Lozman v. City of

Riviera Beach, 585 U.S. 108, 118–19 (2018).

**546.**    When Cody accused Plaintiff and his family, the County acted swiftly and punitively:

arrest warrants were issued; bail was preset at $100,000; and the Roden family was publicly

designated as felons. However, when Plaintiff's parents submitted a sworn, notarized criminal

complaint against Cody for aggravated perjury, false report, and tampering—with attached

affidavits, timestamps, and a recording verifying Cody's admissions—the Sheriff's Office

misclassified the complaint as "civil," prematurely marked it "Cleared – Report Taken," and

routed it back to the same investigator whose prior affidavits depended on Cody's credibility. No

investigative steps were taken.

**547.**    Senior County officials—including the Sheriff and County Attorney leadership—were

formally notified of the misclassification and given full evidentiary packets, including sworn

affidavits and the March 18 recorded call. Yet no corrective action was taken, no independent

inquiry was initiated, and Cody continued to be treated as a "victim" and essential witness in

prosecutions his own conduct had compromised. Such systemic inaction reflects deliberate

indifference to established constitutional obligations and supports Monell liability. See Webster

v. City of Houston, 735 F.2d 838, 842–43 (5th Cir. 1984) (en banc) (municipal liability arises

where policymaker knowledge is followed by failure to act).

**548.**    This pattern—immediate punitive action when Cody accused Plaintiff, simultaneous

refusal to act when Plaintiff's family produced sworn evidence of Cody's wrongdoing, and

disparate treatment between Plaintiff and similarly situated advocate Kimberly Kennedy—

demonstrates a County custom of selective enforcement and unequal application of the law. Such

enforcement "with an evil eye and an unequal hand" violates the Equal Protection Clause. Yick Wo v. Hopkins, 118 U.S. 356, 373–74 (1886).

**Custom / Policy 6 – Failure to Train and Supervise on Core Constitutional and Disability-Rights Obligations**

**549.** Independently and in combination with the customs described above, Guadalupe County failed to train and supervise personnel in the Sheriff's Office and County Attorney's Office regarding basic constitutional obligations and disability-rights requirements. The areas in which training was absent or inadequate included:

**(a)** the duty to preserve, disclose, and consider exculpatory and impeachment evidence, as required by Brady v. Maryland, 373 U.S. 83 (1963), and Giglio v. United States, 405 U.S. 150 (1972);

**(b)** constitutional limitations on supplying false, misleading, or incomplete information in warrant affidavits, prohibited under Franks v. Delaware, 438 U.S. 154 (1978);

**(c)** prohibitions on selective enforcement and retaliatory arrest under the First and Fourteenth Amendments; and

**(d)** compliance with Title II of the Americans with Disabilities Act when interacting with adults with intellectual and developmental disabilities (IDD), as articulated in Delano-Pyle v. Victoria County, 302 F.3d 567, 574–75 (5th Cir. 2002).

**550.** Public-record responses and County correspondence show that:

**(a)** no ADA coordinator was identified, despite ADA Title II requiring one for public entities;

**(b)** no ADA training logs or policy manuals were produced, despite multiple written requests; and

**(c)** the Sheriff's Office updated its publicly posted Criminal Investigations procedures to add

211

language stating that investigators must "interview suspects, witnesses, victims..etc." only after Plaintiff and his family complained that no such interviews were conducted prior to the April 7, 2025 felony arrests. As shown by *Exhibit M-011*, archived versions of the Sheriff's Office website captured via the Wayback Machine reflect that in July 2025, the Criminal Investigations page contained no reference to interviewing suspects, witnesses, or victims as part of investigative duties, while the October 2025 version added this requirement following Plaintiff's formal complaints. Despite this belated revision, Investigator Reamer conducted no interviews of Plaintiff, the alleged victim, or any material witnesses before swearing out the April 7 arrest-warrant affidavits. This sequence supports an inference that policymakers were aware of investigative deficiencies and responded only after constitutional violations had occurred, evidencing deliberate indifference rather than contemporaneous compliance. Courts recognize that post-incident policy revisions may be considered to show prior notice of deficiencies and a failure to train or supervise where the need for such training was obvious. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989); *Brown v. Bryan County*, 219 F.3d 450, 462–63 (5th Cir. 2000); *Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 762–63 (S.D. Tex. 2011).

**551.**    Because County employees received no meaningful training on the constitutional requirements above—and because these failures arose in cases involving adults with known IDD—the resulting violations were not accidental but the predictable outcome of inadequate supervision. The absence of training created a foreseeable risk that officers and prosecutors would:

**(a)** ignore or discount exculpatory statements from S.J.K. and others;

**(b)** fail to interview critical witnesses such as Kimberly Kennedy, despite her role being indistinguishable from Plaintiff's;

**(c)** retaliate against mandated reporters and ADA advocates through misuse of the criminal process; and

**(d)** rely on incomplete or false affidavits to obtain warrants, including those based primarily on a witness who admitted lying under pressure.

**552.**    Under City of Canton v. Harris, 489 U.S. 378, 390 (1989); Connick v. Thompson, 563 U.S. 51, 61–63 (2011); Delano-Pyle, 302 F.3d at 575; and Brown v. Bryan County, 219 F.3d 450, 461–62 (5th Cir. 2000), a municipality is liable where the need for training is obvious, the lack of training is likely to result in constitutional violations, and policymakers disregard that risk. Here, the County's failure to implement and enforce basic constitutional and ADA training—despite handling repeated cases involving adults with IDD—constitutes deliberate indifference, and was a moving force behind Plaintiff's unlawful arrest, fabricated probable cause, and retaliatory prosecution. The resulting injuries were the plainly foreseeable consequence of these training and supervision failures.

**D. Policymaker Involvement, Ratification, and Moving Force**

**553.**    Guadalupe County policymakers—including Sheriff Joshua Ray, County Attorney David Willborn, First Assistant County Attorney Jonathan Amdur, and Chief Prosecutor Maritza Stewart—received repeated, detailed notice of the constitutional violations described throughout this Complaint, via:

**(a)** Plaintiff's March 21, March 23, March 26, and April 1, 2025 filings and emails;

**(b)** post-arrest letters and affidavits from Plaintiff and his parents; and

**(c)** sworn statements and recordings submitted throughout 2025 correcting the record and documenting misconduct.

554.    Despite this notice, no internal investigation, discipline, or corrective action was undertaken. Instead, the County maintained the prosecutions, continued to rely on discredited witnesses, ignored exculpatory evidence, and took no steps to remedy the misuse of subpoenas, bond conditions, or ADA-related failures.

555.    This sustained non-response and continued reliance on known falsehoods constitute ratification and deliberate indifference under *Grandstaff v. City of Borger*, 767 F.2d 161, 171 (5th Cir. 1985), and *Peterson v. City of Fort Worth*, 588 F.3d 838, 848 (5th Cir. 2009).

556.    The policies, customs, failures to train, and deliberate indifference described above were the moving force behind the violations of Plaintiff's constitutional rights, including:

(a) unlawful seizure and false arrest in violation of the Fourth and Fourteenth Amendments;

(b) malicious prosecution and continuing seizure;

(c) First Amendment retaliation for protected speech and mandated reporting; and

(d) unequal, selective enforcement under the Fourteenth Amendment.

557.    Guadalupe County policymakers—including County Judge Kyle Kutscher, Commissioners Jacqueline "Jackie" Ott, Drew Engelke, Michael Carpenter, and Stephen Germann, Elected County Attorney David Willborn, First Assistant County Attorney Jonathan Amdur, Chief Prosecutor Maritza Stewart, Sheriff Joshua Ray, and Chief Deputy Tarinna Skrzycki-Pfeil—were repeatedly placed on actual notice through written communications, certified-mail submissions, ADA-related filings, and formal complaints that Investigator Elaine M. Reamer had (1) conducted no witness interviews, (2) omitted exculpatory evidence already in the County's possession, (3) relied exclusively on materials prepared by the County Attorney's Office and defense counsel John Green, and (4) misapplied disability-related obligations involving adults with intellectual and developmental disabilities. Despite these clear warning

signs, policymakers failed to intervene, supervise, or correct these deficiencies, thereby ratifying

the unconstitutional conduct under City of St. Louis v. Praprotnik, 485 U.S. 112 (1988); Pembaur

v. City of Cincinnati, 475 U.S. 469 (1986); and Grandstaff v. City of Borger, 767 F.2d 161 (5th

Cir. 1985).

