**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| JAMES LOUIS RODEN JR,<br>*Plaintiff* | §<br>§<br>§ | |
| v. | §<br>§ | Case No. SA-26-CA-00054-XR |
| ELAINE MICHELLE REAMER,<br>COUNTY OF GUADALUPE, TEXAS,<br>*Defendants* | §<br>§<br>§<br>§ | |

**Plaintiff's 1st Amended Complaint**

## I. INTRODUCTION

**1.** Like the Good Samaritan in *Hughes v Garcia*, Plaintiff alleges he was punished for reporting danger; but Plaintiff's role was even more formally protected by law. Plaintiff James Louis Roden Jr. was a Texas public-school teacher, special-education-certified educator, mandated reporter, minister, father, and family advocate who reported suspected renewed exploitation of an intellectually disabled adult, Shelby Jane Koelle ("S.J.K."), and asked County officials and the court to provide her meaningful access, communication support, disability accommodations, a neutral Guardian Ad Litem and protection. Six days later, Defendant Sergeant Elaine M. Reamer sought a first-degree felony arrest warrant accusing Plaintiff of witness tampering against the very person he was trying to protect. This case is about whether an officer may convert mandated reporting, good-faith danger reporting, and ADA/Section 504 advocacy into criminal probable cause while omitting the facts that defeated that theory.

**2.** Reamer's core allegation was that Plaintiff coerced S.J.K. to say Jamie Walker was innocent. But the warrant affidavit omitted that S.J.K. had already given Reamer the same core account nearly a year earlier: Michael Walker harmed her, Jamie was not involved, and suffered domestic violence. It also omitted that S.J.K. denied coercion on video, swore her March 2025 statements

1

were voluntary, tried to contact the County Attorney's Office herself, and reported that Cody and Andrea Koelle who supported Michael were interfering with her access to officials and court communications.

**3.** This Complaint does not attempt to plead every harm Defendants caused Plaintiff or every wrongful act to Plaintiff connected to the underlying events. It asks a narrower constitutional question: whether a reasonable officer may obtain a first-degree felony arrest warrant by (a) presenting a facially conclusory affidavit that identifies no specific tampering act, and (b) omitting known facts that directly defeat the probable-cause theory. The answer is no. The affidavit had both a Malley defect and a Franks defect: it failed on its face to identify conduct satisfying felony witness tampering, and it failed as corrected because the omitted facts would show protected reporting and disability advocacy, not probable cause.[1]

**4.** The accusation against Plaintiff did not arise from a neutral investigation of actual witness tampering. Plaintiff alleges, and court records reflect, that it came through a defense-connected and prosecutor-routed accusation stream tied to Michael Walker's defense strategy. Cody accused Plaintiff of forging his affidavit and signature, accused an elderly disabled veteran of making a criminal threat, and accused an IDD domestic-violence victim of bribery.

**5.** The Fifth Circuit's decision in Hughes v. Garcia provides the closest constitutional analogy: officers allegedly turned a danger reporter into a felony defendant by omitting objective facts that supported the reporter's account and undermined the accusation. Here, Reamer allegedly did

---

**1**Franks v. Delaware, 438 U.S. 154, 155–56, 171–72 (1978), and its Fifth Circuit progeny recognize that a warrant affidavit violates the Fourth Amendment when an affiant knowingly or recklessly includes material falsehoods or omits material facts necessary to a fair probable-cause determination. Malley v. Briggs, 475 U.S. 335, 344–46 (1986), confirms that an officer may be liable for seeking a warrant when a reasonably well-trained officer would know the affidavit failed to establish probable cause. See also Winfrey v. Rogers, 901 F.3d 483, 494–97 (5th Cir. 2018); Melton v. Phillips, 875 F.3d 256, 262–64 (5th Cir. 2017) (en banc); Terwilliger v. Reyna, 4 F.4th 270, 281–83 (5th Cir. 2021); Hughes v. Garcia, 100 F.4th 611, 619–22 (5th Cir. 2024).

the same to a mandated reporter and disability advocate by using Plaintiff's own recordings, transcripts, and advocacy communications as probable cause while omitting that they showed voluntariness, prior consistency, direct access-seeking, protected reporting, and no actual tampering act. A corrected affidavit would show protected mandated reporting and ADA advocacy, not probable cause or arguable probable cause for a first-degree felony.

**6.** The consequences to Plaintiff were devastating. He was arrested, booked, placed under felony bond conditions, and publicly tied to a first-degree felony family-violence witness-tampering charge later rejected without conviction, plea, deferred adjudication, pretrial diversion, indictment, or neutral probable-cause testing. The arrest nearly bankrupted him through a $100,000 bond, tens of thousands of dollars in defense fees, lost employment, and the collapse of his education career. The continuing record has damaged his background checks, educator standing, retirement benefits, public image, and income from teaching, consulting, public speaking, books, and music. Meanwhile, the vulnerable person Plaintiff tried to protect allegedly remained in danger after her family was silenced by fear of arrest, with later reports showing domestic abuse, a third unplanned pregnancy, the alleged taking of her child, and a Kansas home where illegal drugs allegedly stored for distribution, large amounts of cash, and loaded weapons were found in plain sight around a two-year-old and an infant child, as documented by the Ford County Sheriff's Office in Case No. 26FO02573. Plaintiff brings this action for unlawful seizure, seizure through criminal process, retaliation, disability-law retaliation, and municipal liability.

**7.** Plaintiff brings this action not only to seek justice for the harm done to him, but to prevent a dangerous precedent from taking hold. If Defendants' actions are allowed to stand, teachers, mandated reporters, family advocates, and good-faith citizens will learn a chilling lesson: speak up for the vulnerable, and you may become the accused. This case asks whether the law will

3

protect those who report legitimate harm or punish them into silence. When advocates are silenced, vulnerable people lose guardians, witnesses, and voices. Plaintiff seeks to affirm a principle that should never be in doubt: those who report real harm must be protected, not destroyed.

## II. JURISDICTION AND VENUE

**8.** This action arises under the Constitution and laws of the United States. Plaintiff brings claims under 42 U.S.C. § 1983 for violations of the First and Fourth Amendments, as incorporated against state actors, and under Title V of the Americans with Disabilities Act, 42 U.S.C. § 12203, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

**9.** This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action presents federal questions and seeks redress for deprivation, under color of state law, of rights secured by the Constitution and federal law.

**10.** Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to these claims occurred in Guadalupe County, Texas, within the San Antonio Division of the Western District of Texas.

## III. PARTIES

**11.** Plaintiff James Louis Roden Jr. is a Texas resident. At all relevant times, he was a public-school teacher, special-education-certified educator, mandated reporter, minister, and family advocate. He reported suspected abuse and renewed exploitation involving S.J.K. and later became the subject of the witness-tampering charge challenged here.

**12.** Defendant Sergeant Elaine M. Reamer was, at all relevant times, a Guadalupe County Sheriff's Office investigator acting under color of state law. She prepared and swore the April 7, 2025 affidavit that caused Plaintiff's arrest. She is sued in her individual capacity only.

4

**13.** Defendant Guadalupe County, Texas is a political subdivision of the State of Texas. Plaintiff alleges that Guadalupe County, through its Sheriff's Office practices, policymakers, ratification, training failures, and prosecutor-directed warrant process, caused or contributed to the violations described below. Guadalupe County is also a public entity subject to federal disability law.

