**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| JAMES LOUIS RODEN JR, <br> *Plaintiff* | § <br> § <br> § | |
| v. | § <br> § | Case No.  SA-26-CA-00054-XR |
| ELAINE MICHELLE REAMER, <br> COUNTY OF GUADALUPE, TEXAS, <br> *Defendants* | § <br> § <br> § <br> § | |

**Plaintiff's 1st Amended Complaint**

**I. INTRODUCTION**

**1.** Like the Good Samaritan in *Hughes v Garcia*, Plaintiff alleges he was punished for reporting danger; but Plaintiff's role was even more formally protected by law. Plaintiff James Louis Roden Jr. was a Texas public-school teacher, special-education-certified educator, mandated reporter, minister, father, and family advocate who reported suspected renewed exploitation of an intellectually disabled adult, Shelby Jane Koelle ("S.J.K."), and asked County officials and the court to provide her meaningful access, communication support, disability accommodations, a neutral Guardian Ad Litem and protection. Six days later, Defendant Sergeant Elaine M. Reamer sought a first-degree felony arrest warrant accusing Plaintiff of witness tampering against the very person he was trying to protect. This case is about whether an officer may convert mandated reporting, good-faith danger reporting, and ADA/Section 504 advocacy into criminal probable cause while omitting the facts that defeated that theory.

**2.** Reamer's core allegation was that Plaintiff coerced S.J.K. to say Jamie Walker was innocent. But the warrant affidavit omitted that S.J.K. had already given Reamer the same core account nearly a year earlier: Michael Walker harmed her, Jamie was not involved, and suffered domestic violence. It also omitted that S.J.K. denied coercion on video, swore her March 2025 statements

were voluntary, tried to contact the County Attorney's Office herself, and reported that Cody and Andrea Koelle who supported Michael were interfering with her access to officials and court communications.

**3.** This Complaint does not attempt to plead every harm Defendants caused Plaintiff or every wrongful act to Plaintiff connected to the underlying events. It asks a narrower constitutional question: whether a reasonable officer may obtain a first-degree felony arrest warrant by (a) presenting a facially conclusory affidavit that identifies no specific tampering act, and (b) omitting known facts that directly defeat the probable-cause theory. The answer is no. The affidavit had both a Malley defect and a Franks defect: it failed on its face to identify conduct satisfying felony witness tampering, and it failed as corrected because the omitted facts would show protected reporting and disability advocacy, not probable cause.[1]

**4.** The accusation against Plaintiff did not arise from a neutral investigation of actual witness tampering. Plaintiff alleges, and court records reflect, that it came through a defense-connected and prosecutor-routed accusation stream tied to Michael Walker's defense strategy. Cody accused Plaintiff of forging his affidavit and signature, accused an elderly disabled veteran of making a criminal threat, and accused an IDD domestic-violence victim of bribery.

**5.** The Fifth Circuit's decision in Hughes v. Garcia provides the closest constitutional analogy: officers allegedly turned a danger reporter into a felony defendant by omitting objective facts that supported the reporter's account and undermined the accusation. Here, Reamer allegedly did

---

[1]Franks v. Delaware, 438 U.S. 154, 155–56, 171–72 (1978), and its Fifth Circuit progeny recognize that a warrant affidavit violates the Fourth Amendment when an affiant knowingly or recklessly includes material falsehoods or omits material facts necessary to a fair probable-cause determination. Malley v. Briggs, 475 U.S. 335, 344–46 (1986), confirms that an officer may be liable for seeking a warrant when a reasonably well-trained officer would know the affidavit failed to establish probable cause. See also Winfrey v. Rogers, 901 F.3d 483, 494–97 (5th Cir. 2018); Melton v. Phillips, 875 F.3d 256, 262–64 (5th Cir. 2017) (en banc); Terwilliger v. Reyna, 4 F.4th 270, 281–83 (5th Cir. 2021); Hughes v. Garcia, 100 F.4th 611, 619–22 (5th Cir. 2024).

the same to a mandated reporter and disability advocate by using Plaintiff's own recordings, transcripts, and advocacy communications as probable cause while omitting that they showed voluntariness, prior consistency, direct access-seeking, protected reporting, and no actual tampering act. A corrected affidavit would show protected mandated reporting and ADA advocacy, not probable cause or arguable probable cause for a first-degree felony.

**6.** The consequences to Plaintiff were devastating. He was arrested, booked, placed under felony bond conditions, and publicly tied to a first-degree felony family-violence witness-tampering charge later rejected without conviction, plea, deferred adjudication, pretrial diversion, indictment, or neutral probable-cause testing. The arrest nearly bankrupted him through a $100,000 bond, tens of thousands of dollars in defense fees, lost employment, and the collapse of his education career. The continuing record has damaged his background checks, educator standing, retirement benefits, public image, and income from teaching, consulting, public speaking, books, and music. Meanwhile, the vulnerable person Plaintiff tried to protect allegedly remained in danger after her family was silenced by fear of arrest, with later reports showing domestic abuse, a third unplanned pregnancy, the alleged taking of her child, and a Kansas home where illegal drugs allegedly stored for distribution, large amounts of cash, and loaded weapons were found in plain sight around a two-year-old and an infant child, as documented by the Ford County Sheriff's Office in Case No. 26FO02573. Plaintiff brings this action for unlawful seizure, seizure through criminal process, retaliation, disability-law retaliation, and municipal liability.

**7.** Plaintiff brings this action not only to seek justice for the harm done to him, but to prevent a dangerous precedent from taking hold. If Defendants' actions are allowed to stand, teachers, mandated reporters, family advocates, and good-faith citizens will learn a chilling lesson: speak up for the vulnerable, and you may become the accused. This case asks whether the law will

protect those who report legitimate harm or punish them into silence. When advocates are silenced, vulnerable people lose guardians, witnesses, and voices. Plaintiff seeks to affirm a principle that should never be in doubt: those who report real harm must be protected, not destroyed.

## II. JURISDICTION AND VENUE

**8.** This action arises under the Constitution and laws of the United States. Plaintiff brings claims under 42 U.S.C. § 1983 for violations of the First and Fourth Amendments, as incorporated against state actors, and under Title V of the Americans with Disabilities Act, 42 U.S.C. § 12203, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

**9.** This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343 because this action presents federal questions and seeks redress for deprivation, under color of state law, of rights secured by the Constitution and federal law.

**10.** Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events and omissions giving rise to these claims occurred in Guadalupe County, Texas, within the San Antonio Division of the Western District of Texas.

## III. PARTIES

**11.** Plaintiff James Louis Roden Jr. is a Texas resident. At all relevant times, he was a public-school teacher, special-education-certified educator, mandated reporter, minister, and family advocate. He reported suspected abuse and renewed exploitation involving S.J.K. and later became the subject of the witness-tampering charge challenged here.

**12.** Defendant Sergeant Elaine M. Reamer was, at all relevant times, a Guadalupe County Sheriff's Office investigator acting under color of state law. She prepared and swore the April 7, 2025 affidavit that caused Plaintiff's arrest. She is sued in her individual capacity only.

4

**13.** Defendant Guadalupe County, Texas is a political subdivision of the State of Texas. Plaintiff alleges that Guadalupe County, through its Sheriff's Office practices, policymakers, ratification, training failures, and prosecutor-directed warrant process, caused or contributed to the violations described below. Guadalupe County is also a public entity subject to federal disability law.

## IV. FACTUAL ALLEGATIONS

### A. Plaintiff's role as mandated reporter and disability advocate *(See Exhibit D)*

**14.** Plaintiff's background matters because the communications Reamer criminalized were consistent with decades of service and mandated-reporting duties. Plaintiff had no criminal history, served more than twenty years as a Texas educator, held Special Education certification, and earned five master's degrees, including a Master of Education Administration from Texas A&M University-San Antonio. He founded the Holistic Church of Christ street ministry, helped homeless veterans seek housing, organized food drives, promoted Walk for Sight, supported youth sports for homeless, underprivileged children and inner city youth, authored work in education and IDD advocacy, and writes Country Christian music through Roden Records. His public role was educator, minister, and advocate - not witness manipulator.

**15.** When S.J.K.'s pregnancy and related allegations first came to light in January 2024, Plaintiff did not try to shield Jamie Walker from investigation. Because the facts were unclear, Plaintiff reported concerns involving both Michael Walker and Jamie Walker. Plaintiff was not present for the events in Seguin and had no firsthand knowledge of what occurred, only rumors. His role was to report what had been disclosed and urge officials to investigate the truth. Plaintiff had not seen Jamie or spoken with her more than a few times in over thirty years, and he had no meaningful relationship with her after early childhood. Reamer's suggestion that Plaintiff acted

5

to protect Jamie merely because she was his sister was therefore misleading, especially when Reamer knew Plaintiff was the person who insisted on an investigation against Jamie.

16. Over time, S.J.K. repeatedly gave the same core account: Michael Walker harmed her; Jamie Walker was not involved in the sexual abuse; and Jamie was also afraid of Michael and abused. Plaintiff relied on that account only after S.J.K. repeated it across recordings, affidavits, calls, and attempted communications with officials. Plaintiff asked questions directed to voluntariness and accuracy, including whether S.J.K. was being pressured or coerced.

**B. S.J.K.'s prior consistent account and the absence of notice to Plaintiff**

17. Long before Plaintiff was accused of influencing S.J.K., Reamer had direct evidence that S.J.K.'s core account predated Plaintiff's March 2025 advocacy. On April 4, 2024, S.J.K. gave Reamer a recorded interview in which she stated, in substance, that Jamie Walker was not involved and that Michael Walker was the person who harmed her and abused her mother. That interview remained in the County's own investigative record when Reamer sought Plaintiff's arrest a year later.

18. The April 4, 2024 interview is central to probable cause. The warrant theory against Plaintiff depended on implying that Plaintiff caused S.J.K. to change her statement. But Reamer herself already had a prior recorded statement from S.J.K. giving the same core exculpatory account. Omitting that interview made S.J.K.'s March 2025 statements appear newly manufactured by Plaintiff when they were prior consistent statements known to the affiant.

19. Reamer also knew that Jamie Renee Walker, S.J.K.'s mother, was not simply an alleged participant in the underlying case but a documented intellectually disabled domestic-violence victim of Michael Walker. Plaintiff alleges that Reamer knew or acknowledged that Michael had previously harmed Jamie, including choking and threatening conduct, and that S.J.K. described

6

Jamie as afraid of Michael rather than as a direct actor. A later psychological evaluation also documented Jamie's intellectual and developmental limitations. These facts mattered because Plaintiff's advocacy sought to ensure that two disabled women - S.J.K. and Jamie - were heard and protected in a coercive domestic-violence context, not to manufacture testimony.

20. County officials also had professional disability evidence supporting Plaintiff's advocacy. Dr. Daniel K. Sanders evaluated S.J.K. and documented significant intellectual and functional limitations, including a Full Scale IQ of 55, severe academic deficits, and an Intellectual Disability / Intellectual Developmental Disorder diagnosis. The report identified Dr. Sanders, listed S.J.K. as the examinee, and provided information for verification. Plaintiff alleges no version identified a provider named Roden or used Roden on the provider letterhead; the correction addressed S.J.K.'s own name, Koelle, being misspelled or misplaced. Yet First Assistant County Attorney Jonathan Amdur later stated in open court that the Roden family had provided a report from a psychiatrist whose last name was "Rhoden" on the letterhead and added, "So I don't know what was fabricated and what was not." That suspicion was objectively wrong and easily verifiable.

21. The failure to verify Dr. Sanders's report mattered because the report supported Plaintiff's APS report, accommodation requests, and concerns about disability-related incapacity and safety. Instead of verifying the report, interviewing Dr. Sanders, interviewing Plaintiff, or re-interviewing S.J.K. with disability-appropriate accommodations, officials allegedly treated Plaintiff's disability advocacy as suspicious and later converted his protected communications into first-degree felony process.

22. Plaintiff further alleges that, before his arrest, Reamer herself treated Plaintiff's persistence and advocacy as protective rather than criminal. Plaintiff alleges that Reamer praised his

persistence and advocacy as helping protect S.J.K. and, in substance, helping save her life. That prior acknowledgment made the later warrant theory especially misleading: the same open persistence Reamer had previously recognized as protective was later stripped of context and recast as first-degree felony witness tampering.

23. Before the April 7, 2025 warrant, neither Reamer nor the Guadalupe County Attorney's Office told Plaintiff that S.J.K. had allegedly given any materially different account, confronted him with any inconsistency, or warned that S.J.K.'s November 2024 affidavit or March 2025 statements were false, coerced, fabricated, or inconsistent with another firsthand statement. Plaintiff was unaware of any contrary firsthand account by S.J.K.

24. Plaintiff later learned in February 2026 that S.J.K. allegedly made other statements to Reamer in August 2024. Those alleged statements did not result in an upgraded charge accusing Jamie of directly raping or sexually assaulting S.J.K., and no charges were brought against prior boyfriends or husbands whom S.J.K. allegedly accused of also raping her.

25. This matters because witness tampering requires more than disagreement with an officer's preferred narrative. Plaintiff could not knowingly cause S.J.K. to give a false account where no official told him of any competing account, and every account she gave him matched the core account Reamer already had. Reamer accepted Cody's defense-aligned statements favoring Michael and harming Jamie, but treated S.J.K.'s firsthand statements favoring Jamie and implicating Michael as felony tampering when Plaintiff advocated for S.J.K. to be heard.

C. Cody Koelle, the defense-connected accusation stream, and reliability problems

26. In November 2024, at Jamie Walker's defense counsel's request, affidavits were prepared for S.J.K. and Cody Koelle after both insisted on giving their accounts and reached out to Plaintiff, as preserved texts, voicemails and emails show. Plaintiff documented the statements as provided.

8

The affidavits were signed and notarized in Kansas, hundreds of miles from Plaintiff. Plaintiff alleges both signed voluntarily, and Cody helped mail them and verify S.J.K.'s identity because she lacked identification.

27. On or about January 31, 2025, after Michael Walker defense contacted Cody, Cody reversed course. Plaintiff alleges Cody had to neutralize his prior notarized affidavit to support the new defense-aligned narrative, so he claimed the November affidavit was false and suggested Plaintiff forged his signature, although Kansas notary and mailing verification were available and Cody had no proof he refused to receive, sign, or deliver it.

28. The forgery allegation was serious. Plaintiff alleges preserved texts and emails showed Cody participating, giving delivery information, and being warned to review for accuracy and not sign anything false under oath. Officials did not verify the claim with the notary, mail records, documents, Plaintiff, or Cody's shifting statements before seeking felony warrants; instead, the affidavit shifted to Plaintiff's advocacy for S.J.K.

29. On March 18, 2025, Plaintiff spoke with Cody in a recorded call later provided to county officials. Cody admitted signing the November 2024 affidavit, confirmed its truth, and said he signed it because he loved his mother. Cody also said County Attorney personnel, including Jessica Johnson and Ileen Rangel, were pressuring him to support Michael Walker and go against Jamie, even though Cody admitted he was not present and did not know what truly happened in Seguin and can give no testimony for either Jamie or Michael.

30. The March 18 recording made Cody a credibility, bias, and motive problem. Plaintiff also stated that S.J.K. had never told him, or Plaintiff's side of the family the 'planned pregnancy' story Cody claimed to have heard. Plaintiff questioned why Cody, who lacked firsthand knowledge, would testify instead of S.J.K. herself.

31. Plaintiff alleges that the timing is significant. After Plaintiff provided the recording undermining Cody's reliability, Plaintiff then filed the April 1 mandated report implicating Cody's home environment, Jesse Ross Cole, drug activity, renewed sexual exploitation, and a second pregnancy. Investigating Plaintiff's report would have required scrutiny of the same witness whose statements were useful to both the Walker defense narrative and the prosecutor-routed tampering theory. Instead, the warrant process moved quickly against Plaintiff.

32. By March 21-22, 2025, county officials had notice that Cody's reliability required careful verification. Plaintiff submitted communications warning of Cody's recent law-enforcement-related credibility problems, including matters involving convictions for false statements to police and impersonating a police officer. Those facts did not automatically disqualify Cody as a witness, but they were directly relevant to whether a reasonable officer could rely on his changing accusations without independent corroboration.

33. Plaintiff further alleges that Cody's recorded statements raised a separate witness-influence concern pointing away from Plaintiff. Cody stated that S.J.K. had been told that if she agreed the pregnancy was planned, her mother would be free and 'this would all be over.' Plaintiff alleges this mattered because Michael Walker's defense later relied on a thin 'planned pregnancy' narrative. Plaintiff did not adopt that account; he stated S.J.K. had never told his family anything like that and urged that S.J.K., be heard directly.

34. Plaintiff alleges that the accusation stream did not arise from a neutral law-enforcement investigation. It came through the Guadalupe County Attorney's Office after materials were received from Michael Walker's defense side and from Cody and Andrea Koelle. In related tampering affidavits, Reamer acknowledged that materials were being received through the County Attorney's Office from Michael Walker's attorneys and the Cody/Andrea affidavits.

Plaintiff alleges that this defense-connected and prosecutor-routed source was material and should have been disclosed to the magistrate.

**35.** Plaintiff further alleges that Michael Walker's defense strategy was to portray the Roden family as the source of allegations against Walker and to minimize Walker's coercive conduct. Later sentencing proceedings reflected that Walker's defense tried to cast Plaintiff's family as having invented or exaggerated the rape and coercion narrative, while the State acknowledged facts supporting that abuse concerns predated Plaintiff's January 2024 APS report and March 2025 advocacy. Plaintiff pleads this as context showing why the source and litigation posture of the tampering accusation mattered.

**D. March 2025 advocacy, recordings, and Reamer's selective use of Plaintiff's materials**

**36.** In March 2025, S.J.K. contacted Plaintiff and asked for help reaching the Guadalupe County Attorney's Office because she wanted her account heard and believed officials were not responding to her directly. Plaintiff's involvement arose from S.J.K.'s request for help, not from any effort to invent or reshape her account as phone and text records show. *(See Exhibit E)*

**37.** On March 10, 2025, Plaintiff participated in recording a video statement at S.J.K.'s request. At the beginning, Plaintiff asked whether she was being coerced or forced and whether she was acting on her own free will. S.J.K. confirmed she was acting freely. In the video, she again stated that Jamie was not involved, that Michael Walker harmed her, and that Jamie had been abused.

**38.** On March 12, 2025, Plaintiff participated in a second video statement concerning Jamie's bond hearing. Plaintiff directly asked whether S.J.K. was being persuaded, forced, or coerced. She answered no and confirmed she was acting on her own free will. Nothing in those recordings reflects Plaintiff threatening, bribing, offering a benefit, or instructing S.J.K. to lie.

**39.** On March 15, 2025, S.J.K. executed a sworn affidavit. She affirmed that her statements were made freely and voluntarily, without coercion, duress, or promise of benefit. She certified the accuracy of the March 10 and March 12 video and again stated that Jamie was not involved. Plaintiff alleges that this affidavit was provided to the County Attorney's Office and placed into the related court record before the April 7 warrant.

**40.** The March 15 affidavit also placed Reamer's own conduct at issue. S.J.K. stated under oath that she had repeatedly told the Sheriff's Office, including Reamer, that Jamie was not involved, and was also a victim. S.J.K. then stated that Reamer refused to believe her and attempted to convince her otherwise. Plaintiff alleges the affidavit was filed and served on Assistant County Attorney Jessica Johnson on March 31st, 2025. Seven days later, Reamer accused Plaintiff of influencing S.J.K. while omitting that S.J.K. had accused Reamer herself of trying to redirect the same account. *(See Exhibit C)*

**41.** On March 19, 2025, Plaintiff and S.J.K. called the Guadalupe County Attorney's Office. During that call, a victim-assistance representative stated that the last recorded communication with S.J.K. was October 30, 2024. Plaintiff alleges Reamer materially misrepresented this point in her arrest-warrant affidavit by portraying Plaintiff as the source of the "no contact" claim, even though the recording Reamer claimed to have received showed the information came from the County Attorney's Office itself.

**42**. Reamer also mischaracterized the contact pattern. The communications available to officials showed S.J.K. repeatedly calling and texting Plaintiff, often urgently asking him to call, asking for help, and expressing that she wanted her story heard. The issue was not Plaintiff pursuing S.J.K. to manufacture testimony; it was S.J.K. seeking help from a trusted family advocate after she reported that officials were not communicating with her directly. *(See Exhibit E)*

12

**43.** On March 20, 2025, S.J.K. left multiple voicemails for County Attorney personnel asking to speak with officials, stating that she had not been contacted, and repeating that Jamie was innocent. These attempts were consistent with Plaintiff's position that S.J.K. wanted access to officials, not that Plaintiff was forcing her to say anything.

**44.** Plaintiff also submitted court-filed communications and accommodation requests in March 2025. He identified himself as S.J.K. chosen advocate, sought a neutral support person and court appointed guardian ad litem, requested simplified communication and other ADA-related accommodations, and asked that S.J.K. be allowed meaningful access to the legal process. These filings made Plaintiff's role public, court-directed, and transparent. No reasonable officer would treat Plaintiff's request just a few weeks prior for a court-appointed, neutral Guardian ad Litem as evidence of tampering. That request pointed in the opposite direction: Plaintiff was asking for neutral court protection for a vulnerable witness, not attempting to control, pressure, or shape her testimony.

**45.** Plaintiff also expressly disclaimed any intent to act as counsel, interfere with the legal process, or represent any party. In his communications, Plaintiff stated in substance that he was not an attorney, was not offering legal advice, was acting only as a concerned family member and citizen, and was seeking to ensure that truth, justice, and S.J.K.'s constitutional right to be heard were protected. That disclaimer was material to intent. A reasonable officer evaluating witness tampering should have recognized that Plaintiff was disclosing an advocacy role and attempting to avoid legal interference, not concealing a corrupt scheme.

**46.** Reamer's warrant affidavit acknowledged that she received and relied on materials routed through the Guadalupe County Attorney's Office between March 17, 2025, and April 5, 2025, including videos, transcripts, recorded phone calls, and related materials. She also stated that she

viewed at least one "FaceTime video" involving Plaintiff and S.J.K. Having used those materials to seek a first-degree felony warrant, Reamer could not fairly present selected portions while omitting the parts showing S.J.K.'s voluntariness, prior consistency, access-seeking, Plaintiff's disability-related advocacy, and the absence of coercion.

**47.** The affidavit identified no specific statement by Plaintiff that constituted witness tampering. It quoted no words directing S.J.K. to lie, cited no timestamp where Plaintiff allegedly coerced her, and identified no threat, bribe, benefit, promise, instruction, or other act designed to alter testimony. Instead, Reamer used broad labels such as "coerce" and "influence" while withholding the actual recorded words and context needed to test those labels.

**48.** This was not a technical failure to attach every exhibit. The recordings and transcripts were the best evidence of what Plaintiff actually said. By invoking those materials as proof of coercion while omitting the portions showing voluntariness, open-ended questioning, S.J.K.'s own request for help, and Plaintiff's advocacy role, Reamer gave the magistrate her conclusion instead of the facts needed for an independent probable-cause determination.

**49.** A reasonably trained investigator would understand that a first-degree felony warrant based on recorded advocacy communications must identify the actual statement or conduct that satisfies the offense. The Texas witness-tampering statute required facts showing coercion, threat, benefit, bribery, or an effort to cause knowingly false testimony. Reamer did not provide those facts. She substituted legal conclusions for statutory elements, preventing the magistrate from independently determining whether probable cause existed.

**E. Allegations that Cody and Andrea interfered with S.J.K.'s access to officials**

**50.** Before the April 7 warrant, county officials also had notice of facts suggesting that Cody and Andrea - not Plaintiff - may have been interfering with S.J.K.'s ability to communicate freely

with the court and prosecutors. In a March 19, 2025 recorded statement, S.J.K. stated that she had not spoken with any advocate, that Cody and Andrea would not allow her to contact anyone, that her mail from the court was opened or withheld, and that Andrea allegedly pretended to be S.J.K. on the phone.

51. Plaintiff further alleges that S.J.K. reported or attempted to report these concerns to Ford County authorities and that Plaintiff forwarded or described these concerns to Guadalupe County officials. These facts were material because they pointed away from Plaintiff as a witness tamperer and toward a different concern: S.J.K. was being isolated from the legal process by the same household and witness network the County later relied upon.

52. A neutral investigation would have examined whether Cody or Andrea were controlling S.J.K.'s communications, opening or withholding court mail, impersonating her, or shaping her statements. Instead, officials treated Plaintiff's efforts to help S.J.K. reach authorities as criminal while failing to investigate the competing allegations that others were blocking her access to authorities. Cody self-incriminated in a recorded call that S.J.K. never received court mail.

53. Plaintiff further alleges that no meaningful investigation was opened into S.J.K.'s competing allegations of interference, mail control, impersonation, or renewed exploitation before the County used the witness-tampering statute against Plaintiff. This selective silence mattered. The County treated Plaintiff's efforts to help S.J.K. speak to officials as criminal, while ignoring evidence that others were restricting her ability to speak to officials at all.

**F. The April 1 mandated report was the trigger and motive** *(See Exhibit B)*

54. On April 1, 2025, Plaintiff submitted a mandated report documenting renewed exploitation of S.J.K. while she was in Kansas and under Cody's care. Plaintiff reported concerns involving Jesse Ross Cole, drug activity, sexual exploitation, and a new pregnancy. The report was

15

supported by Cody's own recorded statements acknowledging that Jesse had moved in, that Jesse was using S.J.K. for sex, that Cody had found drugs, and that S.J.K. might be pregnant.

55. The April 1 report followed S.J.K.'s reports that Cody and Andrea limited her access to officials, opened or withheld mail, and allegedly allowed Andrea to impersonate her. It also followed Cody's recorded statements undermining his reliability, including when Plaintiff asked whether S.J.K. ever received court notices in the mail and Cody replied that she never received court mail, which Plaintiff alleges incriminated Cody because court records show notices existed but were not reaching S.J.K. Cody also suggested County Attorney pressure, admitted lack of firsthand knowledge, and Plaintiff urged S.J.K.'s firsthand testimony and Cody's honesty. Those facts required investigation of safety, exploitation, and access interference; instead, felony warrants followed against Plaintiff and his disabled father.

56. Plaintiff requested confidentiality because he feared retaliation if the people implicated learned he was the reporter. Plaintiff alleges that, instead of investigating the renewed exploitation he reported, officials moved quickly to arrest him. Six days later, Reamer sought the warrant for Plaintiff's arrest on a first-degree felony witness-tampering charge.

57. The April 1 report threatened the same defense-connected narrative that had begun generating accusations against Plaintiff and his family. Investigating the report would have required officials to scrutinize Cody's credibility, Cody's home environment, Cody's alleged pressure on S.J.K., Jesse Ross Cole, the renewed pregnancy, and the comparative issues relevant to Michael Walker's sexual-assault exposure. Instead, the County shifted focus from the reported exploitation to felony warrants against the reporter and his family.

58. The April 1 report also undercut any claim that Plaintiff's communications were secretly corrupt. The report was formal, disclosed, and made pursuant to mandated-reporting obligations.

It identified danger, requested protection, and sought confidentiality because Plaintiff feared retaliation. The report therefore gave Reamer a reason to consider Plaintiff's communications as protected reporting and disability advocacy. Omitting the report allowed the affidavit to make Plaintiff appear like an aggressor rather than the reporter of a current safety concern.

**G. The April 7 warrant, no exigency, selective communication, and unusual thinness**

59. Plaintiff alleges that no one interviewed him, no one meaningfully re-interviewed S.J.K. about whether Plaintiff coerced her, no one interviewed James Louis Roden Sr., no one verified the forgery allegation with the notary or mailing records, no one reconciled Cody's contradictions, and no one investigated the April 1 mandated report before seeking the warrant.

60. There was no emergency, no hearing at which S.J.K. was scheduled to testify, and no imminent safety threat requiring Reamer to bypass basic investigation before seeking a first-degree felony warrant. S.J.K. lived more than 700 miles from Plaintiff. Plaintiff's communications were open and documented. The affidavit did not identify any threat, bribe, violence, instruction to lie, or immediate witness danger. There was time to ask the two central witnesses - Plaintiff and S.J.K. - whether coercion occurred.

61. The speed of the April 7 warrant contrasted sharply with the County's earlier handling of reports concerning S.J.K.'s abuse. Plaintiff alleges that when he first reported S.J.K.'s sexual abuse and disability-related danger in January 2024, the matter was delayed, minimized, or repeatedly shelved despite danger to S.J.K. By contrast, after Plaintiff filed a report implicating Cody's environment and threatening the credibility of a defense-aligned witness, Reamer moved with unusual speed to seek a first-degree felony warrant against Plaintiff.

62. County officials also applied selective communication and investigative treatment. They communicated with Cody, coordinated subpoena logistics, discussed travel arrangements, and

received or shared case-related information through him even though Plaintiff had warned officials about Cody's credibility. In a recorded March 2025 call, Cody described discussions about flights, Uber arrangements, missed work, and the threat of a $500 fine and jail time if he did not appear. Cody also said he learned subpoena information from Ileen Rangel, Jessica Johnson, and Michael Walker's attorney while at the same time the County refusing any accommodation for Shelby to testify.

63. By contrast, before seeking first-degree felony warrants, Reamer and county officials did not interview Plaintiff, James Louis Roden Sr., or S.J.K. about alleged coercion. Plaintiff was a twenty-year educator and mandated reporter; Dolores Jane Roden was a retired special-education teacher; Kimberly Kennedy was a minister; and James Sr. was a medically limited, wheelchair-dependent Army veteran with cancer. Cody's contradictory accusations were treated as warrant-ready while the accused family received no pre-warrant interview.

64. The disparity was material because the alleged offense turned on communications, intent, and voluntariness. A neutral investigation would have asked S.J.K. whether Plaintiff coerced her, asked Plaintiff why he acted, and asked James Louis Roden Sr. whether he had the ability or intent to do what Cody alleged. Instead, officials communicated with Cody when his statements supported the preferred narrative and avoided witnesses whose answers would have tested or defeated the warrant theory.

65. Plaintiff alleges that the April 7 tampering affidavit was unusually thin compared with Reamer's own investigative practice in the same broader case. In earlier affidavits and reports involving Jamie Walker, Reamer used detailed chronologies, named sources, interviews, records reviewed, APS communications, witness statements, and specific investigative steps; she later testified that she had a history of writing long reports, and defense counsel acknowledged the

18

same. Yet the affidavit against Plaintiff identified no interview of Plaintiff, no contemporaneous coercion interview of S.J.K., no fair accounting of the March videos, sworn affidavit, County Attorney call, voicemails, ADA filings, April 1 report, Cody credibility warnings, defense-connected source, or specific tampering act. Given Reamer's supervisory role, 17 years of experience, more than 3,000 TCOLE training hours, master-level credential, and oversight of other investigators, Plaintiff alleges this unusual thinness supports knowing or reckless omission, not mere negligence.

**H. Continuing seizure and continuing harm**

**66.** The warrant issued, Plaintiff was arrested, booked, and subjected to bond conditions and ongoing criminal process. The charge threatened his liberty, damaged his reputation, teaching career, and ability to support his family. Plaintiff remained under the pressure and restraint of a first-degree felony prosecution until the charge was formally rejected or declined on or about July 18, 2025, without conviction, plea, deferred adjudication, pretrial diversion, indictment, or neutral probable-cause review.

**67.** The harm continued after declination. The arrest remains visible in background systems as a first-degree felony witness-tampering arrest. The DPS criminal-history record lists the arrest offense and a custody-style arrest disposition as "HELD" that can reasonably appear unresolved to employment screeners, while separately showing no court data is available. Plaintiff alleges that this record has damaged his career, employment opportunities, reputation, finances, emotional health, and professional licensing status. Plaintiff has been unable to secure meaningful employment for more than a year because he cannot get past background-check screenings, and this employment barrier continues as of this filing. Plaintiff further alleges that his Texas educator certificate remains under investigation by TEA due to backlog and lack of

resources, which TEA Investigator Joseph Lisciandri stated can cause investigations to last for years. As a result, Plaintiff's professional opportunities, income, retirement contributions, and future retirement benefits continue to be severely harmed.

## V. MATERIAL FALSEHOODS, OMISSIONS, AND THE CORRECTED AFFIDAVIT

**68.** Plaintiff incorporates the preceding facts and identifies the following material falsehoods, omissions, and misleading presentations. Each omission was material because it bore directly on whether Plaintiff coerced S.J.K., corruptly influenced testimony, or committed any act satisfying first-degree felony witness tampering. *(See Exhibit A)*

**69.** First, the affidavit omitted the defense-connected origin and nature of the witness-tampering allegation. Plaintiff alleges that Michael Allen Walker's defense team urged or persuaded Guadalupe County Attorney personnel to pursue witness-tampering charges, as later disclosed in court testimony and revealed in the bond condition listing Cody as a victim. The underlying accusation was not merely that Plaintiff had improper contact with a witness, but that Plaintiff had allegedly forged Cody Koelle's November 2024 sworn affidavit and signature. Yet Reamer did not disclose that serious forgery allegation to the magistrate, did not explain its defense-connected source, and did not identify any independent investigation verifying it. Instead, the affidavit shifted the focus away from the forgery accusation and repackaged Plaintiff's disclosed advocacy for S.J.K. as criminal influence. That omission was material because a magistrate needed to know that the accusation arose from an adversarial source with a direct motive to discredit S.J.K.'s account and anyone helping her access the legal process.

**70.** The affidavit also framed repeated contact as Plaintiff's coercive influence while omitting that S.J.K. repeatedly initiated calls, texts, and voicemails seeking Plaintiff's help and trying to have her own account heard. Those preserved communications along with easily accessible

phone records were material because they showed access-seeking by S.J.K., not control by Plaintiff. *(See Exhibit E)*

**71.** The affidavit omitted the April 4, 2024 recorded interview Reamer personally conducted, in which S.J.K. had already given the same core account long before the alleged March 2025 tampering. This concealed that S.J.K.'s March 2025 statements did not originate with Plaintiff.

**72.** The affidavit omitted the March 10 and March 12 videos in which Plaintiff directly asked about coercion and S.J.K. denied being coerced, forced, bribed, or persuaded. It also omitted S.J.K.'s March 15, 2025 notarized sworn affidavit stating that her statements were made freely and voluntarily, without coercion, duress, or promise of benefit. A magistrate evaluating witness tampering needed to know that the alleged witness had repeatedly and formally affirmed voluntariness before the warrant.

**73.** The affidavit omitted Reamer's personal conflict and bias. Reamer did not tell the magistrate that S.J.K. had recently signed a sworn affidavit accusing Reamer of refusing to believe her repeated account and attempting to convince her otherwise. That omission mattered because Reamer was asking the magistrate to believe Plaintiff had improperly influenced S.J.K.'s account while concealing that the alleged victim had accused Reamer herself of trying to redirect that same account.

**74.** The affidavit omitted that Plaintiff's disability-related statements were grounded in a professional psychological evaluation already provided to officials. It did not disclose that Dr. Sanders's report identified the evaluator, documented significant limitations, and could be verified directly. Nor did it disclose that suspicion about the report rested on the false premise that the provider letterhead used the Roden name, when Plaintiff alleges no version did so and the correction concerned S.J.K.'s spelling of her last name.

**75.** The affidavit omitted Plaintiff's disclosed advocacy role, ADA accommodation requests, court-directed filings, and his request just weeks earlier for a court-appointed, neutral Guardian ad Litem. Those facts were not evidence of tampering; they were evidence to the contrary because they showed Plaintiff was seeking independent court protection for a vulnerable person, not private control over her testimony.

**76.** The affidavit omitted the exculpatory contents of the very recordings, videos, transcripts, and related documents Reamer claimed to have received and reviewed. Reamer invoked those materials as evidence of coercion while withholding the portions showing S.J.K.'s voluntariness, prior consistency, direct access-seeking, Plaintiff's open-ended questioning, Plaintiff's lack of knowledge of any contrary account by S.J.K., his insistence that S.J.K. be heard directly.

**77.** The affidavit identified no specific tampering act. Although Reamer claimed to have Plaintiff's recordings and communications, she quoted no statement in which Plaintiff threatened S.J.K. or Cody, offered a benefit, promised anything, instructed anyone to lie, or directed anyone to change testimony. She identified no timestamp and no specific words satisfying the charged offense. Without a quote, timestamp, threat, benefit, promise, or instruction to lie, the affidavit required the magistrate to accept Reamer's conclusion rather than independently decide whether the facts fit the crime.

**78.** The affidavit omitted the April 1, 2025 mandated report. That report showed Plaintiff had just engaged in protected reporting concerning renewed exploitation, Cody's environment, Jesse Ross Cole, drug activity, possible witness interference, and S.J.K.'s second pregnancy. Omitting it concealed the retaliatory context and the reason Cody's accusations required skepticism.

**79.** The affidavit omitted Cody's credibility problems, the defense-connected source of the accusation, and the prosecutor-routed nature of the materials. Plaintiff alleges officials had notice

of Cody's changing statements, law-enforcement-related misconduct, lack of firsthand knowledge, contradiction of his later forgery narrative, and a recording in which Cody described County Attorney pressure. Reamer credited Cody's changed accusations to support three felony warrants while omitting S.J.K.'s sworn affidavits and videos showing voluntariness, prior consistency, and no coercion. Those facts directly affected probable cause and showed selective treatment, especially because Reamer relied on Cody-related affidavits in the related warrants against James Sr. and Jamie.

80. The affidavit omitted competing evidence that others, not Plaintiff, were interfering with S.J.K.'s access to the legal process. County officials had notice of allegations that Cody and Andrea restricted S.J.K.'s contact, opened or withheld court mail, allowed or participated in communications that did not reflect S.J.K.'s own voice, and promoted the "planned pregnancy" narrative. Plaintiff further alleges officials had notice that S.J.K. was told her mother would be free if she agreed the pregnancy was planned. Those facts pointed toward possible influence by defense-connected actors and away from Plaintiff.

81. The affidavit omitted the absence of basic investigation. Reamer did not tell the magistrate that she had not interviewed Plaintiff, had not meaningfully re-interviewed S.J.K. on the coercion question, had not interviewed James Louis Roden Sr., had not reconciled Cody's changing statements, had not verified the disputed forgery theory, and had not tested the accusation against the County's contrary records.

82. The affidavit omitted the absence of exigency and the selective nature of the investigation. S.J.K. lived more than 700 miles from Plaintiff; Plaintiff's communications were recorded or disclosed; the affidavit identified no immediate threat, bribe, violence, instruction to lie, or witness danger; and neither Reamer nor the County Attorney's Office had warned Plaintiff of

23

any contrary S.J.K. account before using his disclosed advocacy materials to support a first-degree felony warrant. A magistrate needed to know that the affiant relied on a disputed witness while avoiding the witnesses and records most capable of confirming or defeating the accusation.

83. A corrected affidavit would show protected reporting and advocacy, not probable cause. It would disclose that S.J.K. had already given Reamer the same core account, denied coercion on video and under oath, sought Plaintiff's help, and that Plaintiff acted openly as a mandated reporter and ADA advocate. It would also show that Reamer had exculpatory recordings, no specific tampering act, no exigency, no interview of Plaintiff or S.J.K., no notice to Plaintiff of any contrary S.J.K. account, and no reliable basis to credit Cody's defense-connected accusations without verification. Those corrected facts defeat probable cause because they show voluntariness, prior consistency, access-seeking, protected advocacy, and a failure to investigate—not witness tampering.

84. Thus, Reamer's affidavit had two independent Fourth Amendment defects. First, on its face, it identified no specific act satisfying felony witness tampering: no threat, bribe, benefit, instruction to lie, timestamp, or quoted coercive statement. Second, when the affidavit is corrected to account for at least fifteen core material omissions and two affirmative false or misleading characterizations, it would show S.J.K.'s prior consistent account, her repeated coercion denials, her own access-seeking, Plaintiff's open mandated reporting and ADA advocacy, and multiple reasons Cody's accusations required skepticism. Under *Malley* or *Franks*, there was no probable cause or arguable probable cause.

## VI. COUNT I - FOURTH AMENDMENT UNLAWFUL SEIZURE / FALSE ARREST AGAINST REAMER

85. Plaintiff incorporates the preceding paragraphs.

**86.** The Fourth Amendment prohibits unreasonable seizures. A warrant does not shield an officer who knowingly or recklessly presents a materially false or misleading affidavit, nor does it shield an officer who submits a warrant application so lacking in facts that a reasonably well-trained officer would know probable cause is absent. The law was clearly established before April 2025 that an affiant may not taint a magistrate's review through material falsehoods, omissions, or conclusory allegations unsupported by facts.*2*

**87.** Reamer caused Plaintiff's arrest by swearing the April 7 affidavit while knowing or recklessly disregarding facts that undermined probable cause: S.J.K.'s prior consistent statement, coercion denials, sworn affidavit, County Attorney call and voicemails, Plaintiff's disclaimers and ADA advocacy, Dr. Sanders's verifiable disability evidence, the false premise used to question that report, the April 1 mandated report, Cody's contradictions and alleged pressure, the defense-connected source, S.J.K.'s allegations against Cody and Andrea, no exigency, no interviews, no specific tampering act, and Reamer's personal conflict.

**88**. Plaintiff pleads two independent bases for denying qualified immunity. The first is facial insufficiency under Malley: even before adding omitted facts, the affidavit did not identify the words or conduct that allegedly constituted first-degree felony witness tampering. The second is a corrected-affidavit theory under Franks: once the omitted facts are restored, the affidavit affirmatively shows no probable cause because S.J.K.'s account predated Plaintiff, S.J.K. denied

---

**2***Franks v. Delaware*, 438 U.S. 154, 155–56, 171–72 (1978); *Malley v. Briggs*, 475 U.S. 335, 344–45 (1986); *Winfrey v. Rogers*, 901 F.3d 483, 494–97 (5th Cir. 2018); *Melton v. Phillips*, 875 F.3d 256, 262–64 (5th Cir. 2017) (en banc); *Terwilliger v. Reyna*, 4 F.4th 270, 281–83 (5th Cir. 2021); *Hughes v. Garcia*, 100 F.4th 611, 619–22 (5th Cir. 2024). *Hughes* is especially instructive because the Fifth Circuit affirmed denial of qualified immunity where officers allegedly used material misstatements and omissions in warrant materials to transform a Good Samaritan's lawful report and citizen's arrest into a felony impersonation charge.

coercion, Plaintiff acted openly, and Cody's accusations were credibility-impaired and defense-connected.

89. This is the same warrant-affidavit problem the Fifth Circuit identified in Hughes: the affiant did not merely choose one permissible interpretation of disputed facts; the affiant allegedly manufactured a more credible criminal narrative by leaving out the objective facts that made the reporter's conduct lawful. Here, the omitted facts did not create a close call. They removed the offense.

90. No reasonable officer could believe probable cause existed after fairly accounting for those facts. A trained investigator would know that a first-degree felony witness-tampering warrant required more than conclusory labels when the available recordings were exculpatory and contained no threat, bribe, benefit, timestamp, instruction to lie, or specific tampering act. Encouraging truthfulness, urging the alleged victim's firsthand testimony do not establish probable cause for felony witness tampering.

91. The magistrate's approval does not cure the violation because Reamer allegedly tainted the independent intermediary's review.*3* Reamer was the affiant who selected the facts, invoked the recordings, omitted their exculpatory content, failed to identify any specific tampering act, and concealed the source and lack of independent investigation. The magistrate could not perform a neutral probable-cause review when the affiant withheld the facts most necessary to evaluate whether Plaintiff had threatened, bribed, coerced, instructed anyone to lie, or instead encouraged truthfulness and firsthand testimony.

92. Qualified immunity fails because the right was clearly established at both general and particularized levels. Every reasonable officer knew she could not obtain a warrant through

---

*3* Hughes v. Garcia, 100 F.4th 611 (5th Cir. 2024); Terwilliger v. Reyna, 4 F.4th 270, 281 (5th Cir. 2021); Winfrey v. Rogers, 901 F.3d 483 (5th Cir. 2018).

material falsehoods or omissions or seek a warrant a reasonably well-trained officer would know was unsupported. No reasonable officer could seek a first-degree felony witness-tampering warrant while relying on recordings but identifying no threat, bribe, benefit, instruction to lie, timestamp, or quote, and omitting the alleged victim's prior consistent account, sworn voluntariness, and denial of coercion.

93. As a direct and proximate result, Plaintiff was arrested, booked, subjected to felony bond conditions, and injured in his liberty, reputation, finances, employment, emotional health, and professional standing.

## VII. COUNT II - FOURTH AMENDMENT SEIZURE THROUGH CRIMINAL PROCESS AGAINST REAMER

94. Plaintiff incorporates the preceding paragraphs.

95. The Fourth Amendment is violated when an officer causes criminal process to issue without probable cause and the plaintiff remains seized through that process. A favorable termination does not require an affirmative declaration of innocence; it is sufficient that the prosecution ended without conviction.*4*

96. Reamer initiated criminal process against Plaintiff by submitting the April 7 warrant affidavit. Plaintiff remained seized through arrest, bond conditions, court supervision, and the ongoing threat of first-degree felony prosecution until the charge was rejected on or about July 18, 2025.

97. The criminal process lacked probable cause because the affidavit omitted facts that defeated the tampering theory, failed to identify any particularized tampering act, and concealed the defense-connected, prosecutor-routed, and unverified nature of the accusation. The prosecution

4 Manuel v. City of Joliet, 580 U.S. 357 (2017); Thompson v. Clark, 596 U.S. 36 (2022); Chiaverini v. City of Napoleon, 602 U.S. 556 (2024).

ended in Plaintiff's favor when the prosecutor rejected the charge without conviction, plea, deferred adjudication, pretrial diversion, indictment, or judicial finding against him.

98. Plaintiff alleges the charges functioned as punishment and restraint rather than good-faith prosecution. After Plaintiff, James Louis Roden Sr., and Jamie Walker were jailed, investigators still refused to take their statements or meaningfully interview S.J.K. about coercion. The charges were never presented to a grand jury and were declined as judicial probable-cause review became imminent, supporting the inference that the felony process itself was the punishment.

## VIII. COUNT III - FIRST AMENDMENT RETALIATION AGAINST REAMER

99. Plaintiff incorporates the preceding paragraphs.

100. Plaintiff engaged in protected First Amendment activity by reporting suspected abuse and exploitation, submitting exculpatory evidence, petitioning the court and County officials for S.J.K. to be heard directly, reporting investigative and prosecutorial misconduct, objecting to retaliatory subpoena practices, and filing the April 1 mandated report.

101. Plaintiff also elevated S.J.K.'s sworn accusation that Reamer had refused to believe her and attempted to convince her to change her account. Within weeks of those formal complaints, and six days after the mandated report, Reamer sought Plaintiff's arrest on a first-degree felony witness-tampering charge. Retaliatory causation is supported by timing, use, and selective treatment.

102. Lack of probable cause is Plaintiff's primary basis for this claim. Alternatively, even if arguable probable cause existed, retaliation is supported by selective enforcement: Kimberly Kennedy, a similarly situated advocate who reported S.J.K.'s account of Jamie's innocence to County Attorneys on May 29th, 2025 via sworn affidavit, was not arrested; Cody and Andrea

28

were not investigated with comparable urgency despite interference allegations; and first-degree felony process was used against Plaintiff only after his court filings, ADA advocacy, and April 1 mandated report.**5**

## IX. COUNT IV - ADA TITLE V AND SECTION 504 RETALIATION AGAINST GUADALUPE COUNTY

**103.** Plaintiff incorporates the preceding paragraphs.

**104.** On information and belief, Guadalupe County receives federal financial assistance for law-enforcement, victim-services, court-access, emergency-management, or related public programs, making it subject to Section 504.

**105.** Title V of the ADA protects **"any individual"** from retaliation, coercion, intimidation, threats, or interference because that individual opposed disability-based exclusion or aided another person in exercising rights protected by the ADA. Plaintiff pleads both retaliation under 42 U.S.C. § 12203(a) and interference/coercion under § 12203(b), together with Section 504 retaliation and interference based on the County's receipt of federal funds and its operation of public programs.**6**

**106.** Plaintiff engaged in protected disability-related activity by informing county officials that S.J.K. had significant intellectual and developmental limitations, requesting accommodations, seeking simplified communication and additional time, asking for a guardian ad litem,

---

**5**Hartman v. Moore, 547 U.S. 250 (2006); Nieves v. Bartlett, 587 U.S. 391 (2019); Gonzalez v. Trevino, 602 U.S. 653 (2024). Plaintiff primarily pleads lack of probable cause. The selective-Enforcement allegations are also pleaded as objective evidence of unusual enforcement and retaliatory motive.

**6**42 U.S.C. § 12203(a)-(b); 29 U.S.C. § 794; Tennessee v. Lane, 541 U.S. 509 (2004); Delano-Pyle v. Victoria County, 302 F.3d 567 (5th Cir. 2002); Block v. Texas Board of Law Examiners, 952 F.3d 613 (5th Cir. 2020).

identifying himself as S.J.K.'s advocate, and helping S.J.K. obtain meaningful access to prosecutors and the court.

107. Plaintiff's protected disability-related activity also included advocacy for Jamie Walker, a documented intellectually disabled domestic-violence victim whose ability to understand, communicate, and protect herself was directly affected by her disability and trauma. Plaintiff's communications asked officials to consider the disability-related vulnerabilities of both S.J.K. and Jamie in the criminal process. Criminalizing those communications penalized Plaintiff for aiding disabled persons in securing meaningful access to government proceedings.

108. Guadalupe County, through its actors and practices, used the same disability-related advocacy communications as part of the criminal narrative against Plaintiff. The County did not treat Plaintiff's accommodation efforts as protected efforts to secure meaningful access. Instead, those communications were stripped of their context and repurposed as evidence of supposed witness tampering in a 1st degree felony arrest warrant affidavit seeking up to 99 years in prison.

109. The County's treatment of the Dr. Sanders report further supports retaliation and interference. Plaintiff aided and encouraged S.J.K. in seeking meaningful access and protection based on professional disability evidence. Rather than verify the report, provide appropriate accommodations, or identify an ADA-informed process, county actors allegedly allowed disability-related advocacy to be reframed as evidence of manipulation. Plaintiff alleges that this response interfered with and retaliated against protected ADA-related assistance.

110. The causal connection is shown by timing and use. Plaintiff's ADA-related filings and advocacy were made in March 2025, and his April 1 mandated report concerned renewed exploitation of an IDD adult. Within days, Reamer sought the warrant, and the warrant narrative

drew on the communications through which Plaintiff had tried to secure access and protection for S.J.K.

**111.** Plaintiff does not sue as S.J.K. and does not assert an independent disability-discrimination claim on his own behalf. He sues as an individual retaliated against for aiding and encouraging S.J.K.'s exercise of disability-related rights and access to government processes. As a direct and proximate result, Plaintiff suffered loss of liberty, reputational injury, emotional distress, legal expense, career damage, and financial harm.

**112**. Plaintiff further alleges that the County's conduct chilled the very access protections federal disability law is designed to secure. The County allegedly used Plaintiff's requests for simplified communication, support-person assistance, direct contact with S.J.K., and disability-aware procedures as evidence of criminal influence. That retaliation would deter a reasonable family advocate, mandated reporter, teacher, or minister from assisting an intellectually disabled victim in seeking meaningful access to prosecutors, law enforcement, and the court.

## X. COUNT V - MUNICIPAL LIABILITY AGAINST GUADALUPE COUNTY *(Exhibit F)*

**113.** Plaintiff incorporates the preceding paragraphs.

**114.** Guadalupe County is liable under § 1983 when an official policy, custom, practice, deliberate indifference, or ratification is the moving force behind a constitutional violation. In Texas, the sheriff is the county's final policymaker for law-enforcement functions, including the supervision and practices of sheriff personnel preparing warrant affidavits.[7]

---

[7]Monell v. Department of Social Services, 436 U.S. 658 (1978); Pembaur v. City of Cincinnati, 475 U.S. 469 (1986); City of Canton v. Harris, 489 U.S. 378 (1989); City of St. Louis v. Praprotnik, 485 U.S. 112 (1988). The Fifth Circuit recognizes that, in Texas, a county sheriff is a final policymaker for law-enforcement matters. Turner v. Upton County, 915 F.2d 133 (5th Cir. 1990); Colle v. Brazos County, 981 F.2d 237 (5th Cir. 1993).

115. Plaintiff does not ask the Court to impose municipal liability merely because prosecutors made charging decisions. Plaintiff alleges a sheriff-side law-enforcement custom and failure of supervision: sheriff personnel accepted prosecutor-curated and defense-connected accusation streams, failed to conduct independent probable-cause review, and converted those accusation streams into felony warrant affidavits without basic verification or fair disclosure to the magistrate.

116. Plaintiff alleges that the moving force here was a County practice in which the County Attorney's Office selected, curated, and routed accusation materials while sheriff personnel failed to independently investigate before seeking felony warrants. Reamer did not act as a neutral factfinder testing probable cause. She adopted a prosecutor-routed, defense-connected narrative, omitted contrary evidence already in the County's possession, and used the Sheriff's warrant authority to convert that narrative into first-degree felony criminal process.

117. After arrest, the lack of investigation continued. Plaintiff, James Louis Roden Sr., and Jamie Walker were jailed on first-degree felony tampering charges, yet when Plaintiff asked to speak with an investigator, jail personnel stated that no investigator was willing to speak with any of them. No investigator later sought statements from the accused or S.J.K. about the alleged tampering. The pattern supports a reasonable inference that Defendants maintained the charges for leverage, restraint, and retaliation for advocacy rather than a good-faith prosecution.

118. This practice was not limited to Plaintiff's warrant. Plaintiff alleges that Reamer used the same prosecutor-routed, defense-connected accusation stream to support three coordinated first-degree felony witness-tampering warrants against Plaintiff, James Louis Roden Sr., and Jamie Renee Walker. In the related affidavits, Reamer acknowledged receiving documentation through the County Attorney's Office originating with Michael Walker's attorneys and Cody/Andrea materials, yet sheriff personnel did not independently interview the central witnesses, verify

32

Cody's forgery claim, test Cody's credibility, or compare the accusations against the County's contrary records. Plaintiff pleads this repeated warrant process as evidence of sheriff-side custom, failure of supervision, and ratification—not a one-off mistake.

119. The later handling of Dolores Jane Roden's sworn criminal complaint against Cody confirmed the same structural problem. That complaint was supported by notary verification, a notary log, recorded admissions, Cody's criminal-history information, and allegations of aggravated perjury and false reports. The Sheriff's Office records reflected that Reamer "reviewed" the complaint and forwarded a packet to the County Attorney's Office. The Sheriff's Office then stated that the County Attorney's Office - not the Sheriff's Office - would conduct the investigation into the criminal offense alleged which is selective investigative treatment.

120. The County's failure to assign a conflict-free investigator after S.J.K.'s sworn accusation against Reamer further supports municipal liability. County actors had notice that Reamer's own conduct had been placed at issue in a court-filed affidavit, yet Reamer remained the investigator-affiant and converted prosecutor-routed materials into a first-degree felony warrant. Plaintiff alleges that the failure to supervise, screen conflicts, or require independent probable-cause review was part of the County practice that caused his arrest.

121. The County's handling of Dr. Sanders's report also supports municipal liability. Plaintiff alleges that Guadalupe County lacked or failed to enforce policies requiring sheriff personnel to verify disability documentation, consult ADA coordination resources, provide disability-informed investigative procedures, and distinguish protected disability advocacy from criminal influence. The County's failure to verify Dr. Sanders's report while accepting prosecutor-routed and defense-connected accusations against Plaintiff was part of the same custom of selective investigation and sheriff abdication of independent probable-cause review.

**122.** Plaintiff repeats that the challenged municipal conduct is the Sheriff's Office practice, not protected prosecutorial advocacy: failure to independently verify probable cause; failure to train officers on Franks duties; failure to supervise warrant affidavits; and ratification of sheriff personnel acting as conduits for prosecutor-selected evidence. The practice was compounded by County ADA failures: when Plaintiff and others raised ADA/Section 504 access concerns, neither the Sheriff's Office nor County Attorney's Office verified relevant ADA/Section 504 training, identified a responsible ADA Coordinator when requested, or provided a meaningful grievance/accommodation process.

**123.** Guadalupe County also engaged in selective investigative treatment.[8] Cody's unverified accusations were treated as warrant-ready. But S.J.K.'s and Plaintiff's reports that Cody and Andrea restricted S.J.K.'s access to officials, opened or withheld court mail, allowed Andrea to impersonate her, and kept her in an environment of renewed exploitation were not investigated with comparable urgency.

**124.** Guadalupe County further failed to train or supervise sheriff personnel on Franks duties, fair disclosure of exculpatory facts to magistrates, verification of credibility-impaired witnesses, protection of mandated reporters, and ADA/Section 504 obligations for IDD victims, witnesses, complainants, and advocates. Those failures allowed protected accommodation requests and reporting to be repurposed as criminal influence.

**125.** County leadership received repeated written notice that the warrant process was defective, exculpatory evidence was omitted, Cody's credibility was contradicted, and protected reporting

---

[8]Selective investigative treatment is pleaded as evidence of retaliation, pretext, ratification, deliberate indifference, and municipal custom, not as a standalone selective-prosecution claim against prosecutors.

34

and ADA advocacy had been repurposed into criminal process. No corrective action followed. Plaintiff alleges ratification and deliberate indifference. *(See Exhibit F)*

126. The County's policy, custom, ratification, and deliberate indifference were the moving force behind Plaintiff's injuries because they allowed a defense-connected accusation stream to become three coordinated first-degree felony warrants without interviews, corroboration, source disclosure, or fair presentation of exculpatory evidence.

127. Had independent investigation, witness interviews, Cody verification, source disclosure, and fair presentation of the recordings occurred, the corrected affidavits would not have supported probable cause. Once may be a mistake. Twice may be a coincidence. Three times suggest a custom/practice.

## XI. DAMAGES AND PRAYER FOR RELIEF

128. As a direct and proximate result of Defendants' conduct, Plaintiff suffered loss of liberty, emotional distress, reputational injury, financial harm, legal expense, loss of employment and professional opportunity, harm to his teaching career, and continuing background-check consequences.

129. Plaintiff seeks compensatory damages, nominal damages, punitive damages against Reamer where allowed, declaratory relief that his constitutional rights were violated, equitable relief, pre- and post-judgment interest, costs, and all other relief available under federal law.

130. Plaintiff also seeks ADA and Section 504 compliance-related declaratory and equitable relief, including policy revision and training regarding accommodation requests, protected reporting, and advocacy for intellectually and developmentally disabled victims.

131. If counsel appears on Plaintiff's behalf, Plaintiff seeks attorney's fees and expenses to the extent permitted by law.

## XII. JURY DEMAND

132. Plaintiff demands a trial by jury on all issues so triable.

35

Respectfully submitted,

/s/ James Louis Roden Jr.
James Louis Roden Jr.,
Plaintiff, Pro Se
1005 Beaumont St, League City, TX 77573
(210) 482-0802 | jroden3@wgu.edu

# Certificate of Service

I certify that on May 4, 2026, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system. Notice of this filing will be sent through the CM/ECF system to all counsel of record who are registered users.

Respectfully submitted,

/s/ James Louis Roden Jr.
James Louis Roden Jr.
Plaintiff, Pro Se
1005 Beaumont St.
League City, Texas 77573
Phone: (210) 482-0802
Email: jroden3@wgu.edu

# Exhibit A - Arrest Warrant Excerpts and Core Probable-Cause Defect

All arrest warrants written and executed April 5th -7th

Source of tampering allegation: <mark>Michael Allen Walker Defense Team</mark>

James Louis Roden Jr. - April 7th, 2025

From 3/17/2025 to 4/5/2025, I have been receiving documentation from the Guadalupe County Attorney's Office that is from the Defendant. The Defendant has repeatedly

James Louis Roden Sr. - April 7th, 2025

From 3/17/2025, I have been receiving documentation <mark>from the Guadalupe County Attorney's Office that they had received from Michael Walker's attorneys.</mark> In the affidavit

Jamie Renee Walker - Saturday April 5th, 2025

On 3/17/2025, I obtained from the <mark>Guadalupe County Attorney's Office affidavits from</mark> Cody and Andrea Koelle that <mark>they had given to Michael Walker's attorneys.</mark> In the

1

**False Statement -1**

CASE to wit, coerce Shelby Jame Koelle, who was a witness in an official proceeding, namely Aggravated Sexual Assault, by means of repeatedly contacting Shelby and

**The objective carrier T-Mobile Plaintiff phone records establishes the following:**

 • <u>**Shelby Jane Koelle initiated approximately 165 incoming calls to Plaintiff**</u>

 • **Plaintiff initiated <u>only 2</u> outgoing calls to Shelby Jane Koelle during the entire period** between October 2024 - April 2025.

• <u>**Plaintiff ignored**</u> or did not answer approximately **145 of the incoming calls** initiated by Shelby Jane Koelle

• Plaintiff answered approximately 20 incoming calls from Shelby Jane Koelle

• Plaintiff returned approximately 35 calls, all in response to prior incoming calls initiated by Shelby Jane Koelle At no point do the records show Plaintiff engaging in persistent, unsolicited, or harassing contact toward Shelby Jane Koelle.

Shelby repeatedly contacted Plaintiff and easily accessible phone records proved it.

**False Conclusion and Omitted Facts - 2**

advising her to tell the prosecution, sign a waiver, and testify in court that her mother did not know she was being sexually assaulted by her stepfather and that her mother is innocent, with intent to influence Shelby to testify falsely in the official proceeding. And it

The warrant's intent theory collapses under its own logic. Reamer assumed that because Plaintiff helped S.J.K. communicate a statement favorable to Jamie, Plaintiff must have intended S.J.K. to testify falsely. But the affidavit never answered the essential question: how would Plaintiff know S.J.K.'s statement was false? Plaintiff did not witness the Seguin events. He had no access to secret law-enforcement theories. No official ever told him S.J.K. had given a different firsthand account. And the account S.J.K. gave Plaintiff was the same core account she had already given Reamer before Plaintiff's alleged influence. The videos show Plaintiff asking the exact questions an advocate should ask when he lacks firsthand knowledge: Are you being coerced? Are you being bribed? Are you being told what to say? S.J.K. answered no and later swore the same under oath. The forensic evaluation of Jamie gave Plaintiff additional reason to believe Jamie may also be a disabled victim of coercion and abuse. Reamer omitted that context

2

and turned a good-faith effort to verify voluntariness into an accusation of criminal intent. That is not probable cause. That is a conclusion built by removing the facts that disproved it.

**Proof from Court Filed and Court Appointed Forensic Evaluation**

Resolution Forensic and Consultation Services
John Delatorre, Psy.D.
Licensed Psychologist

**PSYCHOLOGICAL EVALUATION**

Police interview video of victim (Investigator Elaine Reamer), dated 4/4/2024, this video is of the investigator and the victim in the case. The victim stated she was threatened with physical violence by Michael Walker if she told police the two were having sex. The victim stated her mother was never involved in any sexual activity. The victim stated that Ms. Walker was afraid of Mr. Walker and that she never knew what was happening to her.

Police interview video of Jamie Walker (Investigator Elaine Reamer), dated 4/9/2024, this video is of the investigator and Ms. Walker. She outlined various instances of intimate partner violence. According to Ms. Walker, she learned the victim was pregnant and the father was her husband at the same time. She confronted her husband at that time. She stated that she was never threatened by her husband in an effort to continue to have a sexual assault to happen with the victim. She denied having sexual contact with both of them.

**Notice how GCSO suspended S.J.K. rape case and allowed the abuse to continue for months after I made the report in January 2024 but arrested me in days with no evidence with a 1st degree felony carrying up to 99 years in prison.**

Guadalupe County Sheriff's Office Incident/Offense Report (case number 24-02887), dated 5/21/2024, this reported indicated a 26-year-old woman became pregnant by her stepfather. The woman was diagnosed with intellectual disability and cannot give consent. The reported indicated a history of domestic violence in the home from the stepfather to the woman's mother, Ms. Walker. The case was initially suspended until officers received an APS report. It does not appear as though the victim in the case says Ms. Walker had sexual contact with her; however, emails received by the investigator appeared to indicate the possibility that all individuals were having sex with each other.

3

**SHIPLEY 2 (IQ SCREEN):** The Shipley-2 is intended for use with children and adults in any setting in which an estimate of cognitive functioning is needed, is a brief measure of cognitive functioning, and assesses crystallized abilities through the use of the Vocabulary Scale and assesses fluid cognitive abilities using the Abstraction Scale. The results can adequately determine overall cognitive ability for everyday applications despite the instrument's brevity.

Her composite standard score (estimated IQ) is 56 (Low), using the Abstraction subtest, and is 65 (Low) using the Block Patterns subtest. Her vocabulary scale score of 62 is in the Low range. This suggests she has extremely limited verbal ability and comprehension.

**Forensic Evidence Conclusion Report Court Filed March 31st, 2025 for Jamie Walker**

I.    **Recommendations in reference to performing the psychological examination identifying the following issues:**

*Are there any cognitive issues?*

> Yes, based on her history and current intellectual screener, there are significant concerns about her overall intellectual functioning.

*Are there any mental health issues?*

> Yes, these issues are related to both her current legal situation and her symptoms of PTSD. On their own, these issues would be debilitating, but when combined, especially within the context of the allegations she is facing, Ms. Walker is experiencing a tremendous amount of distress. Her limited cognitive functioning also impairs her ability to cope.

*What role did previous trauma play with respect to the allegations?*

> As the testing suggests, Ms. Walker appears to have been seriously manipulated and coerced by the men in her life. In particular, her most recent marriage appears to be marred with various influences that was used to convince her to engage in sexual behaviors she would not otherwise engage in. Her prior experience of intimate partner violence and limited coping resources influenced her into acquiescing to demands rather than advocating for herself. This is not uncommon in abuse survivors.

Reamer's theory also ignored that a court-filed forensic report, based in part on Reamer's own investigative materials, reflected the same core account Plaintiff was accused of causing. Dr. Delatorre's report summarized S.J.K.'s April 4, 2024 interview with Reamer, including that S.J.K. stated Jamie was not involved in sexual activity, that Jamie was afraid of Michael Walker, and that Jamie did not know what was happening. The same report documented Jamie's low intellectual functioning, including estimated IQ scores of 56 and 65, "extremely limited verbal

4

ability and comprehension," and diagnosed Jamie with Intellectual Developmental Disorder and PTSD, with secondary concerns of spousal physical and sexual abuse. The report further concluded that Jamie appeared to have been seriously manipulated and coerced in abusive relationships. These court-filed professional findings gave Plaintiff reason to understand Jamie as a disabled domestic-violence victim who needed accommodation, protection, and direct access to the legal process, not as a knowing participant. They also showed that S.J.K.'s account was already reflected in Reamer's own investigative record and professional forensic review. Reamer could not fairly treat the same account as Plaintiff-created witness tampering while omitting that it appeared in her own file and in a court-filed psychological evaluation.

### False Statement and Conclusion -3

> been in contact with the victim over phone calls and Facetime. The Defendant has been able to coerce the victim into changing her statement where she stated Jamie and Michael had both been sexually assaulting her while she was in their care. The

Reamer inflated the alleged "changed statement" by describing S.J.K. as having previously accused Jamie of direct sexual assault, even though the indictment charged Jamie only with soliciting, encouraging, directing, aiding, or attempting to aid Michael Walker. That mischaracterization made S.J.K.'s later statement appear like a dramatic Plaintiff-caused recantation from a direct accusation Jamie was never actually charged with.

### Directly from Reamers own Investigative Report:

> Guadalupe County Sheriff's Office Incident/Offense Report (case number 24-02887), dated 5/21/2024, this reported indicated a 26-year-old woman became pregnant by her stepfather. The woman was diagnosed with intellectual disability and cannot give consent. The reported indicated a history of domestic violence in the home from the stepfather to the woman's mother Ms. Walker. The case was initially suspended until officers received an APS report. It does not appear as though the victim in the case says Ms. Walker had sexual contact with her; however,

### False Statement and Conclusion - 4

> Defendant sent videos, transcripts and recorded phone calls, where he is contacting and/or attempting to contact prosecutors with the victim also on the phone, advising the victim on what to say to include the Jamie did not know about the victim being repeatedly sexually assaulted by Michael. I saw a video that the Defendant and the

Reamer falsely labeled advocacy as coaching while supplying no quote, timestamp, or specific statement showing tampering. She claimed to possess videos, transcripts, recorded calls, and communications, yet identified no threat, bribe, benefit, instruction to lie, request to withhold information, or request to avoid court. Those recordings, videos, and documents showed advocacy by a certified Special Education teacher helping an intellectually disabled victim contact prosecutors and the court so she could receive meaningful access and have her own voice

heard. If the materials actually showed witness tampering, Reamer could have quoted the tampering. She did not. Instead, she turned protected advocacy into a crime.

## False Statement and Conclusion - 4

repeatedly sexually assaulted by Michael. I saw a video that the Defendant and the victim are on Facetime, where the Defendant is telling the victim that no one had been in contact with her from the prosecutor's office.

Reamer misattributed the "no prosecutor contact" statement to Plaintiff. The recorded call Reamer claimed to have received and reviewed showed S.J.K. made that statement herself, and County Attorney personnel confirmed on the same call that their office had not contacted S.J.K. since October 31, 2024. Reamer turned S.J.K.'s own access complaint, confirmed by County personnel, into supposed evidence of Plaintiff's influence.

## Mischaracterization - 5

During the investigation, the Defendnant has repeatedly stated he is aware the victim has an Intellectual Disability (IDD) and cannot properly take care of herself. The Defendant has repeatedly stated that the victim has a low IQ.

Reamer treated Plaintiff's knowledge of S.J.K.'s IDD, low IQ, pregnancy, and exploitation as evidence of criminal influence, even though that same knowledge existed because Plaintiff was the mandated reporter and special-education-certified teacher whose APS report helped trigger the underlying investigation. In Plaintiff's view, the County then inverted the law: the report of disability and exploitation became evidence against the reporter, while the sexual-exploitation case against the stepfather who impregnated an IDD woman was reduced through a theory that treated S.J.K.'s age alone as consent. That inversion is why the warrant lacked probable cause and why the arrest was retaliatory.

6

## Mischaracterization - 6

### The Defendant is Jamie's biological brother.

Reamer implied Plaintiff was protecting Jamie Walker because she was his sister, but omitted the fact that Plaintiff himself reported concerns involving Jamie to authorities and helped initiate the investigation. Plaintiff had no motive to shield Jamie from accountability; he wanted the allegations investigated and the truth determined. That is also consistent with Plaintiff's limited adult relationship with Jamie, whom he had seen only a few times over more than thirty years after she moved out when Plaintiff was approximately thirteen. Reporting suspicion was not proof that Plaintiff knew Jamie was guilty. Plaintiff's later advocacy arose because S.J.K.'s repeated firsthand account, Reamer's own records, and court-filed disability evidence showed that both S.J.K. and Jamie diagnosed with IDD needed to be heard and ADA accomediation before suspicion was treated as fact.

### State Proves there was no Probable Cause

70

```
           Closing Statement by Mr. Green
                 November 3, 2025


   waiting to DNA paternity test the client's future daughter,

   Natalie, to match it to the stepfather, Michael Allen Walker,

   and, quote, 'put him -- stepfather -- Michael Allen Walker

   away for life.'"

           We're not seeking a life sentence, but we are

   putting on evidence that shows a witness who is unreliable;

   who has an intellectual development disability; who has

   vacillated in her story; who is easily swayed; who has given

   several conflicting accounts, many of which are documented in

   State's 11 alone; but who, it is undisputed, is the

   stepdaughter of the defendant and was impregnated by the

   defendant and now has a child that is biologically his.
```

7

Amdur's later sentencing argument undermines the warrant theory. If the State's own evidence showed S.J.K. had IDD, was easily swayed, had vacillated, and had given conflicting accounts before Plaintiff's alleged influence, then Reamer could not reasonably infer that Plaintiff caused S.J.K. to lie merely because S.J.K. repeated an account favorable to Jamie. The County's own view of S.J.K. required careful verification, direct disability-informed questioning, and disclosure of prior inconsistent and prior consistent statements. Instead, Reamer skipped the central question—whether Plaintiff coerced S.J.K.—and treated Plaintiff's advocacy as the cause of a "changed story" the State already knew was part of S.J.K.'s broader history.

### Omissions and Proof of Defense Strategy to charge Roden Family with Tampering

### John Green Michael Walker defense Attorney closing argument:

> I think that the -- this case -- the facts are certainly murky, Judge. I think that's because ==from the very beginning the Roden family was out to get Michael Walker because they thought it was a rape from the beginning.== That's why they ==called APS.== That's why they told APS that he's a convicted felon when he's absolutely not and they just kind of

### APS was called because Texas law says this:

The key statute is **Texas Penal Code § 22.011(b)(4)**. It says a sexual assault is "without consent" if:

*"the actor knows that as a result of mental disease or defect the other person is at the time of the sexual assault incapable either of appraising the nature of the act or of resisting it."*

### Dr. Sanders May 2024 Report concluded:

RECOMMENDATIONS

1. ==Ms. Koelle is not capable of independent living.== She will require someone to act as ==legal guardian and== to make legal and financial decisions for her.

8

**Michael Walker defense Strategy was to have Roden Family arrested to assist Michael**

John Green questioning his PI under Oath:

Q.   And did you come with me to meet with the D.A.'s office to tell them this information?

A.   We did twice.

Q.   What happened after that?

A.   They were then charged -- several family members were charged with witness tampering.

Q.   And that would be Jaime, James Roden and James Roden, Sr.?

A.   Correct.

Q.   And who is Cody in all of this?

A.   Cody is Jaime's biological son.  So it's Shelby's brother.

Reamer herself states in two of the affidavits the source of the allegation came form Michael Walker Defense Attorney's

From 3/17/2025, I have been receiving documentation from the Guadalupe County Attorney's Office that they had received from Michael Walker's attorneys. In the affidavit

On 3/17/2025, I obtained from the Guadalupe County Attorney's Office affidavits from Cody and Andrea Koelle that they had given to Michael Walker's attorneys. In the

9

Mr. Amdur admits in Court that it was Michael's defense team to push charges against the Roden Family without proof and used those charges to reduce the charges against Michael.

CROSS-EXAMINATION

Q.   (BY MR. AMDUR) Ma'am, where does it talk about James, Sr. threatening in this document, State's exhibit -- Defense Exhibit 1?

A.   The third page. It says grandad.

Q.   Okay. Not by name, right?

A.   Correct.

Q.   Okay. You're assuming that it is James Roden, Sr. though?

A.   Yes.

Q.   And while that's your assumption, in full disclosure the State has filed charges -- not indicted -- both James, Sr., the father of Jaime; James, Jr., the brother of Jaime; and Jane I think is her name, the mother of Jaime. Is that correct?

A.   Yes.

Amdur's cross-examination of Michael Walker's defense investigator confirms both the weakness and source of the accusation stream. The investigator admitted that the document did not identify James Louis Roden Sr. by name; it only said "grandad," and she assumed that meant James Sr. She also admitted that she and Walker's counsel brought the matter to the State's attention. Amdur further stated that at that meeting the State indicated a willingness to look into the matter and, shortly afterward, indicated a willingness to work out a plea offer on charges much more lenient than aggravated sexual assault or sexual assault. This testimony supports Plaintiff's allegation that the tampering charges arose from a defense-connected accusation stream that benefitted Michael Walker, and that Reamer failed to disclose the adversarial source, assumptions, and motive behind the allegations before seeking first-degree felony warrants.

10

59

Melissa Cortez - November 3, 2025
Cross-Examination by Mr. Amdur

Q. Okay. You actually did, with Mr. Green, bring this to our attention, did you not?

A. I did.

Q. And, if you know, shortly after that -- actually it was at that meeting we indicated a willingness to look into the matter. And shortly after that we indicated to Mr. Green a willingness to work out a plea offer on much more lenient charges than aggravate sexual assault or sexual assault, right?

A. Yes.

Q. Okay. Do you know -- and part of your investigation duties, did that entail looking into the charges against Jaime at this point?

A. I did not look into Jaime's case, specifically. No.

The State's own source evidence points to Cody, not to independent probable cause against Plaintiff or James Sr. If the materials came from Cody and Jamie/Cody jail calls, then Reamer could not simply transfer Cody's accusations onto the entire Roden family. The Fourth Amendment required individualized probable cause. Instead, the warrants treated a defense-routed family narrative as if it were evidence that each accused person committed first-degree felony tampering.

The problem is even clearer for James Sr. The defense investigator admitted the document did not name him; it said "grandad," and she assumed it meant James Sr. An assumption from a defense investigator is not probable cause to arrest a disabled elderly veteran on a first-degree felony without interviewing him, verifying the claim, or identifying a specific threat.

The problem is equally clear for Plaintiff. Reamer claimed to have Plaintiff's videos, transcripts, calls, and advocacy communications, but identified no quote where Plaintiff

11

threatened, bribed, pressured, or instructed S.J.K. to lie. If the evidence came from Plaintiff's own recordings, the tampering words should have been easy to quote. Reamer quoted none.

The defense side gave prosecutors a Cody-centered narrative. Prosecutors routed it to law enforcement. Reamer converted it into felony warrants. But the warrants lacked individualized facts showing what each accused person actually did to satisfy witness tampering.

Cody's most serious allegation against the Roden family was that Plaintiff forged Cody's November 2024 affidavit and signature. Cody made that accusation in a sworn notarized affidavit before Plaintiff's arrest and repeated it under oath at Jamie Walker's June 18, 2025 bond hearing. Yet neither Reamer nor the Guadalupe County Attorney's Office sought a forgery warrant or forgery charge against Plaintiff. Plaintiff alleges that omission is significant because available evidence, including recorded calls and later notary verification, strongly undermined Cody's forgery accusation. Rather than investigate or charge the alleged forgery directly, officials allegedly pivoted to Plaintiff's open advocacy for S.J.K. and used that advocacy as the basis for a first-degree felony tampering charge, a $100,000 bond, and protective conditions barring contact with both S.J.K. and Cody, who were listed as "victims." Plaintiff alleges this sequence supports an inference that the warrant process was used to silence and restrain the Roden family rather than to pursue a verified forgery or witness-tampering offense.

A.    I -- I mean the things they were saying were pretty bad about Michael.  So I would think that it would effect him just as much in a worse way.

Q.    Right.  But these were affidavits to try to exonerate Jaime that were being discussed, right?  The $8,000 was bond money for Jaime.  Really it had nothing to do with this particular case, right?

A.    No, it did.  I mean it was to put all the blame on one person -- on Michael.

Q.    Did you witness any direct communication involving Jaime or her immediate family that related to conspiring to set up or frame or falsely accuse this defendant, your client --

A.    Well --

12

Q.   -- or was it -- let me finish really quickly -- or was it more for the benefit of Jaime getting her out of jail or getting documentation to show that she was a victim in this?

A.   All of the communication, the recordings and I don't know how many text messages I saw from Jaime, it was all with regard to Michael.

Q.   Michael's culpability, not Michael's case, correct?

A.   Michael's case and his past and --

61

|  |
| --- |
| Melissa Cortez - November 3, 2025 <br> Cross-Examination by Mr. Amdur |

Q.   Okay.  How was it in relation to Michael's case or this particular case that you're testifying in today?

A.   She was sending Andrea, her sister-in-law, and her son photos of what she was trying to insinuate was case work.  It was like, you know, files and saying she had all of these records showing all of these things.  And she was using that photo to try to convince them that Michael had done all of these things.

Q.   And did Andrea or Cody do anything with that information to the detriment of your client?

A.   No.

Q.   All right.  So as far as this case is concerned, it was wholly ineffective.  And it just scored three of them -- actually, and Jaime as well with additional charges, right?

13

Q.    Let's talk about the affidavits that are trying to exonerate Jaime.  So if Jaime is a victim in all of this, does that mitigate her culpability in a crime?

A.    Yes.

Q.    And as for the plotting, we talked a little bit on cross how they're supposedly plotting through jail calls.  But who initially called APS?

A.    The Roden family.

Q.    And in those calls to APS, did they mention that my client is a convicted felon?

A.    They did.

Q.    And is he a convicted felon?

A.    He's not.

Q.    All right.  So from the beginning, was that the truth

---

### Criminal Case Records Search Results

iddle Name: Allen   All All   Sort By: Filed Date

| Defendant Info | Filed/Location | Type/Status | Charge(s) |
|---|---|---|---|
| WALKER, MICHAEL ALLEN 06/25/1968 | 06/02/2022 2nd 25th District Court | Adult Felony Dismissed | AGG ASSAULT W/DEADLY WEAPON ASSAULT FAM/HOUSE MEM IMPEDE BREATH/CIRCULAT |
| WALKER, MICHAEL ALLEN 06/25/1968 | 03/31/2023 County Court at Law # 2 | Adult Misdemeanor Disposed | DEADLY CONDUCT |
| WALKER, MICHAEL ALLEN 06/25/1968 | 07/08/2024 274th District Court | Adult Felony Disposed | AGG SEXUAL ASSAULT AGG SEXUAL ASSAULT AGG SEXUAL ASSAULT SEXUAL ASSAULT CONDUCT - LESSER INCLUDED SEXUAL ASSAULT PROH/PURPORT SPOUSE SEXUAL ASSAULT PROH/PURPORT SPOUSE |

**Omitted Mandated Report Against Jesse Ross Cole**

**See Exhibit B for full Mandated Report of Shelby's second pregnancy:**

**Cody claimed he was dealing drugs and feared for the safety of his family and young children:**



00:14:31 ▶ ‖

Cody Lane Koelle ▸ And I was like, hey, this guy's been living with me. My sister moved him in when we told her to let me and me and Shelby talk. About what? Him living here. So, like. Okay, well, what's the situation? I said he has a bag of cocaine on him, and he has weed, and I. I feel that my family is in danger because my three little boys right now.

 **FORD COUNTY SHERIFF'S OFFICE**

Ford County Sheriff
11311 E Comanche
Dodge City, KS 67801

**COLE, JESSE ROSS**                                    **ARREST**

Age: 38 *(at time of arrest)*   Gender: Male

**VARIOUS CHARGES**

*Presumed innocent until proven guilty in a court of law.*

ARREST FOR RECKLESS DRIVING, POSSESSION OF DEPRESSANT, DRIVING UNDER THE INFLUENCE 1ST CONVICTION, LICENSE TO BE CARRIED AND EXHIBITED UPON DEMAND AND FLEE OR ATTEMPT TO ELUDE LAW ENFORCEMENT



Location

**Dodge City, KS 67801**

**ELECTRONICALLY FILED**
2024 Mar 15 PM 3:06
CLERK OF THE FORD COUNTY DISTRICT COURT
CASE NUMBER:  FO-2024-CR-000104
PII COMPLIANT
**IN THE DISTRICT COURT OF FORD COUNTY, KANSAS**
Ford County Courthouse, Central & Spruce, Dodge City, Kansas

**STATE OF KANSAS**
                    Plaintiff,

            vs.

**JESSE ROSS COLE,**
            Defendant.

Case No. **FO 24 CR**
Tracking No.
Agency No. 24FO1893
Court ORI No. KS029015J

**INFORMATION**

15

**Excerpt from April 1st, 2025 Mandated Report**

Shelby, who has Intellectual and Developmental Disabilities (IDD) and receives Social Security Disability benefits, has been living with her brother, Cody, and his wife, Andrea, in Kansas since August 1st, 2024. Despite knowing Shelby's condition, Cody and Andrea allowed a man named Jesse to move into their home. They permitted Jesse to sleep in the same room with Shelby, and Cody has openly stated that he was aware Jesse was using Shelby for sex, claiming that the relationship would not last long. It is now believed that Shelby is pregnant for a second time, potentially as a result of exploitation due to her disability, an issue that both Cody and Andrea had a responsibility to protect her from.

This situation is deeply disturbing, not only because it exposes Shelby to abuse but because it mirrors the very crime Jamie and Michael Allen Walker are being accused of. By allowing this man to have unrestricted access to Shelby, and permitting him to engage in sexual activity with her, Cody and Andrea may have facilitated the same type of abuse that is being prosecuted in Jamie's case. This is a clear violation of Shelby's rights as a vulnerable adult and falls under the same legal concerns as those Jamie and Michael face.

As set forth in Texas Penal Code Section 22.011, which criminalizes sexual assault, the law clearly outlines that individuals with intellectual disabilities cannot consent to sexual activity, and any sexual act committed against them without their consent is a violation of their rights. Under Texas law, consent cannot be legally given by a person who lacks the mental capacity to understand the nature of the act (Tex. Penal Code § 22.011(c)).

In Kansas, the law similarly protects individuals with IDD from sexual exploitation and abuse. According to Kansas Statutes Annotated (K.S.A.) 21-5503, any sexual act involving a person who is unable to provide consent due to mental incapacity is considered sexual assault. Given that Shelby has been diagnosed with IDD, her ability to consent to sexual acts is legally restricted, and Cody and Andrea's actions in permitting this relationship to develop and continue may amount to legal violations under both Texas and Kansas law.

Plaintiff alleges that his April 1, 2025 mandated report was sent to senior County Attorney leadership, including First Assistant County Attorney Jonathan Amdur and elected County Attorney David Willborn. The report raised concerns about renewed exploitation, drug activity, unsafe living conditions, Jesse Ross Cole, Cody Koelle's environment, and S.J.K.'s possible pregnancy. Yet Plaintiff alleges neither Jesse nor Cody was meaningfully investigated with comparable urgency. Instead, six days later, Plaintiff became the target of a first-degree felony warrant. Amdur later characterized the Roden family's efforts as "craziness," even though those efforts included protected reporting, court filings, disability-access requests, and attempts to help an intellectually disabled victim be heard. Plaintiff alleges this sequence supports an inference that County actors treated protected advocacy and mandated reporting as a threat to the preferred narrative rather than as a duty to investigate.

16

**Michael's "best friend" and former lover/wife stated she was in contact with Shelby and Jesse**

```
Q    (MR. GREEN) Where's Shelby now?

A    Kansas.

Q    Is she currently pregnant?

A    Yes.

Q    With whose baby?

A    His name is Jesse.  I'd have to get my phone
to remember what the guy's last name is.
```

Plaintiff alleges the sentencing transcript and recorded communications with investigator Jesse Prado support the inference that County actors had a reason not to investigate Jesse Ross Cole or Cody Koelle at all. Those materials show that Michael Walker's defense side and persons aligned with Walker had access to Jesse Ross Cole and used him as a comparator to argue that, if Jesse was not being investigated or prosecuted for impregnating S.J.K., then Michael Walker should not face first-degree sexual-assault exposure for impregnating her either. Plaintiff alleges this comparison helps explain why Jesse and Cody were not investigated after Plaintiff's April 1 mandated report, while Plaintiff was arrested six days later. Investigating Jesse would have undermined the comparator used to reduce Michael's charges, while investigating Cody would have undermined the "planned pregnancy" narrative used to portray Jamie as the mastermind and discredit the Roden family. Cody himself revealed in the March 18, 2025 recorded call that S.J.K. had been told to say the pregnancy was planned if she wanted her mother free, and later court testimony reflected that Walker's private investigator captured a brief recorded statement from S.J.K. before ending the call. Plaintiff alleges these facts support an inference that the County accepted defense-aligned narratives while refusing to investigate facts that would have undermined those narratives.

17



00:26:03

**Jesse Prado**    ▶    Apparently they're (County Attorney's Office) stating. Now, remember, I know a lot of the answers to the questions that I'm asking you, but but apparently they're stating that Shelby makes her own decisions since she's been an adult. So, in other words, what they're saying is my first question was, is it illegal for someone to have sexual relations with Shelby? That's question number one, right? Because she can't consent on her own, apparently. And the answer to that question that I'm getting is that it is not illegal.

Investigator Jesse Prado informed advocate Kimberly Kennedy that, according to the County Attorney's Office, Michael Walker's impregnation of S.J.K. and Jesse Ross Cole's alleged sexual exploitation of S.J.K. were not being treated as illegal because S.J.K. was an adult and did not have a legal guardian, despite her documented intellectual disability, childlike functioning, and reported vulnerability to coercion and exploitation.

completely candid the Rhoden family, right, which is the codefendant's maiden name, provided us with a report from a psychiatrist whose last name was Rhoden on the letterhead, and then, I think, it was a few days later sent us a corrected report that psychiatrist -- letterhead with that psychiatrist's actual name. So I don't know what was fabricated and what was not. And I think that's a big part of it.

THE COURT:  Okay.

MR. GREEN:  As far as the indictments concerned too, Judge, at the very beginning of this whole process I filed a motion to quash, because the language in the statute didn't specify whether or not he was being prosecuted under the prohibited sexual contact as a stepfather or as sexual relations with a mentally retarded person.  At that time the State clarified this was because it was a stepdaughter-stepfather relationship and that's why they're going forward with that specific charge.

18

| 08/29/2024 | **Motion** |
| | *To Amend The Indictment* |
| 09/11/2024 | **Order** |
| | *Order Amending the Indictment* |

The August 29, 2024 motion practice further exposes the County's inconsistent and retaliatory use of S.J.K.'s disability. Seven months before Plaintiff's arrest, the State clarified that Michael Walker's prosecution was not proceeding on a theory that S.J.K.'s intellectual disability rendered her incapable of consent, but on a stepfather/stepdaughter or force-related theory. Later, when Plaintiff relied on S.J.K.'s documented IDD, low IQ, and communication limitations to request accommodations, direct access, and support so her own voice could be heard, Reamer used that same disability context as suspicious evidence of witness tampering. Amdur then deepened the contradiction by publicly suggesting in open court uncertainty over whether disability evidence supplied by the Roden family was "fabricated," even though the report identified the evaluator and could have been verified directly through a basic phone call, email, subpoena, or records check. Plaintiff alleges this was not a good-faith misunderstanding. It supports the inference that County actors had no real intention of accommodating S.J.K.'s disability when her voice challenged their preferred narrative, but were willing to use that same disability as a weapon against Plaintiff when his advocacy became inconvenient. County actors treated S.J.K. as competent enough that her adult status and lack of guardianship weakened sexual-assault accountability for Michael Walker, but too disabled to speak with help from an advocate without that advocate being accused of manipulation. Reamer then converted that contradiction into a fabricated probable-cause narrative: protected disability advocacy became coercion, S.J.K.'s access-seeking became manipulation, and the absence of any quoted threat, bribe, benefit, or instruction to lie was replaced with the unsupported conclusion that Plaintiff intended false testimony.

19

**Cody Lane Koelle star witness for the State and Michael Walker Defense**



## FORD COUNTY SHERIFF'S OFFICE

Ford County Sheriff
11311 E Comanche
Dodge City, KS 67801

## KOELLE, CODY LANE

**ARREST**

Age: 28 *(at time of arrest)*     Gender: Male

### VARIOUS CHARGES

*Presumed innocent until proven guilty in a court of law.*

ARREST FOR FELONY INTERFERENCE WITH LEO AND FELONY CRIMINAL THREAT

Location

**Dodge City, KS 67801**

Arrest Date

**Apr 14, 2025**

Incident Type

**All Other - Criminal**

Page 10

Supplemental Criminal History Worksheet - Prior Convictions

Page #  1  of  1

Offender's Name (L, F, M) KOELLE, CODY LANE          Judicial District 16TH          County FORD          Case # 2025 CR 000203

| Statute/Ordinance # | Description | Juris. Code | State | County | City | Conviction Date | Case # | Conviction Code | Amended Code | Source of Information |
|---|---|---|---|---|---|---|---|---|---|---|
| 1.  21-5904(a)(1)(C) | INTERFERENCE WITH LEO-FALSE REPORT | S | KS | PAWNEE |  | 5/8/2025 | 24 CR 121 | AMN |  | CR |
| 2.  21-5917(a) | FALSE IMPERSONATION | S | KS | PAWNEE |  | 5/8/2025 | 24 CR 121 | AMU |  | CR |

20

**COUNT 1**

**INTERFERENCE WITH LAW ENFORCEMENT, FALSE REPORT** (Misdemeanor)
**K.S.A. 21-5904(a)(1)(C)**
**Class A Nonperson Misdemeanor**

On or about the 27th of September, 2024, in the State of Kansas and County of Pawnee, CODY LANE KOELLE, did, then and there, unlawfully and knowingly, provide any information to a law enforcement officer, law enforcement agency or state investigative agency, to-wit: DEPUTY NICHOLAS DELANEY, during a misdemeanor investigation, to wit: FALSE IMPERSONATION , by informing the law enforcement officer or a state investigative agency, to-wit: BY INFORMING THE OFFICER HIS FRIEND WAS AUTHORIZED TO USE THE LIGHTS, knowing that such information was false and intending to influence, impeded or obstruct such officer's or agency's duty, contrary to the form of the statutes in such case made and provided and against the peace and dignity of the State of Kansas.

**COUNT 2**

**FALSE IMPERSONATION**
**K.S.A. 21-5917(a)**
**Class B Nonperson Misdemeanor**

On or about the 27th of September, 2024, in the State of Kansas and County of Pawnee, CODY LANE KOELLE, did, then and there, unlawfully and knowingly represent oneself to be a public officer, public employee or a person licensed to practice or engage in any

information and belief:

### COUNT ONE

On or about the 14th day of April, 2025, the above named defendant, within Ford County Kansas, did then and there contrary to the statutes of the State of Kansas unlawfully and knowingly falsely report to a law enforcement agency, to wit: Officer Cisco Soto of the Dodge City Police Department that a particular person has committed a crime, knowing that such information is false and intending that the officer or agency shall act in reliance upon such information. INTERFERENCE WITH LAW ENFORCEMENT ~ FELONY is a severity level 8 non-person felony in violation of the K.S.A. 21-5904(a)(1)(A).

21

**Defendant Knew Plaintiff Advocacy was necessary, Plaintiff saved S.J.K. life when he made the report to APS.**

CLOSING STATEMENT

MR. AMDUR: I want to finish the sentence that Mr. Green read from the last page of the report picking up from "but due to power imbalance/differential, coercion and safety reasons, the client is likely telling the truth about being repeatedly raped by her stepfather, Michael Allen Walker."

And that's really what this comes down to, Judge Mr. Walker has admitted to having impregnated his stepdaughter and Mr. Green is trying to sell that that's the extent of it

RICHARD E. ROBERTS, JR., CSR

22

Closing Statement by Mr. Amdur
November 3, 2025

and that there was no violence.

At this point he's not pleaded to having committed any violence. But this is not a situation between a 70-year-old and a 45-year-old all of whom have high levels or at least average levels of intelligence.

State's Exhibit 11 is very clear that she may have been able to have the capacity to consent, but she absolutely has an intellectual disability -- or it doesn't say "absolutely." It says -- it says she may have mild to moderate intellectual mental disabilities on Page 7 of 12 or Page 4. And then it says in conclusion the same thing further in.

Judge, this case -- these accusations did not begin once the Roden family got their hands on Shelby as Mr. Green is trying to portray. The problems -- the cracks started to show on March 29th, 2022 when Shelby ran to the neighbors to report an assault.

And State's Exhibits 1 through 8 show pictures of the broken strap -- the cut strap on the purse and the knife that was probably used to cut that purse as well as three photos of the goose egg and red marks on the neck.

Shelby's statement in State's Exhibit 9, which was admitted, all of that came in before she went to live with the Roden's before they got her on that long drive from Seguin to the greater Houston area.

23

77

Closing Statement by Mr. Amdur
November 3, 2025

And if the case was in fact pled down to deadly conduct, which it was -- it was technically dismissed as part of the plea deal. As the evidence showed, that was because Jaime filed an affidavit of non-prosecution.

She filed an affidavit of non-prosecution because ostensibly they were scared of the defendant. They were scared of the defendant because of what he did to her. He choked her. He threatened repeatedly, "I'm going to kill you. I'm going to kill you" while he choked her out.

The evidence says she passed out. She hit the floor and she came to as he was slamming her head on the floor, hence the goose egg. And deadly conduct -- or the Roden family's getting ahold of Shelby a year later cannot explain away the goose egg.

So while two years might be appropriate for a mildly egregious situation -- because any instance of this crime that I can imagine is egregious when you're having sex with your stepdaughter and there might be situations where two years is appropriate.

But when you have a man who, in March of 2022, has committed these -- this assaultive behavior to the extent that he's leaving these marks, he's threatening to kill her and her retarded daughter is scared enough to go try to find his gun, which is the gun the evidence said -- or it is a gun as the evidence said he was freaking out over a gun that he

RICHARD E. ROBERTS, JR., CSR

24

78

| Closing Statement by Mr. Amdur |
| :---: |
| November 3, 2025 |

had accused Jaime of stealing at like 5:00 in the morning or something like that.  So of course they were scared of him.

And then their sexual relations started, some evidence would say, before then according to Shelby.  Some of the evidence comes out suggesting that maybe it was after that.

But, again, Shelby is not reliable because she is saying different things.  She doesn't have to be reliable.  She's pregnant.  She has a kid and the defendant has owned that that kid is biologically his.  He's admitted that.

The evidence, State's 1 through 9, shows the damage he did.  That's Shelby's statement and the photos in 1 through 8.  In State's Exhibit 10 the police officer is writing down the observations he has.  He makes a diagram of where the injuries were.

And that officer, Officer Wheeler -- or Deputy Wheeler is saying Shelby had him write down her statement because she couldn't write.  So if there's conflicting evidence later that says she actually can read and write, that does cloud things in terms of Shelby's ability to understand or Shelby's ability to even consent.

It doesn't cloud anything about Shelby's fear of the defendant or Shelby's -- that Shelby has less than average intelligence and that Shelby was taken advantage of given the power imbalance.

RICHARD E. ROBERTS, JR., CSR

25

```
                              Court's Ruling
                             November 3, 2025
```

And if the Roden's pointed out to her "Shelby, this is wrong" -- or if it hadn't been the Rodens who pointed it out to her, we can ask ourselves: Why didn't Jaime or why didn't the defendant point that out to her? That just shows how much more egregious this offense was.

Given his tendency for violence and his threats to harm Jaime and the fact that he scared Shelby enough that she ran to the neighbors to call the police, all of that suggests this man was a threat to them.

They're scared of him and he should be put away for a long time for the egregious behavior he did. And for that reason we would ask for -- we would ask for the maximum, Judge.

The State's own later sentencing argument confirms the defect in Reamer's warrant theory. First Assistant County Attorney Jonathan Amdur argued that the accusations against Michael Walker did not begin when the Roden family became involved, but arose from earlier evidence of violence, fear, injury, power imbalance, and S.J.K.'s vulnerability. That matters because Reamer's warrant depended on making S.J.K.'s March 2025 statements appear Plaintiff-created. The State's own position shows otherwise: the concerns predated Plaintiff's alleged influence, and S.J.K.'s disability, fear, and inconsistent statements required careful investigation, not a first-degree felony warrant against the advocate who tried to have her heard.

# WARRANT OF ARREST

Guadalupe County Sheriff's Office                    CASE #24-02887

_____

STATE OF TEXAS                §                    WARRANT NO. 2402887EMR5

COUNTY OF GUADALUPE        §

WHEREAS, a complaint in oath and in writing has been made before me charging that on or about November 2024 to March 2025, James Luis Roden Jr., **Date of Birth:** ▇▇▇▇▇ did commit the offense of TAMPERING WITH A WITNESS FV CASE WITH F1 CASE, Statute Number 36.05(e-1)(2), CJIS Code 48990025, a 1st Degree Felony, contrary to the statutes, and against the peace and dignity of the State of Texas.

YOU ARE HEREBY COMMANDED to arrest **James Louis Roden JR., Date of Birth:** ▇▇▇▇▇ Guadalupe County Sheriff's Office and Case Number 24-02887. James Louis Roden JR. is height 6'00, ▇▇▇▇▇, with **Blue** eyes and **Brown** hair, and bring HIM before a magistrate in Guadalupe County, Texas to answer to said complaint.

HEREIN FAIL NOT, but due service and return make this Writ as the law directs.

GIVEN UNDER my hand and seal of this court the _7th_ day of _April_ A.D. 2025.

25th District Court Judge
William D. Old III
Guadalupe County, Texas

Court 25th Judicial District

Bond: $100,000.00

OFFICER'S RETURN
Come to hand the _____ day of _____ A.D. 2025.
Executed this _____ day of _____ A.D. 2025

THE STATE OF TEXAS            §         DOCKET # _____

                              §

COUNTY OF GUADALUPE           §         COURT: _____

## COMPLAINT
### {Articles 15.04 & 15.05, Texas Code of Criminal Procedure}

BEFORE ME, THE UNDERSIGNED AUTHORITY PERSONALLY APPEARED THE AFFIANT HEREIN, A PEACE OFFICER UNDER THE LAWS OF TEXAS, WHO, BEING DULY SWORN, ON OATH MADE THE FOLLOWING STATEMENTS AND ACCUSATIONS:

My name is Elaine M. Reamer, the Affiant, and I am commissioned as a peace officer by the Guadalupe County Sheriff's Office, currently assigned to the Criminal Investigation Division as an Investigator. I currently have 16 years law enforcement experience, over 3000 hours of TCOLE training hours and hold a Master TCOLE License. I hereby state upon my oath that I have reason to believe and do believe that heretofore, and before the making and filing of this Complaint, that

James Louis Roden JR, White Male, Date of Birth: ████████ 6'00 in height, ████████, Brown hair, Blue eyes, ████████████████████

on or about the November 2024 to March 2025, in **Guadalupe County, Texas**, did then and there commit the offense of **TAMPERING WITH A WITNESS FV CASE WITH F1 CASE** to wit, coerce Shelby Jame Koelle, who was a witness in an official proceeding, namely Aggravated Sexual Assault, by means of repeatedly contacting Shelby and advising her to tell the prosecution, sign a waiver, and testify in court that her mother did not know she was being sexually assaulted by her stepfather and that her mother is innocent, with intent to influence Shelby to testify falsely in the official proceeding. And it is further presented that the official proceeding involved family violence as defined by Section 71.004 of the Texas family Code, against the laws of the State. **CJIS 48990025**

My probable cause for said belief and accusation is as follows:

In March 2024, I began an investigation into the offense Prohibited Sexual Conduct, where Jamie Renee Walker and her husband Michael Walker were the suspects. Jamie is the victim's biological mother.

It was determined during the investigation; the victim had been diagnosed with an Intellectual Disability while in high school and received an SSI check for a disability. The victim became pregnant from Michael who was her stepfather at the time of the sexual assaults. During the investigation, the victim stated Jamie and Michael had been having a sexual relationship with her. I drafted warrants for the arrest of Jamie and Michael. The couple was arrested for their warrants on 4/9/2024.

1

Jamie and Michael has been indicted on several counts of Aggravated Sexual Assault.

The Defendant is Jamie's biological brother.

From 3/17/2025 to 4/5/2025, I have been receiving documentation from the Guadalupe County Attorney's Office that is from the Defendant. The Defendant has repeatedly been in contact with the victim over phone calls and Facetime. The Defendant has been able to coerce the victim into changing her statement where she stated Jamie and Michael had both been sexually assaulting her while she was in their care. The Defendant sent videos, transcripts and recorded phone calls, where he is contacting and/or attempting to contact prosectors with the victim also on the phone, advising the victim on what to say to include the Jamie did not know about the victim being repeatedly sexually assaulted by Michael. I saw a video that the Defendant and the victim are on Facetime, where the Defendant is telling the victim that no one had been in contact with her from the prosecutor's office.

During the investigation, the Defendnant has repeatedly stated he is aware the victim has an Intellectual Disability (IDD) and cannot properly take care of herself. The Defendant has repeatedly stated that the victim has a low IQ.

Based on the facts and circumstances established in this affidavit, I believe there is probable cause that James Louis Roden JR committed offenses against the laws of the State of Texas as described above.

*Elaine M. Pearson #121*

Affiant

SWORN TO AND SUBSCRIBED BEFORE ME BY SAID AFFIANT/COMPLAINANT ON THIS THE 7th DAY OF April 2025.

*L. Porter 128*

PEACE OFFICER
GUADALUPE COUNTY, TEXAS

The sworn affidavit and accompanying warrant were submitted by reliable electronic means.

William D. Old III
25th Judicial District Judge

2

## WARRANT OF ARREST

Guadalupe County Sheriff's Office

CASE #24-02887

STATE OF TEXAS                    §                    WARRANT NO. 2402887EMR6

COUNTY OF GUADALUPE          §

WHEREAS, a complaint in oath and in writing has been made before me charging that on or about November 2024 to March 2025, James Louis Roden SR, **Date of Birth:** ████████ did commit the offense of TAMPERING WITH A WITNESS FV CASE WITH F1 CASE, Statute Number 36.05(e-1)(2), CJIS Code 48990025, a 1st Degree Felony, contrary to the statutes, and against the peace and dignity of the State of Texas.

**YOU ARE HEREBY COMMANDED** to arrest **James Louis Roden SR, Date of Birth:** ████████, Guadalupe County Sheriff's Office and Case Number 24-02887. James Louis Roen SR. is height 6'01, ████████ with **Blue** eyes and **Brown** hair, and bring HIM before a magistrate in Guadalupe County, Texas to answer to said complaint.

HEREIN FAIL NOT, but due service and return make this Writ as the law directs.

GIVEN UNDER my hand and seal of this court the __7th__ day of April____ A.D. 2025.

25th District Court Judge
William D. Old III
Guadalupe County, Texas

Court __25th Judicial District__

Bond: __100,000.00__

OFFICER'S RETURN
Come to hand the_____ day of _____ A.D. 2025.
Executed this _____ day of _____ A.D. 2025

THE STATE OF TEXAS              §    DOCKET # _____

                               §

COUNTY OF GUADALUPE            §    COURT: _____

## COMPLAINT
### {Articles 15.04 & 15.05, Texas Code of Criminal Procedure}

BEFORE ME, THE UNDERSIGNED AUTHORITY PERSONALLY APPEARED THE AFFIANT HEREIN, A PEACE OFFICER UNDER THE LAWS OF TEXAS, WHO, BEING DULY SWORN, ON OATH MADE THE FOLLOWING STATEMENTS AND ACCUSATIONS:

My name is Elaine M. Reamer, the Affiant, and I am commissioned as a peace officer by the Guadalupe County Sheriff's Office, currently assigned to the Criminal Investigation Division as an Investigator. I currently have 16 years law enforcement experience, over 3000 hours of TCOLE training hours and hold a Master TCOLE License. I hereby state upon my oath that I have reason to believe and do believe that heretofore, and before the making and filing of this Complaint, that

James Louis Roden SR, White Male, Date of Birth: ████████ 6'01 in height, ████, Brown hair, Blue eyes, ████████████████████

on or about the November 2024 to March 2025, in **Guadalupe County, Texas**, did then and there commit the offense of **TAMPERING WITH A WITNESS FV CASE WITH F1 CASE** to wit, coerce Cody Lane Koelle, who was a witness in an official proceeding, namely Aggravated Sexual Assault, by means of contacting Cody and telling him if he lost $40,000.00 he was going to start cracking down. He also told Cody he would come to where he lives and have his children removed if he did not help Jamie Renee Walker, with intent to influence Cody to testify falsely in the official proceeding. And it is further presented that the official proceeding involved family violence as defined by Section 71.004 of the Texas family Code, against the laws of the State. **CJIS 48990025**

My probable cause for said belief and accusation is as follows:

In March 2024, I began an investigation into the offense Prohibited Sexual Conduct, where Jamie Renee Walker and her husband Michael Walker were the suspects. Jamie is the victim's biological mother.

It was determined during the investigation; the victim had been diagnosed with an Intellectual Disability while in high school and received an SSI check for a disability. The victim became pregnant from Michael who was her stepfather at the time of the sexual assaults. During the investigation, the victim stated Jamie and Michael had been having a sexual relationship with her. I drafted warrants for the arrest of Jamie and Michael. The couple was arrested for their warrants on 4/9/2024.

1

Jamie and Michael has been indicted on several counts of Aggravated Sexual Assault.

The Defendant is Jamie's biological father.

From 3/17/2025, I have been receiving documentation from the Guadalupe County Attorney's Office that they had received from Michael Walker's attorneys. In the affidavit written by Cody, he stated the Defendant told him if he lost $40.000.00, "he going to come don cracking hard".

Incldued in the file, is an affidavit from Cody's wife, Andy. Andy stated Cody and her are in fear of Jamie's family. Andy advised they are afraid the family will retaliate if they did not cooperate with their demands and call Child Protective Services on the couple.

I was advised by Guadalupe County Attorney's Office that Cody had told them repeatedly that the Defendant stated he would call Child Protective Services on him and have his children removed if he did not side with Jamie and sign the affidavits that had been sent to them.

Based on the facts and circumstances established in this affidavit, I believe there is probable cause that James Louis Roden SR committed offenses against the laws of the State of Texas as described above.

_____
Affiant

SWORN TO AND SUBSCRIBED BEFORE ME BY SAID AFFIANT/COMPLAINANT ON THIS THE 7th DAY OF April 2025.

_____
PEACE OFFICER
GUADALUPE COUNTY, TEXAS

The sworn affidavit and accompanying warrant were submitted by reliable electronic means.

_____
William D. Old III
25th Judicial District Judge

2

THE STATE OF TEXAS            §   DOCKET # _____

COUNTY OF GUADALUPE          §   COURT: _____

**COMPLAENT**
**}Articles 15.04 & 15.05, Texas Code of Criminal Procedure}**

BEFORE ME, THE UNDERSIGNED AUTHORITY, PERSONALLY APPEARED THE AFFIANT HEREIN, A PEACE OFFICER UNDER THE LAWS OF TEXAS, WHO, BEING DULY SWORN, ON OATH MADE THE FOLLOWING STATEMENTS AND ACCUSATIONS:

My name is Elaine M. Reamer, the Affiant, and I am commissioned as a peace officer by the Guadalupe County Sheriff's Office, currently assigned to the Criminal Investigation Division as an Investigator. I currently have 16 years law enforcement experience, over 3000 hours of TCOLE training hours and hold a Master TCOLE License. I hereby state upon my oath that I have reason to believe and do believe that heretofore, and before the making and filing of this Complaint, that

Jamie Renee Walker, VVhite Female, Date of Birth: ▓▓▓▓▓▓▓ 5'10 in height, 150 pounds, Brown hair, Blue eyes, ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

on or about the November 2024 to March 2025, in Guadalupe County, Texas, did then and there commit the offense of TAMPERING WITI-I **A WITNESS FV CASE WITH F1** CASE to wit, agree to confer a benefit, namely $8,000.00, to Cody Koelle, who was a prospective witness in an official proceeding, Aggravated Sexual Assault, with intent to influence Cody Koelle to testify falsely in the official proceeding, And it is further presented that the official proceeding involved *family* violence as defined by Section 71.004 of the Texas family Code, against the laws of the State. CJIS 48990025

My probable cause for said belief and accusation is as follows:

In March 2024, I began an investigation into the offense Prohibited Sexual Conduct, where the Defendant and her husband Michael Walker were the suspects. The Defendant is the victim's biological mother.

1

It was determined during the investigation, the victim had been diagnosed with an Intellectual Disability while in high school and received an *SSI* check for a disability. The victim became pregnant from Michael who was her stepfather at the time of the sexual assaults. During the investigation, the victim stated the Defendant and Michael had been having a sexual relationship with her. I drafted warrants for the arrest of the Defendant and Michael. The couple was arrested for their warrants on 4/9/2024.

The Defendant has been indicted on several counts of Aggravated Sexual Assault.

On 3/17/2025, I obtained from the Guadalupe County Attorney's Office affidavits from Cody and Andrea Koelle that they had given to Michael Walker's attorneys. In the affidavit, Cody states Jamie has been harassing him to sign an affidavit that they had drafted. Cody advised the victim was also sent an affidavit to sign. The victim does not know how to read. Cody stated he was receiving calls and texts repeatedly to sign the affidavits. Andrea also stated she is being harassed to sign the affidavits.

The Defendant was in custody at the Gudalupe County Jail from 4/9/2024 to 11/6/2024.

The Defendant called the victim on 9/15/2024 and tells her she needs to write a statement.

The Defendant tells the victim's brother Cody Koelle who the victim is living with in Kansas, that her attorney is going to be calling the victim and Cody to get statements.

The Defendant calls Cody again on 9/15/2024. The Defendant is asking the victim if Cody had helped her write the statement yet. The Defendant states she is going to see if"Grandma or Pawpaw° can go down there to help the victim with a statement. The Defendant later states she is going to have someone call her to write the statement. The victim is in obvious distress and trying to confide in the Defendant over her current living situation. The Defendant keeps rerouting the victim into talking about writing the statements. The Defendant ends the phone call stating she is going to talk to Cody to help the victim write her statement.

On 9/2d/2024, the Defendant calls Cody and asks him if he is still going to help her out. The Defendant tells Cody, the sooner she gek out of jail, the sooner she can help with the victim. The Defendant then states "And I got that $8000.00 for ya". The Defendant tells Cody that he needs to remember his mother helped him out for a long time and now it is time for him to help her.

On 10/28/2024, The Defendant called Cody again. The Defendant is wanting Cody to send a confifmation number for money that he was supposed to send the family. The

2

Defendant tells Cody how "Pawpaw" was going to leave him "somethings, some guns, his truck and a few other things".

Oa 2/4/2025, Cody filed a petition for a protective order against the Defendant. Cody states in the affidavit that the Defendant had texted him on 2/7/2025, telling him to get rid of the victim's old phone and to delete everything on it. The Defendant told Cody not to tell anyone that she had been talking to the victim. The Defendant said if Cody did not comply, she would find a way to have his children taken from him and she would kill herself If she went back to jail.

Based on the facts and circumstances established in this affidavit, I believe there is probable cause that Jamie Renee Walker committed offenses against the laws of the State of Texas as described above.

*Elain M. Reana #21*

SWORN TO AND SUBSCRIBED BEFORE ME BY SAID AFFIANT/COMPLAINANT ON THIS THE 5th DAY OF April 2025.

*[signature]* #3

~~PEACE OFFICER~~
GUADALUPE COUNTY, TEXAS

The sworn affidavit and accompanying warrant were submitted by reliable electronic means.

*Jessica Crawford*

Jes

2nd 25th Judicial District Judge

# Exhibit B

# April 1st, 2025 Mandated Report against Cody and Jesse and 03/20/2026 Ford County Kansas Police Report







James Roden

# Reporting Possible Crime - Concern Regarding Shelby Jane Koelle (Case No. 24-1775-CR-B)

3 messages

**James Roden**  Tue, Apr 1, 2025 at 12:49 AM
To: kell , jessica.johnson , jonathan.amdu ,
maritza.stewar , ileen.range , dwillbor , Laura.Bolton

**Subject: Reporting Possible Crime - Concern Regarding Shelby Jane Koelle (Case No. 24-1775-CR-B)**

To Whom It May Concern,

I am writing to express an urgent concern regarding my niece, Shelby ▮▮▮▮ and I am unsure of the proper channels to report this. I just recently became aware of a troubling situation that has left me deeply concerned for Shelby's safety and well-being.

Please note that I wish to remain anonymous in this matter to protect myself and my family (wife and children) from any potential retaliation. Additionally, I wish to distance myself from my sister and the rest of her children moving forward, as this is not something I wish to expose my wife and children to.

Shelby, who has Intellectual and Developmental Disabilities (IDD) and receives Social Security Disability benefits, has been living with her brother, Cody, and his wife, Andrea, in Kansas since August 1st, 2024. Despite knowing Shelby's condition, Cody and Andrea allowed a man named Jesse to move into their home. They permitted Jesse to sleep in the same room with Shelby, and Cody has openly stated that he was aware Jesse was using Shelby for sex, claiming that the relationship would not last long. It is now believed that Shelby is pregnant for a second time, potentially as a result of exploitation due to her disability, an issue that both Cody and Andrea had a responsibility to protect her from.

This situation is deeply disturbing, not only because it exposes Shelby to abuse but because it mirrors the very crime Jamie and Michael Allen Walker are being accused of. By allowing this man to have unrestricted access to Shelby, and permitting him to engage in sexual activity with her, Cody and Andrea may have facilitated the same type of abuse that is being prosecuted in Jamie's case. This is a clear violation of Shelby's rights as a vulnerable adult and falls under the same legal concerns as those Jamie and Michael face.

As set forth in Texas Penal Code Section 22.011, which criminalizes sexual assault, the law clearly outlines that individuals with intellectual disabilities cannot consent to sexual activity, and any sexual act committed against them without their consent is a violation of their rights. Under Texas law, consent cannot be legally given by a person who lacks the mental capacity to understand the nature of the act (Tex. Penal Code § 22.011(c)).

In Kansas, the law similarly protects individuals with IDD from sexual exploitation and abuse. According to Kansas Statutes Annotated (K.S.A.) 21-5503, any sexual act involving a person who is unable to provide consent due to mental incapacity is considered sexual assault. Given that Shelby has been diagnosed with IDD, her ability to consent to sexual acts is legally restricted, and Cody and Andrea's actions in permitting this relationship to develop and continue may amount to legal violations under both Texas and Kansas law.

Case 5:26-cv-00054-XR    Document 15    Filed 05/19/26    Page 75 of 231

To make matters worse, Cody and Andrea kicked both Shelby and Jesse out of the house together after discovering illegal drugs on the property. While I understand their concern about the drugs, it was irresponsible and dangerous for them to allow this situation to escalate without contacting the authorities. Given Shelby's condition, Cody and Andrea should have taken steps to protect her, rather than ignoring the situation and allowing further harm and forcing her to move in with him knowing the dangers of drugs and sexual exploitation.

It is deeply concerning that this is not the first time Shelby has been placed in such a vulnerable position. In less than two years, a pregnancy has occurred again, highlighting significant failures within the system to protect her. As her family, we are devastated that this abuse has continued without intervention and with this potential second pregnancy another life is tragically impacted.

It is my understanding that Shelby has been under the care of the Guadalupe County Attorney's Office Victim Advocate Program, and their office has conducted regular check-ins with her. Given their oversight, I trust they are already aware of this situation and will take the appropriate steps to ensure Shelby's safety. It is imperative that the relevant authorities in Kansas now step in to further investigate this matter and take the necessary legal actions to protect Shelby from future harm.

As a teacher, I have a duty to report potential abuse, and while I wish to remain anonymous to avoid causing additional harm to my elderly parents, my wife and children from retaliation. I believe this situation must be brought to light. Shelby has been subjected to abuse multiple times, and it is vital that her rights and safety be protected moving forward.

I have included Laura Bolton, the CPS worker handling Shelby's case in Kansas, in this email. I want to clarify that I am no longer the family advocate for Jamie Renee Walker or Shelby Jane Koelle in relation to the ongoing criminal case in Guadalupe County as it is beyond my expertise and hope a more qualified individual can be appointed to help both Shelby and Jamie. However, upon learning of this situation, I felt a responsibility to report it. I sincerely hope that the appropriate authorities in both Kansas and Texas can collaborate to address this issue promptly, before further harm occurs.

Thank you for your attention to this serious matter.

Sincerely,
James Louis Roden Jr.

P.S. Again, I ask that my identity remain anonymous as I do not wish to expose my wife and children to retaliation or harm, and I wish to distance myself from my sister's case and her children going forward as this is beyond my ability to advocate effectively.

---

🎵 **Cody in Regards to Shelby pregnancy.m4a**
1328K

---

**James Roden** <jroden████████              Tue, Apr 1, 2025 at 8:24 AM
To: Kimberly Kennedy <kennedyckimberl████████

Sent from my iPhone

Begin forwarded message:

> **From:** James Roden <jroden3████████
> **Date:** April 1, 2025 at 12:49:34 AM CDT
> **To:** kelly████████, jessica.johnson████████ jonathan.amdur████
> maritza.stewart████████, ileen.rangel████████ dwillborn████
> Laura.Bolton████████

Case 5:26-cv-00054-XR    Document 15    Filed 05/19/26    Page 76 of 231

**Subject: Reporting Possible Crime - Concern Regarding Shelby Jane Koelle (Case No. 24-1775-CR-B)**

[Quoted text hidden]

---

🎵 **Cody in Regards to Shelby pregnancy.m4a**
1328K

---

**James Roden** <jroden▮▮▮▮▮▮▮▮▮▮▮           Wed, Apr 9, 2025 at 12:04 PM
To: megan.ru▮▮▮▮▮▮▮▮▮▮   Brianna.Leishma▮▮▮▮▮▮▮▮▮▮▮▮ , mar▮▮▮▮▮▮▮▮▮

**Hi this is James Roden this is my other email and this is the email I reported the newest incident with Shelby to the Guadalupe County Attorney's Office and the current CPS agent that is working with Shelby to find resources for her kids. I made this report April 1st and a week later I'm in jail, me and my family are arrested on 1st degree felony charges, I lost my job, lost all my money to bail and get a lawyer. I stated in the email that I was worried about retaliation and that is exactly what I got.**

**Thank you,**
**James Roden**

---------- Forwarded message ---------
From: **James Roden** ▮▮▮▮▮▮▮▮▮▮
[Quoted text hidden]
[Quoted text hidden]

---

🎵 **Cody in Regards to Shelby pregnancy.m4a**
1328K

Original                                                        26FO02573

# FORD COUNTY SHERIFF'S OFFICE

████████████████

R███████, Kansas ███████
Tel: ██████████

**Investigation Report**

**Description: Family Disturbance**

**Case: 26FO02573**

**Date: 03/20/2026**

**Location:** ████████████████, Ford County, Kansas

**Involved: Cole, Jesse (DOB:** ████████ **)** ████████ **Shelby (DOB:** ████ **)**

**Narrative By: Deputy Vanessa Rivero S.O. 31**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On March 20, 2026, I was on patrol for the Ford County Sheriff's Office (FOSO), in Ford County, Kansas; I was in full uniform and a marked patrol unit.

On March 20, 2026, at approximately 3:23 PM., Ford County Communications dispatched Ford County Deputies to 300 W. Yucca Rd., Bloom, Ford County, Kansas, advising that the reporting party's male half had taken their baby and was refusing to return the child.

At approximately 3:48 PM, I arrived at the residence and made contact with Koelle, Shelby (DOB: ████ ). I asked Shelby what had occurred; Shelby stated that her partner, Cole, Jesse (DOB: ████ ) had arrived at their residence, he became upset because he could not find his drugs and money that had been left in some boxes that he had. Shelby stated that Jesse had got pissed off because his items were missing. When Shelby asked to see their daughter, C███, J████ (DOB: ████ ), Jesse told Shelby "Fuck you. No, you're never going to see her again." Shelby stated that Jesse had shoved Shelby away from the vehicle (2005 Mercury Monetago Kansas License Plate ████ ), to prevent her from opening the door where her daughter was seated. Shelby stated that Jesse then threw her wallet at her. Shelby stated that Jesse had told her that he was going to call CPS on her. Shelby then stated that Jesse has drugs in the home with boxes that have his name.

I asked Shelby if the vehicle was shared between the two; Shelby stated that the vehicle belongs to Jesse. I asked Shelby if Jesse had placed J███ in the vehicle before the altercation had started; Shelby stated that J███ was already inside of the vehicle when the altercation started.

1

Original                                                                                       26FO02573

Shelby said that she was trying to get J̱_ _ _ out of the vehicle, but Jesse would not let her near vehicle at all.

I asked Shelby how Jesse had blocked her away from the vehicle. Shelby stated that Jesse had got in her way and started shoving her away from the car as she reached for the door handle. I asked Shelby if Jesse had shoved her with closed or open fists; Shelby motioned a shove with open fists and stated that Jesse was "pushing her hard core trying to keep her away from the car." I asked Shelby if Jesse had made any other contact with her. Shelby stated that Jesse had tried to swing on her but she had dodged it. I asked Shelby when Jesse had tried to swing on her. Shelby stated that Jesse had swung on her when they were outside by the vehicle. Shelby went on to say that Jesse's son had ran inside the residence because he was scared. I asked Shelby where Jesse's son had ran to. Shelby stated that Jesse's son had ran into the back bedroom because he was frightened to death.

I asked Shelby where Jesse had swung on her. Shelby pointed to the driveway on the east-side of the residence. I asked Shelby which side of the vehicle she was on. Shelby stated that she was on the rear driver side of the vehicle and that her daughter was seated behind the driver's seat. Shelby stated again that as she was trying to open the door Jesse became violent and aggressive. Shelby stated that Jesse would not let Shelby anywhere near J̱_ _ _ _.

I asked Shelby how Jesse had swung on her. Shelby stated that Jesse had his fist clenched near his head and she had dodged it. I asked Shelby where she was at in relation to Jesse when he had his fist clenched. Shelby stated that she was directly in front of him. I asked Shelby how she felt during the altercation. Shelby stated that she had never seen Jesse like that and that Jesse had never done that before. Shelby said that when Jesse got home and realized his things were gone that he went on a rampage.

I asked Shelby if Jesse had made any comments to her when he had swung on her. Shelby stated that Jesse told her, "You'll never see your fucking kid again."

I asked Shelby if Jesse was J̱_ _ _ _s dad; Shelby stated that Jesse is J̱_ _ _ _ s father. I asked Shelby if she and Jesse had any custody agreement; Shelby stated that they do not. Shelby had another child, Ṉ_ Ḵ_ (DOB: _ _ _ _), with her. Shelby stated that Jesse is Ṉ_ 's step-father.

I asked Shelby where Jesse was standing at when he was pushing Shelby. Shelby demonstrated to me that Jesse was standing with his back towards the vehicle blocking the door. Shelby stated that as she reached for the door handle, Jesse extended his arms and pushed her away from the vehicle. Shelby stated that as Jesse shoved her he said, "You're not going to see her until I get my shit back." Shelby stated that she assumed Jesse meant drugs when he said he wanted his shit back.

2

Original                                                                                                    26FO02573

I asked Shelby how many times Jesse had shoved her; Shelby stated "probably twice." I asked Shelby if Jesse had swung on her before or after the shoving. Shelby stated that the swing had come after Jesse had shoved her.

I asked Shelby how far from the car they were when Jesse had swung on her. Shelby stated that they were approximately 3 feet away because he did not want to hit the window.

I asked Shelby if she and Jesse were still together. Shelby stated that they are together and have been together for about a year and a half.

I asked Shelby to clarify where Jesse's son was during the altercation. Shelby stated that Jesse's son was inside of the vehicle when the altercation started. Jesse's son ran out of the vehicle because he was scared and entered the residence. I asked Shelby how old Jesse's son is and where he was sitting inside the vehicle. Shelby stated that Jesse's son is approximately 13, 14, or 15 years old and he was sitting in the passenger seat.

I asked Shelby if Jesse had made any comments to his son. Shelby stated that Jesse had gone back into the residence and told his son to get the fuck back inside of the car, and that they were leaving and never coming back to the residence.

I asked Shelby if any incident had occurred inside of the residence. Shelby stated that Jesse had started screaming while he was inside of the house because he was ticked off. I asked Shelby if Jesse had manipulated anything inside of the house. Shelby said "not that I would know of. I was still outside." Shelby stated that Jesse had left the residence and drove to the east on Highway 54 to Oklahoma City.

I asked Shelby what time the altercation occurred. Shelby stated that the altercation occurred a few hours ago but was unable to provide an exact time.

Sergeant R. Ligon asked Shelby how long Jesse had stayed at the residence before the altercation outside occurred. Shelby said, "I don't know." Shelby stated that when Jesse arrived at their residence he had banged on the door. When Shelby unlocked the door she stated that Jesse had pushed his way into the residence and "got all mad and stuff." Shelby stated that Jesse walked all around the residence trying to find his drugs.

Sergeant Ligon asked Shelby to explain what she meant by saying Jesse got all mad. Shelby stated that Jesse got in her face saying, "where the hell is my shit. I want it now." Sergeant Ligon asked Shelby where all Jesse had gone in the residence. Shelby stated, "He has drugs in our laundry room, he had it in the bedroom, and the living room and stuff." Sergeant Ligon asked Shelby where Jesse went after he could not find his items. Shelby stated that Jesse had gone outside to the car. Sergeant Ligon asked Shelby if Jesse went inside the car or remained outside of the car. Shelby said, "I don't know."

3

Original                                                                26FO02573

Sergeant Ligon asked Shelby when she had gone outside with Jesse. Shelby stated, "All I know is I followed him outside because I wanted to see if my daughter was okay. When I tried to open up the door, he shoved me back."

Sergeant Ligon asked if Shelby and Jesse had walked outside to the vehicle together. Shelby stated that they had. Sergeant Ligon asked Shelby which way the vehicle was facing in the driveway. Shelby stated that vehicle was facing north towards the garage door.

Shelby stated that she wanted to see her daughter to see if she was okay and being fed. Shelby stated that when Jesse is on drugs he does not feed J.        Shelby stated that Jesse told her, "not until I get my shit back, you ain't seeing her." I asked Shelby if she knew whether or not Jesse was under the influence. Shelby stated that Jesse's eyes appeared bloodshot and that he looked like he was high when he arrived at the residence. Shelby stated that Jesse had called her around the time that Ford County Deputies arrived at the residence.

I asked Shelby which door Jesse had entered the residence from when he arrived. Shelby stated that Jesse had walked through the front door. I asked Shelby where Jesse had gone once he was inside of the residence. Shelby stated that Jesse went through the whole house and went everywhere. I asked Shelby what Jesse was doing as he was searching. Shelby stated that Jesse was getting mad and frustrated.

I asked Shelby to explain what she meant by Jesse getting mad. Shelby stated that Jesse was punching stuff, hitting himself, and hitting the walls. I asked Shelby what else Jesse was doing. Shelby stated that Jesse was screaming at her saying "where is my crap." This statement Shelby made was inconsistent with her previous answer when I had asked her if any incident had occurred inside of the residence and if Jesse had manipulated anything inside of the house.

I asked Shelby where the kids were when Jesse was inside of the residence. Shelby stated that she was holding her daughter N       as Jesse was yelling at her. Shelby stated that N       was getting scared and was lunging towards her as she was in Shelby's arms. I asked Shelby where Jesse's son was. Shelby stated that Jesse's son was inside of the back bedroom, shaking from fear. Shelby stated that Jesse told his son "get the fuck in the car now."

I asked Shelby if Jesse had made any comments to her as he was searching the house. Shelby stated that Jesse told her, "You're never going to see her again. Kiss her goodbye."

I asked Shelby how Jesse's facial expression was when he had swung on her. Shelby stated that Jesse's face looked like he did not care and that he was pissed. I asked Shelby to explain his expression. Shelby stated, "Like mad. Like beyond mad. His face was red. Redder than red."

I asked Shelby what happened after Jesse had swung on her. Shelby stated that she called Ford County Communications (FCC) and went back inside. Shelby stated that when she called FCC, Jesse freaked out and left.

4

Original                                                                                    26FO02573

I asked Shelby at what point Jesse's son had got back into the vehicle. Shelby stated that Jesse went back into the residence after she had gone inside. Jesse then yelled at his son to get back into the car. Shelby stated that Jesse's son was visibly shaking and telling Shelby not to let Jesse into the house because he was scared. Shelby stated that Jesse unlocked the front door and got into the house.

At approximately 4:25 P.M., Jesse arrived at the residence. Sergeant Ligon and I made contact with Jesse. Jesse stated that he had heard Shelby called the police and wanted to make the best decision to clear everything up.

Jesse stated that he had boxes inside of the residence that contained vapes, cash, and a box with a gun inside of it. Jesse stated that when he had arrived at the residence earlier, he could not find the items. Jesse stated that he was upset because he had guns and cash missing.

Sergeant Ligon asked Jesse what happened when he first arrived at the residence. Jesse stated that he had initially gone to the residence to pick up some cash that he had stored inside of a box. Jesse estimated that he had left approximately $1,000 dollars inside of a box. Jesse stated that Shelby told him that she had gone through the boxes and that they did not have any money inside of them.

Sergeant Ligon asked Jesse what he did after he could not find the cash. Jesse stated that he had gone back outside and told Shelby that he had returned back to the house to stay the night. After realizing that he did not have the money to fall back on he was going to go back to his dad's residence to figure everything out. Jesse stated that he returned Shelby's wallet to her and made sure she had her food stamp card and the children's Medicaid card. Jesse stated that he and Shelby do not have any set custody arrangement.

Sergeant Ligon asked Jesse what had happened once Jesse and Shelby were by the vehicle. Jesse stated that Shelby wanted to see their daughter J    ·    , so Jesse moved the canopy on the car seat back so that Shelby could see her. Jesse stated that he has been keeping in contact with Shelby about J        's wellbeing through messages and photos.

Sergeant Ligon told Jesse that Shelby had stated that Jesse pushed her; Jesse stated that he did not push Shelby or get near her. Jesse also stated that we could speak with his son B·,    ·    , C    (DOB:            ), who was present during the incident.

I asked B.        what had happened after they got back to the residence. B         stated that Shelby and Jesse had gotten into a verbal argument about Shelby's brother, so he went to the back room of the residence because he does not like when people yell.

I asked B.        what he heard when Shelby and Jesse were yelling; B             ' that the two argued about Shelby's brother having a restraining order against them. B        stated that he walked outside while the argument was ongoing.

5

Original                                                                                          26FO02573

I asked B⸻, if he saw anything occur outside. B⸻, stated that he was in the front passenger seat trying to calm the baby. I asked B⸻ what was wrong with J⸻ that he needed to calm her down. B⸻ stated that J⸻ was hungry.

I asked B⸻ what Jesse and Shelby were doing outside of the car. B⸻ stated that Jesse and Shelby were yelling. B⸻ stated that his father, Jesse, wanted to leave. B⸻ said Jesse gave Shelby her wallet back and drove off.

I asked B⸻ if Shelby had seen the baby before they left. B⸻ stated that Shelby did get to see J⸻. I asked B⸻ how Shelby saw J⸻. B⸻ said that Shelby opened the door and pulled back the canopy of the carseat to see J⸻

I asked B⸻ if he knew what Shelby and Jesse were arguing about. B⸻ stated that Shelby and Jesse were arguing about Jesse's missing items.

After speaking with B⸻, I went back to speak with Jesse and Sergeant Ligon. I asked Jesse if it was him or Shelby who had lifted the canopy; Jesse stated that he did not know.

Sergeant Ligon and I verified that Jesse had the means to care for J⸻. Jesse gave us consent to look through J⸻'s diaper bag. Jesse had extra clothes, diapers, wipes, formula, and bottles with him.

After speaking with Sergeant Ligon, we both deemed that there was not enough probable cause to believe that a domestic had occurred between Shelby and Jesse.

I asked Jesse what kind of bills were in the shoebox that had $1,000. Jesse stated that all of the bills were $100. Jesse described them to be brand new bills.

I asked Jesse to describe his missing handgun. Jesse stated that the handgun is a missing 22 caliber revolver. Jesse was unsure of the brand of the handgun. Jesse stated that he had purchased the firearm from Academy Sports. Jesse stated that the handgun has an interchangeable barrel on it. Jesse stated that the handgun has a 22 magnum chamber on it. Jesse described the handgun to have a 6 inch barrel and a handle that is decorated with the Texas flag. Jesse stated that the handgun is older and 'beat up' in appearance. The handgun was loaded with approximately 6 rounds of ammunition.

Jesse estimated the handgun to be worth approximately $125.

Jesse took B⸻ and J⸻ with him to Oklahoma. N⸻ was left with Shelby.

I have nothing further to report at this time.


**All Events Occurred in Ford County.**

6

**Photos of drugs found in home of Jesse Cole**






**Exhibit C**

**S.J.K. and Cody sworn affidavits sent via email and filed in the 274th District Court**

**AFFIDAVIT OF SHELBY JANE KOELLE**

**STATE OF KANSAS**

**COUNTY OF FORD**

**BEFORE ME, the undersigned authority, personally appeared Shelby Jane Koelle, who, after being duly sworn, deposes and states as follows:**

## I. PERSONAL INFORMATION

1. My name is **Shelby Jane Koelle**, and I am over **18 years of age**.

2. I currently reside in **Dodge City, Kansas, Ford County**.

3. I am competent to testify to the facts contained in this affidavit.

4. I make this statement **freely and voluntarily**, without coercion, duress, or promise of benefit.

## II. CERTIFICATION OF VIDEO TESTIMONY TRANSCRIPTS

5. I am the individual who provided the recorded video testimony titled **"Shelby Testimony Video"**, recorded on **March 10, 2025, at 10:43 p.m.**, and the video titled **"Shelby Testimony for Bond Hearing"**, recorded on **March 12, 2025, at 8:48 p.m.**.

6. I have reviewed the written transcripts of both my video testimonies, attached hereto as:

   o **Exhibit A-1:** Transcript of the March 10, 2025, testimony.

   o **Exhibit C-1:** Transcript of the March 12, 2025, testimony.

7. I affirm and certify that both transcripts are **true, accurate, and complete representations** of my statements in the respective videos.

8. I confirm that the transcripts have not been altered and that they correctly reflect my answers and testimony as I provided them.

## III. STATEMENT REGARDING JAMIE RENEE WALKER'S INNOCENCE

pg. 1

CERTIFIED TRUE AND CORRECT COPY          GUADALUPE COUNTY, TEXAS

Unique Code : CAA-BAA-EIBIHCAA-IEAGBEE-BDFF-JJE-H Page 21 of 23

9. I affirm, under **penalty of perjury**, that my mother, **Jamie Renee Walker, is innocent and had no involvement in the crime committed by Michael Walker**.

10. Jamie Renee Walker was **not an accomplice** and did not aid, assist, encourage, or participate in any way in the crime against me.

11. Instead, Jamie Renee Walker was also **a victim of Michael Walker's abuse**, which included physical violence, threats, and manipulation.

## IV. DISCLOSURES TO GUADALUPE COUNTY SHERIFF'S OFFICE

12. I have made **multiple statements** to the **Guadalupe County Sheriff's Office**, including to **Officer Reamer**, stating that:

- **Jamie Renee Walker was not involved in any criminal activity**.

- **Jamie Renee Walker was also a victim of Michael Walker's ongoing abuse**.

- **Jamie Renee Walker had no knowledge of the crime until after I was removed from the home**.

13. Despite these repeated statements, **Officer Reamer refused to believe me and attempted to convince me otherwise**.

14. The fact that law enforcement **ignored my statements** raises serious concerns about whether all exculpatory evidence was properly considered.

## V. SWORN DECLARATION

15. I make this affidavit under **penalty of perjury** under the laws of the **State of Kansas** and **State of Texas**.

16. I respectfully request that this affidavit, the certified transcripts, and my video testimonies be admitted as evidence in the legal proceedings involving **Jamie Renee Walker (Cause No. 24-1775-CR-B, 274th Judicial District Court, Guadalupe County, Texas)**.

**Further affiant sayeth not.**

## SIGNATURE & NOTARY SECTION

pg. 2



CERTIFIED TRUE AND CORRECT COPY          GUADALUPE COUNTY, TEXAS

Unique Code : CAA-BAA-EIBIHCAA-IEAGBEE-BDFF-JJE-H Page 22 of 23

SIGNED this 15th day of March, 2025.

_Shelby Koelle_

**Shelby Jane Koelle**

**SWORN TO AND SUBSCRIBED BEFORE ME** on this 15th day of March, 2025, by **Shelby Jane Koelle,** who personally appeared before me and signed this affidavit.

_Adriana Vargas_, County of Ford

Notary Public, **State of Kansas**
My Commission Expires: 08/18/2027

ADRIANA L VARGAS
Notary Public, State of Kansas
My Appointment Expires
August 18, 2027

pg. 3

CERTIFIED TRUE AND CORRECT COPY    GUADALUPE COUNTY, TEXAS

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 99051950
Filing Code Description: Letters
Filing Description: from defendant
Status as of 3/31/2025 7:41 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|------|-----------|-------|--------------------|--------|
| Guadalupe County DA Jessica Johnson, ADA | | jessica.johnso███████████ | 3/30/2025 7:45:36 PM | SENT |

I, Linda Balk, Clerk of the District Courts, in Guadalupe County, Texas, certify this copy is true and correct as FILED & RECORDED in the Official Court Records of District Court.

24-1775-CR-B, 12/9/2025 8:58:30 AM

THE HONORABLE LINDA BALK
GUADALUPE COUNTY DISTRICT CLERK,
THE STATE OF TEXAS

SK Initial

# SWORN AFFIDAVIT OF SHELBY JANE KOELLE

**State of** Kansas

**County of** Ford

BEFORE ME, the undersigned authority, on this day personally appeared SHELBY JANE KOELLE, who being by me duly sworn, stated under oath the following:

## 1. Personal Background and Legal Capacity

My name is Shelby Jane Koelle. I am over the age of 18, of sound mind, and fully competent to make this affidavit. I am a single mother. I have never been declared legally incompetent by any court, and I have no legal guardian or conservator. I understand my rights and responsibilities, and I am fully capable of making decisions on my own behalf.

I have the legal right under Texas law and the United States Constitution to speak my truth, to request assistance from people I trust, and to participate in legal matters that affect me. No law prohibits me from submitting an affidavit, testifying, or choosing an advocate to assist me. I am making this statement freely and voluntarily, without any pressure, coercion, threats, or promises.

I understand that this affidavit is made under penalty of perjury, and I affirm that the statements below are true and correct to the best of my knowledge.

## 2. My Prior Statements

I have previously submitted three separate sworn and notarized affidavits, each of which I signed willingly and with full understanding. In addition to those written statements, I have also appeared in multiple video and audio recordings where I confirmed the same facts:

- That I was not coerced or manipulated,
- That I spoke of my own free will,
- And that I was telling the truth.

Everything I previously stated in my prior affidavits remains true today. I have not changed my story, and I continue to stand by my original statements made voluntarily in 2024 and 2025.

## 3. James Roden's Role as My Advocate

I asked James Louis Roden Jr. to help me because I trusted him and needed support. He acted only as my advocate, helping me express what I needed to say and guiding me through the process of submitting truthful statements.

1

_SK_ **Initial**

At no time did James Roden ever threaten, pressure, or force me to say or sign anything. He encouraged me to be honest and made sure I understood what I was signing. He acted with integrity and out of concern for my well-being and safety.

I am stating clearly that James Roden is innocent of the charge of Tampering with a Witness, and I am willing to testify under oath in court that he never committed any wrongdoing toward me.

## 4. Support from Kimberly Kennedy

Kimberly Kennedy is currently helping me submit this affidavit. She is doing so at my request. I asked her to assist me because I needed help getting this affidavit notarized and delivered. She is acting as my advocate, and I want it known that I fully support her helping me.

She is not influencing my words, decisions, or beliefs in any way. She is simply helping me carry out what I have chosen to do.

Any attempt to punish, threaten, or intimidate Kimberly for helping me would be unjust and would interfere with my rights as an independent adult to speak the truth and ask for help when I need it.

## 5. My Voice and My Willingness to Testify

I am ready and willing to testify under oath in court to confirm that I told the truth in all my prior affidavits, video recordings, and phone conversations. Everything I have said has been of my own free will. I am speaking now because I want the truth to be known.

Despite submitting multiple sworn affidavits and recorded statements, I have never been contacted, interviewed, or asked to clarify anything by any law enforcement officer or anyone from the County Attorney's Office as it relates to the charges against James Louis Roden Jr, my advocate. My voice has been ignored, and I believe people have been arrested to stop me from speaking the truth.

## 6. My Rights as a Person with a Disability

I have an intellectual or developmental disability, but I am fully capable of understanding what I am saying and doing. I have never been declared incompetent by a court, and I do not have a guardian. I am an adult and have the right to speak for myself, submit affidavits, and testify in court.

Any attempt to discredit me because of my disability would be a violation of my rights under the following laws:

- **The Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq.**

- **The Rehabilitation Act of 1973, 29 U.S.C. § 794**

2

 _____Initial

- **Olmstead v. L.C., 527 U.S. 581 (1999)**

- **The Texas Persons with an Intellectual Disability Act (Texas Health and Safety Code, Chapter 591)**

Under **Chapter 591 of the Texas Health and Safety Code**, I retain full legal rights unless a Texas court formally appoints a guardian or declares me legally incompetent. **No such ruling has ever been made in my case.** I make this affidavit voluntarily and with full understanding of its contents.

I have the legal right to access the courts, make voluntary statements, and ask for help from people I trust. No one has the right to ignore or dismiss my voice because of my disability.

## 7. My Statement to Those in Power

I want the people in charge of this situation to understand that I am not invisible. I am a human being with rights, thoughts, and a voice. I am not a pawn or a case number. Arresting people who try to help me is wrong. Ignoring my sworn statements is wrong. I ask that the truth be acknowledged and that justice be based on facts, not fear or politics. I will speak the truth as many times as I need to. .

I swear under penalty of perjury that the above is true and correct.

Signed this 29 day of ___May___ , 2025

*Shelby Koelle*

**Shelby Jane Koelle**

Subscribed and sworn to before me, the undersigned authority, on this 29 day of ___May___ , 2025, by Shelby Jane Koelle, who personally appeared before me and affirmed that she executed this affidavit voluntarily and for the purposes stated herein.

*Eduviges Ortiz*

**Notary Public, State of** ___Kansas___

**My Commission Expires:** ___2-28-2028___

NOTARY PUBLIC - State of Kansas
EDUVIGES ORTIZ
My Appt. Exp. 2-28-2028

3

STATE OF Kansas

COUNTY OF Ford

Before me, the undersigned authority in and for the State of Kansas, on this day personally appeared, Shelby Jane Koelle who, after being by me duly sworn, deposed and said:

My name is Shelby Jane Koelle, I am of sound mind, 26 years old and competent to give this affidavit.

I want to make the court and the court members aware that my mother (Jamie Renee Walker) and I are victims of the abuse of Michael Allen Walker. Michal Walker raped me at gunpoint. He told me that he was falling in love with me and that he wanted my Mom dead. He also told me that if I told anyone that he raped me that he was going to shoot me in my mouth.

Michael Walker would beat my mother many times and when he was high on drugs would take his gun and point it at my mother and I and swore to kill us, friends and family if we didn't do what he said. One time he beat her so bad that my mother got a bad concussion. Michael Walker also put a knife to my mothers throat and chocked her until she was unconscious.

Many times, while he raped me, he would take pictures of me while raping me and threatened to post them on Facebook if I ever told. I am so terrified of this man that I don't feel safe with him around and I fear for my daughter who is his biological father from raping me. This man hurt us really bad. I am still terrified of having bad nightmares because of him.

My mother tried to help me but we were to scared of dying and didn't want our family members to be murdered by Michael.

I have read the above statement consisting of 2 page(s), which is based on my personal knowledge, and it is true and correct.

Shelby K

Subscribed and sworn to before me, the undersigned authority, on this the 15 day of November A.D. 2024.

Sandra Roaiz

**Notary**

SANDRA RODRIGUEZ
NOTARY PUBLIC
STATE OF KANSAS
MY APPT. EXP: 09/14/202 S

STATE OF _Kansas_

COUNTY OF _Ford_

Before me, the undersigned authority in and for the State of _Kansas_, on this day personally appeared, _Cody Lane Koelle_ who, after being by me duly sworn, deposed and said:

My name is Cody Lane Koelle, and I am of sound mind, 28 years old and competent to give this affidavit.

Throughout my adult life I lived with my mother (Jamie Renee Walker) and my step father (Michael Allen Walker). On many occasions I have witnessed Michael getting into verbal and physical altercations with my mother. On one particular occasion at Michael's lake house in Cedar Creek Texas I witnessed Michael punch, kick and beat my mother. I tried to step in to help her, however Michael threatened my life. On another occasion in Seguin Texas I witnessed Michael getting upset, started to attack my mother and as soon I as I tried to intervene Michael pulled out a gun and threatened my life and the life of my family.

Michael Walker is mostly drunk and smokes a lot of weed. He owns many guns, is an experienced hunter and has a very bad temper.

I have read the above statement consisting of _1_ page(s), which is based on my personal knowledge, and it is true and correct.

_Cody Koelle_

Subscribed and sworn to before me, the undersigned authority, on this the _15_ day of _November_ A.D. _2024_.

_Sandra Rodriguez_

Notary

SANDRA RODRIGUEZ
NOTARY PUBLIC
STATE OF KANSAS
MY APPT. EXP: 09|14|2025

June 23, 2025


Cofer & Connelly, PLLC

ATTN: Megan Rue

602 W 11th St

Austin TX 78701


**To whom it may concern:**

Please accept this letter as a confirmation that Cody Lane Koelle came in to my location at ██████████ Dodge City KS ██████ on 11/15/2024 time 10:45 A.M. to notarize a document. I did witness him signing the document in front of me, and verified his Identification. I did stamp the letter with my Notary stamp. Please see the Notary Record I have attached.

Sincerely,


Sandra Rodriguez

Landmark National Bank

██████████

Dodge City KS ██████

Sandra Rodriguez                                    06/23/2025
Sandra Rodriguez                                    Date


Notary                                              06/23/2025
                                                    Date

MARIA L. OROZCO
NOTARY PUBLIC
STATE OF KANSAS
MY APPT. EXP: 9/14/2025

# NOTARY RECORD

**Printed Name and Address of Signer:**
Cody Lane Koelle

▆▆▆▆▆▆▆▆▆▆▆▆
DCKS

**Phone Number:** ▆▆▆▆▆▆

**Email:** ▆▆▆

**Signer's Signature:**
X _Cody Koelle_

**Thumb Print**

**Service Performed:**
- O Oath
- O Acknowledgment
- O Jurat
- O Other:

**Identification:**
- O I.D. Card      O Credible Witness
- Ø Drivers License   O Known Personally
- O Passport
- O Other:

**I.D. Number:** ▆▆▆▆▆

**Issued By:** KS

**Issued Date:** 8/1/23

**Expiration Date:** 9/16/2~

**Document Type:** Affidavit

**Date/Time Notarized:** 10:45 AM/PM  11/15/24

**Document Date:** 11/15/24

**Fee Charged:** N/A

**Printed Name and Address of Witness:**

**Phone Number:**

**Email:**

**Witness' Signature:**

**Comments:**

**Record Number**
**74**

# Exhibit D - Plaintiff ADA Protected and Documented Advocacy

1. Texas mandated reporting: abuse, neglect, exploitation, children, elderly persons, and disabled adults

**Disabled adult / elderly abuse, neglect, or exploitation: Texas Human Resources Code Chapter 48**

Texas Human Resources Code § 48.051 requires reporting when a person has cause to believe that an elderly person, a person with a disability, or an individual receiving certain provider services is in a state of abuse, neglect, or exploitation. The report must be made to DFPS or the appropriate state agency

**2. Federal ADA and Section 504: protected advocacy, retaliation, and interference**

**ADA Title V: 42 U.S.C. § 12203**

ADA Title V protects not only disabled persons, but **"any individual"** who opposes disability discrimination or aids another person in exercising ADA rights. Section 12203(b) makes it unlawful to coerce, intimidate, threaten, or interfere with any individual because that person exercised ADA rights or **"aided or encouraged any other individual"** in exercising ADA-protected rights.

ADA Title V and Section 504 protect individuals who aid, encourage, or assist disabled persons in exercising protected rights. Plaintiff's requests for simplified communication, support-person assistance, direct communication with S.J.K., disability-aware procedures, and meaningful access were protected advocacy. Treating those disability-access communications as evidence of witness tampering reverses the purpose of federal disability law.

3. Texas law and guidance on IDD rights, support, family advocacy, and communication

Texas HHS rights handbook: advocate means family or friend helping with decisions

Texas disability policy recognizes that people with IDD retain legal rights, may need help communicating and making decisions, and may receive support from trusted advocates, including family members or friends. The absence of a guardian does not erase the need for accommodations or make advocacy suspicious. It means officials should support the person's meaningful participation, not criminalize the advocate who helps her speak.



# Electronically Certified Court Record

# (Cover Page)

This cover page is for informational purposes only and is not a requirement when presenting the **Electronic Certified Document**. At the last page of this document, you will find the digital signature bearing the identity and authority of the District Clerk. On the left side of each page is a unique code identifying the electronic certification for this document.

## DOCUMENT INFORMATION

| | |
|---|---|
| **Agency Name:** | Guadalupe County District Clerk |
| **District Clerk:** | The Honorable Linda Balk |
| **Date Issued:** | 12/9/2025 8:40:38 AM |
| **Unique Reference Number:** | CAA-BAA-EIBIHCAA-IEABIAG-BDFFIJD-B |
| **Case Number:** | 24-1775-CR-B |
| **Case Document:** | Request:ADA Accommodation Request for Shelby Koelle |
| **Requesting Party Code:** | 100 |

## HOW TO VERIFY THIS DOCUMENT

This electronically certified Court Record contains a unique electronic reference number for identification printed on each page. This document is delivered in PDF format and contains a digital signature identifying the certifier and a tamper proof seal indicating whether this document has been tampered with. The last page of this document contains a digital signature indicating the certifier as the Guadalupe County District Clerk. Open this document using Adobe Reader software to verify the digital signature of the author. Visit https://verify.clerkecertify.com/VerifyImage to learn more about validating this certified copy.



Unique Code : CAA-BAA-EIBIHCAA-IEABIAG-BDFFIJD-B Page 1 of 3

**CASE NO.: 24-1775-CR-B**

| | | |
|---|---|---|
| **STATE OF TEXAS** | § | **COUNTY OF GUADALUPE** |
| **vs** | § | **274th JUDICIAL DISTRICT COURT** |
| **JAMIE WALKER** | § | **GUADALUPE COUNTY, TEXAS** |

# ADA Accommodation Request for Shelby Koelle

**March 23rd, 2025**

**Honorable Gary Steel, Court Coordinator, Guadalupe County Attorney's Office**
274th District Court

■■■■■■■■■■■■■■■■■

Seguin, TX ■■■■■■

**ADA Accommodation Request for Shelby Koelle – Case No. 24-1775-CR-B**
**(State of Texas vs. Jamie Renee Walker 274th District Court Guadalupe County Texas)**

Dear **Honorable Gary Steel, Court Coordinator, Guadalupe County Attorney's Office**

I am writing on behalf of **Shelby Jane Koelle,** a victim and potential witness in the above-captioned case, to formally request **ADA accommodations** for her participation in the upcoming proceedings. Shelby suffers from a **severe intellectual disability (IDD)** with an **IQ of 55** and is currently receiving **Social Security Disability** benefits for her condition. These accommodations are necessary to ensure Shelby's full participation in the judicial process and to protect her rights under the **Americans with Disabilities Act (ADA),** the **Texas Constitution,** and other applicable laws.

**Shelby's Disability and Need for Accommodations**

Due to her **intellectual disability,** Shelby has **significant difficulty** with reading, writing, and understanding complex legal language. She **cannot read or write** and faces challenges articulating her responses in a legal context. Given these limitations, it is critical to provide Shelby with accommodations that will allow her to testify accurately and effectively. Without these accommodations, her ability to meaningfully participate in the case will be severely hindered.

**Request for Accommodations**

FILED
1:34 P M

MAR 2 5 2025
_Linda Balk_
LINDA BALK
Clerk, Dist. Court, Guadalupe Co. Tx.

CERTIFIED TRUE AND CORRECT COPY    GUADALUPE COUNTY, TEXAS

I respectfully request the following accommodations to ensure that Shelby's rights are upheld and that she can fully participate in the legal process:

1. **Court-Appointed Support Person**: We request that a **court-appointed support person** be provided to assist Shelby during questioning and testimony. This person should have experience working with individuals with intellectual disabilities and will help **ensure Shelby understands the questions asked** and **articulate her responses clearly**.

2. **Simplification of Legal Terms**: We request that any legal questions or documents presented to Shelby be **simplified** and explained in clear, plain language that is appropriate for her cognitive abilities.

3. **Additional Time for Response**: Given Shelby's processing time for understanding and responding to questions, we request that she be **given additional time** to respond to questions or statements made by the Court, attorneys, or other witnesses.

4. **Appropriate Communication Methods**: Since Shelby is unable to read or write, we request that any **written communication** from the **County Attorney's Office** or any legal entity be **explained orally** or in a way that Shelby can understand. We also request that **text messages or written correspondence** be avoided in favor of **verbal communication** or in-person visits, as Shelby cannot read text messages and would require someone else to read and explain them.

5. **Breaks as Needed**: We request that Shelby be allowed to take breaks during her testimony if needed to ensure she remains comfortable and able to focus.

6. **Assistance with Court Documents**: Since Shelby is unable to read or write, we request that she be **provided with assistance** in understanding and filling out any necessary documents related to her testimony, and that any correspondence from the **County Attorney's Office** or other legal entities be sent in a format that Shelby can easily comprehend (e.g., with assistance from her support person).

**Instructions for the Guadalupe County Attorney's Office**

Additionally, it is imperative that the **Guadalupe County Attorney's Office**, including **Victim Advocate Ileen Rangel**, take the following actions to ensure proper communication and involvement of Shelby in this case:

1. **Regular Contact**: The **County Attorney's Office** should establish **regular and ongoing contact** with **Shelby Koelle** using accessible methods such as telephone

CERTIFIED TRUE AND CORRECT COPY    GUADALUPE COUNTY, TEXAS

Unique Code : CAA-BAA-EIBIHCAA-IEABIAG-BDFFIJD-B Page 2 of 3

Unique Code : CAA-BAA-EIBIHCAA-IEABIAG-BDFFIJD-B Page 3 of 3

calls or in-person visits. It is crucial that the County Attorney's Office **make sure Shelby fully understands** the case, her rights, and the proceedings.

2. **Use of Appropriate Communication Methods:** All communication with **Shelby Koelle** should **consider her disability** by using simplified language, making sure she understands the nature of the proceedings, and offering **verbal explanations** of any written correspondence or legal terminology.

3. **Assist with Subpoena and Legal Process:** The County Attorney's Office should **assist Shelby in understanding any subpoenas or legal notices**, ensuring that she is fully informed of her role and responsibilities in the case.

4. **Clarification of Shelby's Rights as a Victim:** The County Attorney's Office must ensure that **Shelby's rights as a victim** under the **Victims' Rights Amendment** in the **Texas Constitution** (Article 1, Section 30) are respected, which include her **right to be informed, right to participate** in court proceedings, and **right to be heard**.

**Conclusion**

Shelby has been an essential part of this case as the victim and potential witness, and it is crucial that she be allowed to fully participate in the proceedings. We respectfully request that these **ADA accommodations** be granted to ensure that **Shelby's testimony** is heard, understood, and properly recorded in a manner that protects her rights and promotes fairness in the judicial process.

We look forward to the Court's review of this request and hope that the necessary accommodation will be made to ensure Shelby's participation and effective communication during this case.

Thank you for your attention to this important matter. Should the Court require any additional information or documentation, we are happy to provide it.

Sincerely,
James Louis Roden Jr.
Uncle and Advocate to Shelby Jane Koelle
Phone: ████████████

Shelby Jane Koelle
████████████
████████ Kansas ██████
████████████

I, Linda Balk, Clerk of the District Courts, in Guadalupe County, Texas, certify this copy is true and correct as FILED & RECORDED in the Official Court Records of District Court.



24-1775-CR-B, 12/9/2025 8:40:40 AM

████████ 12/9/2025 8:40:40 AM

THE HONORABLE LINDA BALK
GUADALUPE COUNTY DISTRICT CLERK,
THE STATE OF TEXAS



# Electronically Certified Court Record

# (Cover Page)

This cover page is for informational purposes only and is not a requirement when presenting the **Electronic Certified Document**. At the last page of this document, you will find the digital signature bearing the identity and authority of the District Clerk. On the left side of each page is a unique code identifying the electronic certification for this document.

## DOCUMENT INFORMATION

| | |
|---|---|
| **Agency Name:** | Guadalupe County District Clerk |
| **District Clerk:** | The Honorable Linda Balk |
| **Date Issued:** | 12/9/2025 8:40:28 AM |
| **Unique Reference Number:** | CAA-BAA-EIBIHCAA-IDJJEHJ-BDFFIJC-F |
| **Case Number:** | 24-1775-CR-B |
| **Case Document:** | Correspondence:Letter to the Judge Regarding Subpoena Issues and Conduct of Guadalupe County Attorne |
| **Requesting Party Code:** | 100 |

## HOW TO VERIFY THIS DOCUMENT

This electronically certified Court Record contains a unique electronic reference number for identification printed on each page. This document is delivered in PDF format and contains a digital signature identifying the certifier and a tamper proof seal indicating whether this document has been tampered with. The last page of this document contains a digital signature indicating the certifier as the Guadalupe County District Clerk. Open this document using Adobe Reader software to verify the digital signature of the author. Visit https://verify.clerkecertify.com/VerifyImage to learn more about validating this certified copy.



Electronically Filed
3/21/2025 9:02 PM
Linda Balk
Guadalupe County District Clerk
Denise Stewart

Unique Code : CAA-BAA-EIBIHCAA-IDJJEHJ-BDFFIJC-F Page 1 of 6

**James Louis Roden Jr.**
**Dolores Jane Roden**
**James Louis Roden Sr.**
**Anna Mares Roden –**
**Kimberly Kennedy**

March 21st, 2025

**Judge Gary Steel**
**274th District Court**
**Guadalupe County Courthouse**

**Seguin, TX**

**Re: Cause No. 24-1775-CR-B – Jamie Renee Walker**
**Concerns Regarding Subpoenas, Retaliation, and Subversion of the Legal Process**

Dear Judge Steel,

I am writing to express serious concerns regarding the recent **subpoenas** issued to members of my family in relation to the **bond hearing** for **Jamie Renee Walker** (Cause No. 24-1775-CR-B). These subpoenas were issued only after I intervened to assist the **Guadalupe County Attorney's Office** in obtaining **Shelby Jane Koelle's first-hand testimony**, which is crucial to both the **indictment** and the **bond hearing**. I believe the **Guadalupe County Attorney's Office** retaliated against me and my family for advocating on **Shelby's behalf**, using the **subpoenas** as an intimidation tactic to silence our efforts to ensure that **Shelby's testimony** is heard in the proceedings.

**Family Members Affected by Retaliation**

The **subpoenas** were issued to the following family members, none of whom have **first-hand knowledge** of the facts relevant to the **bond hearing**:

- **My mother, Dolores Jane Roden**, a **stroke survivor** of **83 years old** with **limited mobility**.

- **My father, James Louis Roden Sr.**, a **77-year-old Army veteran** suffering from **severe neuropathy**, which **significantly limits his mobility**.

- **My sister, Kimberly Kennedy**, who lives in **South Carolina** and has a **limited income**.

CERTIFIED TRUE AND CORRECT COPY　　　　　GUADALUPE COUNTY, TEXAS

- **My wife, Anna Mares Roden**, who has **no first-hand knowledge** of the **bond hearing**.

- **Myself, James Louis Roden Jr.**, a **middle school teacher** with **two small children** age ██ and ██

Despite these family members being subpoenaed without any **prior communication** or attempt to verify their **relevance** to the **bond hearing**, the **Guadalupe County Attorney's Office** made no effort to **contact Shelby directly** until **I intervened** and provided the **County Attorney's Office** with **Shelby's contact information**. Prior to my intervention, they did not know **where Shelby lived**, **did not have her phone number**, and had made **no attempt** to reach out to her. It was only **after I provided this contact information** that the **Guadalupe County Attorney's Office** finally made contact with **Shelby**.

**Failure to Investigate Facts Before Filing the Motion**

The **motion to increase bond** was filed without verifying the **facts** surrounding the **allegations** within it. Specifically, **Shelby's name** was used in the motion, suggesting that **Jamie Walker** had violated bond conditions by **contacting the complaining witness**, yet the **Guadalupe County Attorney's Office** never attempted to **contact Shelby directly** to verify these claims. This failure to **verify the facts** before filing the motion raises serious concerns about the **due diligence** of the **Guadalupe County Attorney's Office**.

Instead of ensuring that **Shelby's testimony**, which could **exonerate Jamie**, was properly evaluated and considered before filing the motion, the **Guadalupe County Attorney's Office** proceeded with filing it, without even confirming its accuracy. This oversight undermines the **integrity** of the process and seems to further highlight the **lack of commitment** to a fair and just outcome.

**Retaliatory Nature of the Subpoenas**

After I provided **Shelby's contact information**, the **Guadalupe County Attorney's Office** retaliated by issuing **subpoenas** to my family members, knowing that none of us had **first-hand knowledge** of the facts relevant to the **bond hearing**. The **subpoenas** were issued without any **prior consultation**, **investigation**, or understanding of whether our testimony would be relevant or helpful to the **bond hearing**.

Instead of thanking me for providing the **contact information** that enabled them to connect with **Shelby**, the **County Attorney's Office** chose to issue **subpoenas** with threats of **jail time** and **$500 fines**, using the subpoena process as a **punitive measure** to intimidate my family. These **subpoenas** were not issued in good faith to gather **relevant testimony**, but rather as a form of **retaliation** for our **advocacy on behalf of Shelby**. This

CERTIFIED TRUE AND CORRECT COPY          GUADALUPE COUNTY, TEXAS

Unique Code : CAA-BAA-EIBIHCAA-IDJEHJ-BDFFIJC-F Page 2 of 6

constitutes an **abuse of the subpoena power**, which is meant to be used for legitimate purposes, not to **harass** or **intimidate** those involved in the case.

### Brady Evidence and Retaliation

As I've previously stated, **Shelby's testimony** is **exculpatory evidence** that is **critical** to both the **bond hearing** and the **indictment**. According to **Brady v. Maryland (1963)**, the **prosecution must disclose exculpatory evidence** that could potentially **exonerate the defendant**. In this case, the **Guadalupe County Attorney's Office** has failed to acknowledge the importance of **Shelby's testimony** and its **exculpatory value**. **Shelby's testimony** could potentially **dispel any allegations** against **Jamie**, yet instead of thoroughly investigating it, the **County Attorney's Office** chose to **punish** my family for advocating for the **truth** to be heard. This raises serious concerns about the **retaliatory** and **intimidatory nature** of their actions.

### Legal Implications of Retaliation and Abuse of Subpoena Power

The actions taken by the **Guadalupe County Attorney's Office** raise significant **legal and ethical concerns**. The **misuse of subpoena power**, **failure to investigate** relevant facts, and **retaliatory tactics** employed in this case violate established **legal principles**:

1. **Misuse of Subpoena Power:**
   The **U.S. Supreme Court** in **U.S. v. Fisk (1869)** and **U.S. v. Nixon (1974)** emphasized that subpoenas must be issued for **legitimate purposes** and must be used in good faith to gather **material evidence**. In this case, the subpoenas were issued with no reasonable basis and serve only to **harass** and **intimidate** witnesses.

2. **Failure to Investigate:**
   In **State v. Simpson, 318 S.W.3d 74, 85 (Tex. App. – Houston [14th Dist.] 2010)**, the court emphasized that subpoenas should only be issued if they are **reasonably necessary** to gather **relevant testimony**. The **failure** to contact **Shelby directly** to verify her **exculpatory testimony** before filing the **motion to increase bond** constitutes a failure to exercise **due diligence**.

3. **Ethical Violations:**
   **Texas Disciplinary Rules of Professional Conduct, Rule 3.04**, prohibits attorneys from using the **subpoena power** to **burden, harass,** or **intimidate** witnesses. The actions of the **Guadalupe County Attorney's Office,** by issuing subpoenas without **prior consultation** or consideration of their **relevance**, appear to violate this rule.

4. **Retaliation Against Advocacy:**
   **Retaliation** for advocating for **Shelby's testimony** and **ensuring her rights** are

CERTIFIED TRUE AND CORRECT COPY        GUADALUPE COUNTY, TEXAS

Unique Code : CAA-BAA-EIBIHCAA-IDJEHJ-BDFFIJC-F  Page 3 of 6

Unique Code : CAA-BAA-EIBIHCAA-IDJEHJ-BDFFIJC-F Page 4 of 6

heard is a violation of **due process** and the right to a **fair trial**. As established in **Brady v. Maryland (1963)**, the **prosecution is obligated** to disclose **exculpatory evidence**, and the **failure to investigate or verify Shelby's testimony** constitutes a **violation** of **due process**.

**Request for Action**

I respectfully request that this Court review the **subpoenas** issued to my family and the **actions taken by the Guadalupe County Attorney's Office**, as these actions seem intended not to gather **relevant testimony** but to **punish** and **intimidate** those who have advocated for **Shelby's testimony** to be heard. Please consider taking appropriate action to ensure that **Shelby Jane Koelle's testimony** is **given proper weight** in these proceedings. **Shelby's testimony** is **critical** to ensuring **truth** and **justice** in this case, and I believe it should be heard at the **bond hearing** to ensure that all facts are properly considered.

Thank you for your time and attention to this matter.

Sincerely,

**James Louis Roden Jr.**

*James L. Roch Jr.*

**Date:** March 21st, 2025

League City TX ▓▓▓

**Disclaimer:** I am not an attorney, nor am I offering legal advice. I am a concerned family member and a **citizen of the United States and Texas**, seeking to ensure that the **truth** and **justice** are served in this case. My intention is solely to provide information that may assist in bringing the **truth** to light and ensuring that **Shelby Jane Koelle's voice** is heard in accordance with her **constitutional rights**. I am not acting in any legal capacity and do not intend to interfere with the legal process or represent any party in a legal manner.

CERTIFIED TRUE AND CORRECT COPY    GUADALUPE COUNTY, TEXAS

**Key Legal Precedents and Citations:**

1. **U.S. v. Fisk (1869):** Subpoenas must be issued for **legitimate purposes**, such as obtaining relevant and material testimony.

2. **U.S. v. Nixon (1974):** Subpoenas must serve the purpose of obtaining **evidence** that is **material** and **relevant** to the case.

3. **Brady v. Maryland (1963): Exculpatory evidence** (like **Shelby's testimony**) must be disclosed, and failure to do so may violate **due process**.

4. **Texas Rules of Criminal Procedure - Rule 17:** Subpoenas must be issued for **relevant** testimony related to the case.

5. **Texas Disciplinary Rules of Professional Conduct - Rule 3.04:** A lawyer must not use subpoenas to **harass**, **burden**, or **intimidate** witnesses.

6. **ABA Model Rules of Professional Conduct - Rule 3.4:** A lawyer must not use subpoenas for **improper purposes**, including retaliation against those advocating for the truth.

CERTIFIED TRUE AND CORRECT COPY     GUADALUPE COUNTY, TEXAS

Unique Code : CAA-BAA-EIBIHCAA-IDJEHJ-BDFFIJC-F Page 5 of 6

**Automated Certificate of eService**

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Envelope ID: 98766008
Filing Code Description: Letters
Filing Description: Letter to the Judge Regarding Subpoena Issues and Conduct of Guadalupe County Attorney's Office
Status as of 3/24/2025 7:53 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Guadalupe County DA Jessica Johnson, ADA | | jessica.johnson███████ | 3/21/2025 9:02:15 PM | SENT |

Unique Code : CAA-BAA-EIBIHCAA-IDJEHJ-BDFFIJC-F Page 6 of 6

                                             **Paladin R <░░░░░░░░░░░░░>**

# Important Information Regarding the Case of Jamie Renee Walker (Case No. 24-1775-CR-B)

1 message

---

**Paladin R <░░░░░░░░░░░░░░>**                               Wed, Mar 19, 2025 at 5:06 AM
To: Jessica Johnson <jessica.johnson@░░░░░░░░░░░░>
Cc: Kelly Pittl <kelly░░░░░░░░░░

**Re: Important Information Regarding the Case of Jamie Renee Walker (Case No. 24-1775-CR-B)**

Dear Ms. Johnson and Kelly Pittl,

I am writing to you as a **concerned family member** of **Jamie Renee Walker** and Shelby Jane Koelle as someone who values truth, justice, and fairness in our legal system. My only intent in reaching out is to ensure that **all relevant and truthful information** is made available to those involved in this case. I firmly believe that a fair and just judicial process benefits everyone, and I hope this information will be taken into consideration.

I want to bring to your attention that **Shelby Jane Koelle, the alleged victim in this case, has signed a sworn affidavit stating that Jamie is innocent**. She has also provided **a video statement affirming this**, and she has been consistent in maintaining that **Michael Allen Walker is solely responsible for the crime**. Given the significance of this information, I felt it was my duty to make sure you were aware of it.

Additionally, I have phone recordings in which **Cody Koelle clearly states that he has no firsthand knowledge of Jamie ever contacting Shelby while she has been on bond**. There are concerns that there may be **an effort to falsely accuse Jamie of violating bond conditions**, and I wanted to ensure that all parties involved are fully informed before any further action is taken on such allegations.

**Shelby has personally requested to testify on Jamie's behalf**, as she believes it is important that the truth be heard in court. To support her in doing so, I will be **accompanying her and providing transportation to each pretrial hearing** to ensure that she is able to testify. Given the significance of her testimony, I respectfully ask that **Shelby be given the opportunity to speak under oath** and that her statements be properly considered as part of this case.

I understand that these matters are complex, and I have great respect for the role of your office in pursuing justice. My hope is that **this information is considered carefully, so that all parties have access to the full truth** and that the judicial process is as fair and transparent as possible.

I appreciate your time and consideration, and I am available if you need any further clarification. I trust that your office will do what is right in ensuring that all evidence is properly reviewed and considered in pursuit of justice.

Sincerely,
James Louis Roden Jr. and Family
Phone ░░░░░░░░░░
Email: ░░░░░░░░░░░░░░

Cody Koelle Phone Call March 18th, 2025

Shelby Video Testimony of Jamie Walker Innocence

Shelby Video Testimony of Jamie Walker Bond Violation Innocence.


Going forward the following people will be available for testimony and will be at all future hearings to testify under oath.

James Louis Roden Jr. - Uncle to Shelby Jane Koelle (School Teacher 20+ years experience)
James Louis Roden Sr - Grandfather to Shelby Jane Koelle (Retired Master Sergeant)
Dolores Jane Roden - Grandmother to Shelby Jane Koelle (Retired school teacher)
Kimberly Kennedy - Aunt to Shelby Jane Koelle (Minster at Morning Star Church)
Anna Mares Roden - Aunt to Shelby Jane Koelle (School Counselor 20+ years experience)
Shelby Jane Koelle - Victim in this case

Everyone can testify and give first hand accounts of the abuse Jamie Renee Walker suffered at the hands of Michael Allen Walker and Shelby Jane Koelle can give first hand testimony as to the facts of the case as it relates to Jamie Renee Walker and Michael Allen Walker.

---

**6 attachments**



**Shelby Affidavit Picture March 2025.JPG**
848K

**Exhibit B1 Transcript Shelby Testimony Video.pdf**
45K

**Exhibit B2 Transcript of Shelby Testimony Bond Hearing.pdf**
45K

**Exhibit D Motion to Oppose James Sr Affidavit.pdf**
619K

**Exhibit E Motion to Oppose Dolores Jane Roden Affidavit.pdf**
500K

**Exhibit F Motion to Oppose James Jr Affidavit.pdf**
809K



**Paladin R <​████████████████████>**

---

# Brady Material

---

**Paladin R <​███████████████>**                                        Fri, Mar 21, 2025 at 3:59 PM
To: Jessica Johnson <jessica.johnson​███████████>
Cc: Ileen Rangel <ileen.rangel​█████████>, Maritza Stewart <maritza.stewar​███████████v>, Jonathan Amdur
<jonathan.amdur​████████████>, Kelly Pittl <kell​████████████>

### Subject: Clarification of Brady Material, Subpoenas, and Family Testimony

Dear Jessica Johnson,

I am writing to clarify the **Brady material** in the case of **Jamie Renee Walker** and to express serious concerns regarding the **subpoenas** issued to my family members in relation to the **bond hearing**. I am deeply concerned that the **subpoenas** appear to be issued **not as an effort to uncover the truth**, but rather as an act of **punishment** and **retaliation** against the family for advocating for **Shelby** and seeking **justice**. My primary goal is to ensure that **Shelby Jane Koelle's testimony** is properly considered and that **justice** is served.

### Legal Concerns Regarding Subpoenas

It has come to my attention that the **subpoenas** issued to my family members appear to be **punitive** in nature, and I am concerned that they may be in **violation of legal precedent** regarding **proper subpoena usage**. A subpoena should be used to ensure the **presence of witnesses** who have **relevant testimony** for the case, but **not as a coercive or intimidating tool**.

Legal precedent and **ethical standards** set forth by the **American Bar Association (ABA)** and in **case law** provide guidance on the **appropriate use of subpoenas**. A subpoena should **not be used to harass, burden, or intimidate** potential witnesses. In **U.S. v. Fisk (1869)**, the court ruled that subpoenas must have a **substantial purpose** and cannot be issued **solely for harassment**. Further, the **ABA Model Rules** (Rule 3.4) state that a lawyer should not **use means that have no substantial purpose other than to delay or burden a person**.

The **subpoenas issued** to my family without any prior communication about their **role** or **relevance** to the **bond hearing** suggests **a misuse of the subpoena power**. Instead of contacting the family to understand **what they know** and whether their **testimony is relevant**, the **DA's office has issued subpoenas** with the **threat of jail time** and **$500 fines**—this is both **coercive** and **punitive**. The **lack of prior communication** and the **threatening nature** of the subpoenas seem to suggest **intent to intimidate** rather than a genuine effort to **gather truth**.

### The Role of the Family and Shelby's Testimony

It is also troubling that the **DA's office** is aware that **Shelby's statements** are the key **Brady material** in this case, and yet they have issued subpoenas for the **bond hearing** without ever reaching out to the family to discuss their relevance or what they can contribute. The family members are **willing to testify** about what they have **heard Shelby say**—specifically, that **Jamie is innocent** and that **Shelby has stated this** repeatedly. This is **exculpatory evidence** that supports Jamie's innocence, yet it has been handled in a way that makes it appear as if the **subpoenas** were issued out of **frustration** with the family's willingness to assist in uncovering the truth.

The **bond hearing** typically focuses on whether the defendant should be released on bail, not on the **merits of the charges**. It is **reasonable to assume** that **Shelby's testimony**, which primarily

speaks to **Jamie's innocence** and **Shelby's victimization**, does not directly relate to the **bond hearing**. As such, the **subpoenas** appear to be an attempt to **punish** the family for their advocacy for **Shelby** rather than an attempt to **gather relevant evidence**.

### Legal Implications of the DA's Actions

The legal implications of **misusing subpoenas** for **punitive purposes** can be significant. The **misuse of subpoena power** may violate **due process** and undermine **fairness** in the legal process. If subpoenas are issued without proper **investigation** and **understanding of the relevance of the testimony**, it can be seen as an **abuse of legal process**, which can lead to **court intervention**. In the case of **U.S. v. Nixon (1974)**, the **Supreme Court** ruled that subpoenas should serve the purpose of **obtaining evidence** that is **material** and **relevant** to the case. If the prosecution issues subpoenas without first investigating the **necessity** of the testimony, this could be seen as **an improper use** of the **subpoena power**.

### Failure to Communicate with Family Members

In addition to the **legal concerns** around the **subpoenas**, it is troubling that the **DA's office** has failed to **communicate directly with the family** before issuing the subpoenas. **My father** reached out to **Ileen Rangel** and was told she could not explain **the nature** of his subpoena due to **legal reasons** he did not fully understand. **No family members** were **consulted** about their knowledge or what they could contribute to the case, and yet the **subpoenas** were still issued, complete with threats of **jail time** and **$500 fines**.

This lack of **consultation** before issuing subpoenas is **irregular** and potentially **improper**, given that the **family is willing to help**. Rather than issuing subpoenas, the **DA's office** could have **reached out to the family** to discuss their potential role and the **relevance** of their testimony. This **failure to communicate** not only undermines the **prosecutorial process**, but it also raises the **possibility of misconduct** in how the **subpoenas** were used.

### Financial and Logistical Burden

I want to be transparent about the financial burden this situation is placing on me. As a teacher with two children aged 10 and 12, I simply do not have the funds to fly to Kansas, pick up Shelby, and bring her back to Seguin for the bond hearing. The costs associated with flights, hotels, daycare, and missing work make this an undue burden that I cannot afford at this time.

However, I fully understand the importance of Shelby's testimony to this case. She is the central witness in the bond hearing, and I strongly urge you to find a way to help facilitate her attendance at the hearing so she can testify first-hand about what actually happened. Given that the **County Attorney's office is willing to provide air travel, lodging, and transportation for Cody Koelle's testimony**, it would only seem logical and equitable to extend the same assistance to **Shelby**, considering she is the **star witness for the State** and can provide critical **truth** and **justice** to this case. As of now, I will not be able to provide such services for Shelby at this time, and I hope that the same consideration can be given to her as was provided to Cody.

### Family Testimony and Relevance

The only testimony I can provide at the bond hearing is that I **heard Shelby say exactly what she will likely testify to under oath**, which feels **redundant and unnecessary**. In light of this, I urge you to **reach out to each family member you intend to subpoena** and have a conversation about what they know and how it **relates to the case**. If their testimony does not add new information beyond what **Shelby** can provide, it may not be necessary to bring them in person. I am also concerned that issuing the subpoenas via email, rather than through traditional methods, may result in the recipients not being aware of them if they are inadvertently filtered into their spam

folders. Reaching out to the individuals and having a conversation with them prior to the formal delivery of the subpoenas would seem to be the most professional and reasonable approach.

## A Collaborative Approach

My family and I are **willing to help**, but we need to ensure that we are **working together** in a **cooperative, professional, and fair manner**. I want to make sure that **Shelby's testimony** is central to the process, as she is the **actual victim** and has the **first-hand knowledge** that could significantly impact the case. I am committed to helping **find the truth** and **justice**, and I believe that ensuring **Shelby's voice** is heard is a critical part of this.

Please feel free to reach out to me if you'd like to discuss this further or arrange a way forward that allows for **Shelby's testimony** to be included in the **bond hearing**. I am hopeful that we can work together in a way that upholds **justice** for **Shelby**, and I look forward to collaborating with you in a **professional** and **respectful** manner.

Thank you for your time and attention to this matter.

Sincerely,
**James Louis Roden Jr.**

**Disclaimer**: I am not an attorney, nor am I offering legal advice. I am a concerned family member and a **citizen of the United States and Texas**, seeking to ensure that the **truth** and **justice** are served in this case. My intention is solely to provide information that may assist in bringing the **truth** to light and ensuring that **Shelby Jane Koelle's voice** is heard in accordance with her **constitutional rights**. I am not acting in any legal capacity and do not intend to interfere with the legal process or represent any party in a legal manner.

[Quoted text hidden]

 **Paladin R** ████████████████████████

---

# ADA Accommodation Request Shelby Jane Koelle

2 messages

---

**Paladin R** ████████████████████        Sun, Mar 23, 2025 at 9:02 PM
To: kimberly.mcmahon ████████████████, linda.balk ██████████
Cc: Jessica Johnson <jessica.johnson ███████████>, Jonathan Amdur <jonathan.amdur ████████████>, Maritza Stewart <maritza.stewart ███████████>, dwillborn@ █████████████, Kelly Pittl <kelly@ ████████████>

See Attached

---

📄 **ADA Request for Shelby Jane Koelle.docx**
19K

---

**Paladin R** ████████████████████        Sun, Mar 23, 2025 at 9:03 PM
To: kimberly.mcmahon ████████████████, linda.balk █████████
Cc: Jessica Johnson <jessica.johnson ██████████████, Jonathan Amdur <jonathan.amdur ████████████>, Maritza Stewart <maritza.stewart ███████████>, dwillborn ███████████s, Kelly Pittl <kelly █████████

PDF version of ADA Accommodation Request Shelby Jane Koelle

See attached

On Sun, Mar 23, 2025 at 9:02 PM Paladin R <j████████████████ wrote:
> See Attached

---

📄 **ADA Request for Shelb** ██████████████
54K

---

Case 5:26-cv-00054-XR     Document 15    Filed 05/19/26    Page 114 of 231

![Gmail](M Gmail)                                    **Paladin R** <▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮>

# RE: **EXTERNAL** Re: Brady Material

**Paladin R** <▮▮▮▮▮▮▮▮▮▮▮▮▮▮>                          Tue, Mar 25, 2025 at 3:54 AM
To: Jessica Johnson <jessica.johnson▮▮▮▮▮▮▮▮▮▮▮▮>
Cc: Ileen Rangel <ileen.rangel▮▮▮▮▮▮▮▮▮▮, Maritza Stewart <maritza.stewar▮▮▮▮▮▮▮▮▮▮, Jonathan Amdur
<jonathan.amdur▮▮▮▮▮▮▮▮▮, Kelly Pittl <kelly▮▮▮▮▮▮▮▮▮, dwillborn▮▮▮▮▮▮▮▮▮

**Subject: Concerns Regarding Subpoena Power and Shelby's Accommodations**

Dear Ms. Johnson,

Thank you for your response and for addressing some of my concerns. However, I feel it is necessary to provide additional context regarding the subpoena and how it was issued, as well as the ongoing issues with Shelby's accommodations.

First, regarding the subpoenas issued to my family, it is important to clarify that when I mentioned my family being willing to testify, it was in reference to their knowledge of the individuals involved in this case: Jamie Renee Walker, Michael Allen Walker, and Shelby Jane Koelle. My family has known Jamie and Shelby their entire lives and is well aware of the challenges they face, including the disabilities they suffer from, which is important context for understanding the dynamics at play in this case. My personal knowledge in helping Jamie navigate the legal system as a victim of domestic violence, particularly by Michael Allen Walker, is also highly relevant (Please refer to my "first hand knowledge email").

I have had direct dealings with Michael, and when he discovered that I had been in communication with the County Attorney's Office regarding my concerns about his violent tendencies, particularly in relation to his **Aggravated Assault with a Deadly Weapon** charge against Jamie in March of 2022, he reacted with threats. This led me to contact the County Attorney's Office to inquire about why my name had been disclosed to Michael, especially considering the protective order in place. It is critical that the prosecution has all the context, especially from immediate family members who understand the parties involved, their histories, and the background of the case. I believe this is standard practice in any thorough investigation of this nature.

It is my belief that the reason the County Attorney's Office knows so little about Jamie and Shelby's disabilities is because Officer Reaner communicated to Shelby's family that she has a policy of only speaking with the victim, not family members. While I understand the need to prioritize the victim's voice, this narrow approach to the investigation ultimately harms, rather than helps, the search for the truth. By excluding family members from the conversation—who possess critical context and insight into the lives of Jamie and Shelby—important details about their disabilities and the history of the case are overlooked. This policy, in practice, severely limits the scope of the investigation and contributes to the lack of understanding about the context surrounding this case. It is crucial for a thorough investigation that all relevant parties, including immediate family members, are included in the process to avoid mistakes, inaccuracies, and ensure that justice is served.

Regarding Shelby's accommodations, I must reiterate that Shelby suffers from a severe intellectual and developmental disability (IDD) with an IQ of 55, which significantly impacts her ability to read and write. Despite this, your office continues to communicate with her via text message, which is not an appropriate method for someone in Shelby's position. As mentioned, Shelby often relies on her Aunt Kimberly Kennedy to help her read and respond to text messages, and she uses voice-to-text technology, which can be a cumbersome process that often leads to miscommunication.

Shelby's condition has been well-documented in an IDD assessment completed in May 2024 (which I've attached for your reference), and she has received Social Security Disability benefits due to her IDD since the age of 6 years old. Given this, I strongly urge you to communicate with Shelby using methods that align with her cognitive abilities, such as phone calls or platforms like Google Meet. This would allow for a clearer, more effective communication process and help ensure that Shelby's participation as a victim in this judicial process is properly accomediated.

The issue of whether your office has been communicating with the real Shelby prior to me providing her contact information last week is highly concerning, especially considering your office has continued, up to this very day, to exclusively communicate with Shelby via text message. This ongoing reliance on text-based communication only further highlights the notion that the County Attorney's Office has little to no understanding of Shelby's severe intellectual disability.

If your office had been in regular contact with Shelby since the indictment, this critical information about her inability to read or write would have been well-established. The fact that your office has persisted with text-based communication, despite this knowledge, suggests a lack of due diligence in understanding Shelby's needs. When combined with the other serious issues surrounding the subpoenas—such as the improper issuance, lack of investigation, and failure to communicate properly with the family—it becomes clear that there are significant problems in this case that must be addressed. This raises further questions about the integrity of the prosecution's handling of this matter and underscores the need for a thorough review of the entire investigation.

In conclusion, I request that your office reconsider its approach to both the subpoenas and Shelby's accommodations. I believe that with proper consideration and communication, we can ensure that justice is served and that Shelby's rights are fully protected. Thank you for your time and attention to this matter. I look forward to your response.

Thank you,
James Roden Jr.

P.S. Jamie Renee Walker continues to have difficulty effectively communicating with Kelly Pittl. Every attempt Jamie has made to get proper accomediations to review her evidence has been dismissed and simple questions about the case have been ignored. If you can kindly assist Kelly Pittl in getting Jamie the information she needs, it would be much appreciated. I will be giving a follow up email to help detail the things Jamie has stated she has concerns about and needs clarification on.

**Disclaimer**: I am not an attorney, nor am I offering legal advice. I am a concerned family member and a **citizen of the United States and Texas**, seeking to ensure that the **truth** and **justice** are served in this case. My intention is solely to provide information that may assist in bringing the **truth** to light and ensuring that **Shelby Jane Koelle's voice** is heard in accordance with her **constitutional rights**. I am not acting in any legal capacity and do not intend to interfere with the legal process or represent any party in a legal manner.

[Quoted text hidden]



## please read URGENT



Paladin R <████████████████████>                                              Wed, Mar 26, 2025 at 10:20 PM
To: Kelly Pittl <kelly█████████████, Jessica Johnson <jessica.johnson███████████, Jonathan Amdur
<jonathan.amdu██████████████, Maritza Stewart <maritza.stewar███████████, Ileen Rangel
<ileen.range████████████████, dwillbor██████████████

Dear Guadalupe County Attorney's Office, Kelly Pittl and Advocates,

It was recently shared with by Jamie that the main piece of evidence that Jamie aided Michael Allen Walker is that during interrogation Jamie acknowledged that she performed an oral sexual act upon Michael while Shelby was in the room. However, I feel it's important to draw attention to a critical fact that seems to have been overlooked in the case: Shelby has consistently testified that Jamie was coerced at gunpoint by Michael Allen Walker to perform sexual acts including the one in question, under the threat of death. This is a crucial detail because it changes the narrative entirely —Jamie was not aiding Michael in committing a crime but was herself a victim of physical rape and psychological abuse, coerced into a situation under duress.

During Jamie's interrogation with Officer Reaner, the issue of the gun was not mentioned at the time, as Jamie was understandably in fear for her life. Michael had made it clear that he believed he was above the law and threatened to kill Jamie if she spoke out against him. While Officer Reaner initially acknowledged Jamie's history of abuse, it appears that her Intellectual and Developmental Disabilities (IDD) were not fully understood, leading to a misinterpretation of Jamie's hesitance to open up. Unfortunately, this may have been wrongly viewed as an admission of guilt, when it was, in fact, a result of fear and confusion caused by the trauma Jamie had suffered at Michael's hands.

Both Shelby and Jamie have repeatedly informed investigators that Michael held a gun to Jamie's head, forcing her to participate in sexual acts. This information was shared with Officer Reaner, yet it seems that this critical evidence has not been fully considered or integrated into the case. Shelby has consistently stated to her family, including her grandparents, and others that Jamie was beaten and threatened with death by Michael. However, despite these statements, this testimony seems to have been overlooked by the prosecution. If this information had been shared with Jamie a year ago, as she requested, this misunderstanding could have been easily resolved. This underscores the importance of disclosing evidence as early as possible. Our family has been confused and frustrated by the prolonged nature of this case, as we were under the impression that all relevant facts were already known to everyone involved. This information was provided to investigators well before the indictment. Considering Michael's history and the protection order against him, which was put in place to protect Jamie, these facts hold significant weight. Both Jamie and Shelby have consistently shared this with our family, further confirming the credibility of their statements.

While I do not have a complete understanding of what all transpired in Seguin, Texas at the Walker house, I do know that my sister, Jamie, has suffered significant trauma in her life, including multiple instances where Michael has harmed her. I also know that Jamie has faced challenges due to her intellectual disability, which has significantly impacted her life. Shelby, too, suffers from severe IDD and, like Jamie, needs the assistance of trained professionals to help them navigate this situation.

I am humbly requesting that the court consider appointing a **guardian ad litem** to represent Shelby. As someone who deeply cares for them both, I am limited in my ability to provide the expertise and resources they so desperately need. While I have done everything I can to advocate for them, I believe that someone with professional training and experience in these matters could

offer much-needed assistance to ensure their voices are heard and their rights are protected and this is beyond my expertise.

As a husband, father, and teacher, I face many limitations in terms of resources and time. I am doing all I can to support my sister and Shelby, but I fear that without appropriate legal support and advocacy, they will not receive the help they need. This is why I am reaching out for assistance— because I believe it is essential for them to have a voice in the process, particularly as victims in this case.

Additionally, I must share that Shelby was threatened by CPS today, with accusations that she attacked her baby. This is not true, and I am deeply concerned that this is an attempt to intimidate or retaliate against Shelby for speaking out and asking for help. This situation is becoming overwhelming, and I fear for the safety and well-being of both Shelby and Jamie. My efforts alone are not enough, and I believe it is vital for those who are trained to advocate for women in these circumstances to step in and provide the support they need.

Unfortunately, despite numerous phone calls, emails, and voicemails, I have yet to hear back. This silence only amplifies the fear and uncertainty that Jamie and Shelby are experiencing. In any other situation, I would expect that a conversation would be had to address the concerns of the family, and that a collaborative effort would be made to ensure that both Jamie and Shelby's voices are heard. I reached out to ensure that Shelby has a voice in this process, and to make sure that her rights as a victim are upheld. I also reached out to Kelly Pittl on Jamie's behalf because she has been given little support or communication, despite her right to have counsel and answers to her questions.

This will be my final attempt to open dialogue and seek help. If you are unable or unwilling to communicate with me, I understand, but I urge you to reach out directly to Shelby and ensure that Kelly Pittl is able to communicate with Jamie. These women need to be heard and given the opportunity to fully participate in this process. You have more knowledge and access to resources and are in a better position to help them.

Thank you for your time and consideration. I remain hopeful that the right thing will be done for them both.

Thank you and God Bless,

James L Roden Jr.
Family Advocate

**Disclaimer**: I am not an attorney, nor am I offering legal advice. I am a concerned family member and a **citizen of the United States and Texas**, seeking to ensure that the **truth** and **justice** are served in this case. My intention is solely to provide information that may assist in bringing the **truth** to light and ensuring that **Shelby Jane Koelle's voice** is heard in accordance with her **constitutional rights**. I am not acting in any legal capacity and do not intend to interfere with the legal process or represent any party in a legal manner.

[Quoted text hidden]

 Gmail

**Paladin R <jimlouisroden@gmail.com>**

## Stepping down as Advocate, Jamie and Shelby need a replacement advocate.

**Paladin R** <jimlouisroden@gmail.com>                                    Thu, Mar 27, 2025 at 9:49 PM
To: dwillborn ███████████████, Kelly Pittl <kelly████████████

Dear Mr. Pittl and Mr. Willborn,

I am writing to clarify a situation regarding communication between Jamie, Shelby, and your office. First and foremost, I want to sincerely apologize for any misunderstanding and admit that I was not aware of the sensitive information included earlier in the email chain. Jamie asked me to help share her story and to explain the difficulties she has been facing. As she struggles with reading, writing, and understanding due to her intellectual and developmental disabilities (IDD), she requested my assistance in replying to an email and expressing her experiences. I did not intend to overstep or cause any harm in any way, and I deeply regret any inconvenience this may have caused.

I am not an attorney and, as such, I have made multiple attempts to contact your office for assistance, but have yet to receive a response. My primary goal is to ensure that Jamie and Shelby—both of whom have IDD—receive the support they need and deserve. They are victims of abuse and need an advocate who can help guide them through this complex and difficult process. At present, neither Jamie nor Shelby has anyone else in the family who is capable or has the resources to assist them in navigating the legal challenges they are facing.

While I will no longer be advocating for Jamie and Shelby, I am deeply concerned that they are not receiving the appropriate help and support. It is troubling that both your office and Mr. Pittl have been unwilling to communicate or assist them, despite their urgent needs. Jamie and Shelby have both endured unimaginable abuse, and they need someone to stand up for their legal rights and ensure they have access to proper resources. I kindly request that if possible, you help identify someone who can advocate for them moving forward, especially given their IDD and the need for someone to help them understand the complex legal processes involved.

I humbly request your assistance in ensuring that Jamie and Shelby are provided with the necessary resources to move forward with their case. I do not have the legal knowledge or resources to advocate for them in the way that is needed.

Thank you for your time and attention to this matter. I sincerely hope that you can find someone to advocate for them to ensure that both Jamie and Shelby's voices are heard and that they receive the support they so desperately need.

Sincerely,
James Louis Roden Jr.

P.S. If I may ask one more favor, could you please pray for Jamie and Shelby? I feel that my prayers alone are not enough. We are all brothers and sisters through Christ, and Jamie and Shelby need God's love and guidance more than ever. Thank you, and God bless.



James Roden ███████████████████

# Reporting Possible Crime - Concern Regarding Shelby Jane Koelle (Case No. 24-1775-CR-B)

3 messages

---

**James Roden** ███████████                                          Tue, Apr 1, 2025 at 12:49 AM
To: kell██████████████, jessica.johnson███████████████, jonathan.amdu██████████████,
maritza.stewar████████████, ileen.range██████████████, dwillbor██████████████, Laura.Bolton██████████

**Subject: Reporting Possible Crime - Concern Regarding Shelby Jane Koelle (Case No. 24-1775-CR-B)**

To Whom It May Concern,

I am writing to express an urgent concern regarding my niece, Shelby ████████████ and I am unsure of the proper channels to report this. I just recently became aware of a troubling situation that has left me deeply concerned for Shelby's safety and well-being.

Please note that I wish to remain anonymous in this matter to protect myself and my family (wife and children) from any potential retaliation. Additionally, I wish to distance myself from my sister and the rest of her children moving forward, as this is not something I wish to expose my wife and children to.

Shelby, who has Intellectual and Developmental Disabilities (IDD) and receives Social Security Disability benefits, has been living with her brother, Cody, and his wife, Andrea, in Kansas since August 1st, 2024. Despite knowing Shelby's condition, Cody and Andrea allowed a man named Jesse to move into their home. They permitted Jesse to sleep in the same room with Shelby, and Cody has openly stated that he was aware Jesse was using Shelby for sex, claiming that the relationship would not last long. It is now believed that Shelby is pregnant for a second time, potentially as a result of exploitation due to her disability, an issue that both Cody and Andrea had a responsibility to protect her from.

This situation is deeply disturbing, not only because it exposes Shelby to abuse but because it mirrors the very crime Jamie and Michael Allen Walker are being accused of. By allowing this man to have unrestricted access to Shelby, and permitting him to engage in sexual activity with her, Cody and Andrea may have facilitated the same type of abuse that is being prosecuted in Jamie's case. This is a clear violation of Shelby's rights as a vulnerable adult and falls under the same legal concerns as those Jamie and Michael face.

As set forth in Texas Penal Code Section 22.011, which criminalizes sexual assault, the law clearly outlines that individuals with intellectual disabilities cannot consent to sexual activity, and any sexual act committed against them without their consent is a violation of their rights. Under Texas law, consent cannot be legally given by a person who lacks the mental capacity to understand the nature of the act (Tex. Penal Code § 22.011(c)).

In Kansas, the law similarly protects individuals with IDD from sexual exploitation and abuse. According to Kansas Statutes Annotated (K.S.A.) 21-5503, any sexual act involving a person who is unable to provide consent due to mental incapacity is considered sexual assault. Given that Shelby has been diagnosed with IDD, her ability to consent to sexual acts is legally restricted, and Cody and Andrea's actions in permitting this relationship to develop and continue may amount to legal violations under both Texas and Kansas law.

4/9/25, 10:52 PM          Western Governors University Mail - Reporting Possible Criminal Concern Regarding Shelby (Case No. 24-1775-CR-B)

Case 5:26-cv-00054-XR   Document 15   Filed 05/19/26   Page 120 of 231

To make matters worse, Cody and Andrea kicked both Shelby and Jesse out of the house together after discovering illegal drugs on the property. While I understand their concern about the drugs, it was irresponsible and dangerous for them to allow this situation to escalate without contacting the authorities. Given Shelby's condition, Cody and Andrea should have taken steps to protect her, rather than ignoring the situation and allowing further harm and forcing her to move in with him knowing the dangers of drugs and sexual exploitation.

It is deeply concerning that this is not the first time Shelby has been placed in such a vulnerable position. In less than two years, a pregnancy has occurred again, highlighting significant failures within the system to protect her. As her family, we are devastated that this abuse has continued without intervention and with this potential second pregnancy another life is tragically impacted.

It is my understanding that Shelby has been under the care of the Guadalupe County Attorney's Office Victim Advocate Program, and their office has conducted regular check-ins with her. Given their oversight, I trust they are already aware of this situation and will take the appropriate steps to ensure Shelby's safety. It is imperative that the relevant authorities in Kansas now step in to further investigate this matter and take the necessary legal actions to protect Shelby from future harm.

As a teacher, I have a duty to report potential abuse, and while I wish to remain anonymous to avoid causing additional harm to my elderly parents, my wife and children from retaliation. I believe this situation must be brought to light. Shelby has been subjected to abuse multiple times, and it is vital that her rights and safety be protected moving forward.

I have included Laura Bolton, the CPS worker handling Shelby's case in Kansas, in this email. I want to clarify that I am no longer the family advocate for Jamie Renee Walker or Shelby Jane Koelle in relation to the ongoing criminal case in Guadalupe County as it is beyond my expertise and hope a more qualified individual can be appointed to help both Shelby and Jamie. However, upon learning of this situation, I felt a responsibility to report it. I sincerely hope that the appropriate authorities in both Kansas and Texas can collaborate to address this issue promptly, before further harm occurs.

Thank you for your attention to this serious matter.

Sincerely,
James Louis Roden Jr.

P.S. Again, I ask that my identity remain anonymous as I do not wish to expose my wife and children to retaliation or harm, and I wish to distance myself from my sister's case and her children going forward as this is beyond my ability to advocate effectively.

---

🎵 **Cody in Regards to Shelby pregnancy.m4a**
1328K

---

**James Roden** <jroden███████████                                    Tue, Apr 1, 2025 at 8:24 AM
To: Kimberly Kennedy <kennedyckimberl██████████

Sent from my iPhone

Begin forwarded message:

> **From:** James Roden <jroden3██████████
> **Date:** April 1, 2025 at 12:49:34 AM CDT
> **To:** kelly█████████████, jessica.johnson██████████████, jonathan.amdur████
> maritza.stewart████████████, ileen.rangel█████████, dwillborn██████████
> Laura.Bolton████████████

Case 5:26-cv-00054-XR   Document 15   Filed 05/19/26   Page 121 of 231

**Subject: Reporting Possible Crime - Concern Regarding Shelby Jane Koelle (Case No. 24-1775-CR-B)**

[Quoted text hidden]

♫ **Cody in Regards to Shelby pregnancy.m4a**
1328K

---

**James Roden** <jroden████████████████          Wed, Apr 9, 2025 at 12:04 PM
To: megan.ru████████████     Brianna.Leishma████████████████, mar███████████████

**Hi this is James Roden this is my other email and this is the email I reported the newest incident with Shelby to the Guadalupe County Attorney's Office and the current CPS agent that is working with Shelby to find resources for her kids. I made this report April 1st and a week later I'm in jail, me and my family are arrested on 1st degree felony charges, I lost my job, lost all my money to bail and get a lawyer. I stated in the email that I was worried about retaliation and that is exactly what I got.**

**Thank you,**
**James Roden**

---------- Forwarded message ---------
From: **James Roden** ████████████████
[Quoted text hidden]
[Quoted text hidden]

♫ **Cody in Regards to Shelby pregnancy.m4a**
1328K

 Gmail

**Paladin R** < ▇▇▇▇▇▇▇▇▇▇▇▇ >

## Contact Information to the Guadalupe County Attorneys Office and Ford County Sheriffs Office

3 messages

---

**Paladin R** < ▇▇▇▇▇▇▇▇▇ >                                                Sat, Mar 22, 2025 at 3:45 PM
To: mjones▇▇▇▇▇▇▇
Cc: Jessica Johnson <jessica.johnson▇▇▇▇▇▇▇▇▇▇, Ileen Rangel <ileen.rangel▇▇▇▇▇▇▇▇, Jonathan Amdur <jonathan.amdur▇▇▇▇▇▇▇, Maritza Stewart <maritza.stewar▇▇▇▇▇▇▇▇, dwillbor▇▇▇▇▇▇▇▇▇,
Kelly Pittl <kell▇▇▇▇▇

Dear Deputy Jones of Ford County Kansas Sheriff Office,

Here is the contact information you requested as it relates to the fraud case of Shelb▇▇▇▇▇ in Ford County Kansas and its connection to Guadalupe County Texas.

Jessica Johnson - Guadalupe County Assistant County Attorney
Phone: ▇▇▇▇▇▇▇▇
Email: jessica.johnso▇▇▇▇▇▇

Ileen Rangel - Guadalupe County Victim Advocate
Phone: ▇▇▇▇▇▇▇
Email: ileen.rangel▇▇▇▇▇

Deputy Jones Ford County Kansas Sheriff Office
Email: mjones▇▇▇▇▇
Phone: ▇▇▇▇▇▇

Shelby Jane Koelle (Victim)
Phone: ▇▇▇▇▇
Address: ▇▇▇▇▇▇ KS ▇▇

Case Number in Guadalupe County for the Aggrevated Sexual Assault of Shelby ▇▇▇▇▇:
Case #:  24-1775-CR-B

CC'd in the email is everyone who is working on the case in Guadalupe County Texas. Please feel free to use it if needed to help investigate your case in Ford County.

---

**Kelly Pittl** <kelly▇▇▇▇▇▇▇                                              Sun, Mar 23, 2025 at 9:42 AM
To: Paladin R < ▇▇▇▇▇▇▇ >

What are you alleging is fraud?
[Quoted text hidden]
--
Kelly F. Pittl
The Law Office of Kelly F. Pittl, P.L.L.C.
▇▇▇▇et
▇▇▇▇ Texas
office ▇▇▇
fax ▇▇▇
kelly ▇▇▇



**Paladin R** <‌███████████████‌>                                    Sun, Mar 23, 2025 at 5:46 PM
To: Kelly Pittl <kelly‌██████████████‌, Jessica Johnson <jessica.johnso‌███████████‌, Ileen Rangel
<ileen.range‌█████████████‌, Jonathan Amdur <jonathan.amdur‌████████████‌, Maritza Stewart
<maritza.stewart‌████████████‌, dwillborn‌███████████‌
Cc: mjone‌██████████‌

## Response:

The **fraud** being alleged is not from my personal knowledge but directly from **Shelby**. She has made the following allegations:

1. **Pretending to be Shelby on the phone**: **Shelby** alleges that **Andrea Martin** has **impersonated her** during **phone communications** with **lawyers**, **law enforcement**, and potentially others involved in the legal process. This impersonation was intended to **mislead** or **manipulate** the handling of legal matters related to **Shelby's testimony** and the defense of **Jamie and prosecution of Michael**.

2. **Stealing and keeping Shelby's mail**: **Shelby** has reported that **Andrea Martin and Cody Koelle** has **intercepted, opened**, and **kept mail** that was intended for **Shelby**. This mail likely included important **legal documents** such as **court notices** or **subpoenas**. By keeping or withholding this mail, **Andrea Martin** could be interfering with **Shelby's ability to participate fully** in the legal process, preventing her from receiving important information related to **Jamie's case**.

3. **Forging Shelby's signature**: **Shelby** also alleges that **Andrea Martin** has **forged her signature** on documents, potentially related to the case. **Forgery** is a criminal offense in which a person signs another person's name with the **intent to deceive** or **fraudulently use** those documents, likely to **manipulate the legal process** or **obscure the truth** about **Jamie's innocence and Michael's guilt**.

## Coercion and Influence:

It is also important to note that according to **Shelby** she is being **encouraged** into **speaking to Michael Allen Walker's family**, who are trying to influence her testimony and statements, likely in an effort to **help reduce the charges** for **Michael Allen Walker**. **Andrea Martin**, a **close friend of Michael Allen Walker**, has a personal motive against **Jamie Renee Walker**, likely due to a **possible extramarital relationship and the belief that Jamie called Child Protective Services on Andrea Martin**. This personal animosity and involvement could be leading to **Shelby's manipulation** and possible manipulation of Guadalupe County Attorney's office, in this case.

Additionally, **Cody Koelle**, who is **best friends** with **Dylan (Goose) Walker**, Michael's son, is also believed to be working in conjunction with **Andrea Martin** to **misdirect the court** and **obfuscate the truth** in order to **help Michael Allen Walker** while **hurting Jamie Renee Walker**. These connections indicate that there is possible **collusion** to deceive the court and **undermine the legal process** in favor of **Michael Allen Walker**.

## Shelby's Claims vs. Guadalupe County Attorney's Office:

It's essential to understand that **Shelby** has **consistently stated** that she has not had any **direct communication** with **law enforcement** or anyone from the **Guadalupe County Attorney's Office** since moving to **Kansas in August 2024**. However, **Jessica Johnson**, the **Guadalupe**

**County Attorney**, has claimed that she has been in **regular contact** with **Shelby**. This significant discrepancy raises serious questions about the **credibility of the DA's claims** and the actual **circumstances surrounding Shelby's involvement** in the case and how it relates to the alleged fraud of Andrea Martin pretending to be Shelby to influence the case.

Further supporting **Shelby's claim**, the **Guadalupe County Attorney's Office** did not have **Shelby's address** or **phone number** until **I provided them**. In fact, they had been relying solely on **Cody Koelle** and **Andrea Martin** for any communication, both of whom have clear **personal interests** in **undermining** the case and **influencing** Shelby's testimony.

**The DA's Tactics:**

Moreover, it is worth noting that the **Guadalupe County Attorney's Office** is offering **Cody Koelle** free **flights**, **hotel**, and **lodging** for his testimony, which is only likely to **help the prosecution** of **Jamie**. This offer further illustrates that the prosecution is not focused on **finding the truth or seeking justice**—it is primarily concerned with securing a **win** for the state. A prosecutor is a *MINISTER OF JUSTICE,* prosecutor's role is not just to win cases but to ensure that the **legal process** is fair, that **the rights of the accused** are protected, and that justice is **served impartially**.

The **knee-jerk reaction** of **subpoenaing** my entire family—after I simply encouraged them to speak to the **actual victim**, **Shelby**, who was seeking help—is a clear attempt at **intimidation**. Especially considering the fact that she has made no efforts to contact the individuals she subpoenaed and has not obtained any statements from them, despite the significant financial burden imposed on my family. The cost to bring these individuals from across the country will approach **$10,000**, covering **flights**, **rental cars**, **hotel lodging**, **daycare**, **lost wages**, **food**, and other necessary expenses, all while they are under the threat of **jail time** and a **$500 fine** for non-compliance. This situation appears to be a clear violation of **subpoena power** and **prosecutorial misconduct**, and the **court** and **State Bar** should be made aware of it if this issue is not rectified.

Shelby has allegedly been manipulated by Andrea Martin and Cody Koelle, who have prevented her from speaking to anyone from the Guadalupe County Attorney's Office or law enforcement. It is crucial that the **truth** is heard in court, and the **court should not allow this case to be manipulated** by people with a **vested interest in protecting Michael Allen Walker who actually impregnated Shelby by force**.

**Denial of Financial Assistance and Communication Issues:**

Another troubling issue is that **Shelby** is being **denied any financial assistance** to attend the hearing, even though she lives in **Ford County, Kansas**, just like **Cody Koelle**. Despite the fact that **Cody Koelle** has received **free flights**, **hotel**, and **lodging** from the DA's office to attend the hearing, **Shelby**—the **actual victim**—has been denied any assistance to attend and testify. This is just another example that being a minister of justice is not their priority, they are willing to pay to get testimony that will help them prosecute Jamie even if that testimony is misleading or an outright lie, instead of getting testimony from the actual victim that can bring truth to light. **Shelby** has made it clear that **I will not be able to assist** financially, as I too am being **subpoenaed by the state** and cannot make the trip back and forth from Kansas, yet they still refuse to help financially to get her to 274th District Court to get her on the stand to testify.

Additionally, **Ileen Rangel**, the **Victim Advocate** for the **Guadalupe County Attorney's Office**, has been sending **text messages** to **Shelby**, which is deeply concerning because **Shelby** cannot read or write due to her **severe intellectual disability (IDD)**. **Shelby** can only respond using **voice-to-text**, and she often needs assistance from others to read text messages. If **Ileen Rangel** had reviewed the **case file** or understood **Shelby's situation**, she would be aware that **Shelby has an IQ of 55** and cannot read or write. This only reinforces **Shelby's statement** that she has had no contact with anyone from the **County Attorney's Office**, as **Ileen**, her **Victim**

**Advocate**, would have known that if she had been in regular contact with the real **Shelby**

The lack of **sympathy** or **empathy** in **Ileen Rangel's responses** to **Shelby**, despite her role as a **victim advocate**, is deeply troubling. **Ileen Rangel's text response to Shelby** clearly indicate a lack of understanding of Shelby's condition and the necessary sensitivity required when communicating with someone who has **severe intellectual disabilities (IDD)**. If **Ileen Rangel** had indeed been in **regular contact** with **Shelby**, as **Jessica Johnson** claims, she would have been fully aware of **Shelby's cognitive limitations** and the need to provide appropriate accommodations. Instead, **Shelby** continues to be treated as though she is capable of managing communications that are beyond her abilities, such as receiving text messages that she cannot read or respond to without help.

This failure to provide **Shelby** with the **necessary accommodations** indicates a serious disconnect between **Shelby's actual condition** and the responses from those who are supposed to advocate for her. It raises concerns about whether **Shelby's rights** are being adequately protected and whether she has been given a fair opportunity to communicate effectively with the **Guadalupe County Attorney's Office**. Given that **Shelby** has stated that she has had **no contact** with anyone from the **Attorney's Office**, it seems highly unlikely that the **regular contact** claimed by **Jessica Johnson** is accurate.

### Concerns About the Indictment and Shelby's Exclusion

This lack of due diligence in ensuring Shelby's participation in the process raises significant questions about the integrity of the investigation and the foundation of the indictment. The indictment against Jamie is vague and lacks crucial details that would clarify Jamie's alleged involvement in the crime. Specifically, the indictment fails to provide a clear explanation of what actions Jamie took to assist **Michael Allen Walker**, leaving open questions about the nature of the alleged crime. For example, while the indictment states that Jamie allegedly **aided and abetted**, it fails to provide specific details on how she was involved, leaving crucial aspects of the charge unclear.The indictment also does not address the context of the alleged incident, leaving many of the facts surrounding the charge unclear. According to **Criminal Procedure Code § 21.15**, an indictment must contain sufficient details to notify the defendant of the nature of the offense with enough specificity to allow preparation for defense. The failure to provide these details raises questions about whether the **right to a fair trial** has been properly preserved under the **Sixth Amendment**.

This lack of specificity in the indictment aligns with Shelby's claims that she has not been adequately involved in the process. If Shelby had been properly contacted by the **Guadalupe County Attorney's Office**, her testimony could have directly addressed these ambiguities, especially given that she is the **victim** and has stated that she has not spoken with anyone from the office since moving to **Kansas** in **August 2024 and has claimed since day one that her Mom Jamie Renee Walker who also suffers from IDD is innocent.**. The **failure to communicate with Shelby** about the case calls into question whether the **County Attorney's Office** has truly investigated the matter thoroughly or if the indictment was based on incomplete or misrepresented evidence. The **failure to interview key witnesses** or gather exculpatory evidence could constitute a violation of **Brady v. Maryland, 373 U.S. 83 (1963)**, which mandates the prosecution's duty to disclose favorable evidence to the defense.

In light of Shelby's claims of lack of contact, it becomes evident that the **County Attorney's Office** has not taken the necessary steps to ensure Shelby's inclusion in the case, despite her pivotal role as the victim and potential witness. This failure is not only a violation of **Shelby's rights as a victim** under **Article 1, Section 30** of the **Texas Constitution** but also creates serious concerns about the integrity of the indictment. The lack of clarity in the charges, coupled with Shelby's exclusion, suggests that important **exculpatory evidence** may have been overlooked or

deliberately ignored, further undermining the legitimacy of the case against Jamie. If this failure is not addressed, it could be grounds for **appeal** based on prosecutorial misconduct and violation of the defendant's constitutional rights to a fair trial.

**Why These Actions Are Fraud:**

The actions described above constitute **fraud** because they involve **deceptive practices** intended to **mislead others**, including **law enforcement**, **attorneys**, and potentially the **court**, and obstruct **justice**. The **fraud** here is intended to **suppress truthful testimony** from **Shelby**, prevent her from **fully participating** in the legal process, and **mislead** the court regarding **Jamie's innocence and Michaels guilt**.

The **fraud** described by **Shelby** directly interferes with **Jamie's right to a fair trial** and her ability to **defend herself** in light of the **exculpatory testimony** from **Shelby**. These actions are part of a broader attempt to **hide the truth** and prevent the legal process from reaching a just conclusion.

**Importance of Investigation:**

**Shelby** is being systematically **locked out** of the **legal process** in this trial, which involves both **Jamie** and **Michael**, and a thorough **investigation** is needed to uncover what is truly happening **behind the scenes**. Based on my experiences so far, it appears that neither the **court appointed defense** nor the **prosecution** is genuinely interested in seeking the **truth**. Instead, both sides seem focused on securing a **quick and easy plea deal by any means necessary, even if it means locking up an innocent victim by motion to increase bond, because the more time Jamie spends in jail the easier it is to convince her to plea as the case potentially drags out for years**. It is **disconcerting** that I, as someone who initially **reported the crime** and who is trying to bring the **truth to light**, am being treated with **disdain** rather than **gratitude**. I fear that the **justice system** is failing my sister, and it reminds me of the story of **Fred Gray** and why the **Martin Law** was passed—to protect my sister from situations like this. Thus the reason she doesn't know anything about the evidence against her and the indictment states nothing as to how she aided Michael Allen Walker in any way, all of this violates her Constitutional rights.

It is clear that **exculpatory evidence** exists and that there are serious **Brady violations** occurring. It is now up to you, **Kelly Pittl**, to do what is right. If **Jamie** is wrongfully convicted due to the **prosecution** and **defense** knowingly failing to perform their **due diligence** and allowing **prosecutorial misconduct and ignoring exculpatory evidence**, it would not only provide **grounds for appeal** but also warrant a serious **investigation** by the **State Bar**, **Texas Attorney General's Office**, and any other governing body that oversees such critical issues. Since I am **subpoenaed**, I plan to bring these concerns to the attention of **Judge Gary Steel** and hope that he can take the necessary steps to protect **Jamie Renee Walker's** and **Shelby** ███████**s Sixth** and **Fourteenth Amendment rights** and ensure that **justice** is served.

Furthermore, as the victim in this case, **Shelby** is entitled to several constitutional protections. Under the **Sixth Amendment**, **Shelby** has the right to be heard and to participate in the legal proceedings, and her testimony should not be obstructed. To request a continuance or take any other legal action on **April 7th, 2025**, in an attempt to prevent **Shelby** from testifying and telling the truth—especially knowing the significant cost and resources spent to bring everyone subpoenaed to court, including **Shelby**—would only further expose the misconduct occurring in this case. I sincerely hope that **Shelby** is given the opportunity to be heard and that her testimony is placed on the record on **April 7th, 2025**. As a victim of crime, **Shelby** also has rights under the **Victims' Rights Amendment** in the **Texas Constitution (Article 1, Section 30)**, which guarantees that victims are treated with dignity and respect throughout the judicial process. This includes the right to be informed, the right to be heard, and the right to participate in certain court proceed

**Shelby** also has the **right to be protected from intimidation or harassment** under the **Crime Victims' Rights Act (18 U.S.C. § 3771)**, which guarantees that victims are entitled to be **treated fairly and with respect** for their dignity and privacy. If her **constitutional rights** are being violated—specifically her right to participate and her right to be free from coercion—it is critical that the **court** address these issues to ensure that her **voice** is heard and her **right to justice** is not infringed upon.

Thank you,
James Louis Roden Jr.

**Disclaimer:**

*I am not a lawyer, and the information I have provided should not be construed as legal advice. I am speaking solely as a concerned family member and citizen, sharing my personal concerns and observations about this case. While I cannot independently verify all the allegations made by others, my limited knowledge of the facts only strengthens my insistence that a thorough investigation be conducted to uncover the truth and address the concerns surrounding this case.*

[Quoted text hidden]

 

## Urgent: Immediate Action Required to Support Shelby Koelle – Concerns Regarding APS Handling

3 messages

**Paladin R** <▮▮▮▮▮▮>                                                    Sun, Jun 2, 2024 at 12:42 AM
To: regina.josep▮▮▮▮▮▮, taylor.smith2▮▮▮▮▮, Thomas.kimbark2▮▮▮▮▮, Elaine Reamer
<elaine.reamer▮▮▮▮▮,
Cc: kimberlyckennedy▮▮▮▮▮, Paladin R <▮▮▮▮▮▮>, Anna Roden <rattlerfan▮▮▮▮▮▮>



# <span style="color:red">Urgent</span>: <u>Immediate Action Required</u> to Support Shelby ▮▮▮ – Concerns Regarding APS Handling

**To Whom It May Concern,**

**In Regards to: Shelby ▮▮▮▮▮ (DOB ▮▮▮▮**

I am writing regarding Shelby ▮▮▮. In February 2024, I contacted Adult Protective Services (APS) to report a possible sexual assault involving Shelby ▮▮▮. At the time, Shelby was nearly five months pregnant, and I learned through family members that Michael Allen Walker, Shelby's stepfather, was the father of her child. Initially, APS closed the case because Shelby denied the allegations and later claimed the relationship was consensual. The case was then referred to the Guadalupe County Sheriff's Office, where it was put on hold based on Shelby's testimony.

As a result of the case being closed, Shelby remained in the household with Michael Allen Walker and continued to suffer sexual abuse for nearly an additional month. I was eventually able to get the case reopened by providing documentation of state law indicating that, due to Shelby's intellectual and developmental disability (IDD) (she receives SSI for her disability), and the fact that Texas law prohibits any sexual contact between a stepfather and stepdaughter, the law had been broken.

After Shelby was removed from the home and transferred to League City, her brother Colby took her to their grandfather's house, as I did not have any spare room in my home. Due to my parents' age and their own disabilities, they could only care for Shelby for a few days. I worked tirelessly to find resources for Shelby and eventually secured a place for her at Hope House by Anchor Point in Galveston County. Hope House agreed to take Shelby in but informed us that they could not accommodate her and the baby after birth due to her disability.

Once Shelby was settled in Hope House, we worked diligently to find a facility that could provide services for Shelby while she raised her baby. Debbie Sonnier from Hope House explored every available resource to find a suitable home or facility for Shelby. Hope House also offered Shelby the option of open adoption once it was clear that Child Protective Services (CPS) would become involved after the child's birth due to Shelby's disability as stated by Adult Protective Services of Guadalupe County. Shelby was informed of her options and rights to help her make the best decision. Additionally, her brother Cody Koelle and her aunt Kimberly Kennedy offered to take in both Shelby and her child to provide a safe and supportive environment as a last resort if no other suitable solution for Shelby and baby can be found.

I contacted Regina Joseph from APS, who was handling the case, to explore the possibility of obtaining temporary custody of Shelby and providing her with a facility to stay at while the family gathered resources to support Shelby and her child if she chose not to pursue adoption. Regina facilitated an IDD assessment for Shelby, and I fully supported this, knowing that her last assessment was conducted during her school years and indicated a 51 IQ. Given Shelby's inability to read, write, and follow complex instructions at age 26, I was confident the assessment would confirm her disability and enable the state to find a more suitable facility for her.

Adult Protective Services (APS) conducted an assessment of Shelby ▮▮▮▮; however, the manner in which the assessment was performed raised significant concerns. The results indicated that Shelby was capable of living independently, leading to the closure of her case. I attempted to discuss these results with Regina Joseph, but my calls were no longer returned.

In response, I sent Regina Joseph a copy of the State of Texas policy on Best Practices for conducting IDD assessments. Please see the attached document for the complete Best Practices from the Department of Human Services, specifically *Title 26 of the Texas Administrative Code (TAC) Chapter 304, Subchapter D, §304.401(a)(1).* This section mandates that an Authorized Provider (AP), employed by or contracted with a local intellectual and developmental disability authority (LIDDA) or a state-supported living center (SSLC), must adhere to the Determination of Intellectual Disability Best Practice Guidelines (DID BPG) when conducting a DID assessment or endorsement and when writing a DID report.

On page 13 of Best Practices, it states:

" *Any deviation from standardization, including audio-visual administration, must be explained in the DID report. **Rationale and any possible impacts on test validity and reliability must be included in this explanation**. "*

For audio and visual performance for the test it states the following:

**"Audio-visual administration of standardized intelligence tests to individuals with IDD may be <u>difficult or impossible</u>**. *Individuals with IDD often lack the reading skills and focused attention necessary to complete online intelligence tests. Without a person trained in intelligence test administration being present with the individual to assist with instructions, manipulate the materials, and follow strict standardized procedures, test results can be questionable*."

According to the Texas Administrative Code, conducting an IDD assessment in a manner that fails to account for an existing diagnosis of IDD is both difficult and impossible. Shelby ▮▮▮▮ has been diagnosed with IDD and has been receiving SSI for nearly 20 years due to her disability.

During Shelby's assessment, it was revealed that the assessment was conducted while the assessor was caring for her five-year-old child. <u>The Texas Administrative Code clearly states</u>:

*"If an AP determines that a test can be remotely administered for an individual, the AP must ensure that the individual's environment is **<u>free from distractions</u>**, including other people who could positively or negatively influence their test behavior."*

Shelby's family, including myself, James Louis Roden Jr., Kimberly Collen Kennedy, Cody Koelle, Colby Koelle, Dolores Jane Roden, and James Louis Roden Sr., felt that the initial assessment was unfair and denied Shelby access to much-needed services to which she is entitled under Texas Law and the Federal Americans with Disabilities Act. We decided to seek an independent evaluation at our own expense to counter the state's assessment, which we believed violated best practices.

Dr. Daniel K. Sanders, who has over 30 years of experience conducting such assessments in the Greater Houston Area, performed this independent evaluation. His findings, which have been shared with APS and the Guadalupe County Sheriff's Office with Shelby ▮▮▮▮ permission, indicated that Shelby suffers from a severe intellectual disability and should not live independently due to potential risks to herself and her child. The assessment also highlighted the need for additional support for Shelby to care for her infant.

After receiving Dr. Sanders' assessment, I continued to contact Regina Joseph to secure the necessary support for Shelby. Despite numerous voicemails and text messages pleading for assistance as Shelby's due date approached, I did not receive a response for nearly a month. Consequently, I made another report to APS in hopes of obtaining the support Shelby needed. Kendia James from the Galveston Office of APS contacted me, informing me that she would reach out to Regina and attempt to visit Hope House before May 25th, 2024.

On May 23rd, 2024, APS visited Hope House and communicated with Carmen, the House Mom, and Shelby's advocate, Ms. Dina Ramos from the Resource Crisis Center (RCC). On May 24th, 2024, it was

reported to Shelby's family that APS had transferred Shelby to another facility that would accommodate both her and her child, providing the necessary care for her IDD disability to ensure their safety. We were overjoyed to hear this news, believing that Shelby had finally received the best possible outcome.

During the conversation with Debbie and Carmen from Hope House we inquired who will be the contact person going forward so that we may continue to love and support Shelby and celebrate our new addition to the family ███ ██████████. Debbie informed use that Dina Ramos from RCC was the contact person going forward. I reached out to Regina again to get a summary and to inquire as to what we can do as a family going forward to support Shelby and ██████, however I again did not receive any word back. Once Memorial Day weekend was over the workweek started on Tuesday May 28th, 2024 I reached out to Dina Ramos (RCC). I was informed by Dina that she was instructed to not share any information about Shelby with anyone. I expressed concern about Shelby's IDD and asked that we want to make sure she and baby are safe and well taken care of. She informed me that a lawyer will be reaching out to me that day. I waited until 5:00 p.m. and proceeded to text Dina that the lawyer did not contact. Dina did not respond until two days later stating that she was informed by APS to no longer communicate or give any information about Shelby to anyone going forward. Dina proceeded to block my phone. I continued to reach out to Regina Joseph of APS but still I got no word.

As a result of no communication with the family about Shelby, child and wellbeing I reached out with Consumer Affairs Office of Texas to get APS to contact the family in regards to Shelby. Was finally contacted by Thomas Kimbark of APS. When speaking with Thomas I gave him the whole story about the how I was able to get Shelby out of being sex trafficked and continuously raped by her Step Father and how I was able to get her services at the Hope House and how I was reaching out to APS to get Shelby services because I did not want to see her homeless and due to my age and the age of her immediate family being on the older side we wanted to make sure that Shelby was not homeless if she no longer had immediate family living that could help her. Thomas acted very skeptical of who I was and what I wanted. Showed no compassion or empathy for the Shelby or her families situation. He stated that APS has no clue where Shelby is even though it was confirmed by Kendia James that Shelby was moved to a facility and that she had spoken with Shelby on Thursday and they made arrangements with RCC to get Shelby into another facility that would cater to her child and her IDD. When Thomas informed me that they have no clue where Shelby was and advised me to call police to make a report my heart sank and fear overwhelmed me. I asked Thomas if I could get Debbie from Hope house on a three way call and he refused and he stated he didn't need to talk to anyone and started questioning my legitimacy of being family even though he reached out to me due to my report to Consumer Affairs Office. Upon getting off the phone with Thomas from APS I immediately contacted Debbie and Carmen from Hope House and shared as to what I was informed by Thomas from APS. We agreed that a police report with the League City Police department would be best. Debbie, Carmen, Kimberly Kennedy, Cody Koelle myself and League City Police continued to reach out to Dina Ramos, however she insisted that APS informed her along with APS lawyers that she is not to give any information out about Shelby. League City Police did inform me that upon questing Dina Ramos she revealed that APS did an assessment on Shelby and she was found to be competent to live independently and that APS is helping her to live independently with child. Dina Ramos also informed Debbie from Hope House that the assessment done by the family was possibly fraudulent and won't be considered. I find this disconcerting as Shelby receives SSI for her disability and can easily access her school records and reach out to family for history of her condition.

I understand APS's role in protecting individuals, but as an educator with over 20 years of experience helping countless families obtain services and support from APS, CPS, and charitable organizations, I have never encountered a situation where APS has blocked an entire family and another crisis service provider from any information about a loved one. APS has prevented Shelby from having any contact with her entire family, which includes aunts, uncles, cousins, grandparents, and numerous friends and well-wishers. The individuals who truly harmed Shelby are now in jail, and it is unjust to treat her entire family as criminals when we have no criminal records and have committed no crime. We are advocating for Shelby's best interests and seeking the support she needs.

Our family has limited means but big hearts, and we love Shelby ████████ dearly. We want to ensure she is safe and receives the necessary services, which is why I initially reached out to APS and filed two reports.

Currently, we understand from Dina Ramos of RCC and Kendia James of APS Galveston, as originally reported by Regina Joseph to Debbie and Carmen, that APS, with RCC's assistance, facilitated Shelby's transfer from Hope House to another location. It is perplexing and distressing that Shelby's entire family is barred from offering their love and support during this critical time when she is giving birth to a new family member. This should be a joyous and celebratory time, but instead, we are grieving and fearful for Shelby's well-being.

Dina Ramos from RCC has blocked everyone's numbers and accused Shelby's brothers of being impostors and liars when they reached out to speak with Shelby. How is it in Shelby's best interest to block everyone from her life when there is no immediate threat? Even a simple phone call explaining the situation and the reason for no contact would greatly ease the family's concerns, knowing that an official with authority and validity can confirm Shelby's safety and well-being, and provide a timeline for when the family can have contact with Shelby again.

We cannot imagine that Shelby is happier being isolated from her family, friends, and loved ones. It seems cruel and unusual to deny her the opportunity for family support. There is no credible evidence that anyone from her family, outside of Jamie and Michael, poses a legitimate threat to Shelby. If there were, police or state authorities have not made it known to us.

I respectfully request that you consider this letter and reach out to Shelby's family, Anchor Point Hope House or League City Police Department to give us peace of mind by confirming her safety and addressing the seriousness of her condition of IDD. If APS doubts the credibility of our concerns, I urge you to contact Dr. Sanders for verification and consider conducting another evaluation of APS choice that adheres to Best Practices under *Title 26 of the Texas Administrative Code (TAC) Chapter 304, Subchapter D, §304.401(a)(1).* to ensure that Shelby's rights under the Americans with Disabilities Act are being upheld for her and her baby's safety.

Thank you for taking the time to read this. Here is the following contact information of Shelby's Family for future reference. Please share these contacts with any facility that Shelby may be staying in case the facility needs any support or history of Shelby medical needs and records. If you have any information that confirm the safety of Shelby please contact the League City Police Department and speak with Officer Thomas or his supervisor regarding Shelby's well being and safety to rely to family that it has been confirmed that she is safe and who we can contact moving forward.

---

**Family Contacts for Shelb██████████ DOB:** ████████

**James Louis Roden Jr**. – Uncle to Shelby (filed original report to APS and follow up report)
Address: ████████████. League City TX ████
Phone: ████████████
Email: ████████████████

**Anna Mares Roden** – Aunt to Shelby
Phon████████████
Email: ████████████

**Kimberly Kennedy** – Aunt to Shelby
Phone: ████████0
Email ████████████
████████████

**Dolores Jane Roden** – Grandmother to Shelby
Phone: ████
Email: ████████████

**Cody Koelle** – Brother to Shelby
Phone: ████████

**Colby Koelle -**Brother to Shelby
Phone: ██████████

**Anchor Point of League City Hope House** (Reference Debbie ████)
Address: ████████████ t League City TX ████
Email: ███████████████
Website: https://anchorpoint.us/
Phone: ████████
Phone: ████████

**Hope House:** House Mom Carmen
Address ██████████████████████
Phone: ████████

**League City Police Department** (Missing Person Report for Shelby ████)
Address: 5████████, League City, TX ████
Phone: ████████
Case Number: 2024-290377
Officer on Case: Officer Thomas
Badge #: 1265

---

## This report and plea for help has been sent to the following Contacts:

**Officer Reamer Guadalupe County Sheriff Office**
Case #: 24-02887 (Michael Allen Walker and Jamie Renee Walker Case)
Phone: ████████
Email: elaine.reamer ████████████

**Regina Joseph** – Adult Protective Services Harris County
Phone: ████████
Email: ████████████████

**Taylor Smith** – Adult Protective Services Harris County (Supervisor)
Phone: ████████
Email: ████████████████

**Thomas Kimbark** – Adult Protective Services (Supervisor)
Phone: ████████
Email: ████████████████

**Kendia James** – Adult Protective Services Galveston County
Phone: ████████

**Officer Thomas** – League City Police Department
Phone: ████████
Phone Main Station: ████████

**Debbie** ████ **of Anchor Point**
Phone: ████████
Email: ████████████████

**Office of Consumer Affairs (Internal Affairs of DFPS)**
Phone: ████████
*Case Complaint #:* A052820224.0090017

**Office of the Attorney General of Texas**
Ken Paxton
Website: https://www.texasattorneygeneral.gov/

**US Department of Justice – Civil Rights Division**
https://www.justice.gov/crt

███████████████████████████
███████████████████████

CC: to the following reciepents

**Kimberly Kennedy**
Email: ████████████████████████

**James Roden**
Email: ██████████████████

**Anna Roden**
Email: ████████████████

---

## _I am attaching the following Documents to APS and Law Enforcement:_

**Receipt for Assessment by Dr. Sanders**

**Report of Shelby ████ IDD Assessment administered by Dr. Sandres**
_(I was given permission by Shelby to release this to law enforcement and Adult Protective Services and under HIPA guidelines to Avert a Serious Threat to Health and Safety and serve the best interest of Shelby ████_

**Authorization to Release Records**

Texas Health and Human Services. (2022). _**Determination of intellectual disability best practice guidelines.**_ Texas Health and Human Services.

**Public Information Act of Texas**

---

# Family Rights Under Texas State and Federal Law

1. **Access to Services:**

   - Families have the right to access a variety of state and federally funded services for individuals with IDD. These services include medical care, educational support, vocational training, and residential care.

2. **Individualized Plans:**

   - Individuals with IDD are entitled to have individualized plans tailored to their specific needs. This includes Individualized Education Programs (IEPs) for students and Individualized Service Plans (ISPs) for adults.

3. **Participation in Planning:**

   - Families have the right to actively participate in the planning and decision-making processes regarding the care and services their loved ones receive. This includes being involved in the development, review, and revision of IEPs and ISPs.

4. **Informed Consent:**

   - Families must provide informed consent before any significant decisions are made regarding the care or treatment of their loved ones with IDD. This includes consent for medical treatment,

changes in living arrangements, and participation in certain programs.

5. **Least Restrictive Environment:**

   ○ Individuals with IDD have the right to receive services in the least restrictive environment appropriate to their needs. This principle aims to integrate individuals with IDD into the community as much as possible.

6. **Advocacy and Representation:**

   ○ Families have the right to advocate for their loved ones and to seek representation through advocacy groups or legal counsel if they believe their rights are being violated.

7. **Access to Records:**

   ○ Families have the right to access the medical, educational, and service records of their loved ones with IDD. This helps in understanding the care being provided and in making informed decisions.

8. **Right to Appeal:**

   ○ If families disagree with decisions made regarding the services or care provided, they have the right to appeal those decisions through appropriate channels, including administrative hearings and legal actions.

9. **Protection from Abuse and Neglect:**

   ○ Individuals with IDD are protected under state and federal laws from abuse, neglect, and exploitation. Families have the right to report any suspected abuse or neglect to the appropriate authorities.

**Reference**

Individuals with Disabilities Education Act (IDEA)

Americans with Disabilities Act (ADA)

Texas Administrative Code (TAC)

Disability Rights Texas

---

**6 attachments**



📄 **Shelby ▬▬ Release Form IDD Assessment.pdf**
277K

📄 **S. ▬▬ IDD Assessment Receipt.pdf**
62K

📄 **Shelby ▬▬ Report 05-13-22.pdf**
407K

📄 **Copy of Urgent Email Call to Action Shelby ▬▬.pdf**
530K

📄 **Texas Best Practices IDD Assessment.pdf**
1642K

📄 **Public Information Act Texas.pdf**
3298K

---

**Paladin R <▬▬▬▬▬▬▬▬>**                                      Sun, Jun 2, 2024 at 9:01 AM
To: Kimberly Kennedy ▬▬▬▬▬▬▬▬

Sent from my iPhone

Begin forwarded message:

**From:** Paladin R <​&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;​>
**Date:** June 2, 2024 at 12:42:35 AM CDT
**To:** regina.joseph&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;, taylor.smith2&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;, Thomas.kimbark2&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;
Elaine Reamer <elaine.reamer&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;, debbie&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;r
**Cc:** kimberlyckennedy&#9608;&#9608;&#9608;&#9608; Paladin R <​&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;​>, Anna Roden
&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

**Subject: Urgent: Immediate Action Required to Support  Shelby Koelle – Concerns Regarding APS Handling**

[Quoted text hidden]

---

**6 attachments**



**Shelby &#9608;&#9608;&#9608;&#9608; Release Form IDD Assessment.pdf**
277K

**S. &#9608;&#9608;&#9608;&#9608; IDD Assessment Receipt.pdf**
62K

**Shelby &#9608;&#9608;&#9608;&#9608; Report 05-13-22.pdf**
407K

**Copy of Urgent Email Call to Action Shelby &#9608;&#9608;&#9608;&#9608;pdf**
530K

**Texas Best Practices IDD Assessment.pdf**
1642K

**Public Information Act Texas.pdf**
3298K

---

**Paladin R** <​&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;​>                    Mon, Jun 3, 2024 at 3:57 PM
To: Debbie&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;&#9608;

See email below.
[Quoted text hidden]

---

**6 attachments**



**Shelby &#9608;&#9608;&#9608;&#9608; Release Form IDD Assessment.pdf**
277K

**S&#9608;&#9608;&#9608;&#9608; IDD Assessment Receipt.pdf**
62K

**Shelby Koelle Report 05-13-22.pdf**
407K

**Copy of Urgent Email Call to Action Shelby ████.pdf**
530K

**Texas Best Practices IDD Assessment.pdf**
1642K

**Public Information Act Texas.pdf**
3298K

 Gmail

Paladin R <▮▮▮▮▮▮▮▮▮▮▮▮▮>

## Urgent: Concerns Regarding Mishandling of Shelby ▮▮▮ Case
1 message

**Paladin R <▮▮▮▮▮▮▮▮▮▮▮▮>**                                      Wed, Jun 5, 2024 at 3:10 AM
To: sherif▮▮▮▮▮▮▮▮▮▮▮▮, jrios▮▮▮▮▮▮▮▮ jkoch▮▮▮▮▮▮▮▮, zachary.mcbride▮▮▮▮▮▮
Elaine Reamer <elaine.reame▮▮▮▮▮▮>, cagroup▮▮▮▮▮▮▮▮
Cc: Debbie.▮▮▮▮▮▮▮▮▮, regina.josep▮▮▮▮▮▮▮v, taylor.smith2▮▮▮▮▮▮▮
Thomas.kimbark2▮▮▮▮▮▮ Kimberly Kennedy <kennedyckimberl▮▮▮▮

**Date: 06/05/2024**

## Urgent: Concerns Regarding Mishandling of Shelby ▮▮▮ Case

Dear Arnold S. Zwicke and the Administrative Staff,

 I am writing regarding case 24-02887, which is currently being handled by Officer Elaine Reamer. In February 2024, I reported a rape incident involving my niece, Shelby ▮▮▮▮▮▮▮, to Adult Protective Services (APS). Shelby, a 26-year-old woman with Intellectual Developmental Disability (IDD), has been receiving SSI benefits for her disability for the past twenty years since her diagnosis.

 APS, accompanied by a Guadalupe County Sheriff's deputy, responded to the residence of Jamie Renee Walker and Michal Allen Walker, where Shelby also resided. During this visit, the deputy and APS observed that Shelby was pregnant. Despite being informed of Shelby's IDD, they dismissed the report, citing her age as a reason she could legally consent to sex, regardless of her cognitive condition. The deputy remarked, "She is an adult and it is normal to be sexually active," as documented by APS. Consequently, APS closed the case, and the Guadalupe County Sheriff's Office did not pursue an investigation, only creating an event report.

 I contacted APS again, emphasizing Shelby's IDD and her SSI benefits. This led APS to refer the case back to the Guadalupe County Sheriff's Office for investigation. However, for over a month, no progress was made. In March, I reached out to APS once more, urgently requesting protection for Shelby from Michael Allen Walker, who was sexually assaulting her. APS referred me to Officer Elaine Reamer, who informed me that the case was on hold pending further investigation by APS. APS, in turn, stated they were waiting for the Guadalupe County Sheriff's Office to investigate.

 The lack of action and the failure to take the severity of the crime seriously resulted in Shelby enduring an additional month of sexual assault and abuse. Near the end of March, APS finally intervened and removed Shelby ▮▮▮▮▮▮ from the residence, bringing her to me in League City, Texas. Upon her arrival, we immediately updated her State ID and closed her Social Security debit card, which was still in Jamie and Michael's possession.

 I worked tirelessly to secure support for Shelby, as neither APS nor the Guadalupe County Sheriff's Office provided any assistance. I reached out to Anchor Point, a crisis organization with a maternity house for women in crisis. Shelby moved into this facility on April 4, 2024, where she received excellent support and services tailored to individuals with IDD.

 However, on May 24, 2024, Officer Reamer abruptly removed Shelby from Anchor Point Hope House, just one day before her expected delivery date on May 25, 2024. Shelby was removed by a woman named Dina Marie Ramos who claims to represent RCC (Resource Crisis Center), Dina informed Hope House staff that she was instructed by Officer Reaner to remove Shelby and take her to undisclosed location and further instructed them to not tell any family of the move or who took her. Shelby was in safe environment for nearly two months without issue and was receive exceptional services.

 On May 25th, 2024, I was contacted by the administration at Hope House, informing me that Shelby ▮▮▮ is no longer a resident there. When I inquired about her whereabouts and the reason for her departure, they advised me to contact Adult Protective Services (APS) and Dina Ramos of RCC for further information.

Upon reaching out to Dina Ramos, I was informed that she could not discuss the case with any family members and would no longer respond to my calls. This was particularly disturbing as I had been told she would be the point of contact regarding Shelby's situation.

I then proceeded to contact APS, under the impression that they had facilitated Shelby ███ removal. Despite my repeated attempts over several days, I received no response from Regina Joseph, the caseworker. Consequently, I contacted Consumer Affairs, which oversees the Department of Family Protective Services, to escalate my concerns. Thomas Kimbark, a level 4 manager at APS, informed me that Shelby's case had been closed, stating she was in a safe location at Hope House. I clarified that she had been removed on May 24th, 2024, to which he responded that APS was not involved in her removal.

Alarmed and concerned, I was instructed by Thomas Kimbark to immediately file a police report, suspecting a possible kidnapping or missing person case. I contacted the League City Police Department, initiating an investigation into Shelby ███ disappearance. During the investigation, it was revealed that Officer Reaner coordinated Shelby's removal. However, neither the Guadalupe County Sheriff's Office nor any family members, including myself, who were responsible for advocating for Shelby, were notified.

Throughout this week-long ordeal, our family, including Shelby's grandparents, brothers, aunts, uncles, sister-in-law, and cousins, were grieving and praying for her safety. Despite my pleas for updates and the provision of contact information for immediate relatives, Officer Reaner failed to communicate with us, exacerbating our distress.

As of June 5th, 2024, I have not received any communication from Officer Reaner, who is reportedly on vacation. I have documented all interactions with her, which reveal her policy of not engaging with victims' families and her poor communication skills.

Currently, Officer Reaner and Dina Ramos claim that Shelby no longer wishes to have any contact with her family, which is difficult to believe given Shelby's intellectual and developmental disability (IDD). Shelby has always displayed kindness and compassion, and it is implausible that she would suddenly refuse to speak with her entire family. It is likely that she is being manipulated into making such statements, similar to previous instances where she was coerced into a sexual relationship with Michael Walker.

It is concerning that the Guadalupe County Sheriff's Office is not pursuing felony rape charges against Michael and Jamie Walker, despite clear evidence of Shelby's disability, including her long-term receipt of SSI. If additional proof is needed, the department could easily conduct another evaluation to confirm her condition and proceed with appropriate charges. I am also providing the independent evaluation of Shelby ███ by a licensed psychologist Dr. Sanders who has diagnosed her with a 55 IQ in his thorough report.

The stance of the Guadalupe County Attorney's Office, echoing that of the Sheriff's Office, that "Shelby is an adult and can make her own decisions," has facilitated the continued manipulation of Shelby, severing her ties with her supportive family and causing significant emotional distress. This position also undermines the case against Michael and Jamie Walker, who are likely to use the same defense strategy in the sexual assault case.

We had arranged for Shelby to live with her Aunt Kimberly, a minister at Morning Star Ministries, who was prepared to provide the necessary support for Shelby and her baby, ███. Unfortunately, Dina Ramos has been feeding Shelby false information, leading her to reject her family without any rational basis, with Officer Reaner seemingly encouraging this behavior.

Currently, no one in the family knows Shelby's whereabouts, her well-being, or whether her specific needs are being met. I have received dismissive remarks from individuals closely involved in her placement, including APS's lawyer, Penny, and the attorney in Guadalupe County, undermining Shelby's disability and the support she requires. The potential risks to Shelby and her infant, given her IQ of 55, are significant if she is placed in an unsuitable facility. As of now, there is no known facility in Texas designed to accommodate an IDD mother and her child, raising serious concerns about Shelby's current living conditions and the safety of her and her baby.

# Understanding Shelby's Disability

Given the uncertainty by APS and Guadalupe County Sheriff and Attorneys Office, I would like to clarify what Intellectual and Developmental Disabilities (IDD) are and explain why they can often be challenging to identify. .Detecting that Shelby, a 26-year-old woman with an IQ of 55, has an Intellectual Developmental Disability (IDD) can vary in difficulty for the average person. Here are some factors to consider:

**Communication and Social Skills:**

- **Language Proficiency**: Shelby has relatively clear speech and the ability to hold simple conversations. However, she might struggle with understanding complex language, abstract concepts, or following detailed instructions.

- **Social Cues**: Shelby might have difficulty understanding and responding appropriately to social cues, making nuanced decisions in social interactions, and managing more complex social relationships.

**Daily Living Skills:**

- **Routine Tasks**: Shelby might handle routine daily tasks well, especially those she has practiced and mastered. However, she could face challenges with new, unexpected, or complex tasks.

- **Independence**: While Shelby may manage some level of independence, she will need assistance or supervision for more complicated activities such as managing finances, healthcare, or employment.

**Behavior and Learning:**

- **Learning Difficulties**: Shelby will have difficulty learning new skills, understanding complex concepts, and performing tasks that require higher-order thinking.

- **Behavioral Indicators**: Signs such as frustration with complex tasks, reliance on routines, or discomfort in unfamiliar settings may be noticeable.

**Contextual Factors:**

- **Support Systems**: The presence of strong support systems, such as family, friends, or professional aides, can help mitigate the visibility of Shelby's disability. She may function well in structured environments where support is readily available.

- **Environment**: In familiar and supportive environments, Shelby's disability may be less noticeable. In contrast, in unfamiliar or stressful situations, her challenges might become more apparent.

**Variability in Detection:**

- **Observation Skills**: The average person's ability to detect Shelby's IDD depends on their observation skills, experience, and understanding of intellectual disabilities.

- **Subtle Signs**: Some signs of Shelby's IDD can be subtle and may not be immediately obvious to someone without specific knowledge or experience in recognizing intellectual disabilities.

While some aspects of Shelby's IDD might be noticeable to the average person, particularly in unfamiliar or challenging situations, other aspects might not be immediately apparent, especially in supportive or routine environments. Detecting Shelby's IDD often requires a nuanced understanding of cognitive and behavioral indicators, which may not be readily apparent to everyone.

To determine Shelby's mental age given her IQ of 55, we use the formula for mental age:

**Mental Age = (IQ × Chronological Age) / 100**

Shelby's chronological age is 26. Plugging in the values:

**Mental Age = (55 × 26) / 100**

Therefore, Shelby's mental age would be approximately **14.3 years**.

Shelby's mental age being approximately 14.3 years suggests she might exhibit some behaviors typical of a teenager, but it's important to consider the broader context of her intellectual development, life experiences, and environment. Here are some factors to consider:

**Potential Teenage Behaviors:**

- **Rebelliousness**: Like many teenagers, Shelby might show some signs of rebelliousness, seeking independence and testing boundaries.

- **Emotional Regulation**: She may experience emotional ups and downs typical of adolescence, such as mood swings, frustration, or impatience.

- **Social Dynamics**: Shelby might navigate social dynamics similar to those experienced by teenagers, such as forming friendships, **seeking approval**, and **dealing with peer pressure.**

    While Shelby might exhibit some behaviors characteristic of a teenager due to her mental age, her actual behavior will be influenced by a combination of her intellectual disability, life experiences, personality, and support systems. Understanding and supporting her unique needs and behaviors is key to helping her navigate her environment effectively.

# Potential Liability as the result of harm due to the inappropriate placement of Shelby

Removing Shelby from a supportive family can have significant consequences, especially considering her intellectual developmental disability (IDD) and mental age of approximately 14.3 years.

The consequences of removing Shelby from a supportive family can be profound, affecting her emotional well-being, behavior, cognitive development, health, safety, social connections, and overall quality of life. Ensuring continuity of care and support is crucial for her stability and development.

The liability impact on a facility, such as a maternity home, for not knowing or taking Shelby's intellectual developmental disability (IDD) seriously, particularly in a setting where she is required to care for an infant child, can be significant. Here are some key points:

**Legal Liability:**

- **Negligence**: The facility could be held liable for negligence if it fails to provide appropriate care and accommodations for Shelby's disability. This includes understanding her cognitive limitations and providing the necessary support.

- **Failure to Protect**: If the facility's failure to recognize and address Shelby's disability leads to harm to either Shelby or her infant, it could be liable for failing to protect the individuals in its care.

- **Violation of Disability Rights**: Not accommodating Shelby's disability may violate federal and state disability rights laws, such as the Americans with Disabilities Act (ADA), which requires reasonable accommodations for individuals with disabilities.

**Health and Safety Risks:**

- **Inadequate Care for the Infant**: If Shelby is unable to provide the necessary care for her infant due to her disability, the facility could be liable for any harm that comes to the child. This includes issues related to feeding, hygiene, and general safety.

- **Shelby's Well-being**: The facility is responsible for Shelby's well-being. If it fails to provide appropriate support, Shelby's health and safety could be at risk, leading to potential liability for the facility.

**Ethical and Professional Standards:**

- **Duty of Care**: Facilities have an ethical and professional duty to provide appropriate care and support to all residents, including those with disabilities. Failing to do so could result in reputational damage and professional sanctions.

- **Training and Awareness**: The facility must ensure that staff are adequately trained and aware of how to support residents with disabilities. Lack of training and awareness can lead to inadequate care and potential harm, increasing liability.

**Potential Consequences:**

- **Legal Action**: The facility could face lawsuits from Shelby, her family, or child protection agencies if it is found to have been negligent or in violation of disability rights.

- **Financial Penalties**: Legal action could result in significant financial penalties, including compensation for damages, legal fees, and potential fines.

- **Reputation Damage**: Negative publicity from a lawsuit or regulatory action can severely damage the facility's reputation, impacting its ability to attract and retain residents.

- **Regulatory Sanctions**: The facility could face sanctions from regulatory bodies, including loss of licenses or certifications required to operate.

**Mitigating Liability:**

- **Comprehensive Assessment**: Conduct thorough assessments of Shelby's abilities and needs to ensure she receives appropriate support and accommodations.

- **Individualized Care Plans**: Develop individualized care plans that consider Shelby's disability and provide the necessary support for her and her infant.

- **Training Programs**: Implement training programs for staff to recognize and appropriately respond to the needs of residents with disabilities.

- **Regular Monitoring**: Establish regular monitoring and review procedures to ensure that care plans are effectively implemented and adjusted as needed.

The liability impact of not taking Shelby's disability seriously in a maternity home setting is substantial. It includes legal, financial, ethical, and reputational risks. To mitigate these risks, the facility must ensure appropriate care, support, and accommodations for Shelby and her infant.

# Failure to investigate and seek Justice for Shelby

In Texas, the definition of consent, especially concerning individuals with intellectual and developmental disabilities (IDD), is outlined in several statutes within the Texas Penal Code and the Texas Family Code. Here are the relevant provisions:

**Texas Penal Code**

1. **Section 22.011 - Sexual Assault**:

   - **Subsection (b)** specifically addresses situations where a person cannot consent. It states that a sexual assault is without consent if:

     - The actor knows that the other person is unconscious or physically unable to resist.

     - The other person has not consented and the actor knows the other person is unaware that the sexual assault is occurring.

     - **The actor knows that as a result of mental disease or defect, the other person is at the time of the sexual assault incapable either of appraising the nature of the act or of resisting it.**

- The other person has not consented and the actor knows the other person is unaware of the sexual assault.
- The actor is a public servant who coerces the other person to submit or participate.

**Texas Family Code**

1. **Section 261.001 - Definitions**:
   - This section outlines what constitutes abuse, including sexual abuse, and includes provisions about individuals who cannot legally give consent due to their mental state or incapacity.

**Texas Penal Code**

2. **Section 22.021 - Aggravated Sexual Assault**:
   - This section provides further detail on aggravated sexual assault and includes provisions about the victim's mental capacity to consent. Specifically, it defines situations where the victim is unable to consent due to mental impairment or disability.

**Case Law and Attorney General Opinions**

- Texas courts have interpreted these statutes to protect individuals with intellectual and developmental disabilities by recognizing their limited capacity to consent. Case law and Attorney General opinions provide additional guidance on applying these statutes in specific circumstances.

**Key Points**

- **Mental Incapacity**: The law recognizes that individuals with certain mental impairments or disabilities may be unable to give informed consent.

- **Lack of Understanding**: If an individual cannot understand the nature of the act due to their intellectual or developmental disability, it is considered non-consensual.

- **Coercion and Exploitation**: The law addresses situations where an individual with IDD might be coerced or manipulated into giving apparent consent, which is not legally valid.

**Practical Implications**

- **Protective Measures**: Law enforcement and the judicial system have a duty to protect individuals with IDD from sexual exploitation and assault.

- **Investigations and Prosecutions**: In cases involving individuals with IDD, special consideration is given to their ability to consent, and perpetrators may face enhanced charges and penalties.

These laws collectively ensure that individuals with intellectual and developmental disabilities are protected under Texas law, recognizing their vulnerability and the potential for exploitation.

If Guadalupe County Sheriff Office continues to dismiss Shelby's family pleas and continue to act in malice towards Shelby's family by refusing to communicate and collaborate with to bring Shelby justice and ensure her safety and the safety of her child ███████ ████████, we will have no choice but seek further assistance.

**Local Authorities**

1. **Guadalupe County District Attorney's Office**
   - Address: ███████████  Seguin, TX ████
   - Phone: ████████████
   - Role: The District Attorney can investigate and prosecute cases of official misconduct and ensure that local law enforcement agencies perform their duties.

2. **Guadalupe County Commissioners Court**

- Address: ████████, Seguin, TX ███

- Phone: ████████

- Role: The County Commissioners oversee county operations and can address issues related to the performance of the Sheriff's Office.

## State Authorities

3. **Texas Rangers (Part of the Texas Department of Public Safety)**

   - Address: ████████████, Austin, TX ███

   - Phone: ████████

   - Role: The Texas Rangers can investigate allegations of criminal misconduct by public officials.

4. **Texas Attorney General's Office**

   - Address: ████████, Austin, TX ████

   - Consumer Protection Hotline: ████████████

   - Role: The Attorney General can take legal action against public officials and ensure the enforcement of state laws.

5. **Texas Commission on Law Enforcement (TCOLE)**

   - Address: ██████████████████, Austin, TX ████

   - Phone: ████████

   - Role: TCOLE oversees the certification and conduct of law enforcement officers in Texas and can investigate complaints against officers.

## Federal Authorities

6. **U.S. Department of Justice (Civil Rights Division)**

   - Address: ███████████████████ Washington, DC ██████████

   - Phone: ████████

   - Role: The Civil Rights Division can investigate and address violations of federal civil rights laws, including failures to protect individuals with disabilities.

## Advocacy Organizations

7. **Disability Rights Texas**

   - Address: █████████████ Austin, TX ████

   - Phone: ██████████████████

   - Role: This organization provides legal and advocacy services for individuals with disabilities.

8. **The Arc of Texas**

   - Address: ██████████████████, Austin, TX ████

   - Phon ████████████

   - Role: The Arc advocates for the rights and full inclusion of individuals with intellectual and developmental disabilities.

# The importance of communication and the need for improvement

Sheriff Arnold S. Zwicke, your campaign emphasized the importance of professional training and enhancing the quality of staff and officers to improve the service provided to the community. However, the recent actions taken by your office are not only unprofessional but also willfully detrimental, severely undermining the trust and confidence of the community you serve.

Officer Reaner personal policy of no communication with family goes against your departments goal of improving community relations and trust. Effective communication between police and the families of victims is crucial for several reasons.

**Building Trust and Cooperation**: Transparent and compassionate communication helps build trust between law enforcement and the community. When families feel they are being kept informed and treated with respect, they are more likely to cooperate with investigations and share critical information that could aid in solving cases.

**Providing Emotional Support**: Families of victims often go through intense emotional trauma. Effective communication can provide them with the necessary support, helping them navigate through their grief. It shows that law enforcement cares about their well-being, which can be immensely comforting during such difficult times.

**Ensuring Accuracy and Clarity**: Clear communication helps prevent the spread of misinformation. By keeping the family informed about the investigation's progress and any new developments, police can ensure that the family receives accurate information directly from the source, reducing the likelihood of confusion or misunderstanding.

**Enhancing Community Relations**: Positive interactions with the families of victims can enhance the overall relationship between law enforcement and the broader community. When the community sees that the police are handling cases with sensitivity and transparency, it fosters a more supportive and cooperative environment.

**Facilitating Justice**: Open lines of communication can aid in the pursuit of justice. Families who feel heard and respected are more likely to trust the judicial process and support law enforcement efforts, which can be critical in ensuring that justice is served effectively.

By prioritizing effective communication with the families of victims, Guadalupe County Sheriff Office can foster trust, provide crucial support, ensure clarity, enhance community relations, and facilitate justice. These positive outcomes ultimately contribute to a more effective and compassionate law enforcement system.

I would like to extend my heartfelt gratitude to the Guadalupe County Sheriff's Administration for taking the time to address the serious situation involving our beloved Shelby ███████. We are fully committed to assisting in the prosecution of those responsible for this heinous crime. Should there be any way we can support the efforts of both the Sheriff's Office and the County Attorney, we are prepared to do so to ensure justice is served to the fullest extent of the law.

Furthermore, we request prompt updates on Shelby's wellbeing. It is crucial for us to be assured that her disability needs are met to provide her the best opportunity for a safe and supportive environment. If an appropriate facility cannot be found, we are more than willing to assume responsibility to ensure Shelby receives the care and support she deserves.

Sincerely,

James Louis Roden Jr, Kimberly Kennedy, James Louis Roden Sr, Colby James Koelle, Cody Lane Koelle, ████████████, ████████████, ████████████,

# Contact Information

**James Louis Roden Jr.** – Uncle to Shelby (filed original report to APS and follow up report)
Address: ███████████. League City TX ████
Phone: ████████████
Email: █████████████

**Anna Mares Roden** – Aunt to Shelby
Phone ████████████
Email: r███████████

**Kimberly Kennedy** – Aunt to Shelby
Phone ████████
Email: e███████
Email:k█████████████

**Dolores Jane Roden** – Grandmother to Shelby
Phone: ████████
Email: ████████████

**Cody Koelle** – Brother to Shelby
Phone: ████████

**Colby Koelle** -Brother to Shelby
Phone: ████████

**Anchor Point of League City Hope House (Reference Debbie** ████████
Address: ████████████████ TX ████
Email: Debbie.█
Website: █████████
Phone: █████████
Phone ████████

**Hope House: House Mom Carmen**
Address: ██████████████ TX ████
Phone: ████████

**League City Police Department** (Missing Person Report for Shelby ████
Address: ████████, League City, TX ████
Phone: ████████
Case Number: 2024-290377
Officer on Case: Officer Thomas
Badge #: 1265

# Protection from Retaliation

In Texas, several laws and statutes protect private citizens from retaliation by law enforcement for filing a complaint. These protections are designed to ensure that individuals can report misconduct or abuses of power without fear of retribution.

**Texas Penal Code**

1. **Section 36.06 - Obstruction or Retaliation:**

- This section makes it a criminal offense to intentionally or knowingly harm or threaten to harm another person by an unlawful act in retaliation for or on account of their service or status as a public servant, witness, prospective witness, or informant. This includes private citizens who file complaints against law enforcement officers.

**Texas Whistleblower Act**

2. **Texas Government Code Chapter 554**:

   - While primarily aimed at protecting public employees, the principles of the Texas Whistleblower Act can be used to argue for protections against retaliation for any individual reporting a violation of law.

**Federal Protections**

3. **42 U.S.C. § 1983 - Civil Action for Deprivation of Rights**:

   - This federal statute allows individuals to sue state and local government officials, including law enforcement officers, for civil rights violations. This includes protection against retaliation for exercising First Amendment rights (freedom of speech and the right to petition the government).

4. **First Amendment of the U.S. Constitution**:

   - Protects the rights of individuals to free speech and to petition the government for a redress of grievances. Retaliation for filing a complaint against law enforcement can be seen as a violation of these constitutional rights.

**Texas Constitution**

5. **Article I, Section 8 - Freedom of Speech and Press; Libel**:

   - The Texas Constitution guarantees the right to free speech, which includes the right to file complaints and report misconduct without fear of retaliation.

---

**4 attachments**



Shelby ▮▮▮▮ Report 05-13-22.pdf
407K

S. ▮▮▮▮ IDD Assessment Receipt.pdf
62K

Public Information Act Texas.pdf
3298K

Urgent Conern Regarding Mishandling of Shelby ▮▮▮▮ Case.pdf
396K

**Exhibit E - Objective Phone Records from T-Mobile showing Shelby Contact and Text Messages**

| Date and Time | 210482 | Incoming | Initating Call | Returning Call | Mins | Type |
|---|---|---|---|---|---|---|
| 10/23/2024 16:33 | (620) 518 | Incoming | | | 3 Min | I IGNORED CALL - Voicemail |
| 10/27/2024 18:49 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 10/29/2024 8:50 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 10/29/2024 9:38 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 10/29/2024 9:53 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 10/29/2024 9:54 | (620) 518 | Incoming | | | 2 Min | I IGNORED CALL |
| 11/7/2024 18:56 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/7/2024 19:05 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/7/2024 19:05 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/7/2024 19:05 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/8/2024 11:16 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/8/2024 18:33 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/8/2024 18:45 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/8/2024 18:46 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/9/2024 9:48 | (620) 518 | Incoming | | | 2 Min | I IGNORED CALL |
| 11/9/2024 9:50 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/9/2024 9:52 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/9/2024 9:54 | (620) 518 | Incoming | | | 2 Min | I IGNORED CALL |
| 11/9/2024 9:57 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/11/2024 17:48 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/11/2024 17:55 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/14/2024 11:24 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/15/2024 13:48 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/15/2024 14:02 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 11/16/2024 13:33 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 1/29/2025 18:35 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 1/30/2025 17:29 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 1/30/2025 23:37 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/6/2025 16:43 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/6/2025 17:09 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/7/2025 14:15 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/7/2025 16:43 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/8/2025 13:14 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/8/2025 13:26 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/8/2025 13:26 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/8/2025 14:05 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/10/2025 9:50 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/11/2025 16:16 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/13/2025 18:45 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/14/2025 8:47 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/17/2025 15:51 | (620) 518 | Incoming | | | 4 Min | Breifly Spoke to Shelby, told her I was busy I would call her back |
| 2/17/2025 15:58 | (620) 518 | | | to ___/KS | 3 Min | Breifly Spoke with Shelby telling her I'm driving and can't talk |
| 2/17/2025 16:24 | (620) 518 | Incoming | | | 7 Min | Spoke to her, talked about her day and the baby |
| 2/21/2025 10:28 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/25/2025 15:12 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/25/2025 15:14 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/25/2025 15:16 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 2/27/2025 13:59 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 3/4/2025 10:42 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 3/4/2025 11:27 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 3/4/2025 14:08 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 3/5/2025 18:51 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 3/7/2025 19:17 | (620) 518 | | | to ___/KS | 5 Min | Returning her call |
| 3/10/2025 16:59 | (620) 518 | Incoming | | | 3 Min | Told Shelby I was driving and couldn't talk |
| 3/10/2025 20:10 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 3/10/2025 22:26 | (620) 518 | | | to ___/KS | 14 Min | Returned her call, she asked me for help to get in contact with County Attorney |
| 3/11/2025 11:30 | (620) 518 | Incoming | | | 4 Min | She asked me about doing a video |
| 3/11/2025 17:28 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 3/11/2025 17:31 | (620) 518 | Incoming | | | 6 Min | She again asked me about doing a video |
| 3/12/2025 10:36 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 3/12/2025 16:26 | (620) 518 | | | to ___/KS | 1 Min | Returning her call Did not answer |
| 3/12/2025 20:27 | (620) 518 | | | to ___/KS | 13 Min | She again asked me for help about making video |
| 3/12/2025 20:59 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 3/13/2025 10:47 | (620) 518 | | | to ___/KS | 2 Min | Returned her call She did not answer |
| 3/14/2025 16:34 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 3/14/2025 17:34 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 3/14/2025 17:39 | (620) 518 | Incoming | | | 3 Min | Told her I was busy and couldn't talk |
| 3/14/2025 19:18 | (620) 518 | Incoming | | | 2 Min | I IGNORED CALL |
| 3/14/2025 20:04 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |
| 3/14/2025 20:07 | (620) 518 | Incoming | | | 1 Min | I IGNORED CALL |

| Total Incoming from Shelby | James Initating Calls |
|---|---|
| 165 | 2 |
| 82.50% | 0.00% |

| Missed Calls from Shelby | Returning Shelby's Call |
|---|---|
| 145 | 35 |
| 72.50% | 17.50% |

| Answered Shelby's Call |
|---|
| 20 |
| 10% |

| Date/Time | Number | Incoming | to | /KS | Duration | Notes |
|---|---|---|---|---|---|---|
| 3/14/2025 20:08 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/15/2025 13:47 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/15/2025 21:41 | (620) 518▮ | | to ▮ | /KS | 3 Min | Returned her call |
| 3/16/2025 18:32 | (620) 518▮ | Incoming | | | 2 Min | I IGNORED CALL |
| 3/17/2025 14:43 | (620) 518▮ | Incoming | | | 5 Min | She asked me for help in making conference calls - told her I was busy |
| 3/17/2025 15:33 | (620) 518▮ | Incoming | | | 2 Min | She again asked me for help making conference calls |
| 3/18/2025 23:00 | (620) 518▮ | | to ▮ | /KS | 14 Min | I was returning her call and she was telling me about Cody and Andrea kicking her and her baby out of the house |
| 3/18/2025 23:16 | (620) 518▮ | Incoming | | | 6 Min | Asking me for help and she had nowhere to go, I gave her the number to the County Attorney's Office |
| 3/19/2025 9:59 | (620) 518▮ | Incoming | | | 4 Min | She informed me County Attorney would not speak with her |
| 3/19/2025 10:11 | (620) 518▮ | | to ▮ | /KS | 4 Min | Told her I would call her back |
| 3/19/2025 10:38 | (620) 518▮ | | to ▮ | /KS | 16 Min | Returning her call Shelby was scared and didn't know what to do, she is begging for help and needs to talk to County Attorney's |
| 3/19/2025 10:54 | (620) 518▮ | | to ▮ /KS | | 2 Min | I gave her the number to Ford County Sheriff Office and Guadalupe County Attorney's Office |
| 3/19/2025 11:01 | (620) 518▮ | Incoming | | | 2 Min | I IGNORED CALL |
| 3/19/2025 12:34 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/19/2025 12:35 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/19/2025 13:55 | (620) 518▮ | | to ▮ | /KS | 14 Min | Returning her call -Tried to help Shelby get in contact with Food Pantry and WIC because her baby needed help |
| 3/19/2025 14:18 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/19/2025 14:30 | (620) 518▮ | Incoming | | | 4 Min | I gave her the number to County Attorney's Office again |
| 3/19/2025 14:38 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/19/2025 14:43 | (620) 518▮ | Incoming | | | 3 Min | Told Shelby I was busy and would call back later |
| 3/19/2025 14:46 | (620) 518▮ | | to ▮ | /KS | 8 Min | Returning Shelb's Call |
| 3/19/2025 15:12 | (620) 518▮ | | to ▮ /KS | | 2 Min | Gave her the number to her Church in Dodge City |
| 3/19/2025 18:03 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/19/2025 18:03 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/19/2025 18:04 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/19/2025 18:06 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/19/2025 18:17 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/19/2025 18:21 | (620) 518▮ | Incoming | | | 2 Min | Shelby asked for Conference Call |
| 3/19/2025 19:05 | (620) 518▮ | | to ▮ | /KS | 1 Min | Returning her call |
| 3/20/2025 11:35 | (620) 518▮ | | to ▮ | /KS | 8 Min | Shelby is begging for help and wants to speak to victim advocate |
| 3/20/2025 11:42 | (620) 518▮ | | to ▮ | /KS | 1 Min | Dropped call |
| 3/20/2025 11:42 | (620) 518▮ | Incoming | | | 5 Min | Shelby Asked for Conference Call |
| 3/20/2025 11:47 | (620) 518▮ | | to ▮ | /KS | 3 Min | Conference call |
| 3/20/2025 11:49 | (620) 518▮ | | to ▮ | /KS | 4 Min | Conference call |
| 3/20/2025 11:53 | (620) 518▮ | | to ▮ | /KS | 5 Min | Conference call |
| 3/20/2025 11:58 | (620) 518▮ | | to ▮ | /KS | 2 Min | Ending Confrerence Call |
| 3/20/2025 12:26 | (620) 518▮ | Incoming | | | 2 Min | I IGNORED CALL |
| 3/20/2025 12:35 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/20/2025 12:37 | (620) 518▮ | Incoming | | | 3 Min | Told her I would call back in a few, busy with kids |
| 3/20/2025 12:40 | (620) 518▮ | | to ▮ | /KS | 1 Min | Returning call no answer |
| 3/20/2025 12:41 | (620) 518▮ | | to ▮ | /KS | 2 Min | Returning Call left voice mail |
| 3/20/2025 12:42 | (620) 518▮ | | to ▮ | /KS | 1 Min | Returning call no answer |
| 3/20/2025 12:51 | (620) 518▮ | Incoming | | | 4 Min | Shelby still begging for help, gave her numbers again. |
| 3/20/2025 13:59 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/20/2025 14:09 | (620) 518▮ | Incoming | | | 3 Min | I IGNORED CALL - Voicemial |
| 3/20/2025 18:17 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/20/2025 20:13 | (620) 518▮ | Incoming | | | 8 Min | I answered her call, she is begging for help, no one to turn to. |
| 3/20/2025 20:48 | (620) 518▮ | | to ▮ | /KS | 9 Min | Returning her call with new numbers on getting her support in Dodge City area |
| 3/21/2025 7:29 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 7:48 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 7:49 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 7:52 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 7:54 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 8:09 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 8:11 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 8:14 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 8:24 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 8:26 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 8:26 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 10:03 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 10:04 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 12:21 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 12:21 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 12:23 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 12:29 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 12:51 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 12:54 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 12:58 | (620) 518▮ | | to ▮ | /KS | 2 Min | Returning her call No answer left voicemail |
| 3/21/2025 13:11 | (620) 518▮ | | to ▮ | /KS | 6 Min | Gave Shelby moral support and said a prayer with her on phone - Call Dropped at end |
| 3/21/2025 13:17 | (620) 518▮ | | to ▮ | /KS | 2 Min | Returning Dropped Call - No answer |
| 3/21/2025 13:19 | (620) 518▮ | | to ▮ | /KS | 2 Min | Returning Dropped Call - No Answer |

| Date/Time | Number | Direction | To | | Duration | Notes |
|---|---|---|---|---|---|---|
| 3/21/2025 13:21 | (620) 518▮ | | to ▮ | /KS | 2 Min | Returning Dropped Call - No Answer |
| 3/21/2025 13:34 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 14:22 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 14:42 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/21/2025 15:05 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/22/2025 15:07 | (620) 518▮ | | to ▮ | /KS | 22 Min | Returning Call - Shelby gave me details about her situation with Cody and Andrea and being kicked out of the home |
| 3/22/2025 15:52 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/22/2025 17:41 | (620) 518▮ | Incoming | | | 3 Min | I IGNORED CALL - she left a voicemail |
| 3/22/2025 17:49 | (620) 518▮ | | to ▮ | /KS | 2 Min | Returned her call |
| 3/23/2025 18:44 | (620) 518▮ | Incoming | | | 3 Min | I IGNORED CALL - She Left a voicemail |
| 3/24/2025 8:58 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/24/2025 9:04 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/24/2025 10:15 | (620) 518▮ | Incoming | | | 1 Min | Shelby asked for Conference Call |
| 3/24/2025 11:31 | (620) 518▮ | | to ▮ | /KS | 8 Min | Conference call |
| 3/24/2025 12:17 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/24/2025 12:18 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/25/2025 8:33 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/25/2025 12:35 | (620) 518▮ | Incoming | | | 5 Min | Conference call - Shelby Inticated Conference Call |
| 3/25/2025 12:39 | (620) 518▮ | | to ▮ | /KS | 2 Min | I IGNORED CALL |
| 3/25/2025 13:10 | (620) 518▮ | Incoming | | | 3 Min | I IGNORED CALL - left voicemail |
| 3/25/2025 14:03 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/26/2025 18:16 | (620) 518▮ | | to ▮ | /KS | 9 Min | Returing her call - said a prayer with her and gave her moral support |
| 3/26/2025 19:19 | (620) 518▮ | Incoming | | | 17 Min | Told Shelby I will send an email to the County Attorney's Office asking for a Guardian Ad Liam and that I can't be her Advocate no more |
| 3/26/2025 21:06 | (620) 518▮ | Incoming | | | 2 Min | I IGNORED CALL |
| 3/27/2025 15:30 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/27/2025 16:17 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/27/2025 16:17 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/27/2025 16:19 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/27/2025 17:40 | (620) 518▮ | Incoming | | | 2 Min | I IGNORED CALL |
| 3/27/2025 17:41 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/27/2025 18:10 | (620) 518▮ | Incoming | | | 2 Min | I IGNORED CALL |
| 3/27/2025 18:26 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/27/2025 19:06 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/28/2025 9:24 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/28/2025 9:36 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/28/2025 9:45 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/28/2025 12:28 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 3/29/2025 23:30 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/1/2025 13:39 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/3/2025 10:49 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/3/2025 10:50 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/3/2025 10:58 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 9:53 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 9:54 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 17:32 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 19:49 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 19:50 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 19:51 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 19:55 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 19:58 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 20:02 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 20:09 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 20:12 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 20:25 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 20:25 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 20:26 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 20:27 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 20:30 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |
| 4/4/2025 20:31 | (620) 518▮ | Incoming | | | 1 Min | I IGNORED CALL |

**Exhibit** ▮▮▮▮▮



4

**Exhibit** ▆▆▆▆



**Exhibit** ▮▮▮▮▮



**Exhibit**

.ıll T-Mobile Wi-Fi 🛜    2:52 AM    ⏰ 100% 🔋

**SK**

Shelby ›

Nov 8, 2024 at 11:14 AM

Michael Walker raped me at gunpoint. He told me that he was falling in love with me and that he wanted my mom dead he was. He also even told me that if I told anybody that he ate to me that he was gonna shoot me in my mouth. Point when I did not want to watch It. Now my mother ended up having a bad concussion when he beat her.
 I imaged having birth to my daughter N⬛⬛⬛ He did drugs. Around us all the time that it started to worry me.
 He also drink alcohol. He took pictures of me while we were having. He told me that if I told anybody that he was going to post it on facelook. I am so terrified of this man that I don't feel safe with him around my daughter or around my mother

＋    Text Message • RCS    🎤

7

**Exhibit** ▮▮▮▮▮



**Exhibit** ██████



9

**Exhibit** ▮▮▮▮



10

**Exhibit** ▆▆▆



**Exhibit**

**Exhibit** ▮▮▮▮



13

**Exhibit** █████



**Exhibit** ████



15

**Exhibit** ▮▮▮▮



16

**Exhibit** ▇▇▇



17

**Exhibit**



18

**Exhibit ▮▮▮▮**



**Exhibit**

![Text message conversation with Shelby (SK). 2:55 AM, T-Mobile Wi-Fi, 100% battery.

Sun, Mar 9 at 6:55 PM
Unlocking Unlimited Data Phone Plans
twoapksite.com

Mon, Mar 10 at 5:02 PM
Hey please do not forget to send that stuff to Jessie.Love you stay safe

Do you think that you could do the taxes with me tomorrow? Whenever you are not busy I love you

Mon, Mar 10 at 10:37 PM
Let's video call on Meet! To join, click this link:
Tap to Load Preview
meet.gooogle.c...

Text Message · RCS]

20

**Exhibit** ▮▮▮▮▮



**Exhibit** ▮▮▮▮▮



**Exhibit** ▮▮▮▮



**Exhibit** ▇▇▇▇



**Exhibit**



> Ask if they can give you the same accommodations that Cody is getting which includes flight, hotel and food for yourself and your infant child Natalie.

Can you give me the same accommodations that Cody is getting which includes flight, hotel and food for myself and my infant child Natalie.

I didn't want Cody and them to know that I was going down there.Period because I knew that this s*** was gonna be started.I'm trying not to have drama a beef with them

Can you call me please

Please do not call me if there is

25

**Exhibit**



> Can you call me please

> Please do not call me if there is going to be drawing

>> Sorry, I'm helping my kids with bed time routines (brushing teeth, pajamas...etc)

> It's not your fault

> It's not your fault.
> I asked for antique cause.I trust her way more than cody and candy confined

> I asked for my aunt for a reason.Or andy combined

Fri, Mar 21 at 7:53 AM

> I need you to.
> Call me please

> I want to take this down to the

**Exhibit** ▮▮▮▮



27

**Exhibit** ▇▇▇▇



**Exhibit**



29

**Exhibit**



**Exhibit** ▆▆▆▆



I called them up.They said yes, that they do pay for people's plane flights.So if need be uncle James, you can contact them and see about getting 2 tickets for me and aunt K.K

They should pay for our home.To reply is what the person on the phone said

**Allied Military Travel**
alliedmilitarytravel.com

Cause Grandpa was in the military.They said yes that they Flight

Call me back please

31

**Exhibit** <span style="background:black">   </span>



**Exhibit**

**T-Mobile Wi-Fi**   2:57 AM   100%

SK

Shelby >

Great!

Book flights at best price
usaveonflights.com

Wed, Mar 26 at 6:16 PM

Call me please kind of an emergency about need to talk to you about something

Wed, Mar 26 at 8:06 PM

Have you heard from christian

Haven't spoken to Christian in 20 years.

Read 3/26/25

Thu, Mar 27 at 11:20 AM

6383566777 469672402.jpg
JPEG Image · 461 KB

Text Message · RCS

33

**Exhibit** ███████



34

**Exhibit** ▓▓▓▓▓



**Exhibit** ▮▮▮▮



**Exhibit** ▮▮▮▮



**Exhibit** ███



**Mon, Apr 7 at 11:50 AM**

Photo proof: My free haul! Want yours? 👇

Tap to Load Preview

temu.com

**Mon, Apr 7 at 2:57 PM**

Hey, a lawyer is supposed to be contacting you.If you can't pick it up whenever he does or calm back one of the other

**Exhibit**

> Can you call me please and put the voiding my calls?Please like it kind of hurts

> I don't feel comfortable with CPS showing up to my house.It's making me feel uncomfortable

> That's why I wish my mom was here

> None.Of them sent sure that they got that information from cody and andrea

> Don't worry about it's fine love you

> I'm gonna make cody pay in court

> I'm gonna make cody pay in court for his damn lies

39

# Exhibit F - Failure to Correct, Ratification, Custom/Practice

**Key Points from the Emails and Letter**

1. **May 13, 2025 Letter to Sheriff Ray**
   James Roden Jr. notified Sheriff Ray that he was arrested without being interviewed, without S.J.K. being interviewed about coercion, and without his exculpatory advocacy evidence being included in the warrant. He asked why Reamer sought a first-degree felony warrant against a teacher/mandated reporter and an elderly disabled veteran without basic investigation.

2. **October 11, 2025 Formal Notice from Dolores Roden**
   Dolores Roden notified Sheriff Ray, GCSO leadership, David Willborn, Jonathan Amdur, and others that she had filed a sworn criminal complaint against Cody Koelle for alleged aggravated perjury. She stated the complaint included notary verification, a notary log, Cody's affidavit, a recorded call where Cody admitted signing the affidavit, and Cody's false-report history.

3. **Failure to Investigate Cody Complaint**
   Dolores stated that despite verified evidence, no investigator or prosecutor contacted her for follow-up and no meaningful response was provided beyond a receipt slip. She argued this contrasted with the rapid first-degree felony warrants issued against James Jr., James Sr., and Jamie.

4. **October 21, 2025 Follow-Up Evidence**
   Dolores followed up after no response and provided additional evidence, including a signature comparison between Cody's November 2024 affidavit and a later Kansas probation document, arguing it disproved Cody's claim that he never signed the affidavit.

5. **Prior Consistent S.J.K. Statements in Reamer's File**
   The follow-up reminded officials that S.J.K. had already told Reamer in April 2024 that Jamie was not involved, that Jamie was afraid of Michael, and that Jamie did not know what was happening. Dolores argued this disproved the claim that James Jr. caused S.J.K.'s account.

6. **November 12, 2025 PIA Clarification Request**
   Dolores challenged GCSO's classification of her sworn criminal complaint as "Civil," noting that it alleged aggravated perjury, false report, and tampering with a government

record. She asked who reclassified it, whether any investigator was assigned, and whether the record would be corrected.

7. **November 13, 2025 GCSO Response**
   GCSO stated that a supplemental report was located and that a packet containing the complaint and documentation had been forwarded to the Guadalupe County Attorney's Office on September 24, 2025.

8. **November 13, 2025 Follow-Up to GCSO**
   Dolores asked whether the complaint had been assigned to CID, whether the classification would be corrected from civil to criminal, whether the "cleared/report taken" disposition would be corrected, and whether the forwarded packet included the key evidence.

9. **November 13, 2025 Final GCSO Response**
   GCSO responded that the Guadalupe County Attorney's Office, not GCSO, would conduct the investigation into the alleged criminal offense, and that documents had been forwarded by Sgt. Reamer.

10. **Core Significance**
    These records show post-arrest notice to senior officials, a sworn complaint against Cody supported by verification evidence, GCSO's classification/routing questions, and GCSO's statement that the County Attorney's Office would conduct the investigation rather than GCSO. This supports notice, failure-to-investigate, ratification, and delegation-to-prosecutors theories.

**James Roden**

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

League City, T▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮

**Date:** 05/13/2025

**Sheriff Joshua Ray**
Guadalupe County Sheriff's Office

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Seguin, TX ▮▮▮▮▮

**Subject: Request for a Respectful Conversation Regarding My Arrest and Advocacy Role**

Dear Sheriff Ray,

I'm writing you today not with anger, but with hope for understanding. My name is **James Louis Roden Jr.**, and I have lived a life of service—as a father, a teacher, a mandated reporter, minster and most recently, as an advocate for my niece, **Shelby**, a young woman with intellectual and developmental disabilities.

You don't know me personally, but I've worked for over 20 years in public education, coaching and mentoring students across Texas. I've raised my children with the values of responsibility, courage, and faith. I supported you when you ran for Sheriff, and I still believe that you are a leader who wants to do right by this community. That's why I'm writing to you **before I speak to anyone else beyond my legal counsel.** Because I still believe in the system—and I still believe that when something goes wrong, **a respectful adult conversation, as you've said yourself, is biblical.**

I was arrested on April 8th, 2025, for allegedly tampering with a witness—**Shelby**, the same young woman I fought to protect. No one from your department ever contacted me to ask about my role. **No one contacted Shelby** to confirm whether she had truly been manipulated or coerced. **No one in your department asked a single question of the people involved before a felony charge was filed.**

I was treated not as the **mandated reporter who filed the initial report that led to Michael Allen Walker's arrest**, but as someone to be punished—despite the fact that I had been providing evidence, affidavits, recorded interviews, and emails to support Shelby and protect her rights. I was acting under my legal rights as a **family advocate** and a

**mandatory reporter**. I was trying to help a girl who had already been hurt once—not silence her.

I'm asking you this in good faith:

- Why was there no investigation conducted before Officer Reamer filed the arrest warrant?

- Why was I not contacted—nor Shelby, nor anyone in our family—before such a serious charge was filed?

- Why was **no part of the evidence I provided included in the arrest affidavit**, even though it was reviewed and clearly shows my efforts to support Shelby, not manipulate her?

- Why would your office arrest **a career public school teacher with no criminal record** and my **terminally ill, wheelchair-bound 78-year-old grandfather**, a **30-year Vietnam veteran and retired Sergeant Major with no criminal record**, based solely on an affidavit from Cody Lane Koelle who has **pleaded guilty to making false police reports and impersonating an officer? (See attached Evidence)**

I'm not asking for special treatment. I'm asking to be **seen**, to be heard, and for someone in your position to ask the same questions I'm asking. This situation has devastated my career, my family, and our ability to survive financially. I lost my teaching job. I lost my health insurance. I lost the security I had worked my entire life to provide to my wife and children.

And all of it happened **without a single conversation**. I truly believed—up until the moment I was arrested—that I was helping your office protect Shelby. I was trying to make sure she didn't fall through the cracks. When I reported a second rape involving Shelby while she was under "protective custody," and under the care of Cody Lane Koelle and Andrea Martin Koelle and admitted in a phone conversation (submitted and reviewed by your office) that he knew the man sexually abusing Shelby was using her for sex while living in his house that resulted in another pregnancy and confirmed by your department, I never imagined that your department's response would be to arrest me six days after making that report **(See attached email/report).** As a certified public school teacher and legally protected mandated reporter, I was obligated by law to report, and I fulfilled that duty. In response, I was met with retaliation by Cody and Andrea, who submitted a sworn affidavit against me shortly after my report, despite my prior warning that I feared retaliation. Officer Reamer later stated that she reviewed that email/report as part of the evidence used to justify charging me. Cody and Andrea were made aware that I issued that report by your office even though I asked to remain anonymous and as a result your office accepted a

sworn statement from them to protect themselves from continued charges on top of the false report and impersonating a police officer Cody is now serving probation for.

Sheriff, I still believe in Guadalupe County. I still believe this may have been a mistake. But it is a mistake that is destroying lives—and one that can still be made right if someone with authority takes a second look.

I'm not asking for special treatment. And I'm **not asking you to prove my innocence**. I'm simply asking you—Sheriff Ray—to take an honest look at what happened. To ask yourself if a **good faith effort was truly made** in this investigation, and whether the manner in which it was carried out reflects the **standards you've set for your deputies and investigators**.

Because what happened here was not just a misunderstanding—it was the filing of **a 1st-degree felony charge against an entire family**. My name. My dying father's name. All without a single conversation, a single clarification, or a moment of pause.

I'm asking if **all the evidence was truly reviewed**—not just selected fragments, but the full picture. I'm asking whether the **sworn affidavits Shelby gave in her own words**, as a legally independent adult with no guardian, were acknowledged, valued, or even considered. These were documents, that told her truth—not only to me, but to **anyone who would listen**, including Officer Reamer herself back on April 4th, 2024 in her video testimony with the victim Shelby Jane Koelle where she tells the same story she tells in her affidavit a full year before my arrest. (See attached affidavit from Shelby that was notarized in Kansas over a thousand miles away and it was Cody Lane Koelle that provided that transportation and mailed it to Jamie's attorney who requested it and the independent review by a Forensic Psychologist as it relates to the interview with Officer Reamer and Shelby Jane Koelle).

If this evidence existed—if it was known—then I'm asking you, respectfully, to reflect on **why it wasn't disclosed when submitting the arrest warrant affidavit**, and why it didn't weigh into the decision before filing charges that have now shattered lives and reputations.

I ask you to take a moment to understand **what really happened**, and to ask the questions that should have come **long before** a charge was ever filed. Because somewhere along the way, I—a **mandated reporter**, a **family advocate**, a **public school teacher with no criminal record**, and an **ordained minister** who founded the **Holistic Church of Christ**—was stripped of my dignity and labeled a criminal. All because I tried to protect a young woman with intellectual disabilities who was begging to be heard.

And my father… My father, a **Retired 30-year Army veteran**, a man who gave his body for this country and is now **dying of cancer**, was arrested alongside me—not for anything he did, but because we share the same name. **James Louis Roden Sr. and Jr.** They didn't ask

who was who. They didn't ask if he could even speak. They just filed a felony charge against a man who has given everything to this country and is now **fading in silence in a bed**, his last days clouded by disgrace he never deserved.

How did this happen? How does a system arrest the man who **reported the rape** and stood up for someone vulnerable—and let the predators and manipulators go free? How does a dying veteran, who **never sent a single email, never made a single call**, get treated worse than the man who raped and abused his granddaughter?

I'm asking you—**as one Christian to another**—to ask, "**What would Jesus do?**"

That's the question I live by. And I believe, deep down, that you do too. I respectfully ask that you take a moment to consider whether this investigation was conducted with the thoroughness, fairness, and standard of integrity you expect from those under your leadership. I have great respect for you, your office, and the profession of law enforcement—and I still believe in the system you represent. I know you to be a good man, Sheriff Ray, and I would far prefer that you take the lead in looking into this matter and determining whether it was handled properly. If this is something that can be addressed internally and with integrity, then I trust you to do just that—because that's how much I believe in you, your position, and the system I've spent my entire life supporting. That's why I am coming to you first—before seeking broader support or turning to the court of public opinion.

Please, take a look.

Respectfully,

_____

**James Louis Roden Jr.**
Educator | Advocate | Mandated Reporter | Minister | Father | Son

**P.S.** I've included a photo of my family. My son, Patrick, dreams of becoming a Sheriff one day—just like you. I'm proud that he aspires to a life of service, to stand up for the innocent and protect the vulnerable. That's been my purpose, too. God bless you and your continued service to our community.

**Proverbs 31:8-9 (NIV)**
*"Speak up for those who cannot speak for themselves, for the rights of all who are destitute. Speak up and judge fairly; defend the rights of the poor and needy."*


















**SENDER:** *COMPLETE THIS SECTION*

- Complete items 1, 2, and 3.
- Print your name and address on the reverse so that we can return the card to you.
- Attach this card to the back of the mailpiece, or on the front if space permits.

1. Article Addressed to:

Sheriff Joshua O. Ray
2617 N. Guadalupe St
Seguin, TX 78155

9590 9402 6991 1225 0049 20

2. Article Number *(Transfer from service label)*

7019 1640 0000 2470 6991

*COMPLETE THIS SECTION ON DELIVERY*

A. Signature
X _____  ☐ Agent  ☐ Addressee

B. Received by *(Printed Name)*    C. Date of Delivery
Jerilyn McNulty    5-15-25

D. Is delivery address different from item 1?  ☐ Yes
If YES, enter delivery address below:  ☐ No

3. Service Type
☐ Adult Signature
☐ Adult Signature Restricted Delivery
☐ Certified Mail®
☐ Certified Mail Restricted Delivery
☐ Collect on Delivery
☐ Collect on Delivery Restricted Delivery
☐ Insured Mail
☐ Insured Mail Restricted Delivery over $500)

☐ Priority Mail Express®
☐ Registered Mail™
☐ Registered Mail Restricted Delivery
☐ Signature Confirmation™
☐ Signature Confirmation Restricted Delivery

PS Form **3811**, July 2020 PSN 7530-02-000-9053    Domestic Return Receipt

11/3/25, 12:16 AM     Gmail - Formal Notice Regarding Criminal Complaint #2025-GC00208 – Failure to Investigate Perjury and Retaliation Affecting Eld…

Case 5:26-cv-00054-XR    Document 15    Filed 05/19/26    Page 196 of 231

 Gmail           **Jane Roden <███████████████████>**

---

# Formal Notice Regarding Criminal Complaint #2025-GC00208 – Failure to Investigate Perjury and Retaliation Affecting Elderly and Disabled Citizens (Evidence for Internal Affairs)

2 messages

---

**Jane Roden** <██████████████████████>        Sat, Oct 11, 2025 at 7:34 PM
To: j.ray███████████████v, tarinna.skrzycki███████████v, kelly.mann████████
jonathan.amdu███████████, dwillborn██████████, zachary████████
Cc: jrwilsonii██████████

Dear Sheriff Ray, Mr. Willborn, Mr. Amdur, Mr. Bidner, and Agent Wilson,

I am writing as a disabled and elderly citizen of Texas, age 83, and as the complainant who filed a sworn and notarized criminal complaint against Cody Lane Koelle on June 26, 2025, which I personally resubmitted in person on August 26, 2025, and which was assigned Case Number 2025-GC00208 by the Guadalupe County Sheriff's Office.

This correspondence serves as formal notice under Title II of the Americans with Disabilities Act (42 U.S.C. § 12131 et seq.), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), and the Fourteenth Amendment to the United States Constitution that the County's continuing refusal to process, investigate, or respond to my complaint constitutes discrimination, retaliation, and deliberate indifference toward me as an elderly, disabled citizen and toward my intellectually disabled daughter, Jamie Renee Walker.

---

## Background

On June 26, 2025, I executed and notarized a sworn criminal complaint detailing evidence that Cody Lane Koelle committed aggravated perjury when he falsely testified during the June 18, 2025 in District Court 274 (Judge Steel) bond hearing of my daughter, Jamie Renee Walker, claiming he did not sign his November 15th, 2024 affidavit.

When Cody Lane Koelle lied about his signed affidavit and the County relied on that lie to deny Jamie Walker's bond:

- It violated her Fourteenth Amendment due-process rights to fair proceedings and liberty.

- It likely violated her Eighth Amendment rights against arbitrary detention.

- It violated her Sixth Amendment right to confront truthful witnesses.

- It potentially violated Equal Protection and ADA rights due to discriminatory treatment of an IDD individual.

Attached to my original June 26th and hand delivered August 26th, 2025 complaint were:

- A verification letter from the notary public who witnessed Cody's signature;

- Copy of original notary log bearing Cody Koelle's signed entry; and ID.

- A copy of the notarized affidavit itself.

- Recorded phone call where Cody Lane Koelle admitted signing the November 15th, 2024 affidavit. (originally provided via email on March 19th, 2025 to the County Attorney's Office)

11/3/25, 12:16 AM    Gmail - Formal Notice Regarding Criminal Complaint #2025-0082008 Failure to Investigate Perjury and Retaliation Affecting Eld…

Case 5:26-cv-00054-XR    Document 15    Filed 05/19/26    Page 197 of 231

- Cody Lane Koelle criminal record showing past false statements to police.
  (originally provided via email March 21st, 2025 to County Attorney's Office)

Despite this evidence, no investigator, prosecutor, or official from the Sheriff's Office or County Attorney's Office has contacted me for follow-up or acknowledged receipt beyond a pink case-receipt slip.

Prior to my personal submission, my Public Information Act request for the case file was answered with a statement that no record of the case existed, even though the complaint had already been received by Sheriff Office administrators and County Attorney's office on June 26th, 2025.

I am a documented stroke survivor with limited mobility. My daughter Jamie is a documented intellectually and developmentally disabled (IDD) adult. Insisting on personal delivery and having me drive an eight-hour round trip to hand-deliver a notarized complaint, only to have it ignored, demonstrates disregard for the rights of elderly and disabled complainants under both state and federal law.

Assistant County Attorney Jonathan Amdur personally witnessed Cody Koelle's testimony at the June 18th, 2025 hearing in Judge Steel's courtroom. The County Attorney's Office therefore has actual knowledge that the testimony used to deny Jamie's bond was false.

---

## Legal Standards and Authorities

The County's duty to act on a sworn complaint and to provide equal access to justice for elderly and disabled persons arises under:

- **Tex. Code Crim. Proc. arts. 2.01 & 2.07**, requiring prompt investigation and prosecution of credible felony allegations.
- **Tex. Gov't Code § 552**, mandating accurate recordkeeping and disclosure under the Public Information Act.
- **42 U.S.C. § 12132** and **29 U.S.C. § 794**, prohibiting exclusion or denial of public services to qualified individuals with disabilities.
- **42 U.S.C. § 1983**, providing a civil remedy for deprivations of constitutional rights under color of law.
- **42 U.S.C. § 12203**, prohibiting retaliation against any individual who assists or advocates for a person with disabilities.

**Relevant case precedent establishes these duties:**

- *Tennessee v. Lane*, 541 U.S. 509 (2004) – Title II of the ADA applies to access to courts and judicial processes.
- *Monell v. Department of Social Services*, 436 U.S. 658 (1978) – Municipalities are liable for policies or customs causing constitutional violations.
- *City of Canton v. Harris*, 489 U.S. 378 (1989) – Failure to train or supervise may constitute deliberate indifference under § 1983.
- *Brady v. Maryland*, 373 U.S. 83 (1963), and *Napue v. Illinois*, 360 U.S. 264 (1959) – Prosecutors and law-enforcement officers must correct known false or exculpatory evidence.
- *Hope v. Pelzer*, 536 U.S. 730 (2002) – Officials may be held liable when deliberate indifference violates clearly established rights.

These authorities confirm that once officials have notice of credible evidence or potential false testimony involving disabled victims, they must act promptly, fairly, and consistently.

## Professional and Ethical Duties of Counsel

As members of the State Bar of Texas, both prosecuting and defense attorneys are bound by the Texas Disciplinary Rules of Professional Conduct, which mirror the American Bar Association's Model Rules. Relevant provisions include:

- **Rule 3.03(a)(5)** – A lawyer who knows that evidence offered to a tribunal is false must take reasonable remedial measures to correct the record.

- **Rule 1.01(b)(1)** – A lawyer shall not neglect a legal matter entrusted to the lawyer.

- **Rule 3.09(d)** – A prosecutor must make timely disclosure of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigate the offense.

- **Rule 8.04(a)(3) & (a)(4)** – A lawyer shall not engage in conduct involving dishonesty, fraud, deceit, or misrepresentation, and shall not engage in conduct constituting obstruction of justice.

These duties are reinforced by established precedent:

- *Napue v. Illinois*, 360 U.S. 264 (1959) – the prosecution has an affirmative obligation to correct false testimony.

- *Brady v. Maryland*, 373 U.S. 83 (1963) – suppression of evidence favorable to the accused violates due process.

- *Strickland v. Washington*, 466 U.S. 668 (1984) – defense counsel must conduct reasonable investigation and act with diligence to protect the client's rights.

- *Kimmelman v. Morrison*, 477 U.S. 365 (1986) – failure to investigate or present known exculpatory evidence may constitute ineffective assistance of counsel.

Accordingly, once attorneys become aware of credible, verified evidence that material testimony may be false, both prosecution and defense have ethical and constitutional duties to investigate and, if warranted, to correct the record so that justice is not denied to a disabled or elderly.

---

## Observations

Cody Lane Koelle and Andrea Martin have served as key witnesses both in support of Michael Allen Walker's defense and as the State's primary witnesses against Jamie Renee Walker despite having no firsthand knowledge of what happened in Seguin between Jamie Renee Walker, Michael Allen Walker and Shelby Jane Koelle. After the report of Shelby Jane Koelle's second pregnancy and alleged exploitation while under the care of Cody Lane Koelle and Andrea Martin—both known supporters of Michael Allen Walker—it appears defense attorney's for Michael Allen Walker and the County Attorney's office worked together to shield their star witness. This sequence of events has created a reasonable concern that officials may have sought to discourage or prevent Shelby Jane Koelle from testifying, and to avoid scrutiny of Cody Lane Koelle's prior criminal convictions for making false statements to law enforcement, impersonating a police officer and the exploitation of Shelby Jane Koelle that resulted in a second pregnancy while under his care. Despite possessing extensive evidence of Cody Lane Koelle's criminal record and recorded statements demonstrating his lack of credibility, the Guadalupe County Attorney's Office, in coordination with Michael Allen Walker's defense counsel, continued to rely on Cody as a key witness. This included allowing him to testify at the June 18, 2025 bond hearing, where his statements were accepted without apparent

scrutiny, despite clear and documented evidence of prior false reports, criminal convictions, and conflicting testimony.

The rapid execution of three first-degree-felony warrants against a family consisting of a special education teacher/advocate/minister, a disabled veteran, and an IDD domestic-violence victim—without apparent investigation or evidentiary foundation—contrasts sharply with the complete inaction on a well-documented, notarized criminal complaint presenting verified evidence against Cody Lane Koelle.

Such disparity, if not corrected, raises serious questions under the Equal Protection Clause and the ADA's mandate of nondiscriminatory access to public programs (*Tennessee v. Lane*, 541 U.S. 509).

From the beginning, our family made it clear that we had no firsthand knowledge of what transpired in *Seguin* between Jamie Renee Walker, Michael Allen Walker, and Shelby Jane Koelle. Our only involvement was to relay and report the allegations as they were presented to us. Specifically, Andrea Martin made the allegation implicating *Jamie Renee Walker*, while Shelby Jane Koelle made the allegation implicating *Michael Allen Walker*. Our sole request was that investigators contact and listen directly to Shelby, allowing her voice to be heard and her experiences properly evaluated by the authorities. We completely supported the full investigation of both Michael and Jamie to protect Shelby.

Our family's reporting of *Shelby's allegations* was first made to Officer Elaine Reamer directly by Shelby on April 4, 2024, through a recorded video statement. Additional communications were sent by Shelby to Officer Reamer on April 6, 2024, in the form of text messages from *Hope House*. On April 8, 2024, James Louis Roden Jr. provided sixteen (16) preserved screenshots to Officer Reamer of Shelby's text messages from *Hope House*, each reiterating Shelby's consistent statements regarding her mother's innocence and the abuse she suffered by Michael Allen Walker. This evidence was provided to Officer Reamer a full year prior to James Sr and Jr arrest. This officially proves the narrative that Shelby's mother being innocent originated from Shelby and no one from our family. These records have been preserved as verified evidence.

When Shelby later expressed to us that her attempts to contact the Guadalupe County Attorney's Office were being ignored, our family sought help through proper channels. We asked our son, James Louis Roden Jr., to advocate for Shelby and assist her in reestablishing communication with the County Attorney's Office so that her testimony and concerns could be formally heard. Despite his transparent and good-faith efforts, all attempts at communication were disregarded. Instead of open dialogue, our family was met with retaliatory arrests designed to silence Shelby, discredit her advocates, and protect Cody Lane Koelle—a convicted felon with a documented history of making false statements to law enforcement.

This sequence of events demonstrates a complete breakdown of professional duty and public trust. Rather than ensuring a fair, thorough, and impartial investigation, the actions taken appear to have shielded individuals with known credibility issues while punishing those who sought only truth, safety, and justice for a vulnerable, intellectually disabled young woman.

The charges brought against my son, James Louis Roden Jr., and the allegation that he coerced *Shelby Jane Koelle* to state that her mother is innocent are unequivocally false. James Louis Roden Jr was the first one to insist on Jamie being investigated and demanded protection for Shelby from both Jamie and Micheal. The extensive documentation and transparency reflected in his communications—including multiple emails, formal requests for the appointment of a Guardian ad Litem for Shelby, and evidence already in the possession of Officer Elaine Reamer—clearly demonstrate that his actions were those of a lawful advocate seeking to protect Shelby's rights and safety. The decision to disregard this evidence and instead pursue unfounded criminal charges

represents a profound miscarriage of justice that has caused severe and lasting harm to his personal, professional, and family life.

## (Original attached)

### 3. James Roden's Role as My Advocate

I asked James Louis Roden Jr. to help me because I trusted him and needed support. He acted only as my advocate, helping me express what I needed to say and guiding me through the process of submitting truthful statements.

1

 Initial

At no time did James Roden ever threaten, pressure, or force me to say or sign anything. He encouraged me to be honest and made sure I understood what I was signing. He acted with integrity and out of concern for my well-being and safety.

I am stating clearly that James Roden is innocent of the charge of Tampering with a Witness, and I am willing to testify under oath in court that he never committed any wrongdoing toward me.





11/3/25, 12:16 AM    Case 5:26-cv-00054-XR    Document 15    Filed 05/19/26    Page 203 of 231

Gmail - Formal Notice Regarding Criminal Complaint #2025-F0002085 - Failure to Investigate Perjury and Retaliation Affecting Eld…



11/3/25, 12:16 AM    Case 5:26-cv-00054-XR   Document 15   Filed 05/19/26   Page 204 of 231

Gmail - Formal Notice Regarding Criminal Complaint #2025-60060005 Failure to Investigate Perjury and Retaliation Affecting Eld…







My son, James Louis Roden Jr., is a good and honorable Christian man who seeks no retaliation or harm against Guadalupe County or any of its officials for the injustice he has endured. His only request is to be restored to the life of service and integrity he once lived. He respectfully asks that the County Attorney's Office issue a letter of consent or a certification of non-prosecution, allowing him to pursue expungement of this unjust and unsupported First-Degree Felony Tampering with a Witness arrest.

My son has dedicated his life to serving his community as an educator, mentor, and minister. The mere presence of a *first-degree felony arrest* on his record—regardless of its falsity—has made it impossible for him to secure employment and provide for his wife and children. Employers see only the severity of the charge (1st Degree Felony) and assume the worst, unaware of the truth behind the case.

Under current Texas law, he must wait three years before qualifying for expungement, and the process itself could take up to an additional year. This prolonged delay would impose devastating hardship, likely resulting in homelessness and the total financial collapse of his family. It would also rob his two young children—Patrick (age 10) and Madalyn (age 13)—of the opportunities, stability, and future their father has worked his entire life to provide.

I ask you sincerely and prayerfully to do what is right—to acknowledge the overwhelming evidence of his innocence and to take the just and compassionate step of providing the written authorization necessary for him to rebuild his life, restore his good name, and continue serving the community

he loves. Ask yourself what would you want for your son, father, close friend or family member that was unjustly accused and robbed of everything they worked for.



Case 5:26-cv-00054-XR    Document 15    Filed 05/19/26    Page 208 of 231






11/3/25, 12:16 AM    Gmail - Formal Notice Regarding Criminal Complaint #2025-6000005 Failure to Investigate Perjury and Retaliation Affecting Eld…

Case 5:26-cv-00054-XR    Document 15    Filed 05/19/26    Page 209 of 231

I, along with the rest of our family, feel a deep and lasting sorrow for encouraging my son to assist and advocate for *Shelby Jane Koelle*. My son, James Louis Roden Jr., left home at the age of seventeen and lived independently for nearly thirty years, having little to no contact or communication with his sister *Jamie Renee Walker* or niece *Shelby* during that time. My husband and I only recently reconnected with our son after many years of living abroad and traveling throughout the country.

During this time, we came to see firsthand the man he has become—a man of character, faith, and compassion. James has devoted his life to helping others, especially families struggling to find resources and justice for their children with disabilities. He has always acted with kindness, humility, and integrity. To see him now suffer because he chose to help a vulnerable young woman is heartbreaking beyond words.

The false arrest, coupled with the public exposure of his name and image through media headlines and community gossip, has shattered a reputation that took decades to build. His colleagues, students, and community members—all who once admired him as an educator, mentor, and servant leader—now see him through the distorted lens of an unjust accusation. The emotional, professional, and spiritual toll this has taken on him and our family is immeasurable.

The financial, physical, and emotional toll resulting from these false arrests of James Louis Roden Sr and Jr. has devastated our entire family. We have been left in complete ruin—watching my innocent grandchildren suffer because their father James Jr, an educator and minister with a spotless record, lost everything he worked for and is now unable to obtain employment. Both my son James and granddaughter Madalyn have ongoing medical needs, yet they have lost their essential health insurance coverage due to this injustice. The pain of witnessing their struggles, knowing they have done nothing wrong, is indescribable. The experience of being wrongfully targeted and seeing everything my son has worked for—his career, reputation, and future— stripped away, is no less painful than being victimized by a criminal act. To know that this occurred to shield and protect Cody Lane Koelle, a convicted felon with a known history of making false police reports and statements to police, is beyond comprehension. As I write these words, the heartbreak and disbelief are overwhelming

To arrest members of my family on unverified allegations—without a meaningful investigation—and then to communicate to other legal professionals that we are untrustworthy is unfounded, unethical, and injurious. Prosecutors are ethically bound under Texas Disciplinary Rule 3.09(f) and Rule 8.04(a)(3) to refrain from extrajudicial statements that heighten public condemnation or misrepresent facts, while law-enforcement officers are held to the Texas Commission on Law Enforcement Canons of Ethics, which require honesty, fairness, and respect for constitutional rights. We have provided verifiable documentation, including emails and recorded communications, demonstrating full cooperation and transparency. Nevertheless, the County Attorney's Office appears to have relied solely upon statements from Andrea Martin, Cody Lane Koelle, and Michael Allen Walker, despite their documented criminal records of making false statements to police and history of inconsistent statements, and despite our family's long standing record of integrity and professionalism.

All we have ever asked is that your investigation and reporting be conducted with fairness, honesty, and integrity. To disregard credible evidence and fail to engage with relevant parties risks concealing potential misconduct and undermines the very principles of justice and accountability that your office has sworn to uphold. Such actions not only harm those directly affected but also erode the public's trust in the institutions charged with protecting it.

Cody Lane Koelle has twice, within a span of less than six months, been arrested for criminal offenses involving false statements and reports to law enforcement. He has been found guilty of

these offenses and is currently a convicted felon. In September 2024, approximately six months before the arrests of my husband and son, Cody knowingly provided false information to police and impersonated a peace officer. He was subsequently prosecuted and found guilty of both charges, confirming a documented pattern of deception and disregard for the law. (Original court document attached)

THEREUPON, the Court finds the defendant **Guilty of Interference with Law Enforcement, false report,** in violation of K.S.A. 21-5904(a)(1)(C), a Class A nonperson misdemeanor; **False Impersonation,** in violation of K.S.A. 21-5917(a), a Class B nonperson

Six months later—only seven days after the arrests of my husband and son—Cody Lane Koelle once again made a false criminal accusation against another innocent individual, knowingly alleging conduct that never occurred. In doing so, he attempted to deprive yet another person of their freedom, reputation, and integrity, just as he had done to my husband and my son, and as he did when he provided false testimony under oath against my daughter. This ongoing pattern of deceit and misuse of the justice system underscores a deeply troubling lack of accountability and the serious consequences of allowing known offenders to manipulate legal processes for personal or retaliatory purposes.  (Original Court Document Attached)

### COUNT ONE

On or about the 14th day of April, 2025, the above named defendant, within Ford County Kansas, did then and there contrary to the statutes of the State of Kansas unlawfully and knowingly falsely report to a law enforcement agency, to wit:  Officer Cisco Soto of the Dodge City Police Department that a particular person has committed a crime, knowing that such information is false and intending that the officer or agency shall act in reliance upon such information.  **INTERFERENCE WITH LAW ENFORCEMENT ~ FELONY** is a severity level 8 non-person felony in violation of the K.S.A. 21-5904(a)(1)(A).

Section Violated: K.S.A. 21-5904(a)(1)(A)
Penalty Section: K.S.A. 21-5904(b)(2)(A)

It is deeply troubling that Cody Lane Koelle has accused my husband, a 77-year-old wheelchair-bound, physically disabled veteran who is battling cancer and confined to his bed and chair for most of the day, of being a threat. This accusation defies all logic, as my husband resides more than 700 miles away and poses no conceivable danger to anyone. Despite his age, frailty, and medical condition, he was nonetheless arrested and charged with First-Degree Felony Tampering with a Witness, a charge unsupported by any credible evidence or investigation.

Meanwhile, Cody Lane Koelle, who himself was arrested and pled guilty to a felony offense involving threats, is now an admitted and convicted felon. Yet, along with Michael Allen Walker, also a convicted felon, he appears to have been afforded extraordinary protection and credibility by the authorities—empowering both men to inflict devastating harm upon innocent individuals and our family. The stark contrast between how these known offenders have been shielded and how law-abiding, disabled, and elderly citizens have been treated raises serious concerns about fairness, accountability, and equal protection under the law. (Original Court Document Attached)

11/3/25, 12:16 AM    Gmail - Formal Notice Regarding Criminal Complaint #2025-GC00208 - Failure to Investigate Perjury and Retaliation Affecting Eld…

Case 5:26-cv-00054-XR    Document 15    Filed 05/19/26    Page 211 of 231

## COUNT TWO

On or about the 14th day of April, 2025, the above named defendant, within Ford County Kansas, did then and there contrary to the statutes of the State of Kansas <mark>unlawfully communicate a threat to commit violence with the intent to place another in fear,</mark> to-wit: Boot Hill Casino and Resort. **CRIMINAL THREAT** is a severity level 9 person felony in violation of K.S.A. 21-5415(a)(1).

---

## Formal Requests

1. **Written status report** on Criminal Complaint #2025-GC00208, identifying the assigned investigator, current disposition, and reason for delay.

2. **Written assurance** that the Sheriff's and County Attorney's Offices will provide ADA-compliant communication and updates accessible to both an elderly and an IDD complainant.

3. **Immediate referral** of the complaint and supporting evidence to an outside, conflict-free investigative body such as the Texas Rangers Public Integrity Unit, the Texas Department of Public Safety Criminal Investigations Division, or the FBI Civil Rights Division.

4. **Correction of the record** in my daughter's case to reflect that the testimony relied upon for her continued incarceration was materially false.

5. **Issuance of a formal letter of consent or certification of non-prosecution** from the Guadalupe County Attorney's Office for James Louis Roden Jr., confirming that no charges will be pursued and authorizing him to seek expungement of his record. This letter is requested to mitigate the irreparable professional and financial harm caused by an unjust First-Degree Felony arrest, to allow him to resume his career as an educator and community servant, and to restore his ability to provide for his wife and two children.

---

## Notice of Rights and Anti-Retaliation Protections

This communication is submitted as protected activity under federal and state law. Please note that any adverse or differential treatment in response to the filing of a complaint or request for accommodation is prohibited by Title II of the Americans with Disabilities Act (42 U.S.C. § 12132 and § 12203), Section 504 of the Rehabilitation Act (29 U.S.C. § 794), and Texas Penal Code § 36.06 (retaliation). Federal courts have recognized that individuals are entitled to be free from retaliation for asserting statutory or constitutional rights, including in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), and *Hartman v. Moore*, 547 U.S. 250 (2006).* This notice is provided to preserve all protections available under these authorities and to ensure continued respectful, non-retaliatory communication. I ask that you please not retaliate against me, my husband, son or anyone else in my family for exercising my right to free speech.

Respectfully,
**Dolores Jane Roden**
Elderly/Disabled Complainant
Mother of Jamie Renee Walker

League City, TX

*Enclosures:*
– Sworn Criminal Complaint (June 26 2025)
– Notary Verification Letter and Log
– Proof of Case Receipt (pink slip #2025-GC00208)


*Advocate Disclaimer:*
*I am not an attorney and do not provide legal advice. I submit this correspondence solely in my capacity as a concerned mother, elderly citizen, and disabled family advocate, acting in good faith to protect the rights and welfare of my intellectually and developmentally disabled daughter and our family. I am an elderly and disabled individual exercising my legal right to equal access to government programs, services, and justice under Title II of the Americans with Disabilities Act (42 U.S.C. § 12132) and Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794).*

*These laws guarantee that no qualified individual with a disability shall be excluded from participation in, denied the benefits of, or subjected to discrimination by any public entity. The U.S. Supreme Court's decision in Tennessee v. Lane, 541 U.S. 509 (2004) affirms that individuals with disabilities are entitled to equal and meaningful access to the courts and all related judicial and administrative processes. This correspondence is therefore submitted under those protections, in good faith, and for the purpose of ensuring transparency, accountability, and equal treatment under the law.*

---

**8 attachments**



**Case Filing Proof.jpeg**
2931K

**Exhibit A - Cody and Shelby Sworn Affidavit Nov. 2024 and Verification Letter form Notary - Copy.pdf**
983K

**Dolroes Jane Roden Criminal Complaint against Cody Lane Koelle June 26th 2025 - Copy.pdf**
13702K

**PN-2024-CR-000121 - Order of Probation.pdf**
970K

**FO-2025-CR-000203 - Information April 14t False Report of a Crime.pdf**
344K

**PN-2024-CR-000121 - Complaint - C Koelle.pdf**
746K

**PN-2024-CR-000121 - Journal Entry of Diversion Revocation - revoked placed on Probation 6 mo. (2).pdf**
125K

**Shelby AffidavitI May 29t 2025 via Kimberely Kennedy - Copy.pdf**
1332K

---

**Jane Roden <​                    >**                                          Tue, Oct 21, 2025 at 4:11 PM
To: j.ray                    , tarinna.skrzyck                    , kelly.mann
jonathan.amdu                    , dwillbor                    , zachary
Cc: jrwilsoniii



Dear Sheriff Ray, Mr. Amdur, Mr. Willborn, Ms. Skrzycki, Ms. Mann, and Mr. Bidner,

On October 11, 2025, I sent the attached "Formal Notice Regarding Criminal Complaint #2025-GC00208," outlining evidence of perjury by Cody Lane Koelle and requesting (1) a written status, (2) ADA-compliant updates, (3) referral to an outside, conflict-free agency, (4) record correction in my daughter's matter as it relates to her bond hearing, and (5) a letter of consent/non-prosecution for my son. I have not received any response which is evidence of Deliberate Indifference as you have chosen not to respond or act on credible violations of civil rights and ADA violations, everyone receiving my email has a duty to respond, your failure to investigate is a violation of due process and all these ignored emails providing testimony and evidence seem to be a pattern of practice by Guadalupe County Attorney's and Sheriff's Office.

I am submitting additional evidence that further confirms Cody Lane Koelle committed aggravated perjury during the June 18, 2025 bond hearing for my daughter, Jamie Renee Walker. The following materials and facts substantiate this allegation:

1. **Signature Comparison:** The signature on Cody Koelle's Kansas probation form matches the signature on his November 15, 2024 sworn affidavit—the same affidavit now verified by notary verification letter confirming Cody personally signed it. (see attached verification letter). This comparison disproves his claim that he never signed the November affidavit that was stated under oath on June 18th, 2025 at Jamie Renee Walker bond hearing. Cody was able to convince Judge Steel that wasn't his signature, yet here he is signing exactly the same way he signed his probation notice form in Kansas that is his court record. Mr. Bidner why haven't you filed a motion to Strike Cody as a witness (Motion in Limine)?

2. **Court Transcript Evidence:** I request that the official court reporter's transcript from the June 18, 2025 bond hearing be reviewed. During this hearing, Cody Koelle made materially false statements under oath, directly contradicting his prior sworn affidavit and recorded statements which includes Cody stating that he didn't sign the November 15th, 2024 notarized sworn affidavit. Assistant County Attorney Jonathan Amdur was present and heard these false statements firsthand, satisfying the knowledge requirement for aggravated perjury under Tex. Penal Code § 37.03.  Judge Steel, Court Bailiff, Court Reporter, Sunny Middleton (Public Defender) were all present and heard it.

11/3/25, 12:16 AM       Gmail - Formal Notice Regarding Criminal Complaint #2025-FC020005 - Failure to Investigate Perjury and Retaliation Affecting Eld…

Case 5:26-cv-00054-XR   Document 15   Filed 05/19/26   Page 214 of 231

**Cody Signature on November 15ᵗʰ, 2024 Affidavit**





**Cody Signature on September 2025 Probation Document**



Cody pled guilty to these offenses and is currently serving a one-year term of probation for his crimes. His conduct in both the September 2024 incident—where he lied to law enforcement, obstructed justice, and impersonated a police officer—and the April 2025 incident—where he filed a false police report against an innocent citizen—demonstrates a clear pattern of deceit and manipulation. These are the very same types of offenses he has now committed against my husband and my daughter by lying under oath. Despite this

established pattern and the existence of verifiable evidence, the Guadalupe County Sheriff's Office continues to refuse to investigate his actions.

**Prior Evidence Provided and collected by Officer Reamer and in her case file a full year prior to false accusation against my son James Louis Roden Jr.:**

- The April 4, 2024 video interview between Shelby Jane Koelle and Officer Elaine Reamer, where Shelby stated that both she and her mother were victims of Michael Walker's abuse, long before my son's April 7th, 2025 arrest warrant by Officer Reamer.

  **This is from the Doctors Forensic report on file in Jamie Renee Walker court CASE No. 24-1775-CR-B long before Officer Reamer's arrest warrant affidavit against my son.**

Police interview video of victim (Investigator Elaine Reamer), dated 4/4/2024, this video is of the investigator and the victim in the case. The victim stated she was threatened with physical violence by Michael Walker if she told police the two were having sex. ==The victim stated her mother was never involved in any sexual activity. The victim stated that Ms. Walker was afraid of Mr. Walker and that she never knew what was happening to her.==

- April 6, 2024 text messages from Shelby to Officer Reamer (sent from Hope House's phone Carmen) where she independently wrote that her mother was innocent. My son forwarded these messages, along with screenshots of Shelby's texts, to Officer Reamer that same week. These materials were in Officer Reamer's possession a full year before the false tampering allegations against my son and husband.

***Text Messages from my James Louis Roden Jr (Phone and text messages preserved for evidence)***

11/3/25, 12:16 AM     Gmail - Formal Notice Regarding Criminal Complaint #2025-600000085 Failure to Investigate Perjury and Retaliation Affecting Eld…

Case 5:26-cv-00054-XR    Document 15    Filed 05/19/26    Page 216 of 231



11/3/25, 12:16 AM

Case 5:26-cv-00054-XR    Document 15    Filed 05/19/26    Page 217 of 231

Gmail - Formal Notice Regarding Criminal Complaint #2025-E000008 Failure to Investigate Perjury and Retaliation Affecting Eld…



Reamer 3.png

**This Text Message is a screen shot provided to Officer Reamer on April 8th, 2024 by James Louis Roden Jr. to Officer Reamer:**



Reamer 7.png

Reamer 8.png

On March 26, 2025, James Louis Roden Jr. sent an email to the Guadalupe County Attorney's Office, specifically addressed to Jessica Johnson (jessica.johnson███████████, Jonathan Amdur (jonathan.amdur████████. gov), Maritza Stewart (maritza.stewart████████), Ileen Rangel (ileen.rangel███████████, and David Willborn (dwillborn████████████). In that correspondence, **my son clearly requested that the County or the Court appoint a Guardian Ad Litem for Shelby Jane Koelle**, citing her intellectual disability and need for professional representation. He also informed the recipients that he was formally stepping down from his role as family advocate to promote neutrality and to protect his family from potential retaliation by Cody Lane Koelle, whose conduct had become increasingly threatening. No reasonable officer could have concluded that an individual seeking judicial oversight, professional assistance, and a neutral guardian ad litem—while voluntarily withdrawing himself from involvement—was attempting to tamper with a witness. Rather, his actions demonstrated integrity, transparency, and concern for Shelby's well-being and in true advocate fashion. The record is clear that Shelby consistently stated to me and to multiple officials that both she and her mother were victims of Michael Walker's abuse and that they lived in fear. These were her own words, not fabricated or coerced by my son or anyone in our family, and the documentary evidence reflects exactly that.

**Clips from the March 26th, 2025 Email sent to Jonathan Amdur, Jessica Johnson, David Wilborn, Ileen Rangel and Maritz Stewart):**

March 26th Email to Guadalupe County Attorney's Office 3.jpg

**What reasonable officer would ever come to this conclusion?**

Officer Reamers credientals .jpg

Despite this record, my son (James Roden Jr.) and husband (James Roden Sr.) remain wrongfully accused. Both are men of honor—one a 20-year educator, minister, author and **country singer**, the other a disabled Army veteran, whose reputations, livelihoods, and families have been devastated by a baseless prosecution sustained through omissions, inaction and outright lies.

Disregarding the intellectual and developmental disabilities (IDD) of both Shelby and Jamie is deeply unjust **(see attached emails from June 2024)**. Shelby now faces the unbearable burden of raising two children, with one due in just a few weeks, while also battling a recent cancer diagnosis of the unborn child. I'm certain this is because of the trauma by being forced into homelessness by Cody and Andrea, after being locked out of her established residence by a protective order issued by Cody and Andrea with the help of Michael Allen Walker defense attorney's, and then placed into the care of a known drug dealer by Cody and Andrea by personally dropping her off at Jesse Cole residence.



My son, a teacher and mandated reporter, did what the law requires—on April 1st, 2025, he filed a report and provided a recorded phone call in which Cody admitted Shelby was being used for sex, by Jesse Cole. Instead of investigating and protecting Shelby, who is both IDD and a documented witness under protection by the Guadalupe County Sheriff's Office, they arrested my son on false charges. This is textbook retaliation for engaging in protected ADA activity. The system placed Shelby in harm's way, shielded Cody, a felon known for making false reports to law enforcement, and punished a veteran educator, minister, and lifelong advocate for doing what was right. I can't stop crying—the pain is unbearable. Please, stop this abuse to my innocent son and husband and recognize the fact that both Shelby and Jamie are both documented IDD individuals who should have their ADA rights protected not tarnished.

**Here are clips from my son's April 1st, 2025 mandated report.**

April 1st Email 1 - Copy.jpg

Shelby, who has Intellectual and Developmental Disabilities (IDD) and receives Social Security Disability benefits, has been living with her brother, Cody, and his wife, Andrea, in Kansas since August 1st, 2024. Despite knowing Shelby's condition, Cody and Andrea allowed a man named Jesse to move into their home. They permitted Jesse to sleep in the same room with Shelby, and Cody has openly stated that he was aware Jesse was using Shelby for sex, claiming that the relationship would not last long. It is now believed that Shelby is pregnant for a second time, potentially as a result of exploitation due to her disability, an issue that both Cody and Andrea had a responsibility to protect her from.

April 1st Email 3.jpg
Thank you for your attention to this serious matter.

Sincerely,
James Louis Roden Jr.

P.S. Again, I ask that my identity remain anonymous as I do not wish to expose my wife and children to retaliation or harm, and I wish to distance myself from my sister's case and her children going forward as this is beyond my ability to advocate effectively.

Six days after making this report, my son was arrested and charged with first-degree felony witness tampering. Officer Reamer alleged that he coerced Shelby into saying her mother was innocent—an accusation that defies logic and fact. Shelby had consistently stated her mother's innocence to Officer Reamer, Ileen Rangel, other members of the County Attorney's Office, and our family for over a year and prior to my son being requested to be an advocate for Shelby. How could he have coerced her into repeating a statement she had already made repeatedly and publicly long before he ever discussed it with her? My son's only action was to report Shelby's statements and urge the County Attorney's Office to speak with her directly after she reached out to him for help reestablishing contact following her failed attempts to reach Guadalupe County officials on her own. Despite the repeated emails and phone call attempts, my son was unsuccessful in getting anyone from the County Attorney's office to pick up the phone and attempt to have a discussion about the situation, instead they just arrested him. Please see this clip by Sheriff Ray where he states that having simple conversations is Biblical and that anyone can openly speak and have conversations with him and anyone in his office, yet all I get along with my son and husband is complete silence. **Click here to see Sheriff Ray make this statement.**

The arrest devastated his life—he lost his job, depleted his life savings to post bail and hire counsel, and continues to struggle to find meaningful employment to support his family. On two separate occasions, he requested that the court appoint a qualified professional to protect Shelby's rights, yet no action was taken. The County Attorney's Office remains fully aware of his ongoing suffering under this false charge but continues to ignore the evidence and refuses to correct the record, preventing him from clearing his name and providing for his family. Just more proof of retaliation and harm to my family.

To knowingly allow this injustice to continue, despite full evidentiary awareness, constitutes deliberate indifference under the Fourteenth Amendment's Due Process Clause and violates the Equal Protection Clause by selectively shielding a convicted felon (Cody Lane Koelle and Michael Allen Walker) while criminalizing two innocent men (James Louis Roden Jr and James Louis Roden Sr), one for reporting abuse, saving the life of an IDD victim and advocating for justice.

The ongoing harm continues to cause me severe emotional distress. The continued prosecution against my husband has inflicted significant emotional strain on him, diminishing his quality of life and preventing us from fully enjoying our marriage. This added stress may be the result of his death as it has exacerbated his medical condition. He remains subject to restrictive bond conditions despite the absence of an indictment and the prolonged delay in granting his requested examining trial. I implore each of you to act with integrity, correct the record, and move swiftly to give my son's life back by allowing him to apply for immediate expungement. Justice delayed is justice denied. It appears the County has established a troubling pattern of retaliating against citizens through false or exaggerated charges when they speak out against misconduct or abuse. I sincerely pray that such actions are not taken against me or anyone in my family for exercising my right to report and seek justice.

As an 83-year-old disabled complainant, I respectfully request a **written status update within three (3) business days** identifying the assigned investigator, current disposition, and reasons for delay, and confirming ADA-compliant communication going forward. Continuing to ignore me is Deliberate Indifference.

May you find the courage and faith to do what is right in the eyes of God and under the law.

Respectfully,
**Dolores Jane Roden**
Complainant / Witness

11/3/25, 12:16 AM
Case 5:26-cv-00054-XR   Document 15   Filed 05/19/26   Page 221 of 231
Gmail - Formal Notice Regarding Criminal Complaint #2025-60002085 Failure to Investigate Perjury and Retaliation Affecting Eld…

**Accountability & Record Preservation Notice:**
*This communication is submitted in good faith to ensure accuracy, transparency, and accountability in all official matters referenced herein. All recipients are respectfully requested to preserve this correspondence and any related materials as part of the official record, consistent with state and federal requirements for record retention, due process, and accessibility under the Americans with Disabilities Act (ADA). This notice is not adversarial in nature; it is intended solely to promote full cooperation, fair review, and the proper correction of any misunderstanding or error.*

[Quoted text hidden]

---

**6 attachments**



**November 15th, 2024 -Photo-Cody Signed Affidavit.JPG**
141K

**Notary Verification Letter Sandra Rodriguez June 23rd 2025.pdf**
294K

**EXR-MA~1.PDF**
136K

**EXT-AP~1.PDF**
200K

**EXD-JU~1.PDF**
318K

**EXC-JU~1.PDF**
315K

 **Gmail**            **Jane Roden <** ████████████████████ **>**

## RE: **EXTERNAL** PIA Request for Criminal Complaint #2025-GC00208

**Jane Roden <** ███████████████████ **>**        Wed, Nov 12, 2025 at 1:40 PM
To: "shared-so.openrecords" <so.openrecords ████████████ >, j.ray ███████████ v, kelly.mann ███████████
tarinna.skrzycki ████████████ v, joel.machos ██████████

Dear Public Information Officer, Sheriff Ray, Sgt. Mann, Captain MacHost, Chief Deputy Skrzycki-Pfiel,

Thank you for providing the offense report for Case #2025-GC00208-000. After reviewing the document, I noted that the "Nature of Complaint" field lists this matter as "Civil."

This classification appears to be incorrect. The complaint I originally submitted on June 26, 2025 and August 26th,2025 , was explicitly titled "Formal Criminal Complaint Against Cody Lane Koelle," and was sworn, signed, and notarized under penalty of perjury. The filing cited specific criminal statutes, including Texas Penal Code §§ 37.03 (Aggravated Perjury), 37.08 (False Report), and 37.10 (Tampering with Government Record), and requested an official *criminal investigation and prosecution.*

Accordingly, please confirm:

1. Whether this complaint was internally reclassified from "Criminal" to "Civil," and if so, who made that determination and on what date;

2. Whether any criminal investigator within the Guadalupe County Sheriff's Office or the Criminal Investigation Bureau was assigned to review or act upon the complaint; and

3. Whether a corrected case record will be issued reflecting its proper designation as a criminal complaint.

This misclassification directly affects how the complaint was processed, routed, and closed. Under Tex. Gov't Code §§ 552.108(c) and 552.022(a)(1), I respectfully request public documentation explaining how and when this reclassification occurred, including any internal correspondence or disposition entries that record the change.

To ensure clarity and transparency, I will be attaching the certified transcript of the June 18, 2025, bond hearing, which proves beyond any reasonable doubt that Cody Lane Koelle committed aggravated perjury by providing knowingly false testimony that falsely implicated a teacher, a disabled veteran, and an intellectually disabled domestic violence victim. His perjury on the stand and repeated false reports to law enforcement have directly caused the destruction of an entire family, the loss of professional careers, and the deprivation of liberty. The resulting economic impact from his false statements exceeds several million dollars, alongside severe emotional and physical suffering endured by those affected.

As an elderly and disabled complainant, I request reasonable accommodation under the Americans with Disabilities Act (42 U.S.C. § 12132) and Section 504 of the Rehabilitation Act (29 U.S.C. § 794).

Thank you for your prompt attention to this matter.

Respectfully,
Dolores Jane Roden

P.S.
You arrested my husband and my son—both law-abiding citizens with no criminal record—based solely on the words of a known criminal, Cody Lane Koelle, the same individual implicated in the April 1, 2025 mandated report of sexual exploitation filed by my son, James Louis Roden Jr. A devoted teacher, minister, author, and country music singer, James Jr. was the original reporter who exposed the second sexual exploitation of Shelby Jane Koelle and sought protection for her under the law. Yet only six days later, the very person who reported that abuse was arrested—based on the retaliatory statements of the man accused in his report and by the same officials who had allowed the exploitation to occur. My son was also the one who had previously rescued Shelby from the abuse of Michael Allen Walker. My husband, James Louis Roden Sr., is a devoted husband, father, and 25-year U.S. Army veteran who served his country honorably in Vietnam.

Despite their lifelong records of service and integrity, they were both arrested without any independent investigation or corroborating evidence—simply because Cody's false statements fit a convenient narrative. Yet no matter how much evidence is now presented proving Cody's perjury, your office continues to shield and protect him. His lies have destroyed

the lives of innocent people and appear to have been used to help an accused rapist receive a reduced sentence in the aggravated sexual assault case involving my IDD granddaughter.

In four months, Michael Allen Walker will be eligible for parole and free to walk the streets, while you continue to pursue first-degree felony charges that carry potential sentences of 99 years against my husband and son—both innocent men—based on unverified verbal accusations.

I will pray for you and your department, asking Jesus Christ to lead you toward truth and justice. I wish you good health, peace, and wisdom, and hope that you and your families never have to endure what mine has suffered through silence, false arrest, and injustice.

Sheriff Ray, you have often said that conversations grounded in Scripture can resolve most problems. Yet there has been no conversation—only silence, indifference, and the persecution of those who sought to protect the vulnerable.

**Cody Signature on November 15ᵗʰ, 2024 Affidavit**





**Cody Signature on September 2025 Probation Document**

**Attached:**

**L-009 June 18th, 2025 Certified Transcript of Bond Hearing (Undeniable proof of aggravated perjury)**
**E-008 June 23rd, 2025 - Notary Verification Letter and Copy of Logbook entry (proof Cody Lane Koelle signed November 2024 affidavit)**
**A-004 Arrest Charge Cody Lane Koelle April 14th, 2025 (Filed a false report to LEO against an innocent citizen attempting to deprive the citizen of their liberty along with felony threat)**
**A-005 Arrest Charge Cody Lane Koelle September 27th, 2024 (False statement to LEO, impersonating a police officer, red and blue lights on his vehicle)**
**A-006 Mugshot and Arrest of Cody Lane Koelle April 14th, 2025 in Dodge City Kansas (Ford County)**



**A-007 Police Report Pawnee County Kansas**
**L-001 June 26th 2025 Original Criminal Complaint against Cody Lane Koelle**

[Quoted text hidden]

---

**8 attachments**

📄 **L-009 June 18th, 2025 Bond Hearing Certified Transcript - Copy.pdf**
99K

📄 **E-008 June 23rd 2025 - Notary Verification Letter Sandra Rodriguez and Notary Log.pdf**
294K

📄 **A-007 Police Report Cody Lane Koelle September 27th 2024.pdf**
1024K

📄 **A-006 Mugshot Arrest Cody Lane Koelle April 14th, 2025.pdf**
119K

📄 **A-004 Arresting Charge Cody Lane Koelle April 14th 2025.pdf**
344K

📄 **A-005 Arrest Charge Cody Lane Koelle September 27th, 2024.pdf**
746K

📄 **L-001 June 26th 2025 Dolroes Jane Roden Criminal Complaint against Cody Lane Koelle.pdf**
13702K

📄 **B-024 Apr 1, 2025 - Report of Shelby's New Exploitation Ignored by DA and CPS, Followed by Retaliatory Arrest.pdf**
200K



**Jane Roden** ████████████████████████████

## RE: **EXTERNAL** PIA Request for Criminal Complaint #2025-GC00208

**shared-so.openrecords** <so.openrecords█████████████>                    Thu, Nov 13, 2025 at 1:04 PM
To: Jane Roden ██████████████
Cc: Joshua Ray <j.ray███████████████, Tarinna Skrzycki <tarinna.skrzycki████████████, Joel Machost
<joel.machos████████████████, Kelly Mann <kelly.mann████████████

Good afternoon, Ms. Roden,


Upon further research within the new reporting database, a supplemental report was located and is attached for your review.


Within this document is a notation that a packet including the documentation and complaint was forwarded to the Guadalupe County Attorney's Office on Wednesday, September 24, 2025. You may contact that agency for any questions or concerns you have regarding this case.


Thank you for your consideration.


Respectfully,


**Open Records**

Guadalupe County Sheriff's Office

████████████████████

Seguin, TX █████

**so.openrecords**████████████████


---

**From:** Jane Roden ████████████████████████
**Sent:** Wednesday, November 12, 2025 1:40 PM
**To:** shared-so.openrecords <so.openrecords███████████████; Joshua Ray <j.ray████████████████>; Kelly Mann <kelly.mann████████████>; Tarinna Skrzycki <tarinna.skrzycki███████████>; Joel Machost <joel.machost████████████████
**Subject:** Re: **EXTERNAL** PIA Request for Criminal Complaint #2025-GC00208


> **CAUTION:** This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.

Dear Public Information Officer, Sheriff Ray, Sgt. Mann, Captain MacHost, Chief Deputy Skrzycki-Pfiel,

Thank you for providing the offense report for Case #2025-GC00208-000. After reviewing the document, I noted that the "Nature of Complaint" field lists this matter as "Civil."

This classification appears to be incorrect. The complaint I originally submitted on June 26, 2025 and August 26th,2025 , was explicitly titled "Formal Criminal Complaint Against Cody Lane Koelle," and was sworn, signed, and notarized under penalty of perjury. The filing cited specific criminal statutes, including Texas Penal Code §§ 37.03 (Aggravated Perjury), 37.08 (False Report), and 37.10 (Tampering with Government Record), and requested an official *criminal investigation and prosecution.*

Accordingly, please confirm:

1. Whether this complaint was internally reclassified from "Criminal" to "Civil," and if so, who made that determination and on what date;
2. Whether any criminal investigator within the Guadalupe County Sheriff's Office or the Criminal Investigation Bureau was assigned to review or act upon the complaint; and
3. Whether a corrected case record will be issued reflecting its proper designation as a criminal complaint.

This misclassification directly affects how the complaint was processed, routed, and closed. Under Tex. Gov't Code §§ 552.108(c) and 552.022(a)(1), I respectfully request public documentation explaining how and when this reclassification occurred, including any internal correspondence or disposition entries that record the change.

To ensure clarity and transparency, I will be attaching the certified transcript of the June 18, 2025, bond hearing, which proves beyond any reasonable doubt that Cody Lane Koelle committed aggravated perjury by providing knowingly false testimony that falsely implicated a teacher, a disabled veteran, and an intellectually disabled domestic violence victim. His perjury on the stand and repeated false reports to law enforcement have directly caused the destruction of an entire family, the loss of professional careers, and the deprivation of liberty. The resulting economic impact from his false statements exceeds several million dollars, alongside severe emotional and physical suffering endured by those affected.

As an elderly and disabled complainant, I request reasonable accommodation under the Americans with Disabilities Act (42 U.S.C. § 12132) and Section 504 of the Rehabilitation Act (29 U.S.C. § 794).

Thank you for your prompt attention to this matter.

Respectfully,
Dolores Jane Roden

P.S.
You arrested my husband and my son—both law-abiding citizens with no criminal record—based solely on the words of a known criminal, Cody Lane Koelle, the same individual implicated in the April 1, 2025 mandated report of sexual exploitation filed by my son, James Louis Roden Jr. A devoted teacher, minister, author, and country music singer, James Jr. was the original reporter who exposed the second sexual exploitation of Shelby Jane Koelle and sought protection for her under the law. Yet only six days later, the very person who reported that abuse was arrested—based on the retaliatory statements of the man accused in his report and by the same officials who had allowed the exploitation to occur. My son was also the one who had previously rescued Shelby from the abuse of Michael Allen Walker. My husband, James Louis Roden Sr., is a devoted husband, father, and 25-year U.S. Army veteran who served his country honorably in Vietnam.

Despite their lifelong records of service and integrity, they were both arrested without any independent investigation or corroborating evidence—simply because Cody's false statements fit a convenient narrative. Yet no matter how much evidence is now presented proving Cody's perjury, your office continues to shield and protect him. His lies have destroyed the lives of innocent people and appear to have been used to help an accused rapist receive a reduced sentence in the aggravated sexual assault case involving my IDD granddaughter.

In four months, Michael Allen Walker will be eligible for parole and free to walk the streets, while you continue to pursue first-degree felony charges that carry potential sentences of 99 years against my husband and son—both innocent men—based on unverified verbal accusations.

I will pray for you and your department, asking Jesus Christ to lead you toward truth and justice. I wish you good health, peace, and wisdom, and hope that you and your families never have to endure what mine has suffered through silence, false arrest, and injustice.

Sheriff Ray, you have often said that conversations grounded in Scripture can resolve most problems. Yet there has been no conversation—only silence, indifference, and the persecution of those who sought to protect the vulnerable.

**Cody Signature on November 15th, 2024 Affidavit**





**Cody Signature on September 2025 Probation Document**

[Quoted text hidden]
[Quoted text hidden]

---

📄 **2025-GC00208 Supplemental Report.pdf**
187K

Case 5:26-cv-00054-XR   Document 15   Filed 05/19/26   Page 228 of 231

 **Gmail**

Jane Roden <██████████████████████████>

## RE: **EXTERNAL** PIA Request for Criminal Complaint #2025-GC00208

**Jane Roden** <█████████████████████>                          Thu, Nov 13, 2025 at 4:35 PM
To: "shared-so.openrecords" <so.openrecord██████████████>
Cc: Joshua Ray <j.ray███████████, Tarinna Skrzycki <tarinna.skrzycki██████████████, Joel Machost
<joel.machos█████████████, Kelly Mann <kelly.mann█████████████

Dear Public Information Officer, Sheriff Ray, Sgt. Mann, Captain Machost, and Chief Deputy Skrzycki-Pfiel,

Thank you for providing the recent supplemental report associated with Criminal Complaint #2025-GC00208. After reviewing the materials, I would appreciate clarification on several points to ensure the accuracy of the official record.

First, the supplemental document indicates that Sergeant Elaine Reamer "reviewed" the complaint and forwarded a "packet" to the County Attorney's Office. However, the report does not indicate whether any investigator was assigned, whether any evidence was evaluated, or whether the statutory allegations listed in my sworn and notarized complaint were examined under Texas Penal Code §§ 37.03, 37.08, and 37.10.

Because this is a formal criminal complaint supported by notarized documents, certified transcripts, and publicly verified arrest records, I want to ensure that it is being processed consistent with standard procedures for felony-level allegations. I respectfully request clarification on the following:

1. Whether the complaint has now been assigned to an investigator within the Criminal Investigation Division, and if so, the name of that investigator.

2. Whether the case classification has been corrected to reflect its status as a criminal complaint rather than a civil matter, as the misclassification appeared to affect how the report was initially routed and closed.

3. Whether the "Cleared – Report Taken" disposition date of September 13, 2025 will be corrected, given that the complaint submitted on that date contained none of the exhibits, affidavits, or evidence included in my subsequent sworn filings.

4. Whether the forwarded "packet" contained all of the attachments listed in my November 12th email, including the certified June 18, 2025 transcript showing aggravated perjury, the notarized verification letter, and the arrest records establishing prior false reports to law enforcement.

Because accurate classification and routing determine how criminal complaints are handled and preserved, it is important to me that the record accurately reflects the nature of the filing, the supporting evidence, and the investigative steps taken. As an elderly and disabled complainant, I also reiterate my request for a reasonable ADA accommodation under 42 U.S.C. § 12132 and Section 504 to ensure communication is clear and accessible.

I appreciate your time and attention to these questions and look forward to your clarification so that I may understand the current status of my sworn complaint and how it is being processed.

Respectfully,
Dolores Jane Roden

[Quoted text hidden]

 Gmail

**Jane Roden** ████████████████████████████████

## RE: **EXTERNAL** PIA Request for Criminal Complaint #2025-GC00208

**shared-so.openrecords** <so.openrecords ██████████████>                    Thu, Nov 13, 2025 at 4:51 PM
To: Jane Roden <doloresjaneroden ████████████>
Cc: Joshua Ray <j.ra ██████████████>, Tarinna Skrzycki <tarinna.skrzycki ██████████████>, Joel Machost
<joel.machos ██████████████>, Kelly Mann <kelly.mann ██████████>

Ms. Roden,

The Guadalupe County Attorney's Office will be the agency to better assist with answering your questions that are listed below. They would be conducting the investigation not the Guadalupe County Sheriff's Office for the criminal offense that you are alleging. Any documents that you have provided have been forwarded to that office by Sgt. Reamer per her supplement.

This request is to be closed due to the agency for this request would be the Guadalupe County Attorney's Office.

Respectfully,

**Open Records**

Guadalupe County Sheriff's Office

████████████████████

Seguin, TX ██████

**so.openrecords**██████████████

**From:** Jane Roden ██████████████████████████
**Sent:** Thursday, November 13, 2025 4:35 PM
**To:** shared-so.openrecords <so.openrecords ██████████████>
**Cc:** Joshua Ray <j.ray ██████████████>; Tarinna Skrzycki <tarinna.skrzycki ██████████████>; Joel Machost <joel.machost ██████████████>; Kelly Mann <kelly.mann ██████████████>
**Subject:** Re: **EXTERNAL** PIA Request for Criminal Complaint #2025-GC00208

> **CAUTION: This email originated from outside of the organization. Do not click links or open attachments unless you recognize the sender and know the content is safe.**

Dear Public Information Officer, Sheriff Ray, Sgt. Mann, Captain Machost, and Chief Deputy Skrzycki-Pfiel,



# Guadalupe County Sheriff's Office

**Incident Report**

| | | | |
|---|---|---|---|
| **Incident Number:** | 2025-GC00208-002 | | |
| **Reporting Officer:** | Reamer, Elaine (1301) | | |
| **Report Time:** | 08/26/2025 12:16 | | |

| | | | |
|---|---|---|---|
| Report Location: | **211 W COURT ST,  SEGUIN TX 78155** | | |
| Incident Nature: | **Civil** | Report Date: | **9/25/2025** |
| Disposition: | **Cleared-Cleared** | Disposition Date: | **9/13/2025 12:17:15 PM -05:00** |
| Clearance: | **[RPT] Report Taken** | Report Type: | **Incident** |
| Contact: | | Received By: | **DOLRES RODENT** |
| First Approval By: | **Shockley, Robert (1300)** | First Approval Date: | **9/25/2025** |
| Second Approval By: | | Second Approval Date: | |

**Page 1**
On Friday, 9/19/12025, I was given the report by Deputy Bonner and the complaint he received from the Roden family.

I reviewed the complaint.

On Monday, 9/22/2025, I created a packet to have the reports and complaint forwarded to the lead prosecutor of the investigation.

On Wednesday, 9/24/2025, the packet was transported to the Guadalupe County Attorney's Office by Investigator Roseland. I have attached the property receipt to this supplement.

**NFAT**

**Sgt. Elaine M. Reamer #1301**

## Officers

| | | | |
|---|---|---|---|
| Name: | **Reamer, Elaine 1301** | | |
| Assigned By: | **Reamer, Elaine (1301)** | Date: | **09/25/2025    Primary** |

Title:

Type:

Desc:

Case 5:26-cv-00054-XR    Document 15    Filed 05/19/26    Page 231 of 231

Title:

Type:

Desc: