**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

JAMES LOUIS RODEN, JR.,
Plaintiff,

v.

ELAINE MICHELLE REAMER and
GUADALUPE COUNTY, TEXAS,
Defendants.

**Civil Action No. 5:26-cv-00054-XR**

# EXHIBIT A

## CERTIFIED TRANSCRIPTS OF SENTENCING PROCEEDING

**State of Texas v. Michael Allen Walker**
**Cause No. 24-1776-CR-B**
25th Judicial District Court, Guadalupe County, Texas

November 3, 2025

Attached to Plaintiff's Motion for Judicial Notice

A-1 Certified Reporter's Transcript, Volume 1 (Day 1)
Richard E. Roberts, Jr., CSR

A-2 Certified Reporter's Transcript, Volume 2 (Day 2)
Richard E. Roberts, Jr., CSR

Reporter's Record

VOLUME 1 OF 1 VOLUMES

TRIAL COURT CAUSE NO. 24-1776-CR-B

| | | |
|---|---|---|
| THE STATE OF TEXAS | ) | IN THE DISTRICT COURT |
| | ) | |
| | ) | |
| vs. | ) | GUADALUPE COUNTY, TEXAS |
| | ) | |
| | ) | |
| MICHAEL WALKER | ) | |
| | ) | 274TH JUDICIAL DISTRICT |

---

SENTENCING HEARING

---

On the 22nd day of October, 2025, the following proceedings came on to be heard in the above-titled and -numbered cause before the Honorable GARY STEEL, Judge Presiding, held in SEGUIN, GUADALUPE COUNTY, Texas.

Proceedings reported by oral stenography; Reporter's Record produced by Computer-Assisted Transcription.

**********************************************

CALI REDD, CSR NO. 12860

Deputy Court Reporter, GUADALUPE County, Texas

CaliReddReporting@gmail.com

***********************************************

APPEARANCES

FOR THE STATE OF TEXAS:

JONATHAN AMDUR SBOT NO.: 24015033
Guadalupe County Attorney's Office
211 W Court Street
Seguin, Texas 78155
830-303-6130
john.amdur@guadalupetx.gov

FOR THE DEFENDANT: MICHAEL WALKER

JOHN GREEN SBOT NO.: 24114646
The Law Offices of John Green
100 N Edward Gary St., Ste A2
San Marcos, Texas 78666-5740
830-505-5082
admin@johngreentxlaw.com

CHRONOLOGICAL INDEX VOLUME 1 OF 1


| OCTOBER 22, 2025 | PAGE | VOL. |
|---|---|---|
| Proceedings | 4 | 1 |
| State's Opening Statements | 10 | 1 |
| Defense Opening Statements | 12 | 1 |

DEFENSE WITNESSES

| TESTIMONY OF: | Direct | CROSS | VD | Vol. |
|---|---|---|---|---|
| BRENDY WHITE | 19,30 | 24,32 | | 1 |
| ALEXANDRIA POLK | 33,41 | 35 | | 1 |

| | | |
|---|---|---|
| Proceedings in recess | 42 | 1 |
| Court Reporters Certificate | 43 | 1 |


* * * * *

Proceedings

(Proceedings began)

(Defendant present, counsel present)

THE COURT: Let the record reflect counsel and Mr. Walker are present in the courtroom. We are going to proceed on at least a part of the punishment in Cause Number 24-1776.

I was reviewing the indictment and then the PSI. Just pled to a third-degree felony so the range of punishment is 2 to 10. I guess probation is on the table?

MR. GREEN: I believe, as far as the plea agreement, probation is not on the table.

THE COURT: Okay, so it's 2 to 10.

MR. GREEN: Yes, sir.

THE COURT: I didn't go back and look at the plea papers and I didn't take the plea. So okay. That's really all I questioned was whether it was a misprint, the third degree felony. To use Mr. Green's words the indictment were all over the place. So what I would like to get done today I have been -- I do not think this case was actually set per notice, maybe some misunderstandings.

Mr. Green, defense counsel had some witnesses from out of state and I don't think -- well,

I am not going to speak for the State. Is the State going to ask that your side of the case be done at another time or are you ready? It looks like we may have some time to get all of this done. Did you want to call your own witnesses? It's not properly noticed, I get that. I'll give you every opportunity you want.

MR. AMDUR: Most likely I would ask the Court to allow me the opportunity to prepare and not put on my half of the equation.

THE COURT: Well, then, this is what I'd like to do. If there's no objection we'll just take the defense witnesses out of order. I do want to hear some basic opening statements. Kind of give me a feel for what direction both of you want to go in. And we can kind of do that again when you call your witnesses if you want to. But do you want to give an opening statement before he calls his witnesses?

MR. AMDUR: Well, since -- since the Court specifically mentioned it would like to hear something, yes, absolutely.

THE COURT: Well, little bit. I didn't take the plea. I've read the PSI twice but the person that got my attention was a lot of first-degree felonies were indicted and we pled it to a lesser, a

third degree on only one count of six counts. So and I will be honest I've not had a whole lot of cases like this, so I am interested to hear what you would want me to look for with these witnesses or at least this part or what it is you're asking the Court to do. I didn't mean to obligate you to give an opening statement and I'll give you an opportunity when you present your case if you'd rather do it then.

MR. AMDUR: No. If the Court would like a little bit of a preview both from the State's perspective and defense perspective, I'm happy to indulge the Court. I would ask, just so we don't taint the testimony of the defense witnesses, to go ahead and invoke the rule.

THE COURT: Okay.

MR. GREEN: No objection, Judge.

THE COURT: Why don't the witnesses come forward.

I think I was on the elevator with you ladies this morning, wasn't I.

THE WITNESS: Yes, sir.

THE COURT: We didn't speak if y'all have any concerns about that. If you would all just approach a little bit closer, raise your right hand. You all swear to tell the truth, the whole truth, and

nothing but the truth in this matter, so help you God?

THE WITNESS: Yes, sir.

(Witnesses sworn)

THE COURT: They've all answered to the affirmative. I'll start with you, ma'am, can you state and spell your name.

THE WITNESS: Alexandria A-L-E-X-A-N-D-R-I-A Polk P-O-L-K.

THE COURT: Ma'am?

THE WITNESS: Brendy B-R-E-N-D-Y White.

THE COURT: And ma'am?

THE WITNESS: Melissa Cortez, two S's and a Z. Cortez.

THE COURT: Okay. Two S's and a Z. My wife's name is - off the record.

(Off the record)

THE COURT: Back on the record. Ladies, the rule has been invoked. The rule is the code of criminal procedure. I think it's also in the rules of evidence, which is basically three fold. Number one is you're not to talk about your testimony from here on out, after you testified, before you testified, that is to protect the integrity of your testimony. You are not to review any other documents that any of the other witnesses may have brought,

either for their testimony or to refresh their memory. You are not to be in a courtroom while anyone else is testifying, again to protect the integrity of your testimony. Do you all understand the rule?

THE WITNESS: Yes, sir.

THE COURT: If you'll step outside where you can hear your name called.

MR. GREEN: Judge, my investigator, I intend to use her as an expert witness. It's just that she's looked at multiple reports and everything else just to give you a better context of the PSI --

THE COURT: Any reason she should be held under the rule or at least not be allowed in the courtroom?

MR. AMDUR: No. No. Not -- not as an expert.

THE COURT: Okay. So Ms. Cortez, you'll be allowed to stay in the courtroom.

MR. GREEN: Thank you, Judge.

THE COURT: I would ask that you not discuss what's going on with the other witnesses but you can be in here as an expert, that's how you get some of your information. That's why the rule excuses you. So y'all step outside until your name is called. Ms. Cortez can remain in the courtroom.

And okay. Proceed.

STATE'S OPENING STATEMENT

MR. AMDUR: Okay. Your Honor, just to kind of give you an overview. This case has passed through the hands of a number of prosecutors. It has been indicted and reindicted a number of times. It involves a sexual triangle between the defendant, codefendant Jamie Walker, who was his wife at the time, and Jamie Walker's biological daughter. Who was the defendant's stepdaughter, who has, I think, it is not in dispute, some level of intellectual development disability. I think it's called -- it used to be called mental retardation.

There have been allegations made that the defendant violated both the codefendant Jamie Walker and the daughter who's -- who's the named victim in the indictment. Terrorized them with physical abuse. We anticipate that there will be evidence coming out that there was at least an allegation that he threatened either at gunpoint or with a gun compliance with his sexual demands and that if -- if his actions were reported that he would use the gun on the codefendant and the daughter.

In any event we do believe that there will be documentation that -- that does show this --

this victim has mental deficiencies or limited mental capacity I should say. And I don't think the defense is going to refute that there was a sexual relationship. It was ongoing but at the very least there's -- there's no possible way to refute that it happened at least once, because she had his child.

THE COURT: Was there completed DNA?

MR. AMDUR: There was.

THE COURT: Okay.

MR. AMDUR: There was and it came back demonstrating that the defendant is the biological father and I do not think that he is going to refute that.

There have been a lot of complications, a lot of it has had to do with cross fire, quite frankly, between the two camps, right. Those who are pro this defendant and those who are pro the codefendant, a lot of whom are from the co-defendants family.

We had a bond hearing in front of Judge Mills for the codefendant. And we flew in the codefendant's son who lives in, I want to say, Kansas who is -- between the two of them at this point he is to the defendant's camp. And he -- he -- we put on enough evidence in front of Judge Mills to convince

him that bond should not be reduced because she was in clear violation of no contact orders with -- with the victim. The victim who is supporting her mother and she is vehemently opposed to any leniency at all where Mr. Walker is concerned.

So there is a good amount of crossfire. Mr. Green did, to his credit, an amazing job of coming in at the right time, meeting with us, showing us the evidence that he has, and convincing me, quite frankly, that the interest of justice in this case would not necessitate our prosecuting him at the highest levels, right? Because we could have had him as first degree and second degrees. But instead we arrived at what I thought was a reasonable middle ground, which is an open plea for time on a third degree. Because whether or not there is reasonable doubt that -- that the sexual relations were really tantamount to aggravated sexual assault or for that matter whether she even had the capacity to consent. And we believe she probably did not have the capacity to consent. There's no refuting that she was legally the stepdaughter, and this was in fact prohibited sexual conduct. So really this whole thing is about what is a reasonable amount of time between two and ten.

Mr. Walker has history of violence. And there have been other reports of domestic violence against the codefendants. Given the outrageousness of -- of the facts here, and -- and his history of alleged and in fact in some cases, I think, admitted physical spousal abuse, we would urge the Court as we think the evidence is going to support to -- to impose a higher -- within the 2 to 10 range, a higher penalty and that's kind of the nutshell of it, Judge.

THE COURT: Mr. Green, do you want to give an opening statement at this time?

MR. GREEN: Yes, sir. If it please the Court.

DEFENSE OPENING STATEMENT

MR. GREEN: Judge, we're going to ask for the minimum at the end of this. And just to give the Court full -- that I think the opposing counsel did a good job, I think the contents of this case is everything. So about four or five years ago, Jamie Walker codefendant and her daughter Shelby approached my client after a long day of day drinking, smoking brisket, and they both approached him saying, hey, do you want to have some fun with both of us. My client takes a second -- finishes his beer and says, yes, I do. And at that point they started a sexual

relationship between the three of them that was consensual that went on for many years.

And that of course meets the offense of sex with prohibited person that -- the girl being his stepdaughter who was 21 at the time when he met her and 26 at the time of these allegations were everything blew up.

There's certainly crossfire here because after Shelby got pregnant that there will be evidence to show that she intentionally got pregnant and this was planned between all three of them, they all three wanted to have a kid. After she got pregnant there was no allegations whatsoever by her that there was any kind of forced sex whatsoever. This is not rape. She did not make allegations of rape. Once the family found out, Jamie Walker's family, we'll call them the Rhoden family. Once the Rhoden family found out about Shelby being pregnant they started calling adult protective services. The narrative that's listed out in the PSI is based on the adult protective services narrative in their report. Which is all based on information that was fed to them by the Rhoden family not based on what Shelby actually told them, what I think the facts on the ground actually are.

After Shelby was talked to several times by APS she eventually went and made an outcry in which she said nothing ever happened between me and Mr. Walker. It was after the recorded portion stopped that she tells the officers at the end when they're just hanging out in the lobby, oh, yeah, me and Michael had sex. Which at that point they called the Rhoden family to come get her. Pick her up, they drive her out to Houston. It's only after that three-hour drive with her and the Rhoden family to get to Houston that she starts making the allegations that this was forced, there was a gun involved, any kind of abuse at all. It's only after the Rhoden family, who is trying to protect Jamie Walker the codefendant, it is only after they get their hands on Shelby that any of this comes out so up until that point it is very clear that this was consensual. And if you even look at the PSI, Judge, I believe this is on page 3 at the top there, that second paragraph of when the detective first reached out -- reaches out to Jamie Walker and starts asking about this. Jamie doesn't deny it, she says it is our 14th amendment right to do whatever we want in our own home. And essentially tells the detective to go to hell and they move on with their life. Arrest warrants were shortly -- were put out

shortly after that.

So even the codefendant is not denying that this was going on that was consensual or anything else. But again it's only after she met with the Rhoden family and after the Rhoden family started feeding Shelby lines that would get Jamie off the hook, the codefendant, who's also claiming that Michael forced her to do any of this. It's only after the Rhoden family became involved that any of these allegations of rape, of holding a gun to someone's head or any of that came up. So it -- so and I think that is important to note.

In addition, Judge, once she got to Houston they sent or to a psychiatrist to get her evaluated for her mental aptitude. And I'll put in an exhibit later Judge but that initial evaluation found that she was able to consent to sex. But in that psychiatrist's opinion, since he was a stepfather that overcame her ability to consent to sex. She was suddenly for whatever reason not able to consent just because he was the stepfather, she was the stepdaughter. Again, regardless of the fact that she was 21 when they met and there was no sort of grooming relationship going on here. At that point they took her to a different psychiatrist and got a further

opinion which further helps their case but that first one is the one we're going to talk about later on, Judge.