558.    Sheriff leadership for Guadalupe County has adopted, enforced, and ratified a policy or

longstanding custom whereby the County Attorney's Office is permitted to control criminal

investigations and dictate investigative conclusions in cases involving favored individuals or

politically sensitive matters, while the Guadalupe County Sheriff's Office abdicates its

independent law-enforcement responsibility to determine probable cause. This policy was

expressly acknowledged in a written Open Records response issued after inquiry to Sheriff

Joshua Ray and command staff, stating that the County Attorney's Office—not the Sheriff's

Office—"would be conducting the investigation" of the alleged criminal offense by Cody, with

all supporting materials forwarded by Investigator Elaine Reamer "per her supplement." By

openly deferring investigative authority to prosecutors, Sheriff leadership eliminated the

independent factual verification and neutral probable-cause assessment required by the Fourth

Amendment.

559.    Pursuant to this policy and with actual or constructive knowledge of Sheriff leadership,

Investigator Reamer authored arrest-warrant affidavits against Plaintiff and his father that

repeatedly relied upon unverified prosecutorial representations supplied by the County

Attorney's Office, while omitting or deflecting material exculpatory evidence already in law-

enforcement possession. These affidavits reflect a consistent prosecutor-driven investigative

narrative rather than an independent investigation, demonstrating that the unconstitutional

conduct alleged was not an isolated incident but the foreseeable result of a municipal policy,

215

custom, or practice ratified by final policymakers. As a direct and proximate result of this policy, Plaintiff and his father were arrested without probable cause, in violation of their clearly established constitutional rights.

560.    The County further demonstrated deliberate indifference through a systemic failure to train investigative and prosecutorial personnel in essential constitutional and disability-rights obligations. No training was provided on:

**(a)** disclosure and preservation of exculpatory evidence required by Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972);

**(b)** avoiding false, incomplete, or misleading statements in warrant affidavits as prohibited by Franks v. Delaware, 438 U.S. 154 (1978);

**(c)** First Amendment retaliation standards clarified in Gonzalez v. Treviño, 601 U.S. ___ (2024); and

**(d)** Title II ADA obligations requiring public entities to accommodate communication and cognitive impairments, as recognized in Delano-Pyle v. Victoria County, 302 F.3d 567 (5th Cir. 2002).

561.    Under City of Canton v. Harris, 489 U.S. 378 (1989) and Connick v. Thompson, 563 U.S. 51 (2011), the need for such training was "so obvious" that failing to implement it constitutes deliberate indifference—particularly where County personnel routinely interacted with adults with IDD and where policymakers had been repeatedly informed of Plaintiff's ADA-protected advocacy and the victim's disability status.

562.    The combination of ignored warnings, absence of training, lack of supervision, specific failure to intervene by senior leadership, and the continued reliance on Investigator Reamer's affidavits—despite their known deficiencies—constitutes deliberate indifference and a de facto

policy or custom under Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978). These omissions were the moving force behind Plaintiff's unlawful arrest, malicious prosecution, retaliatory treatment, and continuing constitutional injuries.

### 1. Sheriff Joshua Ray, a Final Policymaker, Publicly Announced a Mandatory Standard of Immediate Investigation and Zero-Tolerance for Officer Misconduct

563.    Guadalupe County Sheriff Joshua Ray is the final policymaker for law-enforcement operations, investigative practices, and disciplinary decisions within the Guadalupe County Sheriff's Office ("GCSO"). Under Texas law and Fifth Circuit precedent, his public statements, directives, and investigative standards constitute official County policy. See Pembaur v. City of Cincinnati, 475 U.S. 469, 480–81 (1986); City of St. Louis v. Praprotnik, 485 U.S. 112, 123–27 (1988).

564.    On November 20, 2025, Sheriff Ray issued a public statement widely distributed through local media, declaring that GCSO personnel "will be held to the highest possible standards of conduct and accountability," and that he "will not tolerate any form of unbecoming or criminal behavior." Ray further stressed that upon receiving notice of potential misconduct, his command staff "moved quickly and decisively to investigate and take the appropriate action without hesitation."

565.    Through these statements, Sheriff Ray publicly articulated an official County policy of *immediate investigation*, *swift corrective action*, *strict accountability*, and *zero tolerance for misconduct*. As the final policymaker, these commitments reflect the standards he directed his agency to follow when allegations of wrongdoing arise.

**2. Yet Despite Receiving Repeated, Formal Notice of Constitutional Violations by Sgt. Reamer, Sheriff Ray Took No Action—Demonstrating Ratification and Deliberate Indifference**

566.    Between May 2025 and November 2025, Sheriff Ray received extensive written notice—including emails, sworn affidavits, forensic evaluations, ADA filings, mandated-report submissions, and evidence packets—documenting that:

• Sergeant Reamer conducted no independent investigation before seeking the felony warrant;

• her warrant affidavit omitted exculpatory evidence long in the County's possession;

• she ignored the April 4, 2024 forensic interview she herself conducted;

• prosecutors had previously acknowledged the same evidence she later claimed Plaintiff fabricated;

• Plaintiff acted as a mandated reporter, not a coercive actor;

• November 2024 text messages show that S.J.K. independently contacted Plaintiff requesting advocacy and affirming her mother's innocence, demonstrating that the narrative originated from *her*, not Plaintiff;

• S.J.K. consistently affirmed she was not coerced and that her mother was innocent;

• County officials pressured witnesses, coordinated narratives, and violated ADA obligations; and

• Plaintiff repeatedly requested ADA accommodations and sought court-supervised protections for an adult with IDD.

567.    Despite receiving these multiple forms of formal notice, Sheriff Ray did not respond once to Plaintiff; did not open an inquiry; did not initiate any internal investigation; did not consult the Texas Rangers; did not review the affidavit; and did not take any corrective action.

218

568.    Ray's failure to act—contrasted with his public statements promising "quick and decisive" investigation whenever misconduct is alleged—constitutes classic ratification under Grandstaff v. City of Borger, 767 F.2d 161, 171 (5th Cir. 1985), and deliberate indifference as defined in Gonzalez v. Treviño, 601 U.S. ___ (2024). His inaction despite clear and repeated notice allows a plausible inference that the County approved, accepted, or deliberately ignored the unconstitutional conduct.

### 3. Sheriff Ray's Public Policies Directly Contradict His Conduct in Plaintiff's Case, Demonstrating Selective Inaction and Pretext

569.    While publicly insisting on "the highest possible standards" and refusing to "tolerate" misconduct, Sheriff Ray simultaneously:

- declined to investigate the falsification and omissions in Sergeant Reamer's warrant affidavit;

- declined to review abundant exculpatory evidence already in the County's possession;

- declined to address evidence of ADA violations involving an adult with IDD;

- declined to take action when the County Attorney's Office leaked a confidential mandated reporter's identity;

- declined to acknowledge or investigate witness coercion;

- declined to take action despite Plaintiff being a mandated reporter documenting renewed criminal conduct.

570.    This stark contrast between Ray's public policies and his actual conduct in Plaintiff's case supports a strong inference of selective enforcement, pretext, and deliberate indifference. The Fifth Circuit has recognized that such inconsistencies between stated policy and actual practice

may demonstrate unconstitutional municipal customs. See **Hobart v. City of Stafford**, 784 F. Supp. 2d 732, 762–63 (S.D. Tex. 2011).

**4. Sheriff Ray's Conduct Meets Every Element of Monell Ratification**

**571.** The Fifth Circuit recognizes ratification where:

**(1)** a policymaker knows the relevant facts;

**(2)** considers or is aware of the challenged conduct;

**(3)** approves, accepts, or declines to correct it; and

**(4)** the failure to act is a moving force behind the constitutional violation.

**572.** See *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123–27 (1988); *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986); *Peterson v. City of Fort Worth*, 588 F.3d 838, 848–50 (5th Cir. 2009).266.

Here:

• Ray is the final policymaker;

• He had repeated, detailed notice of the misconduct;

• He took no corrective action whatsoever;

• His silence endorsed and ratified Reamer's conduct; and

• His refusal to investigate or intervene was a moving force behind Plaintiff's unlawful arrest, fabricated probable cause, and retaliatory prosecution.

**573.** Because Sheriff Ray publicly claims to act "quickly and decisively" when misconduct occurs, his total inaction here is even more probative. A jury could reasonably infer that Ray

knowingly disregarded the unconstitutional conduct because the County Attorney's desired outcome aligned with the arrest of Plaintiff.

**5. The Inconsistency Between Public Policy and Actual Conduct Demonstrates a County Custom of Selective Enforcement and Retaliation**

**574.**    By responding publicly, aggressively, and immediately to unrelated allegations involving Sheriff's Office personnel, while simultaneously refusing to investigate well-documented constitutional violations for nearly a year, Sheriff Ray has demonstrated a pattern of selective enforcement. In Plaintiff's case—where protected speech, ADA advocacy, and mandated reporting were involved—Ray's complete refusal to act reflects:

- deliberate indifference;
- ratification;
- a custom of non-investigation when misconduct benefits the County's narrative; and
- an unconstitutional policy under Monell.