### IV. FACTUAL ALLEGATIONS

**A. Plaintiff's role as mandated reporter and disability advocate** *(See Exhibit D)*

**14.** Plaintiff's background matters because the communications Reamer criminalized were consistent with decades of service and mandated-reporting duties. Plaintiff had no criminal history, served more than twenty years as a Texas educator, held Special Education certification, and earned five master's degrees, including a Master of Education Administration from Texas A&M University-San Antonio. He founded the Holistic Church of Christ street ministry, helped homeless veterans seek housing, organized food drives, promoted Walk for Sight, supported youth sports for homeless, underprivileged children and inner city youth, authored work in education and IDD advocacy, and writes Country Christian music through Roden Records. His public role was educator, minister, and advocate - not witness manipulator.

**15.** When S.J.K.'s pregnancy and related allegations first came to light in January 2024, Plaintiff did not try to shield Jamie Walker from investigation. Because the facts were unclear, Plaintiff reported concerns involving both Michael Walker and Jamie Walker. Plaintiff was not present for the events in Seguin and had no firsthand knowledge of what occurred, only rumors. His role was to report what had been disclosed and urge officials to investigate the truth. Plaintiff had not seen Jamie or spoken with her more than a few times in over thirty years, and he had no meaningful relationship with her after early childhood. Reamer's suggestion that Plaintiff acted

to protect Jamie merely because she was his sister was therefore misleading, especially when Reamer knew Plaintiff was the person who insisted on an investigation against Jamie.

16. Over time, S.J.K. repeatedly gave the same core account: Michael Walker harmed her; Jamie Walker was not involved in the sexual abuse; and Jamie was also afraid of Michael and abused. Plaintiff relied on that account only after S.J.K. repeated it across recordings, affidavits, calls, and attempted communications with officials. Plaintiff asked questions directed to voluntariness and accuracy, including whether S.J.K. was being pressured or coerced.

**B. S.J.K.'s prior consistent account and the absence of notice to Plaintiff**

17. Long before Plaintiff was accused of influencing S.J.K., Reamer had direct evidence that S.J.K.'s core account predated Plaintiff's March 2025 advocacy. On April 4, 2024, S.J.K. gave Reamer a recorded interview in which she stated, in substance, that Jamie Walker was not involved and that Michael Walker was the person who harmed her and abused her mother. That interview remained in the County's own investigative record when Reamer sought Plaintiff's arrest a year later.

18. The April 4, 2024 interview is central to probable cause. The warrant theory against Plaintiff depended on implying that Plaintiff caused S.J.K. to change her statement. But Reamer herself already had a prior recorded statement from S.J.K. giving the same core exculpatory account. Omitting that interview made S.J.K.'s March 2025 statements appear newly manufactured by Plaintiff when they were prior consistent statements known to the affiant.

19. Reamer also knew that Jamie Renee Walker, S.J.K.'s mother, was not simply an alleged participant in the underlying case but a documented intellectually disabled domestic-violence victim of Michael Walker. Plaintiff alleges that Reamer knew or acknowledged that Michael had previously harmed Jamie, including choking and threatening conduct, and that S.J.K. described

6

Jamie as afraid of Michael rather than as a direct actor. A later psychological evaluation also documented Jamie's intellectual and developmental limitations. These facts mattered because Plaintiff's advocacy sought to ensure that two disabled women - S.J.K. and Jamie - were heard and protected in a coercive domestic-violence context, not to manufacture testimony.

20. County officials also had professional disability evidence supporting Plaintiff's advocacy. Dr. Daniel K. Sanders evaluated S.J.K. and documented significant intellectual and functional limitations, including a Full Scale IQ of 55, severe academic deficits, and an Intellectual Disability / Intellectual Developmental Disorder diagnosis. The report identified Dr. Sanders, listed S.J.K. as the examinee, and provided information for verification. Plaintiff alleges no version identified a provider named Roden or used Roden on the provider letterhead; the correction addressed S.J.K.'s own name, Koelle, being misspelled or misplaced. Yet First Assistant County Attorney Jonathan Amdur later stated in open court that the Roden family had provided a report from a psychiatrist whose last name was "Rhoden" on the letterhead and added, "So I don't know what was fabricated and what was not." That suspicion was objectively wrong and easily verifiable.

21. The failure to verify Dr. Sanders's report mattered because the report supported Plaintiff's APS report, accommodation requests, and concerns about disability-related incapacity and safety. Instead of verifying the report, interviewing Dr. Sanders, interviewing Plaintiff, or re-interviewing S.J.K. with disability-appropriate accommodations, officials allegedly treated Plaintiff's disability advocacy as suspicious and later converted his protected communications into first-degree felony process.

22. Plaintiff further alleges that, before his arrest, Reamer herself treated Plaintiff's persistence and advocacy as protective rather than criminal. Plaintiff alleges that Reamer praised his

7

persistence and advocacy as helping protect S.J.K. and, in substance, helping save her life. That prior acknowledgment made the later warrant theory especially misleading: the same open persistence Reamer had previously recognized as protective was later stripped of context and recast as first-degree felony witness tampering.

**23.** Before the April 7, 2025 warrant, neither Reamer nor the Guadalupe County Attorney's Office told Plaintiff that S.J.K. had allegedly given any materially different account, confronted him with any inconsistency, or warned that S.J.K.'s November 2024 affidavit or March 2025 statements were false, coerced, fabricated, or inconsistent with another firsthand statement. Plaintiff was unaware of any contrary firsthand account by S.J.K.

**24.** Plaintiff later learned in February 2026 that S.J.K. allegedly made other statements to Reamer in August 2024. Those alleged statements did not result in an upgraded charge accusing Jamie of directly raping or sexually assaulting S.J.K., and no charges were brought against prior boyfriends or husbands whom S.J.K. allegedly accused of also raping her.

**25.** This matters because witness tampering requires more than disagreement with an officer's preferred narrative. Plaintiff could not knowingly cause S.J.K. to give a false account where no official told him of any competing account, and every account she gave him matched the core account Reamer already had. Reamer accepted Cody's defense-aligned statements favoring Michael and harming Jamie, but treated S.J.K.'s firsthand statements favoring Jamie and implicating Michael as felony tampering when Plaintiff advocated for S.J.K. to be heard.

**C. Cody Koelle, the defense-connected accusation stream, and reliability problems**

**26.** In November 2024, at Jamie Walker's defense counsel's request, affidavits were prepared for S.J.K. and Cody Koelle after both insisted on giving their accounts and reached out to Plaintiff, as preserved texts, voicemails and emails show. Plaintiff documented the statements as provided.

The affidavits were signed and notarized in Kansas, hundreds of miles from Plaintiff. Plaintiff alleges both signed voluntarily, and Cody helped mail them and verify S.J.K.'s identity because she lacked identification.

27. On or about January 31, 2025, after Michael Walker defense contacted Cody, Cody reversed course. Plaintiff alleges Cody had to neutralize his prior notarized affidavit to support the new defense-aligned narrative, so he claimed the November affidavit was false and suggested Plaintiff forged his signature, although Kansas notary and mailing verification were available and Cody had no proof he refused to receive, sign, or deliver it.

28. The forgery allegation was serious. Plaintiff alleges preserved texts and emails showed Cody participating, giving delivery information, and being warned to review for accuracy and not sign anything false under oath. Officials did not verify the claim with the notary, mail records, documents, Plaintiff, or Cody's shifting statements before seeking felony warrants; instead, the affidavit shifted to Plaintiff's advocacy for S.J.K.

29. On March 18, 2025, Plaintiff spoke with Cody in a recorded call later provided to county officials. Cody admitted signing the November 2024 affidavit, confirmed its truth, and said he signed it because he loved his mother. Cody also said County Attorney personnel, including Jessica Johnson and Ileen Rangel, were pressuring him to support Michael Walker and go against Jamie, even though Cody admitted he was not present and did not know what truly happened in Seguin and can give no testimony for either Jamie or Michael.