Finally just to give more context on the Rhoden family, they were consistently making calls to Shelby and to other members of the family including Cody who was mentioned by opposing counsel. And one of the calls from Jamie to Cody was saying that -- and I'm paraphrasing here, Judge, I don't have the exact quote in front of me, if you want that eight thousand dollars you better help me out by signing this affidavit and if you don't I'll call CPS on your family. So the Rhoden family at this time is now -- has been arrested, I don't know if they've been indicted for witness tampering -- all three of them. And again that's where the PSI narrative derives its facts.

So I just want to make the Court aware of that before we go into this because other than the Rhoden family getting involved as far as Shelby's concerned, the only thing that she has ever said about this is that she wants to have the kid with Michael, and there will be evidence of that later on that she said that. And that this was entirely consensual. And I think Jamie's own admission in the PSI when

she's talking to the detectives also indicate this was entirely consensual up and until Jamie the codefendant realized that she was in trouble too for having sex with her own daughter. So at that point I think all the walls shut down, the Rhoden family started circling the wagon around Jamie, and it's at that point that all these allegations involving holding a gun to people's head, forced rape, or anything else came out.

And so that's what I want to show you today, Judge, to paint the broader picture of who my client is, what actually happened in the last four years leading up to today. And that's why we are going to ask for the minimum sentence of two years.

THE COURT: Has the State -- these psychiatrist reports -- does the State agree that there's experts out there that says -- and I know stepdad, I get that -- but that Shelby was capable of consenting?

MR. GREEN: Judge, the main --

THE COURT: Let me -- let me --

MR. GREEN: Of course.

MR. AMDUR: Judge, we're not in agreement on anything because there is so much conflicting information out there. And being

completely candid the Rhoden family, right, which is the codefendant's maiden name, provided us with a report from a psychiatrist whose last name was Rhoden on the letterhead, and then, I think, it was a few days later sent us a corrected report that psychiatrist -- letterhead with that psychiatrist's actual name. So I don't know what was fabricated and what was not. And I think that's a big part of it.

THE COURT: Okay.

MR. GREEN: As far as the indictments concerned too, Judge, at the very beginning of this whole process I filed a motion to quash, because the language in the statute didn't specify whether or not he was being prosecuted under the prohibited sexual contact as a stepfather or as sexual relations with a mentally retarded person. At that time the State clarified this was because it was a stepdaughter-stepfather relationship and that's why they're going forward with that specific charge.

THE COURT: And that's what he's pled guilty to?

MR. GREEN: Yes, sir. And that's what he's pleading guilty to, Judge.

THE COURT: All right. Okay. As we discussed earlier we'll now take defense witnesses

that have traveled in from out of town out of order and you may call your first one.

MR. GREEN: Defense calls Brendy White, the old wife of Mr. Walker.

THE COURT: Could you call Brendy White's name out front?

THE BAILIFF: I would request that counsel does it because I don't want to leave the courtroom.

MR. GREEN: Happy to do it, Judge.

THE COURT: I understand.

Thank you, Mr. Green.

Ms. White, I'll remind you you've already been sworn in, you're still under oath. Go ahead and have a seat. Talk into the microphone, we are making a record. So speak up where not only so we can hear you but we can make a good record of what's said today.

A Yes, sir.

THE COURT: Counsel.

Direct EXAMINATION

BY MR. GREEN:

Q Good afternoon, Ms. White, do you mind introducing yourself and spelling your name for the court reporter here.

A My name is Brendy White. B-R-E-N-D-Y White. I am Michael's ex-wife.
Q Now, when did y'all get married?
A 2009, maybe.
Q When did y'all get divorced?
A 2016.
Q After being married like eight years have y'all still remained friends?
A Yes.
Q And would you say y'all are very close friends?
A Yes.
Q You talk to Mike all the time?
A Yes.
Q How well would you say that you know him?
A Probably better than anybody.
Q So tell us about Mike
A Mike's a good man. Mike's -- none of this was his idea. I know the --
MR. AMDUR: I am going to object to hearsay.
THE COURT: Yeah, just listen to the question that's asked and answer that question. You've always heard that term on TV and everything else you can't tell us what someone else told you. So

listen to the question that's asked and answer that question.

Q (MR. GREEN) Tell us about Mike's character, you said he's a good man, but expand on that.

A He's an honest man. He's a hard-working man. He's -- he's a great dad. He's a good son. He was a good husband, you know, I mean, I can't -- that was a long time ago.

Q And over the eight years that you were married to him was there any kind of rape or abuse or anything like that?

A Absolutely not.

Q Would you be flabbergasted if someone told you that Mike had committed those actions?

A Yes.

Q Why is that?

A Because it's not Michael. I know for a fact that he did do that.

Q Do you know who Shelby is?

A I do.

Q Who is she his?

A His stepdaughter.

Q And she is the daughter of Jamie?

A Yes.

Q Do -- does Mike and Shelby have a daughter

together?

A Yes.

Q What is her name?

A [redacted].

Q How do you know that they have a daughter together?

A Because I have seen [redacted] and I know DNA paperwork came back and proved that Michael was the father of [redacted].

Q Has Michael also told you that?

A Yes.

Q Has Michael told you his feelings about [redacted]?

A Yes.

Q How does he feel about [redacted]?

MR. AMDUR: No, I'm going to object. It's -- well, with if nothing else it's hearsay, if she's basing it off of what he told her. If she happens to know, the foundation hasn't been laid.

MR. GREEN: Well, I think it's not being used for the truth of the matter asserted, Judge. She's just relaying what was told to her.

THE COURT: I'm going to allow it because this is a punishment hearing, and we're talking about character as much -- and those kind of

things, but let's not stray too far afield, Counsel.

MR. GREEN: Yes, sir.

Q (MR. GREEN) How does he feel about [redacted]?

A He loves her. She was planned. They planned her.

Q Would he ever deny that [redacted] was his daughter?

A No.

THE COURT: I understand, Counsel. That's hearsay. I'll be my own filter.

MR. AMDUR: Fair enough.

Q (MR. GREEN) Where's Shelby now?

A Kansas.

Q Is she currently pregnant?

A Yes.

Q With whose baby?

A His name is Jesse. I'd have to get my phone to remember what the guy's last name is.

Q (MR. GREEN) Is he being charged with any similar offense?

A Yes, he has been, yes.

Q With Shelby?

A Yes.

MR. GREEN: I pass the witness, Judge.

CROSS-EXAMINATION

BY MR. AMDUR:

Q Ms. White, you said you were married to the defendant from, you think, about 2009 to 2016, right?

A We were together about 15 years. I just cannot remember exactly.

Q Okay, no, that's fair. But if you divorced in 2016 then you were probably together as of about 2001; is that about right?

A I believe so, yes.

Q Okay. And some of that was, maybe, dating. And some of that was --

A Yes, sir.

Q Girlfriend/boyfriend, and fiancee, and then some of that was married?

A Yes.

Q Okay. And it all blends together, but you know Michael pretty well, don't you?

A Yes, sir.

Q Okay. Well, then, let me ask you, before you got together with him or certainly before you divorced him, you were aware that he's got some criminal history, correct?

A He's never had a felony. He's never had a drug charge. Yes, he's --

MR. AMDUR: I'm going to object as

nonresponsive. It's a yes or no question.
THE COURT: It is and that's the rules, you've got to listen to the questions asked --
A What do you mean criminal history? What are we talking about?
Q (MR. AMDUR) Do you know that in 1986 he was arrested for criminal mischief in Athens, Texas?
A Yes, sir.
Q Which is Henderson, I think?
A Yes, sir.
Q Okay. Do you know that he got a DWI in 1993?
A One DWI. Yes, sir, I do.
Q Ma'am, is that a yes or no?
A Yes.
Q Okay. Thank you.
Do you know that in 1994 he picked up a charge again in Henderson County for resisting arrest?
A I do.
Q Okay. He was convicted of that, was he not?
A I wasn't with him in 1994. I don't know if he was convicted or not.
Q Okay. Well, you know he got picked up on it so do you know that -- do you know if he was convicted of the DWI?

A I believe he was underage and I don't know.
Q Ma'am, if you don't know say you don't know. Otherwise just say yes or no, please.
A I wasn't there.
Q Okay. Okay. Well, you -- you know what -- what about 1999, he got arrested for assault in Conroe which is Montgomery -- Montgomery County, north of Houston. Do you know about that one?
A I do.
Q Okay. 2002, I guess y'all were together at the time. Driving while license suspended again in Henderson County?
A I do. I was with him when that happened, yes, sir.
Q Okay. And he pleaded guilty and did some jail time, right? At that time?
A Because I made him, yes.
Q Well, that's a yes or no?
A Yes.
Q Okay. What about 2010, resisting arrest, again out of Athens, Henderson County, and he was convicted in 2011. Did you know about that one?
A I did.
Q Okay. Also picked up a charge for failure to ID as a fugitive from justice. Did you know about

that?

A No, that was his brother.

Q Okay.

A We're the ones that called and told them his brother was there, wasn't him.

Q All right. So I think that we covered two assaults not even getting into the reason you're testifying today. And those you are at least aware of, right?

A I can tell you specifically about one of them, yes.

Q Okay. And you can tell us specifically about one of them because you were there?

A Yes, sir. Yes, sir.

Q Okay. Who is alleged to have been assaulted in the one you know of?

A A vehicle. A gentleman in a vehicle that went and got his mommy and came back. Because he almost ran over our son. Michael busted the guy's windshield trying to get him to stop.

Q Busting a windshield is not the same as assault?

A They came back.

Q Okay. They came back and it escalated?

A Yes.

Q Does Mr. Walker have a temper?
A I wouldn't say a temper, no. But his child and his nephew were just run over in the road.
Q Does Mr. Walker have a temper, ma'am?
A No.
Q Okay. But he has been arrested for assault twice not even counting this reason that you are here today, correct?
A Sure, if you say so, yes.
Q Well, I didn't say so. You said so. I asked a question and you said you were aware of two assault arrests. And now you're trying to what -- step away from that?
A One was before my time. I don't know if he was convicted. I said, yes --
Q I said arrest, ma'am. I said arrest?
A You asked me if he was convicted.
MR. AMDUR: Objection. Nonresponsive.
Q (MR. AMDUR) Do you know of two arrests for assault?
A One -- yes. One that I was there. One that was before my time that he told me about, yes.
Q Are you -- well, let me -- let me walk this back really quickly. If I heard you correctly, you said that Mr. Walker wanted to have [redacted], that was

a planned pregnancy?

A Yes.

Q And I think your exact words were that he loves [redacted]?

A Yes.

Q Are you aware that as part of the plea deal so he wouldn't have to go to trial --

A Yes.

Q -- where the stakes were much, much higher, he has agreed to --

A Yes.

Q -- to not have any contact with [redacted] until she's at least 18 years old?

A Yes, for her best interest, yes.

Q Okay. Does he have any gang affiliations that you know of?

A No, sir.

Q No.

A No.

Q Has he not been affiliated with the Aryan brotherhood in any way that you know of?

A No, sir.

Q Okay. Okay. And you have since 2016, it's been almost 10 years by my math, 9 years you've maintained close contact with him, correct?

A We have children together, yes, sir.
Q That you're pretty well-versed in what his life has been like post-divorce?
A Yes.
Q Okay.
MR. AMDUR: Pass the witness.
MR. GREEN: Just brief redirect, Judge.

RE-DIRECT EXAMINATION

BY MR. GREEN:
Q Brendy, are you here to make excuses for Mr. Walker?
A Absolutely not.
Q Did he clearly commit a crime here by having sex with his stepdaughter?
A He did, yes.
Q Are you here to make excuses for any of his criminal history?
A No, sir.
Q Knowing that the Judge can do anything here today from sentence Michael to 2 years in prison up to 10 years, what are you asking the Judge to do?
A I don't understand why he has to go to prison. For what? I don't understand.
I would -- if I can say something, please, real quick. When all of this first started

they pulled the wrong record for the wrong Michael Walker. And so everybody had a bad taste in their mouth from the get go, from somebody that had a rap sheet a mile long 14 different felonies, drug charges, all of that. This man has never had any of that.

THE COURT: If it makes any difference, I wasn't aware of that until you told me.

THE WITNESS: He's never --

THE COURT: That's it. That's -- I just wanted you to know.

THE WITNESS: He's a good man.

THE COURT: So I'm the one doing the punishment, so.

Let's move on, counsel.

MR. GREEN: Understood, Judge.

Q (MR. GREEN) And as to the not talking to [redacted] until she's 18, is that part of the plea deal that he took?

A Yes, sir.

MR. GREEN: Okay. No further questions, Judge.

MR. AMDUR: Just a couple if I may.

THE COURT: You may.

FURTHER CROSS-EXAMINATION

BY MR. AMDUR:

Q Have you actually met Shelby?
A Yes.
Q Okay. Have you had conversations with her?
A Yes.
Q Who's more intelligent, you or Shelby, based on your observations?
A Intelligent or educated? There's a difference.
Q Who's more intelligent?
A I'm more intelligent.
MR. AMDUR: Nothing further, Judge.
MR. GREEN: Nothing further, Judge. May this witness be excused?
THE COURT: We're doing this out of order because she's coming in from out of town.
Where are you coming from?
A Athens.
THE COURT: Okay. Athens, Texas.
A Yes, sir.
THE COURT: If you step outside.
Next witness?
MR. GREEN: Yes, sir.
THE COURT: Thank you, ma'am.
MR. GREEN: Alexandria Polk.
THE COURT: Ms. Polk, just follow

Shane, our bailiff. He'll tell you where to sit.

You can go ahead and be seated. You've already been sworn, you're still under oath.

THE WITNESS: Okay.

THE COURT: And we are making a record so speak up and we can all hear you.

THE WITNESS: Okay.

THE COURT: You ready?

THE WITNESS: Sure.

THE COURT: Counsel.

DIRECT EXAMINATION

BY MR. GREEN:

Q Ms. Polk, can you introduce yourself and spell your name for Madam Court Reporter?