**E. Exact Dates of Policymaker Notice via Emails and Certified Submissions**

**575.**    Between March 2024 and September 2025, Guadalupe County policymakers received repeated written communications placing them on actual notice of constitutional violations, ADA-related failures, exculpatory evidence, and misuse of the criminal process. These included:

**1) June 2, 2024 – APS Leadership & Officer Reamer Notified of IDD, Danger, and Family's Inability to Obtain Contact With S.J.K. *(See Exhibit B-004)***

**576.**    Plaintiff emailed APS leadership, Officer Elaine Reamer, and multiple county-affiliated personnel, reporting that S.J.K. was an IDD adult with a long-standing disability diagnosis, that she had been sexually exploited, and that APS and County personnel were refusing to

communicate with the family. The email detailed Shelby's inability to read or write, APS's flawed IDD assessment, and the need for ADA accommodations. Officer Reamer was copied directly

**(2) June 5, 2024 – Sheriff's Office Leadership, Reamer, and County Attorney Group Notified of Severe Mishandling and Failure to Investigate Sexual Abuse *(See Exhibit B-005)***

577.    Plaintiff emailed Sheriff Zwicke, multiple sheriff's administrators, Officer Reamer, and the County Attorney's Office documenting failures to investigate sexual assault, coercive removal of S.J.K. from Hope House by an RCC worker acting under Reamer's instruction, the resulting missing-person investigation, and the IDD-based risks posed to S.J.K. and her newborn child. The email notified top County leadership that Reamer was refusing to communicate with the family and that ADA obligations were being ignored. Officer Reamer was copied directly.

**(1) March 21, 2025 – Email to County Attorney Leadership on Failure to Contact S.J.K. *(See Exhibit B-014 and B-015)***

578.    Plaintiff emailed Elected County Attorney David Willborn, First Assistant County Attorney Jonathan Amdur, and Chief Prosecutor Maritza Stewart providing exculpatory evidence, documenting that S.J.K. had not had contact with prosecutors for months, and explaining ADA communication barriers affecting an adult with IDD.

**(2) March 23, 2025 – ADA Accommodation Request (Certified Submission) *(See Exhibit E-001)***

579.    Plaintiff submitted a formal ADA Title II accommodation request to the County Attorney's Office and E-filed into 274th District Court, placing final policymakers on actual notice of their federal disability-rights obligations. Sent to Elected County Attorney David

Willborn, First Assistant County Attorney Jonathan Amdur, Chief Prosecutor Maritza Stewart and Judge Steel.

### (3) March 26, 2025 – Guardian-Ad-Litem Request *(See Exhibit B-022)*

**580.**    Plaintiff submitted a written guardian-ad-litem request detailing S.J.K.'s intellectual disability and need for communication accommodations. This request was received by Willborn, Amdur, Stewart, and staff. Sent to Elected County Attorney David Willborn, First Assistant County Attorney Jonathan Amdur, and Chief Prosecutor Maritza Stewart

### (4) April 1, 2025 – Mandated Report of Sexual Exploitation *(See Exhibit B-024)*

**581.**    Plaintiff submitted a mandated report to the County Attorney's Office documenting renewed sexual exploitation of an adult with IDD. Plaintiff explicitly requested anonymity, which was immediately violated by County personnel. Sent to Elected County Attorney David Willborn, First Assistant County Attorney Jonathan Amdur, and Chief Prosecutor Maritza Stewart

### (5) May 13, 2025 – Certified-Mail Letter to Sheriff Ray (Received, No Response) *(See Exhibit E-005)*

**582.**    Plaintiff sent a certified-mail return-receipt letter to Sheriff Joshua Ray enclosing:

• exculpatory evidence contradicting the April 7 affidavit;

• a request for review of the felony charge;

• ADA-related concerns involving S.J.K.; and

• a copy of Plaintiff's book *Empowered to Advocate*.

Sheriff Ray received the letter but never responded.

**(6) June 11, 2025 – Second Certified-Mail Letter to Sheriff Ray (Received, No Response)**
*(See Exhibit E-005)*

**583.**    Plaintiff sent a follow-up certified-mail letter to Sheriff Ray reiterating:

• the lack of response to the May 13 letter;

• continued constitutional violations;

• new exculpatory evidence; and

• requests for internal review.

Sheriff Ray again received the letter and provided no response.

**(7) June 26, 2025 – Certified Criminal Complaint Filed by Plaintiff's Mother** *(See Exhibit L-001)*

**584.**    Plaintiff's mother submitted a sworn, notarized criminal complaint to the Sheriff's Office documenting aggravated perjury, false reporting, and tampering by Cody Lane Koelle. The complaint was forwarded to the County Attorney's Office. Sheriff Ray, Chief Deputy Tarinna Skrzycki-Pfeil, Elected County Attorney David Willborn, First Assistant County Attorney Jonathan Amdur

**(8) August 20, 2025 – Evidentiary Email Packet to County Leadership** *(See Exhibit L-001)*

**585.**    Plaintiff's mother Dolores Jane Roden sent a comprehensive evidentiary packet to Sheriff Ray, Chief Deputy Skrzycki-Pfeil, IA Sergeant Mann, County Attorney Willborn, First Assistant Amdur, Chief Prosecutor Stewart, and FBI Agent James Wilson. The submission included:

• evidence of Koelle's criminal conduct and false statements;

• admissions of perjury;

• ADA violations;

• failures to investigate; and

• suppression of exculpatory evidence.

**(9) August 22, 2025 – Public Information Act Request *(See Exhibit D-005)***

**586.**    Plaintiff's mother Dolores Jane Roden submitted a PIA request to the County Attorney's

Office, Sheriff Ray, Sheriff's administrative staff, and County Records seeking, investigative-

policy documentation, and internal procedures.

**August 30, 2025 – Plaintiff's Expungement Request and Notice of Ongoing Harm *(See***

***Exhibit B-055)***

**587.**    On August 30, 2025, Plaintiff sent a detailed written request to First Assistant County

Attorney Jonathan Amdur and Sheriff Joshua Ray explaining that the unresolved felony entry on

his DPS record—still marked as "HELD" despite the formal rejection of the charge—was

preventing him from obtaining employment and causing severe ongoing harm to his family.

Plaintiff emphasized that he had never committed any offense, that all exculpatory evidence had

long been in the County's possession, and that he was facing financial instability and housing

insecurity as a direct result of the County's inaction. Plaintiff requested that officials take

corrective measures, such as issuing a formal letter of non-prosecution or updating the record, so

he could return to work and support his family. No County official responded, and no corrective

action was taken.

**Full Report to Elected County Attorney David Willborn Sheriff Joshua Ray and Jonathan**

**Amdur showing innocence. *(See Exhibit B-055)***

**588.**    On September 3, 2025, Plaintiff emailed Sheriff Joshua Ray, Elected County Attorney

David Willborn, First Assistant County Attorney Jonathan Amdur, and the Sheriff's

administrative address submitting a formal written request for review of his false arrest, ongoing

ADA and advocacy-related violations, and the County's lack of response to his May 13, 2025 criminal-complaint submission. The email attached Plaintiff's comprehensive report detailing the circumstances of the April 7 arrest, extensive exculpatory evidence, the County's failure to contact or accommodate an IDD adult, and the role of advocates in assisting disabled individuals. Plaintiff requested a status update on his pending complaint to Sheriff Ray and asked leadership to evaluate the attached evidence.

**(10) September 24, 2025 – Formal Countywide Notice to Judge, Commissioners Court, and Sheriff's Office *(See Exhibit C-005)***

**589.    Plaintiff's father sent a comprehensive evidentiary packet and Public Information Act Request for ADA training and identification of ADA Coordinator:**

• County Judge Kyle Kutscher;

• Commissioners Jackie Ott, Drew Engelke, Michael Carpenter, and Stephen Germann;

• County Attorney Willborn and First Assistant Jonathan Amdur;

• Chief Prosecutor Stewart;

• Sheriff Joshua Ray;

• Chief Deputy Skrzycki-Pfeil;

• Internal Affairs Sergeant Mann;

• Sheriff's administrative staff; and

• FBI Agent James Wilson.

**This submission included:**

• the criminal complaint against Koelle;

• exculpatory evidence establishing Plaintiff's innocence;

• ADA violations involving S.J.K.; and PIA requesting ADA training confirmation and identify

ADA coordinator.