30. The March 18 recording made Cody a credibility, bias, and motive problem. Plaintiff also stated that S.J.K. had never told him, or Plaintiff's side of the family the 'planned pregnancy' story Cody claimed to have heard. Plaintiff questioned why Cody, who lacked firsthand knowledge, would testify instead of S.J.K. herself.

9

**31**. Plaintiff alleges that the timing is significant. After Plaintiff provided the recording undermining Cody's reliability, Plaintiff then filed the April 1 mandated report implicating Cody's home environment, Jesse Ross Cole, drug activity, renewed sexual exploitation, and a second pregnancy. Investigating Plaintiff's report would have required scrutiny of the same witness whose statements were useful to both the Walker defense narrative and the prosecutor-routed tampering theory. Instead, the warrant process moved quickly against Plaintiff.

**32**. By March 21-22, 2025, county officials had notice that Cody's reliability required careful verification. Plaintiff submitted communications warning of Cody's recent law-enforcement-related credibility problems, including matters involving convictions for false statements to police and impersonating a police officer. Those facts did not automatically disqualify Cody as a witness, but they were directly relevant to whether a reasonable officer could rely on his changing accusations without independent corroboration.

**33**. Plaintiff further alleges that Cody's recorded statements raised a separate witness-influence concern pointing away from Plaintiff. Cody stated that S.J.K. had been told that if she agreed the pregnancy was planned, her mother would be free and 'this would all be over.' Plaintiff alleges this mattered because Michael Walker's defense later relied on a thin 'planned pregnancy' narrative. Plaintiff did not adopt that account; he stated S.J.K. had never told his family anything like that and urged that S.J.K., be heard directly.

**34**. Plaintiff alleges that the accusation stream did not arise from a neutral law-enforcement investigation. It came through the Guadalupe County Attorney's Office after materials were received from Michael Walker's defense side and from Cody and Andrea Koelle. In related tampering affidavits, Reamer acknowledged that materials were being received through the County Attorney's Office from Michael Walker's attorneys and the Cody/Andrea affidavits.

Plaintiff alleges that this defense-connected and prosecutor-routed source was material and should have been disclosed to the magistrate.

**35.** Plaintiff further alleges that Michael Walker's defense strategy was to portray the Roden family as the source of allegations against Walker and to minimize Walker's coercive conduct. Later sentencing proceedings reflected that Walker's defense tried to cast Plaintiff's family as having invented or exaggerated the rape and coercion narrative, while the State acknowledged facts supporting that abuse concerns predated Plaintiff's January 2024 APS report and March 2025 advocacy. Plaintiff pleads this as context showing why the source and litigation posture of the tampering accusation mattered.

**D. March 2025 advocacy, recordings, and Reamer's selective use of Plaintiff's materials**

**36.** In March 2025, S.J.K. contacted Plaintiff and asked for help reaching the Guadalupe County Attorney's Office because she wanted her account heard and believed officials were not responding to her directly. Plaintiff's involvement arose from S.J.K.'s request for help, not from any effort to invent or reshape her account as phone and text records show. *(See Exhibit E)*

**37.** On March 10, 2025, Plaintiff participated in recording a video statement at S.J.K.'s request. At the beginning, Plaintiff asked whether she was being coerced or forced and whether she was acting on her own free will. S.J.K. confirmed she was acting freely. In the video, she again stated that Jamie was not involved, that Michael Walker harmed her, and that Jamie had been abused.

**38.** On March 12, 2025, Plaintiff participated in a second video statement concerning Jamie's bond hearing. Plaintiff directly asked whether S.J.K. was being persuaded, forced, or coerced. She answered no and confirmed she was acting on her own free will. Nothing in those recordings reflects Plaintiff threatening, bribing, offering a benefit, or instructing S.J.K. to lie.

**39.** On March 15, 2025, S.J.K. executed a sworn affidavit. She affirmed that her statements were made freely and voluntarily, without coercion, duress, or promise of benefit. She certified the accuracy of the March 10 and March 12 video and again stated that Jamie was not involved. Plaintiff alleges that this affidavit was provided to the County Attorney's Office and placed into the related court record before the April 7 warrant.

**40.** The March 15 affidavit also placed Reamer's own conduct at issue. S.J.K. stated under oath that she had repeatedly told the Sheriff's Office, including Reamer, that Jamie was not involved, and was also a victim. S.J.K. then stated that Reamer refused to believe her and attempted to convince her otherwise. Plaintiff alleges the affidavit was filed and served on Assistant County Attorney Jessica Johnson on March 31st, 2025. Seven days later, Reamer accused Plaintiff of influencing S.J.K. while omitting that S.J.K. had accused Reamer herself of trying to redirect the same account. *(See Exhibit C)*

**41.** On March 19, 2025, Plaintiff and S.J.K. called the Guadalupe County Attorney's Office. During that call, a victim-assistance representative stated that the last recorded communication with S.J.K. was October 30, 2024. Plaintiff alleges Reamer materially misrepresented this point in her arrest-warrant affidavit by portraying Plaintiff as the source of the "no contact" claim, even though the recording Reamer claimed to have received showed the information came from the County Attorney's Office itself.

**42**. Reamer also mischaracterized the contact pattern. The communications available to officials showed S.J.K. repeatedly calling and texting Plaintiff, often urgently asking him to call, asking for help, and expressing that she wanted her story heard. The issue was not Plaintiff pursuing S.J.K. to manufacture testimony; it was S.J.K. seeking help from a trusted family advocate after she reported that officials were not communicating with her directly. *(See Exhibit E)*

**43.** On March 20, 2025, S.J.K. left multiple voicemails for County Attorney personnel asking to speak with officials, stating that she had not been contacted, and repeating that Jamie was innocent. These attempts were consistent with Plaintiff's position that S.J.K. wanted access to officials, not that Plaintiff was forcing her to say anything.

**44.** Plaintiff also submitted court-filed communications and accommodation requests in March 2025. He identified himself as S.J.K. chosen advocate, sought a neutral support person and court appointed guardian ad litem, requested simplified communication and other ADA-related accommodations, and asked that S.J.K. be allowed meaningful access to the legal process. These filings made Plaintiff's role public, court-directed, and transparent. No reasonable officer would treat Plaintiff's request just a few weeks prior for a court-appointed, neutral Guardian ad Litem as evidence of tampering. That request pointed in the opposite direction: Plaintiff was asking for neutral court protection for a vulnerable witness, not attempting to control, pressure, or shape her testimony.

**45.** Plaintiff also expressly disclaimed any intent to act as counsel, interfere with the legal process, or represent any party. In his communications, Plaintiff stated in substance that he was not an attorney, was not offering legal advice, was acting only as a concerned family member and citizen, and was seeking to ensure that truth, justice, and S.J.K.'s constitutional right to be heard were protected. That disclaimer was material to intent. A reasonable officer evaluating witness tampering should have recognized that Plaintiff was disclosing an advocacy role and attempting to avoid legal interference, not concealing a corrupt scheme.

**46.** Reamer's warrant affidavit acknowledged that she received and relied on materials routed through the Guadalupe County Attorney's Office between March 17, 2025, and April 5, 2025, including videos, transcripts, recorded phone calls, and related materials. She also stated that she

viewed at least one "FaceTime video" involving Plaintiff and S.J.K. Having used those materials to seek a first-degree felony warrant, Reamer could not fairly present selected portions while omitting the parts showing S.J.K.'s voluntariness, prior consistency, access-seeking, Plaintiff's disability-related advocacy, and the absence of coercion.