A My name is Alexandria Polk, A-L-E-X-A-N-D-R-I-A P-O-L-K.

Q And who are you in relation to Mike?

A I'm his daughter.

Q Biological daughter?

A No.

Q What exact relationship?

A I'm sorry. He is my stepfather.

Q And who is your mother?

A Brendy White.

Q Okay.

THE COURT: I'm sorry, who?
THE WITNESS: Brendy White.
MR. GREEN: The prior witness.
THE COURT: That's what I thought.
Q (MR. GREEN) What was your relationship with -- like with Mike growing up?
A I mean, it was great, you know. He taught me how to fish. Taught me how to hunt. Taught me how to shoot a bow, you know. He taught me everything a dad should, you know. He was my father figure at home, because I didn't have one.
Q And as he -- since he's your stepfather what age did you come into his life?
A I would say about seven or eight years old.
Q And he's your father figure ever since then?
A Yes, sir. Absolutely.
Q Again, are you to make excuses for Mike?
A No, sir.
Q Okay. And you know he has a criminal history?
A Yes.
Q Has Mike ever -- have you ever seen him be abusive?
A No.
Q Has he ever -- this may sound weird, I

apologize. Has he ever made a sexual pass with you as his stepdaughter?

A No.

Q And knowing that the Judge today could sentence you from -- or sentence not you, hopefully -- Mr. Walker from anything from 2 years in prison to 10 years in prison, what are you asking Judge Steel to do?

A Honestly, I'm asking him to send him home. I feel like he's -- I feel like he's done his time. I mean, I feel like he's done enough time.

MR. GREEN: Pass the witness, Judge.

THE COURT: Cross.

MR. AMDUR: Yes, sir.

CROSS-EXAMINATION

BY MR. AMDUR:

Q Ms. Polk, it's not an easy situation for you or for your stepfather and I recognize that. Did you come here from out of town?

A Yes.

Q You still have some feelings of affection for him, right?

A Absolutely.

Q He was a good stepfather?

A Yes.

Q I know you're not ever supposed to ask a lady their age, but may I ask how old you were when he came into your life?
A Seven or eight years old.
Q Okay. And by that point was your bio dad no longer in the picture?
A No. My stepfather was just more in the picture than my bio dad ever was.
Q Do you live in Athens?
A Yes, I do.
Q Okay. And he never crossed any lines with you, did he?
A No.
Q Not sexual, not emotional abuse, not physical abuse, nothing like that?
A Never.
Q What were his alcohol consumption habits as you were exposed to that when he lived with you?
A I mean, maybe a beer or two after work.
Q What -- what -- what did he do for work?
A Mostly he was a carpenter.
Q Was he self-employed?
A No.
Q Who did he work for?
A I don't remember.

Q Fair enough. If you know, did he have the same job for most of the time that he lived with you?
A Yes.
Q Did he work in and around Athens?
A Well, at the time we lived in Gun Barrel, but yes.
Q Gun Barrel is -- I'm thinking that is -- that's not -- that's not Rockwall County is it?
A No. It's Henderson County.
Q Oh, it is Henderson.
A It's still Henderson County.
Q Okay, okay. All right. Well, fair enough. Did he work in and around Gun Barrel City as you recall?
A Yes, yes.
Q Okay. Is it inappropriate for a stepfather to have sexual relations with his stepdaughter?
A No.
Q No, it's not -- it's not inappropriate. Let me ask you -- let me ask it in plain speak so you do not think that I'm trying to lawyer you.
Is it okay for a stepfather to have sexual relations with a stepdaughter?
A No.
Q Do you know anything about [redacted]?

A No.
Q Do you know anything about Shelby?
A No.
Q Have you ever met either of those people?
A Shelby once, maybe twice.
Q Okay. If you recall where was that when you met Shelby?
A Once here in Seguin. And then another time eight years ago, I think.
Q Where was that?
A I don't remember where he lived at that time.
Q You both times were going to visit him; is that right?
A Yes, yes.
Q Okay. And how would you describe Shelby based on those one, maybe two interactions?
Let me clarify, because that was a wide open question. Was there anything unusual that you noticed about Shelby?
A No.
Q Okay. She seemed like a perfectly normal person?
A Yeah.
Q Okay. Have you ever commuted --

communicated with Shelby other than those two times --
A No.
Q -- you met her? Okay. How old do you recall Shelby was ballpark when you met her?
A I was 24. So 20 maybe.
Q She's about four years behind you?
A I think so.
Q Is she attractive? I don't mean -- I'm not asking if you're attracted to her. But you can look at somebody and tell in most cases whether objectively speaking most people would think they're attractive or not, that is what I'm asking.
A I mean, I guess.
Q What about Jamie? You met Jamie a couple times as well?
A Uh-huh.
Q Was there anything off, that you would describe as off or unusual about Jamie?
A I don't know about unusual. I just, I don't know -- she is not my mom, so, you know.
Q Without -- without asking whether you find Jamie attractive, that's not what I'm asking here. Would you say Jamie is an attractive person?
A No.
Q Did Michael ever talk to you about his

relationship with Jamie?

A No.

Q Never complimented her, never badmouthed her, right?

A No.

Q To you?

A Not to me.

Q Right, okay. Are you aware that Shelby is the biological daughter of Jamie?

A Yes.

Q And are you aware that Jamie and Michael were married?

A Yes.

Q Okay. Are you aware that [redacted] is Shelby's daughter?

A Yes.

Q And are you aware that he, Michael, is a biological father?

A Yes.

Q Did anybody and by anybody I mean, did Michael, did Jamie, did Shelby, anybody of those three say anything to you at all about Michael and Shelby having a child together?

A No.

MR. AMDUR: Pass the witness.

MR. GREEN: Just very briefly.

RE-DIRECT EXAMINATION

BY MR. GREEN:

Q Is having sex with a stepdaughter a bad idea?

A Yes.

Q Are you here to make excuses for that?

A No.

MR. GREEN: No further questions, Judge.

THE COURT: Text Kim to come in here, would you?

THE BAILIFF: Yes, sir.

THE COURT: Thank you.

Thank you, ma'am, you may step down.

Okay. Next witness for the defense.

MR. GREEN: Defense calls Melissa Cortez, my investigator.

THE COURT: Let me make this point. We are going to have this hearing, that's why I'm having Kim come in.

MR. GREEN: If that's the case I'd rather wait on Melissa.

THE COURT: I know. It's your case, Counsel, I'm just telling you we will have another

hearing. She is an expert. You asked her to come in here so she can hear the other testimony. If it's appropriate for her to testify now, we're all here, we got the time, great. If you want to wait and let her hear some more testimony or prepare something else that's also fine with the Court. I am not forcing you to present all of your witnesses now.

MR. GREEN: I guess with that in mind, Judge, I would like to keep her on reserve until the next hearing so she can hear the other witnesses testify, whoever they bring.

THE COURT: That's the reason I kept her in.

MR. GREEN: Yes, sir.

THE COURT: From the -- from the rule.

So I'm going to bring Kim in. We're going to reset this matter. It'll probably be fairly quickly. I am running out of time.

MR. GREEN: Yes, sir.

THE COURT: Off the record.

(Proceedings concluded)

STATE OF TEXAS )
COUNTY OF GUADALUPE)

I, Cali Redd, Certified Shorthand Reporter in and for the State of Texas, do hereby certify that the above and all foregoing pages contains a true and correct transcription of all portions in evidence and other proceedings requested in writing by Counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and -numbered cause, all off which occurred in open court or in chambers and were reported by me.

I further certify that this Reporter's Record of the proceedings truly and correctly reflects the exhibits, if any, offered by the respective parties.

I further certify that the cost of preparing this transcript was $301.00 paid by James Rhoden.

Witness my official signature on this the 6th day of February 2026.

/S/Cali Redd

CALI REDD, CSR 12860
Expiration date: 04-30-2026
Deputy Court Reporter
274th Judicial District
Guadalupe County Justice Center
211 W Court Street
Seguin, Texas 78155

REPORTER'S RECORD
VOLUME 2 OF 2 VOLUMES
TRIAL COURT CAUSE NO. 24-1776-CR-B

STATE OF TEXAS ) IN THE DISTRICT COURT
)
vs. ) 274TH JUDICIAL DISTRICT
)
MICHAEL ALLEN WALKER ) GUADALUPE COUNTY, TEXAS

HEARING ON SENTENCING (Continued)

On the 3rd day of November, 2025, the following proceedings came on to be held in the above-titled and numbered cause before the Honorable Gary L. Steel, Judge Presiding, held in Seguin, Guadalupe County, Texas.

Proceedings reported by computerized stenotype machine.

APPEARANCES

MR. JONATHAN AMDUR
SBOT NO. 24015033
Guadalupe County Attorney's Office
211 W Court Street
Seguin, Texas 78155-5730
Phone: (830)303-1547
Attorney for State

MR. JOHN P. GREEN
SBOT NO. 24114646
Law Office of John Green
100 N Edward Gary Street
Suite A2
San Marcos, Texas 78666-5740
Telephone: (830)505-5082
Attorney for Defendant

VOLUME 2

Hearing on Sentencing

November 3, 2025

| | PAGE | VOL. |
|---|---|---|
| Hearing on Sentencing (Continued) | 6 | 2 |

| | Direct | Cross | V.Dire |
|---|---|---|---|
| Brendan Wheeler | | | |
| By Mr. Amdur | 9 v2 | | |
| By Mr. Green | | 23 v2 | |
| By Mr. Amdur | 27 v2 | | |
| By Mr. Green | | 28 v2 | |
| By Mr. Amdur | 30 v2 | | |
| Elaine Reamer | | | |
| By Mr. Amdur | 31 v2 | | |
| By Mr. Green | | 38 v2 | |
| Melissa Cortez | | | |
| By Mr. Green | 48 v2 | | |
| By Mr. Amdur | | 58 v2 | |
| By Mr. Green | 65 v2 | | |

| | PAGE | VOL. |
|---|---|---|
| Closing Statement by Mr. Amdur | 69 | 2 |
| Closing Statement by Mr. Green | 70 | 2 |
| Closing Statement by Mr. Amdur | 75 | 2 |
| Court's Ruling | 79 | 2 |
| Reporter's Certificate | 82 | 2 |

ALPHABETICAL INDEX OF WITNESSES


| | Direct | Cross | V.Dire |
|---|---|---|---|
| Cortez, Melissa | 48 v2 | 58 v2 | |
| | 65 v2 | | |
| Reamer, Elaine | 31 v2 | 38 v2 | |
| Wheeler, Brendan | 9 v2 | 23 v2 | |
| | 27 v2 | 28 v2 | |
| | 30 v2 | | |

INDEX OF EXHIBITS

Use is indicated as follows:
J - Jury R - Record Only D - Demonstrative

| EXHIBIT | DESCRIPTION | OFFERED | ADMITTED | USE |
|---|---|---|---|---|
| S 1-8 | Photographs | 15 v2 | 15 v2 | R |
| S 9 | Statement of Shelby Cole | 17 v2 | 22 v2 | R |
| S 10 | Statement Supplement | 19 v2 | 22 v2 | R |
| S 10-A | Page 3 of Supplemental Statement | 20 v2 | | |
| S 11 | Assessment by Julia Piner | 62 v2 | 62 v2 | R |
| D 1 | Petition for Protection from Stalking, Sexual Assault or Human Trafficking | 57 v2 | 57 v2 | R |

P R O C E E D I N G S

HEARING ON SENTENCING (Continued)

*(Open court, defendant present.)*

THE COURT: Okay. Now we're going to now continue the sentencing hearing in 24-1776-CR-B as to Count IV, which was I believe an open plea to a third degree felony; is that correct?

MR. AMDUR: That is correct.

MR. GREEN: That's correct, Your Honor.

THE COURT: And we heard out of order some witnesses on behalf of the Defense. And I brought with me today the notes. I've kept those. I believe -- and just so I'll understand, is the Defense going to call any additional witnesses?

MR. GREEN: Just my investigator briefly, Judge.

THE COURT: Who has been with us.

If you will approach. I mean I'm going to do something today so I'm going to hand you the Trial Court Certification and get that out of the file and get that resolved.

MR. GREEN: Yes, sir. Thanks, Judge.

THE COURT: Thank you.

And I will allow your investigator to be called when it's your turn.

Does the State want to call any witnesses? And

refresh my memory because my notes don't reflect any kind of opening statements. Did we have opening statements?

MR. AMDUR: No. I believe we waived that -- no.

MR. GREEN: I forget too, Judge, just to be totally frank with you.

MR. AMDUR: I want to say at the end of the day we did a very brief opening.

THE COURT: Well, you gave me some background.

MR. GREEN: We're more than happy to do it again today, Judge.

THE COURT: I know you'd love to talk, Mr. Green.

MR. GREEN: I'd love to, Judge.

*(Laughter.)*

THE COURT: Why don't you just -- I'll start with the State. Briefly -- I mean I've read the PSI and the record will reflect that I've read the PSI. And I have some good notes from the Defense witnesses.

I'm not sure exactly where the State wants to go. Well, I assume you want prison. I assume you pled it down to a third degree felony, so I assume you're asking that the Court do the full ten on a third degree felony.

MR. GREEN: I think we did agree too, Judge, that probation was off the table and it was only going to be a prison sentence.

THE COURT: Yes. That's also my -- okay. Good. Thanks for --

MR. AMDUR: As I recall, at the last hearing Mr. Green mentioned to you --

MR. GREEN: I'm probably going to ask for two, Judge. I'm going to ask for the minimum on this.

MR. AMDUR: And I'm going to ask for the maximum.

THE COURT: Call your first witness.

MR. AMDUR: The State calls Deputy Brendon Wheeler.

THE COURT: And we did invoke the Rule, right?

MR. AMDUR: We did, Judge.

THE COURT: So --

MR. GREEN: Yes, sir.

MR. AMDUR: She's an exception because she's an expert.

THE COURT: And I need y'all, if you've got any witnesses, to make sure they know the Rule has been invoked.

MR. GREEN: Yes, sir.