• failures to investigate;

• a formal request for immediate intervention.

*No policymaker initiated corrective action and no identification of an ADA coordinator or training.*

### (11) October 8, 2025 – 53 Page Internal Affairs Complaint Filed with Exhibits *(See Exhibit L-008)*

**590.**    Plaintiff's father, James Louis Roden Sr., submitted an 53-page Internal Affairs complaint with more than 100 evidentiary exhibits (adding 147 pages of evidence) to Internal Affairs Sergeant Mann, documenting:

• the falsification and omissions in Reamer's April 7 affidavit;

• suppression of exculpatory evidence;

• ADA violations involving an IDD adult;

• failure to investigate the criminal complaint against Cody;

• the April 1 mandated-report breach; and

• unlawful preset felony bonds.

Given the size, scope, and nature of the filing, Internal Affairs leadership necessarily would have briefed Sheriff Joshua Ray. No action was taken.

### (12) October 9, 2025 – Follow-Up Email by Plaintiff's Father Requesting IA Confirmation

**591.**    Plaintiff's father sent a follow-up email to Sheriff Ray, Chief Deputy Skrzycki-Pfiel, IA Sergeant Mann, and Sheriff's Office command staff, requesting confirmation that the 53-page IA complaint had been received, assigned, and properly logged.

**(13) November 12, 2025 – Email by Dolores Jane Roden Regarding Misclassification of Criminal Complaint *(See Exhibit D-008)***

**592.**    Plaintiff's mother emailed Sheriff Ray, Chief Deputy Skrzycki-Pfiel, Sergeant Mann, and administrative staff, demanding correction of the improper "civil" classification applied to her notarized June 26, 2025 criminal complaint against Cody Lane Koelle and asking why the Sheriff's Office prematurely marked the report "Cleared – Report Taken." She noted that the misclassification prevented investigative steps from being taken and requested ADA accommodations due to age and disability. No response was provided by policymaker.

**(14) November 13, 2025 – Follow-Up Email to Sheriff Leadership Requesting Status Clarification *(See Exhibit D-009)***

**593.**    On November 13, 2025, Plaintiff's mother sent another detailed follow-up email to the Public Information Office, Sheriff Ray, Chief Deputy Skrzycki-Pfiel, Captain Machost, and IA Sergeant Mann, requesting:

• confirmation of investigator assignment;

• correction of the civil misclassification;

• correction of inaccurate closure dates;

• confirmation that all attached evidence was transmitted to the County Attorney; and

• ADA accommodations for communication.

This email expressly states that Sergeant Reamer "reviewed" the complaint and forwarded a "packet," confirming policymaker-level awareness of the evidence.

No official responded.

**(15) November 13, 2025 – Second Follow-Up Email Requesting Re-Opening of the Criminal Investigation *(See Exhibit D-009)***

228

**594.** On the same day, Plaintiff's mother submitted a second follow-up email reminding leadership that she had provided notarized affidavits, certified transcripts, and arrest records establishing aggravated perjury and false reporting. She explicitly requested the reopening of the investigation and ADA communication accommodations. No acknowledgment or response was provided.

**595.** Despite nearly one hundred written submissions sent by Plaintiff and his family between June 2024 and December 2025—including emails, certified-mail packets, sworn affidavits, forensic evaluations, ADA filings, mandated-report disclosures, and criminal complaints—not a single official from either the Guadalupe County Sheriff's Office or the County Attorney's Office ever initiated contact, requested clarification, acknowledged the evidence, or opened any form of internal review.

**596.** The last direct communication Plaintiff ever received from the Sheriff's Office was Sgt. Elaine Reamer's April 19, 2024 text message stating she would "only speak with S.J.K. going forward," despite S.J.K. being a documented adult with IDD and despite Plaintiff's lawful advocacy role. From that point forward, the Sheriff's Office never responded to Plaintiff—not once.

**597.** The sole communication Plaintiff received from the County Attorney's Office during this nineteen-month period was a brief September 1, 2025 email from First Assistant County Attorney Jonathan Amdur acknowledging receipt of Plaintiff's submission titled "Humble Request for Expungement, with evidence." The email offered no substantive response to Plaintiff's extensive notices regarding constitutional violations, ADA concerns, exculpatory evidence, or criminal complaints.

**598.** This sustained and total refusal of both agencies to respond in any capacity—despite repeated, detailed notice of constitutional violations, evidentiary contradictions, ADA failures, and public-safety concerns—constitutes powerful and probative evidence of deliberate indifference and ratification under well-established Monell standards. *See* Grandstaff v. City of Borger, 767 F.2d 161, 171 (5th Cir. 1985) (ratification found where policymakers repeatedly refused to investigate or correct obvious constitutional violations).

# IX. Damages and Continuing Impact

**Economic Losses (Career and Retirement).**

**599.** Plaintiff's professional trajectory in Texas public education reflected an established pattern of advancement supported by exceptional academic credentials and professional accomplishments. Plaintiff holds five master's degrees in education, leadership, management, curriculum, and administration; fourteen State Board for Educator Certification credentials spanning core subjects, physical education, special education, business, technology, speech, health, family and consumer sciences, and the principal certificate; and is T-TESS certified in teacher evaluation and instructional coaching. He has more than twenty years of successful teaching and coordination experience. In addition, Plaintiff is a published author of numerous books on education, leadership, resilience, and instructional practice, and he frequently delivered trainings, keynote sessions, and conference presentations for school districts, state organizations, and professional associations. Based on these qualifications and the standard progression of similarly credentialed educators in Texas, Plaintiff had a reasonable and well-supported expectation of continued advancement into administrative positions such as assistant principal, principal, director of curriculum, human-resources director, executive director, and ultimately

superintendent—roles that carry substantially higher salaries, stipends, and TRS retirement benefits. Courts recognize that constitutional violations which derail an established professional trajectory and permanently impair future earning capacity—including loss of promotion, leadership opportunities, and reputation-dependent income—support compensatory damages under § 1983. *Memphis Community Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986); *Hobbs v. Hawkins*, 968 F.2d 471, 477 (5th Cir. 1992); *Johnson v. Chapel Hill Indep. Sch. Dist.*, 853 F.2d 375, 382 (5th Cir. 1988).

**600.** The County's actions caused an immediate and concrete wage loss. Plaintiff was employed in Pasadena ISD the time the April 7, 2025 arrest warrant was sworn and the April 8, 2025 arrest was executed On April 9, 2025, Plaintiff lost his position and the income attached to it as a direct and immediate consequence of the arrest and the public dissemination of the felony charge, without any intervening misconduct, disciplinary finding or adjudication of wrongdoing. Plaintiff's compensation at the time of termination was $72,442 in base salary under the applicable district salary schedule, plus supplemental compensation associated with athletics and additional professional work, including curriculum-writing and consulting services. The abrupt loss of this employment and compensation stream marked the beginning of Plaintiff's ongoing economic damages and was a direct and foreseeable consequence of Defendants' initiation and public dissemination of a baseless first-degree felony accusation.

**601.** Plaintiff's professional authorship and speaking portfolio also constituted a significant and growing component of his earning capacity. His publications, consulting engagements, and conference trainings depended heavily on his reputation as an experienced educator and respected leader. Advancement into campus and district administration would have materially expanded these income streams by increasing visibility, credibility, and opportunities for

contracted professional development. The premature termination of his career eliminated not only his administrative earning trajectory but also the derivative professional opportunities connected to his writing, training, and consulting work.

**602.** Following Plaintiff's arrest, online publications containing the accusations and termination details were disseminated broadly across parent groups, staff networks, school districts, colleges, professional-development circles, and social-media platforms nationwide. Because the allegations involved a 1st degree felony charge, the digital circulation of these materials created a permanent stigma that now appears in online search results, employment screenings, and professional background checks. This reputational damage has effectively foreclosed all future employment in public education, private education, higher education, and district-level leadership, as well as professional-development consulting and conference-based work. As a result, Plaintiff's lifetime earning capacity—including salary advancement, stipends, leadership compensation, and professional-services income—has been substantially and permanently reduced.

**Retirement and Pension Damages (TRS)**

**603.** Plaintiff's retirement benefits under the Texas Teacher Retirement System ("TRS") were permanently altered when his twenty-year career was abruptly cut short. Under TRS Tier 1 rules, a member's annuity is calculated as 2.3% × years of service × the highest five-year average salary. Because Plaintiff's employment ceased at twenty years, his retirement is now permanently frozen at 2.3% × 20 × $62,000, resulting in an annual annuity of approximately $28,520. This amount cannot increase because Plaintiff can no longer accumulate service credit or a higher salary base. Courts recognize that the loss or diminishment of pension and retirement benefits—when caused by unlawful termination or constitutional violations that prevent

continued service accrual—constitutes compensable economic damages under § 1983, particularly where benefits are calculated by fixed statutory formulas rather than speculation. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986); *Hobbs v. Hawkins*, 968 F.2d 471, 477–78 (5th Cir. 1992); *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 718–19 (5th Cir. 1998).