**47.** The affidavit identified no specific statement by Plaintiff that constituted witness tampering. It quoted no words directing S.J.K. to lie, cited no timestamp where Plaintiff allegedly coerced her, and identified no threat, bribe, benefit, promise, instruction, or other act designed to alter testimony. Instead, Reamer used broad labels such as "coerce" and "influence" while withholding the actual recorded words and context needed to test those labels.

**48.** This was not a technical failure to attach every exhibit. The recordings and transcripts were the best evidence of what Plaintiff actually said. By invoking those materials as proof of coercion while omitting the portions showing voluntariness, open-ended questioning, S.J.K.'s own request for help, and Plaintiff's advocacy role, Reamer gave the magistrate her conclusion instead of the facts needed for an independent probable-cause determination.

**49.** A reasonably trained investigator would understand that a first-degree felony warrant based on recorded advocacy communications must identify the actual statement or conduct that satisfies the offense. The Texas witness-tampering statute required facts showing coercion, threat, benefit, bribery, or an effort to cause knowingly false testimony. Reamer did not provide those facts. She substituted legal conclusions for statutory elements, preventing the magistrate from independently determining whether probable cause existed.

**E. Allegations that Cody and Andrea interfered with S.J.K.'s access to officials**

**50.** Before the April 7 warrant, county officials also had notice of facts suggesting that Cody and Andrea - not Plaintiff - may have been interfering with S.J.K.'s ability to communicate freely

14

with the court and prosecutors. In a March 19, 2025 recorded statement, S.J.K. stated that she had not spoken with any advocate, that Cody and Andrea would not allow her to contact anyone, that her mail from the court was opened or withheld, and that Andrea allegedly pretended to be S.J.K. on the phone.

51. Plaintiff further alleges that S.J.K. reported or attempted to report these concerns to Ford County authorities and that Plaintiff forwarded or described these concerns to Guadalupe County officials. These facts were material because they pointed away from Plaintiff as a witness tamperer and toward a different concern: S.J.K. was being isolated from the legal process by the same household and witness network the County later relied upon.

52. A neutral investigation would have examined whether Cody or Andrea were controlling S.J.K.'s communications, opening or withholding court mail, impersonating her, or shaping her statements. Instead, officials treated Plaintiff's efforts to help S.J.K. reach authorities as criminal while failing to investigate the competing allegations that others were blocking her access to authorities. Cody self-incriminated in a recorded call that S.J.K. never received court mail.

53. Plaintiff further alleges that no meaningful investigation was opened into S.J.K.'s competing allegations of interference, mail control, impersonation, or renewed exploitation before the County used the witness-tampering statute against Plaintiff. This selective silence mattered. The County treated Plaintiff's efforts to help S.J.K. speak to officials as criminal, while ignoring evidence that others were restricting her ability to speak to officials at all.

**F. The April 1 mandated report was the trigger and motive** *(See Exhibit B)*

54. On April 1, 2025, Plaintiff submitted a mandated report documenting renewed exploitation of S.J.K. while she was in Kansas and under Cody's care. Plaintiff reported concerns involving Jesse Ross Cole, drug activity, sexual exploitation, and a new pregnancy. The report was

supported by Cody's own recorded statements acknowledging that Jesse had moved in, that Jesse was using S.J.K. for sex, that Cody had found drugs, and that S.J.K. might be pregnant.

55. The April 1 report followed S.J.K.'s reports that Cody and Andrea limited her access to officials, opened or withheld mail, and allegedly allowed Andrea to impersonate her. It also followed Cody's recorded statements undermining his reliability, including when Plaintiff asked whether S.J.K. ever received court notices in the mail and Cody replied that she never received court mail, which Plaintiff alleges incriminated Cody because court records show notices existed but were not reaching S.J.K. Cody also suggested County Attorney pressure, admitted lack of firsthand knowledge, and Plaintiff urged S.J.K.'s firsthand testimony and Cody's honesty. Those facts required investigation of safety, exploitation, and access interference; instead, felony warrants followed against Plaintiff and his disabled father.

56. Plaintiff requested confidentiality because he feared retaliation if the people implicated learned he was the reporter. Plaintiff alleges that, instead of investigating the renewed exploitation he reported, officials moved quickly to arrest him. Six days later, Reamer sought the warrant for Plaintiff's arrest on a first-degree felony witness-tampering charge.

57. The April 1 report threatened the same defense-connected narrative that had begun generating accusations against Plaintiff and his family. Investigating the report would have required officials to scrutinize Cody's credibility, Cody's home environment, Cody's alleged pressure on S.J.K., Jesse Ross Cole, the renewed pregnancy, and the comparative issues relevant to Michael Walker's sexual-assault exposure. Instead, the County shifted focus from the reported exploitation to felony warrants against the reporter and his family.

58. The April 1 report also undercut any claim that Plaintiff's communications were secretly corrupt. The report was formal, disclosed, and made pursuant to mandated-reporting obligations.

It identified danger, requested protection, and sought confidentiality because Plaintiff feared retaliation. The report therefore gave Reamer a reason to consider Plaintiff's communications as protected reporting and disability advocacy. Omitting the report allowed the affidavit to make Plaintiff appear like an aggressor rather than the reporter of a current safety concern.

**G. The April 7 warrant, no exigency, selective communication, and unusual thinness**

59. Plaintiff alleges that no one interviewed him, no one meaningfully re-interviewed S.J.K. about whether Plaintiff coerced her, no one interviewed James Louis Roden Sr., no one verified the forgery allegation with the notary or mailing records, no one reconciled Cody's contradictions, and no one investigated the April 1 mandated report before seeking the warrant.

60. There was no emergency, no hearing at which S.J.K. was scheduled to testify, and no imminent safety threat requiring Reamer to bypass basic investigation before seeking a first-degree felony warrant. S.J.K. lived more than 700 miles from Plaintiff. Plaintiff's communications were open and documented. The affidavit did not identify any threat, bribe, violence, instruction to lie, or immediate witness danger. There was time to ask the two central witnesses - Plaintiff and S.J.K. - whether coercion occurred.

61. The speed of the April 7 warrant contrasted sharply with the County's earlier handling of reports concerning S.J.K.'s abuse. Plaintiff alleges that when he first reported S.J.K.'s sexual abuse and disability-related danger in January 2024, the matter was delayed, minimized, or repeatedly shelved despite danger to S.J.K. By contrast, after Plaintiff filed a report implicating Cody's environment and threatening the credibility of a defense-aligned witness, Reamer moved with unusual speed to seek a first-degree felony warrant against Plaintiff.

62. County officials also applied selective communication and investigative treatment. They communicated with Cody, coordinated subpoena logistics, discussed travel arrangements, and

received or shared case-related information through him even though Plaintiff had warned officials about Cody's credibility. In a recorded March 2025 call, Cody described discussions about flights, Uber arrangements, missed work, and the threat of a $500 fine and jail time if he did not appear. Cody also said he learned subpoena information from Ileen Rangel, Jessica Johnson, and Michael Walker's attorney while at the same time the County refusing any accommodation for Shelby to testify.

63. By contrast, before seeking first-degree felony warrants, Reamer and county officials did not interview Plaintiff, James Louis Roden Sr., or S.J.K. about alleged coercion. Plaintiff was a twenty-year educator and mandated reporter; Dolores Jane Roden was a retired special-education teacher; Kimberly Kennedy was a minister; and James Sr. was a medically limited, wheelchair-dependent Army veteran with cancer. Cody's contradictory accusations were treated as warrant-ready while the accused family received no pre-warrant interview.