*(Discussion off the record on another cause.)*

THE COURT: Approach the witness stand. Step up and remain standing and raise your right hand.

*(Witness sworn.)*

THE COURT: Thank you. Have a seat.

THE WITNESS: (Complies.)

THE COURT: Use the microphone so we can hear you. And start by stating and spelling your name for the court reporter, please.

THE WITNESS: (Complies.)

THE COURT: And you probably don't need to lean that far in. We'll let you know if we can't hear you.

Counsel.

MR. AMDUR: Thank you, Your Honor.

BRENDAN WHEELER,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

*Q.* *(BY MR. AMDUR)* So, sir, I can see you're wearing a uniform that would indicate you work with the Guadalupe County Sheriff's Office; is that correct?

*A.* Yes, sir.

*Q.* What position do you hold?

*A.* I'm just a patrol deputy.

*Q.* How long have you been working with the sheriff's office?

*A.* Since January of 2022.

*Q.* And that whole time have you been doing patrol?

*A.* Yes, sir.

*Q.* Do you recall whether you were working on March 29th of 2022 and if you responded to a call at 607 Nocknut Road --

N-O-C-K-N-U-T Road here in Seguin?

*A.* Yes, sir.

*Q.* Would you advise the Court what happened.

*A.* We had received a call from a neighbor saying that her neighbor's daughter had requested that they call 9-1-1 because her stepfather was beating her mother.

*Q.* Was this about 5:23 a.m. in the morning when you arrived?

*A.* Yes, I believe so.

*Q.* Were you by yourself at that time?

*A.* No, I was on FTO with then Corporal Callentine.

*Q.* He was your field training officer?

*A.* Yes, sir.

*Q.* So both of you were in the same unit?

*A.* That is correct.

*Q.* And when you responded to the call, were you together the first on scene?

*A.* Yes, we were first on scene.

*Q.* Would you tell the Court what happened.

*A.* When we arrived both of the parties were separated. I believe the husband was on the back porch and the wife was on the front porch. So Corporal Callentine stayed in the back with the suspect while I spoke to the victim at the front of the house.

Whenever I spoke to her, she began to tell me

about what had happened that night, which was that there was an --

*Q.* Let me stop you there really quickly --

*A.* Okay.

*Q.* -- just preemptively. What was her demeanor when you were talking to her?

*A.* She was very shaken up about the whole incident. At one point when she was speaking to me I had to stop her just because of how worked up she was getting so she could take a second to collect herself.

*Q.* Is it fair to say she is under distress and excitement of the events that she was about to tell you about?

*A.* I believe she was.

*Q.* So please continue.

*A.* She had stated that there was an argument about the divorce they were going through and that her husband began to accuse her of hiding I believe it was paperwork of some kind as well as a gun.

And during the argument things escalated to where he started to choke her with his foreman up against the sink and brandished a knife in his off hand where he threatened to kill her.

She said during the time whenever he was pushing on her neck with the forearm she couldn't breathe. And she eventually lost consciousness and woke up on the floor with

her -- with him banging her head on the floor.

*Q.* Did you identify this person as Jaime Walker?

*A.* I did.

*Q.* Were there any other witnesses to this assault?

*A.* She stated that her daughter, Shelby, witnessed the whole thing and she had sent her over to the neighbor's house.

*Q.* Shelby is the one who went to the neighbors and asked them to call the police?

*A.* Correct.

*Q.* Did you speak with Shelby?

*A.* I did not immediately. She came over a little bit -- to the scene a little bit after.

*Q.* Did you observe anything out of the ordinary on Jaime while you were talking to her that would corroborate that there might have been an assault?

*A.* She had a few injuries. From what I could see, she had a small cut. I believe it was above her -- or on her left eyebrow. She also had a large knot on her forehead and then some redness on her neck.

*Q.* And the redness on the neck would be consistent with being choked, correct?

*A.* I believe so, yes.

*Q.* What about the cut and the knot on her head?

*A.* I believe she stated those were from whenever he was banging her head on the floor after she had lost

consciousness.

*Q.* She lost consciousness and fell to the floor is what she told you?

*A.* Correct.

*Q.* And how did that translate into this person -- this husband banging her head on the floor?

*A.* She just stated when she regained consciousness he was on top of her with him banging her head on the floor.

*Q.* Are you able to advise whether anybody who was a party to that event is currently in the courtroom today?

*A.* I believe I see Mr. Walker, the defendant.

*Q.* And Mr. Walker would be the person who was accused of assaulting Jaime Walker?

*A.* Correct.

*Q.* And you identified him as the defendant. Is he wearing the orange jumpsuit?

*A.* Correct.

MR. AMDUR: Your Honor, may I approach the witness?

THE COURT: You may.

MR. AMDUR: I'm tendering State's -- what have been marked as State's 1 through 8 to Mr. Green.

*Q.* *(BY MR. AMDUR)* And I'm laying before you what has been marked as State's Exhibits 1 through 8 just to kind of cut to the chase a little bit. Are those photos?

*A.* Yes, sir.

*Q.* Do you recognize what those photos are of and when they were taken?

*A.* Yes. I took these photos and I took them the night of the incident.

*Q.* And when you say "the night of the incident --"

*A.* The morning I should say.

*Q.* -- it was early morning, right?

*A.* Correct.

*Q.* Okay. And would you say, based on your recollection and looking at them now, that they fairly and accurately depict the condition of the objects in those photos, 1 through 8, as they were taken at the time of the event?

*A.* Yes.

*Q.* State's Exhibit 1 is a photo of what?

*A.* The photo of the purse she said she had on her, which the defendant cut with a knife.

*Q.* And State's Exhibit 2?

*A.* The photo of the knife that was found on the defendant's person.

*Q.* What about State's Exhibits 3, 4 and 5?

*A.* 3 is a photo of the injury on the right side of the victim's neck.

4 appears to be a closeup photo of the injury I took.

And then 5 is just a general photo I took of the front of her neck.

*Q.* Is there redness visible in those photos?

*A.* Yes, sir.

*Q.* And then what about 6, 7 and 8?

*A.* 6 is a photo I took of her forehead showing the cut around here eyebrow and the knot on her forehead.

7 is another photo of the knot on her forehead from a side angle to show how much it was protruding outwards.

And then 8 is another photo I took of her face in different lighting showing the knot on her forehead.

MR. AMDUR: We move to admit State's 1 through 8.

MR. GREEN: No objection, Judge.

THE COURT: May I see them, please?

THE WITNESS: (Complies.)

THE COURT: 1 through 8 are admitted.

Give me a second, Counsel.

MR. AMDUR: Yes, sir.

THE COURT: You may proceed.

*Q.* *(BY MR. AMDUR)* Did you take Ms. Walker's -- well, let me ask it this way.

Did Ms. Walker give a written statement?

*A.* Yes.

*Q.* And did you take it?

*A.* Yes.
*Q.* Was it consistent with what she had told you?
*A.* Yes.
*Q.* And did she do it that same day?
*A.* Correct.
*Q.* Okay. And what about Shelby? Did Shelby give a statement?
*A.* She did.
*Q.* Okay. Did you take Shelby's statement?
*A.* Yes.
MR. AMDUR: Your Honor, if I may, I'm going to ask for leave to approach the witness once again.
And I'm tendering State's 9 to opposing counsel.
THE COURT: You may.
MR. AMDUR: And State's 10 as well for that matter.
*Q.* *(BY MR. AMDUR)* I'm laying before you what are marked State's Exhibits 9 and 10. Would you first take a look at 9 and tell me if you recognize that.
*A.* I do.
*Q.* What is it?
*A.* It's the statement that I had filled out for Shelby.
*Q.* Now you said you filled it out for Shelby; is that correct?
*A.* Yes, sir.

*Q.* Did you fill out Jaime's statement for Jaime?

*A.* I did not.

*Q.* Okay. Jaime filled it out herself -- her statement, right?

*A.* Correct.

*Q.* Why did you fill out Shelby's for her?

*A.* I was told she couldn't write, so she explained to me what she had witnessed and I wrote it for her.

*Q.* You were told by whom that Shelby couldn't write?

*A.* I believe by both Shelby and Jaime.

*Q.* And so Shelby, in effect, dictated the words and you wrote them down; is that right?

*A.* Correct.

MR. AMDUR: At this time, I would move to admit State's 9.

MR. GREEN: Objection to hearsay, Judge.

MR. AMDUR: Judge, I'm not offering it for the truth of the matter asserted. I'm offering it as evidence that this witness, as he has stated, did not do that for Jaime. He did that for Shelby because Shelby is not able to write.

THE COURT: So I will take his word for that, but the exhibit -- the content of it is hearsay, so it's not admitted. But I will take his testimony under oath.

*Q.* *(BY MR. AMDUR)* Well, then let me drill down a little

bit more if I can, Deputy, without getting into the contents of the exhibit.

Do you recognize your own handwriting in that thing?

*A.* I do.

*Q.* Is it entirely your handwriting?

*A.* I believe the only parts in here that are not mine are where I had her print her name and her signature as well as the initials are all hers.

*Q.* Okay. And is it pretty clear looking at it that her initials and her signature -- is that signature in print or cursive?

*A.* It's in print. It's just the same as her initials.

*Q.* Okay. And is that markedly unobservedly different from your handwriting?

*A.* I believe it to be.

*Q.* Okay. Okay. I'm going to direct your attention to State's 10 now. Would you identify that, please.

*A.* It's the strangulation supplement that I filled out on scene with Jaime.

*Q.* And on I think it's the third page there's some diagramming of the injuries.

*A.* Correct.

*Q.* Okay. You circled where the knot was on the head and you indicated with a slight mark where the injury was or the

cut near the eye; is that right?

*A.* Correct.

*Q.* And was that something that you did or something that Jaime did?

*A.* I filled out the diagram.

*Q.* So it's based on your visual observations?

*A.* Yes.

*Q.* That was based on your observation at the time you were looking at these injuries; is that correct?

*A.* Correct.

MR. AMDUR: I'm going to move to admit State's 10.

MR. GREEN: I have an objection to hearsay, Judge. Even if it's just a diagram, there's plenty of other statements in that exhibit that are hearsay from Jaime. So that's what I'm objecting to.

MR. AMDUR: If I can respond?

THE COURT: Let me see that exhibit. Let me look at it so I can --

MR. AMDUR: Okay.

THE COURT: So you're objecting to Page 1 and 2. Do you have an objection to Page 3?

MR. GREEN: Not a legal objection, Judge, to the diagram. No.

THE COURT: Well --

MR. AMDUR: Judge?

THE COURT: Go ahead.

MR. AMDUR: Well, I would respond -- I guess if he's not objecting, he's not objecting. But he is because I'm not sure where we are. I'd argue present-sense impression. That's been clearly established.

THE COURT: I will admit Page 3 of Exhibit 10, but the objection is sustained as to hearsay. I'm going to tear that off. Page 1 and Page 2 of Exhibit 10 will remain. I will mark this -- we'll call Exhibit 10-A and it's admitted.

MR. AMDUR: Judge, I'm also going to ask -- I'm going to remotion to admit State's Exhibit 9 and the rest of State's 10 on the basis that as per the plea agreement, which would be State's Exhibit 1 for the plea, the third paragraph from the bottom of Page 1 says "Defendant stipulates to the admission of all material provided to the Defense or in the State's file."

This is clearly provided to the Defense and were in the State's file, otherwise. He's already stipulated to it.

THE COURT: Where is that in the plea agreement?

MR. AMDUR: So it's the first page, third paragraph from the bottom.

THE COURT: "Defendant stipulates to the admission of all material provided to Defense or in the

State's file."

MR. GREEN: I still have an objection to hearsay, Judge.

MR. AMDUR: He's already stipulated to it, Judge.

THE COURT: But you will stipulate you received the information and -- and it was provided to you or it was in the State's file.

MR. GREEN: It looks familiar, Judge. I'm having my investigator verify that we got that information right now. If that's the case, then I mean it's stipulated to.

THE COURT: I will give you a second to figure that out.

*(Sotto voce discussion between counsel.)*

THE COURT: And I'll remind both of y'all I mean the rules of evidence apply obviously whether it's a jury or not. But I do have a very lengthy PSI that gives information that's partially based on hearsay. We all agreed to do a PSI. I mean I don't want to do too much of a technical dance on the admission of these documents.

MR. GREEN: I understand, Judge. And my investigator is verifying that we got that information right now. If Mr. Amdur represents to myself and the Court that it was provided, I will take his word for that. But we are going

to verify it.

THE COURT: It will be admitted as State's 10. I've written 10-A on the back. It's not hearsay. But pursuant to the plea agreement, 10 is admitted unless and until you can convince me it wasn't handed over.

MR. GREEN: I understand, Judge.

THE COURT: Now give me a second to review it.

MR. AMDUR: Yes, sir.

THE COURT: You may proceed.

MR. AMDUR: Thank you, Judge.

And again I also did reurge admission of State's 9 as well under the same basis.

THE COURT: Any reason to believe you didn't receive State's 9?

MR. GREEN: Not at this time, Judge.

THE COURT: 9 is admitted subject to showing me you did not.

MR. GREEN: Understood, Judge.

THE COURT: Now give me a second to review it.

*(Pause.)*

THE COURT: Proceed.

MR. AMDUR: I'll pass the witness.

THE COURT: Cross?

MR. GREEN: If it pleases the Court.

THE COURT: Microphone of some form.

MR. GREEN: Can you hear me, Rick?

THE REPORTER: Yes.

CROSS-EXAMINATION

*Q.* *(BY MR. GREEN)* Deputy Wheeler, so when did you graduate the police academy?

*A.* Mid 2021. I don't remember the exact month off the top of my head.

*Q.* How long were you on FTO before you responded to this call?

*A.* I was in Phase 4, I believe. I started in early January and I started FTO pretty much immediately upon starting with the agency. So however long January 2nd is up until the time of the incident.

*Q.* Okay. In the police academy do they teach you to write reports?

*A.* They did.

*Q.* Did they teach you that it has to be complete?

*A.* They did.

*Q.* That it has to be accurate.

*A.* They did.

*Q.* It has to be truthful?