**604.** Prior to the unlawful arrest, Plaintiff was on a documented career trajectory toward campus and district administration, a trajectory supported by Plaintiff's certifications, administrative preparation, prior leadership roles, and contemporaneous advancement opportunities. with qualifications aligning with superintendent-level employment in large Texas districts. Superintendent compensation in major metropolitan areas typically ranges from $325,000 to $400,000 annually; Plaintiff uses a conservative projected high-five average of $300,000 for damages estimation. Had Plaintiff completed a standard 38-year TRS career, his retirement annuity would have been mechanically calculated as 2.3% × 38 × $300,000, resulting in an annual benefit of approximately $262,200.

**605.** The difference between Plaintiff's frozen annuity ($28,520) and the annuity he reasonably expected to earn ($262,200) is approximately $233,680 per year. Over a standard TRS-based life-expectancy period of more than twenty years, this represents a multi-million-dollar loss in retirement income. This loss is permanent and arises solely from the early termination of Plaintiff's career before he could reach the administrative salary tier that TRS formulas reward most heavily.

**606.** In addition to reduced annuity income, the early termination of Plaintiff's career eliminated eighteen years of expected employer and employee TRS contributions, significantly reducing Plaintiff's total account balance, actuarial value, and long-term benefit security. Plaintiff also lost the ability to benefit from cost-of-living adjustments when authorized by the

Texas Legislature, survivor-benefit increases tied to higher salaries, and the stability associated with completing a full administrative career before retirement.

607. These pension losses represent one of the largest categories of Plaintiff's long-term economic damages. They reflect not speculation, but the mechanical application of TRS statutory formulas to Plaintiff's actual frozen service credit and salary history, contrasted with the earnings trajectory he had established through twenty years of experience, five master's degrees, fourteen certifications, T-Tess Certification and repeated advancement toward campus and district leadership roles.

**Loss of Educational Investment, Professional Credentials, and Lifetime Training Value**

608. Plaintiff has sustained substantial financial and professional losses tied to the educational investments he made over more than two decades to build a long-term career in Texas public education. Plaintiff earned an Associate's degree, a Bachelor of Science degree, and five master's degrees—in Management and Leadership, Business Administration, Curriculum and Instruction, Education Administration, and Human Resource Management. Each degree required significant tuition payments, fees, textbooks, and related educational expenses, much of which was financed through federal and private student loans that continue to accrue interest. These degrees were pursued specifically to qualify Plaintiff for advanced roles in public education, district leadership, and executive administration—opportunities that are now foreclosed as a direct result of the unconstitutional actions described in this Complaint.

609. In addition to graduate-level education, Plaintiff earned fourteen Texas educator certifications, each requiring coursework, study time, examination fees, preparation materials, fingerprinting, and ongoing renewal costs. These credentials include high-demand specialty areas

such as Special Education (EC–12), Principal (EC–12), Technology Applications (EC–12), Business Education, ESL Supplemental, Speech, Physical Education, Core Subjects EC–6 with STR, and multiple secondary content certifications. Plaintiff also completed extensive training to become T-TESS certified, requiring specialized evaluator instruction and continuing-education hours. This certification is essential for advancement into leadership and administrative roles and required ongoing maintenance through approved professional-development activities.

**610.** Plaintiff devoted thousands of hours outside of the classroom—nights, weekends, summers, and holidays—toward coursework, certification preparation, professional development, and continuing education required by the Texas Education Agency and the State Board for Educator Certification. These hours represent a substantial personal and financial investment made in reliance on the expectation of a lifelong career in education and administration.

**611.** Because Plaintiff can no longer work in any capacity within public education, private education, higher education, instructional leadership, professional development, or educational consulting, the economic value of these degrees, certifications, and training programs has been effectively destroyed. Plaintiff remains responsible for student-loan balances and compounding interest for credentials he is now unable to use in any professional capacity. The loss of these investments constitutes a significant component of Plaintiff's total economic damages and represents a permanent deprivation of the future earning capacity those credentials were intended to secure. Plaintiff undertook these educational and certification investments in reasonable reliance on continued eligibility for public-education employment and advancement.

**Additional Economic Consequences**

**612.** Plaintiff has also incurred substantial consequential losses resulting directly from the unlawful arrest, fabricated probable cause, and the widespread public dissemination of the criminal accusations. These losses include, but are not limited to:

**(a)** the loss of employer-provided health insurance coverage, resulting in increased out-of-pocket medical expenses, counseling expenses, and costs related to ongoing treatment necessitated by the stress and instability caused by the County's actions;

**(b)** payment of bail, legal fees, travel expenses, document-production costs, and other expenditures required to defend against the criminal charge and mitigate the ongoing consequences of the prosecution;

**(c)** damage to Plaintiff's creditworthiness and financial standing, including negative credit impacts resulting from employment loss, reduced income, missed opportunities, and the direct consequences of the felony arrest appearing in background checks used by lenders, and employers; and

**(d)** continued loss of earning capacity due to the stigma associated with a publicly accessible felony arrest record, which remains widely circulated across search engines, social-media platforms, and third-party aggregation sites, thereby impairing Plaintiff's ability to secure employment or professional opportunities in any field.

**Loss of Professional and Creative Opportunities**

**613.** Plaintiff has also suffered significant losses to his parallel professional career as an author, public speaker, consultant, coach, and musician. Prior to the County's actions, Plaintiff had an expanding platform supported by multiple published books, a growing readership, established speaking engagements, coaching opportunities, and distribution of original music

across national streaming platforms. These roles depended on professional reputation, credibility, and public trust. These harms include the destruction of Plaintiff's professional goodwill and the devaluation of his personal brand as an educator and public-facing professional.

614.    The public visibility and widespread online circulation of the felony arrest record have severely undermined Plaintiff's ability to maintain or expand these creative and professional endeavors. As a result, Plaintiff has experienced a measurable decline in book sales, lost royalties, cancelled or withdrawn speaking invitations, diminished demand for consulting services, a loss of coaching-related engagements, and reduced opportunities for music distribution and collaboration. The ongoing digital stigma continues to foreclose anticipated future income streams across all related fields. Courts recognize that constitutional violations which damage professional reputation and public credibility may support recovery for lost and diminished income from writing, speaking, consulting, coaching, and other reputation-dependent creative endeavors, where such opportunities were reasonably expected to continue or expand. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986); *Hobbs v. Hawkins*, 968 F.2d 471, 477–78 (5th Cir. 1992); *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 718–19 (5th Cir. 1998).

**Non-Economic and Psychological Harm**

615.    Plaintiff has suffered substantial non-economic harm as a direct result of the unlawful arrest, fabricated charges, and widespread public dissemination of the accusations. Plaintiff has experienced severe and continuing emotional distress, including anxiety, depression, persistent fear, loss of sleep, and symptoms consistent with trauma. The destruction of his professional identity and the exposure of the accusations to colleagues, students, parents, and the public have caused profound humiliation and embarrassment.

616.    Plaintiff also lives with a continual and reasonable fear of being rearrested at any time, based on the pattern of conduct by Guadalupe County officials toward both Plaintiff and his father. The County's demonstrated willingness to initiate felony charges without probable cause, to disregard exculpatory evidence, and to take punitive actions under color of law—despite the full knowledge of County leadership—has left Plaintiff in a constant state of apprehension that further retaliatory action may occur if he continues to speak out or challenge the County's misconduct. This ongoing fear has resulted in heightened anxiety, hypervigilance, social withdrawal, and significant interference with daily functioning and overall quality of life. Courts recognize that emotional distress, humiliation, psychological trauma, and a continuing fear of renewed prosecution are compensable non-economic injuries under §1983 when they flow directly from unlawful arrest, fabricated charges, and misuse of criminal process. *Carey v. Piphus*, 435 U.S. 247, 264 (1978); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986); *Hobbs v. Hawkins*, 968 F.2d 471, 477–78 (5th Cir. 1992); *Bevill v. Fletcher*, 26 F.4th 270, 279–80 (5th Cir. 2022)

**Family Impact**

617.    Plaintiff's unconstitutional arrest and prosecution have also caused significant disruption and emotional distress within his immediate family. Plaintiff's wife and minor children experienced instability, anxiety, and hardship resulting from the loss of Plaintiff's income, the widespread damage to his reputation, and the abrupt collapse of his professional standing. These harms are not asserted as independent causes of action but are relevant to the severity of Plaintiff's own emotional distress and the loss of familial enjoyment caused by the County's actions. In addition, because Plaintiff's background checks now reflect a recent first-degree felony arrest—including the appearance of "family violence" in the charge description—Plaintiff

is barred by Raptor Technologies and similar school-screening systems from entering school campuses, attending school-sponsored events, or participating in volunteer activities. As a result, Plaintiff is unable to attend his children's on-campus activities, or be a parent volunteer. This exclusion has caused further emotional harm to Plaintiff by depriving him of participation in routine parental involvement, straining family relationships, limiting shared developmental experiences with his children, and compounding the humiliation associated with the County's actions. Courts recognize that disruption of family life, loss of parental participation, and exclusion from ordinary family and community activities are relevant components of a plaintiff's own emotional-distress damages when they are the foreseeable result of unconstitutional arrest and prosecution. *Carey v. Piphus*, 435 U.S. 247, 264 (1978); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986); *Hobbs v. Hawkins*, 968 F.2d 471, 477–78 (5th Cir. 1992); *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 718–19 (5th Cir. 1998).