64. The disparity was material because the alleged offense turned on communications, intent, and voluntariness. A neutral investigation would have asked S.J.K. whether Plaintiff coerced her, asked Plaintiff why he acted, and asked James Louis Roden Sr. whether he had the ability or intent to do what Cody alleged. Instead, officials communicated with Cody when his statements supported the preferred narrative and avoided witnesses whose answers would have tested or defeated the warrant theory.

65. Plaintiff alleges that the April 7 tampering affidavit was unusually thin compared with Reamer's own investigative practice in the same broader case. In earlier affidavits and reports involving Jamie Walker, Reamer used detailed chronologies, named sources, interviews, records reviewed, APS communications, witness statements, and specific investigative steps; she later testified that she had a history of writing long reports, and defense counsel acknowledged the

same. Yet the affidavit against Plaintiff identified no interview of Plaintiff, no contemporaneous coercion interview of S.J.K., no fair accounting of the March videos, sworn affidavit, County Attorney call, voicemails, ADA filings, April 1 report, Cody credibility warnings, defense-connected source, or specific tampering act. Given Reamer's supervisory role, 17 years of experience, more than 3,000 TCOLE training hours, master-level credential, and oversight of other investigators, Plaintiff alleges this unusual thinness supports knowing or reckless omission, not mere negligence.

**H. Continuing seizure and continuing harm**

66. The warrant issued, Plaintiff was arrested, booked, and subjected to bond conditions and ongoing criminal process. The charge threatened his liberty, damaged his reputation, teaching career, and ability to support his family. Plaintiff remained under the pressure and restraint of a first-degree felony prosecution until the charge was formally rejected or declined on or about July 18, 2025, without conviction, plea, deferred adjudication, pretrial diversion, indictment, or neutral probable-cause review.

67. The harm continued after declination. The arrest remains visible in background systems as a first-degree felony witness-tampering arrest. The DPS criminal-history record lists the arrest offense and a custody-style arrest disposition as "HELD" that can reasonably appear unresolved to employment screeners, while separately showing no court data is available. Plaintiff alleges that this record has damaged his career, employment opportunities, reputation, finances, emotional health, and professional licensing status. Plaintiff has been unable to secure meaningful employment for more than a year because he cannot get past background-check screenings, and this employment barrier continues as of this filing. Plaintiff further alleges that his Texas educator certificate remains under investigation by TEA due to backlog and lack of

19

resources, which TEA Investigator Joseph Lisciandri stated can cause investigations to last for years. As a result, Plaintiff's professional opportunities, income, retirement contributions, and future retirement benefits continue to be severely harmed.

## V. MATERIAL FALSEHOODS, OMISSIONS, AND THE CORRECTED AFFIDAVIT

**68.** Plaintiff incorporates the preceding facts and identifies the following material falsehoods, omissions, and misleading presentations. Each omission was material because it bore directly on whether Plaintiff coerced S.J.K., corruptly influenced testimony, or committed any act satisfying first-degree felony witness tampering. *(See Exhibit A)*

**69.** First, the affidavit omitted the defense-connected origin and nature of the witness-tampering allegation. Plaintiff alleges that Michael Allen Walker's defense team urged or persuaded Guadalupe County Attorney personnel to pursue witness-tampering charges, as later disclosed in court testimony and revealed in the bond condition listing Cody as a victim. The underlying accusation was not merely that Plaintiff had improper contact with a witness, but that Plaintiff had allegedly forged Cody Koelle's November 2024 sworn affidavit and signature. Yet Reamer did not disclose that serious forgery allegation to the magistrate, did not explain its defense-connected source, and did not identify any independent investigation verifying it. Instead, the affidavit shifted the focus away from the forgery accusation and repackaged Plaintiff's disclosed advocacy for S.J.K. as criminal influence. That omission was material because a magistrate needed to know that the accusation arose from an adversarial source with a direct motive to discredit S.J.K.'s account and anyone helping her access the legal process.

**70.** The affidavit also framed repeated contact as Plaintiff's coercive influence while omitting that S.J.K. repeatedly initiated calls, texts, and voicemails seeking Plaintiff's help and trying to have her own account heard. Those preserved communications along with easily accessible

20

phone records were material because they showed access-seeking by S.J.K., not control by Plaintiff. *(See Exhibit E)*

71. The affidavit omitted the April 4, 2024 recorded interview Reamer personally conducted, in which S.J.K. had already given the same core account long before the alleged March 2025 tampering. This concealed that S.J.K.'s March 2025 statements did not originate with Plaintiff.

72. The affidavit omitted the March 10 and March 12 videos in which Plaintiff directly asked about coercion and S.J.K. denied being coerced, forced, bribed, or persuaded. It also omitted S.J.K.'s March 15, 2025 notarized sworn affidavit stating that her statements were made freely and voluntarily, without coercion, duress, or promise of benefit. A magistrate evaluating witness tampering needed to know that the alleged witness had repeatedly and formally affirmed voluntariness before the warrant.

73. The affidavit omitted Reamer's personal conflict and bias. Reamer did not tell the magistrate that S.J.K. had recently signed a sworn affidavit accusing Reamer of refusing to believe her repeated account and attempting to convince her otherwise. That omission mattered because Reamer was asking the magistrate to believe Plaintiff had improperly influenced S.J.K.'s account while concealing that the alleged victim had accused Reamer herself of trying to redirect that same account.

74. The affidavit omitted that Plaintiff's disability-related statements were grounded in a professional psychological evaluation already provided to officials. It did not disclose that Dr. Sanders's report identified the evaluator, documented significant limitations, and could be verified directly. Nor did it disclose that suspicion about the report rested on the false premise that the provider letterhead used the Roden name, when Plaintiff alleges no version did so and the correction concerned S.J.K.'s spelling of her last name.

**75.** The affidavit omitted Plaintiff's disclosed advocacy role, ADA accommodation requests, court-directed filings, and his request just weeks earlier for a court-appointed, neutral Guardian ad Litem. Those facts were not evidence of tampering; they were evidence to the contrary because they showed Plaintiff was seeking independent court protection for a vulnerable person, not private control over her testimony.

**76.** The affidavit omitted the exculpatory contents of the very recordings, videos, transcripts, and related documents Reamer claimed to have received and reviewed. Reamer invoked those materials as evidence of coercion while withholding the portions showing S.J.K.'s voluntariness, prior consistency, direct access-seeking, Plaintiff's open-ended questioning, Plaintiff's lack of knowledge of any contrary account by S.J.K., his insistence that S.J.K. be heard directly.

**77.** The affidavit identified no specific tampering act. Although Reamer claimed to have Plaintiff's recordings and communications, she quoted no statement in which Plaintiff threatened S.J.K. or Cody, offered a benefit, promised anything, instructed anyone to lie, or directed anyone to change testimony. She identified no timestamp and no specific words satisfying the charged offense. Without a quote, timestamp, threat, benefit, promise, or instruction to lie, the affidavit required the magistrate to accept Reamer's conclusion rather than independently decide whether the facts fit the crime.

**78.** The affidavit omitted the April 1, 2025 mandated report. That report showed Plaintiff had just engaged in protected reporting concerning renewed exploitation, Cody's environment, Jesse Ross Cole, drug activity, possible witness interference, and S.J.K.'s second pregnancy. Omitting it concealed the retaliatory context and the reason Cody's accusations required skepticism.

**79.** The affidavit omitted Cody's credibility problems, the defense-connected source of the accusation, and the prosecutor-routed nature of the materials. Plaintiff alleges officials had notice

22

of Cody's changing statements, law-enforcement-related misconduct, lack of firsthand knowledge, contradiction of his later forgery narrative, and a recording in which Cody described County Attorney pressure. Reamer credited Cody's changed accusations to support three felony warrants while omitting S.J.K.'s sworn affidavits and videos showing voluntariness, prior consistency, and no coercion. Those facts directly affected probable cause and showed selective treatment, especially because Reamer relied on Cody-related affidavits in the related warrants against James Sr. and Jamie.