*A.* Correct.

*Q.* Did you have a chance to review your report before testifying today?

*A.* Briefly, yes.

*Q.* Did you find it to be complete?
*A.* I did.
*Q.* Accurate?
*A.* I did.
*Q.* Truthful?
*A.* I did.
*Q.* Anything you would like to change before we go forward?
*A.* No, sir.
*Q.* Okay. Understood.
So this occurred in 2022; is that correct?
*A.* I believe so.
*Q.* About three years ago?
*A.* Correct.
*Q.* And how many cases have you handled -- I know it's going to be a lot. But how many cases have you handled in between today and 2022?
*A.* I couldn't put a number on it.
*Q.* Probably hundreds though, right?
*A.* I would say so.
*Q.* Okay. So would it be fair to say that your memory of this event is based off of your report?
*A.* I would say so, yes.
*Q.* Okay. And you would agree with me that a lot of things can come to light after you leave the scene and the

incident is kind of over and dealt with; is that fair?

*A.* I'm sorry. Could you repeat the question?

*Q.* A lot more information can come to light after you leave the scene and the investigation is done and things of that nature; is that fair?

*A.* Yes, that's fair of any call.

*Q.* Were you aware that an affidavit was signed by Jaime saying that she made up the event?

*A.* I was not aware.

*Q.* Okay. And were you aware that this was eventually pled to a deadly conduct case, a misdemeanor?

*A.* I believe it had been mentioned to me in passing, but I had never verified it on my own.

*Q.* Okay. And so you would agree with me that the offenses that you're describing that you were initially investigating was an Assault Family Violence Strangulation 1, right?

*A.* Yes.

*Q.* And then the second offense would be Assault with a Deadly Weapon; is that fair?

*A.* Yes, sir.

*Q.* And then both of those felonies were pled down to one misdemeanor?

*A.* If that's what you're saying. Again, I haven't verified it for myself.

*Q.* Fair enough.
Let's talk about your conversation with Shelby. How long was that conversation at the scene, if you remember, with Shelby?
*A.* I don't recall. It wasn't too long.
*Q.* Okay. Can you give me a ballpark timeframe? Fifteen minutes?
*A.* Longer than that. I would say anywhere between maybe half an hour and an hour.
*Q.* Okay.
*A.* It took a while to have them both do their statements.
*Q.* Gotcha. And you would agree with me that the statement that was just provided to the Judge, that was used as evidence against my client in that case; is that fair?
*A.* Yes.
*Q.* So would you agree with me -- and this was already mentioned -- that Shelby went across the street? She's the one that attempted to call 9-1-1?
*A.* She asked the neighbor to call 9-1-1 from what my understanding of it was.
*Q.* Okay. So she was really a material witness in this case; is that fair?
*A.* The only thing I'm aware of that Shelby had told me was that she had came out -- she had been woken up by the

screaming, came out and saw everything and then ran over to the neighbor's after hiding a weapon.

*Q.* After Shelby hid a weapon?

*A.* Correct.

MR. GREEN: Pass the witness, Judge.

MR. AMDUR: Briefly if I may, Your Honor.

THE COURT: You may.

REDIRECT EXAMINATION

*Q.* *(BY MR. AMDUR)* Shelby told you she hid a weapon?

*A.* Yes.

*Q.* Okay. Where did she get that weapon?

*A.* Where she had got it I do not remember.

*Q.* When you spoke with Shelby, did you make notes and subsequently type up a report?

*A.* Yes.

*Q.* Would it refresh your memory to review the report and advise at that point where -- if you noted in the report where Shelby said she got that weapon?

*A.* Yes.

*Q.* All right.

*(Sotto voce discussion between counsel.)*

MR. AMDUR: May I approach, Your Honor?

THE COURT: You may.

*Q.* *(BY MR. AMDUR)* Is that your report, sir?

*A.* It is.

*Q.* Okay. If it would refresh your memory, then go ahead and take a moment to review it. But you cannot testify directly from it.

*A.* (Complies.)

*Q.* Do you recall, having refreshed your memory, whether Shelby told you where she got that gun?

*A.* Yes, she did.

*Q.* Okay. Where did she tell you she got the gun?

*A.* She said she got it off Michael's dresser.

*Q.* Was it a handgun?

*A.* It was.

*Q.* Okay. And why -- if she indicated why she got the gun, why did she get the gun? What did she do with it?

*A.* She hid it in his man cave is what she described it as. And she stated the reason was because she was afraid he was going to use it on her mother.

*Q.* Did she indicate why she was afraid he was going to use it on her mother?

*A.* She had stated that during the altercation Michael had kept telling her mom that he was going to kill her.

MR. AMDUR: Pass the witness.

RECROSS-EXAMINATION

*Q.* *(BY MR. GREEN)* Based on your review of the report, did Shelby say that Michael threatened Jaime with the gun or is this just her thinking that something might happen?

*A.* She had stated that he was saying that when slamming the back of her head on a faucet and holding a knife to her.

*Q.* I'm sorry. My question, if you will listen, is whether or not she -- or Michael threatened Jaime with a gun.

*A.* No, he did not.

*Q.* Okay. So did he ever have the gun based on your investigation?

*A.* No.

*Q.* So Shelby just hid the gun and there was no mention of a gun before that. And Michael didn't have a gun or anything else; is that fair?

*A.* The only mention of a gun from what I recall would be from other officers where Michael had stated in his story that Jaime had tried to kill herself and had a gun.

*Q.* But no one said Michael had a gun?

*A.* No.

*Q.* Okay. How often do you follow up on your cases? And, again, I'm sure you've had hundreds since then. But how often do you follow up on your cases and the resolution of them?

*A.* Rarely.

*Q.* Did you say regularly or rarely?

*A.* Rarely.

*Q.* Okay. Is it commonplace in your experience for two felonies to be pled down to a misdemeanor?

*A.* I wouldn't know.

MR. GREEN: Pass the witness.

MR. AMDUR: Really, really brief, Your Honor.

FURTHER REDIRECT EXAMINATION

*Q.* *(BY MR. AMDUR)* When Jaime told you how the fight started, Michael had accused her of taking what?

*A.* I believe it was paperwork and a gun.

MR. AMDUR: Nothing further.

MR. GREEN: Nothing further, Judge.

THE COURT: May he be excused in the sense he can go back to work?

MR. GREEN: Yes, Judge.

MR. AMDUR: Yes, Your Honor.

THE COURT: Thank you. You're excused, Deputy.

THE WITNESS: Thank you, Your Honor.

THE COURT: How many more witnesses do you have?

MR. AMDUR: One more.

THE COURT: Call them.

MR. AMDUR: The State calls Sergeant Eileen Reamer.

Judge, if I can, this will be faster.

THE COURT: (Nods.) In fact, after we've completed the hearing, I will break for lunch.

*(Discussion off the record about other causes.)*

THE COURT: Are you the next witness?

THE WITNESS: Yes, sir.

THE COURT: If you will approach, remain standing and raise your right hand.

*(Witness sworn.)*

THE COURT: Thank you.

Have a seat.

THE WITNESS: (Complies.)

THE COURT: Speak up. Use the microphone as needed. And start by stating and spelling your name, please.

THE WITNESS: (Complies.)

THE COURT: Counsel.

MR. AMDUR: Thank you, Your Honor.

ELAINE REAMER,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

*Q.* *(BY MR. AMDUR)* Thanks for being here, Sergeant. You are employed in what capacity with the sheriff's office?

*A.* I'm a sergeant over at the Guadalupe County Sheriff's Office in the Criminal Investigations Bureau.

*Q.* And when were you promoted to sergeant?

*A.* This year, sir, in January.

*Q.* And before that what was your capacity?

*A.* I was an investigator for the same division in people crimes.

*Q.* And when did you start as an investigator in people

crimes?

*A.* Four years ago, sir.

*Q.* How long have you been employed with the sheriff's office?

*A.* Seventeen-and-a-half years.

*Q.* And were you working as an investigator on -- on or about, shall we say, March 4th of 2024?

*A.* Yes, sir.

*Q.* And did you investigate into offenses involving Michael Walker, Jaime Walker and Shelby Cole being the victim?

*A.* Yes, sir.

*Q.* Were you the lead investigator in the case against Michael Walker?

*A.* Yes, sir.

*Q.* Is Michael Walker in this room today?

*A.* Yes, sir.

*Q.* Okay. Would you identify him by an article of clothing that he's wearing, please?

*A.* He's wearing the orange uniform, sir.

MR. AMDUR: Please let the record reflect that this witness as has the prior has identified the defendant in open court.

*Q.* *(BY MR. AMDUR)* This was a pretty convoluted investigation, right?

*A.* Yes, sir.

*Q.* Can you just parrot down a little bit and just give Judge Steel an idea of what you did and what you concluded as concerns Michael Walker.

*A.* I received an intake from Adult Protective Services that there was a female who possibly had mental health issues being sexually assaulted by her stepfather and her mother.

Shelby was pregnant and that she had been telling her family that Michael was the father of her child. During the course of my investigation I did do search warrants and arrest warrants. One of the search warrants was for a buccal swab.

I asked Mr. Walker if he would give me his buccal swab on his own. He did not want to. And then I explained to him the purpose of it and he said that the DNA -- "Well, why wouldn't it be mine?" He said, "That's what I'm in trouble for."

MR. GREEN: Judge, I'm objecting to narrative.

THE COURT: Yeah. Let's try to avoid narratives.

THE WITNESS: I'm sorry, sir.

THE COURT: Q and A, please.

Counsel, you may.

*Q.* *(BY MR. AMDUR)* So Mr. Walker -- first of all, he would not give you voluntarily a buccal swab?

*A.* No, sir.

*Q.* But you did get the warrant and were able to take it?
*A.* Yes, sir.
*Q.* And Mr. Walker has since acknowledged that Shelby's daughter, [redacted], is biologically his daughter as well?
*A.* Yes, sir.
*Q.* And that came out confirmed through the DNA testing?
*A.* Yes, sir.
*Q.* Okay. Just so we're clear, Shelby was above the age of consent, right?
*A.* Yes, sir.
*Q.* Okay. Aside from the fact that she was the stepdaughter, is there any question of capacity?
*A.* There have been several tests or evaluations -- I don't know what you would call it -- done and it's been both sides, sir.
*Q.* In your experience -- let me walk it back.
You spoke, I assume, with Shelby on at least one occasion; is that right?
*A.* Yes, sir.
*Q.* More than one occasion?
*A.* Yes, sir.
*Q.* In your experience does Shelby strike you as somebody who is at least of average intelligence?
*A.* No, sir.
*Q.* Okay. Is it fair to say that she's probably

intellectually disabled or delayed?

MR. GREEN: Objection, Judge. It's outside this expert's expertise.

THE COURT: A, I've read the PSI. I've gotten that information.

MR. AMDUR: I'll withdraw it.

THE COURT: Well, I'm going to overrule your -- your objection. It's just a layman's view. So I'll allow her to answer it but not as an expert, nor to try to identify what may have caused it or the extent of it.

*Q.* *(BY MR. AMDUR)* Okay. So, if you would, go ahead and answer.

*A.* Shelby didn't come across as very intelligent at all.

*Q.* Did she require a little more hand holding and a little bit more work and a lot more patience than the average person?

*A.* Yes, sir.

*Q.* Okay. And were you able to confirm that Michael Walker was, in fact, legally speaking her stepfather?

*A.* Yes, sir. I did get ahold of the marriage certificate where they were married.

*Q.* And were they married by November of 2022?

*A.* I cannot say dates, sir. I'm sorry.

*Q.* Fair enough. They were married by the time you were involved?

*A.* Yes, sir.

*Q.* Understanding that you cannot say dates, if you know was there -- was their sexual relationship a one-time thing? Was it ongoing? Do you know?

*A.* Shelby said it was ongoing.

*Q.* Did she say for about how long it was?

*A.* She said she was 21 the first time it happened.

*Q.* And if I were to tell you -- because you said you are not good on dates. If I were to tell you that her birthday was March 7th of 1998, would that sound about right?

*A.* Yes, sir.

*Q.* So 21 would have been -- she would have turned 21 on her birthday of about 2021; is that right?

*A.* Yes, I think so.

*Q.* No. No. I'm sorry. That's me. I'm sorry.

1998. If she was born in '98, she would have turned 10 in '08 and she would have turned 20 in '18, right?

*A.* Uh-huh.

*Q.* So that was '18. So 2019 would have been -- one year later she would have turned 21, right?

*A.* Yes, sir.

*Q.* So it was certainly before you got involved?

*A.* Yes, sir.

*Q.* Was Shelby pregnant when you started your investigation?

*A.* Yes, sir.
*Q.* Okay. Was she -- based on your investigation, if you know, how did her relationship seem to be with her mother, Jaime?
*A.* She was very dependent on her mother.
*Q.* Very dependent?
*A.* Yes, sir.
*Q.* Okay. If you know, how did her relationship seem to be with the defendant?
*A.* She said he was in love with her. She sent messages to her mother saying that Michael was being mean to her and sending her kissy faces and loves on her text messages.
*Q.* And in her mind apparently that was him being mean?
*A.* I'm sorry. I'm trying to remember everything, sir. This was a very long case. She would tell Jaime, "Your husband" -- there was a lot of text messages complaining about him. She said that he made her feel very uncomfortable.
*Q.* Okay. Okay. Did she seem interested at that point in having a relationship with Michael if you know the answer?
*A.* No.
*Q.* Did she seem to want Michael to just go away?
*A.* I don't know, sir. I'm sorry.
*Q.* No. You're fine.
Did she seem scared?
*A.* Yes, sir.

*Q.* Of Michael?
*A.* Yes, sir.
*Q.* If you know -- well, did you interact with Jaime as well as part of your investigation?
*A.* Yes, sir.
*Q.* Did Jaime seem scared of Michael?
*A.* Sometimes, yes, sir.
*Q.* All right. Did you interact with the defendant, Michael Walker?
*A.* Yes, sir.
*Q.* Did Michael seem scared of Jaime?
*A.* No, sir.
*Q.* Did Michael seem scared of Shelby?
*A.* No, sir.
MR. AMDUR: Pass the witness.