**Out-of-Pocket, Compliance, and Evidentiary Expenses**

**618.** Plaintiff incurred substantial out-of-pocket expenses directly resulting from the County's unlawful actions and the need to preserve evidence, assert his rights, and comply with court-imposed conditions. These costs include expenditures for certified mailings, document production, public-record requests, printing, technology, and travel undertaken to secure records, obtain witness statements, and respond to administrative and prosecutorial inquiries.

**619.** In addition, Plaintiff was required to travel repeatedly to Seguin for bond supervision, drug testing, and mandatory check-ins, incurring fuel costs, vehicle wear, and significant time away from family and employment opportunities. Plaintiff also spent considerable time traveling to interviews and applying for employment, only to be repeatedly rejected once standard

background checks revealed the ongoing felony prosecution. These repeated, mandatory efforts have imposed continuing financial strain and further reduced Plaintiff's remaining resources.

620.    Plaintiff also devoted more than one thousand hours to legal research, factual analysis, drafting, and evidence organization necessary to defend himself, and pursue available administrative remedies and civil-rights protections. This work—performed out of necessity due to the County's actions and the absence of accessible legal representation—constitutes a substantial diversion of time, labor, earning capacity, and emotional energy that would otherwise have been available for gainful employment, family responsibilities, and income-generating professional endeavors.

621.    Furthermore, because Plaintiff lost access to district-provided technology following his termination, he was required to purchase replacement software, internet services, data storage devices, and computer equipment to document evidence, maintain communication with officials, and prepare legal filings. These additional expenses were borne entirely out of pocket and contributed to the depletion of Plaintiff's savings and financial stability. Courts recognize that out-of-pocket expenses, compliance costs, mitigation expenditures, and the diversion of time and labor incurred in response to unconstitutional arrest and prosecution constitute compensable economic damages under §1983 when they are the foreseeable result of government misconduct. *Carey v. Piphus*, 435 U.S. 247, 257–59 (1978); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986); *Hobbs v. Hawkins*, 968 F.2d 471, 477–78 (5th Cir. 1992); *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 718–19 (5th Cir. 1998).

**Loss of professional goodwill / brand**

**622.**    Plaintiff continues to suffer significant and ongoing reputational harm as a direct result of the unlawful arrest, fabricated charges, and public dissemination of booking information by Guadalupe County. The arrest remains accessible through state criminal-history systems, commercial background-check vendors, third-party data aggregators, and search engines commonly used by school districts, public agencies, and private employers. Plaintiff's booking photograph and arrest details were also widely circulated on social-media platforms, where reposts and derivative content continue to appear in online searches. Because these postings are outside Plaintiff's control and are not subject to any formal removal mechanism, the stigma associated with the arrest persists indefinitely. These reputational harms persist independently of any adjudication on the merits and are not self-correcting absent formal expunction or sealing.

**623.**    Modern hiring practices rely heavily on internet searches, social-media screenings, and automated background reports. As a result, Plaintiff experiences repeated and predictable rejection from employment, consulting, educational, and community opportunities, regardless of his qualifications. This persistent digital stigma continues to damage Plaintiff's professional identity, undermine his ability to support his family, perpetuate emotional and psychological harm, and deter him from engaging in protected speech or advocacy for fear of further retaliation or misinterpretation of the unresolved criminal accusations. Including exclusion at the initial screening stage before qualifications are ever evaluated. *(See Exhibit N-015)*

**624.**    The digital dissemination and algorithmic amplification of Plaintiff's arrest record are not remote, speculative, or extraordinary harms. They are the direct and foreseeable consequences of Defendants' decision to initiate and publish a baseless felony accusation against a Texas public-school educator. Under long-standing precedent, a defendant need not foresee the *precise technological mechanism* by which injury occurs; it is enough that the *general type* of harm is

241

foreseeable. *Paroline v. United States*, 572 U.S. 434, 449–50 (2014) ("The precise manner in which harm occurs need not be foreseen; it is sufficient that the type of harm is foreseeable."); *Storlazzi v. Bakey*, 894 F.2d 1015, 1019 (5th Cir. 1990) (liability attaches even if the exact chain of events is unusual so long as the resulting harm is of the foreseeable kind).

**625.**    In the modern information environment, arrest metadata is routinely scraped, indexed, repackaged, and algorithmically recombined by search engines, commercial background vendors, and social-media recommendation systems. Because Defendants placed a false felony arrest involving a school employee into public databases, platforms such as TikTok, Google, and Bing automatically associated Plaintiff's name, educator role, and school affiliation with "teacher arrest," "school misconduct," and similar high-sensitivity categories. On TikTok in particular, Plaintiff's name and arrest became algorithmically linked and tagged within a broader ecosystem of true-crime and child-abuse–related content, including posts concerning the most disturbing crimes involving children and women. As a result of this automated association, content bearing Plaintiff's name appeared alongside or within hashtag clusters encompassing tens of millions of posts—estimated at approximately 84.9 million—whose combined view counts exceed one billion views. These systems generated auto-summaries, suggested-topic cards, hashtag associations, and recommendation banners that falsely implied criminal conduct and placed Plaintiff within scandal-based and exploitative content clusters. *(See Exhibit N-042)* The emergence and amplification of these algorithmically generated narratives were not spontaneous or user-initiated; they were triggered solely because Defendants injected a false arrest record into the digital ecosystem.

**626.**    The severity and scope of Plaintiff's digital and reputational harm are further illustrated by comparison to Plaintiff's co-arrestee, James Louis Roden Sr. Despite arising from the same

underlying investigation and arrest event, online searches of Mr. Roden Sr.'s name do not

produce algorithmic tagging, hashtag clustering, or social-media amplification. His name is not

associated with viral content, scandal-based narratives, or high-sensitivity topic groupings. By

contrast, Plaintiff's established public identity as a school educator, author, minister, and

recording artist caused automated systems to associate his name with arrest-related and

exploitative content at scale. This contrast demonstrates that the extraordinary reputational harm

suffered by Plaintiff was not an unavoidable consequence of arrest, but a foreseeable result of

Defendants' decision to publicly inject a false felony accusation against a publicly identifiable

school employee into modern digital ecosystems.

627.    Federal courts have repeatedly recognized that reputational harm, employment loss, and

widespread public dissemination of arrest information are well-established, foreseeable

consequences of unconstitutional arrests. The Fifth Circuit has held that reputational injury,

professional exclusion, and loss of future earning capacity are fully compensable damages in

§1983 wrongful-arrest cases. *Winfrey v. Rogers*, 901 F.3d 483, 491–92 (5th Cir. 2018). The

Supreme Court likewise recognizes that the State's maintenance and dissemination of inaccurate

criminal records predictably causes ongoing stigma and continuing injury. *Humphries v. County

of Los Angeles*, 554 U.S. 1, 12–13 (2009). These cases confirm that digital harm flowing from a

false arrest—whether through traditional media or modern algorithms—is not an unforeseeable

or intervening event but an ordinary and legally cognizable consequence of government

misconduct.

628.    Nor does algorithmic amplification break the chain of causation. The Fifth Circuit holds

that defendants are liable for all harms that "would ordinarily result" from their unconstitutional

conduct. *Sanders-Burns v. City of Plano*, 594 F.3d 366, 373 (5th Cir. 2010). In an era in which

employers, schools, licensing agencies, and the public rely heavily on search engines,

background-check systems, and automated content feeds, the viral spread and repeated

resurfacing of arrest-related information is a predictable outcome of placing a false felony

accusation into public circulation. Plaintiff's continuing reputational, professional, and digital

injuries—including algorithm-generated false associations with student misconduct—are

therefore part of the ongoing damage directly traceable to Defendants' unlawful initiation of

criminal process.