80. The affidavit omitted competing evidence that others, not Plaintiff, were interfering with S.J.K.'s access to the legal process. County officials had notice of allegations that Cody and Andrea restricted S.J.K.'s contact, opened or withheld court mail, allowed or participated in communications that did not reflect S.J.K.'s own voice, and promoted the "planned pregnancy" narrative. Plaintiff further alleges officials had notice that S.J.K. was told her mother would be free if she agreed the pregnancy was planned. Those facts pointed toward possible influence by defense-connected actors and away from Plaintiff.

81. The affidavit omitted the absence of basic investigation. Reamer did not tell the magistrate that she had not interviewed Plaintiff, had not meaningfully re-interviewed S.J.K. on the coercion question, had not interviewed James Louis Roden Sr., had not reconciled Cody's changing statements, had not verified the disputed forgery theory, and had not tested the accusation against the County's contrary records.

82. The affidavit omitted the absence of exigency and the selective nature of the investigation. S.J.K. lived more than 700 miles from Plaintiff; Plaintiff's communications were recorded or disclosed; the affidavit identified no immediate threat, bribe, violence, instruction to lie, or witness danger; and neither Reamer nor the County Attorney's Office had warned Plaintiff of

23

any contrary S.J.K. account before using his disclosed advocacy materials to support a first-degree felony warrant. A magistrate needed to know that the affiant relied on a disputed witness while avoiding the witnesses and records most capable of confirming or defeating the accusation.

**83.** A corrected affidavit would show protected reporting and advocacy, not probable cause. It would disclose that S.J.K. had already given Reamer the same core account, denied coercion on video and under oath, sought Plaintiff's help, and that Plaintiff acted openly as a mandated reporter and ADA advocate. It would also show that Reamer had exculpatory recordings, no specific tampering act, no exigency, no interview of Plaintiff or S.J.K., no notice to Plaintiff of any contrary S.J.K. account, and no reliable basis to credit Cody's defense-connected accusations without verification. Those corrected facts defeat probable cause because they show voluntariness, prior consistency, access-seeking, protected advocacy, and a failure to investigate—not witness tampering.

**84.** Thus, Reamer's affidavit had two independent Fourth Amendment defects. First, on its face, it identified no specific act satisfying felony witness tampering: no threat, bribe, benefit, instruction to lie, timestamp, or quoted coercive statement. Second, when the affidavit is corrected to account for at least fifteen core material omissions and two affirmative false or misleading characterizations, it would show S.J.K.'s prior consistent account, her repeated coercion denials, her own access-seeking, Plaintiff's open mandated reporting and ADA advocacy, and multiple reasons Cody's accusations required skepticism. Under *Malley* or *Franks*, there was no probable cause or arguable probable cause.

## VI. COUNT I - FOURTH AMENDMENT UNLAWFUL SEIZURE / FALSE ARREST AGAINST REAMER

**85**. Plaintiff incorporates the preceding paragraphs.

**86.** The Fourth Amendment prohibits unreasonable seizures. A warrant does not shield an officer who knowingly or recklessly presents a materially false or misleading affidavit, nor does it shield an officer who submits a warrant application so lacking in facts that a reasonably well-trained officer would know probable cause is absent. The law was clearly established before April 2025 that an affiant may not taint a magistrate's review through material falsehoods, omissions, or conclusory allegations unsupported by facts.[2]

**87.** Reamer caused Plaintiff's arrest by swearing the April 7 affidavit while knowing or recklessly disregarding facts that undermined probable cause: S.J.K.'s prior consistent statement, coercion denials, sworn affidavit, County Attorney call and voicemails, Plaintiff's disclaimers and ADA advocacy, Dr. Sanders's verifiable disability evidence, the false premise used to question that report, the April 1 mandated report, Cody's contradictions and alleged pressure, the defense-connected source, S.J.K.'s allegations against Cody and Andrea, no exigency, no interviews, no specific tampering act, and Reamer's personal conflict.

**88**. Plaintiff pleads two independent bases for denying qualified immunity. The first is facial insufficiency under Malley: even before adding omitted facts, the affidavit did not identify the words or conduct that allegedly constituted first-degree felony witness tampering. The second is a corrected-affidavit theory under Franks: once the omitted facts are restored, the affidavit affirmatively shows no probable cause because S.J.K.'s account predated Plaintiff, S.J.K. denied

---

**2***Franks v. Delaware*, 438 U.S. 154, 155–56, 171–72 (1978); *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986); *Winfrey v. Rogers*, 901 F.3d 483, 494–97 (5th Cir. 2018); *Melton v. Phillips*, 875 F.3d 256, 262–64 (5th Cir. 2017) (en banc); *Terwilliger v. Reyna*, 4 F.4th 270, 281–83 (5th Cir. 2021); *Hughes v. Garcia*, 100 F.4th 611, 619–22 (5th Cir. 2024). *Hughes* is especially instructive because the Fifth Circuit affirmed denial of qualified immunity where officers allegedly used material misstatements and omissions in warrant materials to transform a Good Samaritan's lawful report and citizen's arrest into a felony impersonation charge.

coercion, Plaintiff acted openly, and Cody's accusations were credibility-impaired and defense-connected.

89. This is the same warrant-affidavit problem the Fifth Circuit identified in Hughes: the affiant did not merely choose one permissible interpretation of disputed facts; the affiant allegedly manufactured a more credible criminal narrative by leaving out the objective facts that made the reporter's conduct lawful. Here, the omitted facts did not create a close call. They removed the offense.

90. No reasonable officer could believe probable cause existed after fairly accounting for those facts. A trained investigator would know that a first-degree felony witness-tampering warrant required more than conclusory labels when the available recordings were exculpatory and contained no threat, bribe, benefit, timestamp, instruction to lie, or specific tampering act. Encouraging truthfulness, urging the alleged victim's firsthand testimony do not establish probable cause for felony witness tampering.

91. The magistrate's approval does not cure the violation because Reamer allegedly tainted the independent intermediary's review.[3] Reamer was the affiant who selected the facts, invoked the recordings, omitted their exculpatory content, failed to identify any specific tampering act, and concealed the source and lack of independent investigation. The magistrate could not perform a neutral probable-cause review when the affiant withheld the facts most necessary to evaluate whether Plaintiff had threatened, bribed, coerced, instructed anyone to lie, or instead encouraged truthfulness and firsthand testimony.

92. Qualified immunity fails because the right was clearly established at both general and particularized levels. Every reasonable officer knew she could not obtain a warrant through

---

[3] Hughes v. Garcia, 100 F.4th 611 (5th Cir. 2024); Terwilliger v. Reyna, 4 F.4th 270, 281 (5th Cir. 2021); Winfrey v. Rogers, 901 F.3d 483 (5th Cir. 2018).

material falsehoods or omissions or seek a warrant a reasonably well-trained officer would know was unsupported. No reasonable officer could seek a first-degree felony witness-tampering warrant while relying on recordings but identifying no threat, bribe, benefit, instruction to lie, timestamp, or quote, and omitting the alleged victim's prior consistent account, sworn voluntariness, and denial of coercion.

93. As a direct and proximate result, Plaintiff was arrested, booked, subjected to felony bond conditions, and injured in his liberty, reputation, finances, employment, emotional health, and professional standing.