CROSS-EXAMINATION

*Q.* *(BY MR. GREEN)* Ms. Reamer, it's a pleasure to meet you. My name is John Green. I represent Mr. Walker.
*A.* Yes, sir.
*Q.* I've seen your name on dozens of reports. It's good to finally meet you in person.
*A.* Thank you, sir.
*Q.* Did you write a report in this case?
*A.* Yes, sir.
*Q.* Is that this 44-page report right in front of me

here?

*A.* Probably, yes, sir.

*Q.* And you would agree that this is much longer than the normal report that you write in most cases; is that right?

*A.* No, sir. I have a history of writing really, really long reports.

*Q.* I do know that for a fact.

*A.* I'm sorry.

*Q.* No, that's okay.

Did you have a chance to review this before today?

*A.* Yes, sir.

*Q.* Did you find it to be complete?

*A.* I want to say that there were three different reports that I wrote under that case number.

*Q.* Did you review all of them before today?

*A.* No.

*Q.* Okay. Which ones did you review?

*A.* The second one, sir.

*Q.* Okay. And was that complete, accurate and truthful?

*A.* Yes, sir.

*Q.* Is there anything that you would change on that?

*A.* No, sir.

*Q.* Okay. For the initial complaint where you went to First Start to talk to Shelby, who gave you that complaint?

Was it the Roden family?

*A.* I received an intake from Adult Protective Services. That was how everything first began.

*Q.* Did they tell you who the complainant is?

*A.* In the APS report I cannot recall, sir. I really can't at this time.

*Q.* Okay. Does the -- the last name Roden mean anything to you?

*A.* Oh, yes, sir.

*Q.* And can you describe -- I know there's a lot of family dynamics here.

*A.* Uh-huh.

*Q.* Can you kind of describe who the Roden family is and who they are in relation to the Walkers?

*A.* They're going to be Jaime's family.

*Q.* And that's the co-defendant in this case?

*A.* Yes, sir.

*Q.* And that is her brother and her father; is that correct?

*A.* Yes, sir.

*Q.* Okay. You would agree with me that multiple evaluations were done on Shelby?

*A.* Yes, sir.

*Q.* And it happened to be with IQ and whether or not she could (inaudible.) Is that fair?

THE REPORTER: And whether or not?
MR. GREEN: She could consent to sex.
*A.* There was nothing in there that I saw about sex. I remember two evaluations being done. I do not remember about sex, specifically.
*Q.* Okay. Have you reviewed the evaluation from UT Health, the McGovern Medical School?
*A.* Sometime in 2024.
*Q.* Okay.
*A.* Sorry.
*Q.* Would it help you if I showed it to you to refresh your memory?
*A.* Please.
MR. GREEN: May I approach again, Judge?
THE COURT: (Nods.)
*Q.* *(BY MR. GREEN)* I'm showing you the UT Health medical report by the McGovern Medical Center. I'm going to ask you about the assessment here.
*A.* Okay.
*Q.* Specifically this paragraph.
*A.* You want me to read it?
*Q.* Yes, ma'am, just to refresh your memory if you don't mind.
*A.* Oh, okay. (Complies.)
*Q.* Do you recognize the report?

*A.* Yes, sir.

*Q.* And that was part of your investigation?

*A.* Yes, sir.

*Q.* Thank you, ma'am.

*A.* Uh-huh.

*Q.* Before we get into this report I want to do a timeline here of the different events. So you initially went to -- well, who was the first person you talked to in this investigation?

*A.* It would have been to -- normally it would be to arrange a forensic interview so the CAC.

*Q.* And you would agree with me that during the CAC interview Shelby didn't make any accusations whatsoever that this was a nonconsensual sexual encounter?

*A.* Yes, sir.

*Q.* And you would agree with me that it was only after the CAC interview was done that she said, "Oh, by the way, Michael Walker is the father of my child"?

*A.* That's not the way I remember it.

*Q.* Okay. Well, tell me what you remember.

*A.* I want to say it was one of the later forensic interviews that APS had arranged that she didn't say anything in that forensic interview. And afterwards APS interviewed her alone and when she came out, then they said that Shelby had said that Michael was the father.

*Q*. So how many interviews did they have with her before --

*A*. That, I cannot speak on.

*Q*. But more than one?

*A*. I can't -- are you saying interviews with APS or forensic interviews?

*Q*. Forensic interviews.

*A*. I want to say that was the second one, sir.

*Q*. Okay. So in both the first and the second forensic interview, as far as you know, she didn't make any outcry whatsoever that this was not consensual?

*A*. Yes, sir.

*Q*. And so it was only when she talked to APS afterward in an unrecorded interview that she said Michael was the father?

*A*. Yes, sir.

*Q*. But she did say it was even rape at that time. She said Michael was the father, correct?

*A*. Yes, sir.

*Q*. Okay. And after that point you would agree with me her family was contacted -- the Roden family?

*A*. Yes, sir.

*Q*. And they came to pick her up from Guadalupe County?

*A*. No, sir.

*Q*. Who came to pick her up?

*A*. They met over -- it was like a halfway point.
*Q*. Probably halfway to Houston?
*A*. League City. Yes, sir.
*Q*. Okay. So at that point Grandpa Roden, Jaime's father, drove her out to Houston?
*A*. Yes, sir.
*Q*. And you would agree with me it's only after that car ride with the Roden family and after she stayed with the Roden family that she made an outcry that this was not consensual; is that fair?
*A*. Yes, sir.
*Q*. Okay. And you would agree with me that they're the family members of the co-defendant?
*A*. Uh-huh. Yes, sir.
*Q*. And you did meet with Jaime at one point, correct?
*A*. Yes, sir.
*Q*. And when you met with Jaime, you asked her about the allegations?
*A*. Yes, sir.
*Q*. And her first response was not, "Help me. Help me. I've been raped," was it?
*A*. No, sir.
*Q*. In fact, her first response was: This is my Fourteenth Amendment right and this is none of your business. Isn't that right?

*A.* Yes, sir.

*Q.* So she wasn't scared at that moment of Michael. She was scared that y'all were in the business of the bedroom of their family; is that fair?

*A.* The Fourteenth Amendment statement wasn't made to me. That was made to APS. But I did ask her about it in the interview.

*Q.* And at that time she didn't think anything was wrong with it. She just wanted people out of her business. Is that fair to say?

*A.* She said it was her privacy.

*Q.* But, again, she didn't say "I'm being raped" or "I'm being threatened" or anything like that, right?

*A.* Yes, sir.

*Q.* So even Jaime at that time isn't alleging any nonconsensual stuff. She's just saying "Stay out of my business," right?

*A.* Yes, sir.

*Q.* And you eventually went out -- was it Houston where you met Shelby?

*A.* Yes, sir.

*Q.* And have you had a chance to review your body cam of that event?

*A.* No, sir.

*Q.* Do you remember generally the event?

*A.* Yes, sir.

*Q.* Is it fair to say that when you went into that interview, you expected that Shelby had a significantly lower IQ than people gave her credit for? Is that fair?

*A.* Yes, sir.

*Q.* In fact, even at one point you said "Well, Shelby, you're a lot smarter than people give you credit for"?

*A.* Yes, sir.

*Q.* And were the people telling you that Shelby had a significantly lower IQ? Was that the Roden family giving you this information?

*A.* Yes, sir.

*Q.* And, again, that's the co-defendant's parents?

*A.* Yes, sir.

*Q.* Would you agree with me that a defense for the co-defendant for the offense of having sex with a biological daughter if you're forced to have sex, that's a defense they can set up; isn't that right?

*A.* I have no idea, sir.

*Q.* Okay. I'll move past it then. Thank you.

For Shelby -- and you already mentioned that she's, I guess, smarter than people give her credit for. Were you aware that she's lived on her own before?

*A.* Yes, sir.

*Q.* Were you aware that she's paid her own bills before?

*A.* Yes, sir.

*Q.* Were you aware --

THE REPORTER: Slow down for me just a little bit.

MR. GREEN: I'm sorry, Rick. I always do that to you.

*Q.* *(BY MR. GREEN)* Were you aware that she's paid rent and for groceries and everything else on her own?

*A.* Yes, sir.

*Q.* And were you aware that she had SNAP benefits because of the intellectual disability that she's alleged to have had?

*A.* Not SNAP specifically, but I knew she was getting a stipend from the State due to her disability.

*Q.* And when that disappeared, she was no longer disabled?

*A.* I have no idea about that, sir.

MR. GREEN: Okay. Pass the witness, Judge.

MR. AMDUR: Briefly, if I can, Your Honor.

Well, may I have just a moment?

THE COURT: You may.

*(Pause.)*

MR. AMDUR: I have no further questions.

THE COURT: May this witness be excused and released from her subpoena?

MR. AMDUR: Yes, Your Honor. That's fine with

the State.

MR. GREEN: Yes, Judge.

THE COURT: We're going to break for about an hour. If the Defense wants to put on your last witness, you may do so then. If not, I will hear closing arguments.

We're in recess.

THE BAILIFF: All rise.

*(At this time other causes were heard.)*

*(Open court, defendant present.)*

THE COURT: Now we're ready to proceed on State versus Michael Walker 24-1776.

Does the Defense wish to call any witnesses?

MR. GREEN: Yes, Judge. The Defense calls my investigator, Melissa Cortez.

*(Witness sworn.)*

THE COURT: Thank you. Have a seat.

THE WITNESS: (Complies.)

THE COURT: Start by stating and spelling your name.

THE WITNESS: (Complies.)

MR. GREEN: May I begin, Judge?

THE COURT: You may.

MELISSA CORTEZ,

having been first duly sworn, testified as follows:

DIRECT EXAMINATION

*Q.* *(BY MR. GREEN)* Ms. Cortez, would you tell the Judge how you're involved in this case.

*A.* I am John Green's investigator for this case.

*Q.* And in doing your investigation in this case, what all have you reviewed in the way of discovery?

*A.* An Adult Protective Services' report.

THE COURT: Before we go any further, we've announced that she's an expert in this case.

Is the State comfortable with her as an expert? Do you want to ask the Court to limit it? What are we doing here on the expert side?

MR. AMDUR: I'm assuming she is an expert in investigatory methods. Anything beyond that I would ask to limit or at least allow us to have a hearing on it.

THE COURT: Stand up and yell when you think we're in that area.

MR. AMDUR: Will do.

*Q.* *(BY MR. GREEN)* And so what have you reviewed for today's case, Ms. Cortez?

*A.* An Adult Protective Services' report, Guadalupe police reports, a PSI, as far as the State's jail call records and a few records that we pulled.

*Q.* And is it fair to say there's lot of discovery in this case?

*A.* There is.

*Q.* Okay. And you spent time going through the reports including the PSI; is that correct?
*A.* I did.
*Q.* In reading the PSI, would you agree that that correlates directly with the Adult Protective Services report?
*A.* It does.
*Q.* Are you aware of who called the Adult Protective Services?
*A.* I am, yes.
*Q.* And who was that?
*A.* James Roden, the uncle to the complainant.
*Q.* And let's -- can we --
THE COURT: The uncle of whom?
*Q.* *(BY MR. GREEN)* Can you explain the family dynamics here?
*A.* Yes. James Roden is the brother of the co-defendant. And then there's the father, James Roden, as well.
*Q.* So James Roden, Sr.?
*A.* Yes. Senior and junior.
*Q.* So was he -- was senior the one that called APS?
*A.* Initially, it was Junior. It was the uncle.
*Q.* And that's the co-defendant's brother?
*A.* Correct.
*Q.* In reviewing all the discovery and listening to Sergeant Reamer on the stand, was there any outcry of

nonconsensual sex before Shelby went with the Rodens?

*A.* There was not.

*Q.* When was the first time that she made an outcry that any sex was nonconsensual?

*A.* It was after being in the care of the Roden family.

*Q.* What is Jaime charged with in this case, the co-defendant?

*A.* Sexual assault.

*Q.* Sexual assault of a probative person?

*A.* Yes.

*Q.* In doing your investigation who did you talk to?

*A.* I spoke with Cody, the brother of complainant. I spoke with the ex-wife of the defendant. I spoke with the sister-in-law of the complainant. And I also spoke with Shelby.

*Q.* And let's -- let's start with Shelby. Did you have long conversations with Shelby?

*A.* I did not.

*Q.* In the conversation that you had, what came to light?

*A.* That the child was planned.

*Q.* Why do you say that?

*A.* I specifically asked her if they wanted this baby and if they planned to have this baby and she responded with "Yes."

*Q.* In speaking to everyone else, what kind of

communications were going on between Jaime, the co-defendant, and Cody and that side of the family?

*A*. There was nonstop communication on a daily basis. Jaime was calling all of them. So I listened to, I want to say, about four hours of recordings.

*Q*. And those were jail call recordings?

*A*. Yes.

*Q*. In those jail call recordings was there anything concerning?

*A*. Yes.

*Q*. And what was concerning to you?

*A*. There was coercion, manipulation tactics. There was feeding of information.

*Q*. And specifically was there anything that we brought to the attention of the Guadalupe County DA's office?

*A*. Yes.

*Q*. And what was that?

*A*. I think we included about four audio recordings, may be five. The most concerning was where Jaime mentioned a large sum of money.

*Q*. Who was she speaking to at that time?

*A*. Cody.

*Q*. So she mentioned a large sum of money. Was there contingencies with that?

*A*. For helping her, specifically. She was preparing to

write an affidavit.

*Q*. And was -- in Cody's words, was that affidavit correct?

*A*. It was not.

*Q*. So she was wanting him -- she was going to pay him money for a false affidavit; is that correct?

*A*. That's what it sounded like, yes.

*Q*. And did you come with me to meet with the D.A.'s office to tell them this information?

*A*. We did twice.

*Q*. What happened after that?

*A*. They were then charged -- several family members were charged with witness tampering.

*Q*. And that would be Jaime, James Roden and James Roden, Sr.?

*A*. Correct.

*Q*. And who is Cody in all of this?