629.    Plaintiff will also incur continuing remedial costs to mitigate and repair the damage

caused by Defendants' publication of a baseless felony accusation, including expenses associated

with correcting and monitoring public records, addressing commercial background-reporting

entries, seeking expunction or sealing when legally eligible, and mitigating ongoing online

dissemination by third-party aggregators. These costs are a direct and foreseeable consequence of

Defendants' unlawful initiation and public dissemination of criminal process.

**Loss of Enjoyment of Life (Hedonic Damages)**

630.    As a direct result of the unlawful arrest, immediate job loss, and resulting financial

instability, Plaintiff and his family experienced a sudden and severe reduction in their standard of

living, altering nearly every aspect of daily family life. Activities and routines that had been

ordinary and central to Plaintiff's role as a father and husband were abruptly eliminated due to

the loss of income.

631.    Plaintiff was forced to withdraw his children from organized sports and extracurricular

activities that required registration fees, equipment, and travel costs. Family memberships and

activities that had been part of the children's regular recreation and development—including gym

access and children's activity venues such as Altitude Trampoline Park—were terminated. Streaming and entertainment services used for family bonding, educational programming, and recreation were cancelled as a matter of financial necessity.

632.　　The economic impact also deprived Plaintiff of the ability to celebrate important family milestones. Plaintiff was unable to provide his daughter with a traditional thirteenth birthday celebration or gifts, could not celebrate his wife's birthday in the customary manner, and was unable to provide his children with customary Christmas gifts. Long-standing family traditions, including annual summer vacations during school recess, were eliminated entirely due to the sudden loss of income.

633.　　Plaintiff's family was forced to curtail basic mobility and quality-of-life choices, including eliminating discretionary travel, avoiding toll roads to reduce commuting expenses for Plaintiff's wife, and abandoning routine family outings. Even small but meaningful traditions— such as Plaintiff's regular Saturday breakfast meetings with his elderly mother—were discontinued due to financial strain.

634.　　The loss extended beyond finances to emotional and psychological well-being. Plaintiff now experiences persistent fear and dread when encountering law-enforcement vehicles, associating police presence with the prior unlawful arrest and the continuing threat of discrimination or renewed false accusations. This fear has diminished Plaintiff's sense of personal security and freedom of movement in public spaces.

635.　　Plaintiff's children experienced the abrupt loss of activities they had come to rely upon for enjoyment, education, and social development, including visits to museums, zoos, summer enrichment camps, and structured learning programs traditionally provided during school breaks.

These experiences were not luxuries, but part of a stable family life Plaintiff had consistently provided prior to Defendants' actions.

636.    In total, the County's conduct caused an immediate and lasting deprivation of Plaintiff's ability to enjoy ordinary family life, participate in meaningful recreational and educational activities with his children, celebrate milestones, and maintain the basic rhythms of family stability. Courts recognize that such losses—distinct from lost income—constitute compensable hedonic damages reflecting a diminished quality of life resulting from unconstitutional government action. Courts recognize that the loss of enjoyment of life—including disruption of ordinary family routines, loss of recreational and educational activities, diminished freedom of movement, and persistent fear arising from unlawful arrest and prosecution—constitutes a compensable component of emotional-distress damages under §1983. *Carey v. Piphus*, 435 U.S. 247, 264 (1978); *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 307 (1986); *Hobbs v. Hawkins*, 968 F.2d 471, 477–78 (5th Cir. 1992); *Brady v. Fort Bend Cnty.*, 145 F.3d 691, 718–19 (5th Cir. 1998); *Bevill v. Fletcher*, 26 F.4th 270, 279–80 (5th Cir. 2022).

**Loss of Insurability and Risk Classification.**

637.    Plaintiff has suffered increased difficulty obtaining or maintaining insurance coverage—including professional liability, personal liability, and employment-related coverage—due to the presence of a first-degree felony arrest in background databases. This has increased Plaintiff's financial exposure and reduced access to ordinary risk-management tools available to similarly situated professionals. In addition, prior to the arrest Plaintiff participated in multiple employer-sponsored and supplemental insurance programs that provided long-term family protection, including life insurance, disability insurance, accident/injury coverage, and specified-disease policies (including heart-attack and cancer coverage). Many of these supplemental policies had

246

been maintained for more than a decade and were effectively "grandfathered" into favorable premium pricing based on continuous enrollment. Following Plaintiff's termination and resulting lapse in coverage, Plaintiff and his family lost these protections. Any future attempt to reestablish comparable coverage will foreseeably require new underwriting, higher premiums, reduced benefits, exclusions, or outright denial due to the lapse and the risk classification effects of the unresolved felony arrest record. These increased insurance costs and reduced insurability constitute additional economic damages directly attributable to Defendants' conduct.

**Delay Damages.**

638.    The County's refusal to formally terminate the prosecution with prejudice has imposed prolonged uncertainty that delays Plaintiff's ability to rebuild his career, pursue alternative licensure, relocate for employment, or seek expunction. This delay itself constitutes a compensable harm.

**Punitive Damages (Individual Defendant Only)**

639.    Plaintiff seeks punitive damages against Defendant Sergeant Elaine M. Reamer in her individual capacity based on conduct demonstrating reckless or callous disregard for Plaintiff's federally protected rights. Plaintiff alleges that Defendant Reamer knowingly disregarded exculpatory evidence, relied on materially unreliable witness statements, omitted key facts from warrant materials, and participated in a pattern of retaliatory conduct that resulted in Plaintiff's unlawful arrest and the destruction of his professional career. Such conduct, if proven, constitutes the type of egregious and conscience-shocking behavior for which punitive damages are appropriate under 42 U.S.C. § 1983.

**640.**    Plaintiff does not seek punitive damages from Guadalupe County, consistent with established precedent that municipalities are not subject to punitive damages under § 1983. See City of Newport v. Fact Concerts, Inc., 453 U.S. 247, 271 (1981).

**Attorneys' Fees and Costs**

**641.**    Plaintiff seeks all recoverable attorneys' fees, expert-witness fees, and court costs pursuant to 42 U.S.C. § 1988 and all other applicable fee-shifting provisions. Plaintiff acknowledges that he is presently proceeding without counsel but expressly reserves the right to recover reasonable attorneys' fees and costs should counsel enter an appearance at any stage of this action, as authorized by federal law. Plaintiff also seeks recovery of all taxable costs, expert expenses, and other litigation-related costs permitted under 28 U.S.C. §§ 1920–1923 and relevant rules.

**Continuing Fourth Amendment Seizure (Manuel v. Joliet)**

**642.**    Plaintiff's unlawful arrest and prosecution resulted in a prolonged Fourth Amendment seizure within the meaning of *Manuel v. City of Joliet*, 580 U.S. 357 (2017). Under *Manuel*, a seizure continues so long as a plaintiff remains subject to restraints on liberty arising from legal process initiated without probable cause. Plaintiff's seizure did not end with his release on bond; rather, it continued—and continues—through legal and practical restraints directly flowing from the fabricated warrant, the initiation of criminal process without probable cause, and the County's refusal to formally terminate that process once exculpatory information was known.

**643.**    These continuing restraints include, but are not limited to:

**(a)** ongoing public access to Plaintiff's arrest and booking information in state criminal-history systems, commercial background-check databases, and public search engines, which continue to

248

display the arrest as unresolved and list its disposition as "HELD," rather than dismissed or closed;

**(b)** the County's decision to decline the charges **without prejudice**, thereby preserving the ability to seek indictment at any time within the applicable statute of limitations and subjecting Plaintiff to a continuing and reasonable fear of renewed prosecution;

**(c)** continued exclusion from employment, professional licensing, and background-sensitive positions, as prospective employers are presented with an unresolved first-degree felony arrest that appears active or pending, notwithstanding the absence of probable cause or prosecution;

**(d)** statutory waiting periods under Texas law that bar expungement or sealing of the arrest record while the case remains in this unresolved posture, thereby prolonging the legal consequences of the unlawful seizure; and

**(e)** ongoing reputational, digital, and practical barriers—including school-access restrictions, employment rejections, and exclusion from community activities—that function as de facto restraints on Plaintiff's liberty and freedom of movement.