## VII. COUNT II - FOURTH AMENDMENT SEIZURE THROUGH CRIMINAL PROCESS AGAINST REAMER

94. Plaintiff incorporates the preceding paragraphs.

95. The Fourth Amendment is violated when an officer causes criminal process to issue without probable cause and the plaintiff remains seized through that process. A favorable termination does not require an affirmative declaration of innocence; it is sufficient that the prosecution ended without conviction.*4*

96. Reamer initiated criminal process against Plaintiff by submitting the April 7 warrant affidavit. Plaintiff remained seized through arrest, bond conditions, court supervision, and the ongoing threat of first-degree felony prosecution until the charge was rejected on or about July 18, 2025.

97. The criminal process lacked probable cause because the affidavit omitted facts that defeated the tampering theory, failed to identify any particularized tampering act, and concealed the defense-connected, prosecutor-routed, and unverified nature of the accusation. The prosecution

---

4 Manuel v. City of Joliet, 580 U.S. 357 (2017); Thompson v. Clark, 596 U.S. 36 (2022); Chiaverini v. City of Napoleon, 602 U.S. 556 (2024).

ended in Plaintiff's favor when the prosecutor rejected the charge without conviction, plea, deferred adjudication, pretrial diversion, indictment, or judicial finding against him.

**98.** Plaintiff alleges the charges functioned as punishment and restraint rather than good-faith prosecution. After Plaintiff, James Louis Roden Sr., and Jamie Walker were jailed, investigators still refused to take their statements or meaningfully interview S.J.K. about coercion. The charges were never presented to a grand jury and were declined as judicial probable-cause review became imminent, supporting the inference that the felony process itself was the punishment.

### VIII. COUNT III - FIRST AMENDMENT RETALIATION AGAINST REAMER

**99.** Plaintiff incorporates the preceding paragraphs.

**100.** Plaintiff engaged in protected First Amendment activity by reporting suspected abuse and exploitation, submitting exculpatory evidence, petitioning the court and County officials for S.J.K. to be heard directly, reporting investigative and prosecutorial misconduct, objecting to retaliatory subpoena practices, and filing the April 1 mandated report.

**101.** Plaintiff also elevated S.J.K.'s sworn accusation that Reamer had refused to believe her and attempted to convince her to change her account. Within weeks of those formal complaints, and six days after the mandated report, Reamer sought Plaintiff's arrest on a first-degree felony witness-tampering charge. Retaliatory causation is supported by timing, use, and selective treatment.

**102.** Lack of probable cause is Plaintiff's primary basis for this claim. Alternatively, even if arguable probable cause existed, retaliation is supported by selective enforcement: Kimberly Kennedy, a similarly situated advocate who reported S.J.K.'s account of Jamie's innocence to County Attorneys on May 29th, 2025 via sworn affidavit, was not arrested; Cody and Andrea

were not investigated with comparable urgency despite interference allegations; and first-degree felony process was used against Plaintiff only after his court filings, ADA advocacy, and April 1 mandated report.**5**

## IX. COUNT IV - ADA TITLE V AND SECTION 504 RETALIATION AGAINST GUADALUPE COUNTY

**103.** Plaintiff incorporates the preceding paragraphs.

**104.** On information and belief, Guadalupe County receives federal financial assistance for law-enforcement, victim-services, court-access, emergency-management, or related public programs, making it subject to Section 504.

**105.** Title V of the ADA protects **"any individual"** from retaliation, coercion, intimidation, threats, or interference because that individual opposed disability-based exclusion or aided another person in exercising rights protected by the ADA. Plaintiff pleads both retaliation under 42 U.S.C. § 12203(a) and interference/coercion under § 12203(b), together with Section 504 retaliation and interference based on the County's receipt of federal funds and its operation of public programs.**6**

**106.** Plaintiff engaged in protected disability-related activity by informing county officials that S.J.K. had significant intellectual and developmental limitations, requesting accommodations, seeking simplified communication and additional time, asking for a guardian ad litem,

---

**5**Hartman v. Moore, 547 U.S. 250 (2006); Nieves v. Bartlett, 587 U.S. 391 (2019); Gonzalez v. Trevino, 602 U.S. 653 (2024). Plaintiff primarily pleads lack of probable cause. The selective-Enforcement allegations are also pleaded as objective evidence of unusual enforcement and retaliatory motive.

**6**42 U.S.C. § 12203(a)-(b); 29 U.S.C. § 794; Tennessee v. Lane, 541 U.S. 509 (2004); Delano-Pyle v. Victoria County, 302 F.3d 567 (5th Cir. 2002); Block v. Texas Board of Law Examiners, 952 F.3d 613 (5th Cir. 2020).

identifying himself as S.J.K.'s advocate, and helping S.J.K. obtain meaningful access to prosecutors and the court.

107. Plaintiff's protected disability-related activity also included advocacy for Jamie Walker, a documented intellectually disabled domestic-violence victim whose ability to understand, communicate, and protect herself was directly affected by her disability and trauma. Plaintiff's communications asked officials to consider the disability-related vulnerabilities of both S.J.K. and Jamie in the criminal process. Criminalizing those communications penalized Plaintiff for aiding disabled persons in securing meaningful access to government proceedings.

108. Guadalupe County, through its actors and practices, used the same disability-related advocacy communications as part of the criminal narrative against Plaintiff. The County did not treat Plaintiff's accommodation efforts as protected efforts to secure meaningful access. Instead, those communications were stripped of their context and repurposed as evidence of supposed witness tampering in a 1st degree felony arrest warrant affidavit seeking up to 99 years in prison.

109. The County's treatment of the Dr. Sanders report further supports retaliation and interference. Plaintiff aided and encouraged S.J.K. in seeking meaningful access and protection based on professional disability evidence. Rather than verify the report, provide appropriate accommodations, or identify an ADA-informed process, county actors allegedly allowed disability-related advocacy to be reframed as evidence of manipulation. Plaintiff alleges that this response interfered with and retaliated against protected ADA-related assistance.

110. The causal connection is shown by timing and use. Plaintiff's ADA-related filings and advocacy were made in March 2025, and his April 1 mandated report concerned renewed exploitation of an IDD adult. Within days, Reamer sought the warrant, and the warrant narrative

30

drew on the communications through which Plaintiff had tried to secure access and protection for S.J.K.

**111.** Plaintiff does not sue as S.J.K. and does not assert an independent disability-discrimination claim on his own behalf. He sues as an individual retaliated against for aiding and encouraging S.J.K.'s exercise of disability-related rights and access to government processes. As a direct and proximate result, Plaintiff suffered loss of liberty, reputational injury, emotional distress, legal expense, career damage, and financial harm.

**112**. Plaintiff further alleges that the County's conduct chilled the very access protections federal disability law is designed to secure. The County allegedly used Plaintiff's requests for simplified communication, support-person assistance, direct contact with S.J.K., and disability-aware procedures as evidence of criminal influence. That retaliation would deter a reasonable family advocate, mandated reporter, teacher, or minister from assisting an intellectually disabled victim in seeking meaningful access to prosecutors, law enforcement, and the court.

## X. COUNT V - MUNICIPAL LIABILITY AGAINST GUADALUPE COUNTY *(Exhibit F)*

**113.** Plaintiff incorporates the preceding paragraphs.

**114.** Guadalupe County is liable under § 1983 when an official policy, custom, practice, deliberate indifference, or ratification is the moving force behind a constitutional violation. In Texas, the sheriff is the county's final policymaker for law-enforcement functions, including the supervision and practices of sheriff personnel preparing warrant affidavits.[7]

---

[7]Monell v. Department of Social Services, 436 U.S. 658 (1978); Pembaur v. City of Cincinnati, 475 U.S. 469 (1986); City of Canton v. Harris, 489 U.S. 378 (1989); City of St. Louis v. Praprotnik, 485 U.S. 112 (1988). The Fifth Circuit recognizes that, in Texas, a county sheriff is a final policymaker for law-enforcement matters. Turner v. Upton County, 915 F.2d 133 (5th Cir. 1990); Colle v. Brazos County, 981 F.2d 237 (5th Cir. 1993).