*A*. Cody is Jaime's biological son. So it's Shelby's brother.

*Q*. What was the communications like between Jaime and Cody?

*A*. It was the same. A lot of "I need you to do this. You have to do this." And she would specifically give him instances that she wanted him to include in this affidavit. And it was constant hounding.

*Q.* And how did Cody feel about all of that?

MR. AMDUR: Objection. It calls for speculation.

*Q.* *(BY MR. GREEN)* Did you talk to Cody about how he felt about that?

*A.* Several times.

*Q.* Okay. And how did he feel about that?

*A.* He was very stressed out. He would call me at all hours. I always answered. And he didn't know how to proceed. He was scared that he was, you know, being dragged into a situation that would, you know, put him in a bad light with the Court.

He knew that he couldn't lie, but he, you know, felt "This is my mom. I don't know what to do." It was difficult. He had three small children so he's also trying to, you know, work and support his family and his wife. So it was a difficult time for them.

*Q.* And what did Cody end up having to do?

*A.* After about six months of this badgering he made --

MR. AMDUR: I'm going to object at this point to hearsay and calls for speculation.

THE COURT: Well, I'm going to sustain the objection as to speculation: badgering. It is an expert on investigation, so hearsay is allowed in the area of her expertise.

Is your objection outside of that area, Counsel?

MR. AMDUR: Well, it is. As far as I can tell, this is not about her investigatory methods at this point. It's about Cody's frame of mind and his motives, which I would say again falls outside of her expertise and that she has no personal knowledge of this.

MR. GREEN: And, Judge, she just testified that Cody called her at all hours of the night. She's very aware of Cody's mindset going into this. And that's part of her investigation is to talk to other witnesses to see who they're talking to and what information is being passed along.

Ultimately where I going with this line of questions is that Cody filed a protective order against his mother, Jaime Walker.

THE COURT: I have a feeling, Mr. Green, you would be objecting to any police officer standing up here and telling us all of their investigation and what they found out from talking to other people. It's still hearsay, is it not?

MR. GREEN: Well, I agree, Judge. But I think that the fact that he filed a protective order, I don't think that's hearsay. It's a government record.

THE COURT: Well, that wasn't what we were objecting to, so move on to the protective order.

MR. GREEN: Understood.

THE COURT: Sustained.

*Q.* *(BY MR. GREEN)* Was there a protective order filed?
*A.* There was in January of this year.
*Q.* Would you recognize it if you saw it?
*A.* Yes, I would.
*Q.* Do you recognize this?
*A.* Yes.
*Q.* How do you recognize it?
*A.* This was forwarded to me on the day that Cody filed it.
*Q.* What is this on the top here?
*A.* This is showing that it has been electronically filed with district court.
*Q.* Is that in Ford County?
*A.* Yes.
*Q.* And what state is that in?
*A.* Kansas.
*Q.* And then what is this?
*A.* A Petition for Protection from Stalking, Sexual Assault or Human Trafficking order.
*Q.* And is this a government document?
*A.* It is.
*Q.* And that was filed with the Court?
*A.* Yes.
*Q.* Is it the same or substantially the same as the last time you saw it?

*A.* Yes.

MR. GREEN: Judge, I move to enter into -- as Defense Exhibit 1, the Petition for Protection from Stalking Sexual Assault or Human Trafficking order that was filed by Cody Cole against Jaime Walker.

MR. AMDUR: I don't think it's admissible, but I will stipulate.

THE COURT: It's admitted.

Give me a second, counsel.

*(Pause.)*

THE COURT: Proceed.

*Q.* *(BY MR. GREEN)* Ms. Cortez, what are the contents of the protective order?

*A.* It goes to --

THE COURT: Wait. Wait. Wait.

Defense 1?

MR. GREEN: Defense 1, Judge.

THE COURT: Did I miss a sticker? Did it fall off? Do you want me to mark it?

MR. GREEN: If you want to mark it, Judge. Or I can get a sticker from Rick.

THE COURT: I'm going to mark it D 1.

MR. GREEN: Understood, Judge.

THE COURT: It's admitted.

*Q.* *(BY MR. GREEN)* Ms. Cortez, what are the contents of

the protective order?

*A.* He goes on to explain how he's been harassed by his mother to falsify information, to sign affidavits, to delete everything that his mother texted him. He talks about his granddad, Mr. James, Sr., threatening -- yeah.

*Q.* And if a mother would threaten and try to bribe her son, would she do that to her daughter?

*A.* I believe so.

MR. GREEN: Pass the witness, Judge.

CROSS-EXAMINATION

*Q.* *(BY MR. AMDUR)* Ma'am, where does it talk about James, Sr. threatening in this document, State's exhibit -- Defense Exhibit 1?

*A.* The third page. It says grandad.

*Q.* Okay. Not by name, right?

*A.* Correct.

*Q.* Okay. You're assuming that it is James Roden, Sr. though?

*A.* Yes.

*Q.* And while that's your assumption, in full disclosure the State has filed charges -- not indicted -- both James, Sr., the father of Jaime; James, Jr., the brother of Jaime; and Jane I think is her name, the mother of Jaime. Is that correct?

*A.* Yes.

*Q.* Okay. You actually did, with Mr. Green, bring this to our attention, did you not?

*A.* I did.

*Q.* And, if you know, shortly after that -- actually it was at that meeting we indicated a willingness to look into the matter. And shortly after that we indicated to Mr. Green a willingness to work out a plea offer on much more lenient charges than aggravate sexual assault or sexual assault, right?

*A.* Yes.

*Q.* Okay. Do you know -- and part of your investigation duties, did that entail looking into the charges against Jaime at this point?

*A.* I did not look into Jaime's case, specifically. No.

*Q.* Okay. Are you aware that we had a bond hearing where Jaime's then lawyer at the time tried to get the bond reduced and we played for visiting judge, Judge Mills, that recording you referenced where she was talking about I think -- I think it was $8,000 to Cody? Were you aware of that bonding hearing?

*A.* I was aware of the hearing. I don't know what happened at the hearing.

*Q.* Okay. But most of the communications that you heard had more to do with Jaime and Jaime's family trying to manipulate different people to benefit Jaime and the charges

against her much more so than they had anything to do with this particular case, right?

*A.* I -- I mean the things they were saying were pretty bad about Michael. So I would think that it would effect him just as much in a worse way.

*Q.* Right. But these were affidavits to try to exonerate Jaime that were being discussed, right? The $8,000 was bond money for Jaime. Really it had nothing to do with this particular case, right?

*A.* No, it did. I mean it was to put all the blame on one person -- on Michael.

*Q.* Did you witness any direct communication involving Jaime or her immediate family that related to conspiring to set up or frame or falsely accuse this defendant, your client --

*A.* Well --

*Q.* -- or was it -- let me finish really quickly -- or was it more for the benefit of Jaime getting her out of jail or getting documentation to show that she was a victim in this?

*A.* All of the communication, the recordings and I don't know how many text messages I saw from Jaime, it was all with regard to Michael.

*Q.* Michael's culpability, not Michael's case, correct?

*A.* Michael's case and his past and --

*Q*. Okay. How was it in relation to Michael's case or this particular case that you're testifying in today?

*A*. She was sending Andrea, her sister-in-law, and her son photos of what she was trying to insinuate was case work. It was like, you know, files and saying she had all of these records showing all of these things. And she was using that photo to try to convince them that Michael had done all of these things.

*Q*. And did Andrea or Cody do anything with that information to the detriment of your client?

*A*. No.

*Q*. All right. So as far as this case is concerned, it was wholly ineffective. And it just scored three of them -- actually, and Jaime as well with additional charges, right?

*A*. Can you rephrase that question?

*Q*. Yeah. Her attempt -- when I say "her," I mean that entire family. They're plotting, it had zero affect on this case -- or zero or a negative affect on this case, right?

I mean it didn't make us or compel us to come down harder on this case. Like we saw the transparency and we offered a more lenient deal because of the craziness of their efforts at convoluting all of these cases. Do you see that?

*A*. I suppose.

*Q*. Okay. Are you familiar with this assessment done by a psychiatrist by the name of Julia Piner?

*A.* I would have to look at it.

MR. AMDUR: Sure. May I approach the witness, Your Honor?

THE COURT: You may.

*Q.* *(BY MR. AMDUR)* I'm handing to you what has been marked as State's Exhibit 11. Have you seen that document?

*A.* I have not.

MR. AMDUR: Okay. Okay. Let's do this then.

Under that stipulation that was part of the agreement of this plea deal, at this time I would proffer State's 11 into evidence, Your Honor.

MR. GREEN: No objection, Judge.

THE COURT: 11 is admitted.

*Q.* *(BY MR. AMDUR)* Ms. Cortez, would you take a moment and just scan it. I'm not going to test you in depth on it.

*A.* (Complies.)

*Q.* In your testimony with Mr. Green, you did say that you had conversations -- or at least a conversation with Shelby, correct?

*A.* Yes.

*Q.* How many times have you talked to her?

*A.* Once.

*Q.* Once. How long was that conversation?

*A.* Not long. A minute.

*Q.* Okay. In that minute were you able to -- I

understand that you're not a psychiatrist or a psychologist.

Just as a regular person who has interacted with other people in the course of her life, were you able to assess whether Shelby seemed to have at least average or higher intelligence?

*A.* She was able to answer questions. I didn't -- from my one-minute conversation, I didn't sense that I was talking to somebody who didn't understand.

*Q.* Okay. I'm going to ask you to turn to Page 6, the last section, the heading of which is "Safety." And if you'll read the third sentence. It starts with the word "Feels:" F-E-E-L-S. It's just that sentence out loud and that sentence only.

Just for clarification, on the lower left-hand corner it says 9 of 12 and then in the middle of the bottom it says 6.

*A.* You want me to read -- say it again.

*Q.* The last session that says "Safety."

*A.* Uh-huh.

*Q.* And then the third sentence begins with "Feels."

*A.* "Feels safer now that her stepfather, Michael Allen Walker, is in jail and that she is no longer living with him."

*Q.* Okay. And if you turn it to the next page, the fifth section is "Current Medical Symptoms." And then there's a one sentence -- a one-word sentence "Denies." And then would you

read the next full sentence after "Denies."

*A.* "In general, states she is, quote, 'scared' of her stepfather, Michael Allen Walker."

*Q.* Okay. What's the next sentence?

*A.* "Relates that her stepfather, Michael Allen Walker, quote, 'forced her to have sexual intercourse vaginally many times.'"

*Q.* Okay. And then if you go to the very last page, the second paragraph begins with "Although." And I -- I do apologize because this a run-on sentence, but I'm going to ask you to read that entire sentence.

*A.* "Although it has been noted that her accounting of the sexual relationships with her stepfather, Michael Allen Walker, has changed over time, the inherently balanced power differential in the step-parent/child relationship and the inherent course of nature of the sexual relationship between a step-parent and child cannot be overlooked as a reasonable cause for the client initially changing stories."

*Q.* And then what is the last -- in that paragraph what is the last very bottom line starting with the word "Client"?

*A.* "Client likely is telling the truth about being repeatedly raped by her stepfather, Michael Allen Walker."

MR. AMDUR: Move to publish, Your Honor.

MR. GREEN: No objection.

THE COURT: How do you want to publish? Just

for me the read it?

MR. AMDUR: As you would care to, yes.

THE COURT: That will be fine.

Are you through with your cross of this witness.

MR. AMDUR: I am, Your Honor. I will pass her.

THE COURT: Mr. Green, if you will give me a second.

MR. GREEN: Certainly, Judge.

*(Pause.)*

THE COURT: There's a lot of information in this, Counsel. She completed high school. It states she can read and write.

Redirect.

REDIRECT EXAMINATION

*Q.* *(BY MR. GREEN)* Do you still have that document in front of you, Ms. Cortez?

*A.* The protective order?

*Q.* Do you have the Piner document in front of you?

THE COURT: (Indicating.)

MR. GREEN: Oh, thank you, Judge.

*Q.* *(BY MR. GREEN)* So I'm just going to ask you a couple of more questions about this and then a few more to wrap up.

But on Page 9 of 12, which says 6 at the bottom there, the last sentence under "Type" where they're arranging for adequate shelter, can you read that out loud for us.

Start with "Supplemental information."

*A.* "Supplemental information notes that the client's location was revealed to her mother, Jaime Rene Walker; and stepfather, Michael Allen Walker. So APS tried to convince the client to move to a Harris County facility instead of Hope House in Galveston County, but the client declined."

*Q.* So they're saying that Mr. Walker here, who Shelby is supposedly so scared of, found out where the location is and Shelby knew that but she still said "It's okay. I'm staying here"?

*A.* Yes.

*Q.* Okay. And then going to 12 of 12, which says 9 at the bottom, you read the last half of this sentence in the second paragraph. But can you start at the beginning there with "The client acted in age and developmentally appropriate" -- and then go on to the end of that paragraph.

*A.* "The client acted in age and developmentally appropriate and expected ways by initially stating the sexual acts between her and her stepfather, Michael Allen Walker, were consensual."

"The client does have the capacity to consent to sexual activity, in general. But due to power imbalance, differential (inaudible) and safety reasons, the client is likely telling the truth about being repeatedly raped by her stepfather, Michael Allen Walker."

*Q.* So at first she did say it was consensual, right?
*A.* Yes.
*Q.* And the power imbalance would be the fact that he's the stepfather and she's the stepdaughter?
*A.* Yes.
*Q.* Okay. And this report was made after Shelby drove to Houston with the Roden family; is that correct?
*A.* Yes.
*Q.* So she already had spent time with the Roden family by the time she's making these statements, right?
*A.* Yes.
*Q.* Let's talk about the affidavits that are trying to exonerate Jaime. So if Jaime is a victim in all of this, does that mitigate her culpability in a crime?
*A.* Yes.
*Q.* And as for the plotting, we talked a little bit on cross how they're supposedly plotting through jail calls. But who initially called APS?
*A.* The Roden family.
*Q.* And in those calls to APS, did they mention that my client is a convicted felon?
*A.* They did.
*Q.* And is he a convicted felon?
*A.* He's not.
*Q.* All right. So from the beginning, was that the truth

or lies?