**644.**    These continuing restraints are not incidental or collateral consequences; they are the direct and foreseeable result of the County's initiation of criminal process without probable cause, its presentation of misleading or fabricated information to the magistrate, and its deliberate refusal to dismiss the charges with prejudice or otherwise formally terminate the prosecution. By maintaining the case in an unresolved "held" status and preserving the threat of future indictment, the County continues to impose a legally cognizable seizure under the Fourth Amendment. Accordingly, Plaintiff remains subject to an ongoing seizure within the meaning of *Manuel*, for which Defendants are liable.

**Chilling Effect on Mandated Reporter and Ministerial Activity**

249

**645.**    As a long-time educator, minister, and community advocate, Plaintiff's professional and moral responsibilities included reporting suspected abuse, neglect, or exploitation and providing support to vulnerable individuals. The retaliatory arrest and fabricated charge brought by Guadalupe County have imposed a substantial chilling effect on Plaintiff's ability to engage in future protected reporting activity. The Supreme Court and Fifth Circuit recognize that government retaliation which would deter a person of ordinary firmness from engaging in protected conduct constitutes a compensable constitutional injury and warrants significant damages due to the broader societal harm created by such deterrence.

**646.**    The County's actions also irreparably damaged Plaintiff's ability to continue his parallel religious and charitable work. Plaintiff founded and led the "Holistic Church of Christ," a street ministry serving homeless individuals and homeless veterans in the Pasadena area, through which he provided religious services, advocacy, and community assistance. Plaintiff also organized and supported youth-centered charitable programs, including after-school sports for homeless children residing at The Bridge in Pasadena, campus ministries such as Youth for Christ, holiday service projects such as the "Turkey Trot" food-drive initiative, and charitable events including "Walk for Sight," which provided eyeglasses to underprivileged children.

**647.**    The stigma associated with a publicly searchable first-degree felony arrest—including the appearance of "family violence" in commercial background checks—has rendered Plaintiff unable to participate in, lead, or support these ministries and charitable activities. As a result, Plaintiff has suffered the loss of a major component of his identity, purpose, and religious expression, and the community he previously served has been deprived of his long-standing contributions. These losses amplify Plaintiff's emotional distress and represent a continuing harm flowing directly from the County's unconstitutional conduct.

**Loss of Future Educational and Public-Leadership Opportunities**

648.    Prior to the unlawful arrest and prosecution, Plaintiff had invested substantial time, education, and financial resources into advancing his career toward campus and district educational leadership. Plaintiff had recently earned multiple graduate degrees in educational leadership, curriculum, management, human resources, and administration, and had obtained the certifications and professional qualifications required for roles such as assistant principal, principal, district coordinator, director, and ultimately superintendent. Plaintiff was actively preparing for central-office placement and long-term advancement along the administrative leadership pathway.

649.    In addition to his professional leadership track, Plaintiff also maintained a well-established record of civic engagement and public service. Plaintiff previously served as an elected Precinct Chairman and had run for public office multiple times, including campaigns for City Council. Plaintiff had planned, upon retirement from public education, to seek election to the Texas Legislature or other state-level roles—a natural progression given his community involvement, leadership credentials, and history of public service. These opportunities required community trust, professional credibility, and the absence of disqualifying criminal accusations.

650.    The fabricated criminal charge, the public dissemination of Plaintiff's arrest, and the persistent online presence of a first-degree felony accusation—including descriptors containing "family violence"—have rendered both educational leadership positions and public-office candidacy unattainable for the foreseeable future. Criminal-history databases, Raptor school-screening systems, background-check vendors, and online search engines now associate Plaintiff with a severe felony arrest. These systems are widely used by educational institutions, political organizations, party committees, civic groups, donors, and campaign consultants. As a result,

Plaintiff is effectively barred from administrative employment, public campaigning, political fundraising, service on public boards, and elected-office eligibility.

**651.** The loss of a projected 20–25 year career in campus and district administration, combined with the permanent loss of public-office viability, represents the loss of millions of dollars in future salary, administrative stipends, retirement contributions through the Texas Teacher Retirement System, and professional consulting revenue. It also forecloses future leadership-oriented opportunities—including political service, educational policy influence, and community engagement—that Plaintiff had spent decades preparing to enter. These combined losses constitute a substantial and permanent reduction in Plaintiff's lifetime earning capacity, professional trajectory, and civic participation, all flowing directly from the County's unconstitutional conduct.

**652.** Plaintiff anticipates presenting expert testimony regarding economic loss, retirement valuation, reputational harm, algorithmic amplification, and hedonic damages.

# X. PRAYER FOR RELIEF

**653.** **WHEREFORE**, Plaintiff **James Louis Roden Jr.** respectfully requests that this Court enter judgment in his favor and against Defendants **Sergeant Elaine M. Reamer** (in her individual capacity) and **Guadalupe County, Texas**, and award the following relief:

**a. Declaratory Relief**

A declaration that Defendants' conduct violated Plaintiff's rights under the First, Fourth, and Fourteenth Amendments, and that Defendants retaliated against Plaintiff in violation of Title V of

the Americans with Disabilities Act, 42 U.S.C. § 12203, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

A further declaration that Plaintiff's actions constituted protected advocacy and mandated reporting under Texas Family Code § 261.101 and related federal disability-rights statutes, and that Defendants unlawfully penalized Plaintiff for engaging in protected activity.

**b. Compensatory Damages**

An award of compensatory damages for all economic losses, loss of future earning capacity, loss of employment opportunities, reputational injury, emotional distress, loss of standing in the community, costs incurred to mitigate harm, and all other actual and continuing damages sustained as a direct and proximate result of Defendants' unlawful conduct.

**c. Nominal Damages and Interest**

An award of nominal damages where applicable, together with pre-judgment and post-judgment interest at the maximum rate permitted by law.

**d. Punitive Damages (Individual Defendant Only)**

An award of punitive damages against Defendant Sergeant Elaine M. Reamer, in her individual capacity only, for her willful, malicious, or recklessly indifferent violation of Plaintiff's clearly established constitutional rights.

**e. Attorneys' Fees and Costs**

An award of reasonable attorneys' fees, expert-witness fees, and litigation costs pursuant to 42 U.S.C. § 1988, as well as any other applicable provisions of federal law.

**f. Equitable and Injunctive Relief**

**Appropriate equitable and prospective relief against Guadalupe County, including but not limited to:**

1. Implementation of ADA-compliance policies ensuring appropriate communication, accommodation, and protection for individuals with intellectual or developmental disabilities during investigations and criminal-justice proceedings;

2. Training and supervision requirements mandating constitutionally compliant investigative practices, preservation and disclosure of exculpatory evidence, and protection of mandated reporters and advocates from retaliation;

3. Prospective injunctive measures necessary to ensure ongoing compliance with federal constitutional and statutory obligations, consistent with the limits of federal authority under existing precedent;

4. An order requiring correction, amendment, or annotation of all law-enforcement, prosecutorial, and public-facing records to reflect the absence of probable cause, the declination of prosecution, and the non-criminal nature of Plaintiff's conduct, including notification to appropriate state and third-party repositories to prevent continued reputational and employment harm; and

5. An order prohibiting Defendants from relying upon, republishing, or reusing the April 7, 2025 arrest-warrant affidavit or its factual assertions for any law-enforcement, prosecutorial, or employment-related purpose absent judicial findings of probable cause or lawful reauthorization consistent with constitutional requirements.

254

**g. Other and Further Relief**

Such other and further relief as the Court deems just, proper, and equitable under the circumstances.

# XI. Demand for Jury Trial

**654.** Pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment to the United States Constitution, Plaintiff James Louis Roden Jr. hereby demands a trial by jury on all issues so triable.

**655.** Plaintiff asserts that the factual questions underlying his claims—including probable cause, fabrication or suppression of evidence, retaliatory motive, selective enforcement, municipal liability, and ADA retaliation—are issues properly reserved for determination by a jury of his peers.

**Respectfully submitted,**

*James L. Roden Jr.*

**James Louis Roden Jr.**
Plaintiff, Pro Se
1005 Beaumont Street League City, Texas 77573
Phone: (210) 482-0802
Email: jroden3@wgu.edu

**Verification and Declaration**

I, **James Louis Roden Jr.**, declare under penalty of perjury **under 28 U.S.C. § 1746** that the foregoing Complaint—including all factual statements and exhibits incorporated herein—is true and correct to the best of my knowledge, information, and belief.

I further certify that this pleading is submitted in good faith and not for any improper purpose, and that all factual contentions have evidentiary support or will likely have such support after a reasonable opportunity for investigation and discovery, in accordance with Rule 11(b) of the Federal Rules of Civil Procedure.

Executed on this 29 day of Dec _____, 2025, in League City, Texas.

**James Louis Roden Jr.**
Plaintiff, Pro Se