**115.** Plaintiff does not ask the Court to impose municipal liability merely because prosecutors made charging decisions. Plaintiff alleges a sheriff-side law-enforcement custom and failure of supervision: sheriff personnel accepted prosecutor-curated and defense-connected accusation streams, failed to conduct independent probable-cause review, and converted those accusation streams into felony warrant affidavits without basic verification or fair disclosure to the magistrate.

**116.** Plaintiff alleges that the moving force here was a County practice in which the County Attorney's Office selected, curated, and routed accusation materials while sheriff personnel failed to independently investigate before seeking felony warrants. Reamer did not act as a neutral factfinder testing probable cause. She adopted a prosecutor-routed, defense-connected narrative, omitted contrary evidence already in the County's possession, and used the Sheriff's warrant authority to convert that narrative into first-degree felony criminal process.

**117.** After arrest, the lack of investigation continued. Plaintiff, James Louis Roden Sr., and Jamie Walker were jailed on first-degree felony tampering charges, yet when Plaintiff asked to speak with an investigator, jail personnel stated that no investigator was willing to speak with any of them. No investigator later sought statements from the accused or S.J.K. about the alleged tampering. The pattern supports a reasonable inference that Defendants maintained the charges for leverage, restraint, and retaliation for advocacy rather than a good-faith prosecution.

**118.** This practice was not limited to Plaintiff's warrant. Plaintiff alleges that Reamer used the same prosecutor-routed, defense-connected accusation stream to support three coordinated first-degree felony witness-tampering warrants against Plaintiff, James Louis Roden Sr., and Jamie Renee Walker. In the related affidavits, Reamer acknowledged receiving documentation through the County Attorney's Office originating with Michael Walker's attorneys and Cody/Andrea materials, yet sheriff personnel did not independently interview the central witnesses, verify

32

Cody's forgery claim, test Cody's credibility, or compare the accusations against the County's contrary records. Plaintiff pleads this repeated warrant process as evidence of sheriff-side custom, failure of supervision, and ratification—not a one-off mistake.

119. The later handling of Dolores Jane Roden's sworn criminal complaint against Cody confirmed the same structural problem. That complaint was supported by notary verification, a notary log, recorded admissions, Cody's criminal-history information, and allegations of aggravated perjury and false reports. The Sheriff's Office records reflected that Reamer "reviewed" the complaint and forwarded a packet to the County Attorney's Office. The Sheriff's Office then stated that the County Attorney's Office - not the Sheriff's Office - would conduct the investigation into the criminal offense alleged which is selective investigative treatment.

120. The County's failure to assign a conflict-free investigator after S.J.K.'s sworn accusation against Reamer further supports municipal liability. County actors had notice that Reamer's own conduct had been placed at issue in a court-filed affidavit, yet Reamer remained the investigator-affiant and converted prosecutor-routed materials into a first-degree felony warrant. Plaintiff alleges that the failure to supervise, screen conflicts, or require independent probable-cause review was part of the County practice that caused his arrest.

121. The County's handling of Dr. Sanders's report also supports municipal liability. Plaintiff alleges that Guadalupe County lacked or failed to enforce policies requiring sheriff personnel to verify disability documentation, consult ADA coordination resources, provide disability-informed investigative procedures, and distinguish protected disability advocacy from criminal influence. The County's failure to verify Dr. Sanders's report while accepting prosecutor-routed and defense-connected accusations against Plaintiff was part of the same custom of selective investigation and sheriff abdication of independent probable-cause review.

**122.** Plaintiff repeats that the challenged municipal conduct is the Sheriff's Office practice, not protected prosecutorial advocacy: failure to independently verify probable cause; failure to train officers on Franks duties; failure to supervise warrant affidavits; and ratification of sheriff personnel acting as conduits for prosecutor-selected evidence. The practice was compounded by County ADA failures: when Plaintiff and others raised ADA/Section 504 access concerns, neither the Sheriff's Office nor County Attorney's Office verified relevant ADA/Section 504 training, identified a responsible ADA Coordinator when requested, or provided a meaningful grievance/accommodation process.

**123.** Guadalupe County also engaged in selective investigative treatment.**8** Cody's unverified accusations were treated as warrant-ready. But S.J.K.'s and Plaintiff's reports that Cody and Andrea restricted S.J.K.'s access to officials, opened or withheld court mail, allowed Andrea to impersonate her, and kept her in an environment of renewed exploitation were not investigated with comparable urgency.

**124.** Guadalupe County further failed to train or supervise sheriff personnel on Franks duties, fair disclosure of exculpatory facts to magistrates, verification of credibility-impaired witnesses, protection of mandated reporters, and ADA/Section 504 obligations for IDD victims, witnesses, complainants, and advocates. Those failures allowed protected accommodation requests and reporting to be repurposed as criminal influence.

**125**. County leadership received repeated written notice that the warrant process was defective, exculpatory evidence was omitted, Cody's credibility was contradicted, and protected reporting

---

**8**Selective investigative treatment is pleaded as evidence of retaliation, pretext, ratification, deliberate indifference, and municipal custom, not as a standalone selective-prosecution claim against prosecutors.

34

and ADA advocacy had been repurposed into criminal process. No corrective action followed. Plaintiff alleges ratification and deliberate indifference. *(See Exhibit F)*

**126.** The County's policy, custom, ratification, and deliberate indifference were the moving force behind Plaintiff's injuries because they allowed a defense-connected accusation stream to become three coordinated first-degree felony warrants without interviews, corroboration, source disclosure, or fair presentation of exculpatory evidence.

**127.** Had independent investigation, witness interviews, Cody verification, source disclosure, and fair presentation of the recordings occurred, the corrected affidavits would not have supported probable cause. Once may be a mistake. Twice may be a coincidence. Three times suggest a custom/practice.

### XI. DAMAGES AND PRAYER FOR RELIEF

**128.** As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of liberty, emotional distress, reputational injury, financial harm, legal expense, loss of employment and professional opportunity, harm to his teaching career, and continuing background-check consequences.

**129.** Plaintiff seeks compensatory damages, nominal damages, punitive damages against Reamer where allowed, declaratory relief that his constitutional rights were violated, equitable relief, pre- and post-judgment interest, costs, and all other relief available under federal law.

**130.** Plaintiff also seeks ADA and Section 504 compliance-related declaratory and equitable relief, including policy revision and training regarding accommodation requests, protected reporting, and advocacy for intellectually and developmentally disabled victims.

**131.** If counsel appears on Plaintiff's behalf, Plaintiff seeks attorney's fees and expenses to the extent permitted by law.

### XII. JURY DEMAND

**132.** Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

/s/ James Louis Roden Jr.
James Louis Roden Jr.,
Plaintiff, Pro Se
1005 Beaumont St, League City, TX 77573
(210) 482-0802 | jroden3@wgu.edu

# Certificate of Service

I certify that on May 4, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent through the CM/ECF system to all counsel of record who are registered users.

Respectfully submitted,

/s/ James Louis Roden Jr.
James Louis Roden Jr.
Plaintiff, Pro Se
1005 Beaumont St.
League City, Texas 77573
Phone: (210) 482-0802
Email: jroden3@wgu.edu