A. Lies.

MR. GREEN: We're going to pass the witness, Judge.

THE COURT: Anything additional from the State with this witness?

MR. AMDUR: No, Your Honor.

THE COURT: Thank you. You may step down.

Additional witnesses from the Defense?

MR. GREEN: Nothing further, Judge.

THE COURT: Any additional witnesses from the State?

MR. AMDUR: No, Your Honor.

THE COURT: I've just got one exhibit from the Defense, correct?

MR. GREEN: That's correct, Judge.

THE COURT: I just want to make sure I have them all here to give to Rick.

Closing arguments from the State, first and last.

MR. AMDUR: Your Honor, certainly.

And just so I don't forget, part of the plea deal calls for a protective order so that the defendant will not be able to contact [redacted], his biological daughter, and Shelby.

And she'll -- at the earliest is her 18th birthday. And so I just wanted to bring that to your attention so at the appropriate time I can provide it to you.

MR. GREEN: That's our understanding.

THE COURT: That's granted.

MR. GREEN: Yes, sir.

MR. AMDUR: Okay.

THE COURT: Hang on just a second. I made the mistake of bringing my phone up here. Let me turn it off. I do that sometimes after lunch inadvertently.

Done.

CLOSING STATEMENT

MR. AMDUR: Judge, I'm going to keep the first close very short.

I'm just going to bring your attention to State's Exhibit 11, what's in the lower left-hand corner is Page 10 of 12 and in the middle it says Page 7. It starts with the large paragraph with the heading "Current medical symptoms."

And toward the bottom where it's one, two, three, four, five -- six lines down toward the end. The sentence begins "The client states her stepfather, Michael Allen Walker, denies these accusations of raping the client and the sister in law."

"Client states law enforcement officers are

waiting to DNA paternity test the client's future daughter, [redacted], to match it to the stepfather, Michael Allen Walker, and, quote, 'put him -- stepfather -- Michael Allen Walker away for life.'"

We're not seeking a life sentence, but we are putting on evidence that shows a witness who is unreliable; who has an intellectual development disability; who has vacillated in her story; who is easily swayed; who has given several conflicting accounts, many of which are documented in State's 11 alone; but who, it is undisputed, is the stepdaughter of the defendant and was impregnated by the defendant and now has a child that is biologically his.

Everything else I will respectfully reserve to address in my close.

THE COURT: Closing, Mr. Green.

MR. GREEN: If it please the Court.

CLOSING STATEMENT

MR. GREEN: Judge, Mr. Walker would never in a million years deny that that child is his. That's why we pled guilty to the offense of sex with a prohibited person. He knows that child is his. He understands that. He's not denying it.

Everything else he is adamantly denying and that's why we called the witnesses we did in the first hearing that we had, Judge, and now today. So I will remind the Court

that the last hearing we had we called Alexandria Polk who's my client's stepdaughter.

When he first married their mother, she was very young. And she testified that throughout their entire relationship it was an extremely good relationship. He was nothing but a perfect father figure to her. He taught her to hunt, to fish and to fend for herself.

At no point did she ever felt like Mr. Walker was coming on to her or doing anything inappropriate or even coming close to that line, Judge. So I think that's important. If Mr. Walker is a predator and going out there preying on people, he had a much younger and more impressionable victim in front of him. But he didn't act on it.

We also called Brandi White, my client's ex-wife. And it's very rare that you get an ex-wife that will positively testify for you, Judge. But she testified unequivocally there was absolutely no violence and that she was never scared of him during her testimony.

I think that the -- this case -- the facts are certainly murky, Judge. I think that's because from the very beginning the Roden family was out to get Michael Walker because they thought it was a rape from the beginning. That's why they called APS. That's why they told APS that he's a convicted felon when he's absolutely not and they just kind of

exaggerated from the get-go.

But again I think it's important to note, as Sergeant Reamer said on the stand today, at no point during these forensic interviews did Shelby ever even insinuate that this is nonconsensual sex that they had.

It was not until after the second forensic interview that she told the APS, "Yes, the child is Michael Walker's." At that point she didn't even say it was rape. She said, "Yes, it's Michael Walker's. That's the father."

It wasn't until she took a two-hour ride with her grandfather, the father of the co-defendant, out to Houston. And they were talking all the way to Houston I'm sure, Judge, that she came up with the story that was rape.

And I think that the best evidence that this was completely consensual is how Jaime Walker responds when she -- Detective Reamer at the time -- asked her about these charges.

Jaime Walker went alone in her room with Detective Reamer and doesn't say, "Help me. Michael Walker has been preying on my family for years." She doesn't say, "Help me. Michael Walker has been holding us captive and forcing us all to have sex." She doesn't say anything of that nature, Judge.

What she does say is, "That's our Fourth Amendment right to do" -- or sorry. Fourteenth, I think she said. "That's our Fourteenth Amendment right to do and you

have no business asking us about that."

Judge, in that statement she's implicitly admitting that, yes, that's going on but it's none of your business to the detectives because she didn't realize at that point that having sexual relationships with her biological daughter is illegal, which Michael Walker will freely admit that he didn't know that having sex with his stepdaughter was illegal.

So I think we need to look at this with context, Judge. His stepdaughter, when they first got married, she's 21 years of age. She wasn't a child that he groomed from an early age by any stretch of the imagination. She was an adult and so was he.

And again it's clearly illegal to have sex with your stepdaughter, Judge, so we're not arguing against that. But I think all the other stuff that's come out, whether this is rape or she was forced to, I think it's fictitious and made up by the Roden family in order to get Jaime out of trouble that she got herself in.

And specifically, Judge, if we look at the Piner report -- and I will remind the Court that this report was made after Shelby was with the Roden family for multiple days and then she went in to make this report.

And in here, as the Court noted, it says she can read and write. She graduated high school. Detective Reamer

on the stand stated that Shelby was able to live alone, pay for rent, pay for groceries and survive on her own.

Furthermore, Judge, the sentence that I think is the most interesting out of this report is on the last page, Page 12 of 12. And it says 9 at bottom. "The client does have the capacity to consent to sexual activity in general. But due to power imbalance/differential, coercion and safety reasons, client is likely telling the truth."

So they're even saying in this report that she's able to consent to sex, but they're taking as fact the Roden family's story that Michael Walker was victimizing both Jaime and Shelby and forcing them to have consensual sex.

And I think what conflicts with that directly is my investigator, Melissa Cortez, when she had a conversation with Shelby. The first question was, "Well, did you guys want this baby? Was this baby planned?"

And Shelby said, "Yes. Absolutely." And so even just from Shelby's mouth, she's the one that wanted the baby. And again we understand that's illegal to have sex with your stepdaughter, Judge. No one is contesting that he did that.

But the idea that this was some sort of coercive relationship between Michael Walker, Jaime Walker and Shelby is not supported by the facts. And I think, as I said, earlier the most compelling reason to believe that is the fact

that Jaime didn't even deny it. She didn't ask for help.

When Shelby was in the first two forensic interviews she didn't say anything about a coercive relationship with Michael Walker. And the first time that she did so she said, "He's the father." That's it.

It wasn't until the Roden family got involved that all of this other narrative came out that he was raping both of them and holding them captive and everything else.

So, Judge, I think with that -- with that in context, my client -- and that's what he pled guilty to. He's guilty of having sex with his stepdaughter. That's it. And I think in light of that, what he deserves is the minimum: two years in TDCJ. That's what we're asking for today, Judge.

THE COURT: Final closing?

MR. AMDUR: Yes, Your Honor.

CLOSING STATEMENT

MR. AMDUR: I want to finish the sentence that Mr. Green read from the last page of the report picking up from "but due to power imbalance/differential, coercion and safety reasons, the client is likely telling the truth about being repeatedly raped by her stepfather, Michael Allen Walker."

And that's really what this comes down to, Judge Mr. Walker has admitted to having impregnated his stepdaughter and Mr. Green is trying to sell that that's the extent of it

and that there was no violence.

At this point he's not pleaded to having committed any violence. But this is not a situation between a 70-year-old and a 45-year-old all of whom have high levels or at least average levels of intelligence.

State's Exhibit 11 is very clear that she may have been able to have the capacity to consent, but she absolutely has an intellectual disability -- or it doesn't say "absolutely." It says -- it says she may have mild to moderate intellectual mental disabilities on Page 7 of 12 or Page 4. And then it says in conclusion the same thing further in.

Judge, this case -- these accusations did not begin once the Roden family got their hands on Shelby as Mr. Green is trying to portray. The problems -- the cracks started to show on March 29th, 2022 when Shelby ran to the neighbors to report an assault.

And State's Exhibits 1 through 8 show pictures of the broken strap -- the cut strap on the purse and the knife that was probably used to cut that purse as well as three photos of the goose egg and red marks on the neck.

Shelby's statement in State's Exhibit 9, which was admitted, all of that came in before she went to live with the Roden's before they got her on that long drive from Seguin to the greater Houston area.

And if the case was in fact pled down to deadly conduct, which it was -- it was technically dismissed as part of the plea deal. As the evidence showed, that was because Jaime filed an affidavit of non-prosecution.

She filed an affidavit of non-prosecution because ostensibly they were scared of the defendant. They were scared of the defendant because of what he did to her. He choked her. He threatened repeatedly, "I'm going to kill you. I'm going to kill you" while he choked her out.

The evidence says she passed out. She hit the floor and she came to as he was slamming her head on the floor, hence the goose egg. And deadly conduct -- or the Roden family's getting ahold of Shelby a year later cannot explain away the goose egg.

So while two years might be appropriate for a mildly egregious situation -- because any instance of this crime that I can imagine is egregious when you're having sex with your stepdaughter and there might be situations where two years is appropriate.

But when you have a man who, in March of 2022, has committed these -- this assaultive behavior to the extent that he's leaving these marks, he's threatening to kill her and her retarded daughter is scared enough to go try to find his gun, which is the gun the evidence said -- or it is a gun as the evidence said he was freaking out over a gun that he

had accused Jaime of stealing at like 5:00 in the morning or something like that. So of course they were scared of him.

And then their sexual relations started, some evidence would say, before then according to Shelby. Some of the evidence comes out suggesting that maybe it was after that.

But, again, Shelby is not reliable because she is saying different things. She doesn't have to be reliable. She's pregnant. She has a kid and the defendant has owned that that kid is biologically his. He's admitted that.

The evidence, State's 1 through 9, shows the damage he did. That's Shelby's statement and the photos in 1 through 8. In State's Exhibit 10 the police officer is writing down the observations he has. He makes a diagram of where the injuries were.

And that officer, Officer Wheeler -- or Deputy Wheeler is saying Shelby had him write down her statement because she couldn't write. So if there's conflicting evidence later that says she actually can read and write, that does cloud things in terms of Shelby's ability to understand or Shelby's ability to even consent.

It doesn't cloud anything about Shelby's fear of the defendant or Shelby's -- that Shelby has less than average intelligence and that Shelby was taken advantage of given the power imbalance.

And if the Roden's pointed out to her "Shelby, this is wrong" -- or if it hadn't been the Rodens who pointed it out to her, we can ask ourselves: Why didn't Jaime or why didn't the defendant point that out to her? That just shows how much more egregious this offense was.

Given his tendency for violence and his threats to harm Jaime and the fact that he scared Shelby enough that she ran to the neighbors to call the police, all of that suggests this man was a threat to them.

They're scared of him and he should be put away for a long time for the egregious behavior he did. And for that reason we would ask for -- we would ask for the maximum, Judge.

THE COURT: The defendant will rise.

THE DEFENDANT: (Complies.)

COURT'S RULING

THE COURT: I find you guilty in Cause No. 24-1776-CR-B, Count IV. The State will dismiss the other counts upon me finding him guilty as per the plea agreement.

I sentence you to eight years in the Texas Department of Criminal Justice, Institutional Division. I'll give you credit for time received as allowed.

No fine. I heard no evidence of restitution so I'm not going to leave that door open. I will waive court costs and reimbursing the county for court-appointed

attorney's fees.

Good luck to you, sir.

MR. AMDUR: Judge, we do have a victim impact statement.

THE COURT: Let's do it.

It's off the record, Rick.

THE REPORTER: Yes, sir.

*(Discussion off the record for allocution.)*

THE COURT: Mr. Green, the protective order.

MR. GREEN: May my client sit down, Judge?

THE COURT: I'm sorry?

MR. GREEN: May my client sit down?

THE COURT: Yes.

The first question: Have you reviewed this and is this in accordance with the agreement of the parties?

MR. GREEN: It is, Judge. I reviewed it.

THE COURT: And you made a quick mention you wanted me or somebody to review it with your client?

MR. GREEN: I'd like to have it on the -- ordered on the record, Judge. If the Court is not willing to, I'm more than happy to do it, Judge.

THE COURT: Well, it's ten pages. I'm going to approve it.

MR. GREEN: Yes, sir.

THE COURT: And I highly advise that you, as his

counsel, review it with him.

MR. GREEN: I will do that right now, Judge.

THE COURT: And I will give you a second.

*(End of Proceedings.)*

STATE OF TEXAS

COUNTY OF GUADALUPE

I, RICHARD E. ROBERTS, JR., Official Court Reporter in and for the 274th District Court of Guadalupe County, State of Texas, do hereby certify that the above and foregoing contains a true and correct transcription of all portions of evidence and other proceedings requested in writing by counsel for the parties to be included in this volume of the Reporter's Record in the above-styled and numbered cause, all of which occurred in open court or in Chambers and were reported by me.

I further certify that the total cost for the preparation of this Reporter's Record is $551.00 and was paid by Mr. Jim Roden.

WITNESS MY OFFICIAL HAND on this, the 21st day of January, 2026.

/s/ Richard E. Roberts, Jr.

______________________________

RICHARD E. ROBERTS, JR., CSR
Texas CSR 5411
Official Court Reporter
274th District Court
P.O. Box 311905
New Braunfels, Texas 78131-1905
Expiration: 4/30/27